Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Thomas E. Loeser (SBN 202724)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tomloeser@hbsslaw.com

Shana E. Scarlett (SBN 217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

*Attorneys for Plaintiff John Solak and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION | No. 5:18-md-02827-EJD-NC |
| | **PLAINTIFF JOHN SOLAK'S NOTICE OF MOTIONS AND MOTIONS: 1) FOR APPOINTMENT OF HAGENS BERMAN SOBOL SHAPIRO LLP AS INTERIM LEAD CLASS COUNSEL; AND 2) FOR CONSOLIDATION OF RELATED CASES** |
| | Date:       May 10, 2018<br>Time:       10:00 a.m.<br>Courtroom: 4 - 5th Floor<br>Judge:       Hon. Edward J. Davila |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTIONS AND MOTIONS................................................................................1

I.      INTRODUCTION ................................................................................................................1

II.     SUMMARY OF THE CASE ...............................................................................................3

     A.      Facts regarding the dispute ......................................................................................3

     B.      The *Solak* case and Hagens Berman's efforts to-date..............................................5

     C.      Hagens Berman ........................................................................................................6

          1.      The firm's history and scale ........................................................................6

          2.      Hagens Berman's successes .........................................................................7

     D.      Hagens Berman's iPhone performance-throttling team.............................................9

     E.      The trust reposed in Hagens Berman by thousands of iPhone
         consumers ..............................................................................................................10

III.    ARGUMENT IN FAVOR OF THE FIRM'S APPOINTMENT TO
    LEADERSHIP ...................................................................................................................10

     A.      Applicable standards...............................................................................................10

     B.      The Rule 23 class-counsel factors favor Hagens Berman's
         appointment.............................................................................................................11

     C.      Especially in light of *Anthem*, this Court should reject a sprawling
         leadership structure. ...............................................................................................14

IV.     ARGUMENT IN FAVOR OF CONSOLIDATION.............................................................15

V.      CONCLUSION...................................................................................................................15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Michelle v. Arctic Zero, Inc.,*
   2013 WL 791145 (S.D. Cal. Mar. 1, 2013) ...................................................................................14

*In re Stericycle, Inc.,*
   2013 WL 5609328 (N.D. Ill. Oct. 11, 2013) ...............................................................................13

**Other Authorities**

Fed. R. Civ. P. 23.................................................................................................................*passim*

**NOTICE OF MOTIONS AND MOTIONS**

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 10, 2018, at 10:00 a.m. in the courtroom of the Hon. Edward J. Davila of the United States District Court for the Northern District of California, San Jose Division, located at 280 South 1st Street, San Jose, CA, 95113, plaintiff John Solak will and does hereby move the Court for an order appointing Hagens Berman Sobol Shapiro LLP as plaintiffs' interim lead class counsel in this matter. *See, e.g.*, Fed. R. Civ. P. 23(g).

Also, plaintiff Solak moves that all related matters presently before this Court, and those that are filed or transferred hereafter pursuant to the order of the Judicial Panel on Multidistrict Litigation that convened this MDL court, or otherwise, be consolidated pursuant to Fed. R. Civ. P. 42(a).

These motions are based on the foregoing, this notice, the subjoined memorandum of points and authorities, the argument of counsel to be made at the hearing scheduled for May 10, 2018, and the proposed order submitted herewith.

## I.    INTRODUCTION

The efficient and unrivaled prosecution of this case requires appointment of a lead firm with the technical, financial, and attorney resources necessary to take on the world's most valuable company, *and win*. Hagens Berman, uniquely among the applicants here, has those resources. On the technological front, Hagens Berman has proven its abilities across a host of many of the most technologically challenging class cases in modern history, including in the *Apple e-books* litigation where it secured a $400 million settlement (double class damages) against the defendant here, Apple Inc.[1] Notably, Hagens Berman was co-lead counsel in the *Toyota Sudden Unintended Acceleration* litigation, one of the most technically complex class cases ever, which ultimately resulted in a $1.6 billion settlement. After

---

[1] *See In Re Electronic Books Antitrust Litigation.*, No. 11 MD 2293 (DLC) (S.D.N.Y.). The firm acted as co-lead counsel for the Settlement Class with our colleagues at Cohen Milstein Sellers & Toll PLLC. It pioneered this litigation against Apple and the nation's largest brick-and-mortar publishers for antitrust violations. The firm, led by Mr. Berman, represented purchasers of e-books in 19 states and four U.S. territories, working in a novel partnership with the U.S. DOJ and 33 state Attorneys General. When combined with prior settlements with the publisher defendants, consumers received more than $560 million—more than twice the amount of losses that consumers suffered. (*See, e.g.*, https://ebooklawsuits.com/Portals/0/Documents/4248_Apple%20Ebooks_Amended%20Detailed%20Notice_v10.pdf (last accessed May 1, 2018).)

engineers from NASA declared Toyota's ECU software was bug-free, Hagens Berman and its co-leaders soldiered on through years of litigation and over $20 million in expert time to prove NASA wrong and force Toyota to fix its cars and compensate its customers.

