THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
CHRISTOPHER CHORBA, SBN 216692
  cchorba@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
TIMOTHY W. LOOSE, SBN 241037
  tloose@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

G. CHARLES NIERLICH, SBN 196611
  gnierlich@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.374.8458

*Attorneys for Defendant Apple Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION,<br><br>This Document Relates To:<br><br>ALL ACTIONS. | CASE NO. 5:18-md-02827-EJD<br><br>**PUTATIVE CLASS ACTION**<br><br>**DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Edward J. Davila<br>Courtroom: 4, 5th Floor<br>Hearing Date: September 28, 2018<br>Hearing Time: 10:00 a.m. |

Gibson, Dunn & Crutcher LLP

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT - CASE NO. 5:18-MD-02827-EJD

# DECLARATION OF JONATHAN KIRK Q.C.

Pursuant to 28 U.S.C. § 1746 and Rule 44.1 of the Federal Rules of Civil Procedure, I hereby declare as follows:

## BACKGROUND AND QUALIFICATIONS

1. I am Jonathan Kirk Q.C., a barrister in independent practice at Gough Square Chambers, 6-7 Gough Square, London, EC4A 3DE, United Kingdom. I was called to the Bar of England and Wales in 1995 and appointed Queen's Counsel in 2010. I offer this declaration in support of Defendant's Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint. The following is true of my own personal knowledge except where stated on information and belief, and as to those matters I am informed and believe they are true and, if called as a witness, I could and would testify competently thereto.

2. I completed my degree in laws (LLB Hons) at Kings College London in 1994. The following year I completed my professional training as a barrister at the Inns of Court School of Law in London. I was called to the Bar by Lincoln's Inn in November 1995 and have been a practising barrister in England and Wales since that time. I was appointed as Her Majesty's Counsel (Queen's Counsel) in February 2010. I attach my current practising certificate issued by the Bar Council of England and Wales as Exhibit A.

3. I am a specialist practitioner in UK and European Union ('EU') consumer law. I am the General Editor of *Consumer and Trading Standards: Law and Practice*, commonly known as the Pink Book, which is now in its 7th edition. It was published first in 2000 and I have been the General Editor for all of its editions. The Pink Book is the main textbook for legal practitioners that covers most aspects of UK consumer law, trading standards enforcement (the primary enforcement mechanism for consumer protection legislation) and EU consumer law as it affects the UK. In particular, the Pink Book covers in detail the two UK measures relied upon in relation to this claim, the Consumer Protection from Unfair Trading Regulations 2008 and the Consumer Rights Act 2015.

4. I routinely advise consumer law regulators, consumer protection organisations and businesses on the application of UK consumer law. In particular, I am standing counsel to National Trading Standards ('NTS') and the Chartered Trading Standards Institute ('CTSI'). In 2017 I was

1

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFFS' COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Gibson, Dunn & Crutcher LLP

made an honorary member of the CTSI for services to consumer protection law. I also advise the Bar Council of England and Wales and the Law Society of England and Wales on consumer law questions affecting the legal professions. In the two main legal practitioner directories (the Legal 500 and Chambers and Partners) I am one of two QCs in band 1 for consumer law for the UK. I have appeared in numerous consumer law cases, including appellate cases in the UK Supreme Court. I have represented parties in appellate cases involving both of the provisions relied upon in this claim.

5. I have been asked to provide the Court with background information concerning the UK's consumer protection laws and regulations, as well as a discussion of the potential implications of a U.S. court applying this law to claims made on behalf of UK consumers in a U.S. civil class action.

6. I make this declaration as an expert on foreign law, having regard to Rule 44.1 of the Federal Rules of Civil Procedure and the Northern District of California's local Rule 7-5. In compiling this declaration I have endeavoured to provide an accurate, objective, and impartial statement of the law in order to assist the court in making its determination on Defendant's motion.

