**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-05777
*jcotchett@cpmlegal.com*
*mmolumphy@cpmlegal.com*

*Interim Co-Lead Class Counsel*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*

David A. Straite (*pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
*dstraite@kaplanfox.com*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION | Case No. 5:18-md-02827-EJD |
| | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT APPLE INC.'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| This Document Relates To:<br><br>ALL ACTIONS. | Judge:          Hon. Edward J. Davila<br>Courtroom:   4, 5th Floor<br>Hearing Date:  September 28, 2018<br>Hearing Time:  10:00 a.m. |

Case No. 5:18-md-02827-EJD

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1

II.  PLAINTIFFS' COUNTER-STATEMENT OF ISSUES TO BE DECIDED
     PURSUANT TO CIVIL L.R. 7-4(a)(3) ..................................................................... 1

III. PLAINTIFFS' OBJECTIONS TO THE MTD PURSUANT TO CIVIL L.R. 7-3(a) ........ 2

IV.  FACTUAL BACKGROUND ...................................................................................... 2

     A.   Apple's Misconduct And Active Concealment Of Its Defective Devices ............. 2

     B.   Apple's Materially False Statements And Omissions To Sell Defective
          Devices .......................................................................................................... 4

     C.   Apple's Materially False Representations And Omissions Cause
          Consumers To Download The Throttling Updates ............................................ 5

V.   LEGAL STANDARDS .............................................................................................. 6

VI.  ARGUMENT ............................................................................................................ 7

     A.   The Complaint States A Claim For Violation Of The Computer Fraud And
          Abuse Act, 18 U.S.C. § 1030(a)(5)(A) And (C) (The "CFAA") (Count 1) ........... 7

          1.   Apple Intentionally Caused Damage to a Protected Computer. ................ 7

          2.   Apple Intentionally Accessed a Protected Computer ............................... 8

          3.   Apple Misapplies the Economic Loss Doctrine ...................................... 9

     B.   The Complaint States California Consumer Protection Claims (Counts 2-4) ...... 10

          1.   Plaintiffs State Claims for Misrepresentation by Omission ..................... 10

          2.   Plaintiffs' Misrepresentation Claims Also Survive the Pleading
               Stage ................................................................................................. 14

     C.   The CAC States A Claim For Violation Of Cal. Bus. & Prof. Code
          §§ 17200, *et seq.* ("UCL") (Count 3) ................................................................ 20

          1.   Apple's Conduct Was Unlawful Under The UCL .................................... 20

          2.   Apple's Practices Were Unfair Under The UCL ..................................... 21

          3.   Apple's Practices Were Fraudulent Under the UCL ............................... 22

     D.   The CAC States A Claim For Violation Of California's Computer Data
          Access And Fraud Act ("CDAFA" Or "Section 502") (Count 5) ........................ 22

     E.   The Complaint States A Claim For Trespass Tto Chattels (Count 6) ................. 23

**TABLE OF CONTENTS**
(cont.)

Page

F.  The Court Cannot Close Its Doors To The Non-U.S. Plaintiffs ......................... 25

    1.  This Court Has Personal Jurisdiction over All Named Plaintiffs ............. 26

    2.  This Court Has Subject Matter Jurisdiction over all Claims ................... 26

    3.  CAC Counts 1 through 6 Apply Extraterritorially .................................... 26

        a.  Apple Required All Plaintiffs (other than in the UK) to
            Agree to the Application of California Law to their Claims......... 26

        b.  California Law Would Apply Even Absent the SLA.................... 28

        c.  The CFAA Applies Extraterritorially............................................ 30

G.  The Complaint Sufficiently Alleges Facts To Include iPhone 5 And iPads
    As Devices Subject To This Litigation ................................................................ 34

VII.  CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abad v. Bayer Corp*.
563 F.3d 663 (7th Cir. 2009)..................................................................................... 26

*Aguila v. Gen. Motors LLC*,
2013 WL 3872502 (E.D. Cal. July 25, 2013) ............................................................ 14

*Alcala v. Martel*,
2:09–cv–3407 FCD JFM (PC), 2011 WL 2671507 (E.D. Cal. July 6, 2011)............................ 10

*Anwar v. Fairfield Greenwich Ltd.*,
289 F.R.D. 105 (S.D.N.Y. 2013), *vacated on other grounds sub nom.*,
570 F. App'x 37 (2d Cir. June 19, 2014) ................................................................ 33, 34

*Apollo Group v. Avnet, Inc.*,
58 F.3d 477 (9th Cir. 1995)...................................................................................... 10

*Ass'n for L.A. Deputy Sheriffs v. Cty. of L.A.*,
648 F.3d 986 (9th Cir. 2011)....................................................................................... 6

*Avedisian v. Mercedes-Benz USA, LLC*,
2013 WL 2285237 (C.D. Cal. May 22, 2013) ............................................................ 19

*Bates v. United Parcel Serv., Inc.*,
511 F.3d 974 (9th Cir. 2007)..................................................................................... 34

*Bazuaye v. I.N.S.*,
79 F.3d 118 (9th Cir. 1996)....................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................... 6

*Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*,
181 F.3d 435 (3d Cir. 1999)...................................................................................... 29

*Berenblat v. Apple Inc.*,
2010 WL 1460297 (N.D. Cal. Apr. 9, 2010) ............................................................. 20

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
2018 WL 2124064 (N.D. Cal. May 8, 2018) ............................................................. 32

*Brothers v. Portage Nat'l Bank*,
No. Civ. A 306–94, 2007 WL 965835 (W.D. Pa. Mar. 29, 2007).............................. 32

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011).................................................................................... 31

*Cholakyan v. Mercedes-Benz USA, LLC*,
796 F.Supp.2d 1220 (C.D. Cal., 2011) ..................................................................... 32

**TABLE OF AUTHORITIES**
(cont.)

Page

*City of Amsterdam v. Daniel Goldreyer, Ltd.*,
  882 F.Supp.1273 (E.D.N.Y. 1995) ....................................... 25

*Colgan v. Leatherman Tool Grp., Inc.*,
  135 Cal.App.4th 663 (2006) ................................................ 10

*Collins v. eMachines, Inc.*,
  202 Cal.App.4th 249 (2011) ................................................ 12

*Consumer Advocates v. Echostar Satellite Corp.*,
  113 Cal.App.4th 1351 (2003) .............................................. 15

*Corson v. Toyota Motor Sales, U.S.A., Inc.*,
  2013 WL 10068136 (C.D. Cal. July 18, 2013) .................... 16

*Cousins v. Lockyer*,
  568 F.3d 1063 (9th Cir. 2009)............................................... 7

*Cromer Fin. Ltd. v. Berger*,
  205 F.R.D. 113 (S.D.N.Y. 2001) ........................................ 33

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015).......................................... 17, 18

*Davidson v. Apple, Inc.*,
  2018 U.S. Dist. LEXIS 137707 (N.D. Cal. May 8, 2018) ......... 17

*Day v. AT & T Corp.*,
  74 Cal.Rptr.2d 55 (1995) ................................................... 20

*Demetriades v. Yelp, Inc.*,
  228 Cal.App.4th 294 (2014) .............................................. 15

*Deposit Guaranty Nat. Bank v. Roper*,
  445 U.S. 326 (1980)........................................................... 33

*Desnick v. American Broadcasting Cos., Inc.*,
  44 F.3d 1345 (7th Cir. 1995).............................................. 9

*Doyle v. Chrysler Grp., LLC*,
  2014 WL 3361770 (C.D. Cal. July 3, 2014) ....................... 18

*Eastman v. Life Insurance Co. of North America*,
  2018 WL 3688983 (M.D. Ala. July 26, 2018)..................... 28

*EF Cultural Travel BV v. Explorica, Inc.*,
  274 F.3d 577 (1st Cir. 2001) .............................................. 9

# TABLE OF AUTHORITIES
## (cont.)

Page

*Ehret v. Uber Techs., Inc.*,
   68 F.Supp.3d 1121 (N.D. Cal. 2014) ................................................................... 12

*Elden v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   2011 WL 1236141 (S.D.N.Y. March 30, 2011) ...................................................... 28

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ...................................................................................... 6

*Forcellati v. Hyland's, Inc.*,
   876 F. Supp. 2d 1155 (C.D. Cal. 2012) ................................................................. 28

*Friedman v. AARP, Inc.*,
   855 F.Supp.3d 1047 (9th Cir. May 3, 2017) ................................................. 16, 22

*Giles v. GMAC*,
   494 F.3d 865 (9th Cir. 2007) ...................................................................... 9, 10

*Glass v. BMW of N. Am., LLC*,
   WL 6887721 (D.N.J. Dec. 29, 2011) ................................................................... 20

*Golden v. Home Depot, U.S.A., Inc.*,
   2018 WL 2441580 (E.D. Cal. May 31, 2018) ........................................................ 35

*Gonzales v. Uber Techs., Inc.*,
   305 F.Supp.3d, 1078 (N.D. Cal. 2018) ................................................................. 23

*Grace v. Apple Inc.*,
   2017 WL 3232464 (N.D. Cal. July 28, 2017) ................................................. 23, 24

*Gutierrez v. Carmax Auto Superstores Cal.*,
   19 Cal.App.5th 1234 (2018) ................................................................. 11, 14, 17

*Hartford Fire Insurance Co. v. California*,
   509 U.S. 764 (1993) ...................................................................................... 30

*Hauenstein v. Lynham*,
   100 U.S. 483 (1879) ...................................................................................... 30

*Hodsdon v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) ................................................................. 10, 11, 12

*Huntzinger v. Aqua Lung Am., Inc.*,
   2015 WL 8664284 (S.D. Cal. Dec. 10, 2015) ....................................................... 20

*Hurtado v. Superior Court*,
   11 Cal. 3d 574 (1974) .................................................................................... 30

*In re Apple & ATTM Antitrust Litig.*,
   2010 WL 3521965 (N.D. Cal. Jul. 8, 2010) ........................................................... 9

**TABLE OF AUTHORITIES**
(cont.)

Page

*In re Apple & ATTM Antitrust Litig.*,
   596 F.Supp.2d 1288 (N.D. Cal. 2008) ........................................................................ 8, 9, 24

*In re Apple In-App Purchase Litig.*,
   855 F.Supp.2d 1030 (N.D. Cal. 2012) ........................................................................ 11

*In re Carrier IQ, Inc.*,
   78 F.Supp.3d 1051 (N.D. Cal. 2015) .......................................................... 13, 18, 21

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*,
   295 F.Supp.3d 927 (N.D. Cal. 2018) ............................................................. 12, 16

*In re Gupta Corp. Sec. Litig.*,
   900 F. Supp. 1217 (N.D. Cal. 1994) .......................................................................... 6

*In re iPhone 4S Consumer Litig.*,
   2013 WL 3829653 (N.D. Cal. July 23, 2013) ......................................................... 29

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012) ............................................................. 8, 24

*In re Jamster Mktg. Litig.*,
   No. 05CV0819 JM (CAB), 2009 WL 1456632 (S.D. Cal. May 22, 2009) .............................. 32

*In re MyFord Touch Consumer Litig.*,
   46 F.Supp.3d 936 (N.D. Cal. 2014) ....................................................................... 12

*In re Nexus 6P Products Liab. Litig.*,
   Case No. 17-cv-02195-BLF, 293 F.Supp.3d 888 (2018) ..................................... 15, 16

*In re NJOY Consumer Class Action Litig.*,
   2014 U.S. Dist. LEXIS 196586 (C.D. Cal. May 27, 2014) ..................................... 16

*In re Sony PS3 "other OS" Litig. v. Sony Comput. Entm't Am., Inc.*,
   551 F. App'x 916 (9th Cir. 2014) .......................................................................... 10

*In re Tobacco II Cases*,
   207 P.3d 20 (Cal. 2009) ....................................................................................... 11

*In re Tobacco II Cases*,
   46 Cal.4th 298 (2009) .......................................................................................... 17

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
   754 F.Supp.2d 1145 ............................................................................................. 16

*In re U.S. Fin. Sec. Litig.*,
   69 F.R.D. 24 (S.D. Cal. 1975) ................................................................................ 33

PLTFS' MPA IN OPP. TO MOT. TO DISMISS

**TABLE OF AUTHORITIES**
(cont.)

Page

*In re: Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016)................................................................ 12, 24

*In re: Turkcell Iletisim Hizmetler*,
209 F.R.D. 353 (S.D.N.Y. 2002) ................................................................ 33

*Iragorri v. United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001)................................................................ 32

*Kasky v. Nike, Inc.*,
27 Cal.4th 939 (2002) ................................................................ 15, 22

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal.4th 95 (2006) ................................................................ 29

*Keegan v. Am. Honda Motor Co.*,
838 F.Supp.2d 929 (C.D. Cal. 2012) ................................................................ 14

*Klein v. Chevron U.S.A., Inc.*,
202 Cal.App.4th 1342 (2012) ................................................................ 20

*Kowalsky v. Hewlett-Packard Co.*,
771 F.Supp.2d 1138 (N.D. Cal. 2010) ................................................................ 15

*Lazar v. Hertz Corp.*
69 Cal.App.4th 1494 (1999) ................................................................ 20

*Leonhart v. Nature's Path Foods, Inc.*,
2014 WL 1338161 (N.D. Cal. Mar. 31, 2014)................................................................ 35

*Linear Tech. Corp. v. Applied Materials, Inc.*,
152 Cal.App.4th 115 (2007) ................................................................ 16

*McDougal v. Cty. of Imperial*,
942 F.2d 668 (9th Cir. 1991)................................................................ 6

*McKell v. Wash. Mut., Inc.*,
49 Cal.Rptr.3d 227 (2006) ................................................................ 20

*McQueen v. BMW of N. Am., LLC*,
2014 WL 656619 (D.N.J. Feb. 20, 2014) ................................................................ 20

*Mickens v. Ford Motor Co.*,
2015 WL 5310755 (D.N.J. Sept. 10, 2015) ................................................................ 13

