UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION | Case No.  18-md-02827-EJD |
| | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| | Re: Dkt. No. 176 |

This putative worldwide class action is brought by one hundred and twenty-two Plaintiffs who hale from the fifty states and several U.S. territories as well as multiple foreign countries.[1] Plaintiffs allege that, in an effort to fix battery life issues, Apple included code in updates to its mobile operating system (iOS) that significantly reduced the performance of certain models of the iPhone.  Plaintiffs also allege that Apple failed to adequately disclose that the iOS updates would affect the performance of their iPhones and, more broadly, that Apple made representations and omissions regarding the capacity of iPhone and iPad devices.

Apple moves to dismiss claims in the Consolidated Amended Complaint ("Complaint") under Federal Rule of Civil Procedure 12(b)(6).  The Court finds that some of Plaintiffs' allegations are at full capacity, but others need to be recharged.  The Court GRANTS in part and DENIES in part Apple's motion to dismiss.

---

[1] The named Plaintiffs are identified in paragraphs 29 through 272 of the Consolidated Amended Complaint.  Dkt. No. 145 ("CAC") ¶¶ 29–272.

## I.     BACKGROUND

This case primarily concerns Apple's response to software capability and battery capacity issues in certain older-model iPhones and iPads. The following facts are drawn from Plaintiffs' Complaint.

Beginning in late 2015, consumers began reporting that their iPhone and iPad devices were experiencing unexpected shutdowns despite showing more than 30% remaining charge on the battery. CAC ¶¶ 2–3. When the device shut down, it would remain dead until the user reconnected the device to power. Id. ¶ 4. The number of complaints increased through the fall of 2016. Id. ¶¶ 2–3. At the end of 2016, Apple suggested that a remedy would be forthcoming in the next round of software updates. Id. ¶ 7.

On January 23, 2017, Apple released iOS 10.2.1, an update to its iOS 10 operating system. Id. ¶¶ 359, 398. The update was sent directly to users' iPhone and iPad devices, and users had the option of downloading and installing the update on their devices. Id. ¶¶ 359, 386–87. The alert that accompanied the update stated that the "update include[d] bug fixes and improve[d] the security of [the user's] iPhone or iPad." Id. ¶¶ 360, 399. In February 2017, Apple added more information in a "Read Me" section which stated: iOS 10.2.1 "improves power management during peak workloads to avoid unexpected shutdowns on iPhone." Id. ¶ 400. In a statement issued at the end of February 2017, Apple explained that ""[w]ith iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone." Id. ¶ 401.

On September 19, 2017, Apple released a new version of its operating system, iOS 11. Id. ¶ 406. When consumers with older-model iPhone and iPad devices downloaded iOS 11, they experienced a marked decrease in battery life from the prior iOS 10 operating system. Id. ¶¶ 407–08. On December 2, 2017, Apple released iOS 11.2. Id. ¶ 363. Like the iOS 10.2.1 update, the iOS 11.2 update was sent directly to users' iPhone and iPad devices, and the update was available for immediate download and installation on their devices. Id. ¶¶ 363, 386–87. The alert

Case No.: 18-md-02827-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

accompanying the update stated, among other things, that the update "include[d] bug fixes and improvements."  Id. ¶ 363.

In mid-December 2017, independent research was published online "demonstrating the marked degradation of performance in a large sampling of . . . Devices after installation of the [iOS 10.2.1 and 11.2] Updates."  Id. ¶ 11.  For example, software engineer John Poole "published a report based on an analysis of 100,000 iPhones and conclud[ed] that the decrease in performance of the affected iPhones was caused by the iOS 10.2.1 and iOS 11.2 updates, and not the normal decreased function that would be caused by an aging battery."  Id. ¶ 410.  On December 20, 2017, Apple released a statement about the iOS 10.2.1 and 11.2 updates:

> Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to smooth out the instantaneous peaks only when needed to prevent the device from unexpectedly shutting down during these conditions.  We've now extended that feature to iPhone 7, with iOS 11.2, and plan to add support for other products in the future.

Id. ¶ 11.  Apple also asserted that "another contributor to these user experiences is the continued chemical aging of the batteries in older iPhone 6 and iPhone 6s devices, many of which are still running on their original batteries."  Id. ¶ 415.

Then, on December 28, 2017, Apple released another statement that confirmed some consumers' suspicions that the iOS updates had intentionally slowed down the processing speeds of iPhone 6 and iPhone 7 models.  Id. ¶ 20.  Apple's statement read:

> iOS 10.2.1 (released January 2017) includes updates for previous models of iPhone to prevent them from unexpectedly shutting down.  This includes a feature for iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE to dynamically manage the instantaneous performance peaks, only when needed, to prevent the device from unexpectedly shutting down.  This capability was also extended to iPhone 7 and iPhone 7 Plus with iOS 11.2, and we will continue improving our power management feature in the future.  This feature's only intent is to prevent unexpected shutdowns so that the iPhone can still be used.  This power management feature is specific to iPhone and does not apply to any other Apple products.
>
> This power management works by looking at a combination of the device temperature, battery state of charge, and battery impedance.   Only if these

United States District Court
Northern District of California

variables require it, iOS will dynamically manage the maximum performance of some system components, such as the CPU and GPU, in order to prevent unexpected shutdowns. As a result, the device workloads will self-balance, allowing a smoother distribution of system tasks, rather than larger, quick spikes of performance all at once. In some cases, a user may not notice any differences in daily device performance. The level of perceived change depends on how much power management is required for a particular device.

Id. Apple also admitted that in extreme cases, the user may notice effects such as longer launch times, lower frame rates, backlight dimming, and lower speaker volume. Id. The iOS updates impaired the functioning of Plaintiffs' iPhones by substantially slowing their processing speed (by as much as 50%). Id. ¶¶ 405, 409–17.

According to Plaintiffs, Apple's iOS updates were symptomatic of a greater defect that was present in older-model iPhone and iPad devices from the date of purchase.[2] Specifically, Plaintiffs allege that Apple was attempting to conceal the "mismatch between the Devices' hardware, including their processing chips and rechargeable lithium-ion batteries, and the ever-increasing demands placed on the Devices via Apple's constantly-updating iOS software platform." Id. ¶ 9; id. ¶ 370 (noting "an inherent mismatch between battery performance and the operational needs of the Devices"). Whereas faster and more powerful processing units "require more power from the phone's battery," id. ¶ 391, "[a] lithium-ion battery's capacity is degraded over time by discharge/recharge cycles, elevated temperatures, and aging," id. ¶ 380. Eventually, a phone may shut down when "the battery ages and is unable to deliver the peak power demanded by the phone's processor." Id. ¶ 396. Apple allegedly knew about this phenomenon but did not design the devices to ensure that the battery would "be capable of meeting the processor's peak power demands for years to come." Id. ¶ 393.

A number of class action lawsuits were filed by consumers against Apple. These lawsuits generally alleged that Apple's conduct violated federal and state computer-intrusion laws, as well

_____

[2] The iPhone models at issue are iPhone 5, iPhone 5s, iPhone 5c, iPhone SE, iPhone 6, iPhone 6s, iPhone 6 Plus, iPhone 6s Plus, iPhone 7, and iPhone 7 Plus. Id. ¶ 1 n.1. And the iPad models at issue are the Fourth Generation iPad, iPad Mini, iPad Air, iPad Mini 2, Update to Fourth Generation iPad, iPad Air 2, iPad Mini 3, iPad Mini 4, iPad Pro, 9.7-Inch iPad Pro, Fifth Generation iPad, iPad Pro 10.5-inch and 12.9 inch models, and Sixth Generation iPad. Id.

as state consumer-protection laws and common law. In early 2018, one of the plaintiffs who filed a class action in this district moved to centralize pretrial proceedings in a single judicial district. 28 U.S.C. § 1407(a) ("When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings."). On April 4, 2018, the Judicial Panel on Multidistrict Litigation ("JPML") issued a transfer order selecting the undersigned judge as the transferee court for "coordinated or consolidated pretrial proceedings" in the multidistrict litigation ("MDL") arising out of Apple's conduct. See Dkt. No. 1 at 1–2.

At the April 25, 2018 initial case management conference, the Court suggested—and the parties agreed—to proceed with a motion to dismiss on a limited set of claims in Plaintiffs' forthcoming consolidated complaint. Dkt. No. 23 at 24:13–26:7. In the subsequent case management orders filed on April 26, 2018 and May 18, 2018, the Court solicited the parties' "proposals for proceeding on a limited set of claims in the consolidated complaint." Dkt. Nos. 101 at 1, 21 at 1.

On July 2, 2018, Plaintiffs filed their Complaint, which asserts seventy-six causes of action under one federal statute, all fifty states' statutes, and the common law on behalf of a global class of consumers from the fifty states and other territories of the United States as well as multiple foreign countries. See generally CAC. Plaintiffs proposed "prioritiz[ing] the California statutory claims (Counts 2 through 5), the Trespass to Chattels common law claim (Count 6) and the federal Computer Fraud and Abuse Act claim (Count 1) for the upcoming Motion to Dismiss." Dkt. No. 153 at 3. Apple proposed focusing on two threshold issues: "(1) Plaintiffs' attempt to assert claims on behalf of non-U.S. residents; and (2) the conclusory allegations seeking to expand this case to include iPad devices." Id. at 5–6.

The Court concluded that Apple's motion to dismiss would be "limited to the six claims identified by Plaintiffs and the two threshold issues identified by Apple." Dkt. No. 163 at 1. Thus, Apple would be permitted to challenge Plaintiffs' claims for (1) violations of the federal

Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*; (2) violations of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770, *et seq.*; (3) violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; (4) violations of the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; (5) violations of the California Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, *et seq.*; and (6) trespass to chattels under California common law. CAC ¶¶ 473–537. The Court noted that "[t]his limitation is without prejudice to Apple's ability to challenge Plaintiffs' remaining claims." Dkt. No. 163 at 1. Apple was also permitted to address the threshold issues related to claims brought by non-U.S. citizens and Plaintiffs' inclusion of iPad devices. Id.