Hagens Berman's financial resources are also unparalleled.  It *never* seeks outside funding for any case it prosecutes.  As shown by *Toyota SUA* and legion other expensive, high-risk nationwide class cases, Hagens Berman can internally meet the financial demands of any litigation, no matter the expert needs or financial resources of its adversary.

For attorney resources, Hagens Berman offers both: (1) a core team for this litigation who are attorneys with significant class action expertise in technologically intense cases; and (2) the ability to augment that team as needed from the 70+ attorneys at the firm, all of whom have directly relevant class action expertise.  The core team members, Mr. Berman, Ms. Scarlett, Mr. Lopez and Mr. Loeser, include one of the nation's most revered class action lawyers in Mr. Berman; an 18-year veteran of the Bay Area bar with a storied record in technology matters in Ms. Scarlett; a 25-year class-action veteran with significant experience prosecuting cases against the largest technology companies such as Google and various device manufacturers in Mr. Lopez; and a former technology analyst, Silicon Valley attorney and federal cyber-prosecutor with unmatched technological expertise in Mr. Loeser.  These attorneys can lead this case from a position of expertise and knowledge that no other applicant can match, and they can do it efficiently, without the need for layer upon layer of committees and inter-firm complexities.

Plaintiff does not see the need for a large, multi-tiered leadership structure in this case.  While Plaintiff believes that one well-qualified firm can manage the case, Plaintiff's counsel is happy to serve as co-lead with another well-qualified firm should the Court deem that appropriate.  If the Court is inclined to appoint an Executive Committee or Plaintiffs' Steering Committee, plaintiff suggests that it consist of only two members at most (in addition to lead or co-lead counsel).  Plaintiff also moves for consolidation of all related cases.[2]

_____

[2] At the last case management conference, Joseph Cotchett told the Court that leadership was, essentially, a *fait accompli*.  But it appears now that there was no such structure in place, and certainly none with actual persons selected for the many positions Mr. Cotchett described.  All plaintiff knows is that Mr. Cotchett and David Straite seek to be co-leads.

The structure likely to be proposed by Mr. Cotchett threatens to become the Full Attorney Employment Act of 2018.[3]  This is especially concerning when a review of the complaints reveals that this is a high-tech consumer-product case with narrow issues that have arisen in a narrow time frame. This is not a case where it might make sense to deploy multiple firms where each can devote attention to a particular defendant—here, we have only one defendant.  In short, this matter does not call for a sprawling leadership structure; it calls for one or two leads that are qualified and have the technological, financial, and attorney resources to run a case of this particular type and magnitude.  Hagens Berman and its managing partner, Mr. Berman, are demonstrated leaders in large class actions, including MDL proceedings.[4]  They have the skills and wherewithal to drive this case to a successful conclusion.

## II.       SUMMARY OF THE CASE

### A.       Facts regarding the dispute

Year after year, Apple sells millions of its signature product, the iPhone, across America and worldwide.  Each time it releases a new phone, it lures buyers with the promise of top-notch, competitor-beating performance.  Apple became the largest company in the world by way of its high profit margins.  It markets premium products at premium prices.

But for years now, Apple has received complaints that certain more-recent iPhone models, starting with the iPhone 6, shut down unexpectedly.[5]  These reports have not only been U.S. based— Chinese consumers and a Chinese government agency have complained as well.  So have the French.

Apple responded near the end of 2016 with a program to replace a relatively small number of batteries that it said had suffered manufacturing defects.  But complaints persisted.

---

Hagens Berman has not participated in devising the baroque structure described by Mr. Cotchett at the case management conference, and to Plaintiff's knowledge, Hagens Berman and Steve Berman have not been invited to participate in that structure.  Rather than apply to Mr. Cotchett and Mr. Straite for a position, Plaintiff prefers instead to apply directly to the Court, as Fed. R. Civ. P. 23 envisions.

[3] *See* below for a discussion of the cautionary tale told by the *Anthem* data breach case.

[4] *See, e.g.,* Hagens Berman, *Hagens Berman Celebrates 25 Years of Leading the Plaintiffs' Bar* (Apr. 2, 2018), https://www.hbsslaw.com/cases/closed-case/pressrelease/closed-case-hagens-berman-celebrates-25-years-of-leading-the-plaintiffs-bar (statement on the firm's 25th anniversary).

[5] The allegations underlying this summary can be found in Mr. Solak's complaint. Complaint ¶¶ 12–26, *Solak v. Apple Inc.*, No. 18-cv-00123 (N.D. Cal. Jan. 5, 2018).

LEAD COUNSEL APPL. AND
MOT TO CONSOLIDATE- 3
Case No.: 5:18-md-02827-EJD-NC
010725-11 1030641 V1

1    Customers also complained that these iPhones models suffered performance slowdowns.  Then,

2    near the end of 2017, independent actors examined code and analyzed performance statistics, and

3    voila!—they demonstrated that Apple was affirmatively causing slowdowns in certain iPhones.

4    But why?  Some theorized that Apple was engaging in forced obsolescence.  If confronted with

5    shutdowns and slowdowns, consumers would buy new iPhones.

6    Finally, faced with scores of hot press reports and consumer outcry, Apple admitted that it had

7    pushed a software feature to several iPhone models that purposely slowed their performance.  Apple

8    called this "smoothing."