## SUMMARY OF OPINIONS

7. For the Court's convenience, I briefly summarize my opinions in this action, which are set forth in more detail below:

   a. This claim involves relatively complex legal issues concerning recently enacted UK consumer protection legislation that has not currently been the subject of appellate authority.

   b. Those issues are likely to be the subject of parallel litigation in the English courts because they are raised in current UK consumer protection cases.

   c. The consumer protection provisions that have been relied upon by the Plaintiffs implement European Union ('EU') laws, which must be interpreted in accordance with EU interpretation principles. These are substantially different to traditional common law principles of interpretation.

Gibson, Dunn & Crutcher LLP

2
DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

d.  The UK has a robust and respected legal system that would allow UK consumer protection issues to be ventilated and determined in UK courts, on behalf of multiple litigants, by UK judges that have long experience of applying English law and EU laws.

## OVERVIEW OF RELEVANT UK LAWS AND REGULATIONS

8.  The UK has its own laws that would govern the claims purportedly made on behalf of UK consumers arising from purchases made in their home country, as well as its own legal regime for enforcing these laws.

9.  I understand that the Plaintiffs' counsel have brought claims alleging breaches of two UK provisions: A purported claim for violation of the Consumer Protection from Unfair Trading Regulations 2008 (2008 No. 1277) ("CPUT") and the Consumer Rights Act 2015 (2015 c. 15) ("CRA15").

10.  It is important to understand that most of UK consumer law now derives from the laws of the European Union ('EU'). Both of the provisions relied upon in this claim implement EU law. It should also be noted that most of these consumer protection provisions were implemented relatively recently in the UK and have not yet been the subject of substantive litigation.[1]

11.  The Consumer Protection from Unfair Trading Regulations 2008 implements the EU Unfair Commercial Practices Directive (2005/29/EC) ('UCPD') and the EU Misleading and Comparative Advertising Directive (2006/114/EC) ('MCAD').

12.  The UK Consumer Rights Act 2015 implements, *inter alia*, the Consumer Sales Directive (1999/44/EC) ('CSD'), the primary EU legislation that underpins the EU law requirement for implied quality terms in consumer contracts for the sale of goods. It also implements the Unfair Terms in Consumer Contracts Directive (93/13/EEC). In addition, the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013 implement EU law on the pre-contractual information that must be provided to consumers set out in the Consumer Rights Directive (2011/83/EU). This legislation has not been referred to by Plaintiffs but is plainly highly relevant.

---

[1] The CRA15 came into force on 1st October 2015; Part 4A of CPUT came into force on 1st October 2014; The pre-contractual information provisions in the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations came into force on 13th June 2014.

13. It is important to understand that there are various principles of EU law that apply when interpreting all of these provisions. This is not simply an application of traditional principles of statutory interpretation that can be found in the common law. These principles are different to traditional common law analysis and sometimes surprising in their result.

    a. EU law must be interpreted teleologically (purposively), not literally. EU laws are published in many different languages with no particular language version taking precedence. EU law is often drafted in general terms and in pursuit of broad aims and purposes. The process of interpretation places little emphasis on the literal drafting of legal provisions and focuses on the purpose gleaned from a variety of sources, such as the background recitals in an EU directive.[2] The approach of the Court of Justice of the European Union ('CJEU') to statutory interpretation is rather different to that of common law courts. As noted by the late Bingham J in *Customs and Excise Commissioners v Samex ApS*:[3] "The interpretation of Community instruments involves very often not the process familiar to common lawyers of laboriously extracting the meaning from words used but the more creative process of supplying flesh to a spare and loosely constructed skeleton."

    b. There is no doctrine of binding precedent at EU level. The distinction between the *ratio* of a judgment of the CJEU and *obiter* remarks is not recognised in EU law. The entirety of the judgment is seen as an expression of the will of the Court. The absence of a formal doctrine of binding precedent also means that the CJEU does not always indicate whether it is developing, distinguishing, departing from or altogether overruling its previous decisions.[4] Within the EU, a national court uncertain as to the meaning of an EU measure can currently seek an interpretative ruling from the CJEU, although this *may* change following the implementation of the Brexit referendum result in 2016.