*Morrison v. National Australia Bank, Ltd.*,
561 U.S. 247 (2010)................................................................ 26

*Mujica v. AirScan, Inc.*,
771 F.3d 580 (9th Cir. 2014)................................................................ 31

**TABLE OF AUTHORITIES**
(cont.)

Page

*Multiven, Inc. v. Cisco Sys., Inc.*,
   725 F.Supp.2d 887 (N.D. Cal. 2010) ...................................................................... 23

*Munch v. Sears Roebuck & Co.*;
   2007 WL 2461660 (N.D. Ill. Aug. 27, 2007) ........................................................... 20

*Nedlloyd Lines B.V. v. Superior Court*,
   834 P.2d 1148 (Cal. 1992) ....................................................................................... 27

*NovelPoster v. Javitch Canfield Grp.*,
   140 F.Supp.3d 954 (N.D. Cal. 2014) ........................................................................ 23

*Oestreicher v. Alienware Corp.*,
   544 F.Supp.2d 964 (N.D. Cal. 2008) ........................................................................ 19

*P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore LLC*,
   2007 WL 708978 (D.N.J. Mar. 5, 2007) ................................................................... 23

*People v. Childs*,
   220 Cal.App.4th 1079 (2013) ................................................................................... 23

*People v. Toomey*,
   157 Cal.App.3d 1 (1984) ........................................................................................... 20

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) .................................................................................................. 33

*Resnick v. Hyundai Motor Am., Inc.*,
   2017 WL 1531192 (C.D. Cal. Apr. 13, 2017) .......................................................... 20

*Rice v. Sunbeam Prod., Inc.*,
   2013 WL 146270 (C.D. Cal. Jan. 7, 2013) ............................................................... 20

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
   102 P.3d 268 (Cal. 2004) ..................................................................................... 9, 10

*Rutledge v. Hewlett-Packard Co.*,
   238 Cal.App.4th 1164 ...................................................................................... 12, 13, 15

*Ryanair DAC v. Expedia Inc.*,
   Case No. C17-1789RSL, 2018 WL 3727599 (W.D. Wash. Aug. 6, 2018) .............. 30

*San Miguel v. HP, Inc.*,
   2018 WL 1536766 (N.D. Cal., Mar. 29, 2018) ......................................... 7, 13, 23, 25

*Scott & White Memorial Hosp. v. Aetna Health Holdings, LLC*,
   2018 WL 1498842 (W.D. Tex. Mar. 27, 2018) ........................................................ 28

*Sullivan v. Oracle Corp.*,
   254 P.3d 237 (Cal. 2011) .......................................................................................... 29

**TABLE OF AUTHORITIES**
(cont.)

Page

*Takiguchi v. MRI Int'l, Inc.*,
   2016 WL 1091090 (D. Nev. Mar. 21, 2016)................................................................. 34

*Tatum v. Chrysler Grp. LLC.*,
   2011 WL 1253847 (D.N.J. Mar. 28, 2011)................................................................. 13

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004)................................................................. 8

*Thomas v. Dun & Bradstreet Credibility Corp.*,
   100 F.Supp.3d 937 (C.D. Cal. 2015) ................................................................. 28

*U.S. v. Christensen*,
   828 F.3d 763 (9th Cir. 2016)................................................................. 23

*U.S. v. Gasperini*,
   729 F. App'x 112 (2d Cir. 2018) ................................................................. 30

*U.S. v. Ivanov*,
   175 F.Supp.2d 367 (D. Conn. 2001)................................................................. 30

*U.S. v. Kramer*,
   631 F.3d 900 (8th Cir. 2011)................................................................. 7

*U.S. v. Thomas*,
   877 F.2d 591 (5th Cir. 2017)................................................................. 7

*United States v. Morris*,
   928 F.2d 504 (2d Cir. 1991)................................................................. 9

*Van Staphorst v. Maryland*,
   2 U.S. 401 (1791)................................................................. 26

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003)................................................................. 6

*Washington v. Baenziger*,
   673 F. Supp. 1478 (N.D. Cal. 1987) ................................................................. 6

*Weeks v. Google LLC*,
   2018 WL 3933398 (N.D. Cal. Aug. 16, 2018)................................................................. 11

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008)................................................................. 10, 15, 16

*Williams v. Yamaha Motor Co.*,
   851 F.3d 1015 (9th Cir. 2017)................................................................. 13

*Wilson v. Hewlett-Packard Co.*,
   668 F.3d 1136 (9th Cir. 2012)................................................................. 12, 20

**TABLE OF AUTHORITIES**
(cont.)

Page

*Won Kyung Hwang v. Ohso Clean, Inc.*,
   No. C-12-06355 JCS, 2013 WL 1632697 (N.D. Cal. Apr. 16, 2013)......................................... 29

*Yastrab v. Apple Inc.*,
   173 F.Supp.3d 972 (N.D. Cal. Mar. 25, 2016)......................................................................... 17


**Statutes**

22 C.F.R.
   §§ 120-30 [the ITAR Regulations] ...................................................................................... 31

15 U.S.C.
   §§ 41-58, as amended (the Federal Trade Commission Act), § 5........................................ 21

18 U.S.C.
   § 1030 [the Consumer Fraud and Abuse Act ("CFAA")]............................................... *passim*
   § 1030(a)(5)(A) ............................................................................................................... 7, 8
   § 1030(a)(5)(A)(i) ................................................................................................................ 8
   § 1030(a)(5)(A)(iii) ............................................................................................................. 8
   § 1030(a)(5)(C) ............................................................................................................... 7, 8
   § 1030(e) ............................................................................................................................. 7
   § 1030(e)(1)......................................................................................................................... 7
   § 1030(e)(2)(B) ................................................................................................................. 30
   § 1030(e)(8)......................................................................................................................... 8

22 U.S.C.
   § 2778 [the Arms Export Control Act ("AECA")] ............................................................ 31

28 U.S.C.
   § 1331................................................................................................................................ 26
   § 1332(d)(2) ...................................................................................................................... 26
   § 1367(a) ........................................................................................................................... 26

California Civil Code
   §§1750, *et seq.* [the Consumer Legal Remedies Act ("CLRA")] ................................... *passim*
   § 1770(a) ........................................................................................................................... 10
   § 1770(a)(5)....................................................................................................................... 10
   § 1770(a)(7)....................................................................................................................... 10
   § 1770(9)............................................................................................................................ 10
   § 1770(16).......................................................................................................................... 10

California Business & Professions Code
   §§ 17200 *et seq.* [the Unfair Competition Law ("UCL")] ............................................ *passim*
   § 17500 [the False Advertising Law ("FAL")]............................................................... *passim*

California Penal Code
   § 502 [the California Comprehensive Data Access and Fraud Act ("CDAFA")] ..... 9, 21, 22, 23
   § 502(c)(2)......................................................................................................................... 23
   § 502(c)(4)..................................................................................................................... 22, 23
   § 502(c)(5)..................................................................................................................... 22, 23

# TABLE OF AUTHORITIES
### (cont.)

**Page**

**Rules**

Federal Rules of Civil Procedure
  Rule 8(a)................................................................................................. 6, 23
  Rule 9(b) ................................................................................................ 6, 19
  Rule 12 ....................................................................................................... 32
  Rule 12(b)(6)........................................................................................... *passim*
  Rule 15 ....................................................................................................... 35
  Rule 23 ............................................................................................ 1, 2, 25, 32
  Rule 23(b) ............................................................................................. 32, 33
  Rule 23(c)(4) ............................................................................................. 32
  Rule 44.1 ..................................................................................................... 2
  Rule 56(c)(4) ............................................................................................... 2


**Treatise**

John F. Coyle, The Canons of Construction for Choice-of-Law Clauses,
  92 Wash. L. Rev. 631 (2017) ................................................................ 27, 30

Pltfs' MPA in Opp. to Mot. to Dismiss

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

Apple admits that millions of its premium devices have a problem—the battery cannot handle the demands placed on it by the software (iOS), resulting in frequent "unexpected shutdowns." Apple admits that it "faced a complex technological problem," ("MTD," ECF No. 176 at 1), but rather than fessing up and recalling the devices, Apple instead tricked its customers into accepting a software "patch" that secretly "throttled" the devices' performance—by as much as 50%. Apple knew that a $79 battery replacement would alleviate some woes, yet it withheld this information from its customers as well. Apple also knew that customers were prematurely upgrading to new models as a result of the frustration. *And still Apple remained silent*.

Defendant's MTD is outlandish.  Apple does not say, "I didn't do it." Instead, Apple says "there is nothing you can do about it." But Apple is wrong. Plaintiffs plead multiple counts under federal, state (and foreign) laws providing that Apple *can* be held accountable. Apple also improperly invites this Court to render a 12(b)(6) ruling by resolving *disputed* facts. Finally, Apple improperly briefs two issues in contravention of CMO No. 4, ECF No. 163 (whether iPhone 5's are in the case, and whether to dismiss <u>absent</u> foreign class members).[1]  For the reasons stated in this opposition, accompanied by the Declaration of Kyle McGee (attaching six foreign declarations) ("McGee Decl."), Declaration of David Straite ("Straite Decl."), Objections to the MTD (as noted below), and Objections to Apple's Request for Judicial Notice (the "RJN," ECF No. 177), filed herewith, the MTD should be denied.

## II.  PLAINTIFFS' COUNTER-STATEMENT OF ISSUES TO BE DECIDED PURSUANT TO CIVIL L.R. 7-4(a)(3)

1.  Whether the CAC sufficiently pleads Counts 1 through 6.

2.  Whether the Court has jurisdiction over claims of the non-U.S. named plaintiffs.

3.  Whether the Court should exercise its discretionary authority to dismiss four plaintiffs from the case on comity or *forum non conveniens* grounds.

---

[1] On this latter point, Apple was only permitted to raise jurisdictional challenges as to named plaintiffs, not to transform a 12(b)(6) motion into a preemptive strike against a Rule 23 motion.  For completeness, Plaintiffs respond to the improper arguments in full, while preserving objections.

III.   **PLAINTIFFS' OBJECTIONS TO THE MTD PURSUANT TO CIVIL L.R. 7-3(a)**

Plaintiffs raise three evidentiary and procedural objections to the MTD. These objections are developed more fully in a separate document, filed herewith.[2]

IV.   **FACTUAL BACKGROUND**

A.   **Apple's Misconduct And Active Concealment Of Its Defective Devices**

On December 20, 2017, eleven months late, Apple was forced to admit it intentionally released undisclosed code in a software update for iPhones and iPads (update 10.2.1), to purportedly "smooth out instantaneous peaks" in "current demand" to prevent "unexpected shutdowns" of certain of its iPhones (the "Admission"). ¶¶8-11 ("¶__" refers herein to the CAC). Apple also admitted that it released similar code in a December 2, 2017 update, known as iOS 11.2. ¶¶10-11.[3]

Apple's long overdue Admission was not voluntary. Just days earlier, a third-party software engineer, John Poole of Primate Labs ("Poole"), published research online that correlated to a nearly 50% decline in performance on certain of the Devices after installation of the Updates. ¶¶410-413. Media and consumer attention prompted the Admission, not Apple's altruism. ¶¶2, 11, 18, 410.  The Admission also included more lies and material omissions. *See e.g.* ¶¶12-18. First, Apple misled consumers about the prior Updates' impact—telling Apple customers that the Updates merely "smoothed" performance, when in fact the Updates actually "throttled" performance. ¶¶12, 18, 411-413. Second, Apple falsely told consumers that the Updates were only to fix "bugs" or "improve security" (iOS 10.2.1), or to fix "bugs" and provide "improvements." (iOS11.2) ¶¶8, 10, 359-364. Apple never told consumers that the Updates included embedded programming to reduce the operating speed or performance of their Devices. *See e.g.* ¶¶29-272.

---

[2] First Objection to the MTD: Apple violated CMO No. 4 by moving to dismiss claims related to iPhone 5 devices. Second Objection to the MTD: Apple violated CMO No. 4 by prematurely requesting relief under Rule 23 in a Rule 12(b)(6) motion. Third Objection to the MTD: Seven of Apple's eight "Foreign Law Expert Declarations" violate Fed. R. Civ. P. 44.1 and 56(c)(4) (formerly 56(e)), and Civil L.R. 7-5(b). Plaintiffs raise a fourth objection to the RJN, addressed elsewhere.

[3] "Updates" refers to iOS 10.2.1 and iOS 11.2. ¶10, n.2. "Devices" (¶1, n.1) includes all models of iPhone 5, 6, and 7, as well as specified iPads. All iOS installed on the Devices are part of Apple's misconduct and/or attempt to conceal the Defects and Battery Issues. ¶¶10, n.2, 345, 365. For brevity, the term Defects includes the Battery Issues. The "Class" (¶455) includes all purchasers, owners, users or lessees of the Devices in the U.S. and the Foreign Countries (¶455, n.70).

Third, the reported "shutdowns"—Apple's later claim as to why the "smooth[ing]" Updates were necessary—were not "unexpected" or a new problem. ¶¶2-3, 13. Since the Fall of 2016, users of iPhones 5 and 6, whose devices were running on iOS 10, reported shutdowns even when their devices indicated the battery life was at or above 30%. ¶¶2, 390, n.42. The inventor of the iPod (and leader of the first iPhone team) Tony Fadell, publicly voiced concern, in early December 2016, about the repeated shutdown problem. ¶¶3. Safety hazards have also occurred. *See* ¶320, n.17 (citing reports of explosion and fires, including 2018 explosion at Apple store). ECF No. 145 at 320.

The biggest lie, however, is what Apple is still concealing today—that the Devices were defective "out of the box," with the factory-installed iOS, back to at least iOS 6. ¶¶9, 13-14. The Updates were belated "band-aids" that Apple was rushing to place on a larger, undisclosed problem—a mismatch (existing even before point of sale) between the Devices, including their processing chips and rechargeable lithium-ion batteries, and the ever-increasing demands placed on the Devices by Apple's constantly-updating iOS platform, through which it fed new features to outpace competition. ¶289.[4] This mismatch goes to the heart of the central functionality of the Devices and is referred to as the "Defect(s)." ¶¶9, 13-15, 19, 371, 382-384, 391-397, 403-417. It is linked not only to device performance problems, but safety issues as well. ¶¶14, 320, n.17.