Apple filed its motion to dismiss on August 9, 2018. ECF No. 176 ("Mot."). Plaintiffs filed their opposition on September 3, 2018. ECF No. 194 ("Opp."). Apple filed its reply on September 14, 2018. ECF No. 197 ("Reply").

## II.     LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of claims alleged in the complaint. Fed. R. Civ. P. 12(b)(6); Conservation Force v. Salazar, 646 F.3d 1240, 1241–42 (9th Cir. 2011). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When deciding whether to grant a motion to dismiss, the court must construe the alleged facts in the light most favorable to the plaintiff. See Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am., 768 F.3d 938, 945 (9th Cir. 2014) (providing the court must "draw all reasonable inferences in favor of the nonmoving party" for a Rule 12(b)(6) motion). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678. Dismissal "is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).

Consumer-protection claims that sound in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). <u>Vess v. Ciba-Geigy Corp. USA</u>, 317 F.3d 1097, 1103–04 (9th Cir. 2003); <u>In re Apple & AT & T iPad Unlimited Data Plan Litig.</u>, 802 F. Supp. 2d 1070, 1075 (N.D. Cal. 2011). Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The circumstances constituting the fraud must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." <u>Kearns v. Ford Motor Co.</u>, 567 F.3d 1120, 1124 (9th Cir. 2009) (alteration in original) (quoting <u>Bly-Magee v. California</u>, 236 F.3d 1014, 1019 (9th Cir. 2001)). Therefore, a party alleging fraud must set forth "the who, what, when, where, and how" of the misconduct. <u>Vess</u>, 317 F.3d at 1106 (quoting <u>Cooper v. Pickett</u>, 137 F.3d 616, 627 (9th Cir. 1997)).

## III. DISCUSSION

The Court first addresses Apple's threshold argument with respect to the claims brought by the non-U.S. Plaintiffs. The Court then addresses the adequacy of Plaintiffs' allegations as to each of their claims, grouping together claims related to computer intrusion and claims related to consumer protection.

### A. Claims Brought By Non-U.S. Plaintiffs

Apple first seeks to excise from this case all claims brought by non-U.S. Plaintiffs. Mot. at 7. Apple advances four arguments in this respect: (1) allowing non-U.S. Plaintiffs to pursue claims would raise practical and constitutional problems, (2) the non-U.S. Plaintiffs may not invoke California law, (3) the federal and California laws at issue do not apply extraterritorially, and (4) the Court should exercise its discretion to dismiss the claims under U.K. law under the doctrine of international comity or forum non conveniens. <u>Id.</u> at 7–18. The Court proceeds through each of these bases for dismissal in turn.

### 1.      Practical and Constitutional Problems

Apple's opening, and most amorphous, contention is that multiple significant practical and constitutional concerns will arise from the adjudication of claims by consumers in 40 foreign countries.  Mot. at 7.  For example, Apple asserts that it will be unable to conduct certain forms of discovery and that notice to the members of a putative or certified class will be prohibitive, if not impossible.  Id. at 8.  Similarly, Apple presents declarations to the effect that a judgment in this action would not bind non-U.S. customers and would not have preclusive effect in many of the countries sought to be included.  Id. at 8–10.

Many of the concerns that Apple raises are substantial and potentially well-founded.  But Apple brings its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."  And Apple's identified practical and constitutional concerns do not supply a basis to conclude that the non-U.S. Plaintiffs have failed to state a claim.  Nor does Apple explicitly argue that this Court lacks subject matter jurisdiction over the non-U.S. Plaintiffs' claims or in personam jurisdiction over the non-U.S. Plaintiffs.[3]

The issues identified by Apple are better addressed at a later stage of the proceedings, such as class certification.  At this point, it is not even clear that Plaintiffs will propose inclusion of foreign citizens in the class.  Indeed, one of Apple's own authorities deferred consideration of potential enforceability issues to the class certification stage "because, should plaintiffs limit their class to U.S. citizens, defendants' concerns will evaporate."  In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig., 228 F. Supp. 2d 348, 364 (S.D.N.Y. 2002).  Nevertheless, the Court is cognizant that in light of the significant costs associated with discovery and continued litigation, "defendants should be entitled to a decision concerning the claims of foreign plaintiffs early in the progress of the litigation."  Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 997 (2d Cir. 1975), abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010).  For this

---

[3] Similarly, Apple cites no authority for the proposition that Plaintiffs must include a named Plaintiff for every country that they seek to include in the class.  Mot. at 15.

reason, the Court allowed Apple to brief any threshold grounds for dismissal in its motion to dismiss. Dkt. No. 163 at 1. The Court also is willing to hear proposals from the parties regarding discovery management techniques—including "time limits, restrictions on scope and quantity, and sequencing," Manual For Complex Litigation (Fourth) § 11.422 (2004)—that may be employed to advance the interests of all parties in the litigation.

## 2. Application of California Law

Apple next contends that the non-U.S. Plaintiffs' claims should be dismissed because they "offer no basis for applying California law." Mot. at 10. In other words, Apple asks the Court to conduct a choice-of-law analysis. Plaintiffs contend that the choice-of-law inquiry begins and ends with Apple's own iOS software license agreement, which all users worldwide must accept to use Apple's iOS software. CAC ¶ 446. According to Plaintiffs, that agreement mandates application of California law to the claims of all Plaintiffs (except U.K. Plaintiffs, who are expressly carved out). Id. ¶¶ 276–79; id., Ex. 5 ¶ 12. Apple responds that its hardware warranty should apply because this case does not involve a license dispute. Mot. at 11. The parties also squabble over the appropriate application of California's governmental interests choice-of-law test. Compare id. at 11–13, with Opp. at 28–30.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1187 (9th Cir. 2001). California has two different tracks for selecting which law should be applied in an action. Wash. Mut. Bank, FA v. Superior Court, 15 P.3d 1071, 1077 (Cal. 2001). Where there is no advance agreement between the parties regarding applicable law, courts apply the three-step governmental interest test, "analyz[ing] the governmental interests of the various jurisdictions involved to select the appropriate law." Id. Where, as here, the parties have entered an agreement containing a choice-of-law provision, courts follow Nedlloyd Lines B.V. v. Superior Court, 834 P.2d 1148 (Cal. 1992).

Nedlloyd instructs courts to "first examine the choice-of-law clause and ascertain whether the advocate of the clause has met its burden of establishing that the various claims of putative class members fall within its scope." Wash. Mut. Bank, 15 P.3d at 1078. The language of the choice-of-law clause at issue in Nedlloyd is indistinguishable from the language at issue here, aside from the selection of the substantive law. In Nedlloyd, the choice-of-law provision read: "This agreement shall be governed by and construed in accordance with Hong Kong law . . . ." 834 P.2d at 1150. The choice-of-law provision in Apple's software license agreement provides: "This License will be governed by and construed in accordance with the laws of the State of California . . . ." CAC ¶ 276. Given the identity in language, this Court follows Nedlloyd's understanding of the scope of the choice-of-law clause.

The California Supreme Court in Nedlloyd explained that "[t]he phrase 'governed by' is a broad one signifying a relationship of absolute direction, control, and restraint." 834 P.2d at 1154. Because the choice-of-law provision contained no exceptions, "the clause reflect[ed] the parties' clear contemplation that 'the agreement' [wa]s to be completely and absolutely controlled by [the selected] law." Id. Looking beyond the words, the California Supreme Court further reasoned that a broad interpretation "comports with common sense and commercial reality." Id. "When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to all disputes arising out of the transaction or relationship." Id. Otherwise, "the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship." Id. The California Supreme Court summed up its holding: "a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized." Id. at 1155.

Although Nedlloyd dealt with an agreement between sophisticated businesspeople, its principles are "suitable for a broader range of contract transactions," including contracts of adhesion between consumers and corporations. Wash. Mut. Bank, 15 P.3d at 1079; see also Frenzel v. Aliphcom, No. 14-CV-03587-WHO, 2015 WL 4110811, at *8–9 (N.D. Cal. July 7, 2015) (applying Nedlloyd in such circumstances). Thus, the relevant question here is whether the non-U.S. Plaintiffs' causes of action arise from or relate to Apple's software license agreement. The Court has no trouble concluding that they do. Apple does not actually sell its iOS software to consumers, but instead licenses that software for consumers' use under the software license agreement. CAC, Ex. 5 ¶ 1(a). As Plaintiffs allege, without the iOS software, their Apple devices cannot operate. Id. ¶ 446. Thus, with every purchase of an Apple device, Apple binds consumers to the software license agreement as a condition of using the iOS software. Id., Ex. 5 at 1. And Plaintiffs' claimed injuries—which underlie each cause of action and give rise to this entire lawsuit—are allegedly caused by this very software. Indeed, the iOS updates form a central component of Plaintiffs' case, and the software license agreement grants users the right to download iOS updates. Id., Ex. 5 ¶ 2(b). The non-U.S. Plaintiffs' causes of action fall within the scope of the choice-of-law clause because, at a minimum, the claims relate to the software license agreement.