9    According to Apple, affected iPhone models were designed to shut down when hardware voltage

10    calls were too high for the phone's battery to fulfill.  It said that these demands could occur under

11    several circumstances—all of which were altogether foreseeable.  Its solution was a software feature that

12    smoothed out these power demands by damping down performance, such that the demands could be

13    mitigated and met by the battery.

14    But fatefully, Apple failed to get its customers' consent to this extraordinary solution.  On

15    January 23, 2016, and December 2, 2017, Apple released iOS versions 10.2.1 and 11.2.  Each of these

16    bore Apple's performance-throttling feature.  That is, they *secretly* bore the feature.  The release notes that

17    Apple pushed to phones along with these operating-system updates omitted to advise that they

18    contained this feature, nor did they describe how and when it operates, or to what effect.  This pointed

19    lack of candor accounts for the admissions that the defendant finally felt compelled to make on

20    December 28, 2017, in its now-famous apology.[6]

21    Customers were angry.  Apple had slowed their phones purposely and it hadn't told them.

22    Consequently, many bought new iPhones and some guessed that perhaps a new battery might help.  So

23    they spent hundreds of their hard-earned dollars for the former or $79 for the latter—blindly.

24    Apple's reaction has been to say it's sorry, to protest that it doesn't engage in planned

25    obsolescence, and to offer affected consumers a $29 battery replacement for a year.  Apple also

26    promised to design and release yet another update that would allow consumers a measure of control

27

28    [6] Apple, *A Message to Our Customers About iPhone Batteries and Performance* (Dec. 28, 2017), https://www.apple.com/iphone-battery-and-performance/.

LEAD COUNSEL APPL. AND
MOT TO CONSOLIDATE- 4
Case No.: 5:18-md-02827-EJD-NC
010725-11 1030641 V1

over the throttling feature—which is, of course, *not* to say that Apple offered them a solution to the shutdown characteristic that led it to backfill with its performance-throttling feature in the first place.

Consumers saw this response as woefully inadequate. Under at least the several conditions described by Apple, they were denied the performance levels for which they'd paid. Nor did Apple offer to pay back money they would not have spent but for these impairments in and to their phones. Apple has also failed to offer refunds to consumers who unknowingly purchased iPhones that Apple itself knew to be prone to shutdowns. As to all such customers, Apple has presented them with what amounts to a Hobson's choice: if you don't want to risk shutdowns, take our fix—which will slow down your phones. Nice, when these devices can cost well over $750.[7]

Many sued, resulting in the dozens of federal cases transferred to this Court. By way of a few theories,[8] all seek recompense for, and injunctive relief meant to alleviate, the harms we have described.

### B.   The *Solak* case and Hagens Berman's efforts to-date

Plaintiff Solak owns an iPhone 6, one of the Affected Phones in this litigation. Mr. Solak installed Apple's iOS 10.2.1 and 11.2 updates, which secretly contained the speed-throttling feature. The performance of his iPhone 6 has declined, and Mr. Solak attributes the slowness to Apple's intentional performance-throttling. Apple did not obtain Mr. Solak's consent, let alone his informed consent, to install its throttling code on his iPhone.

Hagens Berman did not leap to file suit. Instead, it investigated and researched carefully before proceeding on Mr. Solak's behalf. Consequently, the *Solak* complaint contains a much more detailed

---

[7] A Jet Black iPhone 7 Plus, with 128GB of storage, sells for the princely sum of $769 on Apple's website. (https://www.apple.com/shop/buy-iphone/iphone-7/5.5-inch-display-128gb-jet-black-unlocked (last accessed May 1, 2018).)

[8] For example, Mr. Solak, in his complaint filed January 5, 2018, alleges counts for trespass to chattels, violation of California's Unfair Competition Law (UCL), Fraudulent Misrepresentation, and Quantum Meruit To Recover Sums by Which Defendant Has Been Unjustly Enriched. (*Solak* Complaint, *supra* note 9, ¶¶ 37–79.)

Mr. Cotchett's and Mr. Straite's clients, Mr. Gilson and Ms. Gallmann, filed suit on January 10, 2018, and December 22, 2017, respectively. Mr. Gilson alleges counts for Fraud and Deceit, Trespass to Chattels, Violation of the UCL, and Unjust Enrichment. (Complaint, *Gilson v. Apple Inc.*, No. 5:18-cv-00216 (N.D. Cal. Jan. 10, 2018).) Ms. Gallman alleges three counts: violation of the UCL, Trespass to Chattels, and Breach of the Implied Covenant of Good Faith and Fair Dealing. (Complaint, *Gallmann v. Apple Inc.*, No. 5:17-cv-07285 (N.D. Cal. Dec. 22, 2017).)

All seek monetary and injunctive relief on behalf of a nationwide class pursuant to California law. (*See generally Solak*, *Gilson*, and *Gallman* complaints.)

factual account than that set forth in *Gallman*.  As for *Gilson*, though it was filed five days after *Solak*, its factual allegations do not better his account of pertinent facts.