---

2   See, for instance, Case C-562/08 *Muller Fleisch GmbH v Land Baden-Wurttemberg* [2010] ECR I-1391 at para 40, Case C-134/08 *Tyson Parketthandel* [2009] ECR I-2875 at para 16.
3   *Customs and Excise Commissioners v Samex ApS* [1983] 3 CMLR 194 (QBD), at 211.
4   See, for instance, Case C-368/95 *Familiapress v Bauer Verlag* [1997] ECR I-3689, which failed to make any reference to its previous ruling which pointed the other way (Joined Cases 60 and 61/84 *Cinetheque SA and Others v Federation Nationale des Cinemas Français* [1985] ECR 2605). The CJEU has only expressly overruled its decisions in a small number of cases. See, for instance, Case C-267, 268/91 *Criminal Proceedings against Keck and Mithouard* [1993] ECR I-6097.

c.  The nature of EU law-making across many member states requires significant harmonisation of legal standards, with member states required to implement both a minimum and maximum legal standard. Minimal harmonisation measures act as minimum standards, with the EU measure acting as a floor below which national legislation cannot fall. Maximum harmonisation, on the other hand, prevents Member States from maintaining or adopting measures that are more restrictive than the harmonising measure.[5] Under the maximum harmonisation model the harmonising measure acts as both floor and ceiling. The rationale for this is that the same level of consumer protection should apply across all member states. The provisions on which Plaintiffs rely will include the interpretation of both minimal (for example the CRD) and maximum harmonisation (the UCPD) directives. The effect of maximum harmonisation in EU law causes surprising results. For example, measures must be interpreted so that they do not provide a greater level of consumer protection than is provided in the EU law. The *Plus*[6] and *Total*[7] cases under the UCPD illustrate this point. In both cases, Member States had unilaterally introduced blanket bans on certain commercial practices they considered detrimental to consumers. The CJEU struck down both measures because they exceeded the consumer protection envisaged in the UCPD.

d.  For the provisions relied upon there is an important *causal* threshold for determining whether there is an actionable consumer claim. For example, in relation to CPUT, this requires proof that the *'average consumer'* as defined in EU law would have made a different *'transactional decision'*. Presumably, this would be advanced by Plaintiffs on the basis that UK consumers would not, in the factual circumstances alleged, have purchased the particular Apple product. Although the concept of the *average consumer* is an objective standard, a court should[8] have regard to relevant cultural and linguistic factors relating to the consumers affected. It is plain that a UK court is in a far better position to determine the relevance of those factors in relation to UK

---

5   See, for instance, Case C-44/01 *Hartlauer* [2003] ECR I-3095 on Directive 84/450 on misleading advertising (superseded by Directive 2006/114/EEC).
6   Joint cases C-261/07 and C-299/07 *VTB-VAB NV v Total Belgium NV* and *Galatea BVBA v Sanoma Magazines Belgium NV* [2010] All ER (EC) 694.
7   Case C-304/08 *Zentrale zur Bekämpfung unlauteren Wettbewerbs eV v Plus Warenhandelsgesellschaft mbH* [2011] All ER (EC) 338.
8   Graffione (C-313/94) and Lifting (C-220/98)

5

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Gibson, Dunn & Crutcher LLP

consumers.

14. There are several specific legal reasons why, in my opinion the UK is the appropriate forum for considering these consumer protection provisions in the context of UK consumers.

    a. This Court will need to make novel determinations of UK laws in the course of applying the CRA15 to the UK claims. This is likely to be in parallel to a consideration of these issues in the English courts. For example, the CRA15 sets out a framework that consolidates the key consumer rights covering contracts for goods, services, digital content and the law relating to unfair terms in consumer contracts. The CRA15 is relatively new and consequently, there is virtually no interpretative appellate case law. In particular, the complicated rights relating to digital content under Chapter 3 of the CRA15 have not yet been litigated in a domestic forum at all.