In addition, Apple's batteries (as designed) degraded too rapidly such that they were incapable of delivering the power required to run the Devices during the normal life of a lithium-ion battery. ¶¶9, 13-15, 19, 371, 382-384, 391-397, 403-417. As Apple added more demanding iOS updates, consumers experienced even slower performance—not only due to the Devices' own limitations but the limitations of the batteries to provide enough power to keep pace with the new demands (the "Battery Issues," which are part the Defects). ¶13. Due to the Defects and Battery Issues, the Devices require constant recharging, further degrading batteries and defeating the purpose of having a *mobile* device. ¶14.

---

[4] The CAC details (¶¶344-369) Apple's dependence on constantly updating iOS, and why Apple's statements about its constantly "improved" iOS updates were materially false. Apple never told the Class that adding the updates (which they had no option other than to install—as detailed in ¶¶386-389 of the CAC) would require increased current draw on the batteries of the Devices to run the processors, amplifying the Defects.

1

### B.    Apple's Materially False Statements And Omissions To Sell Defective Devices

2    Apple uses a "direct contact" approach to sell its Devices. ¶288, n.8. Apple admits that its

3    sales approach is "critical" for "attracting new and retaining existing customers", and it has sales

4    staff "convey the value of the hardware and software integration" of its products. *Id*. Apple engaged

5    in a multiple year, consistent marketing plan of constantly introducing new iterations or generations

6    of the Devices. ¶¶288-369. Each iteration emphasized battery power and long life, designed to keep

7    pace with enhanced processor "chips," and a panoply of ever-increasing, features loaded onto the

8    Devices via the iOS and subsequent updates. *Id*. This marketing—directed to consumers worldwide,

9    and emanating from California[5]—included press releases, Apple "Special Events", advertisements

10    on both Apple's website and in its stores, and Apple's packaging. *See e.g.* ¶¶292, n.12, 291-294.

11    Apple made consistent promises to consumers for the performance speed and battery power

12    of the Devices. *See e.g.* ¶291 (iPhone 5: "blazing fast performance" with "even better battery life[].";

13    ¶¶297, 301, 304: (iPhone 5S/5C/6/6Plus: "blazing fast performance" and "great battery life"); ¶310

14    (iPhone 6s/6s Plus: "faster performance and great battery life"; ¶317 (iPhone 7/7 Plus: "more power

15    and performance with the best battery life ever").[6]

16    These statements and omissions about the Devices were materially false, and purposely

17    designed to conceal the Defects, including that Apple was using updates to throttle Devices to mask

18    these defects.[7]  Each Plaintiff alleges that their Device(s) did not "operate as promised in Apple's

19    advertisements, representations, and the information publicly available in the marketplace." ¶¶29-

20    272. Each Plaintiff also alleges that "none of the packaging" for their Devices "revealed that there

21    were any Defects, Battery Issues, or that Apple would use the Updates to 'smooth,' 'throttle,' or

22    [5] *See* ¶¶291-92, 296-98, 300-302, 304-05, 310-11, 314-315, 317-318, 322-23, 324, n.19, 325, 327,
23    329-34, 336-340, 348-54, 356-358, 366. The packaging references Apple's California address, and
both the packaging and the Devices include the statement: "Designed by Apple in California." ¶290,
24    n.11 & ¶321. As detailed *infra*, Apple has thrust upon each Class member a "Software Licensing
Agreement" ("SLA"). Apple takes the position that agreement to the SLA is mandatory to use the
25    Devices because they operate only on Apple's iOS. ¶¶276-286. The SLA, which consumers
ostensibly must accept at point of sale, contains a California choice of law provision. *Id*.

26    [6] The representations are similar for the iPads alleged in the CAC. *See e.g.* ¶322 (4th Gen. iPad:
"incredible 10 hours battery life . . . "); *see also* ¶¶324-342.

27    [7] *See e.g.* ¶¶9-14, 18-19, 290 n.11, 295, 298, 302, 305, 311, 315, 318, 323, 326, 328, 331, 334, 337,
343, 345, 365, 382-83, 404-417.

28

PLTFS' MPA IN OPP. TO MOT. TO DISMISS

otherwise regulate the battery power and speed" of the Devices. *Id*. Each Plaintiff alleges that their Device(s) was "defective at point of sale" due to the Defects, and that Apple concealed and "exacerbated" these problems via the falsely represented iOS Updates. *Id*.

        **C.**    **Apple's Materially False Representations And Omissions Cause Consumers To Download The Throttling Updates**

When it released iOS 10.2.1 in January 2017, Apple caused a notification to appear on the Devices advising consumers that iOS 10.2.1 was available for installation. *Id*.[8] Apple represented on the Devices only that the update "includes bug fixes and improves the security of your iPhone or iPad, then hyperlinking to a support document.[9] But iOS 10.2.1 was designed by Apple to throttle the Devices, contrary to what Apple stated about the update including "bug fixes" and "improv[ing]" security for iPhone and iPad. ¶360. Apple made an affirmative, knowing choice to release the update with concealed throttling code, to the Class, while continuing to hide the Defects.[10] As a result, Plaintiffs were not notified that a throttling mechanism of any nature was included in the updates (nor that it was needed in the first instance, due to the Defects), and were deceived into thinking that their devices were no longer capable of providing an adequate level of performance. ¶¶29-272.

In February 2017, Apple released a "Read Me" note, purportedly causing the following statement to be displayed on users' Devices regarding the (already released) software upgrade:  iOS 10.2.1 "also improves power management during peak workloads to avoid unexpected shutdowns on iPhone." ¶400. On or about February 23, 2017, Apple stated that "[w]ith iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone." ¶401. As time would demonstrate, Apple also lied—yet again—in February 2017 by telling the tech media that it had "almost fully cured [the shutdown] issue with

---

[8] Apple pushed the software directly to the Devices. ¶386. It is very difficult, if not impossible, for consumers to avoid downloading an iOS update, including as a result of Apple's "Automatic Downloads" feature. ¶388.

[9] In the hyperlinked document found at https://support.apple.com/en-gb/HT201222 ("HT201222"), Apple states that iOS 10.2.1 is available for: "iPhone 5 and later, iPad 4th generation and later . . . ." HT201222 also states that iOS 11.2 is "available" for these same Devices. Apple repeatedly admits that iOS applies to both iPhones and iPads. *See* ¶¶345, 347, 349, 356-58, 360-61, 362, 366.

[10] As noted above, on December 2, 2017, Apple released iOS 11.2, similarly telling consumers only that the update includes "bug fixes and improvements." ¶363.

iOS 10.2.1." ¶8. While Apple cites its buried "Read Me" notes issued *after* 10.2.1 to claim that consumers were on notice that the Updates contained "power management" and were limited to iPhone, the facts do not support Apple's position. Neither the software update notifications nor the software update release notes made any mention of the throttling effect of "power management" or the real reason why Apple had to throttle the Device:  To mask the Defects. Even software aficionado Poole stated that the impact of 10.2.1 "caught me completely by surprise when I discovered it in December." CAC, Ex. 4 at 341. Poole viewed the "power management" release as not being "tied to" or "mention[ing]" the shutdown issue. *Id.* at 343. As Apple admits it did not provide consumers any choice to install only part of an iOS update, and that until iOS 11.3, consumers also had no ability to turn off the "power management feature." *See* CAC, Ex. 3 at 331.[11]

## V.      LEGAL STANDARDS

Under Rule 8(a), Plaintiffs are not required to plead "detailed factual allegations" to state claims at the pleading stage of litigation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Under Rule 9(b), fraud allegations must "be specific enough to give defendants notice of the particular misconduct . . ." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Knowledge and state of mind "may be alleged generally." Fed. R. Civ. P. 9(b). As to facts within Apple's knowledge, Rule 9(b) standards are "relaxed" prior to discovery. *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1228 (N.D. Cal. 1994)). Similarly, for fraudulent omission claims, Rule 9(b) is relaxed because "a plaintiff cannot plead either the specific time of [an] omission or the place, as he is not alleging an act, but a failure to act." *Washington v. Baenziger*, 673 F. Supp. 1478, 1482 (N.D. Cal. 1987).

A Rule 12(b)(6) motion is "viewed with disfavor." *McDougal v. Cty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991). The Court accepts all allegations in the complaint as true, considers them as a whole, and draws all reasonable inferences in Plaintiffs' favor. *Ass'n for L.A. Deputy Sheriffs v. Cty. of L.A.*, 648 F.3d 986, 991 (9th Cir. 2011). The complaint need not "contain detailed

---

[11] To point to the ongoing problem with Apple's Devices, barely a month before the CAC's filing, Apple's SVP of Software Engineering acknowledged that Apple's "full range of devices," and not just the "older" devices, need to ramp up processor speed for performance when needed, yet ramp down to "preserve battery life." ¶367.

factual allegations," but only "enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009).

## VI.   ARGUMENT

### A.   The Complaint States A Claim For Violation Of The Computer Fraud And Abuse Act, 18 U.S.C. § 1030(a)(5)(A) And (C) (The "CFAA") (Count 1)

Apple tricked consumers into downloading code that impaired the Devices for the purpose of concealing the Defects. ¶¶390-417. Apple's actions violate two separate provisions of the CFAA: the "intentional damage" provision, and the "unauthorized access" provision.

#### 1.   Apple Intentionally Caused Damage to a Protected Computer.[12]

Apple contends that access to the Devices was authorized, and Apple disputes that it intentionally caused damage. MTD at 31-35. Both of Apple's contentions are incorrect. First, a claim for "intentionally causing damage" under subsection  (a)(5)(A) does not require unauthorized *access*; it only requires unauthorized *damage*. Apple conflates "intentional damage" under subsection (a)(5)(A) with an "unauthorized access" under subsection (a)(5)(C). Congress purposefully created separate causes of action, and an  (a)(5)(A) claim does not require unauthorized access. Apple never argues that any Plaintiff consented to *damage*, which would be contrary to the allegations in the CAC, *see* ¶475, and contrary to common sense when the throttling code was concealed until very recently. This Court succinctly explained the distinction just a few months ago. *San Miguel v. HP, Inc.*, 2018 WL 1536766, at *5 (N.D. Cal., Mar. 29, 2018) (holding CFAA adequately pled where defendant knowingly caused damage, noting that authorization is not the issue for a Section 1030(a)(5)(A) claim; *accord*, *U.S. v. Thomas*, 877 F.2d 591, 595 (5th Cir. 2017) (Section 1030(a)(5)(A) "does not also require a lack of authorization to access the computer").

Apple also incorrectly argues that the CAC failed to allege that Apple acted with an "intent"

---

[12] It is unlawful to "knowingly cause the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A). Plaintiffs pled each element. ¶¶385-389, 474 (covering Apple's knowing transmission of code). Second, the Devices are "protected computers" under 18 U.S.C. § 1030(e). *See* ¶ 475. The MTD does not dispute these two statutory elements. *See also* 18 U.S.C. § 1030(e)(1) ("protected computer" defined simply to be a computer used in, or affecting, interstate or foreign commerce); *U.S. v. Kramer*, 631 F.3d 900, 901 (8th Cir. 2011) (finding a cell phone to be a "computer"). Apple used the means of "interstate" commerce. ¶475.

to "damage" the devices. MTD at 34. The CAC repeatedly alleges that Apple purposefully designed code to reduce processor speeds. ¶¶390-417. That is intentional "damage" under any definition, including the statute. *See* 18 U.S.C. § 1030(e)(8) ("the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1067 (N.D. Cal. 2012) (a computer's "slowdown" is impairment).

### 2.   Apple Intentionally Accessed a Protected Computer.

The CFAA also prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss" *See* 18 U.S.C. § 1030(a)(5)(C).[13] Apple does not dispute that it intentionally accessed the Devices. Instead, Apple argues that it was authorized to do so because the code was "voluntarily" installed by Plaintiffs, that no one forced them to upgrade. MTD at 33. Neither the Ninth Circuit nor established principles of common law agree with Apple's definition of "voluntary." First, as pled in the complaint, it is impossible to use any of the Devices without using iOS. ¶¶446-454. Second, no Plaintiff "voluntarily" consented to the throttling software because Apple concealed the true nature of the software at the time consent was requested. ¶¶398-408. Apple's deceit vitiates consent. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1072-73 (9th Cir. 2004) (providing example of the "busybody who gets permission to come inside by posing as a meter reader is a trespasser."). Consent to the entry is not "voluntary." Apple advanced this same "voluntary" argument ten years ago in an unrelated case with similar claims, and it was rejected by the Honorable Judge William James Ware (Ret.), who ruled it was a question of fact as to whether the Plaintiffs had been deceived into consenting to the download, denying Apple's motion to dismiss. *See In re Apple & ATTM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1307 (N.D. Cal. 2008) ("*Apple & ATTM I*") (cases cited by Apple "do not, as a matter of law, foreclose a trespass claim incident to a software download").[14]

---

[13] Apple quibbles with Plaintiffs' citation to CFAA subsection  (a)(5)(A)(iii) in ¶476, arguing that such a section does not exist. MTD at 34. The "intentional access" section was originally subsection (a)(5)(A)(iii), exactly as pled—Congress only recently changed the paragraph numbering (but not the content) of this section of the CFAA. *See* Pub. L. 110-326, 122 Stat. 3560 (changing  (a)(5)(A)(i) to  (a)(5)(A) and changing (a)(5)(A)(iii) to (a)(5)(C)). The CAC at ¶¶475-76 quotes verbatim from the current statute. Apple had sufficient notice of which sections were alleged to have been violated.