In arguing to the contrary, Apple gets its wires crossed. Apple relies on a case in which the clause at issue "merely identifie[d] the law that govern[ed] the contract, not the forum in which suit [could] be brought." Khokhar v. Yousuf, No. 15-CV-06043-SBA, 2017 WL 3535055, at *3 (N.D. Cal. Aug. 16, 2017). But the relevant question here is which law applies. Apple does not challenge this particular forum on the basis of improper venue or lack of personal jurisdiction. Nor could it, given that Apple is incorporated in California and has its principal place of business in Cupertino. CAC ¶ 273; see 28 U.S.C. § 1391(b)(1) (providing that venue lies in "a judicial district in which any defendant resides"); Daimler AG v. Bauman, 571 U.S. 117, 137 (2014)

1   (holding that a corporation is subject to general personal jurisdiction in its "place of incorporation

2   and principal place of business").

3       Apple's remaining arguments are equally unavailing.  Apple says that the software license

4   agreement is not "applicable on its face" because this case does not involve a license dispute.

5   Reply at 4.  However, Apple does not even acknowledge Nedlloyd in making this argument.

6   Instead, Apple falls back on the general proposition that "choice-of-law agreements have no effect

7   in a class action if the trial court determines that . . . class claims fall outside their scope." Wash.

8   Mut. Bank, 15 P.3d at 1080.  While that statement is true as far as it goes, it simply begs the

9   question here.  The Court's analysis above confirms why the claims at issue here fall within the

10  scope of the choice-of-law provision in Apple's software license agreement.  Finally, Apple

11  attempts to shoehorn the non-U.S. Plaintiffs' claim into Apple's hardware warranty, which is

12  "governed by and construed under the laws of the country in which the Apple Product purchase

13  took place."  ECF No. 177-1 at 8.  Even if the Court were inclined to take judicial notice of

14  Apple's hardware warranty, Plaintiffs' claims cannot be said to arise therefrom or relate thereto

15  because the warranty explicitly exempts "consumable parts, such as batteries" from its coverage.

16  Id. at 5.  Thus, the Court concludes that all of the non-U.S. Plaintiffs' claims fall within the scope

17  of the choice-of-law provision in Apple's software license agreement.

18      Once a court finds that the claims fall within the scope of the choice-of-law clause, it must

19  then consider whether the clause is enforceable.  Wash. Mut. Bank, 15 P.3d at 1078.  Typically,

20  choice-of-law provisions will be enforced in California unless (1) the chosen state has no

21  substantial relationship to the parties or the transaction or (2) application of the chosen state's law

22  would be contrary to a fundamental policy of another interested state.  Nedlloyd, 834 P.2d at 1151.

23  In the instant case, California has a substantial relationship to defendant Apple because Apple has

24  its principal place of business in California, Apple conducted much of the conduct relevant to the

25  lawsuit in California, and Apple seeks to apply California law to its sales transactions.  CAC

26  ¶¶ 280–84.  Additionally, the Court has not located or been pointed to a fundamental policy of a

27

28  Case No.: 18-md-02827-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

foreign jurisdiction that would be undermined by applying California law in this case. Thus, the Court also concludes that the choice-of-law clause in Apple's software license agreement is enforceable.

The Court's decision that the non-U.S. Plaintiffs may bring claims under California law comes with one caveat, however. As the Ninth Circuit has held, "[w]hen a law contains geographical limitations on its application, . . . courts will not apply it to parties falling outside those limitations, even if the parties stipulate that the law should apply." Gravquick A/S v. Trimble Navigation Int'l Ltd., 323 F.3d 1219, 1223 (9th Cir. 2003). As Apple aptly notes, the California False Advertising Law ("FAL") contains such a geographical limitation. Mot. at 14. Specifically, the FAL prohibits false or misleading statements made "before the public in *this state*" or "before the public in *any state*." Cal. Bus. & Prof. Code § 17500 (emphases added). In this way, the FAL precludes any application beyond the borders of the United States. The parties are not permitted to contract around this geographical limitation, and Plaintiffs have not pled that this element is satisfied. Accordingly, while the Court agrees that the non-U.S. Plaintiffs may invoke California law with respect to most of the claims at issue, the non-U.S. Plaintiffs' FAL claim must be dismissed. Because the Court cannot determine as a matter of law that Plaintiffs will be unable to plead that the geographical limitation is met as to the non-U.S. Plaintiffs, the Court's dismissal is with leave to amend.

### 3. Extraterritoriality

Having determined that the parties agreed that California law would apply to all of the non-U.S. Plaintiffs' claims at issue (except the FAL claim), the Court need not address Apple's arguments as to whether the California laws apply extraterritorially. See Gravquick, 323 F.3d at 1223 ("If a state law does not have limitations on its geographical scope, courts will apply it to a contract governed by that state's law, even if parts of the contract are performed outside of the state."); O'Connor v. Uber Techs., Inc., No. 13-CV-03826-EMC, 2013 WL 6354534, at *4 (N.D. Cal. Dec. 5, 2013) ("In the absence of an express statutory limit, . . . the presumption against

United States District Court
Northern District of California

extraterritorial application of a law is rebutted when there is a choice-of-law clause governing the parties' relationship."). The Court's ruling as to California law would seem to resolve the question whether the non-U.S. Plaintiffs may bring claims under the CFAA because "[t]he federal law is law in the State as much as laws passed by the state legislature." Howlett ex rel. Howlett v. Rose, 496 U.S. 356, 380 (1990). In any event, the Court will address Apple's argument that the CFAA does not apply extraterritorially, Mot. at 14, as it provides an independent justification for the non-U.S. Plaintiffs to bring their CFAA claims.

Courts start with a presumption that federal statutes "apply only within the territorial jurisdiction of the United States." Foley Bros. v. Filardo, 336 U.S. 281, 285 (1949). The U.S. Supreme Court has established a two-step framework for analyzing questions of extraterritoriality. WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2136 (2018). The first step asks "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101 (2016). If that presumption has not been rebutted, then the second step asks "whether the case involves a domestic application of the statute." Id.

Here, this Court need not proceed beyond the first step because the text of the CFAA provides a clear indication of extraterritorial application. The subsections on which Plaintiffs rely—namely, 18 U.S.C. § 1030(a)(5)(A), (C)—guard against damage and unauthorized access to a "protected computer." A "protected computer" is defined under the CFAA to include a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). As another district court in this circuit addressing a similar factual scenario put it, "[t]hat definition is as clear an indication as possible short of saying 'this law applies abroad.'" Ryanair DAC v. Expedia Inc., No. 17-CV-01789-RSL, 2018 WL 3727599, at *2 (W.D. Wash. Aug. 6, 2018) (quoting Morrison, 561 U.S. at 265); cf. United States v. Gasperini, 729 F. App'x

112, 114 (2d Cir. 2018) ("There is a strong argument that § 1030(a)(2) applies extraterritorially.");
United States v. Ivanov, 175 F. Supp. 2d 367, 375 (D. Conn. 2001) (holding that Congress has "clearly manifested its intention" to apply the CFAA extraterritorially).

Apple's counterarguments are unpersuasive. Apple points to the U.S. Supreme Court's observation that "even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." Morrison, 561 U.S. at 262–63 (quoting E.E.O.C. v. Arabian Am. Oil Co., 499 U.S. 244, 251 (1991)). The CFAA does not simply define the term "commerce" but instead defines the term "protected computer," which is central to the violation of the asserted subsections. More importantly, the CFAA goes beyond a baseline reference to "foreign commerce" and expressly encompasses "a computer located outside the United States." 18 U.S.C. § 1030(e)(2)(B). While Apple rightly points out that the computer must be "used in a manner that affects interstate or foreign commerce or communication of the United States," id., Plaintiffs satisfy this element with the allegation that their devices "are used in interstate commerce and/or communication," CAC ¶ 475. Finally, to the extent that legislative history could inform the analysis, Apple's cited excerpts come from the 1996 amendment inserting the "foreign commerce" language, not the 2001 amendment inserting the crucial "computer located outside the United States" language. See Reply at 6 (citing to discussion of S. Rep. No. 104-357, at 4–5 (1996) in case law). In the end, the CFAA's text, particularly its coverage of "a computer located outside the United States," qualifies as a clear indication of congressional intent that the CFAA applies extraterritorially on the facts of this case.

### 4. International Comity and Forum Non Conveniens

Apple's last request with respect to the non-U.S. Plaintiffs asks the Court to exercise its discretion under either the doctrine of international comity or the doctrine of forum non conveniens to dismiss the claims by U.K. citizens under U.K. law. Mot. at 15–18. These two doctrines are closely intertwined. See Mujica v. AirScan Inc., 771 F.3d 580, 598 (9th Cir. 2014). The particular strain of comity at issue here involves the discretion of a federal court to stay or

dismiss a domestic action in favor of a pending or future proceeding in a foreign forum with proper jurisdiction. Id. at 599 (quoting JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V., 412 F.3d 418, 424 (2d Cir. 2005)). Similarly, the doctrine of forum non conveniens involves a federal court's discretion to decline to exercise jurisdiction "when an alternative forum has jurisdiction to hear the case, and trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems." Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 429 (2007) (alterations omitted) (quoting Am. Dredging Co. v. Miller, 510 U.S. 443, 447–448 (1994)).

Neither party appears to dispute that the existence of an adequate alternative forum is a prerequisite to the application of the international comity and forum non conveniens doctrines. Although the Ninth Circuit has not directly spoken to this issue in the context of the international comity doctrine, the Second Circuit has stated that "[w]hen a court dismisses on the ground of comity, it should normally consider whether an adequate forum exists in the objecting nation and whether the defendant sought to be sued in the United States forum is subject to or has consented to the assertion of jurisdiction against it in the foreign forum." Jota v. Texaco, Inc., 157 F.3d 153, 160 (2d Cir. 1998). At least one district court in this circuit has held that "the existence of an adequate alternative forum . . . is a necessary condition to apply the doctrine of international comity." Mujica v. Occidental Petroleum Corp., 381 F. Supp. 2d 1134, 1163 (C.D. Cal. 2005), aff'd sub nom. Mujica, 771 F.3d 580. In the context of forum non conveniens, the U.S. Supreme Court and Ninth Circuit have been explicit that the existence of an adequate alternative forum is the first question that must be answered. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981); Lueck v. Sundstrand Corp., 236 F.3d 1137, 1143 (9th Cir. 2001).