Since filing Mr. Solak's suit, which seeks certification of a nationwide class of affected iPhone owners, Hagens Berman has continued to gather facts by way of extensive research and analysis of the public record, to research the law in light of the growing factual record, to analyze the law, to develop theories and themes, and to communicate with Apple and other plaintiffs' counsel as appropriate.

Given that others were undertaking activity in their cases with which Mr. Solak did not necessarily agree, he filed a separate initial Case Management Statement with Apple.  During the course of settling on the terms of this joint filing, the parties conferred and made a joint statement regarding, *inter alia*, the preservation of evidence.  Additionally, Mr. Solak and Apple have engaged in efforts to agree upon an order covering specific evidence-preservation matters; Mr. Solak did this with the view that such an agreement could be beneficial to all members of the putative class, including the named plaintiffs in other matters now on file.

Following the J.P.M.L.'s transfer order, Mr. Solak endeavored to determine if it was appropriate for him to join the multi-plaintiff Case Management Statement that was filed on April 13, 2018.  After discussions with Mr. Straite toward improvement of the draft, and in light of other communications, Mr. Solak opted to sign on to that Case Management Statement.[9]

Along the way, counsel has engaged an exceedingly well-qualified expert consultant on behalf of Mr. Solak and the proposed class.  In addition to engaging in informative discussions with this expert, counsel also has procured and transmitted certain items to this consultant for testing.

## C.     Hagens Berman

### 1.     The firm's history and scale

Hagens Berman is a true leader of the plaintiffs' bar.  In its twenty-five years of existence, the firm, led by its founder and managing partner, Mr. Berman, has won billions of dollars for the classes it

---

[9] Unfortunately, in the view of these counsel, Mr. Cotchett deviated from the April 13 CMS in his remarks to the Court.  Plaintiffs were not all agreed that May 3, rather than May 16, should be the date for leadership applications.  Nor was it accurate to suggest that most if not all plaintiffs were agreed on proposed leaders and a multi-committee leadership structure, or that all or most desire the appointment of a special master at this time for discovery purposes.  We have maintained all along that the decision as to whether to seek appointment of a special master should be left to leadership, once it is decided.

1   has had the privilege to represent.  As of today, it has grown to 11 offices nationwide, including three in

2   California, one of which is located in Berkeley.  The firm employs 80 attorneys.  As one of the largest

3   and best-managed plaintiffs' firms in the country, Hagens Berman has the size and financial wherewithal

4   to take on any case, including this one against Apple.

5          **2.     Hagens Berman's successes**

6          Hagens Berman, led by Mr. Solak's lead counsel here,[10] has recovered billions of dollars for its

7   clients and class members, including $400 million from Apple.  The firm has extensive experience

8   litigating in this district, as illustrated in the summary of some of its cases below.

9          Hagens Berman's stock-in-trade are complex class actions and MDLs on behalf of plaintiffs

10  throughout the country.  We have great expertise in high-tech cases, including those involving software

11  and hardware.  For example, in this era of emissions-cheating software and computerized vehicle

12  features, we were named to Law360's Automotive Practice Group of the Year for 2017 and one of

13  *National Law Journal*'s 2016 Elite Trial Lawyers for our work in automotive class actions.  We also have a

14  dedicated patent-litigation practice, which has brought patent infringement actions against numerous

15  leading high-tech companies including Oracle, AT&T, Salesforce, Samsung, and LG.  Hagens Berman

16  attorneys have tried numerous patent cases to verdict.

17         The firm's success is due to our focus on providing real recoveries for class members. We

18  recently negotiated a $1.2 billion settlement on behalf of Volkswagen franchise dealers for fraud related

19  to Volkswagen's diesel emissions. The firm successfully seeks to obtain high recoveries to the greatest

20  number of class members. For example, in *In re Charles Schwab Corp. Securities Litigation*, the firm

21  recovered $235 million in damages (recovering between 42% and 82% of class members' damages); and

22  we are the first firm in the country to mail checks directly to class members in a securities case without

23  requiring a claim form. Similarly, in *Toyota*, referenced below, the firm obtained injunctive relief in the

24  form of extended warranties and the installation of a safety-enhancing brake override in 1.6 million

25  vehicles in addition to $500 million in cash payments mailed directly to class members.  And in its

26

27         [10] *See* Declaration of Steve W. Berman (Berman Decl.) Ex. B (Berman resume), listing at Attachment
        1 his leadership and committee roles in notable cases.

28

1   groundbreaking NCAA grant-in-aid case, Hagens Berman recovered $208 billion for former student-

2   athletes.[11]  Checks averaging $4,000 were mailed to class members with no need to file claims.

3        Mr. Berman and the firm have been appointed lead or co-lead counsel in many of the largest

4   consumer fraud, product liability, securities, and antitrust cases in history.  This experience includes[12]:

5   - *E-Books Antitrust* (S.D.N.Y.). Mr. Berman and the firm pioneered this litigation as lead counsel
       against Apple and the nation's largest brick-and-mortar publishers for antitrust violations. We
6       represented purchasers of e-books in 19 states and 4 U.S. territories and worked in novel
       partnership with the DOJ and 33 state Attorneys General. As a result of the settlement, the class
7       may receive up to $560 million to resolve price-fixing allegations and single damages of $270
       million.