        i) Section 33 of the CRA15 sets out the types of contracts covered by the Act. That section provides that Chapter 3 of the CRA15 does not apply to digital content which is supplied entirely free of charge. However, free content supplied with goods for which a price is payable is covered, as is content which is supplied free, but is not *"generally available to consumers unless they have paid a price for it or for goods or services or other digital content."* The question of whether free software updates supplied some time after the purchase of a mobile telephone can be said to have been supplied *"with"* the telephone has not been litigated. Neither has the question of whether such software updates may be considered to be *"not generally available"* to consumers unless they have purchased a telephone.

        ii) The application of the requirements that digital content be of *"satisfactory quality"* and *"fit for purpose"* have also not been litigated. By way of example, the complaint in the present case alleges that Defendant's software updates sought to cure shutdowns by "throttling" performance. However, it admits that the purpose of curing shutdowns was partially achieved (at [9]). The question raised by this allegation — namely whether digital content can be considered to be unfit for purpose and/or of unsatisfactory quality if it achieves its stated purpose at the expense of other capabilities of the product to which it is applied — has not been considered by a domestic court.

        iii) The complaint also raises novel issues in relation to the requirement

6
DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Gibson, Dunn & Crutcher LLP

that the digital content be *"as described."* The complaint in this case is not that the digital content did not perform as described — i.e. to fix bugs and cure shutdowns — but rather that Defendant's description of the digital content's functionality did not inform consumers that this would be achieved at the expense of processor performance. This is therefore not an allegation of insufficient performance when judged against the description given, but one of an insufficient description being provided in the first place. Whether this would fall within the ambit of section 36 of the CRA15, and whether Defendant was under a duty to provide the information which Plaintiff alleges is missing from the description are not questions which have been considered by a domestic court.

        iv) In my opinion it is wholly undesirable for a court of foreign jurisdiction to litigate such unsettled consumer protection issues of English law, when those issues can and should be considered by domestic courts.

    b. The extent to which a supplier of goods must provide pre-contractual information is governed in the UK by the Consumer Contracts (Information, Cancellation and Additional Charges) Regulations 2013. This provision implements in the UK the EU Consumer Rights Directive (2011/83/EU). The extent of the information obligation is potentially legally complex, particularly in its interface with existing common law contractual obligations. It has not yet been litigated in the UK courts.

    c. The redress regime under Part 4A of CPUT is relatively new and thus far untested in the courts in any cases of significance. There are currently no appellate decisions on these provisions. Over the next five years there is likely, however, to be a significant body of case law developed in the English courts. There are currently several claims (for example, the Volkswagen diesel "Group Litigation Order" ('GLO')) that are working their way through the courts. Key issues under this part of the legislation will include whether Defendant's alleged acts should more properly be characterised as actions or omissions (since damages are available only for the former), and how quantum should be assessed under Regulations 27I (4) and (5) of CPUT.

    d. The current claims made in relation to *'contravening professional diligence'* under regulation 3 of CPUT and for *'misleading omissions'* under regulation 6 of CPUT are unlikely to be actionable in the UK as a civil claim by consumers. Part 4A of CPUT implemented a Law

7
DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Gibson, Dunn & Crutcher LLP

Commission recommendation that these two provisions were too vague for a specific right of redress.[9] There is a difficult legal question, however, as to whether they are relevant to the application of the unfair terms regime, which will undoubtedly need to be considered in relation to the relevant contractual terms. Again, this has not yet been considered by the English courts.

## THE RISK OF ENCROACHING UPON UK SOVEREIGNTY

15. In my opinion the interpretation, by a U.S. court, of untested UK law may encroach upon the sovereign authority of the UK to adjudicate matters related to consumer protection for UK consumers. The UK has a robust system of regulation. Consumer protection laws are enforced in the UK by both national (such as the Competition and Markets Authority ('CMA')) and local regulators (local authority trading standards departments). There is also a wide range of sectoral regulators that enforce consumer protection legislation in areas such as energy, water, railways and broadcasting. Alongside those enforcement bodies, consumers are also entitled to bring their own civil actions before the courts.