[14] Apple cites a later opinion from the same *Apple/AT&T* case, where the Court granted defendants' motion for *summary judgment* when plaintiffs failed to adduce evidence that Apple intentionally

1   Thus, while Apple cites cases rejecting an "unauthorized access" claim when software is

2   voluntarily downloaded (MTD at 33), none of those cases address the question here—whether the

3   download is in fact voluntary. Other cases have addressed this more precise question, and they are

4   a better guide. *See, e.g., EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 582, n.10 (1st Cir.

5   2001) (computer access under the CFAA is not "authorized" if deceptive manner of obtaining

6   consent is "not in line with the reasonable expectations" of the party granting consent); *United States*

7   *v. Morris*, 928 F.2d 504, 510 (2d Cir. 1991) (access deemed "unauthorized" where representation is

8   not "in any way related to[the system's] intended function"); *Desnick v. American Broadcasting*

9   *Cos., Inc.*, 44 F.3d 1345, 1351 (7th Cir. 1995) (no consent "if procured by a misrepresentation or a

10  misleading omission"). As pled in the CAC, Apple's "permission" to access the Devices was void

11  because it was secured by deceit, and, thus, the Plaintiffs did not "voluntarily" consent to upload the

12  throttling software within the meaning of the CFAA.

13              **3.      Apple Misapplies the Economic Loss Doctrine**

14  Apple argues that Plaintiffs are barred from bringing CFAA claims (plus Penal Code 502

15  and Trespass to Chattels claims) under the "Economic Loss Doctrine." MTD at 34-35. Apple

16  misapplies the doctrine. Stated simply by the Ninth Circuit, the doctrine bars duplicative ***tort*** claims

17  for damages when the damages arise solely from a breach of contract. *Giles v. GMAC*, 494 F.3d

18  865, 873 (9th Cir. 2007). A CFAA claim is ***not*** a tort claim, and the source of Plaintiffs' claim is

19  Apple's additional illicit conduct, not a breach of the original contracts with Plaintiffs. Where a

20  claim for money damages arises from conduct separate and apart from the breach of contract, the

21  additional claim can proceed irrespective of the fact that plaintiff and defendant are in privity of

22  contract. *See, e.g., Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 274-75 (Cal. 2004).

23  Apple cites to a superficially broader formulation taken from an earlier case, suggesting that

24  no pecuniary damage claims may proceed beyond a breach of contract claim absent "additional

25  physical injury to person or property." MTD at 34 (citing *Apollo Group v. Avnet, Inc.*, 58 F.3d 477,

26  wrote software for the purpose of "bricking" phones. *In re Apple & ATTM Antitrust Litig.*, 2010 WL
    3521965 (N.D. Cal. Jul. 8, 2010) ("*Apple & ATTM II*"). MTD at 34. The opinion cited above, *Apple*

27  *& ATTM I*, is Judge Ware's opinion two years earlier denying Apple's motion to dismiss at the 12(b)
    stage. *Apple & ATTM II*, is inapplicable to this case because here Apple admitted to designing

28  software with the purpose of throttling phones. There was no such admission in *Apple & ATTM*.

479 (9th Cir. 1995)). But the broad *Apollo Group* formulation from 1995 was later rejected by the Ninth Circuit in 2007. In *Giles,* the court cited to the exact line from *Apollo Group* used in the MTD and held, "Such broad statements are not accurate." *Giles*, 494 F.3d at 875. The *Giles* court then offered a more limited formulation, consistent with *Robinson Helicopter*. *See Giles*, 494 F.3d at 875. No court has rejected CFAA claims by reason of the economic loss doctrine.

## B.   The Complaint States California Consumer Protection Claims (Counts 2-4)

Apple does not separately address Plaintiffs' specific allegations relating to the three California consumer protection statutes (the CLRA, UCL and FAL), electing instead to lump them together and to address only one issue: Apple's deceptive statements and omissions.[15]   Thus, Plaintiffs address Apple's deceptive statements and omissions in this CLRA section, and will address other points under the UCL section below.

### 1.   Plaintiffs State Claims for Misrepresentation by Omission

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).[16]   Conduct that is "likely to mislead a reasonable consumer" violates the CLRA. *Colgan v. Leatherman Tool Grp., Inc*., 135 Cal.App.4th 663, 680 (2006) (citation omitted). Deception under the CLRA is a question of fact rarely appropriate for decision on MTD. *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008).

Omissions are actionable under California consumer protection laws where the omission is "contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Hodsdon v. Mars, Inc*., 891 F.3d 857, 861 (9th Cir. 2018) (citing *Daugherty v. Am. Honda Motor Co*., 144 Cal.App.4th 824 (2006)). As set forth above, Apple engaged in a

---

[15] Apple has waived any additional arguments concerning the CAC claims pursuant to these statutes. *See Bazuaye v. I.N.S*., 79 F.3d 118, 120 (9th Cir. 1996); *Alcala v. Martel*, 2:09–cv–3407 FCD JFM (PC), 2011 WL 2671507, at *19 (E.D. Cal. July 6, 2011).

[16] "Section 1770(a)(9) is the only subsection that requires pleading fraud, since it specifically requires intent to defraud . . ." *In re Sony PS3 "other OS" Litig. v. Sony Comput. Entm't Am., Inc*., 551 F. App'x 916, 921 (9th Cir. 2014). Section 1770(a)(5) concerns representations that the product had a characteristic that it did not actually have, while 1770(a)(7) focuses on the product being of a different quality or grade than represented, 1770(9) on advertising goods with intent not to sell them as advertised, and 1770(16) on representing the subject of a transaction has been supplied in accordance with a previous representation when it has not. ¶486.

multiple-year marketing scheme to convince consumers to purchase Devices by concealing fundamental Defects in those Devices. Not only did Apple fail to disclose the Defects in its marketing (and on the packaging of the Devices), but Apple *also* created a scheme to *further* conceal the Defects via the iOS updates containing undisclosed code that throttled Device speed.

First, Apple had a duty to disclose its material *omissions* regarding the Defects. This duty arises where a defendant (1) has exclusive knowledge of material facts unknown to Plaintiffs, (2) actively conceals such facts or (3) makes a partial representation while suppressing such facts, all of which are alleged here. *Gutierrez v. Carmax Auto Superstores Cal*., 19 Cal.App.5th 1234, 1258 (2018); *In re Apple In-App Purchase Litig*., 855 F.Supp.2d 1030, 1039 (N.D. Cal. 2012). "In the context of the CLRA, a fact is 'material' if a reasonable consumer would deem it important in determining how to act in the transaction at issue." *Gutierrez*, 19 Cal.App.5th at 1258. Materiality is ordinarily a question of fact for the jury. *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009); *Gutierrez*, 19 Cal.App.5th at 1262 (citing *Engalla v. Permanente Med. Grp., Inc*., 15 Cal.4th 951, 977 (1997)). Here, Apple concealed the fundamental Defects in its Devices: A mismatch between the batteries and the software, resulting in Device shut-downs and the loss of functionality. ¶¶2, 390. Worse, when the Devices shut down, they could not be powered back on unless plugged in, contravening the purpose of a *mobile* device. ¶4. Because the loss of all functionality implicates the device's "central functionality," Apple's failure to disclose the Defects are actionable as a "pure omission." *Hodsdon*, 891 F.3d at 863 ("[M]anufacturers have a duty to disclose a defect when it affects the central functionality of a product."); *Weeks v. Google LLC*, 2018 WL 3933398, at *27 (N.D. Cal. Aug. 16, 2018) ("[I]t is manifest that knowledge of a defect that would render a phone unfit for its normal use is material.").

Second, to further conceal the Defects, Apple pushed out iOS updates without informing customers the updates contained secret code designed to throttle the Devices' processors and hide the Defects' symptoms. ¶¶9-12, 402. The alert to download iOS 10.2.1 stated only that the update included "bug fixes" and improvements in Device security. ¶¶359-364, 399. In February 2017, Apple added that in iOS 10.2.1, Apple made "improvements" to avoid unexpected shutdowns on iPhone. ¶¶400-401. However, Apple concealed that the system update was designed to significantly

inhibit the Devices' processing speeds, "effectively turn[ing] the device's performance into that of a device 1-2 generations older." ¶¶400-404, 410-418.

Apple was well aware of the importance of device performance to consumers and marketed its Devices by advertising battery life **and** speed of the Devices (*see, e.g.,* ¶¶288, 290-91, 297, 299, 301-02, 304, 308, 310, 314-15, 319), remaining silent about the Defects and software concealing the Defects.[17] Because battery life, power, and processor speed encompass the Device's "central functionality," Apple had a duty to disclose the Defects and its intentionally throttling Devices to conceal the Defects. *Hodsdon*, 891 F.3d at 862; *c.f. Ehret v. Uber Techs., Inc.*, 68 F. Supp. 3d 1121, 1135 (N.D. Cal. 2014) (noting that "someone who, for example . . . bought a computer advertised at a processor speed of 2ghz but which actually ran at 1.8ghz" would have been defrauded).

Relying on *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141 (9th Cir. 2012), Apple argues it had no duty to disclose because the undisclosed information did not relate to "unreasonable safety hazards." MTD at 24, 26. Apple is wrong. While safety defects do give rise to a duty to disclose, defects that go to the "central functionality" of the product **also** trigger a duty to disclose.[18] In *Hodsdon*, the Ninth Circuit stated, "[R]ecent California cases show that *Wilson's* safety hazard pleading requirement is not necessary in **all** omission cases." 891 F.3d at 864. In *Rutledge v. Hewlett-Packard Co.,* the court rejected the argument that "manufacturers do not have an independent duty to disclose a product defect absent an unreasonable risk of 'physical injury or other safety concerns,'" finding triable issues of fact regarding a failure to disclose a computer defect. 238 Cal.App.4th 1164, 1173 (2015), as modified (Aug. 21, 2015). Other recent cases are in accord.[19]

---

[17] *See In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1014 (N.D. Cal. 2018) ("Defendants promoted the Class Vehicles as such, they believed that such information was material to the consuming public."); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 956, 966 (N.D. Cal. 2014) (stating that "it is odd for Ford to quibble with materiality here when it promoted the MFT system as a desirable component of a vehicle in the first place").

[18] As noted above, the CAC alleges safety hazards exist due to the tendency of certain Devices and/or their batteries to overheat, with several reports of Devices catching fire or causing explosions. Even in the absence of such events, consumers rely on their Devices to communicate in emergencies. Accordingly, shutdowns and throttling of the Devices raise practical, every-day safety issues.

[19] *See In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *12-13 (N.D. Cal. Oct. 27, 2016) (rejecting argument that duty to disclose was limited to defects relating to safety concerns); *Collins v. eMachines, Inc.*, 202 Cal.App.4th 249, 258 (2011) (duty to disclose non-dangerous computer disk

Apple also argues there is no duty to disclose because it "forthrightly" disclosed in its warranty that batteries are "consumable parts" that may "diminish over time." MTD at 24-26. Even assuming that the Court considers Apple's warranty at the pleading stage, *see* RJN Ex. A, Apple's argument disregards the *actual terms of the warranty*. *See* Objection to MTD. Further, Apple's argument ignores allegations that the concealed Defects were not limited to normal decay of batteries but involved a fundamental design flaw—the mismatch between the Devices' hardware and the iOS software that affected the central functionality of the device. ¶¶9, 370. Unlike *Williams v. Yamaha Motor Co*., 851 F.3d 1015, 1028 (9th Cir. 2017) this case does not involve "premature but otherwise normal wear and tear."[20] Plaintiffs allege that the Devices contained material Defects that affected the central functionality ***at the point of sale***, which Apple failed to disclose (and further concealed through additional misrepresentations).[21] *E.g.*, ¶46 ("Devices [were] defective at the point of sale").

Apple next argues that Plaintiffs' claims should fail because they merely go to "wear and tear" and involve non-safety related defects that accrue *after* the warranty period on the Devices expires. MTD at 25-26. Apple is correct that "[a]ll parts will wear out sooner or later" (*id.* at 25); however, that is not what Plaintiffs' case is about. Here, Plaintiffs allege a defect that affects the central functionality of the device that existed at the time of purchase. *See Rutledge*, 238 Cal.App.4th at 1175 (the appropriate UCL inquiry is regarding the defendant's *conduct in failing to disclose* the

---

controller defect that was "central to the function of a computer as a computer"); *In re Carrier IQ, Inc.*, 78 F.Supp.3d 1051, 1112-15 (N.D. Cal. 2015) (denying motion to dismiss where defendant had exclusive knowledge of intrusive software); *San Miguel*, 2018 WL 1536766 (alleged omission sufficient to state fraud by omission under the FAL, CLRA and UCL).

[20] Apple's New Jersey cases are similarly inapposite. MTD at 25; *Mickens v. Ford Motor Co*., 2015 WL 5310755, at *11 (D.N.J. Sept. 10, 2015) (summary judgment decision for corrosion claims not impacting "mechanical quality"). In contrast, the Defects here indisputably affected the "mechanical quality" of the devices. *Tatum v. Chrysler Grp. LLC*., 2011 WL 1253847, at *3, 18 (D.N.J. Mar. 28, 2011) ("the Court *declines* to dismiss Count II, violation of the [CLRA]" finding "it is a question better suited to a factually developed record").