Apple has the burden of demonstrating that an alternative forum is available and adequate. Carijano v. Occidental Petroleum Corp., 643 F.3d 1216, 1224 (9th Cir. 2011) (stating that the defendant seeking dismissal bears the burden). Generally, this requirement will be met when the

defendant is "amenable to process" in the other jurisdiction. Piper Aircraft, 454 U.S. at 255 (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 506–07 (1947)). However, "the entire case and all parties [must] come within the jurisdiction of that forum." Gutierrez v. Advanced Med. Optics, Inc., 640 F.3d 1025, 1029 (9th Cir. 2011) (quoting Dole Food Co. v. Watts, 303 F.3d 1104, 1118 (9th Cir. 2002)).

Here, Apple has not shown that the U.K. Plaintiffs could bring their U.K. claims against Apple in the U.K. courts. In particular, Apple cannot bring itself to say that it is amenable to process in the United Kingdom. Instead, Apple states only that it does not "contest that it *or one of its subsidiaries* is subject to service of process in the U.K." Mot. at 17 (emphasis added). Clearly, this concession is insufficient to conclude that "the entire case and all parties can come within the jurisdiction of [the United Kingdom]." Gutierrez, 640 F.3d at 1029. Without the requisite assurance that the U.K Plaintiffs could sustain their suit against Apple in the United Kingdom, this Court does not have a legitimate basis on which to dismiss the U.K. Plaintiffs' claims under the doctrine of international comity or forum non conveniens.

In sum, the Court GRANTS with leave to amend Apple's motion to dismiss the FAL claim of the non-U.S. Plaintiffs but otherwise finds that Apple has not raised any legitimate basis to wholesale dismiss any other claims brought by non-U.S. Plaintiffs. The Court next turns to the adequacy of Plaintiffs' allegations as to each of their claims.

**B.      Computer Intrusion Claims (Counts 1, 5–6)**

Plaintiffs bring three causes of action based on allegations that Apple did not have authorization to reduce the performance of Plaintiffs' iPhones via the iOS updates. The Court first addresses a threshold issue about whether these claims are viable with respect to iPhone 5 and iPad devices. The Court then analyzes each of Plaintiffs' three computer-intrusion causes of action in turn.

1.      **iPhone 5 and iPad Devices**

Plaintiffs' allegations as presently pled do not warrant computer-intrusion claims on behalf of Plaintiffs with iPhone 5, 5c, or 5s or iPad models. All three of Plaintiffs' computer-intrusion claims are premised upon Apple's having included the reduced-speed feature in the iOS updates sent to Plaintiffs' devices. See, e.g., CAC ¶¶ 474, 523, 534. While the Complaint provides that this feature operates on iPhone SE, 6, 6 Plus, 6s, 6s Plus, 7, and 7 Plus devices, id. ¶¶ 11, 20; id., Ex. 2, the Complaint is devoid of any allegations that the feature runs on any iPhone 5, 5c, or 5s or iPad models. Thus, Plaintiffs have failed to state a claim under Count 1 (violation of the Computer Fraud and Abuse Act), Count 5 (violation of the California Computer Data Access and Fraud Act), and Count 6 (trespass to chattels) with respect to iPhone 5, 5c, or 5s or iPad models. The Court therefore GRANTS with leave to amend Apple's motion to dismiss these claims for this limited set of devices. The Court's remaining discussion of Plaintiffs' computer-intrusion claims therefore excludes these devices.

2.      **Violation of the Computer Fraud and Abuse Act (Count 1)**

The Computer Fraud and Abuse Act ("CFAA") is a federal criminal statute that also authorizes civil actions for any person who suffers damage or loss by reason of a violation of the statute. 18 U.S.C. § 1030(g). "The CFAA prohibits a number of different computer crimes, the majority of which involve accessing computers without authorization or in excess of authorization, and then taking specified forbidden actions, ranging from obtaining information to damaging a computer or computer data." LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1131 (9th Cir. 2009) (citing 18 U.S.C. 1030(a)(1)–(7) (2004)). Plaintiffs allege that Apple violated § 1030(a)(5)(A) and (C), which create liability for whoever:

> (5)(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; . . . or
>
> (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

18 U.S.C. § 1030(a)(5)(A), (C).

No party contests that each Plaintiff's iPhone qualifies as a "protected computer," which the statute defines in relevant part as "an electronic . . . or other high speed data processing device performing logical, arithmetic, or storage functions" that "is used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(1)–(2); United States v. Kramer, 631 F.3d 900, 903 (8th Cir. 2011) (concluding the cell phones fall within this definition). Rather, the parties focus on the "without authorization" language, which appears in both § 1030(a)(5)(A) and § 1030(a)(5)(C). The phrase "without authorization" has been interpreted to mean "without permission." United States v. Nosal, 844 F.3d 1024, 1028 (9th Cir. 2016), cert. denied, 138 S. Ct. 314 (2017). Thus, a person may act "without authorization" where permission has never been given or where permission has been affirmatively revoked. Brekka, 581 F.3d at 1135.

The phrase "without authorization" modifies different actions in § 1030(a)(5)(A) and (C), and that distinction proves crucial to the analysis in this case. The Court begins with § 1030(a)(5)(A). There is no disagreement that Apple "knowingly cause[d] the transmission of a program, information, code, or command" by sending iOS updates. Rather, the dispute here centers on whether Apple, "as a result of [its knowing transmission], intentionally cause[d] damage without authorization" to Plaintiffs' iPhones. Thus, the relevant question is whether Plaintiffs have adequately pled that Apple caused damage to their iPhones without permission and did so intentionally. The Court concludes that Plaintiffs' allegations are sufficient.

Under the CFAA, "damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). The Complaint's allegations that the iOS updates slowed processor speeds in Plaintiffs' iPhones readily fit that definition. CAC ¶¶ 402–03. Moreover, based on the present allegations, Apple caused this damage without authorization. Specifically, the Complaint states that "[n]either the software update notification nor the software update release notes made any mention of this severe throttling effect." Id. ¶ 404. In this way, even though Plaintiffs voluntarily installed the iOS

United States District Court
Northern District of California

updates, they never gave permission for Apple to cause damage to their iPhones. That result is not changed for those Plaintiffs who were exposed to Apple's February 2017 disclosures about power management because those disclosures never mentioned the reduction in processor speeds. See id. ¶¶ 400–01. Finally, Plaintiffs plausibly plead intentionality by alleging that Apple designed the iOS updates to slow processing speed and concealed this effect. Id. ¶ 402. At the pleading stage, these allegations are sufficient to state a claim under § 1030(a)(5)(A). See San Miguel v. HP Inc., 317 F. Supp. 3d 1075, 1086 (N.D. Cal. 2018) (upholding § 1030(a)(5)(A) claim against motion to dismiss where plaintiffs alleged they authorized software update, not that they authorized damage to their devices).

The Court reaches a different result with respect to § 1030(a)(5)(C). Unlike in § 1030(a)(5)(A), the phrase "without authorization" in § 1030(a)(5)(C) modifies "access." In the statute's words, liability attaches if Apple "intentionally accesses a protected computer without authorization." 18 U.S.C. § 1030(a)(5)(C). Here, Apple had permission to access Plaintiffs' iPhones. Indeed, Plaintiffs gave Apple permission by choosing to voluntarily download and install the iOS updates. CAC ¶¶ 386–89. Although Plaintiffs plead that they must use Apple's operating software in order to use their iPhones, id. ¶ 446, they admit that they have a choice about whether to download an update, id. ¶ 387; see also id. ¶ 527 (stating that "Apple offered iOS Updates to consumers"). Courts in this district have reasoned that users who voluntarily installed software "would have serious difficulty" pleading unauthorized access under the CFAA. In re iPhone Application Litig., 844 F. Supp. 2d 1040, 1066 (N.D. Cal. 2012); In re Apple & ATTM Antitrust Litig., No. 07-CV-05152-JW, 2010 WL 3521965, at *7 (N.D. Cal. July 8, 2010) (noting that "[v]oluntary installation runs counter to . . . CFAA's requirement that the alleged act was 'without authorization'"). The Ninth Circuit has recognized the same, albeit in an unpublished decision. See In re Sony PS3 Other OS Litig., 551 F. App'x 916, 923 (9th Cir. 2014) ("[U]sers who had 'voluntarily installed' software that allegedly caused harm cannot plead unauthorized 'access' under the CFAA.").

Plaintiffs seek to remove themselves from these cases by arguing that their consent was not voluntary because "Apple concealed the true nature of the software at the time consent was requested." Opp. at 8. Although the Court does not necessarily foreclose a § 1030(a)(5)(C) claim based on ill-gotten consent, Plaintiffs do not sufficiently plead such a claim here. Plaintiffs do not, for example, allege that Apple posed as someone else or blatantly misdescribed the nature of the iOS updates in order to gain access to Plaintiffs' iPhones. Rather, Apple's message stated that the updates "include[d] bug fixes and improve[d] the security of [the] iPhone" or "include[d] bug fixes and improvements," and Plaintiffs allowed the update. CAC ¶¶ 360, 363, 399. As Plaintiffs' own authority acknowledges, "consent to an entry is often given legal effect even though the entrant has intentions that if known to the owner of the property would cause him . . . to revoke his consent." Desnick v. Am. Broad. Cos., 44 F.3d 1345, 1351 (7th Cir. 1995). The critical inquiry is the extent to which the intrusion infringes upon the specific interests that the underlying cause of action seeks to protect. Theofel v. Farey-Jones, 359 F.3d 1066, 1073 (9th Cir. 2004). Here, the CFAA was enacted "primarily to address the growing problem of computer hacking," and the Ninth Circuit has resisted efforts to expand the statute beyond that core. United States v. Nosal, 676 F.3d 854, 858 (9th Cir. 2012) (en banc). Permitting Plaintiffs' § 1030(a)(5)(C) claim to proceed on such thin allegations of vitiated consent would expand the CFAA too far.[4] However, the Court will grant Plaintiffs leave to amend their claim under § 1030(a)(5)(C) to add additional allegations about whether Apple's access was without authorization.