8   - *Volkswagen "Clean Diesel" MDL* (N.D. Cal.). As lead counsel for the Volkswagen Franchise
       Dealers, we received final approval of a settlement of $1.2 billion, representing a result of nearly
9       full damages for the class. Mr. Berman also served on the Plaintiffs' Steering Committee and
       played a role in obtaining a settlement of $14.7 billion on behalf of consumers that included
10      injunctive relief in the form of an optional buyback of the affected vehicles.

11  - *Toyota SUA MDL* (C.D. Cal.). As co-lead counsel for the economic loss classes, we challenged a
       defect causing dozens of models spanning an 8-year period to undergo sudden, unintended
12      acceleration. The resulting $1.6 billion settlement included $500 million in cash payments to class
       members, many of whom received checks for thousands of dollars; a program that substantially
13      extended warranties for millions of consumers; and, most importantly, installation of a safety-
       enhancing brake override system on millions of vehicles (a fix that Mr. Berman proposed and
14      that, since implementation, has dropped reports of sudden unintended acceleration to near-zero).

15  - *In re Optical Disk Drive Products Antitrust Litigation* (N.D. Cal.). The firm acted as lead counsel in
       action on behalf of consumers in more than two dozen states against the manufacturers of optical
16      disk drives. The plaintiffs allege defendants conspired to increase the price of ODDs that were
       sold to original equipment manufacturers. Defendants' conduct allegedly caused millions of
17      consumer electronics products, such as computers, to be sold at illegally inflated prices.  Class
       members recovered $180 million in settlement.

18  - *In re Lithium Ion Batteries Antitrust Litigation* (N.D. Cal.). The firm was co-lead in a class-action
       lawsuit against some of the largest electronics manufacturers including Sony, Samsung and
19      Panasonic for illegally fixing the price of lithium ion batteries, pushing costs higher for
       consumers. Defendants collectively controlled between 60 to 90 percent of the market for
20      lithium-ion batteries between 2000 and 2011 and used that power to fix battery prices.  There
       were $65 million in total settlements with multiple defendants.

21  - *McKesson* (D. Mass.). As co-lead counsel, Mr. Berman pioneered these racketeering cases alleging a
       conspiracy to increase by 4% the list price on most brand-name drugs. After certification of a
22      nationwide class, the case settled for $350 million and injunctive relief that included a roll back of
       drug prices on all brand-name drugs. This outcome continues to save consumers billions of
23      dollars to this day.

24  - *AWP MDL* (D. Mass.). As a co-lead and as lead trial counsel, Mr. Berman and the firm proved
       that the nation's major drug companies fraudulently inflated their prices by billions of dollars. A

25

26  _____

    [11] Settlement Agmt., *In re: National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No.
27  14-md-02541-CW (N.D. Cal. Feb 3, 2018) (Dkt. No. 560-1).

    [12] *See also, e.g.*, Hagens Berman, *Victories & Successes*, https://www.hbsslaw.com/success-
28  record/victories-and-settlements (last accessed May 2, 2018).

bellwether trial resulted in a plaintiffs' verdict against three defendants, and the cases concluded with $338 million in settlements, with consumers receiving three times actual damages.

- *Attorneys General Tobacco Litigation*. In the historic litigation against the tobacco industry, Mr. Berman represented 13 states and advanced groundbreaking legal claims to secure a global settlement worth $200 billion, still the largest recovery in history. Only two law firms, including Hagens Berman, went to trial in these actions, and Mr. served as co-lead trial counsel.

The firm willingly takes cases through years of discovery and motion practice and settle only if we position the case to a point where consumers obtain real relief. Recently, Judge Griesa lauded Hagens Berman's commitment through ten years of litigation where the risk of non-recovery was "extremely high": "Even when recovery seemed unlikely…, Hagens Berman steadfastly continued to represent the class…. Hagens Berman's willingness to take this case on a contingency basis in spite of the risks involved, and to continue to represent the class even when success appeared unlikely, is a testament to its commitment."[13]

And, unlike many class action firms, Hagens Berman also takes cases to trial. In lead roles, the firm did so in the *Tobacco* trial, in the successful three-month *AWP* trial, and in the successful *In re Neurontin* trial.

If appointed here, Hagens Berman will devote itself to achieving the same sort of results that the foregoing examples illustrate.

**D.      Hagens Berman's iPhone performance-throttling team**

Mr. Berman, with his wealth of experience, expertise in highly complex and technical litigation, and indefatigable disposition, leads Hagens Berman's team in this matter. If the Court appoints the firm, partners Shana Scarlett of Hagens Berman's Berkeley office, and Rob Lopez and Tom Loeser of its Seattle office, will work with Mr. Berman as needed. As their resumes demonstrate, each has extensive experience in complex litigation, including litigation involving large defendants and highly technical evidence and analytics.[14] Other Hagens Berman partners, associates, and staff attorneys will be available to work on this matter *if and as needed*. The firm has the ability to staff this litigation to the degree

---

[13] Opinion & Order, *Brecher v. Republic of Argentina*, No. 1:06-cv-15297 (S.D.N.Y. Apr. 27, 2017) (Dkt. No. 148).