16. The UK allows for three types of collective action: joint claims, representative actions, and group litigation. Group litigation is closest in nature to a class action such as the present case. On application, the High Court may make a GLO under Part 19.11 of the English Civil Procedure Rules ('CPR') where there are a number of claims raising common issues. There are currently 105 GLOs in place that include claims concerning a wide variety of issues including personal injury, financial services and the motor industry. A list of current GLOs is publicly available and can be accessed online.[10]

17. The GLO process works on the basis of an *opt-in* process. Where a claimant opts in, the final decision on whether an individual claimant is allowed to be a party to the GLO remains as the discretion of the court,[11] which has a wide-ranging oversight of the management of the group action, including advertisement, identification of the issues, and cut-off dates for claimants to be

---

9    They are only actionable as criminal law provisions or at the suit of a public enforcement body under Part 8 of the Enterprise Act 2002 as public law injunctions.
10   https://www.gov.uk/guidance/group-litigation-orders#list-of-all-group-litigation-orders
11   Under paragraphs 6.3 and 6.4 of Practice Direction 19 of the CPR

added to the group register. It is arguable that automatically opting-in all UK members of the class usurps the function of the domestic English courts to manage group litigation within the ambit of the appropriate procedural framework as contained in the CPR.

18. Generally, English law operates on the basis of territorial jurisdiction. It is presumed that a statutory provision will not apply overseas, unless a contrary intention is expressed. The UK has rules providing for limitation on party choice in favour of consumer protection in the areas of: choice of law and jurisdiction.

## THE UK IS THE MORE APPROPRIATE FORUM TO HEAR THE CASE

19. In my opinion the UK legal system provides an adequate and appropriate forum to hear the claims of UK consumers. There are substantive consumer protection laws that will plainly apply to this claim. The UK has a robust and respected legal system, which is best placed to address the complexities of consumer protection claims brought by UK consumers.

20. In litigation involving multiple claimants under UK consumer protection laws, although there may well be common issues, it is usually necessary to consider evidential factors that are specific to the individual claim/plaintiff. In this claim, factors such as causation, quantum and consequential loss are likely to be in issue. Their resolution in an individual case is likely to require evidence, which may be contested. That is not a process that can sensibly and proportionately be achieved by a U.S. court for multiple UK consumers in a case of this nature.

21. It is also likely that expert evidence on English and EU law will be required to resolve the English consumers' case in the U.S. This is unsatisfactory because it will involve a U.S. judge hearing evidence about English and EU law from UK lawyers, then deciding what the law in the UK should be on the basis of evidence, rather than experience and jurisprudence. That is cumbersome, costly and circumvents the obvious way that such UK consumer protection issues should be decided, in a UK court by a UK judge.

Gibson, Dunn & Crutcher LLP

9

DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

Pursuant to 28 § U.S.C. 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __9__ August, 2018.

_____
Jonathan Kirk Q.C.

Gibson, Dunn & Crutcher LLP

10
DECLARATION OF JONATHAN KIRK Q.C. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT - CASE NO. 5:18-MD-02827-EJD

# EXHIBIT A

 

# Practising Certificate

The General Council of the Bar of England and Wales
hereby declares that

## Mr Jonathan Kirk QC

a self-employed barrister

is authorised to undertake the following reserved legal activities, subject to compliance with the relevant provisions of the BSB Handbook which includes the Code of Conduct for barristers:

The exercise of rights of audience before every court in relation to all proceedings

Administration Of Oaths

Immigration Work

Probate Activities

Reserved Instrument Activities

Registration as a public access practitioner

This certificate is valid from 01 April 2018 until 30 April 2019.

**Malcolm Cree CBE**
Chief Executive
Bar Council

**Dr Vanessa Davies**
Director General
Bar Standards Board

www.barcouncil.org.uk    www.barstandardsboard.org.uk
289-293 High Holborn, London WC1V 7HZ, DX: 240 LDE
Tel: 020 7242 0082   Fax: 020 7831 9217