[21] *See also* ¶¶2, 9, 20, 289-92, 297-98, 301-02, 304-05, 310-11, 314-15, 317-18, 322-23, 325-26, 327-28, 330-31, 333-37, 342-43, 369, 398-408, 467-72. Apple represents that iPhone batteries are "designed to retain up to 80% of [their]  original capacity at 500 charge cycles," (MTD at 25; ¶¶382-383); however, Apple did not at any time inform consumers that the Devices could not deliver enough power to run the processors over the lifetime of the battery to keep up with the demanding software consumers were *required* to use on the Devices. Apple's representation concerning iPads (80% of original capacity at 1000 charge cycles) is similarly false. ¶417, n.60.

fact(s), not the "argument that the expiration of the warranty period precludes a claim for fraudulent concealment under the UCL[ ]".); *cf. Guttierez*, 19 Cal.App.5th at 1239-40 (failure to disclose brake light switch recall actionable after warranty period).   That Apple determined how to hide the Defects—with clever software updates that throttled Device performance—should not be a basis to punish the consumers and prevent them from seeking relief under consumer protection statutes. Courts have sustained CLRA causes of action where defendants try to conceal defects by implementing "quick fixes"—preventing consumers from understanding the true nature of the defect within a warranty period. *See, e.g., Aguila v. Gen. Motors LLC*, 2013 WL 3872502, at *2, 7 (E.D. Cal. July 25, 2013) (denying motion to dismiss where plaintiff alleged manufacturer replaced a defective part with a similarly defective part to prevent a defect from manifesting itself within the product's warranty period).[22]   Here, Plaintiffs allege that Apple employed a strategy to hide the Defects in its Devices, and Courts have previously held that defendants cannot escape liability merely because that strategy of concealment sometimes works.

### 2.   Plaintiffs' Misrepresentation Claims Also Survive the Pleading Stage

Apple also argues that Plaintiffs failed to assert an affirmative misrepresentation claim (MTD at 18-23). As alleged in the CAC, in addition to concealing the Defects and throttling, Apple made numerous actionable materially false and misleading statements about the Devices.

#### a.   Apple's Misleading Marketing Representations are Actionable

Plaintiffs also plead a duty to disclose because Apple made partial representations in its marketing materials that were likely to mislead a reasonable consumer. *See Gutierrez*, 19 Cal.App.5th at 1262–63. Apple repeatedly emphasized battery power designed to keep pace with ever-improving processor "chips" and features loaded onto the Devices. ¶¶288-342. However, Apple failed to disclose that due to the Defects, the Devices would shut down at random intervals, even though the battery indicated that it was still charged. ¶¶390, 395. Nor did Apple disclose that

---

[22] *Compare Keegan v. Am. Honda Motor Co.*, 838 F.Supp.2d 929, 935 (C.D. Cal. 2012) ("Plaintiffs allege that defendants know the recommended modification does not fix the defect and that it will only 'prolong the amount of time that will elapse' before the defect manifests again.") *with* CAC ¶9 (Apple did not fix the Defect—it instead concealed it by secretly throttling the performance to reduce the number of unexpected shutdowns); ¶¶15, 398-408, and 483.

to mitigate the "mismatch," it would throttle the processors to conceal the Defects. Consumers expect their Devices will operate as advertised and intended upon purchase. ¶¶29-273, 448.[23]

Apple argues its deceptive statements about the speed of its processor chips and effectiveness of its power management were mere puffery. MTD at 18-19, 29. California's consumer protection statutes prohibit not only advertising that "which is false, but also advertising [that] which [ ] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 119 (2002). Even puffery may "contribute[]. . . to the deceptive context . . . as a whole." *Williams*, 552 F.3d at 939 n.3 (declining to give defendant the "benefit of the doubt" that mere puffery could not deceive a reasonable consumer). "A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance." *Demetriades v. Yelp, Inc.*, 228 Cal.App.4th 294, 311 (2014) (citing *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008)). "The question of whether a manufacturer's representation about a product is specific, and was relied upon by a consumer should be decided by a trier of fact." *Rutledge*, 238 Cal.App.4th at 1176.

Apple's misrepresentations are actionable as alleged. In *In re Nexus 6P Products Liab. Litig.*, Case No. 17-cv-02195-BLF, 293 F.Supp.3d 888 (2018), the court found that Google's statements that a user can "get up to seven hours of use after only ten minutes of charging" was "directly contrary to Plaintiffs' allegations about sudden shutdowns from battery failures" and "not properly dismissed as inactionable puffery." *Nexus 6P*, 293 F.Supp.3d at 937-38. Here, Apple's misrepresentations that the Devices would deliver "even better battery life. With up to twice the CPU and graphics performance" (¶291), "[p]erformance and graphics up to twice as fast. With battery life to spare." (¶294), and that "even at its accelerated speed, iPhone 5 has more than twice enough battery power to last throughout the day—up to 8 hours of browsing on a cellular connection, up to 8 hours of talk time, and up to 10 hours of video playback time" (*id.*), are specific factual

---

[23] *Kowalsky v. Hewlett-Packard Co.*, 771 F.Supp.2d 1138, 1149 (N.D. Cal. 2010) ("Where a defendant's representations generate reasonable expectations that a product will have qualities or capabilities it does not have, courts have found that those representations may be likely to deceive."); *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.App.4th 1351, 1362 (2003) (triable issue as to whether statement that consumer would receive 50 channels was deceptive where all 50 channels were not available at all times, contrary to consumer's expectations).

1   representations of the Devices' ability to continue functioning without shutting down while

2   performing intended tasks.[24]   These statements are measurable, based on numerical factual

3   assertions, designed to induce reasonable consumers to make the purchase. Apple's consistent

4   misrepresentations in its multi-year marketing campaign are directly contrary to the concealed

5   Defects and the actions taken by Apple to throttle performance to prevent unexpected shutdowns.

6   *Nexus 6P*, 293 F.Supp.3d at 937-38.[25]

7              **b.      The CAC Adequately Alleges That Plaintiffs and Reasonable
                         Consumers Relied Upon Apple's Misrepresentations**

8

9           Reliance pursuant to the CLRA (and for UCL and FAL) is the "reasonable consumer" test,

10   which requires a plaintiff to show members of the public are likely to be deceived. *Williams,* 552

11   F.3d at 938. Whether a business practice is deceptive is a question of fact, not appropriate at the

12   pleading stage. *Linear Tech. Corp. v. Applied Materials, Inc*., 152 Cal.App.4th 115, 134 (2007).

13   Reliance is presumed where a misrepresentation is material. *See Friedman v. AARP, Inc*., 855

14   F.Supp.3d 1047, 1055-56 (9th Cir. May 3, 2017) (*citing Chapman v. Skype, Inc*., 220 Cal.App.4th

15   217, (2013) (analyzing reliance and materiality for UCL claims). In the case of material omissions,

16   reliance is also presumed. *Corson v. Toyota Motor Sales, U.S.A., Inc*., 2013 WL 10068136, at *15

17   (C.D. Cal. July 18, 2013) ("Plaintiffs have sufficiently alleged material omissions and reliance is

18   presumed."). Each of the alleged misrepresentations and omissions by Apple were material.

19           In addition, a plaintiff "is not required to necessarily plead and prove individualized reliance

20   on specific misrepresentations or false statements, where . . . those misrepresentations and false

21   statements were part of an extensive and long-term advertising campaign." *In re Tobacco II Cases*,

---

22   [24] *See also,* ¶297 ("[A]lmost everything you do on iPhone 5s is faster and better than ever, from
23   launching apps and editing photos to playing graphic-intensive games—all while delivering great
     battery life."); ¶304 (advertising faster performance, sustained performance, and great battery life).

24   [25] *See also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.
     Liab. Litig*., 754 F.Supp.2d 1145, 1177 (C.D. Cal. 2010) ("[A]llegations about product safety are
25   more than "mere puffery" that Toyota's cars were superior to others. They constitute a campaign by
     Toyota in which it represented itself as prioritizing (even 'obsessing over') safety."); *EcoDiesel*, 295
26   F.Supp.3d at 1006 ("statements placed in an ad knowing or intending that they are of the type that
     will affect the consumer's judgment, are not puffery, but rather [are] actionable representations.");
27   *In re NJOY Consumer Class Action Litig.*, 2014 U.S. Dist. LEXIS 196586, at *30 (C.D. Cal. May
     27, 2014) (finding "implied misrepresentation not so vague or general that it constitutes mere
28   puffery" where it "concern[ed] a product characteristic of importance to consumers").

46 Cal.4th 298, 328 (2009). Again, Plaintiffs allege a multiple year, consistent marketing scheme. This Court has stated that it "accepts that under appropriate factual circumstances, such as those presented in *Tobacco II*, a representative consumer plaintiff may not be able to pinpoint the exact portion of a long-standing, widespread advertising campaign he or she relied on when purchasing a product." *Yastrab v. Apple Inc.*, 173 F.Supp.3d 972, 980 (N.D. Cal. Mar. 25, 2016).

In *Yastrab*, the Court found that the plaintiffs did not "particularly explain[] what was false about Apple's marketing materials and why such materials were false." *Id*. The *Yastrab* plaintiffs also complained of matters external to the devices themselves. *Id*. at 978. Here, not only do Plaintiffs allege Apple's long-term, consistent marketing scheme across all Devices and iOS, but also that the marketing scheme tied directly to the Devices and Defects, and the Updates and iOS system on which the Devices run. *See supra* Section IV. These detailed allegations, particularly when combined with each Plaintiffs' affirmation that his or her Device(s) did not "operate as promised in Apple's advertisements, representations and information publicly available in the marketplace" (*see e.g.*, ¶30), suffices to allege reliance on the misrepresentations pursuant to *Tobacco II* and *Yastrab*. Further, with regard to Apple's fraudulent omissions, reliance is satisfied, as Plaintiffs allege that "none of the packaging" for their Devices revealed any Defects. *See e.g.* ¶¶29-272, 290, n.11, 321. Omissions from packaging permits an inference of reliance on a class-wide basis. *See e.g., Davidson v. Apple, Inc.*, 2018 U.S. Dist. LEXIS 137707, at *47-*54 (N.D. Cal. May 8, 2018).

Finally, "[a] plaintiff may show reliance "by simply proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Daniel v. Ford Motor Co*., 806 F.3d 1217, 1225 (9th Cir. 2015) (citing *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993)).[26] Here, the Complaint satisfies this standard, alleging as to each Plaintiff: "If [Plaintiff] had been told of these Defects, Battery Issues, and the deceptive manner in which Apple would damage the Device after sale, [Plaintiff] would not have purchased the Device, or would have paid substantially less for it." ¶¶29–272. Apple disagrees, arguing there is no showing that the

---

[26] *See also Gutierrez*, 19 Cal.App.5th at 1238-39 ("As to the elements of reliance and the causation of harm, Gutierrez alleged she would not have purchased the vehicle if she had known its true condition, including recall history. . . . this allegation adequately states Gutierrez suffered "any damage" as that term is used in the CLRA.").

disclosure of any additional information would have changed Plaintiffs' behavior, and that "the only inference from the CAC's allegations is that Plaintiffs would have purchased the phones whether these effects were disclosed or not," because it is better for a device to be throttled than shutdown. MTD at 28. This argument improperly asks the Court to make factual assessments and draw inferences against Plaintiffs (which it cannot). Further, "[t]hat one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Daniel*, 806 F.3d at 1225. Moreover, if the truth had been revealed, consumers had alternatives because other manufacturers had "not experienced the same problems or resorted to throttling" performance (¶416), and Apple was "experiencing increased competition" at the time (¶426).

The CAC also adequately alleges a "method" by which Plaintiffs would have been made aware of the required disclosure. Apple delivers "Software Update" notifications directly to the Devices describing the iOS updates, which notifications failed to disclose that the update contained any code or method that would "smooth", "throttle" or otherwise degrade or slow the performance of their Devices. ¶¶388, 399, 404. Had Apple "been transparent," Plaintiffs would have received the message. ¶¶398-99. Moreover, "[g]iven the importance of the [the alleged] defect, had [Apple] chosen to disclose it to prospective buyers, presumably Plaintiff, as a member of the buying public, would have become aware of the defect in the course of making his purchasing decision*." In re Carrier IQ, Inc.,* 78 F.Supp.3d at 1114; *Doyle v. Chrysler Grp., LLC*, 2014 WL 3361770, *6 (C.D. Cal. July 3, 2014) ("[B]ecause the alleged omission here is material, it is presumed Doyle would have been aware of any disclosure unless Chrysler rebuts the presumption."). Additionally, as in *Carrier IQ*, the Complaint "contains extensive allegations regarding the public outcry regarding the Defect and the iOS update once its existence became public knowledge"—including Congressional proceedings, SEC and DOJ investigations, and international regulatory proceedings. ¶¶429-445. "The intensity of their outcry underscores the materiality of the alleged omission." *In re Carrier IQ, Inc.,* 78 F.Supp.3d at 1115-15.

1

     **c.**   **Plaintiffs Adequately Allege Apple's Knowledge of the Fraud**

2

   Rule 9(b) does not apply to allegations of knowledge and intent. Fed. R. Civ. P. 9(b). Thus,

3

Plaintiffs only need to allege facts raising "a plausible inference that Defendant knew of the [] Defect

4

at the time of the sale." *Avedisian v. Mercedes-Benz USA, LLC*, 2013 WL 2285237, at *7 (C.D. Cal.

5

May 22, 2013). The CAC unequivocally alleges a plausible inference that Apple knew about the

6

Defects and knowingly caused throttling of the Devices.

7

   On *December 20, 2017*, Apple *admitted* that the Updates included a throttling "feature" to

8

slow down older iPhone models. ¶414. These Updates were *designed* to surreptitiously deliver the

9

throttling software to hundreds of millions of devices under the false guise of a seemingly routine

10

operating system update. ¶¶2, 398. In the *Autumn of 2016*, complaints about unexplained shutdowns

11

proliferated. ¶2. For example, the Tony Fadell Twitter string, referenced at ¶3, which is participated

12

in by **@AppleSupport**, includes 23 complaints about the shutdown problem from November and

13

December, including:

14
- Anyone else's iPhone shutting down with ~30% battery left?
- It's happening to me every other day - especially while using any mapping app.

15
 Have to always carry an external battery to revive it
- I've had the same problem since early 2016. . .

16
- Yes, happening to me nearly twice a day since iOS10 upgrade. Total crap.
 **@AppleSupport** can you please advise??

17
- Got increasingly bad after iOS 10 release, returned to apple store when would
 shutdown @30% consistently

18
- I live in Norway and this happens to both me and my wife's iPhone 6S . . .
- **@tim_cook** please sort this crippling issue out!