Finally, the Court rejects Apple's suggestion that the economic loss rule bars Plaintiffs' CFAA claim. Mot. at 34–35. The purpose of the economic loss rule is to "prevent[] the law of contract and the law of tort from dissolving one into the other." Robinson Helicopter Co. v. Dana Corp., 102 P.3d 268, 273 (Cal. 2004). Under the rule, a purchaser must "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and

---

[4] Similarly, Plaintiffs' cases regarding scope of consent are unhelpful to the "without authorization" inquiry. See Opp. at 24–25. Plaintiffs have not pled that Apple violated any of the CFAA sections that proscribe "exceed[ing] authorized access." See, e.g., 18 U.S.C. § 1030(a)(4).

Case No.: 18-md-02827-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

beyond a broken contractual promise." Id. at 272. The CFAA claim plainly falls outside the strictures of the economic loss rule. A CFAA claim is decidedly not a state-law tort claim but is instead a federal claim appended to a federal criminal statute. See 18 U.S.C. § 1030. Further underscoring that point, Plaintiffs allege that they were injured by Apple's violation of the CFAA, not by Apple's breach of a contractual promise to Plaintiffs. See Robinson Helicopter, 102 P.3d at 274 (holding that economic loss rule did not bar fraud and misrepresentation claims because those claims were independent of the alleged breach of contract). Thus, the economic loss rule does not operate to preclude Plaintiffs' CFAA claim.

Accordingly, the Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' CFAA claim under § 1030(a)(5)(C) but DENIES Apple's motion to dismiss Plaintiffs' CFAA claim under § 1030(a)(5)(A).

### 3. California Computer Data Access and Fraud Act (Count 5)

The California Computer Data Access and Fraud Act ("CDAFA") is the California state analogue to the federal CFAA. The CDAFA, codified in the California Penal Code, permits civil redress for any person who suffers damage or loss by reason of the commission of certain computer-related offenses. Cal. Penal Code § 502(c), (e)(1). Plaintiffs allege that Apple violated § 502(c)(4) and (5), which impose liability on any person who:

> (4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

> (5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

Id. § 502(c)(4)–(5).

For the CDAFA claim, Apple largely parrots its arguments with respect to the CFAA. In particular, Apple contends that "Plaintiffs have not alleged that Apple accessed their iPhones 'without permission,' as would be required to bring a claim under the CDAFA." Mot. at 32. The plain language of the statute belies Apple's reading. Section 502(c)(5) does not reference access

at all.  See People v. Childs, 164 Cal. Rptr. 3d 287, 303 (Ct. App. 2013) (explaining that § 502(c)(5) does not require unauthorized access).  Instead, that subsection asks whether the defendant "[k]nowingly and without permission disrupts or causes the disruption of computer services or causes the denial of computer services to an authorized user of a computer, computer system, or computer network."  While § 502(c)(4) requires access, it speaks of knowing—not unauthorized—access.  The Ninth Circuit has definitively recognized this distinction between the CFAA and the CDAFA: "The statutes are different.  In contrast to the CFAA, the California statute does not require *unauthorized* access.  It merely requires *knowing* access."  United States v. Christensen, 828 F.3d 763, 789 (9th Cir. 2015).  Under § 502(c)(4), the question is whether Apple acted without permission in "add[ing], alter[ing], damag[ing], delet[ing], or destroy[ing] any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network."

As to the substance of the alleged § 502 violations, Plaintiffs' allegations are sufficient to state a plausible claim for violations of both § 502(c)(4) and § 502(c)(5).  Under § 502(c)(4), Apple "knowingly access[ed]" a "computer system"—namely, Plaintiffs' iPhones—by providing and installing the iOS updates.  CAC ¶¶ 523–24.  Moreover, Plaintiffs plead that Apple did not inform Plaintiffs that installation of the iOS updates would slow the performance of their iPhones' processors and, therefore, that Plaintiffs did not consent to these changes.  Id. ¶¶ 524–25.  These allegations are adequate to conclude that Apple "without permission add[ed], alter[ed], damage[d], delete[d], or destroy[d] any data, computer software, or computer programs" on Plaintiffs' iPhones.  Cal. Penal Code § 502(c)(4).  Plaintiffs also state a viable claim under § 502(c)(5) based upon the alleged knowing and unconsented-to disruption of data processing caused by the iOS updates to their iPhones.  CAC ¶ 528; Cal. Penal Code § 502(b)(4) (defining "computer services" as "computer time, data processing, or storage functions, Internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network").  To the extent that Apple renews its economic loss rule argument with respect to the

CDAFA claim, Mot. 34–35, the Court again rejects this argument because Plaintiffs' CDAFA claim neither qualifies as a tort claim nor seeks the same damages as an alleged breach of contract. Accordingly, the Court DENIES Apple's motion to dismiss Plaintiffs' CDAFA claim.

### 4. Trespass to Chattels (Count 6)

"The essence of the cause of action for trespass is an 'unauthorized entry' onto the land of another." Miller v. Nat'l Broad. Co., 232 Cal. Rptr. 668, 677 (Ct. App. 1986) (citation omitted). The California Supreme Court has held that the principles underlying the tort apply to allegations of digital trespass. Intel Corp. v. Hamidi, 71 P.3d 296, 300 (Cal. 2003). Under California law, trespass to chattels "lies where an intentional interference with the possession of personal property has proximately caused injury." Thrifty-Tel, Inc. v. Bezenek, 54 Cal. Rptr. 2d 468, 473 (Ct. App. 1996). Thus, "[i]n order to prevail on a claim for trespass based on accessing a computer system, the plaintiff must establish: (1) defendant intentionally and without authorization interfered with plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately resulted in damage." eBay, Inc. v. Bidder's Edge, Inc., 100 F. Supp. 2d 1058, 1069–70 (N.D. Cal. 2000) (citing Thrifty-Tel, Inc., 54 Cal. Rptr. 2d at 473).

Plaintiffs plausibly plead facts establishing each of these elements. First, the Complaint contains sufficient allegations that Apple intentionally and without authorization interfered with Plaintiffs' possession of their iPhones. California case law has long recognized that consent to enter may be limited and that a trespass claim may lie when the scope of consent is exceeded. Civic W. Corp. v. Zila Indus., Inc., 135 Cal. Rptr. 915, 925 (Ct. App. 1977). Here, Plaintiffs' allegations fit that paradigm. Plaintiffs allege that the iOS updates were designed to slow their iPhones' processing speed. CAC ¶¶ 359, 364. And they allege that Apple did not inform consumers that the updates would do so. Instead, Apple's accompanying message told users that the updates "include[d] bug fixes and improvements," id. ¶¶ 360, 363, and "improve[d] power management during peak workloads to avoid unexpected shutdowns on iPhone," id. ¶¶ 400–01. In light of this limited information from Apple, Plaintiffs plausibly plead that they consented only "to

the installation of iOS Updates that would improve performance, not diminish performance" and that Apple acted outside the scope of that consent. Id. ¶ 534. Plaintiffs' allegations mirror other allegations held "sufficient to state a claim for digital trespass incident to a software download." San Miguel, 317 F. Supp. 3d at 1088 (collecting cases).

Second, the Complaint includes the requisite allegations that Apple's unauthorized use caused injury. The California Supreme Court has recognized that the California tort of trespass "does not encompass . . . an electronic communication that neither damages the recipient computer system nor impairs its functioning." Hamidi, 71 P.3d at 300. However, the "damages" element may be satisfied when the plaintiff pleads that the trespass "impaired the condition, quality, or value of the personal property." Fields v. Wise Media, LLC, No. 12-CV-05160 WHA, 2013 WL 5340490, at *4 (N.D. Cal. Sept. 24, 2013). Plaintiffs easily clear that hurdle here. They plead that the iOS updates impaired the functioning of their iPhones by substantially slowing their processing speed (by as much as 50%). CAC ¶¶ 405, 409–17. Such significant reduction in performance is enough to state a claim for trespass to chattels. See In re Lenovo Adware Litig., No. 15-MD-02624-RMW, 2016 WL 6277245, at *9 (N.D. Cal. Oct. 27, 2016) (finding sufficient plaintiffs' allegations that the defendant's actions "significantly degraded the performance of the Lenovo computers," such as by "slow[ing] internet upload speeds by as much as 55 percent" and causing webpages not to load). This is not a case in which the plaintiff has alleged that the defendant's actions have merely "taken up valuable bandwidth and storage space" or "shortened the battery life of the [device]." In re iPhone, 844 F. Supp. 2d at 1069. Instead, the alleged changes wrought by Apple's iOS updates in the instant case "establish a significant reduction in service constituting an interference with the intended functioning of the system." Id.