[14] Berman Decl. Exs. C–E.

merited, without the inefficiencies of calling on other firms to provide additional attorneys.  This will avoid the costs of firms ramping-up and the unfortunate diffusion of knowledge.

**E.      The trust reposed in Hagens Berman by thousands of iPhone consumers**

Hagens Berman maintains a section of its website, www.hbsslaw.com, that is dedicated to this matter.  As of today, over 2,400 individuals from all 50 states and D.C., and from other countries including Canada, have contacted us to join in our effort on behalf of them and their peers.  These consumers provide us with a large sample of iPhone owners who possess much information regarding their experiences and the ways in which they have been affected by Apple's behavior.  They also provide us with the opportunity to conduct surveys regarding desired relief in this matter, and they can serve as a source of additional plaintiffs should they be needed as litigation proceeds.  We are honored that so many have looked to Hagens Berman to be their voice in this case.

**III.      ARGUMENT IN FAVOR OF THE FIRM'S APPOINTMENT TO LEADERSHIP**

Plaintiff proposes a one or two firm lead structure comprised of Hagens Berman and, should the Court desire, one other firm that can demonstrate the necessary experience and qualifications.  If the Court is inclined to appoint an Executive Committee, plaintiff submits that one or two firms from among the most qualified will be ample.

**A.      Applicable standards**

Fed. R. Civ. P. 23(g)(3) provides for the appointment of "interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action."  "Instances in which interim class counsel is appointed are those in which overlapping, duplicative, or competing class suits are pending before a court, so that appointment of interim counsel is necessary to protect the interests of class members."[15]

"Although Rule 23(g)(3) does not provide a standard for appointment of interim counsel, the court may consider the factors contained in Federal Rule of Civil Procedure 23(g)(1)."[16]  These include:

---

[15] Order Granting Motions To Consolidate; Appointing Lead Interim Counsel ("*Dependable Component Order*") at 3, *Dependable Component Supply Corp. v. Murata Mfg. Co., Ltd.*, No. 5:18-cv.00198-EJD (N.D. Cal. Apr. 27, 2018) (citing *White v. TransUnion, LLC*, 239 F.R.D. 681, 683 (C.D. Cal. 2006) (citing Manual for Complex Litigation (Fourth) § 21.11 (2004))).

[16] *Id.*

1  (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's

2  experience in handling class actions, other complex litigation, and the types of claims asserted in the

3  action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to

4  representing the class."[17]  Additionally, the Court may "consider any other matter pertinent to counsel's

5  ability to fairly and adequately represent the interests of the class."[18]

6        As for the appointment of executive or steering committees, the Manual for Complex Litigation

7  provides important guidance.  Mr. Solak contends that no such committees are needed here and that

8  appointment of his counsel as lead counsel, or as part of a two-firm structure, is ample.  The Manual is

9  in accord.  It provides:

10       *Committees of counsel.*  Often called steering committees, coordinating committees,
         management committees, executive committees, discovery committees, or trial teams.
11       Committees are most commonly needed *when group members' interests and positions are
         sufficiently dissimilar to justify giving them representation in decision making*.  The court or lead
12       counsel may task committees with preparing briefs or conducing portions of the
         discovery program if one lawyer cannot do so adequately.  *Committees of counsel can
13       sometimes lead to substantially increased costs,* and they should try to avoid unnecessary
         duplication of efforts and control fees and expenses.[19]

14       Here, there are no "substantially dissimilar" interests or positions that demand appointment of

15  an EC.  But if the Court is inclined to appoint an EC in the best interests of the class, again, we

16  respectfully submit that it should be limited to no more than two excellent members.

17  **B.       The Rule 23 class-counsel factors favor Hagens Berman's appointment.**

18       The considerations of Fed. R. Civ. P. 23(g)(1)(A) and (B) favor Hagens Berman's application.

19       Rule 23(g)(1)(A)(i) (work counsel has done): The firm took its time to investigate the facts and

20  state credible claims for recovery.  Mr. Solak's complaint exceeded the details of Mr. Straite's *Gallman*

21  complaint and likely became the bar for successive complaints, like Mr. Cotchett's *Gilson* complaint.

22       The identification and investigation of additional potential claims in the action continues with

23  the firm's ongoing research and analysis, and its engagement of a highly qualified expert consultant.

24

25

26       [17] *Dependable Component* Order, *supra* note 28, at 3 (citing Fed. R. Civ. P. 23(g)(1)(A)).

27       [18] *Id.* (citing Fed. R. Civ. P. 23(g)(1)(B)).

         [19] Manual for Complex Litig. § 10.221 (first emphasis in original).

28

1    <u>Rule 23(g)(1)(A)(ii) (counsel's experience)</u>: The firm's experience in handling class actions and

2    other complex litigation meets that of any leadership contestant.  Among the high-tech cases successfully

3    prosecuted by Hagens Berman are the *Toyota Unintended Acceleration* and *VW Emissions* cases referenced in

4    above.  Additionally, the parties in *Whalen v. Ford Motor Co.*,[20] which addresses alleged defects in the

5    MyFord Touch computerized user interface, have recently announced a settlement.[21]  As co-lead

6    counsel, we also took the *Carrier iQ* MDL[22] to settlement (which included changes to the way that

7    software is coded).[23]  During this litigation, we were able to demonstrate, after securing through

8    discovery motions practice computerized records referred to by counsel for Google Inc. as

9    "radioactive," that the software at issue was intercepting consumers' private SMS text messages.