19

20

   Straite Decl., Ex. 1. As alleged, reports of unexplained shutdowns surfaced *in 2015*. ¶2.

21

Further supporting an inference of knowledge are allegations of Apple's dependence on the

22

"success" of the Devices in that they represented at least 70% of Apple's overall revenue for at least

23

fiscal years 2013 to 2017 (nearly $800 billion) (¶16); Apple's financial, competitive and business

24

motives (¶¶15-17, 416-423); Apple's consistent hyper-focus on processing speed and battery power

25

in its marketing campaigns (*e.g.*, ¶¶288, 290-91, 297, 299, 301-02, 304, 308, 310, 314-15, 319); and

26

that electronics manufacturers like Apple are aware that batteries must be designed to meet the

27

28

processor's peak power demand (¶392).[27]  A plausible inference of Apple's knowledge is also

supported by the materiality of the Defects, which rendered the iPhones inoperable, and the scale of

the damage to the Devices. ¶2 (affecting hundreds of millions of devices across the globe). At the

pleading stage, these allegations establish a plausible inference that Apple knew about the Defects.

*Huntzinger v. Aqua Lung Am., Inc.*, 2015 WL 8664284 , at *4 (S.D. Cal. Dec. 10, 2015) (factual

allegations of consumer complaints and repairs sufficient to support an inference that the Defendant

knew of the defects); *Day v. AT & T Corp.*, 74 Cal.Rptr.2d 55, 60 (1995) ("[U]nless we can say as

a matter of law that contrary to the complaint's allegations, members of the public were not likely

to be deceived . . . we must hold that [plaintiffs] stated a cause of action."). For the foregoing reasons,

the Court should deny the MTD as to the CLRA, UCL and FAL claims.

## C. The CAC States A Claim For Violation Of Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") (Count 3)

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair,

deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "The scope of the

UCL is quite broad." *McKell v. Wash. Mut. Inc.*, 49 Cal.Rptr.3d 227, 238 (2006). "What

constitutes . . . [an] unfair or fraudulent business practice under any given set of circumstances is a

question of fact[.]" *People v. Toomey*, 157 Cal.App.3d 1, 16 (1984). Plaintiffs allege that Apple

engaged in unfair competition that was "unlawful, unfair or fraudulent," in violation of the UCL.

### 1. Apple's Conduct Was Unlawful Under The UCL

Section 17200's "unlawful" prong "borrows violations of other laws … and makes those

unlawful practices actionable under the UCL." *Lazar v. Hertz Corp.*, 69 Cal.App.4th 1494, 1505

(1999). "'[V]irtually any law or regulation—federal or state, statutory or common law—can serve

---

[27] Thus, the CAC does not provide "[r]andom anecdotal examples of disgruntled customers" as were at issue in *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 974 n.9 (N.D. Cal. 2008). Apple's other cases are similarly distinguishable. *Rice v. Sunbeam Prod., Inc.*, 2013 WL 146270, at *6 (C.D. Cal. Jan. 7, 2013) (relying exclusively on "mere consumer complaints"); *Berenblat v. Apple Inc.*, 2010 WL 1460297, at *9 (N.D. Cal. Apr. 9, 2010) (complaints on Apple's website); *Wilson*, 668 F.3d at 1147 (conclusory allegations and undated complaints); *Resnick v. Hyundai Motor Am., Inc.*, 2017 WL 1531192, at *16-17 (C.D. Cal. Apr. 13, 2017) (unrelated website); *McQueen v. BMW of N. Am., LLC*, 2014 WL 656619, at *4 (D.N.J. Feb. 20, 2014) (fewer than 10 complaints). *Munch v. Sears Roebuck & Co.*; 2007 WL 2461660, at *3 (N.D. Ill. Aug. 27, 2007) (undefined number of repairs and complaints). *Glass v. BMW of N. Am., LLC*, WL 6887721 (D.N.J. Dec. 29, 2011) did not involve a California consumer protection statute.

1    as [a] predicate for a … [section] 17200 'unlawful' violation.'" *Klein v. Chevron U.S.A., Inc.*, 202

2    Cal.App.4th 1342, 1383-84 (2012) (citation omitted). Here, Plaintiffs' UCL claim is viable because

3    Plaintiffs state CFAA, CLRA, FAL, CDAFA, and trespass claims, among others.

4                    **2.    Apple's Practices Were Unfair Under The UCL**

5           Apple does not even attempt to contest the viability of Plaintiffs' claim under the "unfair"

6    prong of the UCL, except with respect to Apple's misstatements. "Under the unfairness prong of the

7    UCL, 'a practice may be deemed unfair even if not specifically proscribed by some other law.'"

8    *Carrier IQ*, 78 F.Supp.3d at 1115.  California courts have articulated three tests defining "unfair"—

9    the "tethering test," a balancing test, and the three-part test set forth in § 5 of the Federal Trade

10   Commission Act. *Id*. As stated above, the MTD does not contest the sufficiency of Plaintiffs'

11   allegations under any of these tests. Apple has waived such arguments.

12          Apple caused consumers substantial harm in violation of the UCL by marketing and selling

13   defective Devices, concealing further Defects, and urging customers to install what appeared to be

14   routine iOS updates to severely throttle the Devices—depriving consumers of the promised

15   performance of the Devices at the time of purchase and thereafter. ¶¶497, 501 (pleading that utility

16   of "upgrading" iOS was outweighed by damage to functionality), 509. Plaintiffs could not

17   reasonably avoid Apple's failures to disclose the Defects or the throttling of their Devices upon

18   downloading the iOS update. ¶388-89. Apple engaged in this conduct to gain an unfair commercial

19   advantage over its competitors, seeking to avoid public knowledge of the Defects in its Devices to

20   avoid damage to its sales and reputation. ¶502.

21          For the reasons set forth *supra,* Plaintiffs sufficiently have alleged materially false and

22   misleading statements and omissions that are likely to deceive a reasonable consumer in violation

23   of the FAL, UCL and CLRA. In addition, the MTD must be denied because Apple does not dispute

24   Plaintiffs' other allegations that it violated the UCL's unfair prong. ¶497. Nor does Apple deny that

25   these unfair business practices had anticompetitive effects in violation of the UCL. ¶502 ("Apple

26   engaged in this conduct to gain an unfair commercial advantage over its competitors"); *see also*

27   ¶457-27 (describing Apple's business motives based on increased competition in the smartphone

28

market); ¶609 ("Apple's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor devices.").

### 3.   Apple's Practices Were Fraudulent Under the UCL

"A fraudulent business practice is one which is likely to deceive the public." *McKell*, 142 Cal.App.4th at 1471. "It may be based on representations to the public which are untrue, and "'also those which may be accurate on some level, but will nonetheless tend to mislead or deceive. … A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under'" the UCL." *Id.* The determination as to whether a business practice is deceptive is based on the likely effect such practice would have on a reasonable consumer. *Id.* (citing *Lavie v. Procter & Gamble Co.* 105 Cal.App.4th 496, 507 (2003)). As with the "unfairness" prong, plaintiff's "burden of proof is modest." *Friedman v. AARP, Inc.*, 855 F. 3d 1047, 1055 (9th Cir. 2017) (reversing Rule 12(b)(6) dismissal of UCL claim).

Plaintiffs sufficiently have alleged materially false and misleading statements and omissions that are likely to deceive a reasonable consumer in violation of the FAL, UCL and CLRA. Accordingly, the Court should deny the MTD the UCL claim.[28]

### D.   The CAC States A Claim For Violation Of California's Computer Data Access And Fraud Act ("CDAFA" Or "Section 502") (Count 5)

Penal Code Section 502 (the CDAFA) is the California state analogue to the CFAA. Section 502(c)(5) is the corollary to the CFAA's "intentional *damage*" claim (discussed *supra*), permitting an action against one who "[k]nowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network." ¶528 (quoting subsection (c)(5)). Similarly, Section 502(c)(4) is the corollary to the CFAA's "unauthorized *access*" claim, permitting an action against one who "[k]nowingly accesses and without permission adds, alters, damages, deletes, or

---

[28] The CAC also states a claim under California's False Advertising Law ("FAL") (Count 4). To do so, a plaintiff need "only to show that members of the public are likely to be deceived." *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 119 (Cal. 2002).  Plaintiffs have sufficiently alleged materially false and misleading statements and omissions likely to deceive a reasonable consumer. *See supra* § V.C.

destroys any data, computer software, or computer programs which reside or exist internal or external to a computer." As discussed more below, "unauthorized access" under the CFAA and "knowing access" under the CDAFA are different, but otherwise the statutes are materially the same for purposes of this litigation. *See generally Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010). Plaintiffs thus allege all elements of a claim under both 502(c)(4) and (c)(5).

Apple says it did not intentionally damage any Device. But Apple's argument is contrary to the CAC and seeks an inappropriate factual determination on this motion, as discussed in the CFAA section *supra*. Apple also argues that it cannot be liable under the CDAFA unless it circumvented technical or "code-based barriers" to gain access to the Devices—"unauthorized access" requires overcoming a technical barrier, according to Apple. MTD at 34. Apple is incorrect for two reasons.

The "intentional damage" claim (Section 502(c)(5)), unauthorized *access* is simply not an element, as made clear by the California Court of Appeals four years ago, bringing the CDAFA into line with the CFAA on this point. *People v. Childs*, 220 Cal.App.4th 1079, 1102 (2013). Second, with respect to the "knowing access" claim under Section 502(c)(4), older cases cited in the MTD requiring "technical circumvention" are no longer good law. In 2016, in the context of a related Section 502(c)(2) claim, the Ninth Circuit held that California's "knowing access" is not the same as the CFAA's "unauthorized access." *U.S. v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2016) ("The statutes are different. In contrast to the CFAA, the California statute does not require unauthorized access. It merely requires knowing access."); *accord, San Miguel*, 2018 WL 1536766, at *6-7. And, of course, one can "knowingly" access without circumventing technical barriers. *See also NovelPoster v. Javitch Canfield Grp.*, 140 F.Supp.3d 954, 967 (N.D. Cal. 2014) (presaging *Christensen* and rejecting Defendant's argument regarding "circumvention of technical barriers").[29]

### E.   The Complaint States A Claim For Trespass Tto Chattels (Count 6)

Under California law, trespass to chattels "lies where an intentional interference with the

---

[29] Apple also seeks to dismiss the Section 502 claim because the CAC did not specify subsections. MTD at 34. Rule 8(a) does not require Plaintiffs to do so. *See, e.g., P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore LLC*, 2007 WL 708978, at *8 (D.N.J. Mar. 5, 2007). Apple cites to *Gonzales v. Uber Techs., Inc.*, 305 F.Supp.3d, 1078, 1090 (N.D. Cal. 2018), but *Gonzales* dealt with the exact opposite situation: The plaintiff identified the specific subsections of the statute but failed to allege facts to support them. As such, *Gonzales* does not apply here.

possession of personal property has proximately caused injury." *Grace v. Apple Inc.*, 2017 WL 3232464, at *11 (N.D. Cal. July 28, 2017) (quoting *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350-51 (2003)). A claim for trespass does not require full conversion or disabling of the entire Device, and injury is adequately alleged where the plaintiff pleads 'that the purported trespass: (1) caused physical damage to the personal property, (2) impaired the condition, quality, or value of the personal property, or (3) deprived plaintiff of the use of personal property for a substantial time.'" *Id.* (quoting *Fields v. Wise Media, LLC*, 2013 WL 5340490, at *4 (N.D. Cal. Sept. 24, 2013)).

Plaintiffs sufficiently allege a claim for trespass to chattels under California law. Plaintiffs allege that the Updates secretly and intentionally slowed the Devices (¶¶9-12) but failed to inform consumers that they were doing so. Instead, the Updates only informed users that they "include bug fixes and improve[ment]s [to] the security of your iPhone or iPad," ¶¶359-364, and "improve[] power management during peak workloads to avoid unexpected shutdowns on iPhone." ¶¶400-401. In actuality, the Updates impaired the Devices by reducing their performance, making them run slower (by 50%), and draining the Devices' battery. ¶¶398-417. Such significant reduction in performance is sufficient to sustain a trespass claim. *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *9 (complaint sufficiently alleged trespass to chattels claim and distinguishing *iPhone Application* because the plaintiff alleged that Lenovo's actions "significantly degraded the performance of the Lenovo computers," such as by slowing "internet upload speeds by as much as 55 percent" and causing webpages to not load); *Grace*, 2017 WL 3232464, at *11 (loss of "FaceTime" feature on iPhone is sufficient injury to sustain trespass claim).

Trespass is similar to CFAA and 502, which are addressed *supra*. As with those claims, Apple asserts a consent defense: because Plaintiffs "voluntarily" downloaded its software, there can be no trespass to chattels claim. MTD at 31-32. But as noted above, the cases cited by Apple "do not, as a matter of law, foreclose a trespass claim incident to a software download." *Apple & ATTM I*, 596 F. Supp. 2d at 1307. Plaintiffs allege that the software downloads were ***not*** voluntary, and Apple's defense prematurely asks this Court to resolve questions of fact at the pleading stage.

Furthermore, even if the software downloads were deemed "voluntary" and "authorized," Apple can still be liable in trespass if Apple exceeded the scope of its authorized access to the

Devices. "Consent can be limited by its scope, however, and 'creates a privilege to [enter] only in so far as [a] condition or restriction is complied with.'" *Id.* (quoting *Civil Western Corp.*, 66 Cal.App.3d at 17). In the digital context, courts often find trespass when access is granted but the scope of consent is exceeded. *See, e.g., San Miguel*, 2018 WL 1536766, at *7-8 (allowing trespass claims to proceed against HP for software exceeding authorized scope of consent); *accord, City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F.Supp.1273, 1281 (E.D.N.Y. 1995) ("One who uses a chattel with the consent of another is subject to liability in trespass for any harm to the chattel which is caused by or occurs in the course of any use exceeding the consent, even though such use is not a conversion.") (citing Restatement (Second) of Torts § 256, at 488 (1965)).