Unlike Plaintiffs' CFAA and CDAFA claims, Plaintiffs' trespass to chattels claim is a tort claim that could be subject to the economic loss rule. Baggett v. Hewlett-Packard Co., No. 07-CV-0667-AG, 2009 WL 3178066, at *2 (C.D. Cal. Sept. 29, 2009) ("[M]any cases have applied the economic loss rule to bar claims of trespass to chattels . . . ."). Despite this distinction, the

Court still finds that the economic loss rule is inapplicable to Plaintiffs' trespass to chattels claim. The operative inquiry is whether "the alleged damages 'are the same economic losses arising from the alleged breach of contract.'" Senah, Inc v. Xi'an Forstar S & T Co., No. 13-CV-04254-BLF, 2014 WL 3044367, at *6 (N.D. Cal. July 3, 2014) (quoting Multifamily Captive Grp. LLC v. Assurance Risk Managers, Inc., 629 F. Supp. 2d 1135, 1146 (E.D. Cal. 2009). Thus, courts have applied the economic loss rule to trespass claims when the duty owed arises solely out of a contract. See, e.g., Expedited Packages, LLC v. Beavex Inc., No. 15-CV-00721-MMM, 2015 WL 13357436, at *4 (C.D. Cal. Sept. 10, 2015) ("[W]here the duty arises as a result of the contract, the claim is not cognizable."); McGehee v. Coe Newnes/McGehee ULC, No. 03-CV-05145-MJJ, 2004 WL 2452855, at *3 (N.D. Cal. Feb. 10, 2004) ("[T]he duty Plaintiffs owed Defendant was only a contractual one."). As discussed above, Plaintiffs plead their trespass to chattels claim with its attendant damages separate and apart from any breach of contract. See Robinson Helicopter, 102 P.3d at 274 (holding that economic loss rule did not bar fraud and misrepresentation claims because those claims were independent of the alleged breach of contract). For these reasons, the Court rejects Apple's final challenge to Plaintiffs' trespass to chattels claim and therefore DENIES Apple's motion to dismiss this claim.

## C. California Consumer Protection Claims (Counts 2–4)

Plaintiffs bring three causes of action which centrally focus on allegations that Apple made misrepresentations or concealed information about the characteristics of Plaintiffs' iPhones and the nature of the iOS updates. Because Plaintiffs' theory for these consumer-protection claims is not confined to the iOS updates, Apple cannot seek wholesale dismissal of the claims with respect to iPhone 5 and iPad devices. Contra Mot. at 35. The Court first addresses Plaintiffs' affirmative misrepresentation and fraudulent omissions theories for all three causes of action, then addresses the additional theories of liability under other prongs of the California Unfair Competition Law.

**1.** **California Consumer Legal Remedies Act, Unfair Competition Law "Fraudulent" Prong, and False Advertising Law (Counts 2–4)**

Plaintiffs assert misrepresentation and concealment theories under the California Consumer Legal Remedies Act ("CLRA"), the "fraudulent" prong of the California Unfair Competition Law ("UCL"), and the California False Advertising Law ("FAL"). See Cal. Civ. Code § 1770 (prohibiting "unfair methods of competition and unfair or deceptive acts or practices"); Cal. Bus. & Prof. Code § 17200 (prohibiting any "fraudulent business act or practice"); id. § 17500 (prohibiting any "unfair, deceptive, untrue, or misleading advertising"). Specifically, Plaintiffs raise an affirmative misrepresentation theory and a fraudulent omissions theory. The Court examines each theory in turn.

### a. Affirmative Misrepresentation

Plaintiffs' first theory of liability under the CLRA, the "fraudulent" prong of the UCL, and the FAL is that Apple affirmatively misrepresented the characteristics of Plaintiffs' devices. In spite of the length of Plaintiffs' complaint, their allegations in this regard are relatively skimpy and unfocused. The most specific allegation is that "Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market." CAC ¶ 488. Even if that allegation has a solid factual basis, see id. ¶¶ 288–342, general assertions that a product "would operate at or above the industry standard or performance" are non-actionable because they are very unlikely to mislead a reasonable consumer. Williams v. Yamaha Motor Corp., U.S.A., No. 13-CV-05066-BRO, 2015 WL 13626022, at *9 (C.D. Cal. Jan. 7, 2015); Elias v. Hewlett-Packard Co., 950 F. Supp. 2d 1123, 1133 (N.D. Cal. 2013) (holding that "generalized advertisements that a computer is 'ultra-reliable' or 'packed with power'" are non-actionable because they "say nothing about the specific characteristics or components of the computer"). Apple's broad statements about improving features and product superiority are insufficient to ground Plaintiffs' affirmative misrepresentation claim.

In their opposition, Plaintiffs select a handful of specific statements made by Apple that are applicable to only some of the devices at issue. Opp. at 15–16. Those statements do not fare any better. For example, Apple's press releases for the iPhone 5s, iPhone 6, and iPhone 6 Plus allegedly touted faster performance and better battery life. See CAC ¶¶ 297 (advertising iPhone 5s as "faster and better than ever" with "great battery life."), 304 (advertising iPhone 6 and iPhone 6 Plus as having "blazing fast performance and power efficiency"). But, again, none of these statements makes a claim about specific or absolute characteristics of the products. Plaintiffs mainly focus their energy on certain statements made by Apple about the iPhone 5. In particular, Apple allegedly proclaimed in marketing materials that the iPhone 5 would "deliver[] even better battery life" with "performance and graphics up to twice as fast," and that, "even at [its] accelerated speed, iPhone 5 has more than twice enough battery power to last throughout the day—up to 8 hours of browsing on a cellular connection, up to 8 hours of talk time, and up to 10 hours of video playback time." CAC ¶¶ 291, 294 (alteration omitted). Even if these statements about the attributes of the iPhone 5 are actionable, In re Nexus 6P Prod. Liab. Litig., 293 F. Supp. 3d 888, 937 (N.D. Cal. 2018) (discussing statement about "get[ting] up to seven hours of use after only ten minutes of charging"), Plaintiffs "fail to particularly explain what is false or misleading about the statements," Yastrab v. Apple Inc., 173 F. Supp. 3d 972, 979 (N.D. Cal. 2016). No Plaintiff who purchased an iPhone 5 alleges that he or she was unable to use the phone for the amount of time specified in Apple's advertising. And while Plaintiffs plead that some users faced "sudden shutdowns of iPhones 5 and 6," those users indicated only that their "battery life was still at or above 30%" at the time of shutdown, not that their phones had not lasted for the indicated amount of time. CAC ¶ 390.[5]

Plaintiffs' affirmative misrepresentation claim falters on another front: Plaintiffs do not plead exposure to Apple's allegedly misleading advertising statements. Federal Rule of Civil

---

[5] Plaintiffs also do not elaborate on their allegation that Apple advertised the iPhone 6 as having a processor speed of 1.4 GHz, but "benchmark tests run by iPhone 6 users following the iOS 10.2.1 update revealed a processor speed of 600MHz." Id. ¶ 413.

Case No.: 18-md-02827-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Procedure 9(b) requires that Plaintiffs "specify which statements the plaintiff actually saw and relied upon." In re Nexus 6P, 293 F. Supp. 3d at 951 (quoting In re Arris Cable Modem Consumer Litig., No. 17-CV-01834-LHK, 2018 WL 288085, at *8 (N.D. Cal. Jan. 4, 2018)); Figy v. Amy's Kitchen, Inc., No. 13-CV-03816 SI, 2013 WL 6169503, at *4 (N.D. Cal. Nov. 25, 2013) ("Although there may be an inference of reliance upon a showing of materiality, to adequately allege reliance, a plaintiff must still at a minimum allege that he saw the representation at issue."). Plaintiffs do not come close to fulfilling that high burden here. At best, Plaintiffs present a conclusory allegation that their devices "did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace." See, e.g., CAC ¶¶ 30, 32, 34. That allegation is not enough.

Nor can Plaintiffs escape this conclusion merely by pointing to the allegation that Apple conducted a "multiple year, consistent marketing plan." Id. ¶ 288. Even if Plaintiffs are able to amend the Complaint's allegations to show that Apple's advertising campaign is false or misleading, Plaintiffs are still obligated under Rule 9(b) to "plead separately and with particularity their individual exposure to the purportedly deceptive advertising campaign so as to put defendant on notice 'what' the alleged misrepresentations were." In re NJOY, Inc. Consumer Class Action Litig., No. 14-CV-00428-MMM, 2014 WL 12586074, at *10 (C.D. Cal. Oct. 20, 2014). Without any exposure allegations in the Complaint, Plaintiffs' affirmative misrepresentation claim fails.

Accordingly, the Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' claims under the CLRA, the "fraudulent" prong of the UCL, and the FAL to the extent those claims are predicated upon an affirmative misrepresentation theory.

### b. Fraudulent Omissions

Plaintiffs' second theory of liability under the CLRA, the "fraudulent" prong of the UCL, and the FAL is that Apple fraudulently omitted information about Plaintiffs' devices. Omissions may give rise to liability under California consumer-protection laws. Hodsdon v. Mars, Inc., 891 F.3d 857, 861 (9th Cir. 2018). But "to be actionable the omission must be contrary to a

representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." Daugherty v. Am. Honda Motor Co., 51 Cal. Rptr. 3d 118, 126 (Ct. App. 2006); see also Wilson v. Hewlett-Packard Co., 668 F.3d 1136, 1141 (9th Cir. 2012) (same). Plaintiffs contend that Apple had a duty to disclose the purported defect—namely, the alleged mismatch between the battery performance and the operational needs of the devices. Opp. at 10–14.