10    <u>Rule 23(g)(1)(A)(iii) (knowledge of applicable law)</u>: The firm is also well-versed in applicable

11    California common and statutory law, including the UCL.  Further, should Apple contest the nationwide

12    applicability of California law, the firm is equally versed in the laws of other states, as well as the ways

13    they can be grouped for purposes of establishing predominance and manageability.[24]

14    <u>Rule 23(g)(1)(A)(iv) (resources that counsel will commit)</u>: As for resources, counsel will commit

15    the resources necessary.  Mr. Berman will lead a team of himself and three Hagens Berman lawyers.

16    These lawyers will be used as needed, and if more are ever needed, Mr. Berman can draw upon the 79

17    other lawyers at the firm.  Further, as a successful and well-managed firm, Hagens Berman will have

18    available, and commit, the financial resources necessary to prosecute the case against Apple.

19

20

21

22    [20] No. 13-cv-03072-EMC (N.D. Cal.).  Hagens Berman serves as co-lead counsel in the matter. The
       case has been ongoing for some five years and has involved the review and analysis of many millions of
23    pages of documents, as well as software source code, along with other intensive discovery and motions
       practice on the merits.  The firm looks forward to concluding this case on behalf of the proposed
24    settlement class of consumers.

       [21] *See* Civil Minutes, *Whalen v. Ford Motor Co.*, No. 13-cv-03072-EMC (N.D. Cal. Mar. 29, 2018) (Dkt.
25    No. 433).

       [22] *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 12-md-2330-EMC (N.D. Cal.).

26    [23] Amended Stipulation of Settlement and Release, *In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. 12-
27    md-02330-EMC (N.D. Cal. Feb. 29, 2016) (Dkt. No. 419).

       [24] The firm demonstrated this in, *e.g.*, the *AWP* litigation referenced above.

28

Rule 23(g)(1)(B): As for other pertinent factors, plaintiff cites to the comments of a true judicial lion,[25] the Hon. Milton Shadur,[26] in *In re: Stericycle, Inc., Steri-Safe Contract Litigation.* *Stericycle* was a large, complex MDL case that involved the pricing of medical-waste services.  (It is now settled,[27] as referenced below.)  There, in appointing Hagens Berman as sole interim lead counsel in a leadership contest, Judge Milton Shadur cited the "high praise of attorney Berman's skills" that inquiry to his Northern District of Illinois colleagues had elicited.  And while the court noted a competitor's "wealth of trial experience," including in class actions, it also stated: "it must be said that the track record of Hagens Berman and its lead partner Steve Berman is even more impressive, having racked up such accomplishments as a $1.6 billion settlement in the *Toyota Unintended Acceleration Litigation* and a substantial number of really outstanding big-ticket results."[28]  As Judge Shadur put it, the firm's, and in particular Mr. Berman's, "sterling credentials" were to be considered pursuant to Rule 23(g)(1)(B).[29]

---

[25] *See, e.g.*, Gregory Pratt, *Judge Shadur, 93, to step down after 37 years on federal bench*, CHICAGO TRIBUNE (Aug. 1, 2017), available at http://www.chicagotribune.com/news/local/breaking/ct-judge-milton-shadur-retires-met-20170801-story.html.

[26] Judge Shadur recently passed away after an exemplary life and long turn on the bench.  *E.g.*, Tony Briscoe, *Milton Shadur, federal judge who oversaw key cases involving Chicago schools, Cook County jail, dies*, CHICAGO TRIBUNE (Jan. 16, 2018), available at http://www.chicagotribune.com/news/obituaries/ct-met-milton-shadur-obituary-20180116-story.html.

[27] *See, e.g.*, Notice of Proposed Settlement of Class Action Involving Stericycle, Inc., http://www.stericycleclassaction.com/docs/LFN.pdf (last accessed May 2, 2018).

[28] *In re Stericycle, Inc.*, 2013 WL 5609328, at *2 (N.D. Ill. Oct. 11, 2013).  As the court noted further: "In that respect District Judges (sic) James Selna went out of his way, at the windup of the case, in describing the settlement as truly extraordinary—indeed unique—in terms of the benefits conferred on the plaintiff class."  *Id.* n.4.

[29] *See id.*  The court was offered a "multilayered format" by other firms but declined it, noting that it "is not one that fosters efficiency—instead it tends to promote a duplication of effort via conferencing, as well as overlapping work assignments and other inefficiencies too often attendant on such a structure. And that of course inevitably tends to increase the lodestar figure without any corresponding increase in meaningful lawyer output."  *Id.*

The court's decision to choose Hagens Berman was vindicated when the firm, led by Mr. Berman, settled the case for $295 million,[30] together with changes to the company's pricing practices.[31]

**C.      Especially in light of *Anthem*, this Court should reject a sprawling leadership structure.**

Judge Shadur's approach in *Stericycle*[32] contrasts starkly with what recently ensued in the *Anthem* data breach case, where too many lawyers were allowed to participate.  In *Anthem*, an esteemed leadership applicant promised the court that there was nothing to fear if it appointed two co-leads and allowed them to call upon the services of six other firms.[33]  After Judge Koh advised that she "was very disappointed to see that you need eight law firms to litigate this case"; that she thought the proposed structure would be "very inefficient"; and that the proposal made her "wonder whether your two firms don't have the resources or the expertise in data breach and privacy cases to be lead Plaintiffs' counsel here,"[34] she appointed a two-attorney co-lead team along with a two-person Steering Committee.  But others were allowed to participate.