**F.**   **The Court Cannot Close Its Doors To The Non-U.S. Plaintiffs**

Apple asks this Court to narrow the "geographic reach of this action," MTD, Notice of Motion at 1. According to Apple, "this Court lacks jurisdiction over the Non-U.S. Plaintiffs" and also lacks "jurisdiction to adjudicate the claims," MTD at 7, suggesting challenges to personal and subject matter jurisdiction.  Yet Apple does not use either term, and this is not a Rule 12(b)(1) motion in any event. The MTD is only brought under Rule 12(b)(6).  Apple's basis for relief is not stated.

It is also unclear who or what Apple seeks to dismiss. Apple alternatively raises arguments based on residence of the plaintiff <u>now</u>, or location of purchase in the <u>past</u>. MTD at 8. But clarity is required. For example, plaintiff Kaixuan Ni is now a permanent resident of the United States, teaching in California. ¶249. Yet he purchased his Device in China, and he is a Chinese citizen. *See also* ¶69 (purchase in Colorado; current residence in France). Apple also needlessly creates further confusion in its references to jurisdiction over "*absent* foreign *plaintiffs*" and Rule 23. MTD at 8. Plaintiffs cannot be "absent" and thus presumably Apple means putative *class member*, implying (as Plaintiffs suspect) that Apple's true mission is to artificially and improperly hem in the contours of an as-yet-unfiled class action motion without the benefit of a developed record.

Despite the MTD's deficiencies, Plaintiffs respond to ***all*** possible permutations while preserving objections as noted above. *See* Objections, *supra*. But in substance, plaintiffs respectfully ask the Court to keep it simple: 1) the Court has personal jurisdiction over all who voluntarily avail themselves of this Court, regardless of nationality; 2) all Apple customers ***in this case*** are protected

by California and federal law; and 3) it is premature to oppose class certification before the certification motion is filed.

### 1.   This Court Has Personal Jurisdiction over All Named Plaintiffs

Personal jurisdiction is a personal right and can be waived—the Court has personal jurisdiction over a plaintiff when he or she chooses to submit the Court's jurisdiction. Plaintiffs of any nationality are "entitled to sue . . . American corporations in American courts." *Abad v. Bayer Corp*. 563 F.3d 663, 666 (7th Cir. 2009) (Posner, J.). "[A] foreign plaintiff has the same rights in American court as an American citizen has . . . [D]iscrimination against foreign litigants should be unthinkable in this cosmopolitan age of commercial globalization." *Id*. And it also does not matter that the plaintiff sustained injury abroad or that some evidence might be located there—the Court still has *jurisdiction* over plaintiffs who seek it. *Van Staphorst v. Maryland,* 2 U.S. 401 (1791) (first case docketed in Supreme Court brought by foreign plaintiffs with evidence located abroad).

### 2.   This Court Has Subject Matter Jurisdiction over all Claims

Apple also argues that this Court "lacks jurisdiction" over the foreign plaintiffs' *claims*. MTD at 7. But this Court has jurisdiction to hear claims for violations of federal law, pursuant to 28 U.S.C. § 1331, and all other claims pursuant to §§ 1332(d)(2) and 1367(a), no matter who brings them. If Apple is arguing that California or federal law do not reach extraterritorially, that is a choice of law question and does not implicate the "tribunal's power to hear the case." *Morrison v. National Australia Bank, Ltd*., 561 U.S. 247, 254 (2010). It is a "threshold error" to consider the extraterritorial reach of a law as a jurisdictional issue. *Id*. at 253. To the extent Apple advances *forum non conveniens* arguments (for the British plaintiff) or *comity* arguments (for the British, Colombian and Canadian plaintiffs), those are rules of abstention discussed below.

### 3.   CAC Counts 1 through 6 Apply Extraterritorially

#### a.   Apple Required All Plaintiffs (other than in the UK) to Agree to the Application of California Law to their Claims

Apple requires consumers to use iOS to operate Apple Devices. ¶¶ 446-454, CAC Ex. 5 at 1, CAC Ex. 6 at 1. Unless consumers use Apple's iOS, the Devices are little more than expensive paperweights. Accordingly, with each purchase of a Device, Apple purports to bind consumers to a

Software License Agreement (the "SLA," CAC Exs. 5-6) as a condition of using iOS—the very software alleged to cause injury to Plaintiffs. The SLA is governed by California law on a global basis, except in the United Kingdom. CAC, Ex. 5, ¶12. The SLA also grants users the right to download iOS updates, *id*. ¶2(b), and these updates further injured plaintiffs. There should be no dispute that Plaintiffs' claims arising out of downloading and using iOS are closely related to the SLA that governs use of iOS. Nevertheless, Apple disputes application of its California clause.

First, Apple argues the SLA's governing law clause only applies to claims for breach of the SLA itself, or at Apple puts it, "a license dispute." Apple's position is known by scholars as the "canon *against* non-contractual claims" and it finds support in a few states. *See generally* John F. Coyle, The Canons of Construction for Choice-of-Law Clauses, 92 Wash. L. Rev. 631 (2017) ("The Canons"). But there is an opposite canon (the "canon *in favor of* non-contractual claims") used by the California Supreme Court, applying a choice-of-law clause not just for a breach of the agreement but also for any dispute "arising out of the transaction or relationship." *Nedlloyd Lines B.V. v. Superior Court*, 834 P.2d 1148 (Cal. 1992); *see also* The Canons, 92 Wash. L. Rev at 675 ("[S]ince *Nedlloyd* was decided, the state and federal courts of California have scrupulously adhered to its holding"). Apple's authority is not California law and applies the wrong standard.

Second, Apple claims that a second choice-of-law clause in a second document (the U.S. hardware warranty) governs at least "some" claims—the CAC describes the "defect" as both a "battery issue" and a "software issue" and thus Apple argues that a ***software*** license choice-of-law clause cannot govern all claims. But as discussed in the Objection to RJN, the U.S. hardware warranty ***excludes batteries from its coverage***, a fact that Apple should have disclosed to the Court. Equally problematically, Apple never explains how a U.S. hardware warranty would apply to foreign purchases. And finally, even if the defect were determined after discovery to involve both software and battery aspects,[30] the SLA's provision would still govern as a matter of law.  The SLA

---

[30] *See, e.g.,* ¶371 (describing Defects as combination between design of batteries, rated power that the iOS needed from the batteries, and the Devices' inadequate power to accommodate the iOS); ¶388 (nearly impossible for typical Apple owner to avoid downloading iOS updates); ¶¶402-03 (describing update to iOS that underclocked processors and diminished peak power requirements).

1  is more closely related to the defect,[31] and ambiguity caused by Apple must be construed against

2  Apple.[32] To the extent more facts are needed to render a choice of law decision, Apple's argument

3  is premature. *Scott & White Memorial Hosp. v. Aetna Health Holdings, LLC*, 2018 WL 1498842, at

4  *4 (W.D. Tex. Mar. 27, 2018) (choice of law provision best left for summary judgment).

### b.   California Law Would Apply Even Absent the SLA

6          "Whether a nonresident plaintiff can assert a claim under California law is a constitutional

7  question based on whether California has sufficiently significant contacts with the plaintiff's claims."

8  *Forcellati v. Hyland's, Inc.*, 876 F.Supp.2d 1155, 1160 (C.D. Cal. 2012) (citing *Mazza v. Am. Honda*

9  *Motor Co.*, 666 F.3d 581, 589–90 (9th Cir. 2012)). Sufficient contacts may be found where

10  defendant is headquartered in California such that the "application of California law poses no

11  constitutional concerns." *Id.* (citing *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379

12  (N.D. Cal. 2010) (where defendant is "headquartered in California and their misconduct allegedly

13  originated in California," application of California law not arbitrary or unfair); *see also Thomas v.*

14  *Dun & Bradstreet Credibility Corp.*, 100 F.Supp.3d 937, 946 (C.D. Cal. 2015) (defendant "bears

15  the burden" to "'defeat the presumption that California law applies'").

16          Here, named plaintiffs outside of California are members of this litigation.[33] Apple

17  distributes uniform Devices and software across the world, all afflicted with the same Defects.

18  ¶¶287-290, 370-408. Apple designed and caused to be distributed the Devices and software to both

19  U.S. and non-U.S. consumers from California. ¶¶287-290. Apple's decisions concerning the

20  promotion and marketing of the Devices and software to both U.S. and non-U.S. consumers were

21  ───────────────
    [31] *Elden v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2011 WL 1236141, at **3-4 (S.D.N.Y.
22  March 30, 2011) (where two contracts containing competing choice of law provisions were executed
    at the same time, agreement that governs activity at the heart of the case applies).

23  [32] *Eastman v. Life Insurance Co. of North America*, 2018 WL 3688983, at *3 (M.D. Ala. July 26,
    2018) (where two choice of law provisions arguably applied, ambiguities must be construed against
24  drafter and plaintiffs' interpretation is controlling).

25  [33] Apple raises "choice of law" only in opposition to the International Plaintiffs. But a decision on
    choice of law here will impact all non-California US plaintiffs as well. If the Court were to accept
26  Apple's argument and apply the laws of the jurisdiction of purchase rather than uniformly apply
    California law class-wide, it would necessarily transform this case from a 40-country case with a
27  ***single, uniform set of applicable laws*** into a 50-state case with 50 different sets of laws. As a
    precaution, the plaintiffs have pled statutory causes of action from 50 states and several territories,
28  but the law and facts of this case mandate applying California and federal law uniformly on a global
    basis (except in the UK).

made in California. *Id*. And, the agreements at issue provide that California law applies. ¶¶446-454. These allegations are more than sufficient.  As Apple counsel represented to the JPML in this case, "if there is ever a case that should be centralized [in the N.D. Cal.] . . . ***it should be this one***," JPML Hearing Mar. 29, 2018, Tr. 13:21 (emphasis added), because the N.D. Cal. is where we have "decisions made, witnesses found, documents located." *Id*. Tr. 14:3-5.

Not surprisingly, past courts have applied California law to claims brought by non-California residents against Apple. *In re iPhone 4S Consumer Litig.*, 2013 WL 3829653, at *7 (N.D. Cal. July 23, 2013) (the "misleading marketing, promotional activities and literature were coordinated at, emanate from and are developed at [Apple's] California headquarters, and that all 'critical decisions' regarding marketing and advertising were made within the state.").  The cases Apple cites actually support Plaintiffs. For example, in *Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011), California law did not apply to the nonresident plaintiffs' claims – but the unlawful conduct occurred outside of California. *Id.* at 248-49.  The court expressly distinguished cases where "the unlawful conduct that formed the basis of the out-of-state plaintiffs' claims . . . occurred in California." *Id.* at 248 n.10. If further inquiry is still needed, determination can await summary judgment. *Won Kyung Hwang v. Ohso Clean, Inc.*, 2013 WL 1632697, at *21 (N.D. Cal. Apr. 16, 2013).

In addition, courts also employ the "governmental interest" analysis, <u>*first*</u> determining "whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different." *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107-108 (2006). Only if there is a difference, "the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists." *Id.* Finally, if there is a true conflict, a court compares "the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.*

Apple has not even attempted to meet its burden to establish a conflict. *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 441 (3d Cir. 1999) (Apple has "burden of establishing the content of the foreign law"); *accord*, *Hurtado v. Superior Court*, 11 Cal. 3d 574, 581 (1974). Moreover, California law applies even if it is not identical to foreign law, as Apple can clearly comply with

both California law and foreign consumer protection law—all of which prohibit practices that treat consumers unfairly or at a minimum do not expressly permit it. *Hartford Fire Insurance Co. v. California,* 509 U.S. 764, 794-95 (1993). Apple cannot identify any relevant foreign law that would expressly permit computer fraud and abuse, trespass, or unfair competition as pled in the CAC.

### c.     The CFAA Applies Extraterritorially

Citing *Morrison* as inspiration, the MTD says the CFAA lacks an explicit extraterritorial provision in the text. MTD at 14. But it does, clearly, in text added 22 years ago for the purpose of extending the statute globally. *U.S. v. Gasperini*, 729 F. App'x 112, 114 (2d Cir. 2018). Protected computers are now defined to include computers in or "affecting" foreign commerce. 18 U.S.C. § 1030(e)(2)(B). Multiple courts have so found, including the Western District of Washington just last month. *Ryanair DAC v. Expedia Inc*., Case No. C17-1789RSL, 2018 WL 3727599, at *2 (W.D. Wash. Aug. 6, 2018) ("the CFAA's text gives a clear, affirmative indication that its civil provision applies extraterritorially" and "Protected computer" includes "computer[s] located outside the United States." . . . That definition is as clear an indication as possible short of saying "this law applies abroad."") (citing *Morrison*); *see also U.S. v. Ivanov*, 175 F.Supp.2d 367, 374 (D. Conn. 2001) ("Congress intended CFAA to apply to computers used 'in interstate or foreign commerce or communication'"). Apple cites to no cases to the contrary.[34]

### 4.     This Court Should Not Dismiss British, Colombian or Canadian Claims

Apple seeks discretionary dismissal of claims of four plaintiffs on "comity" and "*forum non conveniens*" theories:  Dr. Julie Caceres (Colombia); Hanpeng Chen and Elisa Gaudio (Canada) and Kushagra Sharma (United Kingdom). MTD at 15-18. Neither doctrine applies here.

International comity is a discretionary basis for declining jurisdiction. The Ninth Circuit recently provided detailed guidance on the application of the doctrine of comity, *Mujica v. AirScan, Inc*., 771 F.3d 580 (9th Cir. 2014), and relevant here, two factors are dispositive: the U.S. has a greater interest in these claims, and the alternative *fora* are clearly inadequate. These two factors are

---

[34] In addition, if this Court were to determine that the SLA's California choice-of-law clause were to apply, federal laws are included. *Hauenstein v. Lynham*, 100 U.S. 483, 490 (1879) (federal law is "as much a part of the law of every State as its own local laws and Constitution"). This is known as the Canon of Federal Inclusion and Preemption. The Canons, 92 Wash. L. Rev. at 661.

also dispositive in the related *forum non conveniens* inquiry. *See Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011) (moving party "bears the burden of demonstrating an adequate alternative forum" and that "the balance of private and public factors favor dismissal").