The state of the law on the duty to disclose under California law is in some disarray. A 2012 Ninth Circuit decision contained language suggesting that, in the absence of affirmative misrepresentations, a plaintiff must "allege that the design defect caused an unreasonable safety hazard." Wilson, 668 F.3d at 1143; see also Williams v. Yamaha Motor Co., 851 F.3d 1015, 1026 (9th Cir. 2017) (citing Wilson as "holding that where a defendant has not made an affirmative misrepresentation, a plaintiff must allege the existence of an unreasonable safety hazard"). However, an intervening 2015 decision by the California Court of Appeal casts some doubt on the notion that a plaintiff must always plead an unreasonable safety hazard. See Rutledge v. Hewlett-Packard Co., 190 Cal. Rptr. 3d 411, 420 (Ct. App. 2015) (allowing consumer-protection claims to proceed even without "defects related to safety concerns"). In a recent 2018 case, the Ninth Circuit recognized this tension in the cases but declined to decide whether the safety-hazard requirement applies in all circumstances. See Hodsdon, 891 F.3d at 861–62 ("While the recent California cases do cast doubt on whether Wilson's safety-hazard requirement applies in all circumstances, we have no occasion in this case to consider whether the later state-court cases have effectively overruled Wilson."). Specifically, the Ninth Circuit concluded that plaintiffs could not state a claim even under their own reading of the California cases. Id. at 862.

This Court similarly need not offer any commentary on the vitality of Wilson and the safety-hazard requirement because Plaintiffs do not state a claim under any formulation of the duty to disclose that they advance. First and foremost, Plaintiffs plainly do not "allege that the design defect caused an unreasonable safety hazard." Wilson, 668 F.3d at 1143. Although the Complaint offhandedly mentions reports of Apple devices catching fire or exploding, the Complaint concedes

that those events may be "[i]n addition to," not caused by, the asserted defects. CAC ¶ 320 n.17. Plaintiffs' opposition also refers to "practical, every-day safety issues" that may arise because "consumers rely on their Devices to communicate in emergencies." Opp. at 12 n.18. Not only do Plaintiffs fail to plead that fact in their Complaint, but courts have dismissed claims of safety risks in similar circumstances. See Smith v. Ford Motor Co., 462 F. App'x 660, 663 (9th Cir. 2011) (finding too speculative the safety concern that a defective ignition-lock could leave consumers stranded on the side of the road); In re Nexus 6P, 293 F. Supp. 3d at 928 ("[T]he safety risk of being stranded with a nonfunctioning phone has been held to be too speculative to amount to an unreasonable safety hazard."). Plaintiffs do not adequately allege an unreasonable safety hazard.

As the Ninth Circuit explained, one reading of the case law is that the "safety hazard pleading requirement is not necessary in *all* omission cases." Hodsdon, 891 F.3d at 864. Specifically, the Ninth Circuit recognized that manufacturers may "have a duty to disclose a defect when it affects the central functionality of a product." Id. at 863. And the Ninth Circuit laid out the three circumstances that a plaintiff must plead to raise this duty to disclose. First, a plaintiff must allege "that the omission was material." Id. Second, a plaintiff must allege "that the defect was central to the product's function." Id. Third, a plaintiff must allege one of the following: "(1) [that] the defendant is the plaintiff's fiduciary; (2) [that] the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff; (3) [that] the defendant actively conceals a material fact from the plaintiff; [or] (4) [that] the defendant makes partial representations that are misleading because some other material fact has not been disclosed." Id. at 862 (quoting Collins v. eMachines, Inc., 134 Cal. Rptr. 3d 588, 593 (Ct. App. 2011)).

Before delving into the heart of the inquiry, the Court notes upfront a slight shift in Plaintiffs' theory that affects the analysis. Before the JPML, Plaintiffs zeroed in on the iOS updates and Apple's alleged misrepresentations with regard to those updates. In re Apple Inc. Device Performance Litig., 291 F. Supp. 3d 1371, 1371–72 (U.S. Jud. Pan. Mult. Lit. 2018) ("Plaintiffs also allege that Apple misrepresented the nature of the iOS updates and failed to

adequately disclose to iPhone owners the impact the iOS updates would have on the performance of their iPhones.").  Plaintiffs have greatly expanded their theory of liability in the Complaint. Now, Plaintiffs allege that all devices at issue in this case were "defective at the point of sale," <u>see, e.g.</u>, CAC ¶¶ 30, 32, 34, because Apple sold them with a known mismatch between software and hardware capability, <u>see id.</u> ¶ 9 (defining the defect as "a mismatch between the Devices' hardware, including their processing chips and rechargeable lithium-ion batteries, and the ever-increasing demands placed on the Devices via Apple's constantly-updating iOS software platform").  Plaintiffs' Complaint and opposition treat the iOS updates as further evidence that Apple concealed and exacerbated the underlying defect.  <u>See, e.g.</u>, <u>id.</u> ¶ 30; Opp. at 11–12.  As the Court noted above, this wide-ranging theory undermines Apple's efforts to dismiss Plaintiffs' claims with respect to iPhone 5 and iPad devices.  <u>Contra</u> Mot. at 35.

Nevertheless, without sufficient supporting factual allegations, the breadth of Plaintiffs' theory buckles under its own weight.  Although the asserted defects affect the operation of the processors in Plaintiffs' devices and can cause those devices to shut down and remain dead until reconnected to power, CAC ¶¶ 2, 4, Plaintiffs do not satisfactorily plead the circumstances necessary to trigger Apple's duty to disclose.  As discussed in more detail below, the Complaint does not provide a sufficient basis to conclude either that Apple's omission is material or that Apple concealed material facts unknown to Plaintiffs.

First, Plaintiffs do not adequately allege that Apple's omission was material.  <u>Hodsdon</u>, 891 F.3d at 863.  A fact is "material" if "a reasonable consumer would deem it important in determining how to act in the transaction at issue."  <u>Gutierrez v. Carmax Auto Superstores Cal.</u>, 228 Cal. Rptr. 3d 699, 720 (Ct. App. 2018) (CLRA); <u>see also</u> <u>Hinojos v. Kohl's Corp.</u>, 718 F.3d 1098, 1107 (9th Cir. 2013) (UCL and FAL).  Because the test focuses on the "reasonable consumer," Plaintiffs cannot overcome this requirement with their uniform allegation that all Plaintiffs "would not have purchased the Device, or would have paid substantially less for it" had they been told about the defects.  <u>See, e.g.</u>, CAC ¶¶ 30, 32, 34.  Instead, Plaintiffs must plead facts

sufficient to raise the plausible inference that Apple's disclosure of the alleged defects would be important in the reasonable consumer's decision about whether to purchase the Apple device at the stated price.

Although the Court is mindful that materiality is typically a question of fact that should not be decided at the motion to dismiss stage, In re Tobacco II Cases, 207 P.3d 20, 39 (Cal. 2009), both common sense and Plaintiffs' own allegations here undercut the materiality element. Importantly, Plaintiffs plead that Apple was required to inform customers about the "Defects and Battery Issues." CAC ¶¶ 488, 499, 514. However, Plaintiffs have not defined those terms in a way that disclosure would affect a reasonable consumer's decision about whether to purchase the product at the stated price. The Complaint broadly defines the "Defects" as the alleged "mismatch between the Devices' hardware, including their processing chips and rechargeable lithium-ion batteries, and the ever-increasing demands placed on the Devices via Apple's constantly-updating iOS software platform." Id. ¶ 9; id. ¶ 370 ("Apple developed and sold Devices that contained an inherent mismatch between battery performance and the operational needs of the Devices."). Relatedly, the Complaint defines "Battery Issues" as "the limitations of the batteries to provide enough power current to keep pace with the new demands." Id. ¶ 11. In other words, Plaintiffs' theory appears to be that Apple was duty-bound to disclose that their batteries will eventually need replacement because increasing software capability puts more demands on hardware and battery capacity degrades over time. See id. ¶ 397 ("[T]he battery was not designed with enough power to meet the peak demands of the phone's processor as the battery aged."). Plaintiffs' contention is far too sweeping.

As Plaintiffs' own allegations demonstrate, consumers are fully aware of the facts regarding software capability and battery capacity. For years, consumers have had to replace batteries in their cell phones and other devices. Indeed, before the Apple iPhone came on the market, "cell phones without user-replaceable batteries were almost unheard of." Id. ¶ 378. Replacing batteries is a natural consequence of the fact that "[a] lithium-ion battery's capacity is

degraded over time by discharge/recharge cycles, elevated temperatures, and aging." Id. ¶ 380; see also id. ¶ 392 ("[T]he impedance of lithium-ion batteries used in iPhones increases as the cells age, resulting in both a reduction in overall battery capacity and a reduction in the battery's ability to produce peak power output."). Plaintiffs even allege that "[i]t is *well known* to smartphone manufacturers, including Apple, that lithium-ion batteries degrade over time as the number of discharge/recharge cycles increases." Id. ¶ 381 (emphasis added). Similarly, Plaintiffs' Complaint explains the natural phenomenon that as "processing units become faster and more powerful," "they also require more power from the phone's battery." Id. ¶ 391. Eventually, a phone may "switch off" when "the battery ages and is unable to deliver the peak power demanded by the phone's processor." Id. ¶ 396.[6]

In addition to consumers' baseline awareness of the inevitably of battery decay, Apple's representations made that point even more salient with respect to the devices at issue. For example, Plaintiffs acknowledge that Apple, like other smartphone manufacturers (including Samsung, LG, and Google), warranties its batteries for a limited amount of time. CAC ¶ 416. Specifically, Apple provides a "one-year warranty," which includes "service coverage for a defective battery." Id. In that warranty, Apple explicitly notes that the iPhone "battery is designed to retain up to 80% of its original capacity at 500 complete charge cycles." Id.; id. ¶ 416 n.60 (stating that the iPad "battery is designed to retain up to 80% of its original capacity at 1000 complete charge cycles"). These statements make clear that consumers cannot realistically expect their batteries to last for the lifetime of their devices (or even necessarily for more than a year). No Plaintiff alleges that the battery in his or her device did not live up to the standards actually communicated by Apple. Even if Apple's later statements about the iOS updates designed to fix the battery-capacity issue omitted key information, Plaintiffs tie their claims and alleged harm to the point of sale, not to the point at which Apple slowed the processing speed of their devices.