The result, despite the assurances of counsel who no doubt believed them when he made them, was a fee request that included 331 billers from 53 law firms claiming 78,892.5 hours of legal work.[35]  All told, plaintiffs requested 33% of the $115 million settlement fund, that is, $37.95 million.[36]

---

[30] At the preliminary approval hearing, Judge Shadur commended both sides for their "professionalism of the highest order" and commented that "the current submission [papers in support of plaintiffs' motion for preliminary approval of the class settlement] contains [] an impeccable covering of all the necessary bases, demonstrating the type of high quality work product that this Court anticipated when it designated Hagens Berman and its lead partner Steve Berman as Class Counsel." *Id.*, at *1.

[31] Notice of Proposed Settlement of Class Action Involving Stericycle, Inc., *supra* note 43.

[32] *See also Michelle v. Arctic Zero, Inc.*, 2013 WL 791145, at *4 (S.D. Cal. Mar. 1, 2013) (rejecting request for a structure with one lead and one liaison counsel, together with a three-firm executive committee, and noting that "Plaintiff has not demonstrated that a committee of counsel is necessary to effectively and efficiently prosecute this action, while avoiding unnecessary costs and duplication of efforts.") (citation omitted).

[33] *See* Order Granting Mot. to Appoint Special Master 2–4, *In re Anthem Inc. Data Breach Litig.*, No. 15-md-02617-LHK (N.D. Cal. Feb. 2, 2018).

[34] *Id.* at 2–3.

[35] *Id.* at 4.

[36] *Id.*

1        Here, too, we expect our colleagues to offer sincere assurances in support of an even larger

2    structure than that originally proposed (and rejected) in *Anthem*.  But respectfully, the Court should not

3    accept these assurances, however sincere.  With a large, multi-pronged structure such as that which we

4    expect to be proposed, the system itself is prone to engendering the problems that arose in *Anthem*.  This

5    is good reason to reject such a structure.  A better reason is that it is not needed in this case, which has

6    one defendant and no nuclear science at its heart.[37]

### IV.   ARGUMENT IN FAVOR OF CONSOLIDATION

8        The Court should consolidate all related actions because they involve common questions of law

9    and fact.[38]  In exercising its broad discretion, the court "weighs the saving of time and effort

10   consolidation would produce against any inconvenience, delay, or expense that it would cause."[39]

11        Here, an examination of the transferred complaints will reveal substantially similar factual and

12   legal issues involving Apple's secret installation of a performance-throttling feature on plaintiffs'

13   iPhones, as well as the propensity of those phones to shut down.  All cases are at the same, stayed stage.

14   Also, "discovery issues relating to each action will be parallel."[40]

15        Finally, all plaintiffs appear to support consolidation, with the possible exception of a *pro se*

16   plaintiff whose case was filed in the Northern District of California.  Under these circumstances, all

17   related cases should be consolidated.[41]

### V.   CONCLUSION

19        Plaintiff Solak asks that the Court grant his motion for appointment of his counsel to a lead or

20   co-lead position in this matter, and for consolidation of all related cases.

---

[37] Already we see that because one set of lawyers filed a still-pending preservation motion in one case, and because others have determined that discovery will be intractably contentious, Mr. Cotchett and others have concluded that a special master ought to be appointed.  This will add yet more expense and complexity to this matter.  We have expressed our own view that a decision to seek the appointment of a special master should be left to appointed leadership, as the Court has directed.  As of now, we see no reason why a magistrate from this district, where so many high-tech cases are litigated, cannot ably decide any discovery disputes that remain open after the parties attempt to resolve them.

[38] *E.g.*, *Dependable Component* Order, *supra* note 28, at 1 (citing Fed. R. Civ. P. 42(a)(2)).

[39] *Id.* at 2 (citation omitted).

[40] *Id.*

[41] *See id.* at 1-2.  To the best of plaintiff's knowledge, the latest list of related cases appears at Dkt. No. 16.

LEAD COUNSEL APPL. AND
MOT TO CONSOLIDATE- 15
Case No.: 5:18-md-02827-EJD-NC
010725-11 1030641 V1

Dated:  May 3, 2018

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
    Steve W. Berman (*pro hac vice*)
Robert F. Lopez, (*pro hac vice*)
Thomas E. Loeser (SBN 202724)
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: robl@hbsslaw.com
Email: tomloeser@hbsslaw.com


Shana E. Scarlett (SBN 217895)
715 Hearst Avenue, Suite 202
Berkeley, California  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
Email: shanas@hbsslaw.com

*Attorneys for Plaintiff John Solak and the Proposed Class*