First, the only defendant in this case is California-based Apple, Inc., and the U.S. clearly has a "greater interest" than Canada, Colombia or the U.K. in adjudicating California and U.S. federal claims against Apple. *See id.* at 606-07; *see also* CAC, Ex. 4, tr. at 15 (testimony of Apple Canada lawyer refusing to provide evidence to Canadian investigators because of the pendency of U.S. litigation). And as noted above, Apple counsel testified in this MDL "if there is ever a case that should be centralized in the [N.D. Cal.] . . . it should be this one." JMPL Tr. 13:21.

Second, Apple has not attempted to show that the UK, Canada or Colombia would be an adequate alternative forum. *Mujica*, 771 F.3d at 607-08.  The only defendant in this case (Apple, Inc.) refuses to say whether it will even submit to the jurisdiction of the courts of these three countries, saying only that it *or one of its subsidiaries* might. MTD at 17.  But many of the claims might only be viable against Apple, Inc. specifically.  It is also impossible for these plaintiffs to prosecute their claims because Apple won't let core evidence leave the U.S., claiming that some of their computer code is restricted under the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 and the related ITAR Regulations, 22 CFR §§ 120-30. Straite Decl. ¶¶2-4. Apple insists that documents so designated cannot be hosted on any server outside of the U.S., taken out of the U.S. *even for deposition*, and cannot even be viewed by counsel on a laptop in Montréal. *Id.* ¶4.  With respect to possible class actions in Canada, Apple's Canadian declaration, ECF No. 176-5, mischaracterized the litigation, and Plaintiffs' counter-declaration clarifies that the cases are still in the preliminary stages and coordination is possible even if the MDL includes Canadians. McGee Decl., Ex. D.[35]

Finally, Apple's *forum non conveniens* argument (applicable to plaintiff Sharma) ignores this plaintiff's right to choose his forum when suing the defendant in its home court. *Iragorri v.*

---

[35] Even if competing class actions were to proceed in both countries, there are tools to efficiently coordinate between the Courts. Many class actions in the past have proceeded in parallel on both sides of the border, even when the US action included Canadians. *See, e.g., In re: Imax Securities Litigation*, 06-cv-06128-NRB (S.D.N.Y.).

*United Techs. Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001). Apple also ignores that the U.S. and the U.K. have a treaty of friendship, commerce and navigation that requires U.S. Courts to give equal access to U.K. citizens on the same terms as U.S. citizens. Straite Decl., Ex. 6. Finally, if this Court were called upon to decide issues of U.K. law, that alone is insufficient reason to dismiss a claim. *See, e.g.*, *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 2018 WL 2124064, at *1-2 (N.D. Cal. May 8, 2018)  (interpreting contract under U.K. law); *see also* McGee Decl. Ex. F (application of U.K. law).

### 5.   <u>The Court Should Not Merge Rule 12(b)(6) and Rule 23</u>

Apple asks this Court "dismiss" non-parties, specifically, "absent foreign plaintiffs," MTD at 8. This is just a veiled attempt to get a premature decision from the Court on class definition—and perhaps not so veiled, because Apple cites to Rule 23 as one of the bases for its argument.[36]

*First*, Apple's request violates CMO No. 4; the Court's order was designed to streamline briefing, not to enlarge Rule 12 to encompass Rule 23.  Plaintiffs preserve their objection.

*Second*, it is improper to preemptively ask this Court to define the geographic scope of the class before it has been proposed or a record created. A complaint is not a class certification motion. In the motion, Plaintiffs will propose geographic scope, type of class  (23(b) or 23(c)(4), for example) and whom to propose as class representatives. Until then, Apple's request is premature. A Rule 12(b)(6) motion must not be used "as a vehicle for preempting a certification motion." *Brothers v. Portage Nat'l Bank,* 2007 WL 965835, *7 (W.D. Pa. Mar. 29, 2007).[37]

*Third*, to the extent that Apple is suggesting transnational class actions are impermissible or rare, that is strange indeed. The Supreme Court approved the inclusion of non-U.S. class members more than 30 years ago, *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), and since then it has become routine to include foreign class members; attached to this brief (**<u>Attachment A</u>**) is a sampling of more than 50 of them, including even a class action in this District against Apple. To

---

[36] Apple only challenges 8 countries (China, Japan, the UK, France, Turkey, Italy, Peru and Nigeria) although the CAC preliminarily proposes 40 foreign countries. CAC n.70.

[37] *See also Cholakyan v. Mercedes-Benz USA, LLC*, 796 F.Supp.2d 1220, 1246 (C.D. Cal., 2011) ("plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery of, for example, the ... lists that they claim will identify the class members"); *In re Jamster Mktg. Litig.,* No. 05CV0819 JM (CAB), 2009 WL 1456632, *7 (S.D. Cal. May 22, 2009) ("Piece-meal resolution of issues related to the prerequisites for maintaining a class action do not serve the best interests of the court or parties").

the extent Apple complains about discovery from absent class members in other countries, absent class members are not parties and the Federal Rules do not provide for or permit discovery from such individuals. *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 342 (1980).

*Fourth,* Apple has failed to meet its burden to exclude ***any*** of the 40 foreign countries. The test of whether a country should be excluded from a proposed Rule 23(b) damages class is a "superiority" issue. Apple focuses on recognition of class judgments abroad (*res judicata*)—but recognition of judgments is but one factor to be considered in a superiority analysis; it is not dispositive. *In re U.S. Fin. Sec. Litig.*, 69 F.R.D. 24 (S.D. Cal. 1975). Apple never fully develops a superiority analysis, and nor could it in the limited context of a Rule 12(b)(6) brief.

Additionally, even just considering *res judicata*, Apple failed to meet its burden. The leading case regarding certifying transnational class actions is *Anwar v. Fairfield Greenwich Ltd.*, 289 F.R.D. 105 (S.D.N.Y. 2013), *vacated on other grounds sub nom.*, 570 F. App'x 37 (2d Cir. June 19, 2014). Plaintiffs need only establish that the foreign country would recognize a U.S. judgment generally; defendants then must show that it is "more likely than not" that class judgments would be exempt from the general rule. *Id.* at 114-15. Even if a defendant can meet the "more likely than not" standard, the country would still not be excluded if other factors demonstrate "superiority." *Id.* at 115; *see also Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 135 (S.D.N.Y. 2001) (inclusion sometimes proper even if just a "possibility" of recognition); Straite Decl. Ex. 3, ¶14 (foreign law declaration in *Anwar* rejecting relevance of *res judicata* inquiry when defendant located in U.S.).

Apple fails the *Anwar* test for all 8 countries it challenged. Apple's **Turkish** law expert only says that a class judgment "may" be unenforceable, not "more likely than not" unenforceable. ECF No. 176-2. But U.S. courts in the past have included Turkey. *See, e.g., In re: Turkcell Iletisim Hizmetler*, 209 F.R.D. 353 (S.D.N.Y. 2002). Apple's **Italian** expert only says that an Italian court "may" not recognize a class judgment from this Court, ECF No. 176-3, but Plaintiffs' expert says otherwise and better addresses the *Anwar* standard. McGee Decl. Ex. A; *accord*, Straite Decl. Ex. 5. U.S. courts typically include Italy. *Anwar*, 289 F.R.D. at 120. **U.K.** class members are never excluded, for reasons noted by the foreign law expert in *Anwar*, *see* Straite Decl. Ex. 4, and Apple's expert only addresses the *forum non conveniens* argument in any event. ECF No. 176-8. Plaintiffs'

U.K. expert addresses the deficiencies in Apple's expert declaration. McGee Decl., Ex. F. Apple's **Peruvian** expert only says it "could be debated" that a Peruvian court would not recognize a U.S. class judgment, ECF No. 176-9, but as *Anwar* noted, South American (including Peruvian) courts enforce U.S. class judgments.  289 F.R.D. at 120; Straite Decl. Ex. 2. Apple's **Nigerian** expert says only that courts would be "concerned," ECF No. 176-1, ignoring cases that have included Nigerian class members.  *In re Nigeria Charter Flights Contract Litig*., 233 F.R.D. 297 (E.D.N.Y. 2006).

Apple's **Japanese** expert opines that Japanese courts would "likely not" recognize a class judgment of this Court. ECF No. 176-7. But Plaintiffs' expert disagrees and has a deeper and more persuasive analysis. *See* McGee Decl., Ex. B. Furthermore, Apple's expert does not address burdens on the court in the absence of inclusion—the "multiplicity of actions" in Japan is an appropriate factor for this court to consider. *See Takiguchi v. MRI Int'l, Inc*., 2016 WL 1091090 (D. Nev. Mar. 21, 2016)  (including Japan in the class). Apple's **French** expert concludes that French courts would not recognize a class judgment of this Court. ECF No. 176-4. But Plaintiffs' expert explains why Apple's expert is out of date. McGee Decl., Ex. E. As importantly, Apple's expert does not conduct the "multiplicity of actions" analysis as done in *Takiguchi*. And Apple's **Chinese** law expert does not meet the *Anwar* standard, even conceding that the issue is "unsettled." ECF No. 176-10. Plaintiffs' expert, on the other hand, explains why it is unsettled—because the law changed in 2017, in plaintiffs' favor. McGee Decl., Ex. C.

*Finally*, Apple argues that the Court should "dismiss" claims of absent class member for which there is currently no representative. But Plaintiffs do have representatives in the 15 foreign plaintiffs currently before the Court—all have standing to represent all class members if the claims are closely related, which they are. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). Several of the cases listed below in Attachment A had only one class representative yet the case was global. If truly needed, separate class representatives for each country can easily be added.

### G.    The Complaint Sufficiently Alleges Facts To Include iPhone 5 And iPads As Devices Subject To This Litigation

Apple seeks dismissal of all iPad and iPhone 5 claims, asserting that the CAC is "devoid" of any allegation that the "power management feature" operates on those Devices, which it further

asserts is the issue at the "heart" of this action. MTD at 35. To the contrary, this action's "heart" is the Defects impacting *each* of the Devices, and Plaintiffs explain why the term "power management" is a non-starter for Apple's MTD, and that it is a factual issue whether "power management" applied to iPads and iPhone 5's. *See supra*, Section IV. [38]

In fact, Plaintiffs iPad and iPhone 5 allegations convey Battery Issues and the impact of the Defects, which they further allege Apple exacerbated by the iOS Updates. *See e.g.* ¶¶39-40 (iPhone 5); ¶¶83-84 (iPad Air2); ¶¶85-86: (iPads). The CAC also details an increase in sudden shutdowns that iPhone 5 users reported by at least the Fall of 2016, when running iOS 10 (¶390) and includes a link to an Apple-hosted forum where iPhone 5 users reported shutdowns and other issues *before and after* iOS 10.2.1 (*see* ¶390, n.42). The CAC further alleges that the Battery Issues (a part of the Defects) plagued both iPhone and iPad users, even after downloading iOS 11. ¶406.

Apple also argues that named plaintiffs only have standing to bring class claims on behalf of others who purchased (or used, leased, or owned) the exact same model Device. MTD at 35. The CAC includes separate representatives for each model iPhone, so Apple's argument is apparently only limited to iPads. However, all of the iPads are "substantially similar" in that they perform the same basic function, have similar processor chips and iOS, Plaintiffs need not have purchased each version of the Devices for purposes of the CAC. *See e.g. Golden v. Home Depot, U.S.A., Inc.*, 2018 WL 2441580, at *37-*43 (E.D. Cal. May 31, 2018). Plaintiffs adhere to *Golden*.  ¶¶321-369.[39]

## VII.   <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court deny Apple's motion in its entirety. To the extent the Court grants any portion of the MTD, Plaintiffs request leave to amend. Fed. R. Civ. P. 15.

---

[38] Indeed, Apple's documentation provides that iOS 10.2.1 and 11.2 (the updates Apple admits carried the "smooth[ing]" mechanism)—were available for download to: "iPhone 5 and later, iPad 4th generation and later . . ." *See* Section IV, above.

[39] This analysis is consistent with this Court's approach on the Rule 12(b)(1) motion in *Leonhart v. Nature's Path Foods, Inc.*, 2014 WL 1338161 (N.D. Cal. Mar. 31, 2014). MTD at 35. In *Leonhart*, the plaintiff failed to allege that the other products were "substantially similar." *Id.* at *10-*15. Plaintiffs' allegations herein do not suffer the same infirmity, as detailed above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY LLP**

DATED:  September 3, 2018      By:   */s/ Joseph W. Cotchett*
                                         Joseph W. Cotchett

Joseph W. Cotchett
Mark C. Molumphy
Brian Danitz
Stephanie D. Biehl
Gina Stassi
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
*jcotchett@cpmlegal.com*
*mmolumphy@cpmlegal.com*
*bdanitz@cpmlegal.com*
*sbiehl@cpmlegal.com*
*gstassi@cpmlegal.com*

**KAPLAN FOX & KILSHEIMER LLP**

DATED:  September 3, 2018      By:   */s/ Laurence D. King*
                                         Laurence D. King

Laurence D. King
Mario Choi
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:  415-772-4707
*lking@kaplanfox.com*

David A. Straite (*pro hac vice*)
850 Third Avenue
New York, NY  10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
*dstraite@kaplanfox.com*

*Interim Co-Lead Class Counsel*

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2

I, David A. Straite, attest that concurrence in the filing of this document has been obtained

3

from the other signatories.  I declare under penalty of perjury under the laws of the United States of

4

America that the foregoing is true and correct.

5

Executed this 3rd day of September, 2018, at New York, NY.

6

7

*/s/ David A. Straite*
David A. Straite

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28