---

[6] Although Plaintiffs also plead that "Apple's batteries (as designed) degraded *overly quickly*," id. ¶ 384 (emphasis added), they provide no explanatory allegations and do not otherwise allege that Apple knew about this over-degradation.

See, e.g., id. ¶¶ 30, 32, 34. Without a solid factual underpinning, Plaintiffs have not adequately alleged that the omitted information would have influenced a reasonable consumer's decision about whether to purchase the Apple device at the stated price.

Second, Plaintiffs do not adequately allege that Apple was Plaintiffs' fiduciary, had exclusive knowledge of material facts not reasonably accessible to Plaintiffs, concealed a material fact from Plaintiffs, or made partial representations while suppressing other material facts. Hodsdon, 891 F.3d at 862. Plaintiffs do not contend that Apple had any fiduciary role. Instead, Plaintiffs argue that the other three circumstances relating to suppression of materials facts are adequately alleged in the instant case. Again, the disclosures that Plaintiffs wish Apple to have made are so far-reaching that they do not fit within any of the recognized circumstances triggering the duty to disclose.

For example, Plaintiffs have not adequately pled that Apple "ha[d] exclusive knowledge of material facts not known or reasonably accessible to the plaintiff" or "actively conceal[ed] a material fact from the plaintiff." Id. (quoting Collins, 134 Cal. Rptr. 3d at 593). The Court has already detailed above that common sense and Plaintiffs' own allegations demonstrate that consumers know about the degradation of batteries and the increasing capability of software. Plaintiffs admit that their "iPhones worked as expected when new." CAC ¶ 397. Their real concern is that "even after a few months or years, [the devices] began to cease functioning, i.e., switching off at random intervals, when the iPhone processor required too much power of its flagging iPhone battery." Id. However, Plaintiffs do not plead that Apple knew that the devices would cease functioning within "a few months." Rather, Plaintiffs generally assert that Apple was on notice that the software would eventually outpace the hardware (as the software improved and the battery degraded). Id. ¶¶ 393–97. Framed in this way, Plaintiffs' allegations are insufficient because these facts were not in Apple's exclusive knowledge but were readily accessible to the public, including Plaintiffs.

1    Nor have Plaintiffs adequately alleged that Apple "ma[de] partial representations that

2  [we]re misleading because some other material fact ha[d] not been disclosed." Hodsdon, 891 F.3d

3  at 862.  As a preliminary matter, Plaintiffs flunk the standards of Federal Rule of Civil Procedure

4  9(b) because they fail to pinpoint which of Apple's representations were rendered misleading by

5  the identified omission.  See Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (explaining

6  that Rule 9(b) requires an account of the content of the allegedly false representations).  To the

7  extent that Plaintiffs rely on Apple's general advertising statements evincing the speed and long

8  battery life of the devices, Plaintiffs do not explain precisely how those statements are misleading

9  when consumers know about the problem of declining battery performance.  That conclusion has

10  added force because Apple's "one-year warranty" on its batteries expressly notes that the iPhone

11  "battery is designed to retain up to 80% of its original capacity at 500 complete charge cycles."

12  CAC ¶ 416; id. ¶ 416 n.60 (listing battery life for iPad).  At this juncture, the Court need not

13  address whether Apple's statement that the iOS updates included only "bug fixes" and

14  "improvements" was misleading when Apple designed the updates to inhibit the processing speed

15  of the devices because Plaintiffs regard these updates as a means of hiding the defects.

16    In reality, Plaintiffs apparently seek to hold Apple liable for failing to provide a battery

17  that lasted as long as Plaintiffs preferred.  Plaintiffs' own allegations are to that effect.  Plaintiffs

18  readily concede "that iPhones worked as expected when new."  Id. ¶ 397.  In their view, the

19  problem is that "[a] battery and processor must be designed such that even as the battery ages and

20  loses performance, it will still be capable of meeting the processor's peak power demands for

21  years to come."  Id. ¶ 393; see also id. ¶ 394 ("Electronics manufacturers like Apple . . . must

22  design batteries to be more powerful than they need to be so that as they grow weaker, they still

23  have the ability to meet the processor's peak power demands.").  Nevertheless, California courts

24  have been careful to "cabin[] the scope of the duty to disclose to avoid the unsavory result that

25  manufacturers are on the hook for every product defect that occurs at any time, regardless of any

26  time limits contained in their warranties."  In re Nexus 6P, 293 F. Supp. 3d at 928 (citing

27

28

Daugherty v. Am. Honda Motor Co., 51 Cal. Rptr. 3d 118, 122 (Ct. App. 2006)). Plaintiffs' liability theory is nearly limitless and "raises concerns about the use of consumer fraud statutes to impermissibly extend a product's warranty period." Williams, 851 F.3d at 1029.

Accordingly, the Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' claims under the CLRA, the "fraudulent" prong of the UCL, and the FAL to the extent those claims are predicated upon a fraudulent omissions theory.

### 2. California Unfair Competition Law "Unlawful" Prong (Count 3)

Plaintiffs predicate their claim under the "unlawful" prong of the UCL in part on Apple's alleged violation of the CDAFA. See CAC ¶ 508. The "unlawful" prong of the UCL covers "any business practice that violate[s] an independent statutory duty." Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 973 P.2d 527, 549 (Cal. 1999). Because the Court has already concluded that Plaintiffs have stated a claim against Apple under the CDAFA for all devices except iPhone 5 and iPad devices, they have also stated a claim against Apple for violation of the UCL "unlawful" prong except with respect to iPhone 5 and iPad models. Accordingly, the Court GRANTS with leave to amend Apple's motion to dismiss Plaintiff's UCL claim under the unlawful prong with respect to iPhone 5 and iPad models, but otherwise DENIES Apple's motion to dismiss Plaintiffs' UCL claim under the unlawful prong.

### 3. California Unfair Competition Law "Unfair" Prong (Count 3)

The "unfair" prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law. Korea Supply Co. v. Lockheed Martin Corp., 63 P.3d 937, 943 (Cal. 2003). The UCL does not define the term "unfair," and the proper definition in the consumer context is "currently in flux" among California courts. Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting Lozano v. AT & T Wireless Servs., Inc., 504 F.3d 718, 735 (9th Cir. 2007)). Although the precise test has not been definitively established, the Ninth Circuit has approved the use of two tests in consumer actions. Lozano, 504 F.3d at 736. First, the "tethering test" requires "that the public policy which is a predicate to a

consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions." Drum v. San Fernando Valley Bar Ass'n, 106 Cal. Rptr. 3d 46, 53 (Ct. App. 2010) (quoting Bardin v. DaimlerChrysler Corp., 39 Cal. Rptr. 3d 634, 636 (Ct. App. 2006)). Second, the "balancing test" asks whether the alleged business practice "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." Id. (quoting Bardin, 39 Cal. Rptr. 3d at 636).

The Court may sidestep the bulk of this analysis because Apple challenges Plaintiffs' claim under the UCL's "unfair" prong on the ground that the "unlawful" and "fraudulent" prongs do not survive. Mot. at 31 n.22; Reply at 17 n.16. The Court has already ruled that Plaintiffs' claim under the UCL's "unlawful" prong may proceed as to all devices except iPhone 5 and iPad models. Thus, Apple's argument falls away on that front. The allegations that would apply to the iPhone 5 and iPad concern whether Apple concealed the asserted defects from consumers. See CAC ¶¶ 497, 499, 501. But Apple's "failure to disclose information it had no duty to disclose in the first place is not substantially injurious, immoral, or unethical" and has not been alleged to violate any manifest legislative policy. Hodsdon, 891 F.3d at 867. Accordingly, the Court GRANTS with leave to amend Apple's motion to dismiss Plaintiff's UCL claim under the unfair prong with respect to iPhone 5 and iPad models, but otherwise DENIES Apple's motion to dismiss Plaintiffs' UCL claim under the unfair prong.

## IV. CONCLUSION

For the reasons set forth above, Apple's motion to dismiss is GRANTED in part and DENIED in part. Specifically, the Court rules as follows:

- The Court GRANTS with leave to amend Apple's motion to dismiss the non-U.S. Plaintiffs' FAL claims.

- The Court DENIES Apple's motion to dismiss the U.K. Plaintiffs' claims under either the doctrine of international comity or forum non conveniens.

United States District Court
Northern District of California

- The Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' CFAA claim with respect to iPhone 5 and iPad models. The Court also GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' CFAA claim to the extent that it is based on § 1030(a)(5)(C). The Court otherwise DENIES Apple's motion to dismiss Plaintiffs' CFAA claim.

- The Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' CLRA claim.

- The Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' UCL claim under the unlawful and unfair prongs with respect to iPhone 5 and iPad models, but otherwise DENIES Apple's motion to dismiss Plaintiffs' UCL claim under the unlawful and unfair prongs. The Court GRANTS Apple's motion to dismiss Plaintiffs' UCL claim under the fraudulent prong.

- The Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' FAL claim.

- The Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' CDAFA claim with respect to iPhone 5 and iPad models, but otherwise DENIES Apple's motion to dismiss Plaintiffs' CDAFA claim.

- The Court GRANTS with leave to amend Apple's motion to dismiss Plaintiffs' trespass to chattels claim with respect to iPhone 5 and iPad models, but otherwise DENIES Apple's motion to dismiss Plaintiffs' trespass to chattels claim.

Plaintiffs may file and serve an amended complaint consistent with this Order no later than November 1, 2018.

**IT IS SO ORDERED.**

Dated: October 1, 2018

EDWARD J. DAVILA
United States District Judge

Case No.: 18-md-02827-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS