# Attachment A

**COTCHETT, PITRE & McCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: 650-697-6000
Facsimile: 650-697-0577
*jcotchett@cpmlegal.com*
*mmolumphy@cpmlegal.com*

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206243)
350 Sansome Street, Suite 400
San Francisco, California 94104
Telephone: 415-772-4700
Facsimile: 415-772-4707
*lking@kaplanfox.com*

Frederic S. Fox (*pro hac vice*)
Donald R. Hall (*pro hac vice*)
David A. Straite (*pro hac vice*)
850 Third Avenue
New York, New York 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*dstraite@kaplanfox.com*

*Interim Co-Lead Class Counsel*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION | Case No. 5:18-md-02827-EJD |
| | **CLASS ACTION** |
| This Document Relates To: | **SECOND CONSOLIDATED AMENDED COMPLAINT** |
| ALL ACTIONS. | |
| | Hon. Edward J. Davila |

**REDACTED PUBLIC VERSION OF DOCUMENT**

**PURSUANT TO COURT ORDER**

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ........................................................................................................... 1

**JURISDICTION AND VENUE** ...................................................................................... 6

**INTRADISTRICT ASSIGNMENT** ................................................................................ 7

**PARTIES** ........................................................................................................................ 7

    A.   Plaintiffs ................................................................................................................ 7

    B.   Defendants and Their Relevant Corporate Structure ...................................... 97

**SUBSTANTIVE ALLEGATIONS** ................................................................................ 99

I.    APPLE ISSUED MATERIALLY FALSE AND STATEMENTS EMINATING FROM CALIFONRIA TO SELL DEFECTIVE DEVICES TO THE CLASS ........................................................................ 99

    A.   iPhones ............................................................................................................. 101

        i.     iPhone 5 ................................................................................................ 101

        ii.    iPhone 5s ............................................................................................... 103

        iii.   iPhone 5c ............................................................................................... 104

        iv.   iPhone 6 and 6 Plus .............................................................................. 105

        v.    iPhone 6s and iPhone 6s Plus .............................................................. 107

        vi.   iPhone SE ............................................................................................. 108

        vii.  iPhone 7 and iPhone 7 Plus ................................................................ 109

    B.   iPads ................................................................................................................. 111

        i.     Fourth Generation iPad ........................................................................ 111

        ii.    iPad Mini .............................................................................................. 111

        iii.   iPad Air ................................................................................................ 112

        iv.   iPad Mini 2 ........................................................................................... 113

        v.    Update to Fourth Generation iPad ....................................................... 114

        vi.   iPad Air 2 .............................................................................................. 114

|     |     | vii. | The iPad Mini 3 ................................................................ | 115 |
|     |     | viii. | iPad Pro and iPad Mini 4 ............................................... | 115 |
|     |     | ix. | 9.7-Inch iPad Pro ............................................................ | 116 |
|     |     | x. | Fifth Generation iPad ..................................................... | 117 |
|     |     | xi. | iPad Pro in 10.5-inch and 12.9-inch Models ................. | 117 |
|     |     | xii. | Sixth Generation iPad ..................................................... | 118 |

II.  APPLE'S MATERIALLY FALSE STATEMENTS AND OMISSIONS CONCERNING THE iOS SOFTWARE ................................................................................................ 119

III.  APPLE'S DEFECTIVE DEVICES AND ITS SECRET THROTTLING IN iOS UPDATES .................. 126

    A.  The Devices are Defective Resulting in Staggering Levels of UPOs ......................... 126

        i.  An Overview ................................................................... 126

        ii.  Lithium-ion Battery Aging as a Function of Resistance Level ........................ 128

        iii.  Representations Regarding Device Performance and Battery Life .................. 129

        iv.  Apple's Internal Analysis of UPOs and Prematurely Aging Batteries ............. 130

        v.  Apple Throttles the Devices Based on Resistance ............................. 134

        vi.  Apple Failed to Adequately Test the Devices and Had no Basis for Its False Statements ................................................................ 135

        vii.  Apple's Statements Were Material to iPhone Consumers ................................ 136

    B.  Apple Compounded the Defect by Stressing Device Batteries with Power-Hungry Software: iOS Updates ................................. 138

    C.  The Release of iOS 10 was Secretly Designed to Camouflage the Defect ................ 140

    D.  Apple Released iOS 10.2.1 to Further Conceal the Defect ......................................... 142

    E.  The Defect in Apple's Devices, and the Impact of Throttling, is Evidenced by Independent Analysis ................................. 145

IV.  APPLE'S REVENUES DEPEND ON SELLING NEW DEVICES, AND THE "UPGRADE" FINANCIAL MODEL WAS CRITICALLY FAILING IN 2016-2017 ................................................ 148

V.  RELATED CASES AND PROCEEDINGS ........................................................................... 152

    A.  United States – California State Court ........................................................................ 152

B.  United States – Federal Cases Not Consolidated ........................................ 152

C.  United States – Congressional and Senate Proceedings ............................. 152

D.  United States – Federal Regulatory Proceedings ....................................... 153

E.  Canada – Regulatory Proceedings ............................................................. 153

F.  Canada – Litigation ................................................................................... 154

G.  Canada – Litigation – Quebec ................................................................... 154

H.  Israel – Regulatory Proceedings ................................................................ 155

I.  Israel – Litigation ..................................................................................... 155

J.  France – Criminal Proceedings ................................................................. 155

K.  Italy – Regulatory Proceedings ................................................................. 156

L.  China – Regulatory Proceedings ............................................................... 156

M.  Russia – Litigation .................................................................................... 156

N.  South Korea – Litigation ........................................................................... 156

O.  South Korea – Regulatory Proceedings ..................................................... 157

P.  Additional Regulatory Proceedings ........................................................... 157

Q.  Additional Related Litigation .................................................................... 158

VI.  APPLE'S SOFTWARE LICENSE AGREEMENT ..................................................... 160

CLASS ALLEGATIONS ................................................................................................ 162

TOLLING OF APPLICABLE LIMITATIONS PERIODS ............................................. 166

CAUSES OF ACTION ON BEHALF OF THE CLASS ................................................ 167

VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT .................................... 167

VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT ....................................... 168

VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ........................... 170

VIOLATIONS OF CALIFORNIA'S FALSE AND MISLEADING ADVERTISING LAW . 175

CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT ..................................... 176

TRESPASS TO CHATTELS ................................................................................. 178

FRAUD ................................................................................................................ 179

CONSTRUCTIVE FRAUD ................................................................................ 180

FRAUDULENT INDUCEMENT ...................................................................... 182

BREACH OF CONTRACT ................................................................................. 183

BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING ................. 184

MONEY HAD AND RECEIVED ...................................................................... 186

FRAUDULENT OMISSION OR CONCEALMENT ......................................... 186

FRAUDULENT MISREPRESENTATION ........................................................ 188

NEGLIGENT MISREPRESENTATION ........................................................... 190

QUASI-CONTRACT / UNJUST ENRICHMENT ............................................. 190

VIOLATION OF THE CONSUMER PROTECTION FROM UNFAIR TRADING
   REGULATIONS 2008 (2008 NO. 1277) (ON BEHALF OF THE UNITED KINGDOM
   SUBCLASS ................................................................................................... 191

VIOLATION OF THE CONSUMER RIGHTS ACT 2015 (2015 C. 15) (ON BEHALF OF THE
   UNITED KINGDOM SUBCLASS) ............................................................... 193

ALABAMA DECEPTIVE TRADE PRACTICES ACT ....................................... 195

ALASKA CONSUMER PROTECTION ACT ..................................................... 197

ARIZONA CONSUMER FRAUD ACT ............................................................. 199

ARKANSAS DECEPTIVE TRADE PRACTICES ACT ..................................... 200

COLORADO CONSUMER PROTECTION ACT ............................................... 202

CONNECTICUT UNFAIR TRADE PRACTICES ACT ..................................... 204

DELAWARE CONSUMER FRAUD ACT ......................................................... 206

DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT .............. 208

FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT .................. 210

GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT ....................... 211

HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT .............. 213

HAWAII UNIFORM DECEPTIVE TRADE PRACTICE ACT ............................ 215

IDAHO CONSUMER PROTECTION ACT ........................................................................ 216

ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ........ 217

ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT ........................................ 219

INDIANA DECEPTIVE CONSUMER SALES ACT ......................................................... 220

IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT ........................ 224

KANSAS CONSUMER PROTECTION ACT ................................................................... 225

KENTUCKY CONSUMER PROTECTION ACT ............................................................... 227

LOUISIANA UNFAIR TRADE PRACTICES AND  CONSUMER PROTECTION LAW ... 229

MAINE UNFAIR TRADE PRACTICES ACT .................................................................. 231

MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT ........................................... 232

MARYLAND CONSUMER PROTECTION ACT .............................................................. 234

MASSACHUSETTS CONSUMER PROTECTION ACT .................................................... 236

MICHIGAN CONSUMER PROTECTION ACT ................................................................ 238

MINNESOTA CONSUMER FRAUD ACT ...................................................................... 239

MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT .................................. 240

MISSISSIPPI CONSUMER PROTECTION ACT .............................................................. 242

MISSOURI MERCHANDISE PRACTICES ACT .............................................................. 244

MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT ...... 245

NEBRASKA CONSUMER PROTECTION ACT ................................................................ 247

NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT .................................... 248

NEVADA DECEPTIVE TRADE PRACTICES ACT .......................................................... 250

NEW HAMPSHIRE CONSUMER PROTECTION ACT ..................................................... 251

NEW JERSEY CONSUMER FRAUD ACT ...................................................................... 253

NEW MEXICO UNFAIR PRACTICES ACT .................................................................... 254

NEW YORK GENERAL BUSINESS LAW ...................................................................... 256

NORTH CAROLINA UNFAIR TRADE PRACTICES ACT ............................................... 257

NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT .................................. 258

OHIO CONSUMER SALES PRACTICES ACT .......................................................... 260

OHIO DECEPTIVE TRADE PRACTICES ACT ......................................................... 261

OKLAHOMA CONSUMER PROTECTION ACT ....................................................... 263

OREGON UNLAWFUL TRADE PRACTICES ACT .................................................... 265

PENNSYLVANIA UNFAIR TRADE PRACTICES AND ............................................... 267

CONSUMER PROTECTION LAW ....................................................................... 267

RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT .......................................... 269

SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT ........................................... 270

SOUTH DAKOTA DECEPTIVE TRADE PRACTICES .............................................. 273

AND CONSUMER PROTECTION ACT ................................................................ 273

TENNESSEE CONSUMER PROTECTION ACT ..................................................... 275

TEXAS DECEPTIVE TRADE PRACTICES — CONSUMER PROTECTION ACT ........... 278

UTAH CONSUMER SALES PRACTICES ACT ....................................................... 281

VERMONT CONSUMER FRAUD ACT ................................................................ 283

VIRGIN ISLANDS CONSUMER FRAUD AND DECPETIVE BUSINESS
    PRACTICES ACT ....................................................................................... 286

VIRGIN ISLANDS CONSUMER PROTECTION LAW .............................................. 288

VIRGINIA CONSUMER PROTECTION ACT ........................................................ 290

WASHINGTON CONSUMER PROTECTION ACT .................................................. 293

WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT .............................. 294

WISCONSIN DECEPTIVE TRADE PRACTICES ACT ............................................. 298

WYOMING CONSUMER PROTECTION ACT ....................................................... 300

**PRAYER FOR RELIEF** ................................................................................ 302

**JURY DEMAND** ........................................................................................ 302

## INTRODUCTION

1.      Plaintiffs file this Second Consolidated Amended Complaint[1] for Damages and Equitable Relief against Apple Inc. ("Apple," the "Company," or "Defendant") on behalf of themselves and all persons worldwide who purchased, owned, used, or leased one or more of Apple's Devices[2] (the "Class" as defined herein) for fraudulent misrepresentations and omissions, and other unlawful and unfair business practices.  The allegations in this Second Amended Complaint are based on information and belief, including *inter alia* a review of documents produced by Apple in this litigation to date and consultation with experts.

2.      After years of customer frustration, on December 20, 2017, Apple admitted to one of the largest consumer frauds in history, affecting hundreds of millions of Apple Devices across the globe.  Prompting the admission were reports of unexplained shutdowns and unexpected power-offs ("UPOs") of certain Devices and Apple's decision to secretly throttle certain Devices, which was discovered by a third-party.

3.      Apple's conduct, as alleged herein, caused the U.S. Department of Justice – Criminal Division, Fraud Section ████████████████████████ to issue grand jury subpoenas to Apple.  Non-public investigations have also been opened by the U.S. Securities and Exchange Commission, ██████████████████████████████ ████████████████████████ and foreign regulatory entities.

4.      As discussed in detail below and in ¶¶ 369 - 405, Apple designed its Devices in such a way that when used in the ordinary course, Apple's power-hungry operating software (which is required to use the Device) and its applications strained the battery powering the

---

[1] Plaintiffs' reallege the claims related to iPads in their entirety and the "throttling" claims for the iPhone 5, iPhone 5s, and iPhone 5c solely to preserve those claim for appeal.  *Miletak v. Allstate Ins. Co.*, 2007 WL 7061350, at *4 (N.D. Cal. July 18, 2007).

[2] As used herein, the term "Devices" are the following products designed and marketed by Apple for sale: the iPhone 5, iPhone 5s, iPhone 5c, iPhone SE, iPhone 6, iPhone 6s, iPhone 6 Plus, iPhone 6s Plus, iPhone 7, iPhone 7 Plus, the Fourth Generation iPad, iPad Mini, iPad Air, iPad Mini 2, Update to Fourth Generation iPad, iPad Air 2, iPad Mini 3, iPad Mini 4, iPad Pro, 9.7-Inch iPad Pro, Fifth Generation iPad, iPad Pro 10.5-inch and 12.9 inch models, and Sixth Generation iPad.

Device, thereby causing the battery to age and degrade prematurely (the "Defect").  As set forth herein, batteries in the Devices aged more than twice as fast as Apple represented.

5.      Apple represents that its batteries will last for 500 complete charge cycles.  Apple's Device batteries, however, "aged" well before 500 cycles and well before the typical aging of batteries.



6.      Apple's internal findings prompted a Senior Software Engineering Manager at Apple to state:

> **I am highly concerned that we have a bigger issue here then [sic] [user interface] and customer perception.  There is some evidence that we truly have batteries that are reaching high [resistance] values at a rate that is faster then [sic] expected.**

7.      Based on Apple's standardized metric of one complete charge cycle per day, Apple's representation that its batteries are "designed to retain up to 80% of its original capacity at 500 complete charge cycles" was plainly intended to convey to consumers that their batteries are designed to function as advertised for approximately 500 days.

8.      These representations were materially false because they failed to disclose the known Defect, and because millions of Devices did not perform as stated under normal use.

9.      Members of Apple's Executive Team, including CEO Tim Cook, knew that consumers were frustrated by the UPOs.  Mr. Cook also knew that AppleCare told a consumer that it received "over 1 million complaints" regarding slowed Devices and that AppleCare encouraged the consumer to upgrade "to the new iPhone 8."

10.



████████████████████████ These individuals were also aware that in many cases, Devices were experiencing UPOs well before 500 cycles.

11.     Despite this knowledge at the upper echelons of the Company, Apple failed to inform consumers of the Defect and continued selling millions of Devices, notwithstanding their knowledge of the Defect and the increasing rate of UPOs.

12.     Members of Apple's Executive Team instead decided to throttle Devices with high resistance levels via iOS 10.2.1 (and later iOS 11.2) (the "Updates") in response to batteries in the field that had aged prematurely.  Apple actively concealed the decision to slow millions of the Devices from Plaintiffs and the Class.

13.     The throttling via the Updates permitted Apple to have batteries that draw less current to run the Devices.  The trade-off, however, was that the processing speed and other operations were substantially reduced.

14.     The Updates did not solve the problem caused by the Defect.  It merely concealed the Defect from the public by secretly throttling the Devices' performance to reduce the number of UPOs consumers experienced.  Yet, even after the iOS update, Apple acknowledged that ████████████████████████████████████████

15.     Apple's secret throttling did not stop at iOS 10.2.1.[3]  On December 2, 2017, another set of throttling code was inserted in iOS 11.2, but Apple again told consumers the update was primarily to fix "bugs" and provide "improvements."  Apple did not reveal the Defect until independent research was published online in mid-December 2017, which demonstrated the marked degradation of performance in a large sampling of Devices following installation of the Updates, thereby prompting Apple to begin to come clean.

16.     On December 20, 2017, Apple tacitly admitted that the Updates intentionally slowed the Devices (the "December 20 Admission") stating, in relevant part:

Our goal is to deliver the best experience for customers, which includes overall

---

[3] Notably, prior to releasing 10.2.1, in early January 2017, Apple released a software update on the Devices to gather additional diagnostic data.

performance and prolonging the life of their devices.  Lithium-ion batteries become less capable of supplying peak current demands when in cold conditions, have a low battery charge or as they age over time, which can result in the device unexpectedly shutting down to protect its electronic components.

Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to **smooth out** the instantaneous peaks only when needed to prevent the device from unexpectedly shutting down during these conditions. We've now extended that feature to iPhone 7, with iOS 11.2, and plan to add support for other products in the future.[4]

17.     The December 20 Admission, however, contained the further misrepresentation that the code was designed to "**smooth out**" allegedly "[unexpected] instantaneous peaks" in performance.  A downpour of media reports ensued, several of which used the more appropriate term — "throttle" — to define this "smooth[ing]" feature that Apple inserted into the Updates.

18.     While Plaintiffs and the Class need not attribute any motive behind Apple's intentional degradation of the Devices, it is evident that Apple did so for the simple reason most frauds are committed: money.  Although technically complex in part, the scheme was logical and simple:  Devices were designed defectively, and Apple released Updates to conceal the Defect, all the while exacerbating the Defect's effects— principally decreased performance — so that Device users had no choice but to purchase new batteries or upgrade their Devices, resulting in additional payments to Apple and a sustained (albeit forced) customer base.

19.     Highlighting Apple's dependence on the "success" of its defective products, the Devices represented at least 70% of Apple's overall revenue for at least fiscal years 2013 to 2017 (nearly $800 billion), and to date.  In 2016 — just prior to the first of the Updates — Apple was stumbling for the first time in 15 years in iPhone sales, was facing a saturated iPhone market, decreased sales of iPads (and even its Mac product line), the end or phasing out of third party vendor "two-year" service contracts, and increased competition overall.

20.     As such, a perfect storm was brewing for Apple, with a host of problems threatening its continued ability to profit in the smartphone and tablet markets.  ***No time, and***

---

[4] Shara Tibiken, "Apple admits slowing older iPhones, says it's to prevent battery issues," *C/Net* (Dec. 20, 2017) (available online at https://www.cnet.com/news/apple-slows-down-older-iphone-battery-issues/#ftag=CAD-09-10aai5b) (last visited July 1, 2018).

*particularly during 2016 and 2017*, was a good time for Apple to reveal that its Devices were defective.  And so, the sly saga progressed.

21.    Following the December 20 Admission, Apple's statements and conduct reveal a carefully orchestrated public relations maneuver to continue to conceal and misrepresent the true extent of Apple's misconduct with regard to the Devices and the Defect.  Apple has failed, even today, to affirmatively tell consumers that the Company sold them Devices that suffered from the Defect, which impairs the Device's central functioning and purpose.

22.    While Apple also "apologize[d]" on December 28, 2017, the apology is just more public relations machinations.  In fact, the December 28, 2017 Apple statement (the "Apology") merely confirmed the earlier undisclosed material facts – facts which Apple should have disclosed long before. As stated by Apple in the "Apology":

> iOS 10.2.1 (released January 2017) includes updates for previous models of iPhone to prevent them from unexpectedly shutting down.  This includes a feature for iPhone 6, iPhone 6 Plus, iPhone 6s, iPhone 6s Plus, and iPhone SE to dynamically manage the instantaneous performance peaks, only when needed, to prevent the device from unexpectedly shutting down.  This capability was also extended to iPhone 7 and iPhone 7 Plus with iOS 11.2, and we will continue improving our power management feature in the future.  This feature's only intent is to prevent unexpected shutdowns so that the iPhone can still be used.

> This power management works by looking at a combination of the device temperature, battery state of charge, and battery impedance.  Only if these variables require it, iOS will dynamically manage the maximum performance of some system components, such as the CPU and GPU, in order to prevent unexpected shutdowns. As a result, the device workloads will self-balance, allowing a smoother distribution of system tasks, rather than larger, quick spikes of performance all at once.  In some cases, a user may not notice any differences in daily device performance.  The level of perceived change depends on how much power management is required for a particular device.

> In cases that require more extreme forms of this power management, the user may notice effects such as:

> Longer app launch times

> Lower frame rates while scrolling

> Backlight dimming (which can be overridden in Control Center)

> Lower speaker volume by up to -3dB

> Gradual frame rate reductions in some apps

> During the most extreme cases, the camera flash will be disabled as visible in the

camera UI

Apps refreshing in background may require reloading upon launch.[5]

23.     While government officials and regulators, both domestic and foreign, are investigating and/or examining Apple's conduct,[6] it is insufficient to help members of the Class, each of whom are forced to choose among four harms going forward: 1) turn off the "throttling" feature, subjecting the Device to increased risk of UPOs; 2) keep the "throttling" feature on, subjecting the Device to reduced performance; 3) buy a new battery, paying money now ($29 in the United States and a similar amount in other countries) and not knowing whether or when the Device will again be at risk for UPOs; or 4) upgrade to a new Device.  So not only are Plaintiffs and the Class entitled to damages for past harms, each and every Class member who has not yet upgraded must necessarily choose which of the four harms above they "prefer" in the future.

24.     As discussed herein, Apple includes a California choice-of-law provision in the Software License Agreement accompanying its iOS software, ostensibly applicable on a near-global basis.   Plaintiffs accordingly allege claims under both federal and California law, and in the alternative under (or in some cases, in addition to) the laws of other jurisdictions.

## JURISDICTION AND VENUE

25.     This Consolidated Complaint is intended to serve as a superseding complaint as to all other complaints consolidated in this multidistrict litigation, and to serve for all purposes as the operative pleading for the Class defined below.  As set forth herein, this Court has general jurisdiction over Apple and original jurisdiction over Plaintiffs' claims.

26.     This Court has federal question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs allege that Apple violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

---

[5] Apple, iPhone and Battery Performance, Understand iPhone performance and its relation to your battery (Dec. 31, 2017), *available at* https://goo.gl/C4paop.

[6] *See* discussion *supra* at ¶ 3 and *infra* at Part V.

27.     This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, and Apple is a citizen of a State different from that of at least one Class member.

28.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

29.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because Apple's principal place of business is located in this District and substantial parts of the events or omissions giving rise to the claims occurred in the District.  Venue is also proper in this Court because Apple is located here, the causes of action arose here, and as Apple has admitted, the Devices at issue herein have always been designed, manufactured, and tested by Apple in this District.

## INTRADISTRICT ASSIGNMENT

30.     Assignment of the cases originally filed within this District to the San Jose Division is proper pursuant to Local Rule 3-2-(c)-(e), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Santa Clara County, California.

## PARTIES

A.  **Plaintiffs**[7]

### ALABAMA

31.     **Plaintiff Joseph Taylor** is a resident and citizen of the State of Alabama and he acquired an iPhone 6 on April 8, 2015. Prior to his purchase of the Device, he did not know, nor

---

[7] With the filing of this Consolidated Amended Complaint in this multidistrict jurisdiction case, several Plaintiffs have been "added" that were not in the original filed complaints before the Judicial Panel on Multidistrict Litigation or otherwise transferred to this Court.  Accordingly, Plaintiffs have filed a separate complaint with this Court on behalf of the added Plaintiffs, and are seeking intra-district transfer and consolidation, for the sake of ensuring subject matter jurisdiction.

could he have known through reasonable diligence, of the Defect in his Device.  Taylor

downloaded and installed iOS 10.2.1 on his Device in or around January or February of 2017.

32.     Not only did Taylor's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS updates would cause the way

Taylor's Device operated to fundamentally change.  Taylor's Device did not operate as

promised in Apple's advertisements, representations, and the information publicly available in

the marketplace.  Additionally, none of the packaging in which the Device was sold to Taylor

revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

or otherwise regulate the battery power and speed pursuant to which Taylor's Device would

operate.  Accordingly, not only was Taylor's Device defective at the point of sale due to the

Defect, but Apple exacerbated the problems with Taylor's Device via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, Taylor did not receive

the benefit of his bargain, and was injured as a result.  If Taylor had been told of the Defect and

the deceptive manner in which Apple would damage the Device after sale, Taylor would not

have purchased the Device, or would have paid substantially less for it.

## ALABAMA

33.     **Plaintiff Khendle Harvest Williams** is a resident and citizen of the State of

Alabama and she purchased an iPhone 6 and 6s for her daughter in or about September 2014.

She purchased two iPhone 7 Pluses in or about January 2017.  She also purchased an iPhone 7

Plus in or about November 2016.  Prior to her purchases of the Devices, she did not know, nor

could she have known through reasonable diligence, of the Defect in her Devices.

34.     Not only did Williams's Devices not operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS updates would cause the way

Williams's Devices operated to fundamentally change.  Williams's Devices did not operate as

promised in Apple's advertisements, representations, and the information publicly available in

the marketplace.  Additionally, none of the packaging in which the Devices were sold to

Williams revealed that there was any Defect or that Apple would use the Updates to "smooth,"

"throttle," or otherwise regulate the battery power and speed pursuant to which Williams's Devices would operate.  Accordingly, not only were Williams's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Williams's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Williams did not receive the benefit of her bargains, and was injured as a result.  If Williams had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Williams would not have purchased the Devices or would have paid substantially less for them.

### ALASKA

35.     **Plaintiff Loren Haller** is a resident and citizen of the State of Alaska and he purchased an iPhone 6 on or around October 2014, an iPhone 6s on or around November 2015, an iPhone 7 on or around October 2016, and an iPhone 7 Plus on or around January 2017. Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence of the Defect in his Devices.

36.     Not only did Haller's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Haller's Devices operated to fundamentally change.  Haller's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Haller revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Haller's Devices would operate.  Accordingly, not only was Haller's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Haller's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Haller did not receive the benefit of his bargain, and was injured as a result.  If Haller had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Haller would not have purchased the Devices, or would have paid substantially less for them.

**ARIZONA**

37.     **Plaintiff Alex Eugene Rodriguez** is a resident and citizen of the State of Alaska and he purchased an iPhone SE in or about July or August 2016 in Arizona. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Defect in his Device.  Rodriguez downloaded and installed iOS updates as they were recommended.

38.     Not only did Rodriguez's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Rodriguez's Device operated to fundamentally change.  Rodriguez's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Rodriguez revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Rodriguez's Device would operate.  Accordingly, not only was Rodriguez's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Rodriguez's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Rodriguez did not receive the benefit of his bargain, and was injured as a result.  If Rodriguez had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Rodriguez would not have purchased the Device, or would have paid substantially less for it.

**ARIZONA / TEXAS**

39.     **Plaintiff Jonathan David** is a resident and citizen of the State of Arkansas and he purchased an iPhone 6 Plus in Arizona and an iPhone 6 in Texas in March 2015.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence of the Defect in his Devices.  At time of initial purchase, the Devices operated on iOS 8.  David downloaded and installed iOS 10 on his iPhone 6 in the fall of 2016.

40.     Not only did David's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way David's Devices operated to fundamentally change.  David's Devices, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to David revealed that there was any Defects or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which David's Devices would operate.  Accordingly, not only were David's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with David's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, David did not receive the benefit of his bargain, and was injured as a result.  If David had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, David would not have purchased the Devices, or would have paid substantially less for them.

## ARIZONA

41.     **Plaintiff Daphne Bowles Rodriguez** is a resident and citizen of the State of Arizona and she purchased an iPhone 5 on December 1, 2012, an iPhone 6 in or around 2014 or 2015, and an iPhone 7 in 2017.  Prior to her purchases of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchases, the Devices operated on the latest version of iOS.

42.     Not only did Rodriquez's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Rodriquez's Devices operated to fundamentally change.  Rodriquez's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Rodriquez revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Rodriquez's

Devices would operate.  Accordingly, not only were Rodriquez's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Rodriquez's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Rodriquez did not receive the benefit of her bargain, and was injured as a result.  If Rodriquez had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Rodriquez would not have purchased the Devices, or would have paid substantially less for them.

**ARIZONA**

43.      **Plaintiff Trent Young** is a resident and citizen of the State of Arizona and he purchased an iPhone 6s in September 2015. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device. Young regularly downloaded and installed iOS updates when prompted.

44.      Not only did Young's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Young's Device operated to fundamentally change.  Young's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Young revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Young's Device would operate.  Accordingly, not only was Young's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Young's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Young did not receive the benefit of his bargain, and was injured as a result.  If Young had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Young would not have purchased the Device, or would have paid substantially less for it.

**ARKANSAS**

45.     **Plaintiff Cynthia Stacy** is a resident and citizen of the State of Arkansas and she purchased an iPhone 6 Plus on or around 2015.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

46.     Not only did Stacy's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Stacy's Device operated to fundamentally change.  Stacy's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Stacy revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Stacy's Device would operate.  Accordingly, not only was Stacy's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Stacy's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Stacy did not receive the benefit of her bargain, and was injured as a result.  If Stacy had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Stacy would not have purchased the Device, or would have paid substantially less for it.

**CALIFORNIA**

47.     **Plaintiff Amanda Holman** is a resident and citizen of the State of California and she purchased an iPhone 6 in January 2015 and an iPhone 6 Plus in October 2016.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, her Devices operated on their factory-installed iOS versions.   Holman downloaded and installed iOS 9 on her iPhone 6 in or around October 2015 and iOS 10.3.1 on her iPhone 6 Plus in or around May 2017.

48.     Not only did Holman's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 9, 10.3.1, or any of the future updates would cause the way Holman's Devices operated to fundamentally change.  Holman's

Devices, particularly after installation of iOS 9 and 10.3.1, respectively, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Holman revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Holman's Devices would operate.  Accordingly, not only were Holman's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Holman's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Holman did not receive the benefit of her bargain and was injured as a result.  If Holman had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Holman would not have purchased the Devices, or would have paid substantially less for them.

## CALIFORNIA

49.   **Plaintiff John Webb** is a resident and citizen of the State of California and he purchased an iPhone 7 Plus on January 4, 2017.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on iOS 10.  Webb downloaded and installed iOS 11 on his iPhone 7 Plus in or around September 2017.

50.   Not only did Webb's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Webb's Device operated to fundamentally change.  Webb's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Webb revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Webb's Device would operate.  Accordingly, not only was Webb's Device defective at the point of sale due to the Defect, but Apple exacerbated the

1    problems with Webb's Device via its misrepresentations and omissions with the iOS software

2    Updates.  As a result of Apple's actions, Webb did not receive the benefit of his bargain, and

3    was injured as a result.  If Webb had been told of the Defect and the deceptive manner in which

4    Apple would damage the Device after sale, Webb would not have purchased the Device, or

5    would have paid substantially less for it.

6                                          **CALIFORNIA**

7            51.    **Plaintiff Laura Gail Diamond** is a resident and citizen of the State of California

8    and she has purchased multiple generations of the iPhone dating back to the iPhone 4

9    generation, including an iPhone 6 and 6s Plus in fall 2015, and an iPhone 7 in fall 2016.  Prior

10   to her purchases of the Devices, she did not know, nor could she have known through

11   reasonable diligence, of the Defect in her Devices.  At time of initial purchase, the Devices

12   operated on their factory-installed iOS versions.

13           52.    Not only did Diamond's Devices not operate as Apple warranted and promised

14   initially, but Apple never represented or warranted that iOS 11.1 or any future updates would

15   cause the way Diamond's Devices operated to fundamentally change.  Diamond's Devices, for

16   example after installation of iOS 11.1 on her iPhone 7, did not operate as promised in Apple's

17   advertisements, representations, and the information publicly available in the marketplace.

18   Additionally, none of the packaging in which the Devices were sold to Diamond revealed that

19   there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

20   regulate the battery power and speed pursuant to which Diamond's Devices would operate.

21   Accordingly, not only were Diamond's Devices defective at the point of sale due to the Defect,

22   but Apple exacerbated the problems with Diamond's Devices via its misrepresentations and

23   omissions with the iOS software Updates.  As a result of Apple's actions, Diamond did not

24   receive the benefit of her bargain and was injured as a result.  If Diamond had been told of the

25   Defect and the deceptive manner in which Apple would damage the Devices after sale,

26   Diamond would not have purchased the Devices, or would have paid substantially less for them.

27

28

**CALIFORNIA**

53.     **Plaintiff Robert Gilson** is a resident and citizen of the State of California and he purchased an iPhone 6s.  Prior to his purchases of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on iOS 9.   In or around January 2017, Gilson downloaded and installed iOS 10.2.1 on his Device.

54.     Not only did Gilson's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any future updates would cause the way Gilson's Device operated to fundamentally change.  Gilson's Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Gilson revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Gilson's Device would operate.  Accordingly, not only was Gilson's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Gilson's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Gilson did not receive the benefit of his bargain and was injured as a result.  If Gilson had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Gilson would not have purchased the Device, or would have paid substantially less for it.

**CALIFORNIA**

55.     **Plaintiff Romeo Alba** is a resident and citizen of the State of California and he purchased an iPhone 6 Plus in September 2014.  Prior to his purchases of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the iPhone 6 Plus operated on iOS 8.   In or around October 2017, Alba downloaded and installed iOS 11 on his iPhone 6 Plus.

56.     Not only did Alba's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any future updates would cause the way Alba's Device operated to fundamentally change.  Alba's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Alba revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Alba's Device would operate.  Accordingly, not only was Alba's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Alba's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Alba did not receive the benefit of his bargain, and was injured as a result.  If Alba had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Alba would not have purchased the Device, or would have paid substantially less for it.

## CALIFORNIA

57.     **Plaintiff Sara Hawes** is a resident and citizen of the State of California and she leased multiple generations of the iPhone, including an iPhone 5 (in August 2013), two iPhone 6 Devices (in September and December 2014), and an iPhone 7 Plus (in September 2016).  Prior to her lease of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial lease, the Devices operated on their factory-installed iOS versions.

58.     Not only did Hawes's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Hawes's Devices operated to fundamentally change.  Hawes's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Hawes revealed that

there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Hawes's Devices would operate.

Accordingly, not only were Hawes's Devices defective at the point of lease due to the Defect,

but Apple exacerbated the problems with Hawes's Devices via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, Hawes did not receive

the benefit of her bargain and was injured as a result.  If Hawes had been told of the Defect and

the deceptive manner in which Apple would damage the Devices after sale, Hawes would not

have leased the Devices, or would have paid substantially less for them.

### CALIFORNIA

59.  **Plaintiff Thomas Cook** is a resident and citizen of the State of California, and

he purchased an iPhone 6 on September 30, 2014.  Prior to his purchase of the Device, he did

not know, nor could he have known through reasonable diligence, of the Defect in his Device.

At time of initial purchase, the Device operated on iOS 8.  Cook downloaded and installed iOS

10.2.1 on his Device in or around January 2017.

60.  Not only did Cook's Device fail to operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS 10.2.1 or any future updates would

cause the way Cook's Device operated to fundamentally change.  Cook's Device, particularly

after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements,

representations, and the information publicly available in the marketplace.  Additionally, none

of the packaging in which the Device was sold to Cook revealed that there was any Defect or

that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

power and speed pursuant to which Cook's Device would operate.  Accordingly, not only was

Cook's Device defective at the point of sale due to the Defect, but Apple exacerbated the

problems with Cook's Device via its misrepresentations and omissions with the iOS software

Updates.  As a result of Apple's actions, Cook did not receive the benefit of his bargain, and

was injured as a result.  If Cook had been told of the Defect and the deceptive manner in which

Apple would damage the Device after sale, Cook would not have purchased the Device, or would have paid substantially less for it.

### CALIFORNIA

61.      **Plaintiff Ida Villegas** is a resident and citizen of the State of California and she purchased an iPhone 6 in or about September 2014.  She also purchased and iPhone 6S in or about 2016.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.

62.      Not only did Villegas's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Villegas's Devices operated to fundamentally change.  Villegas's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Villegas revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Villegas's Devices would operate.  Accordingly, not only were Villegas's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Villegas's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Villegas did not receive the benefit of her bargain, and was injured as a result.  If Villegas had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Villegas would not have purchased the Devices, or would have paid substantially less for them.

### CALIFORNIA

63.      **Plaintiff Heidi Valle** is a resident and citizen of the State of California and she purchased two iPhone 5s in or about 2013 or 2014.  She also purchased an iPhone 6 and iPhone 6s Plus on or about September 12, 2014.  She purchased an iPhone 6 on or about October 2, 2015.  She purchased an iPhone 7 in or about September 2016.  Prior to her purchases of the

1    Devices, she did not know, nor could she have known through reasonable diligence, of the

2    Defect in her Device. Valle regularly updated iOS as prompted.

3         64.    Not only did Valle's Devices not operate as Apple warranted and promised

4    initially, but Apple never represented or warranted that iOS updates would cause the way

5    Valle's Devices operated to fundamentally change. Vales's Devices did not operate as

6    promised in Apple's advertisements, representations, and the information publicly available in

7    the marketplace. Additionally, none of the packaging in which the Devices were sold to Valle

8    revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

9    or otherwise regulate the battery power and speed pursuant to which Valle's Devices would

10   operate. Accordingly, not only were Valles's Devices defective at the point of sale due to the

11   Defect, but Apple exacerbated the problems with Valle's Devices via its misrepresentations and

12   omissions with the iOS software Updates. As a result of Apple's actions, Valle did not receive

13   the benefit of her bargain, and was injured as a result. If Valle had been told of the Defect and

14   the deceptive manner in which Apple would damage the Devices after sale, Valle would not

15   have purchased the Devices, or would have paid substantially less for it.

16                                    **CALIFORNIA**

17        65.    **Plaintiff Samara Diner** is a resident and citizen of the State of California and

18   she purchased an iPhone 6 on April 15, 2015. Prior to her purchase of the Device, she did not

19   know, nor could she have known through reasonable diligence, of the Defect in her Device. At

20   time of initial purchase, the Device operated on the latest version of iOS. Diner downloaded

21   and installed the latest versions of iOS on her Device within a couple days of receiving any

22   update notifications.

23        66.    Not only did Diner's Device not operate as Apple warranted and promised

24   initially, but Apple never represented or warranted that any version of iOS or any of the future

25   updates would cause the way Diner's Device operated to fundamentally change. Diner's

26   Device, after continued installations, did not operate as promised in Apple's advertisements,

27   representations, and the information publicly available in the marketplace. Additionally, none

28

of the packaging in which the Device was sold to Diner revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Diner's Device would operate.  Accordingly, not only was Diner's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Diner's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Diner did not receive the benefit of her bargain, and was injured as a result.  If Diner had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Diner would not have purchased the Device, or would have paid substantially less for it.

## COLORADO

67.    **Plaintiff Gary Merenstein** is a resident and citizen of the State of Colorado and he purchased an iPhone 5c in the Fall of 2013 and an iPhone SE in 2016.  Prior to his purchases of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the iPhone 5c operated on iOS 7 and the iPhone SE operated on iOS 9.

68.    Not only did Merenstein's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any future iOS updates would cause the way Merenstein's Devices operated to fundamentally degrade.  Merenstein's Devices, particularly after installation of the Updates in his iPhone SE, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Merenstein revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Merenstein's Devices would operate.  Not only were Merenstein's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Merenstein's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Merenstein did not receive the benefit of his bargain, and was injured as a result.  If

Merenstein had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Merenstein would not have purchased the Devices, or would have paid substantially less for them.

### COLORADO

69.    **Plaintiff Steven Connolly** is a resident and citizen of the State of Idaho and he purchased two iPhone 6 Devices on February 14, 2015 in Colorado while a Colorado resident. Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the iPhone 6 Devices operated on iOS 8.

70.    Not only did Connolly's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Connolly's Devices operated to fundamentally change.  Connolly's Devices, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Connolly revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Connolly's Devices would operate. Accordingly, not only were Connolly's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Connolly's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Connolly did not receive the benefit of his bargain and was injured as a result.  If Connolly had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Connolly would not have purchased the Devices, or would have paid substantially less for them.

### COLORADO

71.    **Plaintiff Bryan Schell** is a resident of France and citizen of the State of Wyoming and he purchased an iPhone 5s on May 15, 2014 in Colorado.  Prior to his purchase

of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on iOS 7.

72.     Not only did Schell's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 9 or any of the future updates would cause the way Schell's Device operated to fundamentally change.  Schell's Device, particularly after installation of iOS 9, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Schell revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Schell's Device would operate.  Accordingly, not only was Schell's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Schell's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Schell did not receive the benefit of his bargain, and was injured as a result.  If Schell had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Schell would not have purchased the Device, or would have paid substantially less for it.

## CONNECTICUT

73.     **Plaintiff Sandra Merola** is a resident and citizen of the State of Connecticut and she purchased an iPhone 6 Plus in 2015 and purchased an iPhone 7 Plus in December 2017. Prior to her purchases of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.

74.     Not only did Merola's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Merola's Devices operated to fundamentally change.  Merola's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Merola revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

or otherwise regulate the battery power and speed pursuant to which Merola's Devices would operate.  Accordingly, not only were Merola's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Merola's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Merola did not receive the benefit of her bargain, and was injured as a result.  If Merola had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Merola would not have purchased the Devices, or would have paid substantially less for them.

## CONNECTICUT

75.    **Plaintiff Ashley Ann Antonucci** is a resident and citizen of the State of Connecticut and she purchased an iPhone 6 in or about November 2015.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

76.    Not only did Antonucci's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Antonucci's Device operated to fundamentally change.  Antonucci's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Antonucci revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Antonucci's Device would operate.  Accordingly, not only was Antonucci's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Antonucci's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Antonucci did not receive the benefit of her bargain, and was injured as a result.  If Antonucci had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Antonucci would not have purchased the Device, or would have paid substantially less for it.

**DELAWARE**

77.     **Plaintiff Aisha Boyd** is a resident and citizen of the State of Delaware and she purchased an iPhone 6 on December 12, 2015.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 8.  Boyd downloaded and installed iOS 11 on her Device in or around October 2017.

78.     Not only did Boyd's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Boyd's Devices operated to fundamentally change.  Boyd's Devices, particularly after installation of iOS 11 and 11.3, respectively, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Boyd revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Boyd's Devices would operate.  Accordingly, not only were Boyd's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Boyd's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Boyd did not receive the benefit of her bargain and was injured as a result.  If Boyd had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Boyd would not have purchased the Devices, or would have paid substantially less for them.

**DELAWARE / PENNSYLVANIA**

79.     **Plaintiff Irwin Darack** is a resident and citizen of the State of Pennsylvania and he purchased an iPhone 6 on April 22, 2015 in Delaware and another iPhone 6 on December 15, 2017 in Pennsylvania.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the Devices operated on iOS 8.  Darack downloaded and installed iOS 11 on his Devices in the fall of 2017.

80.     Not only did Darack's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Darack's Device operated to fundamentally change. Darack's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Darack revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Darack's Device would operate.  Accordingly, not only was Darack's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Darack's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Darack did not receive the benefit of his bargain, and was injured as a result.  If Darack had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Darack would not have purchased the Device, or would have paid substantially less for it.

### DISTRICT OF COLUMBIA

81.     **Plaintiff Brandi S. White** is a resident and citizen of the District of Columbia and she purchased an iPhone 6s in July 2016.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

82.     Not only did White's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way White's Device operated to fundamentally change.  White's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to White revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which White's Device would operate.  Accordingly, not only was White's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with White's Device via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, White did not receive the benefit of her bargain, and was injured as a result.  If White had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, White would not have purchased the Device, or would have paid substantially less for it.

### DISTRICT OF COLUMBIA

83.     **Plaintiff Lauren Weintraub** is a resident and citizen of the District of Columbia and she leased an iPhone 6 on September 21, 2015 and an iPhone 7 in October 2016.  Prior to her lease of the Devices, she did not know, nor could she have known through reasonable diligence of the Defect in her Devices.  At time of initial lease, the iPhone 6 operated on iOS 8 and the iPhone 7 operated on iOS 10.   Weintraub downloaded and installed iOS 9 on her iPhone 6 in or around September 2016 and iOS 11 on her iPhone 7 on October 19, 2017.

84.     Not only did Weintraub's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 9, 11, or any of the future updates would cause the way Weintraub's Devices operated to fundamentally change.  Weintraub's Devices, particularly after installation of iOS 9 and 11, respectively, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Weintraub revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Weintraub's Devices would operate.  Accordingly, not only were Weintraub's Devices defective at the point of lease due to the Defect, but Apple exacerbated the problems with Weintraub's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Weintraub did not receive the benefit of her bargain, and was injured as a result.  If Weintraub had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Weintraub would not have leased the Devices, or would have paid substantially less for them.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FLORIDA**

85.     **Plaintiff Sandra Brodsky** is a resident and citizen of the State of Florida and she, her husband, and her two children have leased iPhones dating back to the first generation, including the iPhone 6, iPhone 6s, iPhone 6s Plus, iPhone 7, and iPhone 7 Plus in Florida, as well as purchasing the iPad Air 2.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence of the Defect in her Devices.  At time of initial lease and purchase, the Devices operated on their factory-installed iOS versions.

86.     Not only did Brodsky's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that the future iOS updates would cause the way Brodsky's Devices operated to fundamentally change.  Brodsky's Devices, particularly after installation of subsequent iOS updates, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Brodsky revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Brodsky's Devices would operate.  Accordingly, not only were Brodsky's Devices defective at the point of sale or lease due to the Defect, but Apple exacerbated the problems with Brodsky's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Brodsky and her family did not receive the benefit of their bargain, and were injured as a result.  If Brodsky and her family had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, they would not have purchased or leased the Devices, or would have paid substantially less for them.

**FLORIDA**

87.     **Plaintiff Stephen Margolis** is a resident and citizen of the State of Florida and he leased multiple generations of the iPhone, including an iPhone 6 on December 30, 2014 and an iPhone 7 on October 14, 2016 in Florida, and also purchased multiple generations of the iPad, including a sixth generation iPad.  Prior to his lease and purchase of the Devices, he did

not know, nor could he have known through reasonable diligence, of the Defect in his Devices. At time of initial lease and purchase, the Devices operated on their factory-installed iOS versions.

88.     Not only did Margolis's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Margolis's Devices operated to fundamentally change.  Margolis's Devices, particularly after installation of subsequent iOS updates, like iOS 11 on his iPhone 7, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Margolis revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Margolis's Devices would operate.  Accordingly, not only were Margolis's Devices defective at the point of sale or lease due to the Defect, but Apple exacerbated the problems with Margolis's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Margolis did not receive the benefit of his bargain, and was injured as a result. If Margolis had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Margolis would not have purchased or leased the Devices, or would have paid substantially less for them.

### FLORIDA

89.     **Plaintiff Jessica Greenshner** is a resident and citizen of the State of Indiana and she purchased an iPhone 6 in November 2015 in Florida and an iPhone 6s in November 2016 in Florida.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, the iPhone 6 operated on iOS 8 and the iPhone 7 operated on iOS 10.

90.     Not only did Greenshner's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that future iOS updates would cause the way Greenshner's Device operated to fundamentally change.  Greenshner's Devices, particularly

after installation of subsequent iOS updates, did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Devices were sold to Greenshner revealed that

there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Greenshner's Devices would operate.

Accordingly, not only were Greenshner's Devices defective at the point of sale due to the

Defect, but Apple exacerbated the problems with Greenshner's Devices via its

misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

actions, Greenshner did not receive the benefit of her bargain, and was injured as a result.  If

Greenshner had been told of the Defect and the deceptive manner in which Apple would

damage the Devices after sale, Greenshner would not have purchased the Devices, or would

have paid substantially less for them.

### GEORGIA

91.    **Plaintiff Jason Ratner** is a resident and citizen of the State of Georgia, and he

purchased four iPhone 5c Devices in June 2015, two iPhone 5C Devices in June 2017, and two

iPhone 6s Devices in May 2017 for him and his family.  Prior to his purchase of the Devices, he

did not know, nor could he have known through reasonable diligence, of the Defect in his

Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS

versions.  Ratner and his family downloaded and installed iOS 10 on their iPhone 5c Devices in

the summer of 2016 and iOS 11.4 on his iPhone 6s in May 2018.

92.    Not only did Ratner's Devices fail to operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS 10, 11.4, or any of the future

updates would cause the way Ratner's Devices operated to fundamentally change.  Ratner's

Devices, particularly after installation of 10 and 11.4, respectively, did not operate as promised

in Apple's advertisements, representations, and the information publicly available in the

marketplace.  Additionally, none of the packaging in which the Devices were sold to Ratner

revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

or otherwise regulate the battery power and speed pursuant to which Ratner's Devices would operate.  Accordingly, not only were Ratner's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Ratner's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Ratner did not receive the benefit of his bargain and was injured as a result.  If Ratner had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Ratner would not have purchased the Devices, or would have paid substantially less for them.

### GEORGIA

93.     **Plaintiff Tamica Gordon** is a resident and citizen of the state of Georgia and she purchased an iPhone 6s on or around December 22, 2016.  Prior to her purchase of the device, she did not know, nor could she have known through reasonable diligence, of the Defect in her device.  At time of initial purchase or lease, the device operated on the current version of iOS available at the time.   Tamica downloaded and installed version 11.3 of iOS on her device at some point after the purchase of her device.

94.     Not only did Gordon's device not operate as apple warranted and promised initially, but apple never represented or warranted that iOS 11.3 or any of the future updates would cause the way Gordon's device operated to fundamentally change.  Gordon's device, particularly after installation of iOS 11.3, did not operate as promised in apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the device was sold to Gordon revealed that there was any Defect or that apple would use the updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Gordon's device would operate.  Accordingly, not only was Gordon's device defective at the point of sale due to the Defect, but apple exacerbated the problems with Gordon's device via its misrepresentations and omissions with the ios software updates.  As a result of apple's actions, Gordon did not receive the benefit of her bargain, and was injured as a result.  If Gordon had been told of the Defect and the deceptive manner in

which apple would damage the device after sale, Gordon would not have purchased the device, or would have paid substantially less for it.

**HAWAII**

95.   **Plaintiff Amy Brown** is a resident and citizen of the State of Hawaii and she purchased an iPhone 5 on February 28, 2013 in Hawaii and an iPhone 6 on March 7, 2015 in Hawaii.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, her Devices operated on their factory-installed iOS versions.

96.   Not only did Brown's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way Brown's Device operated to fundamentally change.  Brown's Device, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Brown revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Brown's Device would operate.  Accordingly, not only was Brown's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Brown's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Brown did not receive the benefit of her bargain, and was injured as a result.  If Brown had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Brown would not have purchased the Device, or would have paid substantially less for it.

**HAWAII**

97.   **Plaintiff Ruth Beauchan** is a resident and citizen of the State of Hawaii and she purchased an iPhone 6 on or about September 14, 2014.  She also purchased an iPhone 7 on or about April 18, 2017.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.

98.     Not only did Beauchan's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Beauchan's Devices operated to fundamentally change.  Beauchan's Devices, particularly after installation of iOS updates in late 2016/early 2017, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Beauchan revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Beauchan's Device would operate. Accordingly, not only was Beauchan's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Beauchan's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Beauchan did not receive the benefit of her bargain, and was injured as a result.  If Beauchan had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Beauchan would not have purchased the Devices, or would have paid substantially less for it. Ultimately, the function of Beauchan's Devices degraded too much for her to continue using and she replaced it with an iPhone 7 on April 18, 2017 in Hawaii.

### HAWAII / OREGON

99.     **Plaintiff Eric Tanovan** is a resident and citizen of California and he leased an iPhone 6 in November 2014 in Hawaii and an iPhone 7 Plus in June 2017 in Oregon, both while residing in Hawaii.  Prior to his purchases of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the iPhone 6 operated on iOS 8 and the iPhone 7 Plus operated on iOS 10.

100.    Not only did Tanovan's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Tanovan's Devices operated to fundamentally change.  Tanovan's Devices, particularly after installation of updates like iOS 10 on his iPhone 6 and iOS 11 on his iPhone 7 Plus, did not operate as promised in Apple's advertisements, representations, and the

information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Tanovan revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Tanovan's Devices would operate. Accordingly, not only were Tanovan's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Tanovan's Devices via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Tanovan did not receive the benefit of his bargain, and was injured as a result. If Tanovan had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Tanovan would not have purchased the Devices, or would have paid substantially less for them.

### IDAHO

101.    **Plaintiff Linda Sauer** is a resident and citizen of the State of Idaho and she purchased an iPhone 5s in or around 2015 in Idaho. Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device. At time of initial purchase, the Device operated on iOS 7. Sauer downloaded and installed iOS 8 on her Device after purchase.

102.    Not only did Sauer's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Sauer's Device operated to fundamentally change. Sauer's Device, after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Sauer revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Sauer's Device would operate. Accordingly, not only was Sauer's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Sauer's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Sauer did not receive the benefit of her bargain and

was injured as a result.  If Sauer had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Sauer would not have purchased the Device, or would have paid substantially less for it.

### ILLINOIS

103.  **Plaintiff Rifah Alexander** is a resident and citizen of the State of Illinois and she purchased an iPhone 6 Plus on April 19, 2015.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

104.  Not only did Alexander's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Alexander's Device operated to fundamentally change.  Alexander's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Alexander revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Alexander's Device would operate.  Accordingly, not only was Alexander's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Alexander's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Alexander did not receive the benefit of her bargain, and was injured as a result.  If Alexander had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Alexander would not have purchased the Device, or would have paid substantially less for it.

### ILLINOIS

105.  **Plaintiff Andrew Yashchuk** is a resident and citizen of the State of Texas and he purchased two iPhone 6 Pluses on September 19, 2014 in Illinois.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.

106.   Not only did Yashchuk's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any iOS update would cause the way Yashchuk's Devices operated to fundamentally change, let alone render any of his Devices inoperable.  Yashchuk's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Yashchuk revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Yashchuk's Devices would operate.  Accordingly, not only were Yashchuk's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Yashchuk's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Yashchuk did not receive the benefit of his bargain, and was injured as a result.  If Yashchuk had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Yashchuk would not have purchased the Devices, or would have paid substantially less for them.

**INDIANA**

107.   **Plaintiff Alisha Boykin** is a resident and citizen of the State of Tennessee and she purchased an iPhone 6s on October 14, 2015 in Indiana while residing in Indiana.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 9.  Boykin downloaded and installed iOS 11 on her Device in the fall of 2017.

108.   Not only did Boykin's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Boykin's Device operated to fundamentally change.  Boykin's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Boykin revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

power and speed pursuant to which Boykin's Device would operate.  Accordingly, not only was Boykin's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Boykin's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Boykin did not receive the benefit of her bargain and was injured as a result.  If Boykin had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Boykin would not have purchased the Device, or would have paid substantially less for it.

## IOWA

109.    **Plaintiff Tammy Greenfield** is a resident and citizen of the State of Iowa and she purchased five iPhone 6s Devices on September 25, 2015 for her and her family.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of purchase, the Devices operated on iOS 9.

110.    Not only did Greenfield's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Greenfield's Devices operated to fundamentally change.  Greenfield's Devices, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Greenfield revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Greenfield's Devices would operate.  Accordingly, not only were Greenfield's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Greenfield's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Greenfield did not receive the benefit of her bargain and was injured as a result.  If Greenfield had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Greenfield would not have purchased the Devices, or would have paid substantially less for them.

**KANSAS**

111.   **Plaintiff Natasha Bryant** is a resident and citizen of the State of Kansas and she purchased an iPhone 5c on November 29, 2013 and an iPhone 6 Plus on July 1, 2016.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, the iPhone 5c Device operated on iOS 7 and the iPhone 6 Plus operated on iOS 8.

112.   Not only did Bryant's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way Bryant's Devices operated to fundamentally change.  Bryant's Devices, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Bryant revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Bryant's Devices would operate.  Accordingly, not only were Bryant's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Bryant's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Bryant did not receive the benefit of her bargain and was injured as a result.  If Bryant had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Bryant would not have purchased the Devices, or would have paid substantially less for them.

**KANSAS**

113.   **Plaintiff John Farris** is a resident and citizen of the State of Texas and he purchased an iPhone 6 on October 29, 2014 and and an iPhone 6s on August 2, 2017, both in Kansas while a resident of Kansas.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the iPhone 6 Device operated on iOS 8.   In February 2017, Apple automatically downloaded and installed iOS 10.2.1 on Farris's iPhone 6 Device.

114.     Not only did Farris's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates would cause the way Farris's Device operated to fundamentally change.  Farris's Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Farris revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Farris's Device would operate.  Accordingly, not only was Farris's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Farris's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Farris did not receive the benefit of his bargain and was injured as a result.  If Farris had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Farris would not have purchased the Devices, or would have paid substantially less for them.

## KENTUCKY

115.     **Plaintiff Herman Praszkier** is a resident and citizen of the Commonwealth of Kentucky and he has purchased multiple generations of iPhones, including two iPhone 6 Plus Devices, and an iPhone 7 Device in Kentucky.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS versions.

116.     Not only did Praszkier's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Praszkier's Devices operated to fundamentally change.  Praszkier's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Praszkier revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Praszkier's Devices would operate. Accordingly, not only were Praszkier's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Praszkier's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Praszkier did not receive the benefit of his bargain and was injured as a result.  If Praszkier had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Praszkier would not have purchased the Devices, or would have paid substantially less for them.

### KENTUCKY

117.     **Plaintiff Lawrence Pethick** is a resident and citizen of the State of Michigan and he purchased multiple generations of the iPhone and iPad in Kentucky while a Kentucky resident, including the iPhone 5, and 6 (purchased on December 17, 2014) and the iPad Air and Air Mini.  Prior to his purchases of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the Devices operated on the factory-installed iOS versions.

118.     Not only did Pethick's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Pethick's Devices operated to fundamentally change.  Pethick's Devices, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Pethick revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Pethick's Devices would operate.  Accordingly, not only were Pethick's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Pethick's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Pethick did not receive the benefit of his bargain and was injured as a result.  If Pethick had been told of the Defect and the deceptive

1    manner in which Apple would damage the Devices after sale, Pethick would not have purchased

2    the Devices, or would have paid substantially less for them.

3                                              **LOUISIANA**

4           119.     **Plaintiff Kenyotta Smith** is a resident and citizen of the State of Louisiana

5    and she purchased an iPhone 6s on June 22, 2016.  Prior to her purchase of the Device, she did

6    not know, nor could she have known through reasonable diligence, of the Defect in her Device.

7           120.    Not only did Smith's Device not operate as Apple warranted and promised

8    initially, but Apple never represented or warranted that iOS updates would cause the way

9    Smith's Device operated to fundamentally change.  Smith's Device did not operate as promised

10   in Apple's advertisements, representations, and the information publicly available in the

11   marketplace.  Additionally, none of the packaging in which the Device was sold to Smith

12   revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

13   or otherwise regulate the battery power and speed pursuant to which Smith's Device would

14   operate.  Accordingly, not only was Smith's Device defective at the point of sale due to the

15   Defect, but Apple exacerbated the problems with Smith's Device via its misrepresentations and

16   omissions with the iOS software Updates.  As a result of Apple's actions, Smith did not receive

17   the benefit of her bargain, and was injured as a result.  If Smith had been told of the Defect and

18   the deceptive manner in which Apple would damage the Device after sale, Smith would not

19   have purchased the Device, or would have paid substantially less for it.

20                                               **MAINE**

21          121.    **Plaintiff Judith Thompson** is a resident and citizen of the State of Maine and

22   she purchased an iPhone 6 on or about October 2014.  Prior to her purchase of the Device, she

23   did not know, nor could she have known through reasonable diligence of the Defect in her

24   Device.  At time of initial purchase, the Device operated on version 8 of iOS.   Thompson

25   downloaded and installed version 11.2 of iOS on her Device in or around December 2017.

26          122.    Not only did Thompson's Device not operate as Apple warranted and promised

27   initially, but Apple never represented or warranted that version 8 of iOS or any of the future

28

updates would cause the way Thompson's Device operated to fundamentally change. Thompson's Device, after installation of various versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Thompson revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Thompson's Device would operate.  Accordingly, not only was Thompson's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Thompson's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Thompson did not receive the benefit of her bargain, and was injured as a result.  If Thompson had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Thompson would not have purchased the Device, or would have paid substantially less for it.

**MAINE**

123.   **Plaintiff Drew Victory** is a resident and citizen of the State of Maine and he purchased an iPhone 6 on or about July 4, 2015 and an iPhone 6s on or about 2016.  Prior to his purchases of the Devices, he did not know, nor could he have known through reasonable diligence of the Defect in his Devices.

124.   Not only did Drews's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Drew's Devices operated to fundamentally change.  Drew's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Drew revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Drew's Devices would operate.  Accordingly, not only were Drew's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Drew's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Drew did not receive

the benefit of his bargain, and was injured as a result.  If Drew had been told of the Defect and

the deceptive manner in which Apple would damage the Devices after sale, Drew would not

have purchased the Devices, or would have paid substantially less for them.

## MARYLAND

125.    **Plaintiff Jhonjulee Ray** is a resident and citizen of the State of Maryland and

she purchased an iPhone 6 Plus in or around November 2014.  Prior to her purchase of the

Device, she did not know, nor could she have known through reasonable diligence, of the

Defect in her Device.

126.    Not only did Ray's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS updates would cause the way Ray's

Device operated to fundamentally change.  Ray's Device did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Device was sold to Ray revealed that there

was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Ray's Device would operate.

Accordingly, not only was Ray's Device defective at the point of sale due to the Defect, but

Apple exacerbated the problems with Ray's Device via its misrepresentations and omissions

with the iOS software Updates.  As a result of Apple's actions, Ray did not receive the benefit

of her bargain, and was injured as a result.  If Ray had been told of the Defect and the deceptive

manner in which Apple would damage the Device after sale, Ray would not have purchased the

Device, or would have paid substantially less for it.

## MASSACHUSETTS

127.    **Plaintiff Laura Ciccone** is a resident and citizen of the Commonwealth of

Massachusetts and she purchased an iPhone 6s in or around June 2016.  Prior to her purchase of

the Device, she did not know, nor could she have known through reasonable diligence, of the

Defect in her Device.

128.    Not only did Ciccone's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Ciccone's Device operated to fundamentally change.  Ciccone's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Ciccone revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Ciccone's Device would operate.  Accordingly, not only was Ciccone's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Ciccone's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Ciccone did not receive the benefit of her bargain, and was injured as a result.  If Ciccone had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Ciccone would not have purchased the Device, or would have paid substantially less for it.

### MASSACHUSETTS

129.    **Plaintiff Jonathan Jed Meyers** is a resident and citizen of the Commonwealth of Massachusetts and he purchased an iPhone 6 in or about April 2015. Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  Meyers downloaded and installed iOS updates on his Device at or around their release dates.

130.    Not only did Meyers's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Meyers's Device operated to fundamentally change.  Meyers's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Meyers revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Meyer's Device would operate.  Accordingly, not only was Meyers's Device defective at the point of sale due to the

Defect, but Apple exacerbated the problems with Meyers's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Meyers did not receive the benefit of his bargain, and was injured as a result.  If Meyers had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Meyers would not have purchased the Device, or would have paid substantially less for it.

## MICHIGAN

131.    **Plaintiff Steven Henry** is a resident and citizen of the State of Michigan and he purchased an iPhone 7 in October 2016 in Michigan.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on iOS 10.  Henry downloaded and installed iOS 11.2.1 on his Device in December 2017.

132.    Not only did Henry's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11.2.1 or any of the future updates would cause the way Henry's Device operated to fundamentally change.  Henry's Device, particularly after installation of iOS 11.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Henry revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Henry's Device would operate.  Accordingly, not only was Henry's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Henry's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Henry did not receive the benefit of his bargain and was injured as a result.  If Henry had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Henry would not have purchased the Device, or would have paid substantially less for it.

**MICHIGAN**

133.    **Plaintiff Timothy Baldwin** is a resident and citizen of the State of Michigan and he purchased an iPhone 6s on March 10, 2016 in Michigan.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on iOS 9.  Baldwin downloaded and installed iOS 11.2 on his Device in or around December 2017.

134.    Not only did Baldwin's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11.2 or any of the future updates would cause the way Baldwin's Device operated to fundamentally change.  Baldwin's Device, particularly after installation of iOS 11.2, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Baldwin revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Baldwin's Device would operate. Accordingly, not only was Baldwin's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Baldwin's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Baldwin did not receive the benefit of his bargain and was injured as a result.  If Baldwin had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Baldwin would not have purchased the Device, or would have paid substantially less for it.

**MINNESOTA**

135.    **Plaintiff Kristin Hansen** is a resident and citizen of the State of Minnesota and she has purchased several iPhones for her and her family in Minnesota, including an iPhone SE and an iPhone 6 in December 2015, an iPhone 6s in January 2016, and another iPhone 6s in December 2017.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase,

the Devices operated on their factory-installed iOS versions. Hansen and her family downloaded and installed iOS 11.1 on their Devices in or around November 2017.

136.    Not only did Hansen's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11.1 or any of the future updates would cause the way Hansen's Devices operated to fundamentally change. Hansen's Devices, particularly after installation of iOS 11.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Hansen revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Hansen's Devices would operate. Accordingly, not only were Hansen's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Hansen's Devices via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Hansen did not receive the benefit of her bargain and was injured as a result. If Hansen had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Hansen would not have purchased the Devices, or would have paid substantially less for them.

## MISSISSIPPI

137.    **Plaintiff Mary Jackson** is a resident and citizen of the State of Mississippi and she purchased an iPhone 6 on December 3, 2014. Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

138.    Not only did Jackson's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Jackson's Device operated to fundamentally change. Jackson's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Jackson revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Jackson's Device would

1 operate.  Accordingly, not only was Jackson's Device defective at the point of sale due to the

2 Defect, but Apple exacerbated the problems with Jackson's Device via its misrepresentations

3 and omissions with the iOS software Updates.  As a result of Apple's actions, Jackson did not

4 receive the benefit of her bargain, and was injured as a result.  If Jackson had been told of the

5 Defect and the deceptive manner in which Apple would damage the Device after sale, Jackson

6 would not have purchased the Device, or would have paid substantially less for it.

7 **MISSISSIPPI**

8   139. **Plaintiff Alvin Davis** is a resident and citizen of the State of Mississippi and he

9 purchased an iPhone 6s on December 13, 2016.  Prior to his purchase of the Device, he did not

10 know, nor could he have known through reasonable diligence of the Defect in his Device.

11   140. Not only did Davis's Device not operate as Apple warranted and promised

12 initially, but Apple never represented or warranted that iOS updates would cause the way

13 Davis's Device operated to fundamentally change.  Davis's Device did not operate as promised

14 in Apple's advertisements, representations, and the information publicly available in the

15 marketplace.  Additionally, none of the packaging in which the Device was sold to Davis

16 revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

17 or otherwise regulate the battery power and speed pursuant to which Davis's Device would

18 operate.  Accordingly, not only was Davis's Device defective at the point of sale due to the

19 Defect, but Apple exacerbated the problems with Davis's Device via its misrepresentations and

20 omissions with the iOS software Updates.  As a result of Apple's actions, Davis did not receive

21 the benefit of his bargain, and was injured as a result.  If Davis had been told of the Defect and

22 the deceptive manner in which Apple would damage the Device after sale, Davis would not

23 have purchased the Device, or would have paid substantially less for it.

24 **MISSOURI**

25   141. **Plaintiff Kim Burton** is a resident and citizen of the State of Missouri and she

26 purchased an iPhone 5s on September 20, 2013, which was delivered between October 8-11,

27 2013. She also purchased an iPad Mini on or around November 26, 2014.  Prior to her purchase

28

of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  Burton downloaded and installed an iOS 11 update on her Devices in December 2017, specifically iOS 11.2.1 for her iPad Mini.

142.    Not only did Burton's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Burton's Devices operated to fundamentally change.  Burton's Devices, particularly after installation of one of the iOS 11 updates, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Burton revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Burton's Devices would operate. Accordingly, not only were Burton's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Burton's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Burton did not receive the benefit of her bargain, and was injured as a result.  If Burton had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Burton would not have purchased the Device, or would have paid substantially less for it.

**MISSOURI**

143.    **Plaintiff Christopher Gautreaux** is a resident and citizen of the State of Missouri and he leased multiple generations of the iPhone for him and his family in Missouri, including an iPhone 5, an iPhone 5s, and an iPhone 6 on October 17, 2014; an iPhone 6 Plus on February 27, 2015; an iPhone 6s on December 2, 2015; and an iPhone 7 Plus on January 30, 2017.  Prior to his lease of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial lease, the Devices operated on their factory-installed iOS versions.

144.    Not only did Gautreaux's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would

cause the way Gautreaux's Devices operated to fundamentally change.  Gautreaux's Devices, particularly after installation of subsequent iOS updates, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Gautreaux revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Gautreaux's Devices would operate. Accordingly, not only were Gautreaux's Devices defective at the point of lease due to the Defect, but Apple exacerbated the problems with Gautreaux's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Gautreaux did not receive the benefit of his bargain and was injured as a result.  If Gautreaux had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Gautreaux would not have leased the Devices, or would have paid substantially less for them.

### MISSOURI

145.     **Plaintiff Charlie Bell Daily** is a resident and citizen of the State of Missouri and she purchased an iPhone 6s Plus in or about mid-2016.   Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

146.     Not only did Daily's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the iOS updates would cause the way Daily's Device operated to fundamentally change.  Daily's Device, particularly after installation of a version of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Daily revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Daily's Device would operate.  Accordingly, not only was Daily's Device defective at the point of sale due to the Defect, but Apple exacerbated the

problems with Daily's Device via its misrepresentations and omissions with the iOS software

Updates.  As a result of Apple's actions, Daily did not receive the benefit of her bargain, and

was injured as a result.  If Daily had been told of the Defect and the deceptive manner in which

Apple would damage the Device after sale, Daily would not have purchased the Device, or

would have paid substantially less for it.

### MISSOURI

147.  **Plaintiff William C. Ellis** is a resident and citizen of the State of Missouri and

he purchased an iPhone 7 on September 9, 2016.  Prior to his purchase of the Device, he did not

know, nor could he have known through reasonable diligence, of the Defect in his Device.

148.  Not only did Ellis' Device not operate as Apple warranted and promised initially,

but Apple never represented or warranted that iOS updates would cause the way Ellis' Device

operated to fundamentally change.  Ellis' Device did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Device was sold to Ellis revealed that there

was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Ellis's Device would operate.

Accordingly, not only was Ellis' Device defective at the point of sale due to the Defect, but

Apple exacerbated the problems with Ellis' Device via its misrepresentations and omissions

with the iOS software Updates.  As a result of Apple's actions, Ellis did not receive the benefit

of his bargain, and was injured as a result.  If Ellis had been told of the Defect and the deceptive

manner in which Apple would damage the Device after sale, Ellis would not have purchased the

Device, or would have paid substantially less for it.

### MONTANA

149.  **Plaintiff Michelle Martino** is a resident and citizen of the State of Montana and

she purchased an iPhone 6 Plus in Fall 2014. Prior to her purchase of the Device, she did not

know, nor could she have known through reasonable diligence, of the Defect in her Device.

Martino downloaded and installed a version of iOS on her Device in or around December 2017.

150.    Not only did Martino's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Martino's Device operated to fundamentally change.  Martino's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Martino revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Martino's Device would operate.  Accordingly, not only was Martino's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Martino's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Martino did not receive the benefit of her bargain, and was injured as a result.  If Martino had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Martino would not have purchased the Device, or would have paid substantially less for it.

### NEBRASKA

151.    **Plaintiff Kevin Browne** is a resident and citizen of the State of Nebraska and he purchased an iPhone 6s Plus on October 2, 2015.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.

152.    Not only did Browne's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Browne's Device operated to fundamentally change.  Browne's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Browne revealed that thise was any Defect or that Apple would use the Updates to "smooth," "throttle," or othiswise regulate the battery power and speed pursuant to which Browne's Device would operate.  Accordingly, not only was Browne's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Browne's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Browne did not

1    receive the benefit of his bargain, and was injured as a result.  If Browne had been told of the

2    Defect and the deceptive manner in which Apple would damage the Device after sale, Browne

3    would not have purchased the Device, or would have paid substantially less for it.

**NEBRASKA**

5    153.    **Plaintiff Jill Klingman** is a resident and citizen of the State of Nebraska and

6    she purchased an iPhone 6 in or around 2015 in Nebraska and an iPhone 7 on October 28, 2017

7    in Nebraska.  Prior to her purchase of the Devices, she did not know, nor could she have known

8    through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, the

9    iPhone 6 operated on iOS 8 and the iPhone 7 operated on iOS 10.  Klingman downloaded and

10   installed iOS 10 on her iPhone 6 in or around November 2016.

11   154.    Not only did Klingman's Devices not operate as Apple warranted and

12   promised initially, but Apple never represented or warranted that any of the future iOS updates

13   would cause the way Klingman's Devices operated to fundamentally change.  Klingman's

14   Devices, particularly after installation of subsequent iOS versions, did not operate as promised

15   in Apple's advertisements, representations, and the information publicly available in the

16   marketplace.  Additionally, none of the packaging in which the Devices were sold to Klingman

17   revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

18   or otherwise regulate the battery power and speed pursuant to which Klingman's Devices would

19   operate.  Accordingly, not only were Klingman's Devices defective at the point of sale due to

20   the Defect, but Apple exacerbated the problems with Klingman's Devices via its

21   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

22   actions, Klingman did not receive the benefit of her bargain, and was injured as a result.  If

23   Klingman had been told of the Defect and the deceptive manner in which Apple would damage

24   the Devices after sale, Klingman would not have purchased the Devices, or would have paid

25   substantially less for them.

26

27

28

NEVADA

155.    **Plaintiff Angela Boykin** is a resident and citizen of the State of Nevada and she purchased an iPhone 6s on February 25, 2016 in Nevada.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 9.

156.    Not only did Boykin's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.3.2 or any of the future updates would cause the way Boykin's Device operated to fundamentally change.  Boykin's Device, particularly after installation of 10.3.2, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Boykin revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Boykin's Device would operate.  Accordingly, not only was Boykin's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Boykin's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Boykin did not receive the benefit of her bargain and was injured as a result.  If Boykin had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Boykin would not have purchased the Device, or would have paid substantially less for it.

NEVADA

157.    **Plaintiff Barbara Moriello** is a resident and citizen of the State of Nevada and she purchased an iPhone 6 on in April 2015 in Nevada.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 8.  Moriello downloaded and installed iOS 11 on her Device in or around the fall of 2017.

158.    Not only did Moriello's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates

would cause the way Moriello's Device operated to fundamentally change.  Moriello's Device, particularly after installation of 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Moriello revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Moriello's Device would operate.  Accordingly, not only was Moriello's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Moriello's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Moriello did not receive the benefit of her bargain and was injured as a result.  If Moriello had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Moriello would not have purchased the Device, or would have paid substantially less for it.

### NEW HAMPSHIRE

159.   **Plaintiff Thomas Toth** is a resident and citizen of the State of New Hampshire and he purchased two iPhone 5s Devices for him and his wife in March 2015 in Massachusetts and two iPhone 7 Devices for him and his wife in July 2017 in New Hampshire. Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the iPhone 5s Devices operated on iOS 7 and the iPhone 7 Devices operated on iOS 10.   Toth and his wife downloaded and installed iOS 10.2.1 in January 2017 and iOS 10.3 in April 2017, respectively, on their iPhone 5s Devices.

160.   Not only did Toth's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1, 10.3 or any of the future updates would cause the way Toth's Devices operated to fundamentally change.  Toth's Devices, particularly after installation of iOS 10.2.1 and 10.3, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Toth

revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Toth's Devices would operate.  Accordingly, not only were Toth's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Toth's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Toth did not receive the benefit of his bargain and was injured as a result.  If Toth had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Toth would not have purchased the Devices, or would have paid substantially less for them.

**NEW JERSEY**

161.    **Plaintiff Caren Schmidt** is a resident and citizen of the State of New Jersey and she purchased an iPhone 5 in 2014 and an iPhone 6s on November 26, 2016 in New Jersey.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS versions.

162.    Not only did Schmidt's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10, 11.3, or any of the future updates would cause the way Schmidt's Devices operated to fundamentally change.   Schmidt's Devices, particularly after installation of 10 and 11.3, respectively, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Schmidt revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Schmidt's Devices would operate.  Accordingly, not only were Schmidt's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Schmidt's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Schmidt did not receive the benefit of her bargain, and was injured as a result.  If Schmidt had been told of the

Defect and the deceptive manner in which Apple would damage the Devices after sale, Schmidt would not have purchased the Devices, or would have paid substantially less for them.

**NEW JERSEY**

163.    **Plaintiff Jacquelyn O'Neill** is a resident and citizen of the State of New Jersey and she purchased an iPhone 6 on March 21, 2015 in New Jersey.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on its factory-installed iOS versions.

164.    Not only did O'Neill's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates would cause the way O'Neill's Device operated to fundamentally change.  O'Neill's Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to O'Neill revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which O'Neill's Device would operate. Accordingly, not only was O'Neill's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with O'Neill's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, O'Neill did not receive the benefit of her bargain and was injured as a result.  If O'Neill had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, O'Neill would not have purchased the Device, or would have paid substantially less for it.

**NEW MEXICO**

165.    **Plaintiff Patrick DeFillippo** is a resident and citizen of the State of New Mexico and he purchased an iPhone 6s on January 26, 2016 in New Mexico.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable

diligence, of the Defect in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS version.

166.    Not only did DeFillippo's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way DeFillippo's Devices operated to fundamentally change.  DeFillippo's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to DeFillippo revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which DeFillippo's Devices would operate. Accordingly, not only were DeFillippo's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with DeFillippo's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, DeFillippo did not receive the benefit of his bargain and was injured as a result.  If DeFillippo had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, DeFillippo would not have purchased the Device, or would have paid substantially less for it.

### NEW YORK

167.    **Plaintiff Aniledis Batista** is a resident and citizen of the State of New York and she purchased an iPhone 6 on February 16, 2015 in New York and an iPhone 7 Plus on July 16, 2017 in New York.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, her iPhone 6 operated on iOS 8 and her iPhone 7 Plus operated on iOS 10.

168.    Not only did Batista's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10, 11, or any of the future updates would cause the way Batista's Devices operated to fundamentally change.  Batista's Devices, particularly after installation of iOS 10 and 11, respectively, did not operate as promised in

Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Batista revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Batista's Devices would operate.  Accordingly, not only were Batista's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Batista's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Batista did not receive the benefit of her bargain and was injured as a result.  If Batista had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Batista would not have purchased the Devices, or would have paid substantially less for them.

### NEW YORK

169.   **Plaintiff Benjamin Lazarus** is a resident and citizen of the State of New York and he purchased an iPhone 5 on September 13, 2013 in New York and an iPhone 7 on December 13, 2016 in New York.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS versions.

170.   Not only did Lazarus's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Lazarus's Devices operated to fundamentally change.  Lazarus's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Lazarus revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Lazarus's Devices would operate.  Accordingly, not only were Lazarus's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Lazarus's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Lazarus did not

receive the benefit of his bargain and was injured as a result.  If Lazarus had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Lazarus would not have purchased the Devices, or would have paid substantially less for them.

### NEW YORK

171.   **Plaintiff Judy Milman** is a resident and citizen of the State of New York and she purchased an iPhone 6s on April 21, 2016 in New York.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 9.  Milman downloaded and installed iOS 10 on her Device in or around September 2016.

172.   Not only did Milman's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way Milman's Device operated to fundamentally change.  Milman's Device, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Milman revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Milman's Device would operate.  Accordingly, not only was Milman's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Milman's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Milman did not receive the benefit of her bargain and was injured as a result.  If Milman had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Milman would not have purchased the Device, or would have paid substantially less for it.

### NORTH CAROLINA

173.   **Plaintiff Sherri Yelton** is a resident and citizen of the State of North Carolina and she purchased an iPhone 6s on February 26, 2016 in North Carolina.  Prior to her purchase of her Device, she did not know, nor could she have known through reasonable diligence, of the

Defect in her Device.  At time of initial lease, the Device operated on iOS 9.  Yelton

downloaded and installed iOS 11 on her Device in the fall of 2017.

174.    Not only did Yelton's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS 11 or any of the future updates

would cause the way Yelton's Device operated to fundamentally change.  Yelton's Device,

particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

representations, and the information publicly available in the marketplace.  Additionally, none

of the packaging in which the Device was sold to Yelton revealed that there was any Defect or

that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

power and speed pursuant to which Yelton's Device would operate.  Accordingly, not only was

Yelton's Device defective at the point of sale due to the Defect, but Apple exacerbated the

problems with Yelton's Device via its misrepresentations and omissions with the iOS software

Updates.  As a result of Apple's actions, Yelton did not receive the benefit of her bargain and

was injured as a result.  If Yelton had been told of the Defect and the deceptive manner in which

Apple would damage the Device after sale, Yelton would not have purchased the Device, or

would have paid substantially less for it.

### NORTH CAROLINA

175.    **Plaintiff Brinley McGill** is a resident and citizen of the State of North Carolina

and she purchased an iPhone 6s Plus in or around February 2015.  Prior to her purchase of the

Device, she did not know, nor could she have known through reasonable diligence, of the

Defect in her Device.

176.    Not only did McGill's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS updates would cause the way

McGill's Device operated to fundamentally change.  McGill's Device did not operate as

promised in Apple's advertisements, representations, and the information publicly available in

the marketplace.  Additionally, none of the packaging in which the Device was sold to McGill

revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

or otherwise regulate the battery power and speed pursuant to which McGill's Device would operate. Accordingly, not only was McGill's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with McGill's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, McGill did not receive the benefit of her bargain, and was injured as a result. If McGill had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, McGill would not have purchased the Device, or would have paid substantially less for it.

### NORTH CAROLINA

177.  **Plaintiff Jeanette Taylor** is a resident and citizen of the State of North Carolina and she purchased two iPhone SEs on or about September 10, 2017. She also purchased an iPhone 6 on or about September 13, 2017. Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices. At time of initial purchase, the Devices operated on a certain iOS. Taylor installed an update on her Devices in or around October or November 2017.

178.  Not only did Taylor's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Taylor's Devices operated to fundamentally change. Taylor's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Taylor revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Taylor's Devices would operate. Accordingly, not only were Taylor's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Taylor's Devices via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, Taylor did not receive the benefit of her bargain, and was injured as a result. If Taylor had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Taylor would not have purchased the Devices, or would have paid substantially less for it.

**NORTH DAKOTA / ALASKA**

179.    **Plaintiff Matthew Shaske** is a resident and citizen of the State of North Dakota and he leased four iPhone 6 Devices for him and his family in early 2015 in Alaska while residing in Alaska and three iPhone 7 Plus Devices for him and his family in January 2017 in North Dakota while residing in North Dakota.  Prior to his lease of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, his iPhone 6 Devices operated on iOS 8.  Shaske and his family downloaded and installed iOS 10 on their Devices in or around September 2016.

180.    Not only did Shaske's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10 or any of the future updates would cause the way Shaske's Devices operated to fundamentally change.  Shaske's Devices, particularly after installation of iOS 10, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Shaske revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Shaske's Devices would operate.  Accordingly, not only were Shaske's Devices defective at the point of lease due to the Defect, but Apple exacerbated the problems with Shaske's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Shaske did not receive the benefit of his bargain and was injured as a result.  If Shaske had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Shaske would not have leased the Devices, or would have paid substantially less for them.

**OHIO**

181.    **Plaintiff Kelly A. Jankowski** is a resident and citizen of the State of Ohio and she purchased an iPhone 6 on or about May 13, 2015.  She also purchased an iPhone 6s in or about August 2017.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.

182.    Not only did Jankowski's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Jankowski's Devices operated to fundamentally change.  Jankowski's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Jankowski revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Jankowski's Devices would operate.  Accordingly, not only were Jankowski's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Jankowski's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Jankowski did not receive the benefit of her bargain, and was injured as a result.  If Jankowski had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Jankowski would not have purchased the Devices, or would have paid substantially less for it.

### OHIO

183.    **Plaintiff Kristin Bilic** is a resident and citizen of the State of Ohio and she purchased an iPhone 6 Plus on December 1, 2014 (then exchanged it for an iPhone 6 on December 5, 2014), as well as an iPhone 7 Plus on June 24, 2017.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

184.    Not only did Bilic's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Bilic's Device operated to fundamentally change.  Bilic's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Bilic revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Bilic's Device would

operate.  Accordingly, not only was Bilic's Device defective at the point of sale due to the

Defect, but Apple exacerbated the problems with Bilic's Device via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, Bilic did not receive

the benefit of her bargain, and was injured as a result.  If Bilic had been told of the Defect and

the deceptive manner in which Apple would damage the Device after sale, Bilic would not have

purchased the Device, or would have paid substantially less for it.

### OHIO

185.  **Plaintiff Samuel Mangano** is a resident and citizen of the State of Ohio and he

has leased multiple generations of the iPhone in Ohio for him and his family, including an

iPhone 5c in November 2014, and iPhone 6 in September 2014, and three iPhone 7 Devices in

October 2016.  Prior to his lease of the Devices, he did not know, nor could he have known

through reasonable diligence, of the Defect in his Devices.  At time of initial lease, the Devices

operated on their factory-installed iOS versions.

186.  Not only did Mangano's Devices not operate as Apple warranted and promised

initially, but Apple never represented or warranted that any of the future iOS updates would

cause the way Mangano's Devices operated to fundamentally change.  Mangano's Devices,

particularly after installation of subsequent iOS versions, did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Devices were sold to Mangano revealed that

there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Mangano's Devices would operate.

Accordingly, not only were Mangano's Devices defective at the point of lease due to the Defect,

but Apple exacerbated the problems with Mangano's Devices via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, Mangano did not

receive the benefit of his bargain and was injured as a result.  If Mangano had been told of the

Defect and the deceptive manner in which Apple would damage the Devices after sale,

Mangano would not have purchased the Devices, or would have paid substantially less for them.

**OKLAHOMA**

187.   **Plaintiff Sarah Stone** is a resident and citizen of the State of Oklahoma and she purchased an iPhone 6 in or about September 2014.  She also purchased an iPhone 7 Plus in or about September 2016.  Prior to her purchase of these Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.

188.   Not only did Stone's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Stone's Devices operated to fundamentally change.  Stone's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Stone revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Stone's Devices would operate.  Accordingly, not only were Stone's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Stone's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Stone did not receive the benefit of her bargain, and was injured as a result.  If Stone had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Stone would not have purchased the Devices, or would have paid substantially less for it.

**OREGON**

189.   **Plaintiff Susan Rutan** is a resident and citizen of the State of California and she purchased an iPhone 6s Plus in Oregon in or about November 2016.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

190.   Not only did Rutan's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Rutan's Device operated to fundamentally change. Rutan's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the

marketplace.  Additionally, none of the packaging in which the Device was sold to Rutan revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Rutan's Device would operate.  Accordingly, not only was Rutan's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Rutan's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Rutan did not receive the benefit of her bargain, and was injured as a result.  If Rutan had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Rutan would not have purchased the Device, or would have paid substantially less for it

## OREGON

191.  **Plaintiff Megan Mesloh** is a resident and citizen of the State of Oregon and she purchased an iPhone 5c on June 24, 2014.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence of the Defect in her Device.  At time of initial purchase, the Device operated on the latest version of iOS.   Mesloh downloaded and installed version 10.2 of iOS on her Device.

192.   Not only did Mesloh's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that version 10.2 of iOS or any future versions would cause the way Mesloh's Device operated to fundamentally change.  Mesloh's Device, particularly after installation of version 10.2 of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Mesloh revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Mesloh's Device would operate.  Accordingly, not only was Mesloh's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Mesloh's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Mesloh did not receive the benefit of her bargain, and was injured as a result.  If Mesloh had been told of the

Defect and the deceptive manner in which Apple would damage the Device after sale, Mesloh would not have purchased the Device, or would have paid substantially less for it.

## PENNSYLVANIA

193.   **Plaintiff Beckie Erwin** is a resident and citizen of the Commonwealth of Pennsylvania and she purchased three iPhone 6s's on or about July 19, 2016, two of which were for her children.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence of the Defect in her Devices.

194.   Not only did Erwin's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Erwin's Devices operated to fundamentally change.  Erwin's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Erwin revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Erwin's Devices would operate.  Accordingly, not only was Erwin's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Erwin's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Erwin did not receive the benefit of her bargain, and was injured as a result.  If Erwin had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Erwin would not have purchased the Devices, or would have paid substantially less for it.

## PENNSYLVANIA

195.   **Plaintiff Darlane Saracina** is a resident and citizen of the Commonwealth of Pennsylvania and she purchased an iPhone 5s and iPhone 6s Plus on or about February 4, 2016. Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, the Devices operated on various versions of iOS.   Saracina downloaded and installed various versions of iOS on her Devices on various dates.

196.    Not only did Saracina's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that versions of iOS or any of the future updates would cause the way Saracina's Devices operated to fundamentally change.  Saracina's Devices, particularly after installation of various versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Saracina revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Saracina's Devices would operate.  Accordingly, not only were Saracina's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Saracina's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Saracina did not receive the benefit of her bargain, and was injured as a result.  If Saracina had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Saracina would not have purchased the Devices, or would have paid substantially less for them.

### RHODE ISLAND

197.    **Plaintiff Stephen Heffner** is a resident and citizen of the State of Rhode Island and he purchased an iPhone 6.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  After purchasing the device, Heffner downloaded and installed iOS 8.3 on his Device.

198.    Not only did Heffner's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 8.3 or any of the future updates would cause the way Heffner's Device operated to fundamentally change.  Heffner's Device, particularly after installation of iOS 8.3, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Heffner revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Heffner's Device would operate.  Accordingly, not only was

Heffner's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Heffner's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Heffner did not receive the benefit of his bargain, and was injured as a result.  If Heffner had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Heffner would not have purchased the Device, or would have paid substantially less for it.

### RHODE ISLAND

199.  **Plaintiff Brian Macinanti** is a resident and citizen of the State of Rhode Island and he purchased an iPhone 6 on or around September 23, 2015.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on version of 9.0 of iOS. Macinanti downloaded and installed version 11.4 of iOS on his Device in or around June 2017.

200.  Not only did Macinanti's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that version 9.0 of iOS or any future updates would cause the way Macinanti's Device operated to fundamentally change.  Macinanti's Device, after installation of versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to Macinanti revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Macinanti's Device would operate. Accordingly, not only was Macinanti's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Macinanti's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Macinanti did not receive the benefit of his bargain and was injured as a result.  If Macinanti had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Macinanti would not have purchased the Device, or would have paid substantially less for it.

**SOUTH CAROLINA**

201.    **Plaintiff Charlene Lowery** is a resident and citizen of the State of South Carolina and she purchased an iPhone 6 on or about September 2014.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

202.    Not only did Lowery's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Lowery's Device operated to fundamentally change.  Lowery's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Lowery revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Lowery's Device would operate.  Accordingly, not only was Lowery's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Lowery's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Lowery did not receive the benefit of her bargain, and was injured as a result.  If Lowery had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Lowery would not have purchased the Device, or would have paid substantially less for it.

**SOUTH CAROLINA**

203.    **Plaintiff Patti Burriss** is a resident and citizen of the State of South Carolina and she purchased an iPhone 7 in or about July 2017.  She also purchased an iPad Air in approximately 2014 and two iPad Air 2 Devices in approximately 2016.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Devices.

204.    Not only did Burriss's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Burriss's Devices operated to fundamentally change.  Burriss's Devices did not operate as

promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Burriss revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Burriss's Devices would operate.  Accordingly, not only was Burriss's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Burriss's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Burriss did not receive the benefit of her bargain, and was injured as a result.  If Burriss had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Burriss would not have purchased the Devices, or would have paid substantially less for them.

**SOUTH DAKOTA**

205.    **Plaintiff Denise Bakke** is a resident and citizen of the State of South Dakota and she purchased an iPhone 5s in August 2015 and an iPhone 6 in August 2016.  Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence of the Defect in her Devices.

206.    Not only did Bakke's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Bakke's Devices operated to fundamentally change.  Bakke's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Bakke revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Bakke's Devices would operate.  Accordingly, not only were Bakke's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Bakke's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Bakke did not receive the benefit of her bargain, and was injured as a result.  If Bakke had been told of the

Defect and the deceptive manner in which Apple would damage the Devices after sale, Bakke would not have purchased the Devices, or would have paid substantially less for it.

### TENNESSEE

207.   **Plaintiff Jodi Johnson** is a resident and citizen of the State of Tennessee and she purchased an iPhone 5s in or around 2015 in Tennessee.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 7.  Johnson downloaded and installed iOS 11 on her Device in or around November or December 2017.

208.   Not only did Johnson's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Johnson's Device operated to fundamentally change.  Johnson's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Johnson revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Johnson's Device would operate.  Accordingly, not only was Johnson's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Johnson's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Johnson did not receive the benefit of her bargain, and was injured as a result.  If Johnson had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Johnson would not have purchased the Device, or would have paid substantially less for it.

### TEXAS

209.   **Plaintiff Lillie Reap Diaz** is a resident and citizen of the State of Texas and she purchased an iPhone 6 in 2015.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.

210.    Not only did Diaz's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Diaz's Device operated to fundamentally change.  Diaz's Device, particularly after installation of an iOS update in late 2016/early 2017, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Diaz revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Diaz's Device would operate.  Accordingly, not only was Diaz's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Diaz's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Diaz did not receive the benefit of her bargain, and was injured as a result.  If Diaz had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Diaz would not have purchased the Device, or would have paid substantially less for it.

### TEXAS

211.    **Plaintiff Craig Jonathan Moore** is a resident and citizen of the State of Texas and he purchased four (4) iPhone 6's in or about May 2016.  He purchased an iPhone 6 in or about September 2017.  He purchased an iPhone 7 on or about March 23, 2017.  He purchased an iPhone 7 Plus on or about August 2017.  He purchased an iPhone 7 on or about September 2, 2017.  He also purchased an iPhone 7 Plus on or about October 18, 2017.  Prior to his purchases of the Devices, he did not know, nor could he have known through reasonable diligence, of the Defect in his Devices.

212.    Not only did Moore's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Moore's Devices operated to fundamentally change.  Moore's Devices did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Devices were sold to Moore

1    revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

2    or otherwise regulate the battery power and speed pursuant to which Moore's Devices would

3    operate.  Accordingly, not only were Moore's Devices defective at the point of sale due to the

4    Defect, but Apple exacerbated the problems with Moore's Devices via its misrepresentations

5    and omissions with the iOS software Updates.  As a result of Apple's actions, Moore did not

6    receive the benefit of his bargain, and was injured as a result.  If Moore had been told of the

7    Defect and the deceptive manner in which Apple would damage the Devices after sale, Moore

8    would not have purchased the Devices, or would have paid substantially less for it.

9                                                    **UTAH**

10       213.    **Plaintiff Annamarie Vinacco** is a resident and citizen of the State of Utah and

11   she purchased an iPhone 6 Plus in the fall of 2014 and an iPad Pro in 2016.  Prior to her

12   purchase of the Devices, she did not know, nor could she have known through reasonable

13   diligence, of the Defect in her Devices.  At time of initial purchase, her iPhone 6 Plus operated

14   on iOS 8 and her iPad Pro operated on iOS 9.

15       214.    Not only did Vinacco's Devices not operate as Apple warranted and promised

16   initially, but Apple never represented or warranted that iOS 11 or any of the future updates

17   would cause the way Vinacco's Devices operated to fundamentally change.  Vinacco's Devices,

18   particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

19   representations, and the information publicly available in the marketplace.  Additionally, none

20   of the packaging in which the Devices were sold to Vinacco revealed that there was any Defect

21   or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

22   power and speed pursuant to which Vinacco's Devices would operate.  Accordingly, not only

23   were Vinacco's Devices defective at the point of sale due to the Defect, but Apple exacerbated

24   the problems with Vinacco's Devices via its misrepresentations and omissions with the iOS

25   software Updates.  As a result of Apple's actions, Vinacco did not receive the benefit of her

26   bargain and was injured as a result.  If Vinacco had been told of the Defect and the deceptive

27

28

1    manner in which Apple would damage the Devices after sale, Vinacco would not have

2    purchased the Devices, or would have paid substantially less for them.

3                                    **UTAH**

4          215.    **Plaintiff Henry Becker** is a resident and citizen of the State of Utah and he

5    purchased an iPhone 6 Plus for himself on March 30, 2015 in Utah and an iPhone 6 for his wife

6    on June 2, 2015 in Utah.  Prior to his purchase of the Devices, he did not know, nor could he

7    have known through reasonable diligence, of the Defect in his Devices.  At time of initial

8    purchase, their iPhone 6 and 6 Plus operated on iOS 8, and the iPhone X Devices operated on

9    iOS 11.  Becker and his wife downloaded and installed iOS 11 on their iPhone 6 and 6 Plus

10   Devices in the fall of 2017.

11         216.    Not only did Becker's Devices not operate as Apple warranted and promised

12   initially, but Apple never represented or warranted that iOS 11 or any of the future updates

13   would cause the way Becker's Devices operated to fundamentally change.  Becker's Devices,

14   particularly after installation of iOS 11, did not operate as promised in Apple's advertisements,

15   representations, and the information publicly available in the marketplace.  Additionally, none

16   of the packaging in which the Devices were sold to Becker revealed that there was any Defect

17   or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

18   power and speed pursuant to which Becker's Devices would operate.  Accordingly, not only

19   were Becker's Devices defective at the point of sale due to the Defect, but Apple exacerbated

20   the problems with Becker's Devices via its misrepresentations and omissions with the iOS

21   software Updates.  As a result of Apple's actions, Becker did not receive the benefit of his

22   bargain and was injured as a result.  If Becker had been told of the Defect and the deceptive

23   manner in which Apple would damage the Devices after sale, Becker would not have purchased

24   the Devices, or would have paid substantially less for them.

25                                   **VERMONT**

26         217.    **Plaintiff Georgiana D'Alessandro** is a resident and citizen of the State of

27   Vermont and she purchased an iPhone 6 in or about March 2015.  Prior to her purchase of the

28

Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device. D'Alessandro downloaded and installed iOS updates as recommended.

218. Not only did D'Alessandro's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way D'Alessandro's Device operated to fundamentally change. D'Alessandro's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Device was sold to D'Alessandro revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which D'Alessandro's Device would operate. Accordingly, not only was D'Alessandro's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with D'Alessandro's Device via its misrepresentations and omissions with the iOS software Updates. As a result of Apple's actions, D'Alessandro did not receive the benefit of her bargain, and was injured as a result. If D'Alessandro had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, D'Alessandro would not have purchased the Device, or would have paid substantially less for it.

**VIRGINIA**

219. **Plaintiff Aurelia Flores** is a resident and citizen of the Commonwealth of Virginia and she purchased an iPhone 6s and iPad Mini. Prior to her purchase of the Devices, she did not know, nor could she have known through reasonable diligence of the Defect in her Devices. At time of initial purchase, the Devices operated on the current version of iOS at that time. Flores downloaded and installed version 11.4 of iOS on her Devices.

220. Not only did Flores's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that version 11.4 of iOS or any of the future updates would cause the way Flores's Devices operated to fundamentally change. Flores's Devices, particularly after installation of version 11.4 of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the

1    marketplace.  Additionally, none of the packaging in which the Devices were sold to Flores

2    revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

3    or otherwise regulate the battery power and speed pursuant to which Flore's Devices would

4    operate.  Accordingly, not only were Flore's Devices defective at the point of sale due to the

5    Defect, but Apple exacerbated the problems with Flore's Devices via its misrepresentations and

6    omissions with the iOS software Updates.  As a result of Apple's actions, Flores did not receive

7    the benefit of her bargain, and was injured as a result.  If Flores had been told of the Defect and

8    the deceptive manner in which Apple would damage the Devices after sale, Flores would not

9    have purchased the Devices, or would have paid substantially less for them.

10                                    **WASHINGTON**

11        221.    **Plaintiff Thomas Anthony Ciccone** is a resident and citizen of the State of

12   Washington and he purchased an iPhone 5s on or about June 2014 and an iPhone 6s in or about

13   June 2017.  Prior to his purchase of the Devices, he did not know, nor could he have known

14   through reasonable diligence, of the Defect in his Devices.

15        222.    Not only did Ciccone's Devices not operate as Apple warranted and promised

16   initially, but Apple never represented or warranted that iOS updates would cause the way

17   Ciccone's Devices operated to fundamentally change.  Ciccone's Devices did not operate as

18   promised in Apple's advertisements, representations, and the information publicly available in

19   the marketplace.  Additionally, none of the packaging in which the Devices were sold to

20   Ciccone revealed that there was any Defect or that Apple would use the Updates to "smooth,"

21   "throttle," or otherwise regulate the battery power and speed pursuant to which Ciccone's

22   Device would operate.  Accordingly, not only was Ciccone's Devices defective at the point of

23   sale due to the Defect, but Apple exacerbated the problems with Ciccone's Devices via its

24   misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

25   actions, Ciccone did not receive the benefit of his bargain, and was injured as a result.  If

26   Ciccone had been told of the Defect and the deceptive manner in which Apple would damage

27

28

the Devices after sale, Ciccone would not have purchased the Devices or would have paid substantially less for them.

## WASHINGTON

223.  **Plaintiff Kristopher Kingston** is a resident and citizen of the State of Washington and he purchased an iPhone 6s Plus on June 11, 2016 in Washington.  Prior to his purchase of his Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, his Device operated on iOS 9.  Kingston downloaded and installed iOS 11 on the Device in the fall of 2017.

224.  Not only did Kingston's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Kingston's Device operated to fundamentally change.  Kingston's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Kingston revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Kingston's Device would operate.  Accordingly, not only was Kingston's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Kingston's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Kingston did not receive the benefit of his bargain, and was injured as a result.  If Kingston had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Kingston would not have purchased the Device, or would have paid substantially less for it.

## WEST VIRGINIA

225.  **Plaintiff Tonya Margarette Thompson** is a resident and citizen of the State of West Virginia and she purchased an iPhone 5c and two iPhone 6s Pluses in or about September 2016.  Plaintiff also purchased two iPhone 7 Pluses in or about September 2017. Prior to her

1  purchase of the Devices, she did not know, nor could she have known through reasonable

2  diligence, of the Defect in her Devices.

3       226.   Not only did Thompson's Devices not operate as Apple warranted and promised

4  initially, but Apple never represented or warranted that iOS would cause the way Thompson's

5  Devices operated to fundamentally change.  Thompson's Devices did not operate as promised in

6  Apple's advertisements, representations, and the information publicly available in the

7  marketplace.  Additionally, none of the packaging in which the Devices were sold to Thompson

8  revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle,"

9  or otherwise regulate the battery power and speed pursuant to which Thompson's Devices

10  would operate.  Accordingly, not only were Thompson's Devices defective at the point of sale

11  due to the Defect, but Apple exacerbated the problems with Thompson's Devices via its

12  misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

13  actions, Thompson did not receive the benefit of her bargain, and was injured as a result.  If

14  Thompson had been told of the Defect and the deceptive manner in which Apple would damage

15  the Devices after sale, Thompson would not have purchased the Devices, or would have paid

16  substantially less for them.

17                                    **WISCONSIN**

18       227.   **Plaintiff Dale Johnson** is a resident and citizen of the State of Wisconsin and he

19  purchased multiple generations of the iPhone in Wisconsin, including an iPhone 6 on April 3,

20  2015, an iPhone 6s Plus on March 1, 2016, and an iPhone 7 Plus on May 1, 2017.  Prior to his

21  purchase of the Device, he did not know, nor could he have known through reasonable

22  diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on iOS

23  9.  Johnson downloaded and installed iOS 11.2 on his Device in December 2017.

24       228.   Not only did Johnson's Device not operate as Apple warranted and promised

25  initially, but Apple never represented or warranted that iOS 11.2 or any of the future updates

26  would cause the way Johnson's Device operated to fundamentally change.  Johnson's Device,

27  particularly after installation of iOS 11.2, did not operate as promised in Apple's

28

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Device was sold to Johnson revealed that there

was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Johnson's Device would operate.

Accordingly, not only was Johnson's Device defective at the point of sale due to the Defect, but

Apple exacerbated the problems with Johnson's Device via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, Johnson did not

receive the benefit of his bargain and was injured as a result.  If Johnson had been told of the

Defect and the deceptive manner in which Apple would damage the Device after sale, Johnson

would not have purchased the Device, or would have paid substantially less for it.

<strong>WISCONSIN</strong>

229.   **Plaintiff Kyle Herman** is a resident and citizen of the State of Wisconsin and he

purchased an iPhone 6 on March 14, 2016 in Wisconsin.  Prior to his purchase of the Device, he

did not know, nor could he have known through reasonable diligence, of the Defect in his

Device.  At time of initial purchase, the Device operated on its factory-installed iOS versions.

Herman downloaded and installed iOS 10.0 on his Device in September 2016.

230.   Not only did Herman's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that iOS 10.0 or any of the future updates

would cause the way Herman's Device operated to fundamentally change.  Herman's Device,

for example after installation of iOS 10.0, did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Device was sold to Herman revealed that there

was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Herman's Device would operate.

Accordingly, not only was Herman's Device defective at the point of sale due to the Defect, but

Apple exacerbated the problems with Herman's Devices via its misrepresentations and

omissions with the iOS software Updates.  As a result of Apple's actions, Herman did not

1    receive the benefit of his bargain and was injured as a result.  If Herman had been told of the

2    Defect and the deceptive manner in which Apple would damage the Devices after sale, Herman

3    would not have purchased the Devices, or would have paid substantially less for them.

**WYOMING**

5       231.    **Plaintiff Quinn Lewis** is a resident and citizen of the State of Wyoming and he

6    purchased an iPhone 6 on November 24, 2017 in Wyoming.  Prior to his purchase of the

7    Device, he did not know, nor could he have known through reasonable diligence, of the Defect

8    in his Device.  At time of initial purchase, the Device operated on its factory-installed iOS.

9    Lewis downloaded and installed iOS 11.3 on his Device in or around April 2018.

10       232.    Not only did Lewis's Device not operate as Apple warranted and promised

11    initially, but Apple never represented or warranted that iOS 11.3 or any of the future updates

12    would cause the way Lewis's Device operated to fundamentally change.  Lewis's Device,

13    particularly after installation of iOS 11.3, did not operate as promised in Apple's

14    advertisements, representations, and the information publicly available in the marketplace.

15    Additionally, none of the packaging in which the Device was sold to Lewis revealed that there

16    was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

17    regulate the battery power and speed pursuant to which Lewis's Device would operate.

18    Accordingly, not only was Lewis's Device defective at the point of sale due to the Defect, but

19    Apple exacerbated the problems with Lewis's Device via its misrepresentations and omissions

20    with the iOS software Updates.  As a result of Apple's actions, Lewis did not receive the benefit

21    of his bargain and was injured as a result.  If Lewis had been told of the Defect and the

22    deceptive manner in which Apple would damage the Device after sale, Lewis would not have

23    purchased the Device, or would have paid substantially less for it.

**PUERTO RICO**

25       233.    **Plaintiff Shiriam Torres** is a resident and citizen of Puerto Rico and she

26    purchased an iPhone 6s in October 2015 in Puerto Rico and an iPhone 7 Plus in March 2017 in

27    Puerto Rico.  Prior to her purchase of the Devices, she did not know, nor could she have known

28

through reasonable diligence, of the Defect in her Devices.  At time of initial purchase, her iPhone 6s operated on iOS 9 and her iPhone 7 Plus operated on iOS 10.

234.    Not only did Torres's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Torres's Devices operated to fundamentally change. Torres's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Torres revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Torres's Devices would operate. Accordingly, not only were Torres's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Torres's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Torres did not receive the benefit of her bargain and was injured as a result.  If Torres had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Torres would not have purchased the Devices, or would have paid substantially less for them.

**VIRGIN ISLANDS (US)**

235.    **Plaintiff Adam Shapiro** is a resident and citizen of the United States Virgin Islands and he purchased two iPhone 6s Devices for his wife and child on October 25, 2015 in Florida and an iPhone 7 Plus for himself on September 21, 2016 online.  Shapiro has also purchased multiple generations of iPad Devices.  Prior to his purchase of the Devices, he did not know, nor could he have known through reasonable diligence of the Defect in his Devices.  At time of initial purchase, the Devices operated on their factory-installed iOS version.

236.    Not only did Shapiro's Devices not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Shapiro's Devices operated to fundamentally change.  Shapiro's Devices, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace. Additionally, none of the packaging in which the Devices were sold to Shapiro revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Shapiro's Devices would operate. Accordingly, not only were Shapiro's Devices defective at the point of sale due to the Defect, but Apple exacerbated the problems with Shapiro's Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Shapiro did not receive the benefit of his bargain and was injured as a result.  If Shapiro had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, Shapiro would not have purchased the Devices, or would have paid substantially less for them.

**BELGIUM**

237.   **Plaintiff Marianne Wagner** is a resident and citizen of the Country of Belgium and she purchased an iPhone 6s in June 2017.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device. Wagner downloaded and installed the first iOS update available on her Device.

238.   Not only did Wagner's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Wagner's Device operated to fundamentally change.  Wagner's Device, particularly after installation of her initial iOS update, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Wagner revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Wagner's Device would operate.  Accordingly, not only was Wagner's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Wagner's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Wagner did not receive the benefit of her bargain, and was injured as a result.  If Wagner had been told of the Defect and the deceptive manner in

1   which Apple would damage the Device after sale, Wagner would not have purchased the

2   Device, or would have paid substantially less for it.

3   **BRAZIL**

4   239.   **Plaintiff Guilherme Canoa de Oliveira** is a resident and citizen of Brazil and

5   he purchased an iPhone 6s on November 17, 2016.  Prior to his purchase of the Device, he did

6   not know, nor could he have known through reasonable diligence, of the Defect in his Device.

7   At time of initial purchase, the Device operated on iOS 9.  Canoa de Oliveira downloaded and

8   installed iOS 11.2.2 on his Device in or around January 2018.

9   240.   Not only did Canoa de Oliveira's Device not operate as Apple warranted and

10  promised initially, but Apple never represented or warranted that iOS 11.2.2 or any of the future

11  updates would cause the way Canoa de Oliveira's Device operated to fundamentally change.

12  Canoa de Oliveira's Device, particularly after installation of iOS 11.2.2, did not operate as

13  promised in Apple's advertisements, representations, and the information publicly available in

14  the marketplace.  Additionally, none of the packaging in which the Device was sold to Canoa de

15  Oliveira revealed that there was any Defect or that Apple would use the Updates to "smooth,"

16  "throttle," or otherwise regulate the battery power and speed pursuant to which Canoa de

17  Oliveira's Device would operate.  Accordingly, not only was Canoa de Oliveira's Device

18  defective at the point of sale due to the Defect, but Apple exacerbated the problems with Canoa

19  de Oliveira's Device via its misrepresentations and omissions with the iOS software Updates.

20  As a result of Apple's actions, Canoa de Oliveira did not receive the benefit of his bargain and

21  was injured as a result.  If Canoa de Oliveira had been told of the Defect and the deceptive

22  manner in which Apple would damage the Device after sale, Canoa de Oliveira would not have

23  purchased the Device, or would have paid substantially less for it.

24  **CANADA**

25  241.   **Plaintiff Hanpeng Chen** is a resident and citizen of Canada and he purchased an

26  iPhone 6 in or around September 2015.  Prior to his purchase of the Device, he did not know,

27  nor could he have known through reasonable diligence, of the Defect in his Device.  At time of

28

initial purchase, his Device operated on iOS 8.  In or around July 2016, Apple provided a new

iPhone 6 to Chen when his original Device had color distortion on its screen.  Chen downloaded

iOS 11 on his new Device in or around October 2017.

242.    Not only did Chen's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that any of the future iOS updates would

cause the way Chen's Device operated to fundamentally change.  Chen's Device, particularly

after installation of iOS 11, did not operate as promised in Apple's advertisements,

representations, and the information publicly available in the marketplace.  Additionally, none

of the packaging in which the Device was sold to Chen revealed that there was any Defect or

that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

power and speed pursuant to which Chen's Device would operate.  Accordingly, not only were

Chen's Device defective at the point of sale due to the Defect, but Apple exacerbated the

problems with Chen's Device via its misrepresentations and omissions with the iOS software

Updates.  As a result of Apple's actions, Chen did not receive the benefit of his bargain and was

injured as a result.  If Chen had been told of the Defect and the deceptive manner in which

Apple would damage the Device after sale, Chen would not have purchased the Device, or

would have paid substantially less for it.

### CANADA

243.    **Plaintiff Elisa Gaudio** is a resident and citizen of Canada and she purchased an

iPhone 6 Plus November 11, 2014.  Prior to her purchase of the Device, she did not know, nor

could she have known through reasonable diligence, of the Defect in her Device.  At time of

initial purchase, her Device operated on iOS 9.

244.    Not only did Gaudio's Device not operate as Apple warranted and promised

initially, but Apple never represented or warranted that any of the future iOS updates would

cause the way Gaudio's Device operated to fundamentally change.  Gaudio's Devices,

particularly after installation of subsequent iOS versions, did not operate as promised in Apple's

advertisements, representations, and the information publicly available in the marketplace.

Additionally, none of the packaging in which the Device was sold to Gaudio revealed that there

was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

regulate the battery power and speed pursuant to which Gaudio's Device would operate.

Accordingly, not only was Gaudio's Device defective at the point of sale due to the Defect, but

Apple exacerbated the problems with Gaudio's Device via its misrepresentations and omissions

with the iOS software Updates.  As a result of Apple's actions, Gaudio did not receive the

benefit of her bargain and was injured as a result.  If Gaudio had been told of the Defect and the

deceptive manner in which Apple would damage the Device after sale, Gaudio would not have

purchased the Device, or would have paid substantially less for it.

### CHILE

245.    **Plaintiff Corporación Nacional de Consumidores y Usuarios de Chile**

("CONADECUS") is a private non-profit organization with its principal place of business in

Santiago, Chile.  CONADECUS has represented hundreds of thousands Chilean consumers in

collective- or diffuse-interest actions to date.  CONADECUS has standing to pursue this action

on behalf of its members or constituents under *Hunt v. Wash. State Apple Advertising Comm'n*,

432 U.S. 333 (1977). CONADECUS's members, Chilean consumers, purchased the iPhone 5,

5s, 5c, 6, 6 Plus, 6s, 6s Plus, SE, 7, and 7 Plus Devices.  Prior to their purchase of the Devices,

they did not know, nor could they have known through reasonable diligence, of the Defect in

their Devices.

246.    Not only did CONADECUS's members' Devices not operate as Apple warranted

and promised initially, but Apple never represented or warranted that any of the future iOS

updates would cause the way CONADECUS's members' Devices operated to fundamentally

change.  CONADECUS's members' Devices, particularly after installation of subsequent iOS

versions, did not operate as promised in Apple's advertisements, representations, and the

information publicly available in the marketplace.  Additionally, none of the packaging in

which the Devices were sold to CONADECUS's members revealed that there was any Defect

or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery

power and speed pursuant to which CONADECUS's members' Devices would operate.

Accordingly, not only were CONADECUS's members' Devices defective at the point of sale

due to the Defect, but Apple exacerbated the problems with CONADECUS's members'

Devices via its misrepresentations and omissions with the iOS software Updates.  As a result of

Apple's actions, CONADECUS's members did not receive the benefit of their bargain and were

injured as a result.  If CONADECUS's members had been told of the Defect and the deceptive

manner in which Apple would damage the Devices after sale, CONADECUS's members would

not have purchased the Devices, or would have paid substantially less for them.

### CHINA

247.  **Plaintiff Kaixuan Ni** is a permanent resident of the United States residing in

California and a citizen of the People's Republic of China and he purchased an iPhone 6 Plus in

2015 in China.  Prior to his purchases of the Device, he did not know, nor could he have known

through reasonable diligence, of the Defect in his Device.  At time of initial purchase, his

Device operated on iOS 8.

248.  Not only did Ni's Device not operate as Apple warranted and promised initially,

but Apple never represented or warranted that any of the future iOS updates would cause the

way Ni's Device operated to fundamentally change.  Ni's Device, particularly after installation

of new iOS updates, did not operate as promised in Apple's advertisements, representations, and

the information publicly available in the marketplace.  Additionally, none of the packaging in

which the Device was sold to Ni revealed that there was any Defect or that Apple would use the

Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to

which Ni's Device would operate.  Accordingly, not only was Ni's Device defective at the point

of sale due to the Defect, but Apple exacerbated the problems with Ni's Device via its

misrepresentations and omissions with the iOS software Updates.  As a result of Apple's

actions, Ni did not receive the benefit of his bargain, and was injured as a result.  If Ni had been

told of the Defect and the deceptive manner in which Apple would damage the Device after

sale, Ni would not have purchased the Device, or would have paid substantially less for it.

**COLOMBIA**

249.    **Plaintiff Dr. Juliana Caceres** is a citizen of Colombia and she purchased an iPhone 6s on December 1, 2016 at Mac Center in Bogotá, Colombia.  Caceres is a pediatric pulmonologist working and residing in Bogotá, Colombia.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence, of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 10.   Caceres' general practice is to update her software when it becomes available, and she upgraded to iOS 10.2.1.

250.    Not only did Caceres' Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 10.2.1 or any of the future updates would cause the Device operation to fundamentally change.  Caceres' Device, particularly after installation of iOS 10.2.1, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which the Device would operate.  Accordingly, not only was the Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with the Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Caceres did not receive the benefit of her bargain, and was injured as a result.  If Caceres had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Caceres would not have purchased the Device, or would have paid substantially less for it

**INDIA**

251.    **Plaintiff Nakul Chandra** is a resident and citizen of India and he purchased an iPhone 7 on October 26, 2016.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Defect in his Device.  At time of initial purchase, the Device operated on the latest version of iOS at the time.

252.    Not only did Chandra's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any version of iOS or future updates would cause the way Chandra's Device operated to fundamentally change.  Chandra's Device, after installation of versions of iOS did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Chandra revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Chandra's Device would operate.  Accordingly, not only was Chandra's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Chandra's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Chandra did not receive the benefit of his bargain, and was injured as a result.  If Chandra had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Chandra would not have purchased the Device, or would have paid substantially less for it.

**JAPAN**

253.    **Plaintiff Yuichi Murakami** is a citizen and resident of Japan and he purchased an iPhone 7 on March 10, 2017 in Japan.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Defect in his Device.  At time of initial purchase, the Device operated on the latest version of iOS at the time.

254.    Not only did Murakami's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any of the future iOS updates would cause the way Murakami's Device operated to fundamentally change.  Murakami's Device, particularly after installation of subsequent iOS versions, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Murakami revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Murakami's Device would operate.

1    Accordingly, not only was Murakami's Device defective at the point of sale due to the Defect,

2    but Apple exacerbated the problems with Murakami's Device via its misrepresentations and

3    omissions with the iOS software Updates.  As a result of Apple's actions, Murakami did not

4    receive the benefit of her bargain, and was injured as a result.  If Murakami had been told of the

5    Defect and the deceptive manner in which Apple would damage the Device after sale,

6    Murakami would not have purchased the Device, or would have paid substantially less for it.

7                                              **MEXICO**

8          255.    **Plaintiff Linda Sonna** is a citizen of the United States and permanent resident of

9    Mexico, and she purchased an iPhone SE on September 1, 2017.  Prior to her purchase of the

10   Device, she did not know, nor could she have known through reasonable diligence, of the

11   Defect in her Device.

12         256.    Not only did Sonna's Device not operate as Apple warranted and promised

13   initially, but Apple never represented or warranted that any of the future iOS updates would

14   cause the way Sonna's Device operated to fundamentally change.  Sonna's Device, particularly

15   after installation of subsequent iOS versions, did not operate as promised in Apple's

16   advertisements, representations, and the information publicly available in the marketplace.

17   Additionally, none of the packaging in which the Device was sold to Sonna revealed that there

18   was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise

19   regulate the battery power and speed pursuant to which Sonna's Device would operate.

20   Accordingly, not only was Sonna's Device defective at the point of sale due to the Defect, but

21   Apple exacerbated the problems with Sonna's Device via its misrepresentations and omissions

22   with the iOS software Updates.  As a result of Apple's actions, Sonna did not receive the benefit

23   of her bargain, and was injured as a result.  If Sonna had been told of the Defect and the

24   deceptive manner in which Apple would damage the Device after sale, Sonna would not have

25   purchased the Device, or would have paid substantially less for it.

26

27

28

**THE NETHERLANDS**

257.   **Plaintiff Lilav Akrawy** is a resident and citizen of the Netherlands and she purchased an iPhone 6 on November 13, 2014.  Prior to her purchase of the Device, she did not know, nor could she have known through reasonable diligence of the Defect in her Device.  At time of initial purchase, the Device operated on iOS 8.  Akrawy downloaded and installed iOS 11 on her Device in or around September 2017.

258.   Not only did Akrawy's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS 11 or any of the future updates would cause the way Akrawy's Device operated to fundamentally change.  Akrawy's Device, particularly after installation of iOS 11, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Akrawy revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Akrawy's Device would operate.  Accordingly, not only was Akrawy's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Akrawy's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Akrawy did not receive the benefit of her bargain, and was injured as a result.  If Akrawy had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Akrawy would not have purchased the Device, or would have paid substantially less for it.

**NORWAY**

259.   **Plaintiff Burim Daci** is a resident and citizen of Norway and he purchased an iPhone 6s in December 2016.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Defect in his Device.  At time of initial purchase, the Device operated on the latest version of iOS.

260.   Not only did Daci's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any version of iOS or any future updates

would cause the way Daci's Device operated to fundamentally change.  Daci's Device, after installation of various versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to DACI revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Daci's Device would operate.  Accordingly, not only was Daci's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Daci's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Daci did not receive the benefit of his bargain, and was injured as a result.  If Daci had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Daci would not have purchased the Device, or would have paid substantially less for it.

**PERU**

261.    **Plaintiff Pedro Luis Espejo Miranda** is a resident and citizen of Peru and he purchased an iPhone 5s at the end of 2013.  Prior to his purchase of the Device, he did not know, nor could she have known through reasonable diligence of the Defect in his Device.  At time of initial purchase, the Device operated on the current version of iOS at that time.

262.    Not only did Espejo's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any versions of iOS or any of the future updates would cause the way Espejo's Device operated to fundamentally change.  Espejo's Device, after installation of versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Espejo revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Espejo's Devices would operate.  Accordingly, not only was Espejo's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Espejo's Device via its misrepresentations and omissions

with the iOS software Updates.  As a result of Apple's actions, Espejo did not receive the benefit of his bargain, and was injured as a result.  If Espejo had been told of the Defect and the deceptive manner in which Apple would damage the Devices after sale, ESPEJO would not have purchased the Device, or would have paid substantially less for it.

**RUSSIA**

263.    **Plaintiff Roman Dubianskii** is a resident and citizen of Russia and he purchased an iPhone 5s in December 2013.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in his Device.  At time of initial purchase, the Device operated on the current version of iOS.

264.    Not only did Dubianskii's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that versions of iOS or any of the future updates would cause the way Dubianskii's Device operated to fundamentally change.  Dubianskii's Device, after installation of versions of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Dubianskii revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Dubianskii's Device would operate.  Accordingly, not only was Dubianskii's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Dubianskii's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Dubianskii did not receive the benefit of his bargain, and was injured as a result.  If Dubianskii had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Dubianskii would not have purchased the Device, or would have paid substantially less for it.

**SOUTH KOREA**

265.    **Plaintiff Heekyung Jo** is a resident and citizen of South Korea and she purchased an iPhone 6 in or about 2014.  Prior to her purchase of the Device, she did not know,

nor could she have known through reasonable diligence, of the Defect in her Device.  Jo downloaded and installed iOS updates as recommended.

266.    Not only did Jo's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Jo's Device operated to fundamentally change.  Jo's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Jo revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Jo's Device would operate.  Accordingly, not only was Jo's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Jo's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Jo did not receive the benefit of her bargain, and was injured as a result.  If Jo had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Jo would not have purchased the Device, or would have paid substantially less for it.

### SOUTH KOREA

267.    **Plaintiff Youngro Lee** is a resident and citizen of the South Korea, and he purchased an iPhone 6s on or about November 2015.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence, of the Defect in her Device.  Lee downloaded and installed the iOS updates on his Device as recommended.

268.    Not only did Lee's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that iOS updates would cause the way Lee's Device operated to fundamentally change.  Lee's Device did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Lee revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Lee's Device would operate.

Accordingly, not only was Lee's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Lee's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Lee did not receive the benefit of her bargain, and was injured as a result.  If Lee had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Lee would not have purchased the Device, or would have paid substantially less for it.

## UNITED KINGDOM

269.   **Plaintiff Kushagra Sharma** is a resident and citizen of the United Kingdom and he purchased an iPhone 6 Plus in April 2016.  Prior to his purchase of the Device, he did not know, nor could he have known through reasonable diligence of the Defect in his Device.  At time of initial purchase, the Device operated on the latest version of iOS.

270.   Not only did Sharma's Device not operate as Apple warranted and promised initially, but Apple never represented or warranted that any version of iOS or any future updates would cause the way Sharma's Device operated to fundamentally change.  Sharma's Device, after installation of a version of iOS, did not operate as promised in Apple's advertisements, representations, and the information publicly available in the marketplace.  Additionally, none of the packaging in which the Device was sold to Sharma revealed that there was any Defect or that Apple would use the Updates to "smooth," "throttle," or otherwise regulate the battery power and speed pursuant to which Sharma's Device would operate.  Accordingly, not only was Sharma's Device defective at the point of sale due to the Defect, but Apple exacerbated the problems with Sharma's Device via its misrepresentations and omissions with the iOS software Updates.  As a result of Apple's actions, Sharma did not receive the benefit of his bargain, and was injured as a result.  If Sharma had been told of the Defect and the deceptive manner in which Apple would damage the Device after sale, Sharma would not have purchased the Device, or would have paid substantially less for it.

**B.  Defendants and Their Relevant Corporate Structure**

271.    Apple Inc. ("Apple"), is a corporation that was created under the laws of the State of California, and has its principal place of business in Cupertino, California.  Apple is the world's largest information technology company by revenue and the world's third-largest mobile phone developer.  There are currently over one billion Apple products in active use worldwide.

272.    Throughout the events at issue here, Apple has operated through its directors, officers, employees and agents, and each such person acted within the course and scope of such agency, representation or employment and was acting with the consent, permission and authorization of Apple.

273.    Apple has represented that the "design, manufacture, and testing" of the Devices "has always been done by [ ] Apple Inc., which is based in California."  *See* Exhibit 4 (Transcript of House of Commons Standing Committee on Industry, Science, and Technology).

**CHOICE OF LAW: DESIGNED BY APPLE IN CUPERTINO, CALIFORNIA**

274.    By using their Devices or downloading a software update, Device users are presented with the iOS Software License Agreement. There are separate Software License Agreements for each version of iOS software including: iPhone iOS 3.1, iOS 4.1, iOS 5.0, iOS 5.1, iOS 6.0, iOS 7.0, iOS 8.0, iOS 8.1, iOS 9.0, iOS 9.1, iOS 10, iOS 11, and iOS 11.2.  The agreements do not differ in material terms, and provide that California law governs the agreements[8]:

**12. Controlling Law and Severability.** This License will be governed by and construed in accordance with the laws of the State of California, excluding its conflict of law principles. This License shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded. If you are a consumer based in the United Kingdom, this License will be governed by the laws of the jurisdiction of your residence.  If for any reason a court of competent jurisdiction finds any provision, or portion thereof, to be unenforceable, the remainder of this License shall continue in full force and effect.

---

[8] California law applies unless the consumer is based in the United Kingdom.  A subclass is bringing their claims based upon the United Kingdom's licensing agreements, and choice of law provisions therein.  As will be demonstrated by Plaintiffs in their subsequent class certification

275.  *See, e.g.,* Exhibits 5, 6 (Samples of Agreements).

276.  To the extent they apply, the iOS Software Licensing Agreements are effective at the point of sale—as soon as the customers turn on their Devices—and are thus part of the benefit of the consumers' bargain.  Without the iOS, for which there is a purported licensing agreement, the Devices simply do not work.

277.  Apple elected to have California law govern all claims and disputes concerning the common software required to operate all of the Devices at issue in this lawsuit. Accordingly, the application of California law to all of the class members' claims is fair, appropriate, and an election affirmatively made by Apple consistent in its agreements.

278.  By using their Devices, consumers are told that they agree to be bound by California law as consumers must run Apple's proprietary iOS to use their Devices.

279.  Beyond Apple's election of California law to govern the claims described herein, the State of California has a significant interest in regulating the conduct of businesses operating within its borders.  California, which seeks to protect the rights and interests of California and all residents and citizens of the United States against a company headquartered and doing business in California, has a greater interest in the claims of Plaintiffs and class members than any other state or country and is most intimately concerned with the claims and outcome of this litigation.

280.  The principal place of business of Apple, located at 1 Apple Park Way (formerly 1 Infinite Loop) in Cupertino, California, is the "nerve center" of its business activities—the place where its high-level officers direct, control, and coordinate the corporation's activities, including its marketing, software development, and major policy, financial, and legal decisions. As admitted by Apple in its Form 10-K for the fiscal period ended September 24, 2016 (the "2016 Form 10-K"), "most of the Company's key personnel" are from Silicon Valley.

---

brief(s), trial plans and other techniques can be adopted by the Court to ensure manageability of such separate classes.

281.     Indeed, Apple's Devices proudly display that they were "Designed by Apple in California."

282.     Apple's response to the allegations herein, and corporate decisions surrounding such response, were made from and in California.

283.     Apple's breaches of duty to Plaintiffs and the Class emanated from California, and the Devices at issue herein were designed, manufactured, and tested in California.

284.     Application of California law with respect to Plaintiffs' and Class members' claims is neither arbitrary nor fundamentally unfair because California has a state interest in the claims of the Plaintiffs and the Class based upon Apple's significant and ongoing contacts with California.

285.     Under California's choice of law principles, which are applicable to this action, the common law of California applies to the common law claims of all class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's consumer protection laws may be applied to non-resident Plaintiffs and class members.

## SUBSTANTIVE ALLEGATIONS

### I.     APPLE ISSUED MATERIALLY FALSE STATEMENTS EMANATING FROM CALIFORNIA TO SELL DEFECTIVE DEVICES TO THE CLASS

286.     The first Apple "smartphone" blazed onto the market in 2007, and the first Apple iPad did the same in 2010.[9]  These two product lines have historically comprised the majority of Apple's product sales since at least 2013.

287.     Apple engaged in a multiple year, consistent marketing plan of constantly introducing new iterations or generations of the Devices that emphasized battery power designed to keep pace with ever improving processor "chips," and a panoply of ever-increasing,

---

[9] Upon information and belief, the following entities have manufacturing, supply and/or other contracting business relationships with Apple for hardware or other features on one or more of the Devices: Pegatron Corporation, Hon Hai Precision Industry Co., Ltd. (Foxconn Technology Group), Compal Electronics, Inc., and Wistron Corp.

cutting edge features loaded onto the Devices.[10]  Apple's statements were materially false in view of the Defect, and were designed to cause consumers to upgrade their Devices.[11]

288.   Apple has also marketed its Devices in a fashion to drive consumers to consider their Devices, particularly iPhones, as an extension of themselves—something they cannot live without, do not have to be weighed down carrying, and do not need to haul around a battery cord to intermittently keep powered.  Apple CEO Timothy Cook, during the March 21, 2016 Apple Special Event at the Company's then-current Cupertino headquarters, stated that Apple knows iPhones are "deeply personal" and an "extension of ourselves."  The Devices, when operating as promised, are to be a one-stop location for all forms of personal and business use, including, but not limited to, cell phone, e-mail and internet usage, messaging, calendars, calculators, photos and photo editing, watching videos, movies and television programming, monitoring health, receiving digital print magazine subscriptions, reading digital books, playing video games, and a host of other applications (collectively the "Features").

289.   Apple has thus cultivated a dependent relationship between consumers and their Devices, and has exploited that relationship to fuel consumer demand to buy more devices to make money.[12]  Perhaps borrowing a cue from the car industry, Apple self-created a market

---

[10] As stated in Apple's 2016 Form 10-K at 4: "The Company believes that sales of its innovative and differentiated products are enhanced by knowledgeable salespersons who can convey the value of the hardware and software integration and demonstrate the unique solutions that are available on its products.  The Company further believes providing direct contact with its targeted customers is an effective way to demonstrate the advantages of it products over those of its competitors and providing a high-quality sales and after-sales support experience is critical to attracting new and retaining existing customers."

[11] As admitted by Apple in its 2016 Form 10-K at 5: "The Company's future financial condition and operating results depend on the Company's ability to continue to develop and offer new innovative products and services in each of the markets in which it competes."  *See also* 2016 Form 10-K at 9: "Due to the highly volatile and competitive nature of the industries in which the Company competes, the Company must continually introduce new products, services and technologies, enhance existing products and services, effectively stimulate customer demand for new and upgraded products and successfully manage the transition to these new and upgraded products."

[12] As detailed in the chart herein at Section IV, for nearly every year since at least the fiscal year ended 2013, sales of the Devices collectively accounted for at least 70% percent of Apple's revenues (2013: 72.1%; 2014: 72.3%; 2015: 76.2%; 2016: 72.8%; 2017: 70%) and totaled nearly $800 billion.

designed to lure consumers into buying the "latest and greatest" model of the Devices, with the central theme of the marketing ploy being Devices with access to Apple's i0S system to provide more Features, powerful processor chips, and long lasting battery life, all the while in thinner and more light-weight versions.[13]  The parade of Apple's constant marketing plan for each of the Devices demonstrates the marketing message Apple sought to convey: faster, longer battery life, more Features, all crammed into increasingly thinner and lighter physical boundaries.

### A.     iPhones

#### i.     iPhone 5

290.    On September 12, 2012, Apple issued a press release from San Francisco, California, captioned "Apple Introduces iPhone 5: Thinnest, Lightest iPhone Ever Features All-New Aluminum Design, Stunning 4-Inch Retina Display, A 6 Chip & Ultrafast Wireless."  The device was slated to run on iOS 6 initially.  The press release states, in pertinent part (with emphasis added):

> … *the thinnest and lightest iPhone ever* . . . an Apple-designed A6 chip for *blazing fast performance*; and ultrafast wireless technology[]—all while delivering *even better battery life*.[]

*     *     *

> "iPhone 5 is the most beautiful consumer device that we've ever created," said Philip Schiller, Apple's senior vice president of Worldwide Marketing. "We've packed an amazing amount of innovation and advanced technology into a thin and light, jewel-like device with a stunning 4-inch Retina display, *blazing fast A6 chip, ultrafast wireless, even longer battery life*; and we think customers are going to love it."

> iPhone 5 is the thinnest smartphone in the world, . . . 18 percent thinner and 20 percent lighter than iPhone 4S.

*     *     *

> The all-new A6 chip was designed by Apple to maximize performance and power efficiency to support all the incredible new features in iPhone 5, including the stunning

---

[13] In addition, with little variation, the key elements of the box packaging for the Devices was substantially similar and included references to Apple's Cupertino, California address, as well as statements on the box, inserts and/or Devices representing: "Designed by Apple in California." While the packaging contains certain literature, none of the literature contained disclosures regarding the Defect, making Apple's omissions and inadequate disclosures materially false and misleading.

new 4-inch Retina display—***all while delivering even better battery life. With up to twice the CPU and graphics performance, almost everything you do on iPhone 5 is blazing fast*** for launching apps, loading web pages and downloading email attachments.

291.   On September 12, 2012, Apple hosted a Special Event in San Francisco, California to announce the iPhone5.[14]   The Special Event underscored the false representations about the device and failed to disclose the Defect.

292.   In addition to marketing the iPhone 5 via its press release and Special Event, Apple posted similar advertising on its website and in stores for these products.  Apple boasted about its new design being "[t]he thinnest, lightest, fastest iPhone ever":





---

[14] As with all Devices (and the majority of the Updates) identified herein, Apple routinely hosts a "Special Event" presentation for the new product and/or iOS.  These Special Events are traditionally hosted from a location in California, and are attended by Apple executives and staff, as well as media and other persons in the technology field.  These events are videotaped, posted on Apple's website, and also reposted online by various media or other sources.

293.    Apple's marketing materials further boasted "[p]erformance and graphics up to twice as fast.  With battery life to spare."  That is, "even at is accelerated speed, iPhone 5 has more than twice enough battery power to last throughout the day—up to 8 hours of browsing on a cellular connection, up to 8 hours of talk time, and up to 10 hours of video playback time."

294.    As set forth herein, these were materially false statements that failed to warn Plaintiffs and the Class of the known Defect.

### ii.    iPhone 5s

295.    On September 10, 2013, Apple unveiled the iPhone 5s at its Cupertino, California headquarters.  It was released on September 20, 2013, along with its lower-cost counterpart, the iPhone 5C.  These devices, upon initial release, operated on iOS 7 software.

296.    Apple's September 10, 2013 press release, issued from Cupertino, California, is captioned "Apple Announces iPhone 5s—The Most Forward-Thinking Smartphone in the World."  The press release states, in pertinent part (with emphasis added):

> Apple today announced iPhone 5s, the most forward-thinking iPhone yet, featuring an all-new A7 chip, making iPhone 5s the world's first smartphone with 64-bit desktop-class architecture for **blazing fast performance** in the palm of your hand. iPhone 5s redefines the best smartphone experience in the world with amazing new features all **packed into a remarkable thin and light design**. . . .

> \*        \*        \*

> The all-new A7 chip in iPhone 5s brings 64-bit desktop-class architecture to a smartphone for the first time. With up to twice the CPU and graphics performance, **almost everything you do on iPhone 5s is faster and better than ever**, from launching apps and editing photos to playing graphic-intensive games—**all while delivering great battery life**. . . .

> \*        \*        \*

> iPhone 5s features a remarkable *thin and light*, precision-crafted design that customers around the world love, including an anodized aluminum body with diamond cut chamfered edges, a stunning 4-inch Retina display and glass inlays. . . .

297.   On September 10, 2013, Apple also hosted a Special Event from Cupertino, California to announce the product.  The Special Event simply underscored the false representations about the device and failed to disclose the Defect.[15]

298.   In addition to the press release and marketing of the new iPhone 5s, and the Special Event, Apple used similar advertising on its website and in its stores to market the thinness of the phone, its extended battery life, and fast speeds as part of its overall marketing scheme.



### iii.   iPhone 5c

299.   On September 10, 2013, Apple unveiled the iPhone 5c at its Cupertino, California headquarters.  It was released on September 20, 2013, along with its higher-end counterpart, the iPhone 5s.  These devices, upon initial release, operated on iOS 7 software.

---

[15] For example, during the Special Event, Apple's SVP, Worldwide Marketing, stated the following of the iPhone 5s: "What about battery life we're really happy to tell you the team has done a phenomenal job they do have battery life that's equal or greater than the iPhone 5 had 10 hours 3G talktime eight hours 3G browsing 10 hours LTE browsing Wi-Fi browsing video playback 40 hours of music listening up to 250 hours of standby so that's the first of our breakthrough technologies in the iPhone 5s a 64-bit class architecture an incredible performance of a7 and m7." P. Schiller SVP, Worldwide Marketing, Apple, Apple Special Event at 45:22 (Sept. 10, 2013) available at: (https://www.youtube.com/watch?v=yBX-KpMoxYk).

300.    Apple's September 10, 2013 press release, issued from Cupertino, California, is

captioned "Apple Introduces iPhone 5c—The Most Colorful iPhone Yet."  The press release

states, in pertinent part (with emphasis added):

> . . . iPhone 5c is built on a foundation of features people know and love like the beautiful 4-inch Retina display, *blazing fast performance* of the A6 chip, and the 8 megapixel iSight camera—***all while delivering great battery life***. . . .
>
> *                *                *
>
> iPhone 5c comes with all the features customers love in iPhone 5, and more. The Apple-designed A6 chip provides incredible performance and power efficiency, all while delivering great battery life, so almost everything you do on iPhone 5c is blazing fast, from launching apps and loading web pages to downloading email attachments.

301.    On September 10, 2013, Apple also hosted a Special Event from Cupertino,

California to announce the product.  The Special Event simply underscored the false

representations about the device and failed to disclose the Defect.[16]  In addition to the press

release, Special Event and marketing of the new iPhone 5c, Apple used similar advertising on

its website and in its stores to market the its extended battery life and fast speeds as part of its

overall marketing scheme.

### iv.    iPhone 6 and 6 Plus

302.    On September 19, 2014, the iPhone 6 and iPhone 6 Plus were released for sale

(with pre-ordering available on September 12, 2014).  These devices, on the initial date of

release, operated on iOS 8 software.

303.    Apple's September 9, 2014 press release for the iPhone 6 and iPhone 6 Plus,

issued from Cupertino, California, is captioned "Apple Announces iPhone6 & iPhone 6 Plus—

The Biggest Advancements in iPhone History," and states in pertinent part (emphasis added):

> Apple today announced iPhone6 and iPhone 6 Plus, the biggest advancements in iPhone history . . . in an all-new ***dramatically thin*** and seamless design.  . . . engineered to be the ***thinnest ever*** . . . [and include] the Apple-designed A8 chip with

---

[16]  For example, during the Special Event, P. Schiller, Apple's SVP, Worldwide Marketing stated of the iPhone 5c: "It's powered by an apple designed a6 chip that gives great performance and great battery life in fact the battery inside the iPhone 5c is slightly larger than the battery was in the iPhone 5 before.") - P. Schiller SVP, Worldwide Marketing, Apple, Apple Special Event at 25:36 - 25:44 (Sept. 10, 2013) available at: (https://www.youtube.com/watch?v=yBX-KpMoxYk).

second generation 64-bit desktop-class architecture for ***blazing fast performance and power efficiency*** . . . . Both models include iOS8, the latest version of the world's most advanced mobile operating system, featuring a simpler, *faster* and more intuitive user experience . . . .

\*     \*     \*

iPhone 6 and iPhone 6 Plus are the biggest advancements in iPhone history," said Tim Cook, Apple's CEO.  "The iPhone is the most loved smartphone in the world with the highest customer satisfaction in the industry and we are making it much better in every way.  Only Apple can combine the ***best hardware, software*** and services at this unprecedented level and we think customers are going to love it.

\*     \*     \*

With second generation 64-bit desktop-class architecture, the all-new A8 chip offers ***faster performance*** and is more energy efficient, delivering higher sustained performance with ***great battery life***.

304.    On September 9, 2014, Apple hosted a Special Event from Cupertino, California to announce iPhone 6 and iPhone 6 Plus.  The Special Event simply underscored the false representations about the devices and failed to disclose the Defect.

305.    In addition to marketing the iPhone 6 and iPhone 6 Plus via the September 9, 2014 press release and Special Event, Apple posted similar advertising on its website and in stores for these products.

306.    Consistent with previous messaging, Apple touted the iPhone 6's thin design.



307.    Apple advertised that iPhone 6's A8 chip was the "fastest yet," "power efficient," and could "sustain higher performance—so you can play graphics-intensive games or enjoy video at higher frame rates for longer than ever" with the promise of:

# Great battery life. Even while powering great new features.

iPhone 6 is designed to be incredibly efficient. So you can spend your day taking advantage of all its new features and apps while getting better battery life.*

### v.    iPhone 6s and iPhone 6s Plus

308.    On September 25, 2015, the iPhone 6s and iPhone 6s Plus were released for sale (with pre-ordering on September 12, 2015), and initially operated on iOS9 software.

309.    Apple's September 9, 2015 press release for the iPhone 6s and iPhone 6s Plus, issued from San Francisco, California is captioned "Apple Introduces iPhone 6s & iPhone 6s Plus," and states in pertinent part (emphasis added):

. . . the most advanced iPhones ever . . . . iPhone 6s and iPhone 6s Plus also introduce a transformative new approach to photography called Live Photos, bringing still images to life by capturing a moment in motion. Live Photos, 3D Touch and other advancements in the new iPhones are powered by the Apple-designed A9 chip, the most advanced chip ever in a smartphone, ***delivering faster performance and great battery life.***

*          *          *

A9, Apple's third generation 64-bit chip powers these innovations with 70 percent faster CPU and 90 percent faster GPU performance than the A8, all with gains in ***energy efficiency for great battery life***.  The A9 chip and iOS 9 are architected together for optimal performance where it matters most, in real world usage.  M9, Apple's next-generation motion coprocessor, is embedded into A9, allowing more features to ***run all the time at lower power***, including "Hey Siri," without iPhone needing to be plugged in.

*          *          *

. . . The foundation of iOS is even stronger with software updates that require less space to install and advanced security features to further protect your devices.

310.    On September 9, 2015, Apple hosted a Special Event from San Francisco, California to announce the iPhone 6s and iPhone 6s Plus. The Special Event simply underscored the false representations about the devices and failed to disclose the Defect.[17]

311.    In addition to the marketing of the iPhone 6s and iPhone 6s Plus via the September 9, 2015 press release and Special Event, Apple posted similar advertising on its website and in stores for these products.

### vi.    iPhone SE

312.    On March 21, 2016, Apple announced the iPhone SE for release in April 2016. The iPhone SE operated on iOS 9.3 software upon release.

313.    Apple's March 21, 2016 press release for the iPhone SE, issued from Cupertino, California, is captioned "Apple Introduces the iPhone SE—The Most Powerful Phone with a Four-Inch Display."  The press release states, in pertinent part (with emphasis added):

> Apple today introduced iPhone SE, ***the most powerful phone*** with a four-inch display . . . . iPhone SE offers ***exceptional performance*** with the same 64-bit A9 chip offered in iPhone 6s and iPhone 6s Plus for ***blazing fast speeds, longer battery life***, faster wireless, a 12-megapixel iSight® camera featuring Live Photos and 4K video, and Touch ID with Apple Pay.
>
> *          *          *
>
> . . . The 64-bit A9 chip, introduced in iPhone 6s and iPhone 6s Plus, offers iPhone SE customers two times faster CPU and three times faster GPU performance compared to iPhone 5s, all with gains in energy efficiency for improved battery life.

314.    The iPhone SE was also introduced at the Apple Special Event held in Cupertino, California on March 23, 2016.  The Special Event simply underscored the false representations

---

[17] For example, during the Special Event, P. Schiller, SVP, Worldwide Marketing, for Apple stated: "Thank you, Craig . . .  Inside your iPhone is the fastest chip we've ever built into a phone, the new A9 chip, also our third-generation 64-bit chip. It's built with a new transistor architecture. It means we can drive faster performance while being more energy efficient. And our software team has worked together with our chip team to enable it to be maximum performance for the kinds of tasks we do every day. And it delivers a big jump in performance. Compared to the A8, it is 70% faster at CPU tasks, and at graphics tasks, it's 90% faster. This is a big jump in performance. It's going to make using our phone so much faster and a lot more fun."  P. Schiller, SVP, Worldwide Marketing, Apple Special Event for iPhone 6S, iPhone 6S Plus, at 27 (Sept. 9, 2015).

about the device and failed to disclose the Defect.[18]  In addition to the marketing of the iPhone SE via the March 21, 2016 press release, Apple posted similar advertising on its website and in stores for these products.

### vii.    iPhone 7 and iPhone 7 Plus

315.    On September 16, 2016, the iPhone 7 and iPhone 7 Plus were released for sale (with pre-ordering on September 9, 2016), initially operating on iOS 10 software.

316.    Apple's September 7, 2016 press release for the iPhone 7 and iPhone 7 Plus, issued from San Francisco, California is captioned "Apple introduces iPhone 7 & iPhone 7 Plus, the best, most advanced iPhone ever," and states in pertinent part (emphasis added):

Including Breakthrough New Camera Systems, *the Best Battery Life Ever* in an iPhone and Water & Dust Resistance

\*        \*        \*

Apple today introduced iPhone 7 and iPhone 7 Plus, *the best, most advanced* iPhone ever, packed with unique innovations that improve all the ways iPhone is used every day. The new iPhone features new advanced camera systems that take pictures like never before, *more power and performance with the best battery life ever* in an iPhone . . . .

\*        \*        \*

More Performance & Battery Life

The new custom-designed Apple A10 Fusion chip features a new architecture that powers these innovations, making it the *most powerful chip* ever in a smartphone, while also getting *more time between charges with the longest battery life ever* in an iPhone.  The A10 Fusion's CPU now has four cores, seamlessly integrating two high-

---

[18]   For example, during the March 2016 Special Event, Apple's Vice President iPhone Product Marketing, Greg Joswiak, stated the following (emphasis added):

. . . the iPhone SE delivers incredible battery improvements across the board.

\*        \*        \*

But it's on the inside where the iPhone SE really shines.  It's got advanced technologies that make this the *most powerful four-inch phone ever. It's incredibly powerful* which makes it even better to do the things that iPhone customers want to do, including playing the most graphic intensive games. So at the heart of the iPhone SE, of course, is our chips: our amazing Apple A9 chip with its embedded M9 motion coprocessor.  This means that the iPhone SE has the same processing performance as the iPhone 6S which is literally double the speed of the iPhone 5S.

performance cores that run up to *two times faster* than iPhone 6, and two high-efficiency cores that are capable of running at just one-fifth the power of the high-performance cores.  Graphics performance is also *more powerful*, running up to *three times faster* than iPhone 6 at as little as half the power, enabling a new level of gaming and professional apps.

\*     \*     \*

iPhone 7 and iPhone 7 Plus come with *iOS 10, the biggest release ever of the world's most advanced* mobile operating system.

317.    Apple also held a Special Event on September 7, 2016 from San Francisco, California to introduce the iPhone 7 and iPhone 7 Plus.  The Special Event simply underscored the false representations about the devices and failed to disclose the Defect.

318.    In addition to the marketing of the iPhone 7 and iPhone 7 Plus via the September 7, 2016 press release and Special Event, Apple posted similar advertising on its website and in stores for these products.



319.    Apple's CEO Tim Cook raved about the new Devices during the Company's quarterly earnings call with analysts on October 25, 2016 stating:

> As for our newest products, we're thrilled with the customer response to iPhone 7 and iPhone 7 Plus.  These are the best iPhones we've ever made, with breakthrough camera systems, immersive stereo speakers, and the best iPhone performance in battery life ever, thanks to the custom-designed Apple A10 Fusion chip.  They feature the brightest, most colorful iPhone displays to date and come in gorgeous new finishes. Demand continues to outstrip supply, but we're working very hard to get them into customers' hands as quickly as possible.[19]

---

[19] In addition to (or a component of) the Defect described herein, certain of the Devices have been reported as causing fire, explosions and/or injuries.  *See e.g.* Anthony Cuthbertson, "Apple Store Evacuated After iPhone Battery Explosion," *Newsweek* (Jan. 10, 2018) (Available online at

**B.     iPads**

320.     Each iPad described herein sold by Apple to consumers was encased in a box with labeling and inserts substantially similar to that described in section above for the iPhones.

**i.     Fourth Generation iPad**

321.     On October 23, 2012, Apple issued a press release from San Jose, California, announcing the fourth generation iPad.  This iPad initially ran on iOS 6 and was the first iPad to feature a Retina display.[20]  The press release advertised that the iPad included (with emphasis added):

> [A] new Apple-designed A6X chip that delivers up ***to twice the CPU performance*** and up to twice the graphics performance of the A5X chip, all while delivering ***an incredible 10 hours of battery life*** in the ***same thin and light*** iPad design. Other new features include a FaceTime HD camera, twice the Wi-Fi performance when compared to previous iPad models and support for additional LTE carriers worldwide.[6]

322.     On October 23, 2012, Apple hosted a Special Event from San Jose, California to announce the Fourth Generation iPad.  The Special Event simply underscored the false representations about the device, and failed to disclose the Defect.

**ii.     iPad Mini**

323.     Simultaneous to the October 23, 2012 announced release of the fourth generation iPad, Apple also announced the all-new iPad mini.  The iPad mini debuted on iOS 6, "the world's most advance mobile operating system with over 200 new features."  The press release contained the following representations, in pertinent part, concerning the iPad mini (with emphasis added):

---

http://www.newsweek.com/iphone-battery-mysterious-explosion-causes-apple-store-evacuation-776529) (last visited June 18, 2018).  As recently as May 11, 2018, reports have surfaced of an iPhone 6s exploding and catching fire.  Upon information and belief, Apple's throttling of the Devices may also have been out of fear of a massive recall akin to what its competitor, Samsung Electronics Co., Ltd undertook related to one of its phones in 2016 (the "Samsung Recall") due to consumer injuries related to lithium-ion batteries contained within their product.

[20] iOS 6 was first announced via an Apple press release issued on June 11, 2012 from San Francisco, California, promising that the update would introduce 200 new features.

[A] completely new iPad design that is *23 percent thinner and 53 percent lighter* than the third generation iPad.  The new iPad mini features a stunning 7.9-inch Multi-Touch display . . . *ultrafast* wireless performance[1] and *an incredible 10 hours of battery life*[]—every inch an iPad, yet in a revolutionary design you can hold in one hand . . . iPad mini is as thin as a pencil and as light as a pad of paper, yet packs a fast A5 child, FaceTime HD and 5 megapixel iSight cameras and ultrafast wireless—*all while delivering up to 10 hours of battery life* . . . The dual-core *A5 chip delivers responsive graphics and a fast,* fluid Multi-Touch experience, while still providing all-day battery life . . . iPad mini features dual-band 802.11n Wi-Fi support for speeds up to 150 Mbps,[] which is twice the Wi-Fi performance compared to previous iPad models.[21]

### iii.    iPad Air

324.    On October 22, 2013, Apple issued a press release from San Francisco, California, announcing the release of the iPad Air, which initially ran on iOS 7.  The release was captioned as "Apple Announces iPad Air—Dramatically Thinner, Lighter & More Powerful iPad" and included advertising statements (emphasis added) that the iPad Air is:

[T]he latest generation of [Apple's] category defining device, featuring a stunning 9.7-inch Retina display in a *new thinner and lighter design*, Precision-engineered to weigh just one pound, iPad Air is 20 percent *thinner and 28 percent lighter* than the fourth generation iPad, and with a narrower bezel the borders of iPad Air are *dramatically thinner*—making content even more immersive . . . [The] iPad Air . . . *delivers all-day battery life in the lightest full-sized tablet in the world* . . . [T]he new *power-efficient A7 chip* allows the battery to be even smaller, helping reduce the overall volume by 24 percent from the previous generation while doubling its performance and maintaining its up to 10-hour battery life[1] . . . With up to twice the CPU and graphics performance on iPad Air . . . *almost everything you do is faster and better* than ever, from launching apps and editing photos to playing graphic-intensive games—all while delivering *all-day battery life*.

325.    Apple also conducted a Special Event on October 22, 2013.  The Special Event simply underscored the false representations about the device and failed to disclose the Defect.[22]

---

[21]  At Apple's Special Event, held on October 23, 2012 in San Jose, California, it was represented by Apple's SVP Worldwide Marketing that: "[T]he new iPad Mini with Retina display is also powered by this brand new A7 chip with its 64-bit architecture. This delivers a *huge jump in performance* for iPad Mini up to *four times* faster at CPU tasks and up to *eight times faster* at graphics tasks. You're going to feel performance across everything you do that's so fast. And still that great *all day 10-hour battery life.*"

P. Schiller SVP, Worldwide Marketing, Apple Special Event at 1:17:01-1:17:21 (Oct. 22, 2013) *available at*: (https://www.youtube.com/watch?v=4FunXnJQxYU).

[22] For example, during the Special Event, Apple executive J. Ivie stated, in pertinent part (emphasis added) that:

The new A7 chip is *incredibly powerful*. And also, *very power efficient*. Because of this efficiency, the *battery could get smaller yet critically without any loss in battery life*. And of course, by reducing the battery size, the product became significantly lighter. We reduced the dimensions of

iv.    **iPad Mini 2**[23]

326.    On the same day as the release of the iPad Air, Apple also announced via press release from San Francisco, California the new iPad Mini with 7.9-inch Retina display, which similarly initially ran on iOS 7.  Moreover, the press release stated, in pertinent part, that the new iPad Mini had "***the same amazingly thin and light design***," including that (emphasis added):

> [F]eature[s] the ***powerful and power-efficient*** Apple-designed A7 chip with 64-bit desktop-class architecture, ultrafast wireless with *faster* built-in Wi-Fi and expanded LTE cellular connectivity . . . 'It is so ***thin, light and powerful***, once you hold one in your hand you will understand what a tremendous advancement this is,' said Philip Schiller, Apple's senior vice president of Worldwide Marketing . . . [with] ***up to four times the CPU and eight times the graphic performance*** on iPad mini with Retina display, almost everything you do is ***faster and better than ever***, from launching apps and editing photos to playing graphic-intensive games—all while ***delivering all day battery life.***

327.    On October 22, 2013, Apple also announced the release of the iPad Mini2 at the Special Event.  The Special Event simply underscored the false representations about the device and failed to disclose the Defect.[24]

---

the bezel with less mass.  The iPad S still retains its structural rigidity. There's a simplicity to it, but there's nothing precious about it.  This integrity, this durability inspires confidence in a product that's meant to be taken places, handled, and really used.  With the iPad, we set out to redefine mobile computing.  Up until now, 64-bit architecture is something you'd normally only find in desktop computers. The new Apple-designed A7 chip brings 64-bit technology. All of its advanced computing graphics to this ultra-portable, 1-pound device. But even with all of this added processing power, ***iPad Air still has an impressive 10-hour battery life.***

J. Ive, SVP of Design, Apple Special Event at 1:13:04 (Oct. 22, 2013) *available at*: https://www.youtube.com/watch?v=4FunXnJQxYU

[23] Initially, Apple called the iPad mini 2 the "iPad mini with Retina® display."

[24]  For example, during the Special Event on October 22, 2013, Apple's SVP Worldwide Marketing (P. Schiller) also stated (emphasis added):

And the new iPad Mini with Retina display is also powered by this brand new A7 chip with its 64-bit architecture. This delivers a ***huge jump in performance*** for iPad Mini up to four times faster at CPU tasks and up to ***eight times faster*** a graphics tasks. You're going to feel performance across everything you do that's ***so fast***. And still that ***great all day 10-hour battery life***.

P. Schiller SVP, Worldwide Marketing, Apple Special Event at 1:17:01-1:17:21 (Oct. 22, 2013) available at: (https://www.youtube.com/watch?v=4FunXnJQxYU).

### v.     Update to Fourth Generation iPad

328.    On March 18, 2014, Apple announced through a press release from Cupertino, California that the "iPad with Retina display replaces iPad 2 as the most affordable 9.7-inch iPad." The press release, titled "Apple Updates Most Affordable 9.7-inch iPad with Retina display, Improved Cameras & Enhanced Performance—Now Available Starting at $399" featured the iPad's (with emphasis added):

> [F]ast A6X chip, and 5MP iSight camera, offering a ***dramatic upgrade in performance, power and value*** compared to the iPad 2 it replaces,' said Philip Schiller, Apple's senior vice president of Worldwide Marketing. The iPad line sets the gold-standard in mobile computing and all iPads have access to the largest and best ecosystem of more than 500,000 iPad optimized apps from the App Store.

### vi.     iPad Air 2

329.    The iPad Air 2 was introduced through a press release issued on October 16, 2014 from Cupertino, California. The iPad Air 2 initially ran on iOS 8.1, and at the time of its release, it was advertised (emphasis added) as:

> [T]he ***thinnest and most powerful*** iPad ever. Now just 6.1 mm thin and weighing less than a pound, the iPad Air 2 features an improved Retina display for enhanced contrast and richer, more vibrant colors . . . [a] second generation 64-bit A8X chip, all-new iSight and FaceTime HD cameras, faster WiFi and LTE wireless, and includes the revolutionary Touch ID fingerprint identity sensor. Engineered for unmatched portability and ease of use, iPad Air 2 offers a beautiful, precision unibody enclosure of anodized aluminum for durability and a solid feel . . . the new Apple-designed A8X chip [ ] delivers a ***40 percent improvement in CPU performance and 2.5 times the graphic performance of iPad*** Air, while still delivers the up to ***10-hour battery life***[] users expect while working, playing games or surfing the web.

330.    The iPad Air 2 was also discussed at the October 16, 2014 Apple Special Event in Cupertino, California. The Special Event simply underscored the false representations about the device and failed to disclose the Defect.[25]

---

[25] During the Apple Special Event, P. Schiller, SVP of Worldwide Marketing at Apple stated:

Just look what the team is done the original iPad started with an A4 chip and now we're ***12X faster*** than that with iPad air 2. But check out this graphics performance we're now at a 180x faster. . . . And all this power in such a thin package the team has worked to ensure that you have that ***great all-day battery life 10 hours of battery*** so you don't have to give up any of that.

 P. Schiller SVP, Worldwide Marketing, Apple Special Event at 45:01 (Oct. 16, 2014) *available at*: https://www.youtube.com/watch?v=sBfvJn-fpnc.

### vii.   The iPad Mini 3

331.   Alongside the iPad Air 2, Apple introduced the iPad Mini 3 on October 16, 2014

in Cupertino, California via press release.  The iPad mini 3 similarly ran on iOS 8.1, but

continued to feature a "stunning Retina display, amazing A7 chip, 5MP iSight camera,

FaceTime HD camera and ultrafast wireless."  Upgrades to the iPad mini 3 included Touch ID

"so users can unlock their iPad with just the touch of a finger and make purchases easily and

securely within apps using Apple Pay.[1]"

### viii.   iPad Pro and iPad Mini 4

332.   On September 9, 2015, Apple issued a press release from San Francisco,

California, announcing the iPad Pro, which came with Apple's new iOS 9.  As stated in the

release, in pertinent part (with emphasis added):

> Apple today introduced the all-new iPad Pro, featuring a stunning 12.9-inch Retina
> display with 5.6 million pixels, the most ever in an iOS device, and groundbreaking
> performance with the new 64-bit A9X chip, rivaling most portable PCs. The new
> larger iPad Pro is ***thin and light*** and provides ***all-day battery life***.
>
> *         *         *
>
> iPad Pro is the ***most advanced and powerful iPad*** . . . far and away the fastest iOS
> device we have ever made — its A9X chip beats most portable PCs in both CPU and
> graphics tasks, but is ***thin and light*** enough to hold all day . . .
>
> *         *         *
>
> iPad Pro delivers ***groundbreaking performance and energy efficiency, so you can
> tackle the most demanding tasks.*** Apple's powerful new 64-bit A9X chip, with third-
> generation 64-bit architecture, provides desktop-class CPU performance and console-
> class graphics. Ultra-fast wireless connectivity . . . .  *All-day 10-hour battery life**
> delivers the efficiency that users have come to expect from iPad.

333.   On September 9, 2015, Apple hosted a Special Event from San Francisco,

California to announce the release of the product, and reportedly the iPad Mini4 as well.  The

Special Event simply underscored the false representations about the devices and failed to

disclose the Defect.

334. Subsequent advertisements, focusing on the thinness and speed of the iPad Mini4, also failed to disclose the Defect.



There's more to mini than meets the eye. iPad mini 4 puts uncompromising performance and potential in your hand. It's thinner and lighter than ever before, yet powerful enough to help you take your ideas even further.

**Ridiculously light. Seriously thin.**

iPad mini 4 puts everything you love about iPad into an incredibly sleek and portable design. So you can enjoy FaceTime calls with friends or get work done, wherever and whenever you want.

### ix.    9.7-Inch iPad Pro

335. On March 21, 2016, from Cupertino, California, Apple issued a press release that introduced the all-new 9.7-inch iPad Pro, which initially ran on iOS 9.3 (with emphasis added).

The new iPad Pro delivers ***incredible performance with the 64-bit A9X chip that rivals most portable PCs***, along with a four-speaker audio system that is twice as powerful[1] . . . 'iPad Pro is a new generation of iPad that is indispensable and immersive, enabling people to be more productive and more creative. It's ***incredibly fast, extremely portable*** . . .

*      *      *

Pro Performance

The new iPad Pro is just 6.1mm *thin* and weighs just under one pound, yet delivers ***groundbreaking performance***, connectivity and versatility so you can tackle the most demanding tasks wherever you go.  The ***powerful A9X chip with third-generation 64-bit architecture provides performance that rivals many laptops and console-class graphics, while also delivering all day battery life.***[] Ultrafast wireless connectivity . . . .

336.     On March 21, 2016, Apple hosted a Special Event Keynote from Cupertino, California, to announce the 9.7-inch iPad Pro.  The Special Event simply underscored the false representations about the device and failed to disclose the Defect. For example, during the Special Event, Apple's P. Schiller stated (emphasis added) that:

> iPad Pro changes the way people discover, capture, edit, design and produce. At the heart of its versatility is its performance. ***The A9X chip was designed specifically for iPad Pro to provide more power than most PCs in a thin, light, intuitive device you can take anywhere with you.*** The immersive iPad experience starts with its retina display. Each one is individually calibrated, so you always see vibrant color, contrast, and clarity.

### x.     Fifth Generation iPad[26]

337.     On March 21, 2017, Apple announced via press release from Cupertino, California it had "updated its most popular-sized iPad, featuring a brighter 9.7-inch Retina display and best-in-class performance at its most affordable price ever."  The new iPad initially came with iOS 10.  As stated by Apple in the press release (emphasis added), the iPad was:

> [d]esigned for unmatched portability and ease of use, along with ***incredible performance and all-day battery life***, iPad is the world's most popular tablet and primary computing device for millions of customers around the world . . . Philip Schiller, Apple's senior vice president of Worldwide Marketing[] [stated] 'New customers and anyone looking to upgrade will love this new iPad for use at home, in school, and for work, with its gorgeous Retina display, our ***powerful A9*** chip, and access to more than 1.3 million apps designed specifically for it.' . . . The Apple-designed A9 chip with 64-bit desktop-class architecture delivers ***fast processing and graphics performance*** for apps and games, ***while maintaining the same all-day battery life[1] customers have come to expect from iPad.***

### xi.     iPad Pro in 10.5-inch and 12.9-inch Models

338.     The iPad Pro in 10.5-inch and 12.9-inch models was announced in a press release on June 5, 2017 from San Jose, California.  The all-new iPad Pro models were initially set to be powered by iOS 11, which "will radically change what users can do with the iPad."  Apple further advertised in the press release that the new iPad Pro models featured (with emphasis added):

---

[26] The fifth generation iPad was introduced as the "9.7-inch iPad."

[T]he world's most advance display with ProMotion technology and incredible performance with the new A10X Fusion chip. The new 10.5-inch model reduces the borders by nearly 40 percent to fit into an incredibly compact package that still weighs just one pound. Combined with powerful new iPad features in iOS 11 coming this fall, like the all-new Files app, customizable Dock, ***improved multitasking*** and deeper integration of Apple Pencil, iPad Pro gives users the ability to be even more productive and creative.

'These are by far the ***most powerful*** iPads we've ever created . . .' said Greg Jaswiak, Apple's vice president of Product Marketing.

\*        \*        \*

Groundbreaking Performance Powered by A10X Fusion Chip

iPad Pro delivers ***groundbreaking performance***, . . . The powerful new 64-bit A10X Fusion chip provides performance that is faster than most PC laptops shipping today, so tacking complex tasks like editing photos and 4k video, rendering 3D images or playing games feels effortless. A six-core CPU and 12-core GPU deliver ***up to 30 percent faster CPU performance and 40 percent faster graphics performance than the industry-leading A9X chip, while delivering-all day battery life.***[]

339.    The iPad Pro model was also discussed at the June 2017 WWDC Keynote, held at the San Jose McEnery Convention Center, with Apple executive Joswiak emphasizing that these iPad Pro models have "amazing performance, again especially for devices so thin and light and a simple one-pound package you can take with you everywhere you go. And what's also cool is, ***despite all this performance, the new iPad Pro still delivers the same all day 10-hour battery that our iPad users love.***"[27]

340.    Moreover, on Apple's conference call with analysts to release financial results for the third fiscal quarter of 2017, CEO Tim Cook exclaimed that "the all-new 10.5-inch iPad Pro, launched in June, features the world's most advanced display with ProMotion technology and is more powerful than most PC desktops."[28]

### xii.    Sixth Generation iPad[29]

341.    The sixth generation iPad was released on March 27, 2018, running on the iOS11.3 software. In a press release from Chicago, Illinois, Apple announced the new iPad

---

[27] G. Joswiak 2017 WWDC Keynote at 1:43:44-1:43:52, available at: https://developer.apple.com/videos/play/wwdc2017/101/?time=6229 (emphasis added).

[28] T. Cook 2017 Q3 Earnings Call at 2.

[29] The Sixth Generation iPad is also known as "iPad 2018".

1    would come with "Apple Pencil plus even greater performance, starting at $329."  The

2    announcement also emphasized that:

3        The new iPad is more versatile and capable than ever, features a large Retina display,
         the A10 Fusion chip and advanced sensors that help deliver immersive augmented
4        reality, and provides unmatched portability, ease of use and all-day battery life.[]

5                                    *       *       *

6        The new iPad features the Apple-designed A10 Fusion chip with 64-bit desktop-class
         architecture, delivering 40 percent faster CPU and 50 percent faster graphics
7        performance for seamless multitasking and graphics-intensive apps.[]

8        342.    On March 27, 2018, Apple hosted a Special Event from Chicago, Illinois, to

9    announce this iPad.  The Special Event simply underscored the ongoing false representations

10   about the device and failed to disclose the Defect.

11   **II.    APPLE'S MATERIALLY FALSE STATEMENTS AND OMISSIONS**
12           **CONCERNING THE IOS SOFTWARE**

13       343.    As admitted by Apple in its 2016 Form 10-K at 9: "The Company's financial

14   condition and operating results depend substantially on the Company's ability to continually

15   improve iOS and iOS devices in order to maintain their functional and design advantages."

16       344.    In line with Apple's admitted emphasis on iOS, the Company progressively

17   issued numerous updates to iOS from the initial sale of each of the Devices and continuing

18   through to the present date.  As set forth herein, the first of the Devices, largely the iPads, ran

19   on iOS6 when initially released.  Going forward in time, each new iOS release promised even

20   better features and performance, all material misstatements directed to the Class.  The following

21   outlines the various main versions of iOS released for one or more of the Devices since June 11,

22   2012.  Major updates to iOS, such as iOS 6, 7, 8, 9, 10, 11 and 12, are generally announced by

23   Apple via press releases and Special Event presentations.

24       345.    As further detailed above, it was Apple's constant release of these updates, each

25   with new Features and requiring a further draw on the batteries and processor chips of the

26   Devices to run that contributed to the Defect.

27

28

346. With regard to the Devices at issue herein, Apple kicked off (for certain of the iPads) with iOS6.

347. On June 11, 2012, Apple issued a press release from San Francisco, California, announcing that iOS 6 would be released in the Fall of 2012, and would introduce 200 new features.

348. On January 28, 2013, Apple issued a press release from Cupertino, California, announcing, "Apple Updates iOS to 6.1.," and promising that users could experience "ultrafast wireless performance** to browse, download and stream content at blazing fast speeds." Moreover, it was represented that:

> iOS 6 is the world's most advanced mobile operating system, and with nearly 300 million iPhone, iPad and iPod touch devices on iOS 6 in just five months, it may be the most popular new version of an OS in history," said Philip Schiller, Apple's senior vice president of Worldwide Marketing. "iOS 6.1 brings LTE support to even more markets around the world, so even more users can enjoy ultrafast Safari browsing . . .

*       *       *

> Availability
>
> iOS 6.1 is available as a free software update today. iOS 6.1 is compatible with iPhone 5, iPhone 4S, iPhone 4, iPhone 3GS, iPad (third and fourth generation), iPad mini, iPad 2 and iPod touch (fourth and fifth generation).

349. On June 10, 2013, Apple unveiled iOS 7 through a press release from San Francisco, California. Apple represented iOS 7 as "the most significant iOS update since the original iPhone, featuring a stunning new user interface." Moreover, according to Jony Ive, Apple's senior vice president of Design, iOS 7 has "a profound and enduring beauty in simplicity, in clarity, in efficiency."

350. On September 10, 2013, Apple issued a press release from Cupertino, California, announcing that iOS 7 would be available for the public to download on September 18, 2013 for "iPhone, iPad and iPod touch users as a free software update." The release represented that "iOS 7 has been engineered with deep technical and design integration with both the iPhone 5s and iPhone 5C" as:

Apple engineered iOS 7 to take full advantage of the advanced 64-bit technologies in iPhone 5s, including the native 64-bit kernel, libraries and drivers. Al the built-in apps have been re-engineered for 64-bit, and iOS 7 provides a seamless developer transition with Xcode support and the ability to run both 32-bit and 64-bit apps.

351.    On June 2, 2014, Apple issued a press release from San Francisco, California announcing the "unveiling" of iOS 8, stating, in pertinent part, that it provided a "simpler, faster and more intuitive user experience."  Another press release on iOS 8 was released from Cupertino, California on September 9, 2014 reiterating this statement.

352.    Apple also featured iOS 8 during a June 15, 2015 Apple Special Event it hosted in San Francisco, California, wherein Craig Federighi, SVP, Software Engineering stated (with emphasis added):

Next, you guessed it, iOS. Now our current big release of iOS is iOS 8 and iOS 8 was a huge release with tons of new features for users and a phenomenal set of technologies . . . . So, we're now looking forward to iOS 9 and as we can see of what we wanted to accomplish, first and foremost, we wanted to elevate the foundations of the platform.  Things like *extending your battery life, improving performance* and enhancing security to protect customer data.[30]

353.    On June 8, 2015, Apple issued a press release from San Francisco, California, announcing the "preview" of iOS 9.  The release stated, in pertinent part (emphasis added):

iOS 9 makes the foundation of iOS even stronger with refinements including battery optimization that provides a typical user with an additional hour of battery life**, and a low-power mode to help further extend battery life.

354.    On the same day, June 8, 2016, at the Apple WWDC 2015 Keynote, Craig Federighi, SVP Software Engineering at Apple stated the following about iOS 9 (with emphasis added):

Now with battery life, we focused on real-world use cases and *optimized them*, and we're seeing *an addition of one hour of typical use on a full charge on iPhone*. Now we know that for a lot if you're running low on power, you start searching all over for switches and turning off features in the hope of extending your battery life, a little bit further. Well now in iOS 9 we give you a single switch in what we call low-power mode.  It pulls levers that you didn't even know existed and is able to extend battery life for *additional three hours of typical use on top of that additional hour.  It's really great.*[31]

---

[30] C. Federighi, SVP, Software Engineering, Apple Special Event at 23:16-24:28 (June 15, 2015).

[31] C. Federighi, SVP, Software Engineering, Apple, Apple WWDC 2015 Keynote at 63:13-63:57 (emphasis added).

355.     Then on September 9, 2016, Apple issued a press release from San Francisco, California, announcing that iOS 9 was available for download starting September 16, 2016. Apple further represented iOS 9 as (emphasis added):

> [T]he world's most advanced mobile operating system, will be available on Wednesday, September 16 as a free update for iPhone, iPad and iPod touch users. iOS 9 makes iOS devices more intelligent and proactive with powerful search and improved Siri features, all while protecting users' privacy.
>
> The way you interact with iPad gets even better with iOS 9, thanks to new multitasking features . . . Built-in apps become more powerful . . .
>
> 'iOS 9 is packed with intelligence that makes every experience with iPhone and iPad *even more powerful* — Siri can do more than ever and new proactive assistance helps you get more done before you ask, all while protecting users' privacy," said Craig Federighi, Apple's senior vice president of Software Engineering. "With iOS 9 we focused on strengthening the foundation of iOS with a deep focus on quality, and with the help of more than one million users who participated in our first ever public beta program, we're excited to release the best version of iOS yet.'
>
>                               *     *     *
>
> iPad Experience
>
> iOS 9 delivers new multitasking features designed specifically for iPad that allow you to do even more. . .
>
>                               *     *     *
>
> This latest release makes the foundation of iOS even stronger with refinements including battery optimization that provides a typical user with an additional hour of battery life, and a low-power mode to further extend battery life.

356.     Notably, Apple developed it A9 chip and iOS 9 together "for *optimal performance where it matters most, in real world usage*."[32]

357.     On June 13, 2016, Apple issued a press release from San Francisco, California previewing iOS 10, "the biggest iOS release ever."  In iOS 10, Apple purported to make "accessing the information you need is easier and quicker than ever."  The release also featured "'beautifully redesigned apps for Music, Maps, and News that are more intuitive and more powerful, making everything you love about your iPhone and iPad even better,' said Craig

---

[32] Apple iPhone 6 Press Release (Sept. 9, 2015).

Federighi, Apple's senior vice president of Software Engineering." iOS 10 also "increase[ed] security and privacy with powerful technologies like Differential Privacy."

358.    On January 23, 2017, Apple issued a press release announcing the release of iOS 10.2.1. Shortly thereafter, Apple caused the issuance of a notification to appear on the Devices advising that iOS 10.2.1 was available for installation. As alleged herein, iOS 10.2.1 was designed by Apple to throttle the Devices, contrary to what Apple stated about the update.

359.    Apple represented as follows concerning the update on the Devices:



## iOS 10.2.1
Apple Inc.
72.1 MB

iOS 10.2.1 includes bug fixes and improves the security of your iPhone or iPad.

For information on the security content of Apple software updates, please visit this website:
https://support.apple.com/en-gb/HT201222

360.    On September 18, 2017, Apple issued a press release announcing the availability of iOS 11. As stated in the release, in pertinent part:

Starting Tuesday, iPhone and iPad customers around the world will be able to update their devices to iOS 11, a major update to the world's most advanced mobile operating system and the biggest software release ever for iPad.

361.    According to later reports by Apple at the 2018 WWDC: "iOS 11 supports devices that were introduced as far back as 2013, like the iPhone 5S. And we just love the way customers race to update to our newest releases. In fact, half of our customers upgraded to iOS 11 in just seven weeks. It's incredible. Now as we stand here today, 81 percent of our over a billion active iOS devices are running our latest release."[33]

---

[33] C. Federighi 2018 WWDC Keynote at 10:59-11:44.

362.    On December 2, 2017, Apple announced the release of iOS 11.2.0.  Shortly thereafter, Apple caused the issuance of a notification to appear on the Devices advising that iOS 11.2.0 was available for installation.  Apple represented as follows concerning the update:



**iOS 11.2**
Apple Inc.
430.7 MB

iOS 11.2 introduces Apple Pay Cash to send, request and receive money from friends and family with Apple Pay. This update also includes bug fixes and improvements.

For information on the security content of Apple software updates, please visit this website:
https://support.apple.com/en-gb/HT201222

363.    As alleged herein, iOS 11.2.0 was another update designed to throttle the Devices and exacerbate the Defect.

364.    Just weeks after the issuance of iOS 11.2.0, Apple was forced to issue the December 20 Admission, followed eight days later by the Apology.  In a series of the Updates issues after 11.2.0 (including, but not limited to, 11.2.1, and the 11.3 and 11.4 series), Apple proceeded to attempt to cover its tracks and quell consumer ire, though failing to admit the Defect.  Apple's latest software machination is iOS 12.

365.    On June 4, 2018, Apple issued a press release from San Jose, California, announcing iOS12, which stated that the update (emphasis added):

> [I]s designed to make everyday tasks on iPhone and iPad faster and more responsive with performance improvements across the system.  Camera launches up to 70 percent faster, the keyboard appears up to 50 percent faster and typing is more responsive. ***Even when there is a lot going on across the system, apps can launch up to twice as fast****.*  From iPhone 5s, introduced in 2013, to the most advanced iPhone ever, iPhone X, iOS 12 brings performance improvements to more devices than any previous version.

366.     Apple also announced iOS 12 at the 2018 WWDC Keynote held at the San Jose McEnery Convention Center (at 14:22-14:51) with Apple's Senior Vice President of Software Engineering, Craig Federighi, stating in pertinent part (emphasis added):

> Well now on IOS 12, we're m*uch smarter. **When we detect that you** need **a burst of performance, like when you begin scrolling or launching an app, we ramp up processor performance instantly to its highest states, delivering high performance and to ramp it down just as fast to preserve battery life. Now, these are just some of the improvements that are coming to not just our older devices, but the full range of devices, and that's a quick update on performance**.[34]

367.     Similarly, at the 2018 WWDC, Apple's Federighi represented that iOS 12 was intended to: "[D]eliver[ ] all of these features across such a wide range of devices while maintaining high performance is a challenge we take really seriously, and so for iOS 12, we are doubling down on performance.  We're working top to bottom making improvements, to make your device faster and more responsive, and because we want these changes to be available to the full range of our customers, iOS12 will be available on all the same devices as iOS 11.  This is the largest base ever supported by an Apple release.  And we're focusing our efforts especially on the oldest devices."[35]

368.     Apple's iOS12 remains part of its crisis public relations effort.  Apple continues to conceal the Defect inherent in the Devices that caused the need for the Updates.  With the filing of this action, consumers are now able to climb into the driver's seat to obtain full relief for the damages they have suffered, and to prevent Apple's ongoing repetition of the misconduct.  As highlighted in a recent media article "what most users have been asking for" is for the updates to "focus on improving reliability and performance for the devices people already own."[36]  Apple knew this was the focus of consumers from the outset—indeed it was

---

[34] 2018 WWDC Keynote at 14:22-14:51.

[35] 2018 WWDC Keynote at 12:09-12:58.

[36] Kof Leswing,"The new version of iOS is the strongest sign yet that Apple finally believes the customer is always right," *Business Insider* (June 27, 2018) (Available online at https://www.yahoo.com/finance/news/version-ios-strongest-sign-yet-183500270.html) ("For most people, there's only one feature in the latest version of IOS that matters: a big bump in performance.") (last checked June 27, 2018).

the center of its marketing plan—and yet it purposefully denied that to consumers by throttling the Devices without any disclosure or authorization.

### III. APPLE'S DEFECTIVE DEVICES AND ITS SECRET THROTTLING IN IOS UPDATES

#### A. The Devices are Defective Resulting in Staggering Levels of UPOs

##### i. An Overview

369. At least as early as April 2016, Apple internally acknowledged that its Devices suffered from the Defect when used under normal conditions.



370. The nature of the Defect was that Apple had designed its Devices in such a way that the power-hungry software strained the Devices battery thereby causing it to prematurely age — *i.e.*, rapidly develop very high resistance levels — and significantly increased susceptibility to an unexpected power off ("UPO").

371. According to an internal Apple investigation and subsequent discussions thereof, the Defect impacted millions of Device owners world-wide and triggered a company-wide "fire drill (to say the least) to eradicate these quality issues as much as possible."

372. Yet, despite knowledge of the wide-spread Defect alleged herein, Apple continued selling millions more defective Devices to members of the Class as if there was no problem at all. Apple simultaneously falsely represented the attributes of the Devices to members of the Class, including as it relates to the Device's design, processor speed, and battery.

373. Moreover, throughout this period, Apple hid the relationship between high resistance levels and prematurely aged batteries, and instead falsely represented that the batteries in its Devices were "healthy", regardless of resistance levels, until the battery fell

below 80% of its original capacity at 500 charge cycles. In fact, Apple knew that because of premature high resistance levels, the Devices were highly susceptible to UPO's well under 500 charge cycles.

374.    Apple did not publicly admit any problem with its Devices for more than a year-and-a-half (until late December 2017) and did so only after a third-party discovered Apple released iOS 10.2.1 with the secret purpose of throttling tens of millions of its Devices to mitigate the rate of UPOs, caused by the Defect. Apple referred to this decision internally as **"[u]nder the hood throttling (aka throttling without telling users we are throttling)."**

375.    Knowledge that consumers were having frustrating experiences with UPOs and iOS upgrades reached the highest echelons of Apple's Executive Team, including CEO, Tim Cook. Mr. Cook was aware (from a consumer complaint that was sent directly to him) that AppleCare had informed the consumer that it had received over 1 million complaints concerning Devices that slowed following iOS updates, and that the AppleCare representative had told the consumer to upgrade to the then-new iPhone 8.



376.

377.

ii.    **Lithium-ion Battery Aging as a Function of Resistance Level**

378.    A properly functioning lithium-ion battery can provide instantaneous and consistent power (or voltage) to the device's electronic components — *i.e.*, the device's internal storage and power circuits. Apple's Devices, through their operating software, have a "power management system" which "determines the capability of the battery to supply this power, and manages the loads in order to maintain [smooth] operations." Apple, iPhone Battery and Performance (available online at https://support.apple.com/en-us/HT208387) (last visited Nov. 26, 2018). However, as the battery chemically ages, its ability to deliver maximum instantaneous performance, or "peak power," decreases. *Id.* This is due to an increase in the battery's "resistance" ("Ra"),[37] or the force that opposes the currents flow.[38] The higher a battery's resistance, the more the battery's voltage strains (drops) to complete a task.[39]



**Figure 1: Effects of internal battery resistance.**

A battery with low internal resistance delivers high current on demand. High resistance causes the battery to heat up and the voltage to drop. The equipment cuts off, leaving energy behind.

Courtesy of Cadex

Low resistance, delivers high current on demand; battery stays cool.

High resistance, current is restricted, voltage drops on load; battery heats up.

379.    Thus, when a user opens an application that requires instantaneous power, a battery with elevated levels of resistance hinders the power management system's ability to properly manage the loads and maintain device operations, forcing the system to enter a voltage based "shutdown" to preserve the device's electronic components. Apple, iPhone Battery and

---

[37] Apple uses the terms impedance and resistance somewhat synonymously. That is likely because in most battery applications impedance equals resistance. However, impedance is technically defined as resistance *plus* any other opposition to current flow.

[38] Battery resistance is measured in milli-ohms ("mohms" or "mΩ"). While resistance permanently increases based on the chemical age of the battery, it temporarily increases when the battery is at a low state of charge and in a cold temperature environment.

[39]

Performance (available online at https://support.apple.com/en-us/HT208387) (last visited Nov. 26, 2018).  While the shutdown is intentional from the device perspective, it is unexpected by the user who was using their device in an ordinary and typical manner.  *Id.*

### iii.   Representations Regarding Device Performance and Battery Life

380.    Apple represented that its Devices:

- Offered ***faster performance*** and . . . delivering higher sustained performance with ***great battery life***;[40]

- Great battery life.  Even while powering great new features;[41]

- ***Delivered faster performance and great battery life***;[42]

- 90 percent faster . . . all with gains in ***energy efficiency for great battery life***;[43] and

- ***More power and performance with best battery life ever***.[44]

381.    Apple also represented that its batteries are "designed to retain up to 80% of its original capacity at 500 complete charge cycles."[45]  Based on Apple's standardized metric of one complete charge cycle per day, this representation was plainly intended to convey to consumers that the battery in their Device was designed to continue to function as advertised for approximately 500 days.

382.    These representations, however, were materially false because they failed to disclose the known Defect.  Specifically, when Apple made these representations it knew the information set forth in ¶¶ 369 - 381 (above) and ¶¶ 383 - 409 (below) concerning the Defect but failed to disclose this information, which as set forth in ¶¶ 410 - 414 (below) would have

---

[40] *See supra* at ¶ 303.

[41] *See supra* at ¶ 307.

[42] *See supra* at ¶ 309.

[43] *See supra* at ¶ 309.

[44] *See supra* at ¶ 316.

[45] Apple, Battery Service and Recycling, https://www.apple.com/batteries/service-and-recycling (last visited June 1, 2018).

been important and material to reasonable consumers at the time of purchase including, *inter alia*, that battery resistance in their Devices was growing prematurely and causing UPOs.

### iv.  Apple's Internal Analysis of UPOs and Prematurely Aging Batteries

383.     By at least 2016, Apple internally acknowledged that a "considerable number" of users were complaining to Apple that their devices had unexpectedly shut off despite showing battery levels of "50-60 percent," and that their Devices would not power on until plugged into a power source. These UPOs occurred while consumers used their devices in the ordinary course.

384.     For instance, in an email dated December 7, 2016, a Director at Apple noted that the Defect and UPO issue as alleged herein was "a fire drill and [Devices were] definitely not working . . ."

385.     Similarly, on December 10, 2016, a Senior Software Engineering Manager at Apple stated:

> **I am highly concerned that we have a bigger issue here then [sic] [user interface] and customer perception.  There is some evidence that we truly have batteries that are reaching high [resistance] values at a rate that is faster then [sic] expected.**

386.



387.     Moreover, while Apple was having these discussions (which admitted the Defect), internal documents demonstrate that AppleCare was simultaneously telling consumers who came in to complain about UPOs that the battery in their Devices were "fine."

388.    Where, as here, there is a Defect known to Apple, it is highly misleading to represent that the battery will maintain 80% of its original capacity at 500 complete charge cycles



389.

390.



391.

392.

393.    Thus, on December 2, 2017, Apple introduced iOS 11.2, which throttled the speed of the iPhone 7 and 7 Plus to reduce UPOs.

394.    The iPhone 5, 5s, and 5c also had the UPO issue.  According to an Apple iOS Hardware Analysis Manger, one of the top issues facing the iPhone 5 generation of phones at least as of December 12, 2013 was "unexpected power off."

395.    Indeed, data compiled by Apple showed the iPhone 5, 5s, and 5c experienced UPO rates, "[a]s a whole" that were not "much different[] then more recent generations" of Devices.



1

396. 

2

3

4

5

397.

6

7

8

9

10

11

12

13

398.

14

15

16   399.   In another March 2017 email which discussed "recent learnings from the field on

17   the rate of [UPOs]" a Senior Hardware Engineer Manager explained that the company-wide

18   UPO investigation had "really been a wake-up call for the company as a major quality issue."

19   400.   Indeed, by October 2017, Tim Cook was informed that AppleCare had told a

20   consumer that it had received "over 1 million complaints" regarding slow Devices and that

21   AppleCare had encouraged the consumer suffering from this issue to upgrade "to the new

22   iPhone 8."

23   401.   Thus, the representation that the Device's battery is designed to retain up to 80%

24   of its original capacity at 500 complete charge cycles is materially false and misleading because

25   it failed to disclose to consumers that millions of its Devices had prematurely aged batteries and

26   therefore could not perform as represented under normal conditions, which caused millions of

27

28

owners of those devices to experience UPOs well prior to reaching the 500 charge cycle threshold.

### v. Apple Throttles the Devices Based on Resistance

402.     Rather than informing the owners of the Devices of the Defect, and because Apple could do nothing to control premature battery resistance growth in Devices currently in the field (short of recalling and replacing those batteries on a rolling-basis), Apple decided to surreptitiously imbed code in a software update that would throttle Device performance during operations that required a high-power demand.

403.     As alleged herein, Apple did not inform owners of the Devices that software update 10.2.1 was principally designed to (and did in fact) slow the performance of their Devices by

404.     Moreover, because charge cycles alone cannot accurately predict UPOs, iOS 10.2.1 (and later 11.2) throttled Device performance



405. 

### vi. Apple Failed to Adequately Test the Devices and Had no Basis for Its False Statements

406.    That Device batteries would age prematurely was and/or should have been shown in battery testing prior to the Devices being sold to the public.  At a minimum, however, internal communications recognized there was a disconnect between "the current cycle life test regime" of the batteries it places in its Devices and "use patterns in the field."

407.

408.     In fact, without adequate testing that was "reflective of use patterns in the field",
Apple lacked a basis to claim to consumers in its marketing materials that the Devices:

- Offering *faster performance* and . . . delivering higher sustained performance with *great battery life*;

- Great battery life.  Even while powering great new features;

- ***Delivering faster performance and great battery life***;

- 90 percent faster . . . all with gains in energy efficiency for great battery life; and

- More power and performance with best battery life ever.[48]

409.     Indeed, on September 23, 2014, *just four days after the launch of the iPhone 6 and 6 Plus*, an Executive Review of those devices demonstrates that customers were already experiencing UPOs and that Apple was tracking the issue.

### vii.   Apple's Statements Were Material to iPhone Consumers

410.     Apple's statements were important and material to consumers' purchasing decisions.  In a SurveyMonkey® audience survey of 2,063 distinct iPhone users commissioned by Plaintiffs' counsel, 96.95% stated "performance (speed) of the phone" was extremely important, very important, or somewhat important to their "buying decision" while 97.82% stated battery life was extremely important, very important, or somewhat important to their buying decision.

411.     When asked which of the statements listed were important to their iPhone purchasing decision, 72.86% of those surveyed stated that it would be important to consider whether the smartphone "[o]ffer[ed] faster performance and deliver[ed] higher sustained performance with great battery life" while 76.25% would consider it important to purchase a smartphone with "[g]reat battery life even while performing new great features" and 68.64% would consider it important to purchase a smartphone that had "[m]ore power and performance with the best battery life."

---

[48] *See supra* at n.40-44.

| Answer Choices | Responses (percent) | Responses (Number) |
|---|---|---|
| Great battery life even while performing great new features | 76.25% | 1,573 |
| More power and performance with the best battery life ever | 68.64% | 1,416 |
| Offers faster performance and delivering higher sustained performance with great battery life | 72.86% | 1,503 |
| **Total Respondents**: 2,063 | | |

412.    Apple's failure to disclose the UPOs would also have been material to iPhone purchasers.  Indeed, of those surveyed, 92.44% stated it would be important to their buying decision to know if the iPhone might experience UPOs:

Would it be important to your buying decision to know if the iPhone might experience unexpected shutdowns?





413.    Moreover, if iPhone users surveyed knew their iPhones would experience UPOs, 66.12% would consider buying a different brand of smartphone entirely while 88.51% would not be willing the pay the same price for the smartphone:



If you knew your iPhone would experience unexpected shutdowns would you be willing to pay the same price?

Answered: 2,063   Skipped: 0

414.    The fact that 2 out of 3 individuals surveyed would consider buying a different brand of smartphone based on such a disclosure is surprising compared against Apple's 92% iPhone loyalty (or "retention") rate as of May 17, 2017, according to a study published by investment bank Morgan Stanley.[49]  Apple's retention rate was the highest in the industry.[50] The willingness of the surveyed consumers to buy different smartphones if UPOs were disclosed is likely what motivated Apple to conceal the Defect, *i.e.*, to avoid losing consumers and revenue.

**B.    Apple Compounded the Defect by Stressing Device Batteries with Power-Hungry Software: iOS Updates**

415.    Apple's battery designs were also inadequate because they could not handle the power demands of the software Apple mandated users to run.

---

[49] M. Campbell, Apple's iPhone Scores 92% loyalty rate ahead of 'iPhone 8' launch, study finds, Apple Insider (May 17, 2017) (available at: https://appleinsider.com/articles/17/05/18/apples-iphone-scores-92-loyalty-rate-ahead-of-iphone-8-launch-study-finds) (last visited, November 27, 2018).

[50] *Id*.

416.     When Apple releases a new operating system, it pushes the software directly to the customers' device through a red signal with a number in it that notifies users of the existence of an available "software update."



417.     Within minutes, device owners can click on the prompt and download the new operating system.

418.     It is very difficult, if not impossible, for typical Apple owners to avoid downloading an iOS update.  As one site explains:

> The bad news is there's no easy way to stop iOS from repeatedly throwing this alert at you....
>
> To encourage people to get on the latest version of iOS, Apple implemented a feature called Automatic Downloads.  This download updates in the background, and once it is downloaded, you are pushed to install it.  Apple typically installs the software update at night when the iPhone, or iPad, is plugged in and charging.[51]

---

[51] Lucy Hattersley, "How to Stop iOS Nagging You to Update to the Latest Version," MacWorld (July 6, 2016), (available at https://goo.gl/DQ4LK4).  In this context, "jailbreaking" means to modify the iPhone to remove restrictions imposed by Apple and install apps not unauthorized by Apple. Navid Nield, "What is jailbreaking?" Tech Radar (June 6, 2016) (available at

419.     Turning off the updates and the daily push notifications requires users to delve deep into their settings or to forgo WiFi, which ordinary customers would not do.[52]

### C.     The Release of iOS 10 Was Secretly Designed to Camouflage the Defect

420.     In the Fall of 2016, iPhone users reported increasing occurrences of sudden shutdowns of iPhones 5 and 6 running versions of iOS 10 software, including when their devices indicated that battery life was still at or above 30%.[53, 54]  Even the inventor of the iPod, Tony Fadell, voiced concern about this problem, commenting that the battery on his own iPhone kept shutting down despite having a significant amount of charge left in it: "It's happening to me every other day-especially while using the mapping app. Have to always carry an external battery to revive it"[55] and "Issue with battery/shutdown algorithms?!"[56]

421.     As Apple was aware, and confirmed with the diagnostic information it obtained, the shutdown problem was the foreseeable consequence of a serious Defect in Apple's iPhones. The speed for which Apple's products are known and marketed to consumers comes from powerful processing units which are supposed to perform calculations and render graphics on its smart-phones at top speeds.  As these processing units become faster and more powerful, however, they also require more power from the phone's battery.

---

https://www.techradar.com/how-to/phone-and-communications/mobile-phones/what-is-jailbreaking-1322927).

[52] Hattersly, How to Stop iOS Nagging You, *supra*.

[53] Apple Discussion Thread, https://discussions.apple.com/message/30989226?start=165&tstart=0 (last visited June 30, 2018).

[54] Apple Discussion Thread,https://discussions.apple.com/message/30989226?start=165&tstart=0 (last visited June 30, 2018).

[55] Tony Fadell Twitter Comment, (Nov. 30, 2016), https://twitter.com/tfadell/status/804215290871607296?lang=en.

[56] Tony Fadell Twitter Comment, (Nov. 30, 2016), https://twitter.com/tfadell/status/804232051595640833.

422. A further complication is that the resistance of lithium-ion batteries used in iPhones increases as the cells age, resulting in both a reduction in overall battery capacity and a reduction in the battery's ability to produce peak power output.[57]

423. The amount of power that the processing unit requires during its daily operation varies: sometimes very little; sometimes a great deal; and the battery should be designed and capable of producing enough peak power to keep pace with even the processor's highest demands. A battery and processor must be designed such that even as the battery ages and loses performance, it will still be capable of meeting the processor's peak power demands for years to come. As noted above, Apple represented that its batteries were designed to last at least 500 charge cycles.

424. Electronics manufacturers like Apple are aware of this fact and thus must design batteries to be more powerful than they need to be so that as they grow weaker, they still have the ability to meet the processor's peak power demands.

425. Apple's iPhone 6, for example, uses Apple's proprietary A8 System on a Chip ("SoC") as its processor. This processor has low-power cores and high-power cores. The low power cores perform most of the day-to-day functions of the iPhone, and the high-power cores handle more graphically intensive activities such as gaming, recording and editing video, running certain applications at other times.[58]

426. When the high-power cores are active, they can draw peak power from the battery, which the battery should be capable of meeting for the lifetime of the smart-phone.[59]

---

[57] Apple, iPhone Battery and Performance, https://support.apple.com/en-us/HT208387 (June 15, 2018) (last visited June 30, 2018).

[58] *See*, *e.g.*, Mike Wuerthele, "'A11 Fusion' in iPhone X appears to be a six core processor, according to iOS 11 leak," Apple Insider (Sept. 10, 2017), https://appleinsider.com/articles/17/09/10/a11-fusion-in-iphone-x-appears-to-be-a-six-core-processor-according-to-ios-11-leak; Ryan Smith, "Analyzing Apple's A8 SoC: PowerVR GX6450 & More," AnandTech (Sept. 10, 2014), https://www.anandtech.com/show/8514/analyzing-apples-a8-soc-gx6650-more.

[59] Reddit Thread, PSA: iPhone slow? Try replacing your battery!, https://www.reddit.com/r/iphone/comments/7inu45/psa_iphone_slow_try_replacing_your_battery/.

But when the battery ages and is unable to deliver the peak power demanded by the phone's processor, the processor and phone switch off and will not turn on again until the phone is plugged into the wall.

427.   The shutdown problem iPhone users were experiencing in Fall 2016 thus resulted from a significant Defect:  the battery was not designed with enough power to meet the peak demands of the phone's processor as the battery aged.  The result was that iPhones seemed to operate as designed when new, but as early as a few days or months, began to cease functioning, i.e., switching off at random intervals, when the iPhone processor required too much power of its flagging iPhone battery.

**D.   Apple Released iOS 10.2.1 to Further Conceal the Defect**

428.   After confirming this Defect with the software diagnostics it surreptitiously deployed in user's Devices, Apple could have been transparent with its millions of customers and disclosed the Defect.  Instead, Apple released iOS 10.2.1 on January 23, 2017 as a seemingly routine update of its operating system.

429.   The alert to download iOS 10.2.1 stated that the update included "bug fixes" and improvements in device security.  A depiction of the original iOS 10.2.1 notification on an iPhone is set forth below:



430.     Sometime in February 2017, Apple added to its "Read Me" notes the following statement to be displayed on users' iPhones with the software upgrade:  iOS 10.2.1 "also improves power management during peak workloads to avoid unexpected shutdowns on iPhone."[60]

431.     On or about February 23, 2017, Apple issued a statement that "[w]ith iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone."[61]

432.     Throughout 2017, however, Apple failed to inform customers that the "fix" to the shutdown problem in iOS 10.2.1 came with a significant – and undisclosed – tradeoff: the update artificially slowed down the processors in Apple's Devices.  The software change Apple introduced with iOS 10.2.1 concerns the "*powerd*" system, short for "power daemon," which controls CPU and GPU speed and power.[62]  In computer science parlance, Apple concealed within the iOS updates secret commands which "underclocked" the processors in the affected phones, causing them to perform calculations across the board at a slower rate than the hardware was capable of supporting, and slower than they had operated before the iOS updates.

433.     Running at a slower rate after the update, the processors in Apple's Devices would demand less power during peak operation. This diminished requirement for peak power would reduce and eliminate instances where the processor would outpace its battery, meaning that even in their weakened condition, the older batteries could supply enough peak power to meet the now reduced demands of the processors.  Although this "fix" would prevent outright shutdowns, it would slow the customers' product and would scale, meaning as the batteries

---

[60] Apple Support, Download iOS 10.0-10.3.3 Information, https://support.apple.com/kb/dl1893?locale=en_US; *see also* Ex. 2 (Feb. 2, 2018 Letter from C. Hogan to Committee on Energy & Commerce, U.S. House of Representatives).

[61] Matthew Panzarino, "Apple says iOS 10.2.1 has reduced unexpected iPhone 6s shutdown issues by 80%," Tech Crunch (Feb. 23, 2017), https://techcrunch.com/2017/02/23/apple-says-ios-10-2-1-has-reduced-unexpected-iphone-6s-shutdown-issues-by-80/.

[62] Michael Potuck, "Geekbench developer links iPhone performance issues to battery age and iOS updates," 9 to 5 Mac (Dec. 18, 2017), http://9to5mac.com/2017/12/18/iphone-battery-performance-issues/.

continued to grow weaker, the fix would continue to slow the processors so that demand never outpaced available power.[63]

434.    Neither the software update notification nor the software update release notes made any mention of this severe throttling effect.  Apple concealed the problem; Apple concealed the solution; and Apple concealed that its solution would slow its customers' products.

435.    Users of Apple devices immediately began reporting reduced functionality, but there was no way for ordinary consumers to quantify these inklings or give them credence.

436.    As detailed herein, Apple had to continue releasing the "throttling" software in future versions of its iOS as new Devices went to market.  On September 19, 2017, Apple released iOS 11.  Immediately upon downloading iOS 11, existing Apple iPhone and iPad users began to experience a marked decrease in battery life on their Devices.

437.    One study of thousands of iPhone users within a monitored network compared the relative battery life of existing iPhones operating on iOS 10 versus iOS 11.  The chart below shows the rate at which an iPhone with a fully charged battery lost battery power:[64]



---

[63] Reddit Thread, PSA: iPhone slow?  Try replacing your battery!, *supra*.

[64] Liarna LA Porta, "iPhone users charged up over iOS 11 battery drain," Wander (Sept. 21, 2017), https://wandera.com/blog/ios-11-battery-drain/.

438.     This study revealed that existing iPhones operating on the iOS 10 software on average drained to 0% battery after 240 minutes (4 hours), whereas those operating on iOS 11 on average drained to 0% battery after only 96 minutes (just over 1½ hours).  In other words, iOS 11 reduced the average iPhone's battery life by more than 60%.  The study demonstrates the substantially increased power demands that Apple foist upon users' Devices through its iOS update.

E.     **The Defect in Apple's Devices, and the Impact of Throttling, Is Evidenced by Independent Analysis**

439.     As set forth above, on December 9, 2017, a Reddit user by the handle "TeckFire" posted online benchmarks (measurements of the speed with which a phone's processor performs its computations) of his iPhone 6 operating on its old battery, and again after he had replaced it with a new battery. The iPhone's processor's speed had remarkably increased over 50%.  This was incongruous: a new battery alone should not have had any impact on the processor speed.[65]

440.     Then on December 18, 2017, spurred by the ensuing discussion from TeckFire's post, John Poole, a software engineer at Primate Labs, published a report based on an analysis of 100,000 iPhones and concluding that the decrease in performance of the affected iPhones was caused by the iOS 10.2.1 and iOS 11.2 updates, and not the normal decreased function that would be caused by an aging battery.[66]

441.     Poole's analysis, which measures computer processing benchmarks, showed that after updating an iPhone 6s to an iOS 11, there were more "cluster points" where performance would slow down.  The chart below shows phone performance before and after iOS updates that use a "throttling" program.  Ordinarily, operations run smoothly until the battery dies.  The

---

[65] Reddit Thread, PSA: iPhone slow?  Try replacing your battery!, *supra*.

[66] John Poole, "iPhone Performance and Battery Age," Primate Labs (Dec. 18, 2017) (available at https://www.geekbench.com/blog/2017/12/iphone-performance-and-battery-age/). *See also* Exhibit 4 (Testimony of John Poole to House of Commons Standing Committee on Industry, Science, and Technology.

"power management" update bottled up user performance at several points to limit the taxing of the battery:





442.     As Poole explained, "where the peaks happen represents the cluster of phones running at that particular performance level.  And the height of the peaks (in blue) represents the relative frequency of benchmarks being performed at that performance level."  This translates to a real loss of performance.   For example, "the iPhone 6s is slowed down by nearly 60%."  This "effectively turns the device's performance into that of a device 1-2 generations older."[67]

443.     A processor's speed is set, in part, by its clock speed which is measured in Hertz (Hz); the faster a processor is clocked, the faster a processor will normally perform tasks.  For example, Apple advertises the iPhone 6 as having a processor speed of 1.4 GHz.[68]  But benchmark tests run by iPhone 6 users following the iOS 10.2.1 update revealed a processor speed of 600MHz;[69] *less than half as fast as Apple advertises*.[70]

444.     As noted above, on December 20, 2017, Apple admitted to journalists that the iOS 10.2.1 and iOS 11 software updates included a throttling "feature" to slow down older iPhone models.

445.     Attempting to deflect attention from its misdeed, in connection with its December 2017 "revelations" it also asserted: "We now believe that another contributor to these user experiences is the continued chemical aging of the batteries in older iPhone 6 and iPhone 6s devices, many of which are still running on their original batteries."[71]

446.     Other smart phone manufacturers, however, use similar lithium-ion batteries and have not experienced the same problems or resorted to throttling their phones' performance. Samsung, for example, guarantees its Galaxy S7 and Note & lithium-ion batteries will retain

---

[67] Paulo Santos, "Apple: All You Wanted to Know on the iPhone Throttling Scandal," Seeking Alpha (Dec. 26, 2017), (available at https://seekingalpha.com/article/4133931-apple-wanted-know-iphone-throttling-scandal).

[68] 1.4 GHz = 1,400,000,000 Hz.

[69] 600 MHz = 600,000,000 Hz.

[70] Tom Warren and Nick Statt, "Apple confirms iPhones with older batteries will take hits in performance," The Verge (Dec. 20, 2017) (available at https://www.theverge.com/2017/12/20/16800058/apple-iphone-slow-fix-battery-life-capacity).

[71] Apple website, "A Message to Our Customers about iPhone Batteries and Performance," dated December 28, 2017, available at: https://www.apple.com/iphone-battery-and-performance/.

95% of their capacity for at least two years; likewise, LG and Google warranty their smart

phones' batteries for two years.  Apple's warranty is shorter:

> Your battery is designed to retain up to 80% of its original capacity at 500 complete
> charge cycles.  The one-year warranty includes service coverage for a defective
> battery.  If it is out of warranty, Apple offers a battery service for $79, plus $6.95
> shipping, subject to local tax.[72]

447.    Apple has failed to address, or deny, the fact that it never asked its purchasers for

their authorization to slow down their devices, nor inform them of this change.[73]  As a result,

Plaintiffs and other Class members were not notified when the power management technique

was taking effect and were deceived into thinking that their devices were no longer capable of

providing an adequate level of performance.  Furthermore, they were not informed of Apple's

own misgivings about the ability of its batteries to deliver on Apple's representations.

## IV.    APPLE'S REVENUES DEPEND ON SELLING NEW DEVICES, AND THE "UPGRADE" FINANCIAL MODEL WAS CRITICALLY FAILING IN 2016-2017

448.    As set forth above, Plaintiffs and the Class need not plead Apple's motive for

deceit.  While the discovery process will be used to hone the reasons for Apple's malfeasance, it

is apparent that Apple was and is financially dependent on selling new versions of the Devices.

Some have even raised concerns that Apple engages in a "planned obsolescence" scheme to

send consumers rushing to upgrade their Devices.  Under any scenario, Apple's conduct was

unlawful and fraudulent, and also unfair to consumers by causing them to believe their Devices

were failing.

---

[72] Apple, Battery Service and Recycling, https://www.apple.com/batteries/service-and-recycling/ (last visited June 30, 2018).  The iPad battery warranty is also one year, Apple warrants that "Your battery is designed to retain up to 80% of its original capacity at 1000 complete charge cycles."

[73] Apple website, "A Message to Our Customers about iPhone Batteries and Performance," dated December 28, 2017, available at: https://www.apple.com/iphone-battery-and-performance/.  See also Apple Maximizing Battery Performance Website, https://www.apple.com/batteries/maximizing-performance/ (last visited December 21, 2017) (emphasis added).

449.     As detailed in the chart below, sales of the Devices comprised the bulk of Apple's total sales from at least fiscal year ("FY") 2013-2017,[74] and continuing thru the latest Form 10-Q's filed by the Company for FY 2018:[75]



450.     In April 2016, news of the pending financial woes Apple faced from declining iPhone sales hit the news media.  On April 27, 2016, Apple filed its Form 10-Q for the quarterly fiscal period ending March 26, 2016 ("2Q16") reporting that, for the first time since Apple began selling iPhones in 2007, the company sold fewer iPhones than it had sold in the same quarter the previous year (*i.e.* the second fiscal quarter of 2015, or "2Q15").[76]  iPhone sales

---

[74] Data in this chart is derived from Apple's Form 10-K Annual Reports filed with the SEC for the fiscal years ending 2013-2017.   Apple's fiscal year ends on the 52- or 53-week period that ends on the last Saturday of September in a given calendar year.  Apple historically also counted on ramped up sales just prior to the holiday season when it released the "latest and greatest" iPhone just before its fiscal year end.  This trick worked for Apple in both 2012 and 2014, where the Company enjoyed unit sales jumps of 29% and 46%, respectively, when a "radically new" iPhone was released (iPhone 5 released September 21, 2012) and (iPhones 6 and 6 Plus released September 19, 2014).

[75] Fiscal year 2018 ("FY 2018") cumulative sales of the Devices, as a percentage of Apple's overall revenue, is 66.6% for iPhones and 6.6% for iPads.  *See* Reports on Form 10-Q filed by Apple for the quarterly periods ended December 30, 2017 ("1Q18"), available at: https://www.sec.gov/Archives/edgar/data/320193/000032019318000007/a10-qq120181232017.htm, and March 31, 2018 ("2Q18"), available at: https://www.sec.gov/Archives/edgar/data/320193/00003201931800 0070/a10-qq220183312018.htm.

[76]  *See* Apple Form 10-Q for 2Q16 filed April 27, 2016 at 25.  *See also* Brian Barrett, "Apple's iPhone Sales Just Fell for the First Time—It Won't Be the Last," *Wired* (April 26, 2016) (citing both 16% drop in 2Q16 and 32% drop from 4Q15), https://www.wired.com/2016/04/iphone-sales-decline/.  The iPhone is "so critical to Apple's balance sheet that its fall led to a ***13 percent*** drop in

were down 16% in 2Q16 from 2Q15.  Indeed, the 2Q16 Form 10-Q reflects that Apple's unit sales in *each* major product line had declined from 2Q15—iPad declined by 19% and Mac by 12%.

451.    On July 27, 2016, Apple filed its Form 10-Q for the quarterly fiscal period ended June 25, 2016 (the "3Q16 Form 10Q").  The 3Q16 Form 10Q (at 24-25) also reported an ongoing decline of unit sales across iPhone (15%) and iPad (9%), as compared to the third fiscal quarter of 2015 ("3Q15").

452.    These downward unit sales trends ultimately caused Apple to report an annual sales decline for the first time since 2001.[77]

453.    As admitted by Apple in its Annual Report on Form 10-K for the fiscal year ended September 24, 2016, filed with the SEC on October 26, 2016 (the "2016 Form 10-K"), iPhones suffered an 8% decline over fiscal year 2015 ("FY15") unit sales:

> iPhone net sales decreased during 2016 compared to 2015. The Company believes the sales decline was due primarily to a lower rate of iPhone upgrades during 2016 compared to 2015 and challenging macroeconomic conditions in a number of major markets in 2016.

454.    With regard to iPads, which suffered a 17% decline over FY15 unit sales, the 2016 Form 10-K stated:

> iPad net sales decreased during 2016 compared to 2015 primarily due to lower unit sales and the effect of weakness in most foreign currencies relative to the U.S. dollar, partially offset by higher ASPs due to a shift in mix to higher-priced iPads.  The Company believes the decline in iPad sales is due in part to a longer repurchase cycle for iPads and some level of cannibalization from the Company's other products.

455.    By the Fall of 2016, the smartphone industry was facing slowing growth due to a stagnating market with more consumers "holding onto their smartphones longer" and waiting to upgrade their devices.  Worse yet, growth in the market was predicted to come from

---

the company's revenue." *Id*. (emphasis added). And although Apple still saw room for growth in China, analysts observed that "Apple's not going to double their sales anymore." *Id.*

[77] *See* Seth Fiegerman, "Apple's annual sales fall for first time since 2001," *CNN Money* (Oct. 25, 2016), http://money.cnn.com/2016/10/25/technology/apple-earnings-decline/index.html.

international markets favoring lower priced devices from Android vendors, as opposed to the premium smartphone prices demanded by Apple.[78]

456.   In addition, in late 2016, Apple was reportedly experiencing increased competition in the "smartphone" market. Competitors were ramping up their own versions of smartphones at the end of 2016, just before the Updates were issued.  For example, in October 2016, Google was launching its smartphone, known as the "Pixel."  As reported in an October 25, 2016 online article published by Rupert Neate on theguardian.com, entitled, "Apple's annual profits fall for first time in 15 years as iPhone sales decline":

> The iPhone, which first launched in June 2007, has transformed the telecoms industry but Apple is now facing more intense competition from the likes of Google, which last week released its first branded smartphone, the Pixel, and upstart rivals offering much cheaper smartphone devices in key markets such as China.[79]

457.   Therefore, Apple was in a crunch to find ways to increase sales (*i.e.*, consumers upgrading to buy new versions of the Devices)—and avoid a recall like Samsung — just at the time it was forced to launch the Updates to mask the Defect.[80]

---

[78] *See, e.g.*, Elad Natanson, "2016: A Pivotal For The Smartphone Industry," *Forbes* (Sept. 12, 2016), https://www.forbes.com/sites/eladnatanson/2016/09/12/2016-a-pivotal-year-for-the-smartphone-industry/#7b516c68386e.  In addition, between late 2016 and early 2017, third-party vendors phased out two-year service contracts where consumers could buy the newest iPhone for a bargain price.  *See*, *e*.*g*., Aaron Pressman, "The Death of the $199 iPhone Marks A New Era for Wireless," *Fortune* (Jan. 11, 2017), http://fortune.com/2017/01/11/death-of-the-199-iphone-wireless-subsidy (discussing how the end of two-year service contracts with lower pricing on new phones was a factor in changing consumer purchasing patterns toward maintaining phones longer).

[79] *See* Rupert Neate, "Apple's annual profits fall for first time in 15 years as iPhone sales decline," *The Guardian* (Oct. 25, 2016), https://www.theguardian.com/technology/2016/oct/25/apple-profits-sales-decline-2016-iphone-7 (last visited July 2, 2018).

[80] *See* Associated Press, "Sales of iPhones decline, but Apple predicts a better-than-expected holiday season," *Los Angeles Times* (Oct. 25, 2016), http://www.latimes.com/business/la-fi-tn-apple-earns-20161025-snap-story.html ("After stumbling in 2016, Apple is betting on a better year ahead. The Silicon Valley tech giant is forecasting a return to growth in iPhone sales this winter after a rare slump that depressed Apple's revenue and stock performance over the last three quarters. Apple has been struggling with shrinking demand for its signature products at a time when analysts say it is increasingly difficult for tech companies to come up with dramatically new features.  Many consumers are holding on to their old smartphones and PCs for longer, seeing little reason to buy a new model that's only slightly better.").

458.     Apple's conduct, described herein, was intentionally deceptive and, separately, was malicious in that it was intended to cause economic injury to Plaintiffs and the Class. On information and belief based on the course of conduct described above, one or more of Apple's officers, directors or managing agents authorized or ratified Apple's misconduct.

## V.     RELATED CASES AND PROCEEDINGS

### A.     United States – California State Court

459.     There are currently four related class actions pending in California state courts (*Rosalia v. Apple, Inc.*; *Tandel v. Apple, Inc.*; *Santino v. Apple, Inc.*; and *Krueger v. Apple Inc.*) which have been consolidated into *Apple OS Cases*, JCCP No. 4976, and has been assigned to Judge Karnow in the Superior Court for San Francisco County as coordination trial judge. Apple moved to stay proceedings "pending the outcome of the parallel federal litigation" but, on October 30, 2018, Judge Karnow denied the motion.  The Superior Court has also set December 20, 2018 as the date for a hearing on the appointment of lead counsel and for a Case Management Conference.

### B.     United States – Federal Cases Not Consolidated

460.     Only one federal *pro se* case has not been consolidated with the MDL.  *See Oliver v. Apple Inc*, No. 5:18-cv-3638-EJD (N.D. Cal.).

### C.     United States – Congressional and Senate Proceedings

461.     On January 12, 2018, the United States House of Representatives Committee on Energy and Commerce wrote a letter to Apple CEO Tim Cook requesting responses to 13 questions. *See* Exhibit 1. On February 2, 2018, Apple responded by letter. *See* Exhibit 2. As of the date of this Complaint, the investigation is ongoing despite reports on February 1, 2018, of related investigations at the Department of Justice and Securities and Exchange Commission (*see* below, Section V.D.) and statements by two members of Congress (Rep. Robin Kelly of Illinois and Emanuel Cleaver II of Missouri) not directly involved in the House investigation

who said that "we don't know what will come of the DOJ and SEC probes" and suggested that further House action would await word from the DOJ and SEC.

462.    On January 10, 2018, the United States Senate Committee on Commerce, Science & Transportation launched an investigation of the Defect and the Update.  Chairman Sen. John Thune sent a letter to Apple CEO Tim Cook posing eight questions, and during an interview with CNBC said:

463.    They [Apple] just acknowledged after the holidays that this is actually happening, which is an admission that we think is long overdue but that being the case, we at least now want to find out what they are doing to inform consumers. The fact remains there are a lot of unanswered questions about this practice and obviously I think consumers have a right to know and so we're going to make sure that Apple is forthcoming and responsive and we'll take additional steps as necessary.

464.    On February 2, 2018, Apple responded to Sen. Thune's letter, and promised to update the Committee.  *See* Exhibit 3.  The investigation in ongoing.

### D.    United States – Federal Regulatory Proceedings

465.    On January 30, 2018, Bloomberg News reported that both the Securities and Exchange Commission and the Department of Justice were independently investigating Apple for how it disclosed information related to the Updates.  The agencies have demanded documents and information, according to anonymous sources who spoke to Bloomberg News. Although the agencies declined to comment to the reports, Apple confirmed both investigations, said "we have received questions from some government agencies and we are responding to them."

### E.    Canada – Regulatory Proceedings

466.    On March 1, 2018, the Standing Committee on Industry, Science and Technology in the Canadian House of Commons held hearings on the Defect and Updates.  A transcript of the hearing appears as Exhibit 4 to this Complaint.  Those providing testimony included a representative of the Canadian Competition Bureau (Ms. Alexa Gendron-

O'Donnell), who confirmed that her office is investigating Apple related to the Defect and the Update, and that she has the ability to participate in information-sharing with investigators in the United States, France, Israel and South Korea.

467.   Importantly, when Nathaniel Erskine-Smith (Member of Parliament for Beaches-East York) asked Apple to disclose internal communications, opinions or advice given to Apple Canada or Apple Inc. regarding whether the Defect should be made public, Apple's representative refused: "I'm not going to make that undertaking . . . If the committee wants to make a direction about things, we'll reconsider. But the fact is, as people here know, Apple is exposed to a number of class actions in the United States."  Member of Parliament Brian Masse, who pushed for the committee to study the issue, said the reason for his push "was about Canada responding to a problem that is obviously international."

### F.    Canada – Litigation

468.   On February 23, 2018, plaintiff Cherif Saleh filed a statement of claim in the Ontario Superior Court of Justice against Apple Inc. and Apple Canada Inc. alleging eight common law and statutory counts and seeking damages and punitive damages on behalf of a class of Canadian citizens, excluding Quebec, related to the Defect and the Software Updates. On March 2, 2018, plaintiff Antonio Gaudio filed a similar statement of claim against Apple, Inc. and Apple Canada, Inc. in the Ontario Superior Court on behalf of a class that includes all persons, corporations, and other entities in Canada, excluding residents of Quebec, who purchased a Device. The plaintiffs in both cases have agreed to cooperate with each other and have temporarily agreed to hold the action in abeyance in favor of MDL 2827 and are willing to discuss having the Canadian court officially stay the actions in favor of MDL 2827 if the stay would comport with the principles of the cross-border notice protocols set forth by the American Bar Association in August 2011.

### G.    Canada – Litigation – Quebec

469.   On December 29, 2017, Plaintiff Raphael Badaoui filed a class action in Quebec Superior Court (District of Montreal) against Apple Canada Inc. and Apple Inc., Case No. 500-

06-000897-179.  The plaintiff is seeking class action status on behalf of all consumers in Quebec who purchased certain Apple Devices and were injured as a result of the Defect and the Updates.  The case is pending.

### H.    Israel – Regulatory Proceedings

470.    On April 9, 2018, the Israeli Consumer Protection and Fair Trade Authority (part of the Economy Ministry) announced that it launched an investigation into Apple for possible breaches of duty to users to disclose that the Updates would slow the performance of certain model iPhones.  Rony Friedman, CEO of Apple Israel, was questioned in a private session about whether Apple provided "essential" information on the true purpose and effect of the Software Updates. The investigation continues.

### I.    Israel – Litigation

471.    Five class actions have been filed against Apple in Israel.  A hearing was held at the district court in Tel Aviv on April 10, 2018, in which it was agreed that all five class actions will be consolidated and an amended motion for class action would be filed within 90 days (in Israel, the motion for class action precedes the motion to dismiss).  As written in the court's decision, the reason for 90 days is to follow after the consolidated amended complaint in the United States.  Lead counsel have been appointed by the Court and have conferred with Lead Counsel in the United States.  The case is pending.

### J.    France – Criminal Proceedings

472.    On December 27, 2018, an environmental group called HOP ("Halte à l'Obsolescence Programmée" or "Stop the Programmed Obsolescence") filed a complaint with the Prosecutor of the French Republic asserting counts under Article L. 441-2 of the French Consumer Code (planned obsolescence) and Article L. 441-1 of the Consumer Code (deception) against Apple France.  Article L. 441-2 prohibits "the practice of planned obsolescence that is defined by the use of techniques by which the head of the marketing of a product is to deliberately reduce the life span to increase the replacement rate."  HOP alleged that Apple's purposefully slowdown of iPhones via the Updates was done deliberately in violation of the

Consumer Code, which is a <u>criminal</u> offense.  According to French media, prosecutors accepted the complaint and opened a formal probe on January 5, 2018.

### K.    Italy – Regulatory Proceedings

473.    On January 18, 2018, Italy's antitrust enforcer (the Autorit Garante della Concorrenza e del Mercato) ("AGCM") announced that it launched an investigation into consumer complaints that Apple was purposefully slowing certain Devices after software updates in order to force Italian citizens to buy news ones, based on faked obsolescence.  The AGCM claims that if the behavior were proven, it would violate Articles 20, 21, 22 and 24 of the consumer code.  The investigation is continuing.

### L.    China – Regulatory Proceedings

474.    On January 15, 2018, the Xinhua state news agency reported that the Shanghai Consumer Council wrote to Apple asking it to explain the reports of the Device Defect and slowing caused by the Updates.  The Council said it received almost three times as many complaints about Apple products in 2017 compared to just two years prior.  The investigation is continuing.

### M.    Russia – Litigation

475.    Starting in January 2018, individual lawsuits were filed against Apple in the Tverskoy (Moscow district) court, led by legal services firm Lex Borealis in Moscow.  Legal funding is reportedly being provided by NLF Group.  Attorneys at Lex Borealis said in a joint statement with NLF Group that in addition to the early suits filed, they were handling "at least several hundred" claims running into "several tens of millions of rubles."  Although the actions started in Moscow, counsel for the early claimants said they would consider similar litigation in the provinces.

### N.    South Korea – Litigation

476.    In March 2018, an opt-in class action suit on behalf of more than 60,000 named plaintiffs was filed in Seoul against Apple Inc. and its Korean subsidiary in the Seoul Central District Court, alleging purposeful Device degradation.  It set a record for the most number of

plaintiffs in a single lawsuit.  It followed two earlier suits by a consumer advocacy group called Citizens United for Consumer Sovereignty brought on behalf of 401 plaintiffs and 122 plaintiffs, respectively.  The plaintiffs are seeking compensation damages on behalf of those customers who opt in (out of approximately 10 million Korean buyers of certain Apple Devices), and lead counsel in the action reported to the press that they are watching the U.S. litigation closely.

### O.    South Korea – Regulatory Proceedings

477.    Following a complaint made by Seoul-based Citizens United for Consumer Sovereignty (the same group discussed above) against Apple CEO Tim Cook and the head of Apple's Korean subsidiary, the Seoul Central District Prosecutors Office opened a formal probe with its intellectual property crime unit.  The CUCS claimed that Apple deliberately slowed older model iPhones in order to push Apple customers towards newer, more expensive modes of the company's phones as part of a planned obsolescence strategy.  The probe is continuing.

### P.    Additional Regulatory Proceedings

478.    On November 29, 2018 Defendant Apple stated it and/or its affiliates are responding or have responded to the following public government inquiries, criminal referrals, or investigations, which relate to the matters alleged herein but are not identified above:

- Ministry of Justice (Brazil);
- Procon Maranhao (Brazil);
- National Telecommunications Agency (ANATEL, Brazil);
- Procon Porto Alegre (Brazil);
- Procon Sao Paulo (Brazil);
- Public Ministry of the State of Sao Paolo (Brazil);
- State of Minas Gerais Office of the Public Prosecutor (Brazil);
- State of Parana Office of the Public Prosecutor (Brazil);
- State of Rio de Janeiro Office of the Public Prosecutor (Brazil);
- El Servicio Nacional del Consumidor (SERNAC, Chile);

- State Administration for Industry and Commerce (China);

- Superintendency of Industry and Commerce (SIC, Colombia);

- Ministry of Economy, Trade, and Industry (MEIC, Costa Rica);

- BEUC (the European Consumer Organization);

- Provincial Public Prosecutor of Madrid Section for the Protection of the Rights of Consumers and Users (Spain);

- Spanish Agency for Consumer Affairs, Food Safety and Nutrition (AECOSAN, Spain);

- General Directorate of Consumer Affairs of the Ministry of Economy and Finance of the Community of Madrid (Spain);

- Geneva Prosecutor (Switzerland);

- National Communications Commission (NCC, Taiwan);

- Ministry of Customs and Trade, General Directorate of Consumer Protection and Market Observance (Turkey); and

- The Competition and Consumer Protection Authority of Ministry of Industry and Trade (VCA, Vietnam).

**Q.    Additional Related Litigation**

479.    On November 29, 2018 Defendant Apple stated it and/or its affiliates are or have been a defendant in the following public litigation proceedings, which relate to the matters alleged herein but are not identified above:

- *Alexander Alexandrovich Gaun v. Apple Rus LLC* Case No. 2-2009/2018 (Russia);

- *Alexei V. Zaporozhets v. Apple Rus LLC* Case No. 2-1439/2018 (Russia);

- *Ali Hibanaura v. Apple Inc. and Apple Canada Inc.* Case No. 1803 02688 (Canada);

- *Andrei Vladimirovich Perkov v. Apple Rus LLC.* Case No. 02-1242/18 (Russia);

- *Bram v. Apple Inc.* Case No. 47104-12-17 (Israel);
- *Brasileiro de Política e Direito da Informática ("IBDI") e Ministerio Publico do Distrito Federal e Territorios v. Apple Computer Brasil Ltda* Case No. 0700899-55 (Brazil);
- *Collins-Swartz v. Apple Inc. and Apple Canada Inc.* Case No. CV-18-591399 (Canada);
- *Crema v. Apple Inc. and Apple Canada Inc.* Case No. S-188008 (Canada);
- *Elina Yurievna Erlich v. Apple Rus LLC* (Russia);
- *Hung v. Apple Asia LLC* Case No. 107-Bei-Xiao-Chien-Zi 23 (Taiwan);
- *Lapid v. Apple Inc.* Case No. 48637-12-17 (Israel);
- *Levi v. Apple Inc.* Case No. 29438-01-18 (Israel);
- *Liao Wei v. Apple Inc. & CTE, Perkov* (China);
- *Lidia Arkadievna Pasenyuk v. Apple Rus LLC* Case No. 2-5201/18 (Russia);
- *Liu v. Apple Asia LLC, Taipei 101 and Lisa Lu* (Taiwan);
- *Marty Jay Blythman v. Apple Inc. and Apple Canada Inc.* Case No. QB6 302 OT 2018 (Canada);
- *Noy v. Apple Inc.* Case No. 47087-12-17 (Israel);
- *Oscar Ivan Guaque Peña y Otros v. Apple Colombia S.A.S.* (Colombia);
- *Pniel v. Apple Inc.* Case No. 47272-12-17 (Israel);
- *Simon St-Onge v. Apple Inc. and Apple Canada Inc.* Case No. 500-06-000893-178 (Canada);
- *Stacie Strohmaier v. Apple Inc. and Apple Canada Inc.* Case No. S-186592 (Canada);
- *Seong-Hyun Kwak v. Apple Inc. and Apple Korea Ltd.* Case No. 2018*Gaso*1250600 (Korea);

- *Soo-Young Choi v. Apple Korea Ltd.* Case No. 2018*Gaso*1008359 (Korea);

- *Da-Young Kim, et al. v. Apple Inc. and Apple Korea Ltd.* Case No. 2018*Gahap*263 (Korea);

- *Kyung-Kuk Kang, et al v. Apple Inc. and Apple Korea Ltd.* Case No. 2018*Gahap*1419 (Korea);

- *Min-Kuk Kim, et al. v. Apple Inc. and Apple Korea Ltd.* Case No. 2018*Gadan*5017429 (Korea);

- *Seong-Hoon Kim et al. v. Apple Inc. and Apple Korea Ltd.* Case No. 2018*Gahap*2078 (Korea); and

- Ho Chi Minh City Court Case (Vietnam).

## VI.    APPLE'S SOFTWARE LICENSE AGREEMENTS

480.    In order to use any Device sold by Apple, consumers must use Apple's proprietary iOS, which provides the code by which the Devices are operated.  Without the iOS, the Devices do not work as they are intended.

481.    Apple claims that Device users agree to be bound by the iOS Software License Agreement by using their Devices or downloading software updates.[81]  Although the iOS Software License Agreements differ slightly based upon country in which the Device was sold and by version of iOS, the material terms are the same, and—with the exception of the United Kingdom and as previously described herein—provide that California law governs the agreement.

482.    Consumers do not have a choice in selecting software for use on their Devices other than choosing the timing of a software upgrade; that is, consumers must use Apple's

---

[81] Versions of those agreements for each iOS, incorporated herein by reference, are available at https://www.apple.com/legal/sla/ (last visited June 27, 2018).  A sample of these agreements are also attached hereto as Exhibits 5, 6.

operating system if they do not want to risk voiding the warranties that are provided with the sale of any Device.

483.    Accordingly, consumers must use Apple's operating system, ostensibly subject to the terms of the iOS Software License Agreement, to use their Devices.  The iOS Software License Agreement is thus part of the benefit of Plaintiffs' and class members' bargains when purchasing Devices to the extent they apply.

484.    Because of this, to the extent they apply, the iOS Software License Agreements are part of the benefit of consumers' bargain when purchasing the Devices, because consumers expect that their Devices will *operate* as advertised and intended upon purchase of the Devices.

485.    Apple's iOS Software License Agreement attempts to include language that disclaims certain warranties; however, the agreement is one-sided, does not allow consumers to negotiate separate terms, is an unconscionable contract of adhesion, and would essentially render consumers' Devices incapable of operation—and from performing *any* function—if the operating software were corrupted, ceased to function, and restricted the use of Devices as they were intended and marketed to be used.

486.    Additionally, the limitation period in the iOS Software License Agreement prevents consumers from discovering any Defect in operating software within the applicable and unenforceable limitations period even with the use of diligence as Apple is in the exclusive control of information regarding its proprietary software.

487.    Any limitations periods in the iOS Software License Agreement are thus unconscionable and unenforceable.

488.    Additionally, attempts to limit liability for software Updates that would cause Devices to become inoperable are unconscionable and unenforceable, as the operating software is *necessary* in order to use the Devices, and fully realize the benefit of consumers' bargains.

**CLASS ALLEGATIONS**

489.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4),

Plaintiffs seek certification of the following class:

> **All purchasers, owners, users or lessees of the following Apple Devices: the Apple iPhone 5, 5s, 5c, 6, 6s 6 Plus, 6s Plus, SE, 7, 7 Plus, and the Apple iPad, including the Fourth Generation, Mini, Air, Mini 2, Update to Fourth Generation, Air 2, Mini 3, Mini 4, Pro, and 9.7-Inch Pro, Fifth Generation, 10.5-Inch Pro, 12.9-Inch Pro, and Sixth Generation in the United States and Foreign Countries.**[82]

490.     If necessary, Plaintiffs also seek to represent subclasses of individuals who purchased Apple Devices in each of the 50 states and U.S. territories, as well as foreign countries with representative plaintiffs as addressed in this Complaint.  As detailed below in their respective causes of action, each state subclass is referenced by the name of its state (i.e., the Alabama Subclass, the Washington Subclass, etc.).

491.     Plaintiff Sharma also seeks to represent a separate class of individuals who purchased Apple Devices in the United Kingdom, referred to herein as the "U.K. Subclass."

492.     Collectively, unless otherwise so stated, the above-defined classes and subclasses are referred to herein as the "Class."

493.     Excluded from the Class and U.K. Class are Apple, its subsidiaries, affiliates, officers, directors, and employees and persons who have settled with and validly released Apple from separate, non-class legal actions against Apple based on the conduct alleged herein.

494.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1)**.  The members of each class are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  Plaintiffs are informed and believe—based upon the publicly-available information discussed herein—that there are millions of class members, making joinder

---

[82] For purposes of this Consolidated Amended Complaint, "Foreign Countries" refers to Argentina, Australia, Azerbaijan, Belgium, Brazil, Canada, Chile, China, Columbia, the Czech Republic, Denmark, France, Germany, Greece, Hong Kong, India, Italy, Japan, Malaysia, Mexico, the Netherlands, New Zealand, Nigeria, Norway, Peru, Poland, Portugal, Romania, Russia, Saudi Arabia, South Africa, South Korea, Spain, Sweden, Switzerland, Taiwan, Turkey, the Ukraine, and Venezuela.

impracticable.  Those individuals' identities are available through Apple's records, and class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

495.  **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)**.  Apple has acted with respect to Plaintiffs and the other members of the proposed Class in a manner generally applicable to each of them. There is a well-defined community of interest in the questions of law and fact involved, which affect all class members.  The questions of law and fact common to the Class predominate over the questions that may affect individual class members, including the following:

a.  Whether Apple designed, manufactured, advertised, promoted, and sold Devices that it knew contained the Defect, and withheld that information from consumers or purposefully misrepresented the Devices to consumers;

b.  Whether Apple designed updated iOS to address the Defect in a manner that slowed the performance of those Devices;

c.  Whether and to what extent Apple disclosed the effect of iOS Updates to Device performance;

d.  Whether Apple used the iOS modification to profit from Plaintiffs and the other class members by inducing them to buy new replacements for their Devices;

e.  Whether Apple is subject to liability for fraudulently concealing material facts from Plaintiffs and the other class members;

f.  Whether Apple is subject to liability for violating the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and other applicable and similar laws of the United States and territories and laws of foreign countries (such as the United Kingdom);

f.  Whether Apple's conduct has violated the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and other applicable and similar laws of the United States and territories and laws of foreign countries (such as the United

Kingdom);

g.   Whether Apple's conduct has violated the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.;

h.   Whether Apple's conduct has violated Cal. Penal Code § 502.

i.   Whether Apple's conduct violated any additional federal law, law from any United States state or territory, or similar laws of foreign countries;

j.   Whether Apple has been unjustly enriched as a result of its fraudulent conduct, such that it would be inequitable for Apple to retain the benefits conferred upon it by Plaintiffs and the other class members;

k.   Whether compensatory or consequential damages should be awarded to Plaintiffs and the other class members;

l.   Whether punitive damages should be awarded to Plaintiffs and the other class members;

m.  Whether restitution should be awarded to Plaintiffs and the other class members; and

n.   Whether other, additional relief is appropriate, and what that relief should be.

496.   **Typicality: Federal Rule of Civil Procedure 23(a)(3)**.  Plaintiffs' claims are typical of other class members' claims because Plaintiffs and class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

497.   **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4)**. Plaintiffs are adequate class representatives because their interests do not conflict with the interests of class members who they seek to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

498.   **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2)**. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would

establish incompatible standards of conduct for Apple.  Such individual actions would create a risk of adjudications that would be dispositive of the interests of other class members and impair their interests.  Apple has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

499.    Injunctive relief is particularly necessary in this case because: (1) Plaintiffs desire to purchase products with the same qualities and attributes as Apple advertised the Devices to have; (2) if Apple actually manufactured Devices with the qualities and attributes as deceptively represented, Plaintiffs would purchase those Devices; (3) but Plaintiffs do not have the ability to determine whether Apple's representations are true concerning the Devices if they purchase such Devices in the future.  Indeed, Plaintiffs, and putative class members, in the future will likely want to purchase Devices manufactured by Apple; however, they expect that Apple will not misrepresent or conceal defects in those Devices (or subsequently-released iPhones and iPads), and will provide clear explanations regarding the Updates to those Devices (without concealing or misrepresenting what the Updates will do).

500.    **Superiority: Federal Rule of Civil Procedure 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Apple, so it would be impracticable for class members to individually seek redress for Apple's wrongful conduct.  Even if class members could afford litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## TOLLING OF APPLICABLE LIMITATIONS PERIODS

501.   **Discovery Rule Tolling.**  Neither Plaintiffs nor the other class members could have discovered through the exercise of reasonable diligence that their Devices were defective within the time period of any applicable statutes of limitation.  Nor could they have determined with the exercise of any reasonable diligence that the Updates to the iOS would further exacerbate the problems with their Devices.

502.   **Fraudulent Concealment Tolling.**  Throughout the time period relevant to this action, Apple concealed from and failed to disclose to Plaintiffs and the other class members vital information concerning the Defect and problems with the Updates described herein.  Indeed, Apple kept Plaintiffs and the other class members ignorant of vital information essential to the pursuit of their claims.  As a result, neither Plaintiffs nor the other class members could have discovered the Defect or problems with the iOS Updates, even upon reasonable exercise of diligence.

503.   Despite its knowledge of the above, Apple failed to disclose and concealed, and continues to conceal, critical information from Plaintiffs and the other class members, even though, at any point in time, it could have done so through individual correspondence, media release, or by other means.  Although Apple has issued public apologies for throttling Device speeds in its iOS Updates, it has not fully revealed the true nature of the Device Defect.

504.   Plaintiffs and the other Class members justifiably relied on Apple to disclose any defects in their Devices or issues that the iOS Updates would cause to those Devices, because same were hidden and not discoverable through reasonable efforts by Plaintiffs and class members.

505.   Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other class members have sustained as a result of the Defect or iOS Updates, by virtue of the fraudulent concealment doctrine.

506.   **Estoppel.**  Apple was under a continuous duty to disclose to Plaintiffs and the other class members the true nature, quality, and character of its Devices and iOS Updates.

Apple, however, concealed the true nature, quality, and character of the Devices and iOS

Updates, as described herein.  Based upon the foregoing, Apple is estopped from relying on any

statutes of limitations in defense of this action.

**CAUSES OF ACTION**

**ON BEHALF OF THE CLASS**

**COUNT 1**

**VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT**

*18 U.S.C. § 1030, et seq.*

507.    The Plaintiffs identified above ("Plaintiff," for purposes of this Count),

individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged

herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

508.    Apple caused Plaintiff and class members to download and install iOS Updates

to their Devices without informing its customers that the iOS Updates contained code that

would diminish Device performance, or throttle performance, in order to compensate for the

undisclosed Defect in those Devices.  Accordingly, Plaintiff and class members did not give

permission for Apple to install iOS Updates onto their Devices—nor could they—as Apple did

not provide material information to Plaintiff and class members regarding the updates.

509.    Apple violated 18 U.S.C. § 1030(a) by knowingly causing the transmission of

iOS software Updates to Plaintiff and class members' devices to access, collect, and transmit

information to Devices, which are protected computers as defined in 18 U.S.C. § 1030(e)(2)(B)

because they are used in interstate commerce and/or communication.  By transmitting

information to class members' Devices, Apple intentionally caused damage without

authorization to class members' devices by impairing the ability of those Devices to operate as

warranted, represented, and advertised.

510.    Apple violated 18 U.S.C. § 1030(a)(5)(A)(iii) by intentionally accessing Plaintiff

and class members' Devices—protected computers—without authorization, and as a result,

caused damage to Plaintiff and class members' Devices by impairing the integrity of those Devices.

511.    Apple's conduct has caused loss to Plaintiff and class members in real, economic damages.  Plaintiff and class members have additionally suffered loss by reason of these violations, in terms of added expense in operating their Devices, which have been throttled, or in the purchase of new, unthrottled Devices.

512.    Unless Apple is restrained and enjoined, Apple will continue to commit such acts.  Plaintiff's remedy at law is thus inadequate to compensate for these inflicted and threatened injuries, entitling Plaintiff to remedies including injunctive relief as provided by § 1030(g).

513.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the Consumer Fraud and Abuse Act.

## COUNT 2

### VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT

#### *Cal. Civ. Code § 1750, et seq.*

514.    The Plaintiffs identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

515.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), is a comprehensive statutory scheme that is to be liberally construed to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

516.    In accordance with the liberal application and construction of the CLRA, application of the CLRA to all class members is appropriate, given that Apple's conduct as described herein originated from California, the Devices and iOS code were designed and

originated in California, and Apple's uniform iOS Software License Agreement provides that California law shall apply.

517. Apple's uniform iOS Software License Agreement governs the reach of the Class's claims because Apple's violations of the CLRA were caused, in part, by the installation of certain operating software that throttled Device performance in order to further conceal the Defect in Apple's Devices.

518. Apple is a "person" as defined by Civil Code §§ 1761(c) and 1770, and has provided "services" as defined by Civil Code §§ 1761(b) and 1770.

519. Plaintiff and the class members are "consumers" as defined by Civil Code §§ 1761(d) and 1770, and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

520. Apple's acts and practices were intended to and did result in the sales of products and services to Plaintiff and the class members in violation of Civil Code § 1770, including:

    a. Representing that goods or services have characteristics that they do not have;

    b. Representing that goods or services are of a particular standard, quality, or grade when they were not;

    c. Advertising goods or services with intent not to sell them as advertised; and

    d. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

521. Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

522. Had Apple disclosed to Plaintiffs and class members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in common business practices that ultimately hurt consumers, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices. Instead, Apple represented that its Devices were continually improving in speed and battery life and

performed better than other devices on the market.  Plaintiff and the class members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

523.    As a direct and proximate result of Apple's violations of California Civil Code § 1770, Plaintiff and class members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

524.    Apple has already received notice of the class members' intent to seek damages in compliance with California Civil Code § 1782(a), and, on January 24, 2018, responded and rejected such Section 1782 notice.  Apple also received a supplemental notice pursuant to California Civil Code § 1782 concerning its wrongful conduct as alleged herein by Plaintiff and class members.  Any further notice would be an exercise in futility for Plaintiff.

525.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CLRA.

## COUNT 3

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**

*Cal. Bus. & Prof. Code § 17200, et seq.*

526.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

527.    In accordance with the liberal application and construction of the UCL, application of the UCL to all class members is appropriate, given that Apple's conduct as described herein originated from California, the Devices and iOS code were designed and originated in California, and Apple's uniform iOS Software License Agreement provides that California law shall apply.

528.    Apple's uniform iOS Software License Agreement governs the reach of the Class's claims because Apple's violations of the UCL were caused, in part, by the installation of certain operating software that throttled Device performance in order to further conceal the Defect in Apple's Devices.

529.    Apple is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

530.    Apple violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

531.    Apple's "unfair" acts and practices include:

a.   Knowingly designing, developing, manufacturing, advertising, and selling Devices with a significant Defect that result in the Devices not operating as intended, represented, or advertised under normal usage;

b.   Developing software Updates that merely hide the aforementioned Defect by throttling Device performance, resulting in the Devices operating at slower speeds than intended, represented, or advertised under normal usage;

c.   Concealing material information from consumers regarding its Devices and the Defect so that consumers were unable to make informed choices when purchasing the Devices;

d.   Concealing material information from consumers regarding the Updates to operating software, so that consumers would not nor could they know that the Updates throttled their Devices; and

e.   Using uniform, deceptive business practices such as throttling software to slow down Devices, requiring consumers to spend additional money on replacement batteries or Devices as a result of the Defect.

532.    Apple has engaged in "unlawful" business practices by violating multiple laws, including the CLRA, Cal. Civ. Code §§ 1780, *et seq.*, and California common law.

533.    Apple's unlawful, unfair, and deceptive acts and practices include:

a.   Knowingly designing, developing, manufacturing, advertising, and selling Devices

with a significant Defect that result in the Devices not operating as intended, represented, or advertised under normal usage;

b.  Developing software Updates that merely hide the aforementioned Defect by throttling Device performance, resulting in the Devices operating at slower speeds than intended, represented, or advertised under normal usage;

c.  Concealing material information from consumers regarding its Devices and the Defect so that consumers were unable to make informed choices when purchasing the Devices;

d.  Concealing material information from consumers regarding the Updates to operating software, so that consumers would not nor could they know that the Updates throttled their Devices; and

e.  Using uniform, deceptive business practices such as throttling software to slow down Devices, requiring consumers to spend additional money on replacement batteries or Devices as a result of the Defect.

534.    Apple violated § 17200's prohibition against engaging in unlawful acts and practices by engaging in false and misleading advertising and by omitting material facts from purchasers of its Devices.  As alleged more fully herein, Apple's marketing and sale of Devices, and more specifically its failure to inform customers of the negative and throttling impact iOS Updates would have on those Devices, violated Cal. Civ. Code § 1750, *et seq.*, common law, and other statutory violations as alleged herein.  Plaintiff reserves the right to allege other violations of the law, which constitute other unlawful business acts and practices.  Apple's conduct is ongoing and continues to this date.

535.    Apple violated § 17200's prohibition against unfair conduct by failing to inform its customers about the Defect in the Devices; engaging in a pattern or practice of concealing those facts and urging its customers to install regular updates to the iOS software to throttle those devices—thereby depriving those Device owners of the performance of those devices that existed at the time of purchase.  This conduct is substantially injurious to consumers, offends

public policy, is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct—crippling Devices that are, in many instances, consumers' lifelines—outweighs any alleged benefit.  Specifically, the utility gained by "upgrading" the iOS software of the Devices was outweighed by the diminishment of the Device functionality.  Apple engaged in this conduct at the expense of its customers' rights when other, lawful alternatives were available (such as providing customers' with full information about the Devices and iOS software, or offering batteries replacements to customers).

536.    Apple engaged in this conduct to gain an unfair commercial advantage over its competitors, seeking to avoid public knowledge of the Defect in its Devices to avoid damage to its sales or reputation.  It withheld critical and material information from Plaintiff and class members, competitors, and the marketplace, all to its unfair competitive advantage.

537.    Apple's business practices, as alleged herein, constitute fraudulent conduct because they were likely to deceive, and did deceive, class members into purchasing Devices, and upgrading those Devices with iOS Updates, when those Devices were defective and the Updates would only throttle the Devices instead of fixing them.

538.    Apple's representations and omissions—all which emanated from California—were material because they were likely to deceive reasonable consumers.

539.    California law prohibits unauthorized computer access and fraud pursuant to Cal. Penal Code § 502.

540.    As a result of Apple's installation of iOS Upgrades on Plaintiff's and class members' devices, Apple knowingly accessed and without permission altered, damaged, deleted, destroyed, and otherwise used any data stored on Plaintiff's and class members' devices.

541.    Plaintiff and class members did not know that Apple's iOS Update would throttle Device performance; accordingly, Apple did not have permission to install iOS Updates on class members' Devices.

542. Apple accessed and without permission altered and used data on class members' Devices to execute a scheme or artifice to defraud the class members' by, among other things, maintaining market share, convincing Plaintiff and class members to purchase new Devices, and to otherwise ensure that Plaintiff and class members would not discover Apple's underlying fraud regarding its omissions and misrepresentations regarding the Devices. As a result, Apple violated Cal. Penal Code § 502.

543. The iOS Updates led to the deterioration of the Devices and functionality of the Devices as a whole, driving customers to purchase new Devices who would not have outlaid the additional costs had they known the truth, and Apple not concealed the Device Defect.

544. As a direct and proximate result of Apple's unfair, unlawful, and fraudulent acts and practices, Plaintiff and class members were injured and lost money or property, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

545. Apple acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff and class members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

546. Plaintiff and class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Apple's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT 4**

**VIOLATIONS OF CALIFORNIA'S FALSE AND MISLEADING ADVERTISING LAW**

*Cal. Bus. & Prof. Code § 17500, et seq.*

547.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

548.    Apple's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described in Counts I and II above, and throughout this Complaint, Apple misrepresented the Devices, concealed the Devices' Defect, concealed the throttling capabilities of its updated operational software, and misrepresented the purpose of iOS Updates.

549.    By its actions, Apple disseminated uniform advertising regarding iOS Updates based out of California, and governed by California law.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq.*  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

550.    The above-described false, misleading, and deceptive advertising Apple disseminated continues to have a likelihood to deceive in that Apple failed to disclose the true nature of the iOS Updates and the Devices.  Apple failed to instigate a public information campaign to alert consumers of the Defect and the iOS Updates.  Instead, Apple continued to misrepresent the true nature of the iOS Updates and the Devices, continuing to deceive consumers.

551.    Apple continued to misrepresent to consumers that its Devices were fast and had long battery lives, however, the Devices contained the Defect.  Had Apple disclosed those issues, rather than falsely advertising the Devices' properties, consumers would have not purchased or paid significantly less for the Devices.

552.     In making and disseminating the statements alleged herein, Apple knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other class members based their purchasing decisions on Apple's omitted material facts.  The revenues to Apple attributable to products sold in those false and misleading advertisements amount to hundreds of millions of dollars.  Plaintiff and class members were injured in fact and lost money and property as a result.

553.     The misrepresentations and non-disclosures by Apple of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute violations of Cal. Bus. & Prof Code § 17500, *et seq*.

554.     As a result of Apple's wrongful conduct, Plaintiff and the class members lost money.  Plaintiff and the class members are therefore entitled to restitution as appropriate for this cause of action.

555.     Plaintiff and class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Apple's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

### COUNT 5

**CALIFORNIA COMPUTER DATA ACCESS AND FRAUD ACT**

*Cal. Penal Code § 502, et seq.*

556.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the California Subclass.

557.     In pushing Updates to its iOS to unsuspecting users of its Devices, Apple violated the California Penal Code, Computer Data Access and Fraud Act, Cal. Penal Code § 502, *et seq.*

558.    When Apple provided iOS Updates to consumers—Plaintiffs and class members—they did not know, nor could they in the exercise of reasonable diligence know, that the software Updates contained code that would throttle their Devices, designed solely to further conceal the Defect in those Devices.

559.    Because consumers did not know that the iOS Updates contained such throttling code, they did not give Apple permission to access their Devices to alter the data or computer systems on those Devices.

560.    Apple provided the iOS Updates to consumers as part of a scheme or artifice to defraud and deceive, because it provided the Updates to consumers *instead of* informing them of the Defect inherent on their Devices.  Indeed, Apple could have informed consumers that the issues they were having with their Devices could be resolved via a battery replacement.  Apple instead chose concealment, and throttling Devices via the installation of software that would do so.

561.    Apple offered iOS Updates to consumers to throttle their Devices as a means to encourage consumers to purchase new devices, wrongfully obtaining money from those consumers.

562.     By offering the iOS Updates to consumers, instead of revealing the truth, Apple disrupted or caused the disruption of consumer services when it improperly and unlawfully throttled users and class members' Devices.  Plaintiffs and class members did not consent to having their Devices throttled, and had they known that the iOS Updates would throttle their Devices, they would not have installed the iOS Updates.

563.    As a result of Apple's unlawful conduct, Plaintiffs and class members were damaged in an amount to be determined at trial.

564.    Plaintiff and the Class seek all monetary and non-monetary relief allowed by law, including damages and punitive damages, an order enjoining the acts and practices described above, attorneys' fees, and costs under the CDAFA

## COUNT 6

## TRESPASS TO CHATTELS

565.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

566.    California common law prohibits the intentional intermeddling with personal property in the possession of another, without consent, that results in either a) the deprivation of the use of that personal property; or b) the impairment of the condition, quality, or usefulness of the property.

567.    Apple impaired the condition, quality, and usefulness of Plaintiff and class members' Devices, or parts of them, without their knowledge or consent.  Such acts constituted an intentional interference with the use and enjoyment of the Devices.

568.    Apple acted intentionally, because it knew that Plaintiff and class members were downloading computer software onto their Devices that reduced the performance of the Devices.  Plaintiff and other class members only consented to the installation of iOS Updates that would improve performance, not diminish performance.

569.    Apple engaged in deception to gain access to the Devices and install new computer software or iOS Updates.

570.    Plaintiff and class members suffered actual damages as a result of Apple's actions in an amount to be determined at trial.

571.    Furthermore, Plaintiff seeks punitive damages because Apple's trespass was committed from wanton or malicious motives, or reckless disregard of the rights of Plaintiff and the Class, for the purpose of concealing the Defect.

**COUNT 7**

**FRAUD**

572.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

573.    At the time Plaintiff and class members purchased their Devices, Apple did not disclose, but instead concealed and misrepresented, the Defect in the Devices as discussed herein.

574.    Further, Apple represented that Updates to its iOS were designed to improve Device performance, and otherwise resolve issues that could have a negative impact on Plaintiffs' and class members' device experiences.

575.    Apple omitted that the Updates to its iOS were actually designed to further conceal the Defect in the Devices.  Further, Apple omitted and affirmatively misrepresented the true reason for the Updates for its Devices—that such Updates were designed to downgrade Device speed and processing capabilities in order to disguise the fundamental Device Defect.

576.    Apple knew, or should have known, that these Updates were falsely portrayed to the consumer public.

577.    Apple also knew that its omissions and misrepresentations regarding the Updates and Devices were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

578.    Apple, by its clear admissions in December 2017, in fact intended to deceive Plaintiff and class members.

579.    Plaintiff and class members did not know—nor could they have known through reasonable diligence—about the Defect in the Devices, nor could they have known about what the Upgrades were designed to really do.

580.   Plaintiff and class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions and downloading Updates.

581.   Plaintiff and class members had a right to rely upon Apple's representations (and corresponding omissions) as Apple maintained a monopolistic control over what the Updates to the iOS included, and what information was available regarding the Defect in the Devices, when Updates were provided to consumers, how those Updates were promoted to consumers, and why consumers should update their iOS.

582.   Plaintiff and class members sustained damages as a result of their reliance on Apple's omissions and misrepresentations, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT 8

### CONSTRUCTIVE FRAUD

583.   The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.  This cause of action is brought in the alternative to fraud.

584.   At the time Plaintiff and class members purchased their Devices, Apple did not disclose, but instead concealed and misrepresented, the Defect in the Devices as discussed herein.

585.   Further, Apple represented that Updates to its iOS were designed to improve Device performance, and otherwise resolve issues that could have a negative impact on Plaintiff's and class members' device experiences.

586.   Apple omitted that the Updates to its iOS were actually designed to further conceal the Defect in the Devices.  Further, Apple omitted and affirmatively misrepresented the true reason for the Updates for its Devices—that such Updates were designed to downgrade Device speed and processing capabilities in order to disguise the fundamental Device Defect.

587.   Apple knew, or should have known, that these Updates were falsely portrayed to the consumer public.

588.   Apple also knew that its omissions and misrepresentations regarding the Updates and Devices were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

589.   Apple had an obligation not to omit or misrepresent the Defect or the purpose of Updates because: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of Devices and Updates; (c) Plaintiff and class members relied upon Apple to make full disclosures based upon the relationship between Plaintiff and class members, who relied upon Apple's representations and omissions, and were reasonable in doing so, with the full knowledge of Apple that they did and would have been reasonable in doing so.

590.   Plaintiff and class members did not know—nor could they have known through reasonable diligence—about the Defect in the Devices, nor could they have known about what the Upgrades were designed to really do.

591.   Plaintiff and class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions and downloading Updates.

592.   Plaintiff and class members had a right to rely upon Apple's representations (and corresponding omissions) as Apple maintained a monopolistic control over what the Updates to the iOS included, and what information was available regarding the Defect in the Devices, when Updates were provided to consumers, how those Updates were promoted to consumers, and why consumers should update their iOS.

593.   Apple breached its duty to Plaintiff and class members to make full disclosures of the Defect and Updates.

594.     Plaintiff and class members sustained damages as a result of their reliance on Apple's omissions and misrepresentations, and Apple's breach of its duty, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

### COUNT 9

### FRAUDULENT INDUCEMENT

595.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

596.     At the time Plaintiff and class members purchased their Devices, Apple did not disclose, but instead concealed and misrepresented, the Defect in the Devices as discussed herein.

597.     Further, Apple represented that Updates to its iOS were designed to improve Device performance, and otherwise resolve issues that could have a negative impact on Plaintiff's and class members' device experiences.

598.     Apple omitted that the Updates to its iOS were actually designed to further conceal the Defect in the Devices.  Further, Apple omitted and affirmatively misrepresented the true reason for the Updates for its Devices—that such Updates were designed to downgrade Device speed and processing capabilities in order to disguise the fundamental Device Defect.

599.     Apple knew, or should have known, that these Updates were falsely portrayed to the consumer public.

600.     Apple also knew that its omissions and misrepresentations regarding the Updates and Devices were material, and that a reasonable consumer would rely upon Apple's representations (and corresponding omissions) in making purchasing decisions.

601.     Apple, by its clear admissions in December 2017, in fact intended to deceive Plaintiff and class members.

602.   Plaintiff and class members did not know—nor could they have known through reasonable diligence—about the Defect in the Devices, nor could they have known about what the Upgrades were designed to really do.

603.   Plaintiff and class members would have been reasonable in relying on Apple's misrepresentations (and corresponding omissions) in making their purchasing decisions and downloading Updates.

604.   Plaintiff and class members had a right to rely upon Apple's representations (and corresponding omissions) as Apple maintained a monopolistic control over what the Updates to the iOS included, and what information was available regarding the Defect in the Devices, when Updates were provided to consumers, how those Updates were promoted to consumers, and why consumers should update their iOS.

605.   Apple intended to induce—and did, indeed, induce—Plaintiff and class members from purchasing Devices and downloading Updates based upon its affirmative representations and omissions.

606.   Plaintiff and class members sustained damages as a result of their reliance on Apple's omissions and misrepresentations, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT 10

### BREACH OF CONTRACT

607.   The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

608.   Apple solicited and invited Plaintiffs and class members to buy new Devices. Plaintiff and class members accepted Apple's offers and bought Devices from Apple.

609.   Plaintiff and class members formed contracts with Apple at the time they purchased their Apple Devices.  The terms of the contracts include promises and affirmations

made by Apple on its website and through marketing that the Devices would perform as advertised, even after updating the latest iOS.

610.    Further, Plaintiff and class members entered into implied contracts with Apple wherein Apple agreed not to purposefully interfere with, negatively affect, or otherwise harm Plaintiff's and class members' Devices or usage of the Devices.

611.    Updates to the iOS are governed by an agreement that provides that California law shall govern the agreement between Plaintiff and class members on one hand, and Apple on the other.

612.    Plaintiff reasonably relied upon representations that the Devices would perform as advertised and warranted, and class members would be reasonable in relying upon those same representations.

613.    Plaintiff and class members performed their obligations under their contracts with Apple.

614.    Apple's Devices did not perform as advertised or promised.  Accordingly, Apple breached its contract with customers.

615.    As a result of Apple's breach, Plaintiff and class members have been damaged in an amount equal to the purchase price of the Devices.

616.    All conditions precedent to Apple's liability under its contractual obligations, including notice, have been performed by Plaintiff and the Class.

### COUNT 11

### BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

617.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

618.    In every contract or agreement there is an implied promise of good faith and fair dealing under California law.

619.    As described herein, contracts with California choice of law provisions govern the agreements between Apple and its customers.

620.    In dealings between Apple and its customers, Apple has power affecting the rights of its users.

621.    Apple entered into contracts with the class members at the Plaintiff at the time of the download of the iOS Updates.

622.    Apple contractually promised in the iOS 10.2.1 update and later Updates to "deliver the best experience for its customers, which includes overall performance and prolonging the life of their devices."

623.    Each Plaintiff did all, or substantially all, of the things that the contracts required them to do.

624.    The iOS 10.2.1 update throttled Device performance as a means to mitigate issues customers were experiencing with UPOs.

625.    Apple did not inform customers that, rather than throttling devices by installing iOS 10.2.1, those customers could replace the batteries in their Devices.

626.    Despite its contractual promises to prolong the life of the devices, Apple instead purposefully took actions to reduce the life of the devices, and purposefully failed to notify customers that replacing the battery would restore performance that had been artificially throttled by iOS 10.2.1 and later updates to iOS.

627.    Apple's actions were objectively unreasonable given Apple's promises.

628.    Apple's conduct evaded the spirit of the bargain made between Apple and the Plaintiff and class members.

629.    As a result of Apple's misconduct and breach of its duty of good faith and fair dealing, Plaintiff and the Class suffered damages.  Plaintiff and the class members did not receive the benefit of the bargain for which they contracted and for which they paid valuable consideration.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT 12

## MONEY HAD AND RECEIVED

630.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

631.    As a result of the Plaintiff's and class members' purchase of the Devices, Apple obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and class members in an amount to be determined at trial.

632.    No part of any of the monies due and owing to Plaintiff and class members has been repaid, although Plaintiff and class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

## COUNT 13

## FRAUDULENT OMISSION OR CONCEALMENT

633.    The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

634.    At all relevant times, Apple was engaged in the business of designing, manufacturing, distributing, and selling the Devices.

635.    Apple, acting through its representatives or agents, delivered Devices to its own retail stores, distributors, and various other distribution channels.

636.    Apple willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Devices and iOS Updates.

637.    Rather inform consumers of the truth regarding the Device Defect, and that the iOS Updates would degrade Device performance, Apple concealed material information related to the Device Defect and that iOS Updates would throttle Devices.

638.   Apple omitted this material information to drive up sales and maintain its market power, as consumers would not purchase Devices, or would pay substantially less for them, had consumers known the truth.

639.   Plaintiff and the class members accepted the terms of use, which were silent on the performance-throttling features that Apple installed in their Devices.  Plaintiff and class members had no way of knowing about the Devices' Defect or that the iOS Updates would throttle their Devices.

640.   Plaintiff and class members could not have discovered the above information on their own, because Apple was in the exclusive possession of such information.

641.   Although Apple had a duty to ensure the accuracy of the release statements published with respect to iOS Updates, and to ensure accuracy of information regarding the performance of its Devices, it did not fulfill these duties.

642.   Plaintiff and class members sustained injury due to the purchase of Devices that did not live up to performance representations, and the installation of iOS Updates that throttled Devices without their knowledge.  Plaintiff and class members are entitled to recover full or partial refunds for Devices or batteries they purchased due to Apple's misrepresentations, or they are entitled to damages for the diminished value of their Devices, amounts to be determined at trial.

643.   Apple's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being, and in part to enrich itself in California at the expense of consumers.  Apple's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor devices.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT 14

### FRAUDULENT MISREPRESENTATION

644.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

645.     At all relevant times, Apple was engaged in the business of designing, manufacturing, distributing, and selling the Devices.

646.     Apple, acting through its representatives or agents, delivered Devices to its own retail stores, distributors, and various other distribution channels.

647.     Apple willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Devices and iOS Updates.

648.     Rather inform consumers of the truth regarding the Device Defect, and that the iOS Updates would degrade Device performance, Apple misrepresented the Devices' speed, power, and battery life, and misrepresented the content of pertinent iOS Updates, telling its customers that the iOS Updates would *improve* the overall functionality of the Devices.

649.     Apple made these material misrepresentations to boost or maintain sales of the Devices, and in order to falsely assure purchasers of Devices that Apple is a reputable company and that its Devices and iOS Updates are reliable and able to perform as promised.  The false representations were material to consumers because the representations played a significant role in the value of the Devices purchased.

650.     Plaintiff and the class members accepted the terms of use, which were silent on the performance-throttling features that Apple installed in their Devices.  Plaintiff and class members had no way of knowing that Apple's misrepresentations as to the contents of the subject iOS Updates were misleading.

651.     Plaintiff and class members could not have discovered the misleading nature of Apple's misrepresentations on their own, because Apple was in the exclusive possession of such information.

652.     Although Apple had a duty to ensure the accuracy of the release statements published with respect to iOS Updates, and to ensure accuracy of information regarding the performance of its Devices, it did not fulfill these duties.

653.     Apple misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales for its Devices were falling and to maintain and grow its reputation as a premier designer and vendor of the Devices.  Such benefits came at the expense of Plaintiff and class members.

654.     Plaintiff and class members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and class members' actions were justified given Apple's misrepresentations.  Apple was in the exclusive control of material facts, and such facts were not known to the public.

655.     Due to Apple's misrepresentations, Plaintiff and class members sustained injury due to the purchase of Devices that did not live up to performance representations, and the installation of iOS Updates that throttled Devices without their knowledge.  Plaintiff and class members are entitled to recover full or partial refunds for Devices or batteries they purchased due to Apple's misrepresentations, or they are entitled to damages for the diminished value of their Devices, amounts to be determined at trial.

656.     Apple's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being, and in part to enrich itself in California at the expense of consumers.  Apple's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor devices.  Apple's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT 15**

**NEGLIGENT MISREPRESENTATION**

657.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.

658.     Apple negligently and recklessly omitted certain material facts regarding the Devices and impact of the iOS Upgrade on those Devices.  Apple failed to warn consumers that its Devices contained a material Defect that resulted in the Devices not performing as warranted or advertised.  Additionally, Apple then failed to warn consumers that the iOS Update it designed to address the Defect would actually degrade Device performance, resulting in a loss of functionality and performance so that the Devices did not perform as advertised or warranted.

659.     The advertisements and warranties, which were made expressly through uniform representations from Apple that emanated from its corporate headquarters in California, were material and would have been considered by a reasonable consumer in making purchasing decisions.

660.     Plaintiff and class members acquired Devices and downloaded iOS Updates believing that the Devices would function as advertised.

661.     As a result, Plaintiff and class members were directly and proximately injured by Apple's negligence in failing to inform Plaintiff and class members of the material Defect in the Devices and that the iOS Updates would cause Device performance degradation.

**COUNT 16**

**QUASI-CONTRACT / UNJUST ENRICHMENT**

662.     The Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Class, repeats and alleges Paragraphs 1-472, as if fully alleged herein.  In the alternative, Plaintiff brings this claim on behalf of the Subclasses.  This claim is brought in the alternative to contract-based causes of action.

663.    Plaintiff and class members purchased Devices from Apple, and those Devices were not as Apple represented them to be, enticing Plaintiff and the Class to purchase the Devices.  Had Plaintiff and the Class known of the Defect, they would have paid less for their Devices and would not have paid for repairs, service or upgrades caused by the Defect.

664.    Accordingly, Plaintiff and class members were damaged, and Apple was unjustly enriched by the purchase price of those Devices.

665.    Plaintiff and class members are entitled to damages in the amount Apple was unjustly enriched, to be determined at trial.

666.    Furthermore, Apple's conduct was willful, intentionally deceptive, and intended to cause economic injury to Plaintiff and the Class.  Apple is therefore liable to pay punitive damages under California law.

## CLAIMS ON BEHALF OF THE UNITED KINGDOM SUBCLASS

## COUNT 17

### VIOLATION OF THE CONSUMER PROTECTION FROM UNFAIR TRADING REGULATIONS 2008 (2008 No. 1277)

#### (on behalf of the United Kingdom Subclass)

667.    The United Kingdom Plaintiff identified above ("Plaintiff," for purposes of this Count and the following Count under United Kingdom law), individually and on behalf of the United Kingdom Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

668.    The Consumer Protection from Unfair Trading Regulations 2008 (2008 No. 1277) (the "Regulations") prohibits unfair commercial practices and misleading commercial practices, whether through misleading actions or omissions. Plaintiff asserts a claim against Defendant for violation of the Regulations, on behalf of the United Kingdom Subclass.

669.    Plaintiff and members of the United Kingdom Subclass were, at all relevant times, "consumers" as defined in Part 1, Provision 2 of the Regulations.

670.    Defendant was, at all relevant times, a "trader" as defined in Part 1, Provision 2 of the Regulations.

671.     Defendant's actions constitute unfair commercial practices as defined in Part 2, Provisions 3 of the Regulations, as they contravened the requirements of professional diligence and materially distorted or were likely to materially distort the economic behavior of average consumers in the United Kingdom.

672.     Similarly, Defendant's actions constituted misleading actions and/or omissions as defined in Part 2, Provisions 5 and 6 of the Regulations.

673.     In particular, and without limitation, Defendant knowingly or recklessly made the following representations contrary to the Consumer Protection from Unfair Trading Regulations:

a.     Defendant falsely represented that the Devices were of a particular standard, quality, or grade when they were of another;

b.     Defendant falsely represented that the Devices had performance, characteristics, uses, or benefits they did not have; and

c.     Defendant falsely gave to the public warranties and guarantees of the performance, efficacy, or length of life of the Devices that were not based on an adequate or proper test thereof.

674.     Defendant expressly but falsely warranted to Plaintiff and the United Kingdom Subclass the qualities of the Devices.  Defendant materially misrepresented these qualities by providing a product that Defendant has admitted it knew suffered a Defect, knew to suffer unexpected shutdowns, and knew—and intended—to suffer slow processing after the iOS 10.2.1 and iOS 11 Software Updates.

675.     Defendant knowingly sold defective Devices without informing consumers of the Defect of which it knew.

676.     Defendant knew that the iOS 10 and iOS 11 Updates would slow the Devices' processing speed, weaken the Devices' processing power, and deteriorate the Devices' performance and functionality.

677.    Defendant fraudulently omitted to disclose facts within its knowledge to Plaintiff and United Kingdom Subclass, including: (i) that the iOS 10.2.1 and iOS 11 Updates would cause the Devices to run more slowly, and (ii) that the decrease in processing speed could be ameliorated, at least in part, by replacing the battery.

678.    Defendant falsely, misleadingly, and deceptively made representations about the iOS 10.2.1 and iOS 11 Updates by highlighting only the positive aspects of these updates and intentionally concealing the updates' performance-degrading, negative effects.

679.    Specifically, Defendant made identical or substantially similar false, misleading and deceptive marketing statements as those cited above throughout the United Kingdom.

680.    In the absence of Defendant's unfair and misleading commercial practices alleged hereinabove, Plaintiff and the United Kingdom Subclass would not have purchased the Devices, or would not have paid as much as they in fact paid for the Devices.

681.    Plaintiff and the United Kingdom Subclass seek redress for Defendant's unfair and misleading commercial practices pursuant to section 27K the Regulations, as amended by The Consumer Protection (Amendment) Regulations 2014 (2014 No. 870).

682.    As a result of Defendant's unfair and misleading commercial practices, Plaintiff and the United Kingdom Subclass were damaged in amounts to be proven at trial.

**COUNT 18**

**VIOLATION OF THE CONSUMER RIGHTS ACT 2015 (2015 C. 15)**

**(on behalf of United Kingdom Subclass)**

683.    Plaintiff reasserts and reallege the allegations contained in Paragraphs 1-472 of this Complaint.

684.    The Consumer Rights Act 2015 (the "Act") requires that written, oral or implied contracts for goods, digital content or services in the United Kingdom be of satisfactory quality on the standard of a "reasonable person."

685.    Plaintiff asserts a claim against Defendant for violation of the Act, on behalf of the United Kingdom Subclass for purchases on or after March 26, 2015.

686.    Plaintiff and members of the United Kingdom Subclass were, at all relevant times, "consumers" as defined in Chapter 1, section 2 of the Act.

687.    Defendant was, at all relevant times, a "trader" as defined in Chapter 1, section 2 of the Act.

688.    The Devices are "goods" as defined in Chapter 1, section 2 of the Act.

689.    The iOS 10.2.1 and later Software Updates are "digital content" as defined in Chapter 1, section 2 of the Act.

690.    Pursuant to Chapter 2, section 9 and Chapter 3, section 34 of the Act, Defendant's contract for sale of the Affected Phones and its provision of the Software Updates to Plaintiff and the members of the United Kingdom Subclass included terms that required the Devices and the Software Updates to be of a satisfactory quality.

691.    Pursuant to Chapter 2, section 10 and Chapter 3, section 35, Defendant's contract for sale of the Devices and its provision of the Software Updates to Plaintiff and the members of the United Kingdom Subclass included terms that required the Devices and the Software Updates to be for a particular purpose.

692.    Pursuant to Chapter 2, section 11 and Chapter 3, section 36, Defendant's contract for sale of the Devices and its provision of the Software Updates to Plaintiff and the members of the United Kingdom Subclass included terms that required the Devices and the Software Updates to be as described.

693.    The Devices, which suffered from the Defect, were not of a satisfactory quality, were not fit for their particular purpose and were not as described and breached the terms described in Chapter 2, sections 9, 10 and 11.

694.    The Software Updates, which slowed the Affected Phones' processing speed, weakened the Devices' processing power, and deteriorated the Devices' performance and functionality, were not of a satisfactory quality, were not fit for their particular purpose and were not as described and breached the terms described in Chapter 3, sections 34, 35 and 36.

695.   Plaintiff and the United Kingdom Subclass have a right to enforce the breached terms under Chapter 2, section 19 and Chapter 3, section 42 of the Act.

696.   As a result of Defendant's conduct, Plaintiffs and the United Kingdom Subclass were damaged in amounts to be proven at trial.

## CLAIMS ON BEHALF OF THE ALABAMA SUBCLASS

## COUNT 19

## ALABAMA DECEPTIVE TRADE PRACTICES ACT

### *Ala. Code §§ 8-19-1, et seq.*

697.   The Alabama Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Alabama Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

698.   Apple is a "person" as defined by Ala. Code § 8-19-3(5).

699.   Plaintiff and Alabama Subclass members are "consumers" as defined by Ala. Code § 8-19-3(2).

700.   Apple received notice pursuant to Ala. Code § 8-19-10(e) concerning its wrongful conduct as alleged herein by Plaintiff and Alabama Subclass members.  However, sending pre-suit notice pursuant to Ala. Code § 8-19-10(e) would have been an exercise in futility for Plaintiff, as Apple has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit in December 2017, and has yet to offer class members remedy in accordance with similar consumer protection statutes.

701.   Apple advertised, offered, or sold goods or services in Alabama, and engaged in trade or commerce directly or indirectly affecting the people of Alabama.

702.   Apple engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5, including:

a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

b.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

c.   Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

703.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

704.   Apple intended to mislead Plaintiff and Alabama Subclass members and induce them to rely on its misrepresentations and omissions.

705.   Had Apple disclosed to Plaintiff and Alabama Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Alabama Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

706.   Apple acted intentionally, knowingly, and maliciously to violate the Alabama Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Alabama Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

707.   As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Alabama Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

708.     Apple's deceptive acts and practices caused substantial injury to Plaintiff and Alabama Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

709.     Plaintiff and the Alabama Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $100; treble damages; injunctive relief; attorneys' fees, costs, and any other relief that is just and proper.

## CLAIMS ON BEHALF OF THE ALASKA SUBCLASS

## COUNT 20

## ALASKA CONSUMER PROTECTION ACT

*Alaska Stat. §§ 45.50.471, et seq.*

710.     The Alaska Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Alaska Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

711.     Apple advertised, offered, or sold goods or services in Alaska and engaged in trade or commerce directly or indirectly affecting the people of Alaska.

712.     Alaska Subclass members are "consumers" as defined by Alaska Stat. § 45.50.561(4).

713.     Apple received notice pursuant to Alaska Stat. § 45.50.535 concerning its wrongful conduct as alleged herein by Plaintiff and Alaska Subclass members.  However, sending pre-suit notice pursuant to Alaska Stat. § 45.50.535 is an exercise in futility for Plaintiff, as Apple has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit in December 2017, and has yet to offer class members remedy in accordance with similar consumer protection statutes.

714.     Apple engaged in unfair or deceptive acts and practices in the conduct of trade or commerce, in violation Alaska Stat. § 45.50.471, including:

a.   Representing that goods or services have sponsorship, approval, characteristics,

ingredients, uses, benefits, or qualities that they do not have;

b.  Representing that goods or services are of a particular standard, quality, or grade, when they are of another;

c.  Advertising goods or services with intent not to sell them as advertised;

d.  Engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives, or damages a buyer in connection with the sale or advertisements of its goods or services; and

e.  Using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of its goods or services whether or not a person was in fact misled, deceived, or damaged.

715.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

716.    Apple intended to mislead Plaintiff and Alaska Subclass members and induce them to rely on its misrepresentations and omissions.

717.    Apple acted intentionally, knowingly, and maliciously to violate Alaska's Consumer Protection Act, and recklessly disregarded Plaintiff and Alaska Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

718.    As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Alaska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

719.    Plaintiff and the Alaska Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) three times their actual damages or (b) statutory

damages in the amount of $500; punitive damages; reasonable attorneys' fees and costs; injunctive relief; and any other relief that is necessary and proper.

## CLAIMS ON BEHALF OF THE ARIZONA SUBCLASS

### COUNT 21

### ARIZONA CONSUMER FRAUD ACT

#### *A.R.S. §§ 44-1521, et seq.*

720.    The Arizona Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Arizona Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

721.    Apple is a "person" as defined by A.R.S. § 44-1521(6).

722.    Apple advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

723.    Apple engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts affecting the people of Arizona in connection with the sale and advertisement of "merchandise" (as defined in Arizona Consumer Fraud Act, A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1522(A).

724.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

725.    Apple intended to mislead Plaintiff and Arizona Subclass members and induce them to rely on its misrepresentations and omissions.

726.    Had Apple disclosed to Plaintiff and Arizona Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Arizona Subclass members

acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

727.    Apple acted intentionally, knowingly, and maliciously to violate Arizona's Consumer Fraud Act, and recklessly disregarded Plaintiff and Arizona Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

728.    As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Arizona Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

729.    Plaintiff and Arizona Subclass members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE ARKANSAS SUBCLASS

## COUNT 22

### ARKANSAS DECEPTIVE TRADE PRACTICES ACT

*A.C.A. §§ 4-88-101, et seq.*

730.    The Arkansas Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Arkansas Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

731.    Apple is a "person" as defined by A.C.A. § 4-88-102(5).

732.    Apple's products and services are "goods" and "services" as defined by A.C.A. §§ 4-88-102(4) and (7).

733.    Apple advertised, offered, or sold goods or services in Arkansas and engaged in trade or commerce directly or indirectly affecting the people of Arkansas.

734.     The Arkansas Deceptive Trade Practices Act ("ADTPA"), A.C.A. §§ 4-88-101, *et seq.*, prohibits unfair, deceptive, false, and unconscionable trade practices.

735.     Apple engaged in acts of deception and false pretense in connection with the sale and advertisement of services in violation of A.C.A. § 4-88-1-8(1) and concealment, suppression and omission of material facts, with intent that others rely upon the concealment, suppression or omission in violation of A.C.A. § 4-88-1-8(2), and engaged in the following deceptive and unconscionable trade practices defined in A.C.A. § 4-88-107:

   a.   Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services and as to goods being of a particular standard, quality, grade, style, or model;

   b.   Advertising goods or services with the intent not to sell them as advertised;

   c.   Employing consistent bait-and-switch advertising of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell, as evidenced by acts demonstrating an intent not to sell the advertised product or services;

   d.   Knowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of ignorance; and

   e.   Engaging in other unconscionable, false, or deceptive acts and practices in business, commerce, or trade.

736.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

737.     Apple intended to mislead Plaintiff and Arkansas Subclass members and induce them to rely on its misrepresentations and omissions.

738.     Had Apple disclosed to Plaintiffs and class members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that

its devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Arkansas Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

739.     Apple acted intentionally, knowingly, and maliciously to violate Arkansas's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Arkansas Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

740.     As a direct and proximate result of Apple's unconscionable, unfair, and deceptive acts or practices and Plaintiff and Arkansas Subclass members' reliance thereon, Plaintiff and Arkansas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

741.     Plaintiff and the Arkansas Subclass members seek all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE COLORADO SUBCLASS

### COUNT 23

### COLORADO CONSUMER PROTECTION ACT

#### *Colo. Rev. Stat. §§ 6-1-101, et seq.*

742.     The Colorado Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Colorado Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

743.     Apple is a "person" as defined by Colo. Rev. Stat. § 6-1-102(6).

744.     Apple engaged in "sales" as defined by Colo. Rev. Stat. § 6-1-102(10).

745.     Plaintiff and Colorado Subclass members, as well as the general public, are actual or potential consumers of the products and services offered by Apple or successors in interest to actual consumers.

746.     Apple engaged in deceptive trade practices in the course of its business, in violation of Colo. Rev. Stat. § 6-1-105(1), including:

a.   Knowingly making a false representation as to the characteristics of products and services;

b.   Representing that services are of a particular standard, quality, or grade, though Apple knew or should have known that there were or another;

c.   Advertising services with intent not to sell them as advertised; and

d.   Failing to disclose material information concerning its services which was known at the time of an advertisement or sale when the failure to disclose the information was intended to induce the consumer to enter into the transaction.

747.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

748.     Apple intended to mislead Plaintiff and Colorado Subclass members and induce them to rely on its misrepresentations and omissions.

749.     Had Apple disclosed to Plaintiff and Colorado Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Colorado Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

750.     Apple acted intentionally, knowingly, and maliciously to violate Colorado's Consumer Protection Act, and recklessly disregarded Plaintiff and Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

751.     As a direct and proximate result of Apple's deceptive trade practices, Colorado Subclass members suffered injuries to their legally protected interests.

752.     Apple's deceptive trade practices significantly impact the public, because Apple is the second-largest Device manufacturer in the world, with hundreds of thousands of sales of those Devices to Colorado consumers.

753.     Plaintiff and Colorado Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of: (a) actual damages, or (b) $500, or (c) three times actual damages (for Apple's bad faith conduct); injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE CONNECTICUT SUBCLASS

## COUNT 24

## CONNECTICUT UNFAIR TRADE PRACTICES ACT

### *C.G.S.A. § 42-110g*

754.     The Connecticut Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Connecticut Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

755.     Apple is a "person" as defined by C.G.S.A. § 42-110a(3).

756.     Apple is engaged in "trade" or "commerce" as those terms are defined by C.G.S.A. § 42-110a(4).

757.     At the time of filing this Complaint, Plaintiff has sent notice to the Attorney General and Commissioner of Consumer Protection pursuant to C.G.S.A. § 42-110g(c). Plaintiff will provide a file-stamped copy of the Complaint to the Attorney General and Commissioner of Consumer Protection.

758.     Apple advertised, offered, or sold goods or services in Connecticut, and engaged in trade or commerce directly or indirectly affecting the people of Connecticut.

759.     Apple engaged in deceptive acts and practices and unfair acts and practices in the conduct of trade or commerce, in violation of the C.G.S.A. § 42-110b, including:

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

    b.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

    c.   Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

760.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

761.     Apple intended to mislead Plaintiff and Connecticut Subclass members and induce them to rely on its misrepresentations and omissions.

762.     Had Apple disclosed to Plaintiff and Connecticut Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Connecticut Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

763.     Apple acted intentionally, knowingly, and maliciously to violate the Connecticut Unfair Trade Practices Act, and recklessly disregarded Plaintiff and Connecticut Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of

software to throttle phone performance, put it on notice that the Devices were not as it advertised.

764.   As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Connecticut Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

765.   Apple's deceptive acts and practices caused substantial, ascertainabile injury to Plaintiff and Connecticut Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

766.   Apple's violations of Connecticut law were done with reckless indifference to the Plaintiff and the Connecticut Subclass or was with an intentional or wanton violation of those rights.

767.   Plaintiff requests damages in the amount to be determined at trial, including statutory and common law damages, attorneys' fees, and punitive damages.

## CLAIMS ON BEHALF OF THE DELAWARE SUBCLASS

### COUNT 25

### DELAWARE CONSUMER FRAUD ACT

#### *6 Del. Code §§ 2513, et seq.*

768.   The Delaware Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Delaware Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

769.   Apple is a "person" that is involved in the "sale" of "merchandise," as defined by 6 Del. Code § 2511(7), (8), and (6).

770.   Apple advertised, offered, or sold goods or services in Delaware and engaged in trade or commerce directly or indirectly affecting the people of Delaware.

771.     Apple used and employed deception, fraud, false pretense, false promise, misrepresentation, and the concealment, suppression, and omission of material facts with intent that others rely upon such concealment, suppression and omission, in connection with the sale and advertisement of merchandise, in violation of 6 Del. Code § 2513(a).

772.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

773.     Apple acted intentionally, knowingly, and maliciously to violate Delaware's Consumer Fraud Act, and recklessly disregarded Plaintiff and Delaware Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

774.     Had Apple disclosed to Plaintiff and Delaware Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Delaware Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

775.     Apple's unlawful trade practices were gross, oppressive, and aggravated, and Apple breached the trust of Plaintiff and the Delaware Subclass members.

776.     As a direct and proximate result of Apple's unlawful acts and practices, Plaintiff and Delaware Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

777.    Plaintiff and Delaware Subclass members seek all monetary and non-monetary relief allowed by law, including damages under 6 Del. Code § 2525 for injury resulting from the direct and natural consequences of Apple's unlawful conduct; injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE DISTRICT OF COLUMBIA SUBCLASS

## COUNT 26

### DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT

#### *D.C. Code §§ 28-3904, et seq.*

778.    The District of Columbia Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the District of Columbia Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

779.    Apple is a "person" as defined by D.C. Code § 28-3901(a)(1).

780.    Apple is a "merchant" as defined by D.C. Code § 28-3901(a)(3).

781.    Plaintiff and District of Columbia Subclass members are "consumers" who purchased or received goods or services for personal, household, or family purposes, as defined by D.C. Code § 28-3901.

782.    Apple advertised, offered, or sold goods or services in District of Columbia and engaged in trade or commerce directly or indirectly affecting the people of District of Columbia.

783.    Apple engaged in unfair, unlawful, and deceptive trade practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of D.C. Code § 28-3904, including:

   a.   Representing that goods or services have characteristics that they do not have;

   b.   Representing that goods or services are of a particular standard, quality, grade, style, or model, when they are of another;

   c.   Misrepresenting a material fact that has a tendency to mislead;

d.  Failing to state a material fact where the failure is misleading;

e.  Advertising or offering goods or services without the intent to sell them as advertised or offered; and

f.  Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

784.  Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

785.  Apple intended to mislead Plaintiff and District of Columbia Subclass members and induce them to rely on its misrepresentations and omissions.

786.  The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and District of Columbia Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

787.  Apple acted intentionally, knowingly, and maliciously to violate the District of Columbia's Consumer Protection Procedures Act, and recklessly disregarded Plaintiff and District of Columbia Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

788.  As a direct and proximate result of Apple's unfair, unlawful, and deceptive trade practices, Plaintiff and District of Columbia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

789.  Plaintiff and District of Columbia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution, injunctive relief, punitive damages, attorneys' fees and costs, the greater of treble damages or $1500 per violation, and any other relief that the Court deems proper.

## CLAIMS ON BEHALF OF THE FLORIDA SUBCLASS

## COUNT 27

### FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

*Fla. Stat. §§ 501.201, et seq.*

790.   The Florida Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Florida Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

791.   Plaintiff and Florida Subclass members are "consumers" as defined by Fla. Stat. § 501.203.

792.   Apple advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

793.   Apple engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1).

794.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

795.   Had Apple disclosed to Plaintiff and Florida Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Florida Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

796.   As a direct and proximate result of Apple's unconscionable, unfair, and deceptive acts and practices, Plaintiff and Florida Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

monetary damages, including from not receiving the benefit of their bargain in purchasing the

Devices, and increased time and expense in dealing with Device performance issues.

797.    Plaintiff and Florida Subclass members seek all monetary and non-monetary

relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.21;

declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. §

501.2105(1); and any other relief that is just and proper.

**CLAIMS ON BEHALF OF THE GEORGIA SUBCLASS**

**COUNT 28**

**GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**

*O.C.G.A. §§ 10-1-390, et seq.*

798.    The Georgia Plaintiff(s) identified above ("Plaintiff," for purposes of this Count),

individually and on behalf of the Georgia Subclass, repeats and alleges Paragraphs 1-472, as if

fully alleged herein.

799.    Apple, Plaintiff, and Georgia Subclass members are "persons" within the

meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia

UDTPA").

800.    Apple received notice pursuant to O.C.G.A. § 10-1-399 concerning its wrongful

conduct as alleged herein by Plaintiff and Georgia Subclass members.  However, sending pre-

suit notice pursuant to O.C.G.A. § 10-1-399 is an exercise in futility for Plaintiff, as Apple has

already been informed of the allegedly unfair and unlawful conduct as described herein as of the

date of the first-filed lawsuit in December 2017, and has yet to offer class members remedy in

accordance with similar consumer protection statutes.

801.    Apple engaged in deceptive trade practices in the conduct of its business, in

violation of O.C.G.A. § 10-1-372(a), including:

a.   Representing that goods or services have characteristics that they do not have;

b.   Representing that goods or services are of a particular standard, quality, or grade if

they are of another;

c. Advertising goods or services with intent not to sell them as advertised; and

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

802.   Apple's deceptive trade practices include:

a. Knowingly designing, developing, manufacturing, advertising, and selling Devices with a significant Defect that result in the Devices not operating as intended, represented, or advertised under normal usage;

b. Developing software Updates that merely hide the aforementioned Defect by throttling Device performance, resulting in the Devices operating at slower speeds than intended, represented, or advertised under normal usage;

c. Concealing material information from consumers regarding its Devices and the Defect so that consumers were unable to make informed choices when purchasing the Devices;

d. Concealing material information from consumers regarding the Updates to operating software, so that consumers would not nor could they know that the Updates throttled their Devices; and

e. Using uniform, deceptive business practices such as throttling software to slow down Devices, requiring consumers to spend additional money on replacement batteries or Devices as a result of the Defect.

803.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

804.   Apple intended to mislead Plaintiff and Georgia Subclass members and induce them to rely on its misrepresentations and omissions.

805.   In the course of its business, Apple engaged in activities with a tendency or capacity to deceive.

806.   Apple acted intentionally, knowingly, and maliciously to violate Georgia's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Georgia

Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

807.   Had Apple disclosed to Plaintiff and Georgia Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Georgia Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

808.   As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Georgia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

809.   Plaintiff and Georgia Subclass members seek all relief allowed by law, including injunctive relief, and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

### CLAIMS ON BEHALF OF THE HAWAII SUBCLASS

### COUNT 29

### HAWAII UNFAIR PRACTICES AND UNFAIR COMPETITION ACT

### *Haw. Rev. Stat. §§ 480-1, et seq.*

810.   The Hawaii Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Hawaii Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

811.    Plaintiff and Hawaii Subclass members are "consumers" as defined by Haw. Rev. Stat. § 480-1.

812.    Plaintiffs, the Hawaii Subclass members, and Apple are "persons" as defined by Haw. Rev. Stat. § 480-1.

813.    Apple advertised, offered, or sold goods or services in Hawaii and engaged in trade or commerce directly or indirectly affecting the people of Hawaii.

814.    Apple engaged in unfair or deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Hawaii Subclass members in violation of Haw. Rev. Stat. § 480-2(a).

815.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

816.    Apple intended to mislead Plaintiff and Hawaii Subclass members and induce them to rely on its misrepresentations and omissions.

817.    The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

818.    Apple acted intentionally, knowingly, and maliciously to violate Hawaii's Unfair Practices and Unfair Competition Act, and recklessly disregarded Plaintiff and Hawaii Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

819.    As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Hawaii Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

820.   Plaintiff and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, benefit of the bargain damages, treble damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 30

## HAWAII UNIFORM DECEPTIVE TRADE PRACTICE ACT

### *Haw. Rev. Stat. §§ 481A-3, et seq.*

821.   The Hawaii Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Hawaii Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

822.   Plaintiff and Hawaii Subclass members are "persons" as defined by Haw. Rev. Stat. § 481A-2.

823.   Apple engaged in unfair and deceptive trade practices in the conduct of its business, violating Haw. Rev. Stat. § 481A-3, including:

   a.   Representing that goods or services have characteristics that they do not have;

   b.   Representing that goods or services are of a particular standard, quality, or grade if they are of another;

   c.   Advertising goods or services with intent not to sell them as advertised; and

   d.   Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

824.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

825.   The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and Hawaii Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

826.   As a direct and proximate result of Apple's unfair, unlawful, and deceptive trade practices, Plaintiff and Hawaii Subclass members have suffered and will continue to suffer

injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

827.    Plaintiff and Hawaii Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, attorneys' fees and costs, and any other relief that the Court deems proper.

**CLAIMS ON BEHALF OF THE IDAHO SUBCLASS**

**COUNT 31**

**IDAHO CONSUMER PROTECTION ACT**

*Idaho Code §§ 48-601, et seq.*

828.    The Idaho Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Idaho Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

829.    Apple is a "person" as defined by Idaho Code § 48-602(1).

830.    Apple's conduct as alleged herein pertained to "goods" and "services" as defined by Idaho Code § 48-602(6) and (7).

831.    Apple advertised, offered, or sold goods or services in Idaho and engaged in trade or commerce directly or indirectly affecting the people of Idaho.

832.    Apple engaged in unfair and deceptive acts or practices, and unconscionable acts and practices, in the conduct of trade and commerce with respect to the sale and advertisement of goods and services, in violation of Idaho Code §§ 48-603 and 48-603(C), including:

  a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

  b.   Representing that goods are of a particular standard, quality, or grade when they are of another;

  c.   Advertising goods or services with intent not to sell them as advertised;

  d.   Engaging in other acts and practices that are otherwise misleading, false, or

deceptive to consumers; and

e.   Engaging in unconscionable methods, acts or practices in the conduct of trade or commerce.

833.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

834.   Apple intended to mislead Plaintiff and Idaho Subclass members and induce them to rely on its misrepresentations and omissions.  Apple knew its representations and omissions were false.

835.   Apple acted intentionally, knowingly, and maliciously to violate Idaho's Consumer Protection Act, and recklessly disregarded Plaintiff and Idaho Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

836.   As a direct and proximate result of Apple's unfair, deceptive, and unconscionable conduct, Plaintiff and Idaho Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

837.   Plaintiff and Idaho Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, injunctive relief, costs, and attorneys' fees.

### CLAIMS ON BEHALF OF THE ILLINOIS SUBCLASS

### COUNT 32

### ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

#### *815 ILCS §§ 505, et seq.*

838.   The Illinois Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Illinois Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

839.  Apple is a "person" as defined by 815 ILCS §§ 505/1(c).

840.  Plaintiff and Illinois Subclass members are "consumers" as defined by 815 ILCS §§ 505/1(e).

841.  Apple's conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 ILCS § 505/1(f).  Apple's conduct is described in full detail above.

842.  Apple's deceptive, unfair, and unlawful trade acts or practices, in violation of 815 ILCS § 505/2.

843.  Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

844.  Apple intended to mislead Plaintiff and Illinois Subclass members and induce them to rely on its misrepresentations and omissions.

845.  The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury that these consumers could not reasonably avoid; this substantial injury outweighed any benefit to consumers or to competition.

846.  Apple acted intentionally, knowingly, and maliciously to violate Illinois's Consumer Fraud Act, and recklessly disregarded Plaintiff and Illinois Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

847.  As a direct and proximate result of Apple's unfair, unlawful, and deceptive acts and practices, Plaintiff and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

848.   Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including damages, restitution, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

### COUNT 33

### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT

#### *815 ILCS §§ 510/2, et seq.*

849.   The Illinois Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Illinois Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

850.   Apple is a "person" as defined by 815 ILCS §§ 510/1(5).

851.   Apple engaged in deceptive trade practices in the conduct of its business, in violation of 815 ILCS §§ 510/2(a), including:

   a.   Representing that goods or services have characteristics that they do not have;

   b.   Representing that goods or services are of a particular standard, quality, or grade if they are of another;

   c.   Advertising goods or services with intent not to sell them as advertised; and

   d.   Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

852.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

853.   The above unfair and deceptive practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Illinois Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

854.   As a direct and proximate result of Apple's unfair, unlawful, and deceptive trade practices, Plaintiff and Illinois Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages,

including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

855.    Plaintiff and Illinois Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

## CLAIMS ON BEHALF OF THE INDIANA SUBCLASS

## COUNT 34

### INDIANA DECEPTIVE CONSUMER SALES ACT

*Ind. Code §§ 24-5-0.5-1, et seq.*

856.    The Indiana Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Indiana Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

857.    Apple is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

858.    Apple is a "supplier" as defined by § 24-5-0.5-2(a)(1), because it regularly engages in or solicits "consumer transactions" within the meaning of § 24-5-0.5-2(a)(3)(A).

859.    Apple engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3(a).

860.    Apple's representations and omissions include both implicit and explicit representations and were carried out as a scheme or artifice to defraud.

861.    Apple's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

862.    The injury to consumers from Apple's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

863.    Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of

consumer decision-making.  By withholding important information from consumers about the performance of its Devices, and the Defect within those Devices, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

864.    Apple's business practices, in concealing material information or misrepresenting the qualities, characteristics, and performance of its Devices, had no countervailing benefit to consumers or to competition.

865.    Apple's acts and practices were "abusive" for numerous reasons, including:

a.   Because they materially interfered with consumers' ability to understand a term or condition in a consumer transaction, interfering with consumers' decision-making.

b.   Because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction; consumers lacked an understanding of the material risks and costs of a variety of their transactions.

c.   Because they took unreasonable advantage of consumers' inability to protect their own interests; consumers could not protect their interests due to the asymmetry in information between them and Apple concerning Apple's Devices.

d.   Because Apple took unreasonable advantage of consumers' reasonable reliance that it was providing truthful and accurate information about its Devices.

866.    Apple also engaged in "deceptive" acts and practices in violation of Indiana Code § 24-5-0.5-3(a) and § 24-5-0.5-3(b), including:

a.   Misrepresenting that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have;

b.   Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

    c.  Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., greater speed, longer battery life) than the supplier intends or reasonably expects.

867.    Apple intended to mislead Plaintiff and Indiana Subclass members and induce them to rely on its misrepresentations and omissions.

868.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

869.    Had Apple disclosed to Plaintiff and Indiana Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Indiana Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

870.    Apple had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensiveness of the Defect in its Devices, and the generally-accepted standards regarding product safety.  Apple's duty to disclose also arose from its:

    a.  Possession of exclusive knowledge regarding the Defect in its Devices;

    b.  Possession of exclusive knowledge regarding throttling code in its operating software;

    c.  Active concealment of the Devices Defect;

    d.  Active concealment of the fact that its operating software throttled Device performance;

    e.  Incomplete representations about Device safety and performance, while purposefully withholding material facts from Plaintiff and the Indiana Subclass that contradicted

these representations.

871.    Apple acted intentionally, knowingly, and maliciously to violate Indiana's Deceptive Consumer Sales Act, and recklessly disregarded Plaintiff and Indiana Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

872.    Apple received notice pursuant to Ind. Code § 24-5-0.5-5 concerning its wrongful conduct as alleged herein by Plaintiff and Indiana Subclass members.  Apple has had constructive notice of Plaintiff's demand for relief for the Indiana Subclass pursuant to Ind. Code § 24-5-0.5-5 since the filing of the first case, which contained substantially similar allegations.  Accordingly, sending pre-suit notice pursuant to Ind. Code § 24-5-0.5-5 is an exercise in futility for Plaintiff, as Apple has not cured its unfair, abusive, and deceptive acts and practices, or its violations of Indiana Deceptive Consumer Sales Act were incurable.

873.    Apple's conduct includes incurable deceptive acts that Apple engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8).

874.    As a direct and proximate result of Apple's uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiff and Indiana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

875.    Apple's violations present a continuing risk to Plaintiff and Indiana Subclass members as well as to the general public.

876.    Plaintiff and Indiana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

**CLAIMS ON BEHALF OF THE IOWA SUBCLASS**

**COUNT 35**

**IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT**

*Iowa Code § 714H*

877. The Iowa Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Iowa Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

878. Apple is a "person" as defined by Iowa Code § 714H.2(7).

879. Plaintiff and Iowa Subclass members are "consumers" as defined by Iowa Code § 714H.2(3).

880. Apple's conduct described herein related to the "sale" or "advertisement" of "merchandise" as defined by Iowa Code §§ 714H.2(2), (6), & (8).

881. Apple engaged in unfair, deceptive, and unconscionable trade practices, in violation of the Iowa Private Right of Action for Consumer Frauds Act, as described throughout and herein.

882. Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

883. Apple intended to mislead Plaintiff and Iowa Subclass members and induce them to rely on its misrepresentations and omissions.

884. Apple acted intentionally, knowingly, and maliciously to violate Iowa's Private Right of Action for Consumer Frauds Act, and recklessly disregarded Plaintiff and Iowa Subclass members' rights. Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

885. As a direct and proximate result of Apple's unfair, deceptive, and unconscionable conduct, Plaintiff and Iowa Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary

damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

886.     Plaintiff has provided the requisite notice to the Iowa Attorney General, the office of which approved the filing of this class action lawsuit pursuant to Iowa Code § 714H.7.

887.     Plaintiff and Iowa Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, punitive damages, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE KANSAS SUBCLASS**

**COUNT 36**

**KANSAS CONSUMER PROTECTION ACT**

*K.S.A. §§ 50-623, et seq.*

888.     The Kansas Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Kansas Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

889.     K.S.A. §§ 50-623, *et seq.* is to be liberally construed to protect consumers from suppliers who commit deceptive and unconscionable practices.

890.     Plaintiff and Kansas Subclass members are "consumers" as defined by K.S.A. § 50-624(b).

891.     The acts and practices described herein are "consumer transactions," as defined by K.S.A. § 50-624(c).

892.     Apple is a "supplier" as defined by K.S.A. § 50-624(l).

893.     Apple advertised, offered, or sold goods or services in Kansas and engaged in trade or commerce directly or indirectly affecting the people of Kansas.

894.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

895.     Apple intended to mislead Plaintiff and Kansas Subclass members and induce them to rely on its misrepresentations and omissions.

896.    Had Apple disclosed to Plaintiff and Kansas Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Kansas Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

897.    Apple also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including: knowingly taking advantage of the inability of Plaintiff and the Kansas Subclass to reasonably protect their interests, due to their lack of knowledge (*see* K.S.A. § 50-627(b)(1)); and requiring Plaintiff and the Kansas Subclass to enter into a consumer transaction on terms that Apple knew were substantially one-sided in favor of Apple (*see* K.S.A. § 50-627(b)(5)).

898.    Plaintiff and the Kansas Subclass had unequal bargaining power with respect to their purchase and/or use of Apple's Devices because of Apple's omissions and misrepresentations.

899.    The above unfair, deceptive, and unconscionable practices and acts by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Kansas Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

900.    Apple acted intentionally, knowingly, and maliciously to violate Kansas's Consumer Protection Act, and recklessly disregarded Plaintiff and Kansas Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

901.   As a direct and proximate result of Apple's unfair, deceptive, and unconscionable trade practices, Plaintiff and Kansas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

902.   Plaintiff and Kansas Subclass members seek all monetary and non-monetary relief allowed by law, including civil penalties or actual damages (whichever is greater), under K.S.A. §§ 50-634 and 50-636; injunctive relief; and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE KENTUCKY SUBCLASS

## COUNT 37

### KENTUCKY CONSUMER PROTECTION ACT

### *Ky. Rev. Stat. §§ 367.110, et seq.*

903.   The Kentucky Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Kentucky Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

904.   Apple is a "person" as defined by Ky. Rev. Stat. § 367.110(1).

905.   Apple advertised, offered, or sold goods or services in Kentucky and engaged in trade or commerce directly or indirectly affecting the people of Kentucky, as defined by Ky. Rev. Stat. § 367.110(2).

906.   Apple engaged in unfair, false, misleading, deceptive, and unconscionable acts or practices, in violation of Ky. Rev. Stat. § 367.170, as described herein.

907.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

908.   Apple intended to mislead Plaintiff and Kentucky Subclass members and induce them to rely on its misrepresentations and omissions.

909.    Plaintiff and Kentucky Subclass members' purchased goods or services for personal, family, or household purposes and suffered ascertainable losses of money or property as a result of Apple's unlawful acts and practices.

910.    The above unlawful acts and practices by Apple were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Kentucky Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

911.    Apple acted intentionally, knowingly, and maliciously to violate Kentucky's Consumer Protection Act, and recklessly disregarded Plaintiff and Kentucky Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

912.    As a direct and proximate result of Apple's unlawful acts and practices, Plaintiff and Kentucky Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

913.    Plaintiff and Kentucky Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, restitution or other equitable relief, injunctive relief, and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE LOUISIANA SUBCLASS

## COUNT 38

### LOUISIANA UNFAIR TRADE PRACTICES AND

### CONSUMER PROTECTION LAW

***La. Rev. Stat. Ann.*** *§§ 51:1401, et seq.*

914.    The Louisiana Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Louisiana Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

915.    Apple, Plaintiff, and the Louisiana Subclass members are "persons" within the meaning of the La. Rev. Stat. Ann. § 51:1402(8).

916.    Plaintiff and Louisiana Subclass members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

917.    Apple engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(10).

918.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A). Unfair acts are those that offend established public policy, while deceptive acts are practices that amount to fraud, deceit, or misrepresentation.

919.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

920.    Apple intended to mislead Plaintiff and Louisiana Subclass members and induce them to rely on its misrepresentations and omissions.

921.    Apple's unfair and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.  These acts caused substantial injury to Plaintiff and Kentucky Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

922.     Apple acted intentionally, knowingly, and maliciously to violate Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff and Louisiana Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

923.     Had Apple disclosed to Plaintiff and Louisiana Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Louisiana Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

924.     As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Louisiana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

925.     Plaintiff and Louisiana Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; treble damages for Apple's knowing violations of the Louisiana CPL; declaratory relief; attorneys' fees; and any other relief that is just and proper.

### CLAIMS ON BEHALF OF THE MAINE SUBCLASS

### COUNT 39

### MAINE UNFAIR TRADE PRACTICES ACT

*5 Me. Rev. Stat. §§ 205, 213, et seq.*

926.    The Maine Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Maine Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

927.    Apple is a "person" as defined by 5 Me. Stat. § 206(2).

928.    Apple's conduct as alleged herein related was in the course of "trade and commerce" as defined by 5 Me. Stat. § 206(3).

929.    Plaintiff and Maine Subclass members purchased goods and/or services for personal, family, and/or household purposes.

930.    A demand for relief in the form substantially similar to that required by 5 Me. Rev. Stat. § 213(1-A) was already sent at the commencement of this lawsuit but Apple has not made a written tender of settlement or offer of judgment.  Apple received supplemental notice pursuant to 5 Me. Rev. Stat. § 213(1-A) concerning its wrongful conduct as alleged herein by Plaintiff and Maine Subclass members, but this and any subsequent demand was and would be an exercise in futility.

931.    Apple engaged in unfair and deceptive trade acts and practices in the conduct of trade or commerce, in violation of 5 Me. Rev. Stat. §207.

932.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

933.    Had Apple disclosed to Plaintiff and Maine Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead,

Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Maine Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

934.    As a direct and proximate result of Apple's unfair and deceptive acts and conduct, Plaintiff and Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

935.    Plaintiff and the Maine Subclass members seek all monetary and non-monetary relief allowed by law, including damages or restitution, injunctive and other equitable relief, and attorneys' fees and costs.

## COUNT 40

### MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT

#### *10 Me. Rev. Stat. §§ 1212, et seq.*

936.    The Maine Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Maine Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

937.    Apple is a "person" as defined by 10 Me. Rev. Stat. § 1211(5).

938.    Apple advertised, offered, or sold goods or services in Maine and engaged in trade or commerce directly or indirectly affecting the people of Maine.

939.    Apple engaged in deceptive trade practices in the conduct of its business, in violation of 10 Me. Rev. Stat. §1212, including: representing that goods or services have characteristics that they do not have; representing that goods or services are of a particular standard, quality, or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in other conduct that creates a likelihood of confusion or misunderstanding.

940.     Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

941.     Apple intended to mislead Plaintiff and Maine Subclass members and induce them to rely on its misrepresentations and omissions.

942.     Had Apple disclosed to Plaintiff and Maine Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Maine Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

943.     As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Maine Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

944.     Maine Subclass members are likely to be damaged by Apple's ongoing deceptive trade practices.

945.     Plaintiff and the Maine Subclass members seek all monetary and non-monetary relief allowed by law, including damages or restitution, injunctive or other equitable relief, and attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE MARYLAND SUBCLASS**

**COUNT 41**

**MARYLAND CONSUMER PROTECTION ACT**

*Md. Comm. Code §§ 13-301, et seq.*

946.    The Maryland Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Maryland Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

947.    Apple is a person as defined by Md. Comm. Code § 13-101(h).

948.    Apple's conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Comm. Code § 13-101(i) and § 13-303.

949.    Maryland Subclass members are "consumers" as defined by Md. Comm. Code § 13-101(c).

950.    Apple advertises, offers, or sell "consumer goods" or "consumer services" as defined by Md. Comm. Code § 13-101(d).

951.    Apple advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

952.    Apple engaged in unfair and deceptive trade practices, in violation of Md. Comm. Code § 13-301, including:

   a.   False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

   b.   Representing that consumer goods or services have a characteristic that they do not have;

   c.   Representing that consumer goods or services are of a particular standard, quality, or grade that they are not;

   d.   Failing to state a material fact where the failure deceives or tends to deceive;

   e.   Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered;

f.   Deception, fraud, false pretense, false premise, misrepresentation, or knowing

concealment, suppression, or omission of any material fact with the intent that a

consumer rely on the same in connection with the promotion or sale of consumer

goods or services or the subsequent performance with respect to an agreement, sale

lease or rental.

953.    Apple engaged in these unfair and deceptive trade practices in connection with

offering for sale or selling consumer goods or services or with respect to the extension of

consumer credit, in violation of Md. Comm. Code § 13-303.

954.    Apple's representations and omissions were material because they were likely to

deceive reasonable consumers.

955.    Apple intended to mislead Plaintiff and Maryland Subclass members and induce

them to rely on its misrepresentations and omissions.

956.    Had Apple disclosed to Plaintiff and Maryland Subclass members that it

misrepresented the Devices and operating software, omitted material information regarding the

Defect, omitted material information regarding the operating software, and was otherwise

engaged in deceptive, common business practices, Apple would have been unable to continue in

business and it would have been forced to disclose the uniform Defect in its Devices.  Instead,

Apple represented that its Devices were continually improving in speed and battery life and

performed better than other devices on the market.  Plaintiff and the Maryland Subclass

members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of

which they could not have discovered.

957.    Apple acted intentionally, knowingly, and maliciously to violate Maryland's

Consumer Protection Act, and recklessly disregarded Plaintiff and Maryland Subclass

members' rights.  Apple's knowledge of the Devices' performance issues, and release of

software to throttle phone performance, put it on notice that the Devices were not as it

advertised.

958.   As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Maryland Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

959.   Plaintiff and Maryland Subclass members seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE MASSACHUSETTS SUBCLASS

## COUNT 42

### MASSACHUSETTS CONSUMER PROTECTION ACT

*Mass. Gen. Laws Ann. Ch. 93A, §§ 1, et seq.*

960.   The Massachusetts Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Massachusetts Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

961.   Apple and Massachusetts Subclass members are "persons" as meant by Mass. Gen. Laws. Ann. Ch. 93A, § 1(a).

962.   Apple operates in "trade or commerce" as meant by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

963.   Apple advertised, offered, or sold goods or services in Massachusetts and engaged in trade or commerce directly or indirectly affecting the people of Massachusetts, as defined by Mass. Gen. Laws Ann. Ch. 93A, § 1(b).

964.   Demand for relief in a form substantially similar to that required by Mass. Gen. Laws Ann. Ch. 93A § 9(3) was sent to Apple upon the commencement of the original lawsuit in this matter; however, Apple did not remedy its unfair and deceptive acts and practices, nor did it offer relief to the class members by way of settlement or judgment.  Apple received supplemental notice pursuant to Mass. Gen. Laws Ch. 93A § 9(3) concerning its wrongful

conduct as alleged herein by Plaintiff and Massachusetts Subclass members, but this and any additional demand are and would be futile.

965.    Apple engaged in unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

966.    Apple's acts and practices were "unfair" because they fall within the penumbra of common law, statutory, and established concepts of unfairness, given that Apple solely held the true facts about its defective Devices and throttling software.

967.    Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers about the Defect in its Devices and the subsequent implementation of operating software meant to throttle device performance in light of the Defect, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

968.    Apple's practices, omissions, and misrepresentations had no countervailing benefit to consumers or to competition.

969.    Apple intended to mislead Plaintiff and Massachusetts Subclass members and induce them to rely on its misrepresentations and omissions.  Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

970.    Apple acted intentionally, knowingly, and maliciously to violate Massachusetts's Consumer Protection Act, and recklessly disregarded Plaintiff and Massachusetts Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

971.    As a direct and proximate result of Apple's unfair and deceptive practices, Plaintiff and Massachusetts Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including

from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

972.    Plaintiff and Massachusetts Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, double or treble damages, injunctive or other equitable relief, and attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE MICHIGAN SUBCLASS

### COUNT 43

### MICHIGAN CONSUMER PROTECTION ACT

*Mich. Comp. Laws Ann. §§ 445.903, et seq.*

973.    The Michigan Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Michigan Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

974.    Apple and Michigan Subclass members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

975.    Apple advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

976.    Apple engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

    a.   Representing that its goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

    b.   Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

    c.   Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

    d.   Failing to reveal facts that are material to the transaction in light of representations

1    of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. §

2    445.903(1)(cc).

3         977.    Apple's representations and omissions were material because they were likely to

4    deceive reasonable consumers.

5         978.    Apple intended to mislead Plaintiff and Michigan Subclass members and induce

6    them to rely on its misrepresentations and omissions.

7         979.    Apple acted intentionally, knowingly, and maliciously to violate Michigan's

8    Consumer Protection Act, and recklessly disregarded Plaintiff and Michigan Subclass members'

9    rights.  Apple's knowledge of the Devices' performance issues, and release of software to

10   throttle phone performance, put it on notice that the Devices were not as it advertised.

11        980.    As a direct and proximate result of Apple's unfair, unconscionable, and

12   deceptive practices, Plaintiff and Michigan Subclass members have suffered and will continue

13   to suffer injury, ascertainable losses of money or property, and monetary and non-monetary

14   damages, including from not receiving the benefit of their bargain in purchasing the Devices,

15   and increased time and expense in dealing with Device performance issues.

16        981.    Plaintiff and Michigan Subclass members seek all monetary and non-monetary

17   relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any

18   other relief that is just and proper.

19                    **CLAIMS ON BEHALF OF THE MINNESOTA SUBCLASS**

20                                   **COUNT 44**

21                        **MINNESOTA CONSUMER FRAUD ACT**

22                  *Minn. Stat. §§ 325F.68, et seq. and Minn. Stat. §§ 8.31, et seq.*

23        982.    The Minnesota Plaintiff(s) identified above ("Plaintiff," for purposes of this

24   Count), individually and on behalf of the Minnesota Subclass, repeats and alleges Paragraphs 1-

25   472, as if fully alleged herein.

26        983.    Apple, Plaintiff, and members of the Minnesota Subclass are each a "person" as

27   defined by Minn. Stat. § 325F.68(3).

28

984.    Apple goods, services, commodities, and intangibles are "merchandise" as defined by Minn. Stat. § 325F.68(2).

985.    Apple engaged in "sales" as defined by Minn. Stat. § 325F.68(4).

986.    Apple engaged in fraud, false pretense, false promise, misrepresentation, misleading statements, and deceptive practices in connection with the sale of merchandise, in violation of Minn. Stat. § 325F.69(1), as described herein.

987.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

988.    Apple intended to mislead Plaintiff and Minnesota Subclass members and induce them to rely on its misrepresentations and omissions.

989.    Apple's fraudulent, misleading, and deceptive practices affected the public interest, including millions of Minnesotans who purchased and/or used Apple's Devices.

990.    As a direct and proximate result of Apple's fraudulent, misleading, and deceptive practices, Plaintiff and Minnesota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

991.    Plaintiff and Minnesota Subclass members seek all monetary and non-monetary relief allowed by law, including damages, injunctive or other equitable relief, and attorneys' fees, disbursements, and costs.

### COUNT 45

### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT

*Minn. Stat. §§ 325D.43, et seq.*

992.    The Minnesota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Minnesota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

993.    By engaging in deceptive trade practices in the course of its business and vocation, directly or indirectly affecting the people of Minnesota, Apple violated Minn. Stat. § 325D.44, including the following provisions: representing that its goods and services had characteristics, uses, and benefits that they did not have, in violation of Minn. Stat. § 325D.44(1)(5); representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn. Stat. § 325D.44(1)(7); advertising goods and services with intent not to sell them as advertised, in violation of Minn. Stat. § 325D.44(1)(9); and engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44(1)(13).

994.    Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

995.    Apple intended to mislead Plaintiff and Minnesota Subclass members and induce them to rely on its misrepresentations and omissions.

996.    Had Apple disclosed to Plaintiff and Minnesota Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Minnesota Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

997.    Apple acted intentionally, knowingly, and maliciously to violate Minnesota's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Minnesota Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

998.    As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Minnesota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

999.    Plaintiff and Minnesota Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief and attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE MISSISSIPPI SUBCLASS**

**COUNT 46**

**MISSISSIPPI CONSUMER PROTECTION ACT**

*Miss. Code §§ 75-24-1, et seq.*

1000.   The Mississippi Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Mississippi Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1001.   Apple is a "person," as defined by Miss. Code § 75-24-3.

1002.   Apple advertised, offered, or sold goods or services in Mississippi and engaged in trade or commerce directly or indirectly affecting the people of Mississippi, as defined by Miss. Code § 75-24-3.

1003.   Prior to filing suit, Plaintiff made reasonable attempts to resolve Plaintiff's claims via informal dispute resolution processes; however, such processes were unsuccessful.

1004.   The above-described conduct violated Miss. Code Ann. § 75-24-5(2), including: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising goods or services with intent not to sell them as advertised.

1005.   Apple intended to mislead Plaintiff and Mississippi Subclass members and induce them to rely on its misrepresentations and omissions.

1006.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1007.   Had Apple disclosed to Plaintiff and Mississippi Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Mississippi Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1008.   Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its: possession of exclusive knowledge regarding the Defect in its Devices; possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect; active concealment of the Defect in its Devices and purpose of the throttling operating software; and incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1009.   Apple acted intentionally, knowingly, and maliciously to violate Mississippi's Consumer Protection Act, and recklessly disregarded Plaintiff and Mississippi Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1010.   As a direct and proximate result of Apple's unfair and deceptive acts or practices and Plaintiff and Mississippi Subclass members' purchase of goods or services primarily for personal, family, or household purposes, Plaintiff and Mississippi Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and

monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1011.   Apple's violations present a continuing risk to Plaintiff and Mississippi Subclass members as well as to the general public as, *inter alia*, its omissions and misrepresentations have not been corrected.

1012.   Plaintiff and Mississippi Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, restitution and other relief under Miss. Code § 75-24-11, injunctive relief, punitive damages, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE MISSOURI SUBCLASS**

**COUNT 47**

**MISSOURI MERCHANDISE PRACTICES ACT**

*Mo. Rev. Stat. §§ 407.010, et seq.*

1013.   The Missouri Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Missouri Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1014.   Apple is a "person" as defined by Mo. Rev. Stat. § 407.010(5).

1015.   Apple advertised, offered, or sold goods or services in Missouri and engaged in trade or commerce directly or indirectly affecting the people of Missouri, as defined by Mo. Rev. Stat. § 407.010(4), (6) and (7).

1016.   Plaintiff and Missouri Subclass members purchased or leased goods or services primarily for personal, family, or household purposes.

1017.   Apple engaged in unlawful, unfair, and deceptive acts and practices, in connection with the sale or advertisement of merchandise in trade or commerce, in violation of Mo. Rev. Stat. § 407.020(1), as described herein.

1018.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1019.   Apple intended to mislead Plaintiff and Missouri Subclass members and induce them to rely on its misrepresentations and omissions.

1020.   Apple acted intentionally, knowingly, and maliciously to violate Missouri's Merchandise Practices Act, and recklessly disregarded Plaintiff and Missouri Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1021.   As a direct and proximate result of Apple's unlawful, unfair, and deceptive acts and practices, Plaintiff and Missouri Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1022.   Plaintiff and Missouri Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, attorneys' fees and costs, injunctive relief, and any other appropriate relief.

**CLAIMS ON BEHALF OF THE MONTANA SUBCLASS**

**COUNT 48**

**MONTANA UNFAIR TRADE PRACTICES AND CONSUMER**

**PROTECTION ACT**

*M.C.A. §§ 30-14-101, et seq.*

1023.   The Montana Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Montana Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1024.   Apple is a "person" as defined by MCA § 30-14-102(6).

1025.   Plaintiff and Montana Subclass members are "consumers" as defined by M.C.A. § 30-14-102(1).

1026.   Apple advertised, offered, or sold goods or services in Montana and engaged in trade or commerce directly or indirectly affecting the people of Montana, as defined by M.C.A. § 30-14-102(8).

1027.   Apple engaged in unfair and deceptive acts and practices in the conduct of trade or commerce, in violation M.C.A. § 30-14-103, as described herein.

1028.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1029.   Had Apple disclosed to Plaintiff and Montana class members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Montana Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1030.   Apple's acts described above are unfair and offend public policy; they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

1031.   Apple acted intentionally, knowingly, and maliciously to violate Montana's Unfair Trade Practices and Consumer Protection Act, and recklessly disregarded Plaintiff and Montana Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1032.   As a direct and proximate result of Apple's unfair methods of competition and unfair and deceptive acts and practices in the conduct of trade or commerce, Plaintiff and Montana Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not

receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1033.   Plaintiff and Montana Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $500, treble damages, restitution, attorneys' fees and costs, injunctive relief, and other relief that the Court deems appropriate.

**CLAIMS ON BEHALF OF THE NEBRASKA SUBCLASS**

**COUNT 49**

**NEBRASKA CONSUMER PROTECTION ACT**

*Neb. Rev. Stat. §§ 59-1601, et seq.*

1034.   The Nebraska Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nebraska Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1035.   Apple and Nebraska Subclass members are each a "person" as defined by Neb. Rev. Stat. § 59-1601(1).

1036.   Apple advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska, as defined by Neb. Rev. Stat. § 59-1601.

1037.   Apple engaged in unfair and deceptive acts and practices in conducting trade and commerce, in violation of Neb. Rev. Stat. § 59-1602, as described herein.

1038.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1039.   As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and Nebraska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1040.   Apple's unfair and deceptive acts and practices complained of herein affected the public interest, including the large percentage of Nebraskans who have purchased and/or used Apple Devices.

1041.   Plaintiff and Nebraska Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, the greater of either (1) actual damages or (2) $1,000, civil penalties, and reasonable attorneys' fees and costs.

**COUNT 50**

**NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT**

*Neb. Rev. Stat. §§ 87-301, et seq.*

1042.   The Nebraska Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nebraska Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1043.   Apple and Nebraska Subclass members are "persons" as defined by Neb. Rev. Stat. § 87-301(19).

1044.   Apple advertised, offered, or sold goods or services in Nebraska and engaged in trade or commerce directly or indirectly affecting the people of Nebraska.

1045.   Apple engaged in deceptive trade practices in the course of its business, in violation of Neb. Rev. Stat. §§ 87-302(a)(5), (8), and (10), including: represented that goods and services have characteristics, uses, benefits, or qualities that they do not have; represented that goods and services are of a particular standard, quality, or grade if they are of another; and advertised its goods and services with intent not to sell them as advertised and in a manner calculated or tending to mislead or deceive.

1046.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1047.   Apple intended to mislead Plaintiff and Nebraska Subclass members and induce them to rely on its misrepresentations and omissions.

1048.   Had Apple disclosed to Plaintiff and Nebraska Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Nebraska Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1049.   Apple acted intentionally, knowingly, and maliciously to violate Nebraska's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Nebraska Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1050.   As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Nebraska Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1051.   Apple's deceptive trade practices complained of herein affected consumers at large, including the large percentage of Nebraskans who purchased and/or used Apple Devices.

1052.   Plaintiff and Nebraska Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, civil penalties, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE NEVADA SUBCLASS

## COUNT 51

**NEVADA DECEPTIVE TRADE PRACTICES ACT**

*Nev. Rev. Stat. Ann. §§ 598.0903, et seq.*

1053.   The Nevada Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Nevada Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1054.   Apple advertised, offered, or sold goods or services in Nevada and engaged in trade or commerce directly or indirectly affecting the people of Nevada.

1055.   Apple engaged in deceptive trade practices in the course of its business or occupation, in violation of Nev. Rev. Stat. §§ 598.0915 and 598.0923, including:

    a.   Knowingly making a false representation as to the characteristics, uses, and benefits of goods or services for sale in violation of Nev. Rev. Stat. § 598.0915(5);

    b.   Representing that goods or services for sale are of a particular standard, quality, or grade when Apple knew or should have known that they are of another standard, quality, or grade in violation of Nev. Rev. Stat. § 598.0915(7);

    c.   Advertising goods or services with intent not to sell them as advertised in violation of Nev. Rev. Stat § 598.0915(9);

    d.   Failing to disclose a material fact in connection with the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(A)(2); and

    e.   Violating state and federal statutes or regulations relating to the sale of goods or services in violation of Nev. Rev. Stat. § 598.0923(A)(3).

1056.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1057.   Had Apple disclosed to Plaintiff and Nevada Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise

engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Nevada Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1058.   Apple acted intentionally, knowingly, and maliciously to violate Nevada's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Nevada Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1059.   As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Nevada Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1060.   Plaintiff and Nevada Subclass members seek all monetary and non-monetary relief allowed by law, including damages, punitive damages, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE NEW HAMPSHIRE SUBCLASS

## COUNT 52

### NEW HAMPSHIRE CONSUMER PROTECTION ACT

#### *N.H.R.S.A. §§ 358-A, et seq.*

1061.   The New Hampshire Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the New Hampshire Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1062.   Apple is a "person" under the New Hampshire Consumer Protection statute.

1063.   Apple advertised, offered, or sold goods or services in New Hampshire and engaged in trade or commerce directly or indirectly affecting the people of New Hampshire, as defined by N.H.R.S.A. § 358-A:1.

1064.   Apple engaged in unfair and deceptive acts or practices in the ordinary conduct of its trade or business, in violation of N.H.R.S.A. § 358-A:2, including:

  a.   Representing that its goods or services have characteristics, uses, or benefits that they do not have in violation of N.H.R.S.A. § 358-A:2.V;

  b.   Representing that its goods or services are of a particular standard or quality if they are of another in violation of N.H.R.S.A. § 358-A:2.VII; and

  c.   Advertising its goods or services with intent not to sell them as advertised in violation of N.H.R.S.A. § 358-A:2.IX.

1065.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1066.   Apple acted intentionally, knowingly, and maliciously to violate New Hampshire's Consumer Protection Act, and recklessly disregarded Plaintiff and New Hampshire Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.  Apple's acts and practices went beyond the realm of strictly private transactions.

1067.   As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and New Hampshire Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1068.   Plaintiff and New Hampshire Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, punitive damages, equitable relief (including injunctive relief), restitution, civil penalties, and attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE NEW JERSEY SUBCLASS**

**COUNT 53**

**NEW JERSEY CONSUMER FRAUD ACT**

*N.J. Stat. Ann. §§ 56:8-1, et seq.*

1069.   The New Jersey Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the New Jersey Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1070.   Apple is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

1071.   Apple sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

1072.   The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1, *et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

1073.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1074.   Apple intended to mislead Plaintiff and New Jersey Subclass members and induce them to rely on its misrepresentations and omissions.

1075.   Apple acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiff and New Jersey Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1076.   As a direct and proximate result of Apple's unconscionable and deceptive practices, Plaintiff and New Jersey Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1077.   Plaintiff and New Jersey Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## CLAIMS ON BEHALF OF THE NEW MEXICO SUBCLASS

## COUNT 54

### NEW MEXICO UNFAIR PRACTICES ACT

*N.M. Stat. Ann. §§ 57-12-2, et seq.*

1078.   The New Mexico Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the New Mexico Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1079.   Apple is a "person" as meant by N.M. Stat. Ann. § 57-12-2.

1080.   Apple was engaged in "trade" and "commerce" as meant by N.M. Stat. Ann. § 57-12-2(C) when engaging in the conduct alleged.

1081.   The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2, *et seq.*, prohibits both unfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce.

1082.   Apple engaged in unconscionable, unfair, and deceptive acts and practices in connection with the sale of goods or services in the regular course of its trade or commerce, including the following:

    a.   Knowingly representing that its goods and services have characteristics, benefits, or qualities that they do not have, in violation of N.M. Stat. Ann. § 57-12-2(D)(5);

    b.   Knowingly representing that its goods and services are of a particular standard or quality when they are of another in violation of N.M. Stat. Ann. § 57-12-2(D)(7);

    c.   Knowingly using exaggeration, innuendo, or ambiguity as to a material fact or failing to state a material fact where doing so deceives or tends to deceive in violation of N.M. Stat. Ann. § 57-12-2(D)(14);

    d.   Taking advantage of the lack of knowledge, experience, or capacity of its consumers

1        to a grossly unfair degree to Plaintiff's and the New Mexico Subclass' detriment in

2        violation of N.M. Stat. Ann. § 57-2-12(E)(1); and

3      e.  Performing these acts and practices in a way that results in a gross disparity between

4        the value received by Plaintiff and the New Mexico Subclass and the price paid, to

5        their detriment, in violation of N.M. Stat. § 57-2-12(E)(2).

6      1083.  Apple's representations and omissions were material because they were likely to

7 deceive reasonable consumers.

8      1084.  Apple intended to mislead Plaintiff and New Mexico Subclass members and

9 induce them to rely on its misrepresentations and omissions.

10     1085.  Apple acted intentionally, knowingly, and maliciously to violate New Mexico's

11 Unfair Practices Act, and recklessly disregarded Plaintiff and New Mexico Subclass members'

12 rights.  Apple's knowledge of the Devices' performance issues, and release of software to

13 throttle phone performance, put it on notice that the Devices were not as it advertised.

14     1086.  As a direct and proximate result of Apple's unfair, deceptive, and

15 unconscionable trade practices, Plaintiff and New Mexico Subclass members have suffered and

16 will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

17 monetary damages, including from not receiving the benefit of their bargain in purchasing the

18 Devices, and increased time and expense in dealing with Device performance issues.

19     1087.  Plaintiff and New Mexico Subclass members seek all monetary and non-

20 monetary relief allowed by law, including injunctive relief, actual damages or statutory damages

21 of $100 (whichever is greater), treble damages or statutory damages of $300 (whichever is

22 greater), and reasonable attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE NEW YORK SUBCLASS

## COUNT 55

### NEW YORK GENERAL BUSINESS LAW

*N.Y. Gen. Bus. Law §§ 349, et seq.*

1088.   The New York Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the New York Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1089.   Apple engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, as described herein.

1090.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1091.   Apple acted intentionally, knowingly, and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff and New York Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1092.   As a direct and proximate result of Apple's deceptive and unlawful acts and practices, Plaintiff and New York Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1093.   Apple's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the millions of New Yorkers who purchased and/or used Apple's Devices.

1094.   The above deceptive and unlawful practices and acts by Apple caused substantial injury to Plaintiff and New York Subclass members that they could not reasonably avoid.

1095.   Plaintiff and New York Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

## CLAIMS ON BEHALF OF THE NORTH CAROLINA SUBCLASS

## COUNT 56

### NORTH CAROLINA UNFAIR TRADE PRACTICES ACT

*N.C. Gen. Stat. Ann. §§ 75-1.1, et seq.*

1096.   The North Carolina Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the North Carolina Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1097.   Apple advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

1098.   Apple engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, as described herein.

1099.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1100.   Apple intended to mislead Plaintiff and North Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1101.   Had Apple disclosed to Plaintiff and North Carolina Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the North Carolina Subclass

members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1102.   Apple acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff and North Carolina Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1103.   As a direct and proximate result of Apple's unfair and deceptive acts and practices, Plaintiff and North Carolina Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1104.   Apple's conduct as alleged herein was continuous, such that after the first violations of the provisions pled herein, each week that the violations continued constitute separate offenses pursuant to N.C. Gen. Stat. Ann. § 75-8.

1105.   Plaintiff and North Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE NORTH DAKOTA SUBCLASS

## COUNT 57

## NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT

### *N.D. Cent. Code §§ 51-15-01, et seq.*

1106.   The North Dakota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the North Dakota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1107.   Apple, Plaintiff, and each member of the North Dakota Subclass is a "person," as defined by N.D. Cent. Code § 51-15-01(4).

1108.   Apple sells and advertises "merchandise," as defined by N.D. Cent. Code § 51-15-01(3) and (5).

1109.   Apple advertised, offered, or sold goods or services in North Dakota and engaged in trade or commerce directly or indirectly affecting the people of North Dakota.

1110.   Apple engaged in deceptive, false, fraudulent, misrepresentative, unconscionable, and substantially injurious acts and practices in connection with the sale and advertisement of merchandise, in violation of N.D. Cent. Code § 51-15-01, as described herein.

1111.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1112.   Apple's above-described acts and practices caused substantial injury to Plaintiff and North Dakota Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

1113.   Apple intended to mislead Plaintiff and North Dakota Subclass members and induce them to rely on its misrepresentations and omissions.

1114.   Apple acted intentionally, knowingly, and maliciously to violate North Dakota's Unlawful Sales or Advertising Law, and recklessly disregarded Plaintiff and North Dakota Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as advertised.

1115.   As a direct and proximate result of Apple's deceptive, unconscionable, and substantially injurious practices, Plaintiff and North Dakota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1116.   Plaintiff and North Dakota Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, restitution, treble damages, civil penalties, and attorneys' fees, costs, and disbursements.

**CLAIMS ON BEHALF OF THE OHIO SUBCLASS**

**COUNT 58**

**OHIO CONSUMER SALES PRACTICES ACT**

*Ohio Rev. Code §§ 1345.01, et seq.*

1117.   The Ohio Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Ohio Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1118.   Plaintiff and Ohio Subclass members are "persons," as defined by Ohio Rev. Code § 1345.01(B).

1119.   Apple was a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

1120.   Apple advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

1121.   Apple engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code §§ 1345.02, including:

a.   Apple represented that its goods, services, and intangibles had performance characteristics, uses, and benefits that it did not have, in violation of Ohio Rev. Code § 1345.02(B)(1); and

b.   Apple represented that its goods, services, and intangibles were of a particular standard or quality when they were not, in violation of Ohio Rev. Code § 1345(B)(2).

1122.   Apple engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code Ann. § 1345.03, including:

a.   Knowingly taking advantage of the inability of Plaintiff and the Ohio Subclass to reasonably protect their interest because of their ignorance of the issues discussed herein (Ohio Rev. Code Ann. § 1345.03(B)(1)); and

b.   Requiring Plaintiff and the Ohio Subclass to enter into a consumer transaction on

terms that Apple knew were substantially one-sided in favor of Apple (Ohio Rev. Code Ann. § 1345.03(B)(5)).

1123.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1124.   Apple intended to mislead Plaintiff and Ohio Subclass members and induce them to rely on its misrepresentations and omissions.

1125.   Apple acted intentionally, knowingly, and maliciously to violate Ohio's Consumer Sales Practices Act, and recklessly disregarded Plaintiff and Ohio Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1126.   Apple's unfair, deceptive, and unconscionable acts and practices complained of herein affected the public interest, including the millions of Ohioans who purchased and/or used Apple's Devices.

1127.   As a direct and proximate result of Apple's unfair, deceptive, and unconscionable acts and practices, Plaintiff and Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1128.   Plaintiff and the Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

## COUNT 59

### OHIO DECEPTIVE TRADE PRACTICES ACT

#### *Ohio Rev. Code §§ 4165.01, et seq.*

1129.   The Ohio Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Ohio Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1130.   Apple, Plaintiff, and Ohio Subclass members are a "person," as defined by Ohio Rev. Code § 4165.01(D).

1131.   Apple advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

1132.   Apple engaged in deceptive trade practices in the course of its business and vocation, in violation of Ohio Rev. Code § 4165.02, including:

    a.   Representing that its goods and services have characteristics, uses, benefits, or qualities that they do not have, in violation of Ohio Rev. Code § 4165.02(A)(7);

    b.   Representing that its goods and services are of a particular standard or quality when they are of another, in violation of Ohio Rev. Code § 4165.02(A)(9); and

    c.   Advertising its goods and services with intent not to sell them as advertise, in violation of Ohio Rev. Code § 4165.02(A)(11).

1133.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1134.   Apple intended to mislead Plaintiff and Ohio Subclass members and induce them to rely on its misrepresentations and omissions.

1135.   Apple acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Ohio Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1136.   As a direct and proximate result of Apple's deceptive trade practices, Plaintiff and Ohio Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1137.   Plaintiff and Ohio Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, attorneys' fees, and any other relief that is just and proper.

## CLAIMS ON BEHALF OF THE OKLAHOMA SUBCLASS

## COUNT 60

## OKLAHOMA CONSUMER PROTECTION ACT

### *Okla. Stat. Tit. 15, §§ 751, et seq.*

1138.   The Oklahoma Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Oklahoma Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1139.   Apple is a "person," as meant by Okla. Stat. tit. 15, § 752(1).

1140.   Apple's advertisements, offers of sales, sales, and distribution of goods, services, and other things of value constituted "consumer transactions" as meant by Okla. Stat. tit. 15, § 752(2).

1141.   Apple, in the course of its business, engaged in unlawful practices in violation of Okla. Stat. tit. 15, § 753, including the following:

    a.   Making false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits of the subjects of its consumer transactions, in violation of Okla. Stat. tit. 15, § 753(5);

    b.   Representing, knowingly or with reason to know, that the subjects of its consumer transactions were of a particular standard when they were of another, in violation of Okla. Stat. tit 15, § 753(7);

    c.   Advertising, knowingly or with reason to know, the subjects of its consumer transactions with intent not to sell as advertised, in violation of Okla. Stat. tit 15, § 753 (8);

    d.   Committing unfair trade practices that offend established public policy and was immoral, unethical, oppressive, unscrupulous, and substantially injurious to

consumers as defined by section 752(14), in violation of Okla. Stat. tit. 15,

§ 753(20); and

e.   Committing deceptive trade practices that deceived or could reasonably be expected

to deceive or mislead a person to the detriment of that person as defined by section

752(13), in violation of Okla. Stat. tit. 15, § 753(20).

1142.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1143.   Apple intended to mislead Plaintiff and Oklahoma Subclass members and induce them to rely on its misrepresentations and omissions.

1144.   Had Apple disclosed to Plaintiff and Oklahoma Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Oklahoma Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1145.   The above unlawful practices and acts by Apple were immoral, unethical, oppressive, unscrupulous, and substantially injurious. These acts caused substantial injury to Plaintiff and Oklahoma Subclass members.

1146.   Apple acted intentionally, knowingly, and maliciously to violate Oklahoma's Consumer Protection Act, and recklessly disregarded Plaintiff and Oklahoma Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1147.   As a direct and proximate result of Apple's unlawful practices, Plaintiff and Oklahoma Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1148.   Plaintiff and Oklahoma Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, civil penalties, and attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE OREGON SUBCLASS

### COUNT 61

### OREGON UNLAWFUL TRADE PRACTICES ACT

#### *Or. Rev. Stat. §§ 646.608, et seq.*

1149.   The Oregon Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Oregon Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1150.   Apple is a "person," as defined by Or. Rev. Stat. § 646.605(4).

1151.   Apple engaged in the sale of "goods and services," as defined by Or. Rev. Stat. § 646.605(6)(a).

1152.   Apple sold "goods or services," as defined by Or. Rev. Stat. § 646.605(6)(a).

1153.   Apple advertised, offered, or sold goods or services in Oregon and engaged in trade or commerce directly or indirectly affecting the people of Oregon.

1154.   Apple engaged in unlawful practices in the course of its business and occupation, in violation of Or. Rev. Stat. § 646.608, included the following:

a.   Representing that its goods and services have approval, characteristics, uses, benefits, and qualities that they do not have, in violation of Or. Rev. Stat. § 646.608(1)(e);

b.   Representing that its goods and services are of a particular standard or quality if they are of another, in violation of Or. Rev. Stat. § 646.608(1)(g);

c.   Advertising its goods or services with intent not to provide them as advertised, in violation of Or. Rev. Stat. § 646.608(1)(i); and

d.   Concurrent with tender or delivery of its goods and services, failing to disclose any known material defect, in violation of Or. Rev. Stat. § 646.608(1)(t).

1155.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1156.   Apple intended to mislead Plaintiff and Oregon Subclass members and induce them to rely on its misrepresentations and omissions.

1157.   Had Apple disclosed to Plaintiffs and Oregon Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Oregon Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1158.   Apple acted intentionally, knowingly, and maliciously to violate Oregon's Unlawful Trade Practices Act, and recklessly disregarded Plaintiff and Oregon Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1159.   As a direct and proximate result of Apple's unlawful practices, Plaintiff and Oregon Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1160. Plaintiff and Oregon Subclass members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages or statutory damages of $200 per violation (whichever is greater), punitive damages, and reasonable attorneys' fees and costs.

### CLAIMS ON BEHALF OF THE PENNSYLVANIA SUBCLASS

### COUNT 62

### PENNSYLVANIA UNFAIR TRADE PRACTICES AND

### CONSUMER PROTECTION LAW

### *73 Pa. Cons. Stat. §§ 201-2 & 201-3, et seq.*

1161. The Pennsylvania Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Pennsylvania Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1162. Apple is a "person," as meant by 73 Pa. Cons. Stat. § 201-2(2).

1163. Plaintiff and Pennsylvania Subclass members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

1164. Apple engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

    a. Representing that its goods and services have characteristics, uses, benefits, and qualities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

    b. Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

    c. Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

1165. Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1166.   Apple intended to mislead Plaintiff and Pennsylvania Subclass members and induce them to rely on its misrepresentations and omissions.

1167.   Had Apple disclosed to Plaintiffs and Pennsylvania Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Pennsylvania Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1168.   Apple acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff and Pennsylvania Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1169.   As a direct and proximate result of Apple's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and the Pennsylvania Subclass' reliance on them, Plaintiff and Pennsylvania Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1170.   Plaintiff and Pennsylvania Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## CLAIMS ON BEHALF OF THE RHODE ISLAND SUBCLASS

## COUNT 63

## RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT

### *R.I. Gen. Laws §§ 6-13.1, et seq.*

1171.   The Rhode Island Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Rhode Island Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1172.   Plaintiff and Rhode Island Subclass members are each a "person," as defined by R.I. Gen. Laws § 6-13.1-1(3).

1173.   Plaintiff and Rhode Island Subclass members purchased goods and services for personal, family, or household purposes.

1174.   Apple advertised, offered, or sold goods or services in Rhode Island and engaged in trade or commerce directly or indirectly affecting the people of Rhode Island, as defined by R.I. Gen. Laws § 6-13.1-1(5).

1175.   Apple engaged in unfair and deceptive acts and practices, in violation of R.I. Gen. Laws § 6-13.1-2, including:

    a.   Representing that its goods and services have characteristics, uses, and benefits that they do not have (R.I. Gen. Laws § 6-13.1-52(6)(v));

    b.   Representing that its goods and services are of a particular standard or quality when they are of another (R.I. Gen. Laws § 6-13.1-52(6)(vii));

    c.   Advertising goods or services with intent not to sell them as advertised (R.I. Gen. Laws § 6-13.1-52(6)(ix));

    d.   Engaging in any other conduct that similarly creates a likelihood of confusion or misunderstanding (R.I. Gen. Laws § 6-13.1-52(6)(xii));

    e.   Engaging in any act or practice that is unfair or deceptive to the consumer (R.I. Gen. Laws § 6-13.1-52(6)(xiii)); and

    f.   Using other methods, acts, and practices that mislead or deceive members of the

public in a material respect (R.I. Gen. Laws § 6-13.1-52(6)(xiv)).

1176.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1177.   Apple intended to mislead Plaintiff and Rhode Island Subclass members and induce them to rely on its misrepresentations and omissions.

1178.   Apple acted intentionally, knowingly, and maliciously to violate Rhode Island's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Rhode Island Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1179.   As a direct and proximate result of Apple's unfair and deceptive acts, Plaintiff and Rhode Island Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1180.   Plaintiff and Rhode Island Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $200 per Subclass Member (whichever is greater), punitive damages, injunctive relief, other equitable relief, and attorneys' fees and costs.

<u>**CLAIMS ON BEHALF OF THE SOUTH CAROLINA SUBCLASS**</u>

<u>**COUNT 64**</u>

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**

<u>*S.C. Code Ann. §§ 39-5-10, et seq.*</u>

1181.   The South Carolina Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the South Carolina Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1182.   Apple is a "person," as defined by S.C. Code Ann. § 39-5-10(a).

1183.   South Carolina's Unfair Trade Practices Act (SC UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20.

1184.   Apple advertised, offered, or sold goods or services in South Carolina and engaged in trade or commerce directly or indirectly affecting the people of South Carolina, as defined by S.C. Code Ann. § 39-5-10(b).

1185.   Apple's acts and practices had, and continue to have, the tendency or capacity to deceive.

1186.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1187.   Apple intended to mislead Plaintiff and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1188.   Had Apple disclosed to Plaintiffs and South Carolina Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the South Carolina Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1189.   Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose also arose from its:

    a.  Possession of exclusive knowledge regarding the Defect in its Devices;

    b.  Possession of exclusive knowledge regarding the operating software it used to throttle the Devices;

    c.  Active concealment or misrepresentations regarding the operating software it used to

throttle the Devices or the Defect in the Devices; and

d.   Incomplete representations about the Devices and operating software, while purposefully withholding material facts from Plaintiff and the South Carolina Subclass that contradicted these representations.

1190.   Apple's business acts and practices offend an established public policy, or are immoral, unethical, or oppressive.

1191.   Apple's unfair and deceptive acts or practices adversely affected the public interest because such acts or practices have the potential for repetition; Apple engages in such acts or practices as a general rule; and such acts or practices impact the public at large, including millions of South Carolina Subclass members that purchased and/or used an Apple Device.

1192.   Apple unfair and deceptive acts or practices have the potential for repetition because the same kinds of actions occurred in the past, as described herein, thus making it likely that these acts or practices will continue to occur if left undeterred. Additionally, Apple's policies and procedures create the potential for recurrence of the complained-of business acts and practices.

1193.   Apple's violations present a continuing risk to Plaintiff and South Carolina Subclass members as well as to the general public.

1194.   Apple intended to mislead Plaintiff and South Carolina Subclass members and induce them to rely on its misrepresentations and omissions.

1195.   Apple acted intentionally, knowingly, and maliciously to violate South Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff and South Carolina Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.  In light of this conduct, punitive damages would serve the interest of society in punishing and warning others not to engage in such conduct and would deter Apple and others from committing similar conduct in the future.

1196.   As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiff and South Carolina Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1197.   Plaintiff and South Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including damages for their economic losses, treble damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE SOUTH DAKOTA SUBCLASS**

**COUNT 65**

**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES**

**AND CONSUMER PROTECTION ACT**

*S.D. Codified Laws §§ 37-24-1, et seq.*

1198.   The South Dakota Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the South Dakota Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1199.   Apple is a "person," as defined by S.D. Codified Laws § 37-24-1(8).

1200.   Apple advertises and sells "merchandise," as defined by S.D. Codified Laws § 37-24-1(6), (7), & (13).

1201.   Apple advertised, offered, or sold goods or services in South Dakota and engaged in trade or commerce directly or indirectly affecting the people of South Dakota, as defined by S.D. Codified Laws § 37-24-1(6), (7), & (13).

1202.   Apple knowingly engaged in deceptive acts or practices, misrepresentation, concealment, suppression, or omission of material facts in connection with the sale and advertisement of goods or services, in violation of S.D. Codified Laws § 37-24-6, as described herein.

1203.   Apple intended to mislead Plaintiff and South Dakota Subclass members and induce them to rely on its misrepresentations and omissions.

1204.   Apple representations and omissions were material because they were likely to deceive reasonable consumers.

1205.   Had Apple disclosed to Plaintiff and South Dakota class members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the South Dakota Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1206.   Apple had a duty to disclose the above facts because members of the public, including Plaintiff and the South Dakota Subclass.  Apple's duty to disclose also arose from its:

    a.   Possession of exclusive knowledge regarding the Defect in Apple's Devices;

    b.   Possession of exclusive knowledge regarding operating software created to throttle Device performance;

    c.   Active concealment of the Defect in its Devices or regarding operating software to throttle performance of such Devices; and

    d.   Incomplete representations about the Devices and operating software, while purposefully withholding material facts from Plaintiff and the South Dakota Subclass that contradicted these representations.

1207.   As a direct and proximate result of Apple's deceptive acts or practices, misrepresentations, and concealment, suppression, and/or omission of material facts, Plaintiff and South Dakota Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including

from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1208.   Apple's violations present a continuing risk to Plaintiff and South Dakota Subclass members as well as to the general public.

1209.   Plaintiff and South Dakota Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE TENNESSEE SUBCLASS**

**COUNT 66**

**TENNESSEE CONSUMER PROTECTION ACT**

*Tenn. Code Ann. §§ 47-18-101, et seq.*

1210.   The Tennessee Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Tennessee Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1211.   Apple is a "person," as defined by Tenn. Code § 47-18-103(13).

1212.   Plaintiff and Tennessee Subclass members are "consumers," as meant by Tenn. Code § 47-18-103(2).

1213.   Apple advertised and sold "goods" or "services" in "consumer transaction[s]," as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).

1214.   Apple advertised, offered, or sold goods or services in Tennessee and engaged in trade or commerce directly or indirectly affecting the people of Tennessee, as defined by Tenn. Code §§ 47-18-103(7), (18) & (19).  And Apple's acts or practices affected the conduct of trade or commerce, under Tenn. Code § 47-18-104.

1215.   Apple intended to mislead Plaintiff and Tennessee Subclass members and induce them to rely on its misrepresentations and omissions.

1216.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1217.   Had Apple disclosed to Plaintiffs and Tennessee Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Tennessee Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1218.   Apple had a duty to disclose the above facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

   a.   Possession of exclusive knowledge regarding the Defect in the Devices;

   b.   Possession of exclusive knowledge regarding the operating software that throttles performance of the Devices;

   c.   Active concealment of the Defect in the Devices and operating software that throttles performance of those Devices; and

   d.   Incomplete representations about the Defect in the Devices and operating software that throttles performance of those Devices, while purposefully withholding material facts from Plaintiff and the Tennessee Subclass that contradicted these representations.

1219.   Apple's "unfair" acts and practices caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1220.   The injury to consumers was and is substantial because it was non-trivial and non-speculative and involved a monetary injury. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1221.   Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers as described herein, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1222.   Apple's business practices had no countervailing benefit to consumers or to competition.

1223.   By misrepresenting and omitting material facts, Apple violated the following provisions of Tenn. Code § 47-18-104(b):

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

    b.   Representing that goods or services are of a particular standard, quality or grade, if they are of another;

    c.   Advertising goods or services with intent not to sell them as advertised; and

    d.   Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve.

1224.   Apple acted intentionally, knowingly, and maliciously to violate Tennessee's Consumer Protection Act, and recklessly disregarded Plaintiff and Tennessee Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1225.   As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiff and Tennessee Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1226.   Apple's violations present a continuing risk to Plaintiff and Tennessee Subclass members as well as to the general public.

1227.   Plaintiff and Tennessee Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, treble damages for each willful or knowing violation, attorneys' fees and costs, and any other relief that is necessary and proper.

**CLAIMS ON BEHALF OF THE TEXAS SUBCLASS**

**COUNT 67**

**TEXAS DECEPTIVE TRADE PRACTICES — CONSUMER PROTECTION ACT**

*Texas Bus. & Com. Code §§ 17.41, et seq.*

1228.   The Texas Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Texas Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1229.   Apple is a "person," as defined by Tex. Bus. & Com. Code § 17.45(3).

1230.   Plaintiffs and the Texas Subclass members are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

1231.   Apple advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

1232.   Apple engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

    b.   Representing that goods or services are of a particular standard, quality or grade, if they are of another; and

    c.   Advertising goods or services with intent not to sell them as advertised.

1233.   Apple intended to mislead Plaintiff and Texas Subclass members and induce them to rely on its misrepresentations and omissions.

1234.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1235.   Had Apple disclosed to Plaintiff and Texas Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Texas Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1236.   Apple had a duty to disclose the above facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

   a.  Possession of exclusive knowledge regarding the Defect in its Devices;

   b.  Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

   c.  Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

   d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1237.   Apple engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3).  Apple engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

1238.   Consumers, including Plaintiffs and Texas Subclass members, lacked knowledge about the above business practices, omissions, and misrepresentations because this information was known exclusively by Apple.

1239.   Apple intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result.  The unfairness resulting from Apple's conduct is glaringly noticeable, flagrant, complete, and unmitigated.

1240.   Apple acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff and Texas Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1241.   As a direct and proximate result of Apple's unconscionable and deceptive acts or practices, Plaintiffs and Texas Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.  Apple's unconscionable and deceptive acts or practices were a producing cause of Plaintiffs' and Texas Subclass members' injuries, ascertainable losses, economic damages, and non-economic damages.

1242.   Apple's violations present a continuing risk to Plaintiffs and Texas Subclass members as well as to the general public.

1243.   Plaintiffs and the Texas Subclass seek all monetary and non-monetary relief allowed by law, including economic damages, damages for mental anguish, treble damages for each act committed intentionally or knowingly, court costs, reasonably and necessary attorneys' fees, injunctive relief, and any other relief which the court deems proper.

**CLAIMS ON BEHALF OF THE UTAH SUBCLASS**

**COUNT 68**

**UTAH CONSUMER SALES PRACTICES ACT**

*Utah Code §§ 13-11-1, et seq.*

1244.   The Utah Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Utah Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1245.   Apple is a "person," as defined by Utah Code § 13-11-1(5).

1246.   Apple is a "supplier," as defined by Utah Code § 13-11-1(6), because it regularly solicits, engages in, or enforces "consumer transactions," as defined by Utah Code § 13-11-1(2).

1247.   Apple engaged in deceptive and unconscionable acts and practices in connection with consumer transactions, in violation of Utah Code § 13-11-4 and Utah Code § 13-11-5, as described herein.

1248.   Apple intended to mislead Plaintiff and Utah Subclass members and induce them to rely on its misrepresentations and omissions.

1249.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1250.   Had Apple disclosed to Plaintiffs and class members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Utah Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1251.   Apple had a duty to disclose the above facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

a.  Possession of exclusive knowledge regarding the Defect in its Devices;

b.  Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

c.  Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1252.   Apple intentionally or knowingly engaged in deceptive acts or practices, violating Utah Code § 13-11-4(2) by:

a.  Indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not;

b.  Indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;

c.  Indicating that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;

d.  Indicating that the subject of a consumer transaction will be supplied in greater quantity (e.g. more data security) than the supplier intends.

1253.   Apple engaged in unconscionable acts and practices that were oppressive and led to unfair surprise, as shown in the setting, purpose, and effect of those acts and practices.

1254.   In addition, there was an overall imbalance in the obligations and rights imposed by the consumer transactions in question, based on the mores and industry standards of the time and place where they occurred.  There is a substantial imbalance between the obligations and rights of consumers, such as Plaintiff and the Utah Subclass, who purchase Devices based upon the publicly-available information in the marketplace, and Apple, which has exclusive knowledge of any defects in those Devices and software developed to address those defects.

1255.   Apple's acts and practices were also procedurally unconscionable because consumers, including Plaintiff and the Utah Subclass, had no practicable option but to purchase

Devices based upon publicly-available information, despite Apple's omissions and misrepresentations.  Apple exploited this imbalance in power, and the asymmetry of information, to profit by selling defective Devices, throttling them, and then encouraging consumers to spend more money on new devices when the throttling became unbearable.

1256.   As a direct and proximate result of Apple's unconscionable and deceptive acts or practices, Plaintiffs and Utah Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1257.   Apple's violations present a continuing risk to Plaintiffs and Utah Subclass members as well as to the general public.

1258.   Plaintiff and Utah Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages of $2,000 per violation, amounts necessary to avoid unjust enrichment, under Utah Code §§ 13-11-19, *et seq.*, injunctive relief, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE VERMONT SUBCLASS**

**COUNT 69**

**VERMONT CONSUMER FRAUD ACT**

*Vt. Stat. Ann. tit. 9, §§ 2451, et seq.*

1259.   The Vermont Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Vermont Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1260.   Plaintiff and Vermont Subclass members are "consumers," as defined by Vt. Stat. Ann. tit. 9, § 2451a(a).

1261.   Apple's conduct as alleged herein related to "goods" or "services" for personal, family, or household purposes, as defined by Vt. Stat. Ann. tit. 9, § 2451a(b).

1262.   Apple is a "seller," as defined by Vt. Stat. Ann. tit. 9, § 2451a(c).

1263.   Apple advertised, offered, or sold goods or services in Vermont and engaged in trade or commerce directly or indirectly affecting the people of Vermont.

1264.   Apple engaged in unfair and deceptive acts or practices, in violation of Vt. Stat. tit. 9, § 2453(a), as described herein.

1265.   Apple intended to mislead Plaintiff and Vermont Subclass members and induce them to rely on its misrepresentations and omissions.

1266.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1267.   Under the circumstances, consumers had a reasonable interpretation of Apple's representations and omissions.

1268.   Apple had a duty to disclose these facts due to the circumstances of this case. Apple's duty to disclose also from its:

    a.  Possession of exclusive knowledge regarding the Defect in its Devices;

    b.  Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

    c.  Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

    d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1269.   Apple's acts and practices caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1270.   The injury to consumers was and is substantial because it was non-trivial and non-speculative; and involved a concrete monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1271.   Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1272.   Apple's business practices had no countervailing benefit to consumers or to competition.

1273.   Apple is presumed, as a matter of law under Vt. Stat. Ann. tit. 9, § 2457, to have intentionally violated the Vermont Consumer Protection Act because it failed to sell goods or services in the manner and of the nature advertised or offered.

1274.   Apple acted intentionally, knowingly, and maliciously to violate Vermont's Consumer Fraud Act, and recklessly disregarded Plaintiff and Vermont Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1275.   As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiffs and Vermont Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1276.   Apple's violations present a continuing risk to Plaintiffs and Vermont Subclass members as well as to the general public.

1277.   Apple received notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 concerning its wrongful conduct as alleged herein by Plaintiff and Texas Subclass members. However, sending pre-suit notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 is an exercise in futility for Plaintiff, as Apple has already been informed of the allegedly unfair and unlawful conduct as described herein as of the date of the first-filed lawsuit in December 2017,

and has yet to offer class members remedy in accordance with similar consumer protection statutes.

1278.   Plaintiff and Vermont Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, actual damages, disgorgement of profits, treble damages, punitive/exemplary damages, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE VIRGIN ISLANDS SUBCLASS**

**COUNT 70**

**VIRGIN ISLANDS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

*V.I. Code tit. 12A, §§ 301, et seq.*

1279.   Plaintiffs, on behalf of the Virgin Islands Subclass, repeat and allege Paragraphs 1-472, as if fully alleged herein.

1280.   Apple is a "person," as defined by V.I. Code tit. 12A, § 303(h).

1281.   Plaintiff and Virgin Islands Subclass members are "consumers," as defined by V.I. Code tit. 12A, § 303(d).

1282.   Apple advertised, offered, or sold goods or services in the Virgin Islands and engaged in trade or commerce directly or indirectly affecting the people of the Virgin Islands.

1283.   Apple engaged in unfair and deceptive acts and practices, in violation of V.I. Code tit. 12A, § 304, as described herein.

1284.   Apple's acts and practices were "unfair" under V.I. Code tit. 12A, § 304 because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1285.   The injury to consumers from Apple's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1286.   Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1287.   Apple's inadequate data security had no countervailing benefit to consumers or to competition.

1288.   Apple's acts and practices were "deceptive" under V.I. Code tit. 12A, §§ 303 & 304 because Apple made representations or omissions of material facts that had the capacity, tendency or effect of deceiving or misleading consumers, including Plaintiff and Virgin Islands Subclass members.

1289.   Apple intended to mislead Plaintiff and Virgin Island Subclass members and induce them to rely on its misrepresentations and omissions.

1290.   Apple's representations and omissions were material because they were likely to unfairly influence or deceive reasonable consumers.

1291.   Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

    a.   Possession of exclusive knowledge regarding the Defect in its Devices;

    b.   Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

    c.   Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

    d.   Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1292.   Apple acted intentionally, knowingly, and maliciously to violate the Virgin Island's Consumer Fraud and Deceptive Business Practices Act, and recklessly disregarded Plaintiff and Virgin Islands Subclass members' rights.  Apple's knowledge of the Devices'

performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.  Apple intentionally hid this information, callously disregarding the rights of consumers.

1293.   As a direct and proximate result of Apple's unfair and deceptive acts or practices, Plaintiff and Virgin Islands Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1294.   Apple's violations present a continuing risk to Plaintiff and Virgin Islands Subclass members as well as to the general public.

1295.   Plaintiff and Virgin Islands Subclass members seek all monetary and non-monetary relief allowed by law, including compensatory, consequential, treble, punitive, and equitable damages under V.I. Code tit. 12A, § 331, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT 71

### VIRGIN ISLANDS CONSUMER PROTECTION LAW

*V.I. Code tit. 12A, §§101, et seq.*

1296.   Plaintiffs, on behalf of the Virgin Islands Subclass, repeat and allege Paragraphs 1-472, as if fully alleged herein.

1297.   Apple is a "merchant," as defined by V.I. Code tit. 12A, § 102(e).

1298.   Plaintiff and Virgin Islands Subclass members are "consumers," as defined by V.I. Code tit. 12A, § 102(d).

1299.   Apple sells and offers for sale "consumer goods" and "consumer services," as defined by V.I. Code tit. 12A, § 102(c).

1300.   Apple engaged in deceptive acts and practices, in violation of V.I. Code tit. 12A, § 101, as described herein.

1301.   Apple's acts and practices were "deceptive trade practices" under V.I. Code tit. 12A, § 102(a) because Apple:

a.   Represented that goods or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; or that goods or services are of particular standard, quality, grade, style or model, if they are of another;

b.   Used exaggeration, innuendo or ambiguity as to a material fact or failure to state a material fact if such use deceives or tends to deceive;

c.   Offered goods or services with intent not to sell them as offered; and

d.   Stated that a consumer transaction involves consumer rights, remedies or obligations that it does not involve.

1302.   Apple's acts and practices were also "deceptive" under V.I. Code tit. 12A, § 101 because Apple made representations or omissions of material facts that had the capacity, tendency or effect of deceiving or misleading consumers, including Plaintiff and Virgin Islands Subclass members.

1303.   Apple intended to mislead Plaintiff and Virgin Islands Subclass members and induce them to rely on its misrepresentations and omissions.

1304.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1305.   Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

a.   Possession of exclusive knowledge regarding the Defect in its Devices;

b.   Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

c.   Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

d.   Incomplete representations about its Devices, Device performance, battery life of

1    Devices, and the throttling software.

2    1306.   Apple acted intentionally, knowingly, and maliciously to violate the Virgin

3    Island's Consumer Protection Law, and recklessly disregarded Plaintiff and Virgin Island

4    Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release

5    of software to throttle phone performance, put it on notice that the Devices were not as it

6    advertised.

7    1307.   As a direct and proximate result of Apple's deceptive acts or practices, Plaintiff

8    and Virgin Islands Subclass members have suffered and will continue to suffer injury,

9    ascertainable losses of money or property, and monetary and non-monetary damages, including

10   from not receiving the benefit of their bargain in purchasing the Devices, and increased time

11   and expense in dealing with Device performance issues.

12   1308.   Apple's violations present a continuing risk to Plaintiff and Virgin Islands

13   Subclass members as well as to the general public.

14   1309.   Plaintiff and Virgin Islands Subclass members seek all monetary and non-

15   monetary relief allowed by law, including declaratory relief; injunctive relief, the greater of

16   actual damages or $500 per violation, compensatory, consequential, treble, and punitive

17   damages; disgorgement, and reasonable attorneys' fees and costs.

18   ### CLAIMS ON BEHALF OF THE VIRGINIA SUBCLASS

19   ### COUNT 72

20   ### VIRGINIA CONSUMER PROTECTION ACT

21   *Va. Code Ann. §§ 59.1-196, et seq.*

22   1310.   The Virginia Plaintiff(s) identified above ("Plaintiff," for purposes of this

23   Count), individually and on behalf of the Virginia Subclass, repeats and alleges Paragraphs 1-

24   472, as if fully alleged herein.

25   1311.   The Virginia Consumer Protection Act prohibits "[u]sing any . . . deception,

26   fraud, false pretense, false promise, or misrepresentation in connection with a consumer

27   transaction." Va. Code Ann. § 59.1-200(14).

28

1312.   Apple is a "person" as defined by Va. Code Ann. § 59.1-198.

1313.   Apple is a "supplier," as defined by Va. Code Ann. § 59.1-198.

1314.   Apple engaged in the complained-of conduct in connection with "consumer transactions" with regard to "goods" and "services," as defined by Va. Code Ann. § 59.1-198. Apple advertised, offered, or sold goods or services used primarily for personal, family or household purposes.

1315.   Apple engaged in deceptive acts and practices by using deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions, described herein.

1316.   Apple intended to mislead Plaintiff and Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

1317.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1318.   Had Apple disclosed to Plaintiff and Virginia Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Virginia Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1319.   Apple had a duty to disclose these facts due to the circumstances of this case. Apple's duty to disclose also arose from its:

   a.   Possession of exclusive knowledge regarding the Defect in its Devices;

   b.   Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

c.  Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1320.   The above-described deceptive acts and practices also violated the following provisions of VA Code § 59.1-200(A):

a.  Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

b.  Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; and

c.  Advertising goods or services with intent not to sell them as advertised, or with intent not to sell them upon the terms advertised.

1321.   Apple acted intentionally, knowingly, and maliciously to violate Virginia's Consumer Protection Act, and recklessly disregarded Plaintiff and Virginia Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.  An award of punitive damages would serve to punish Apple for its wrongdoing and warn or deter others from engaging in similar conduct.

1322.   As a direct and proximate result of Apple's deceptive acts or practices, Plaintiffs and Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1323.   Apple's violations present a continuing risk to Plaintiffs and Virginia Subclass members as well as to the general public.

1324.   Plaintiff and Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages; statutory damages in the amount of $1,000 per

violation if the conduct is found to be willful or, in the alternative, $500 per violation,

restitution, injunctive relief, punitive damages, and attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE WASHINGTON SUBCLASS**

**COUNT 73**

**WASHINGTON CONSUMER PROTECTION ACT**

*Wash. Rev. Code Ann. §§ 19.86.020, et seq.*

1325.   The Washington Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Washington Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1326.   Apple is a "person," as defined by Wash. Rev. Code Ann. § 19.86.010(1).

1327.   Apple advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code Ann. § 19.86.010 (2).

1328.   Apple engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code Ann. § 19.86.020, as described herein.

1329.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1330.   Apple acted intentionally, knowingly, and maliciously to violate Washington's Consumer Protection Act, and recklessly disregarded Plaintiff and Washington Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1331.   Apple's conduct is injurious to the public interest because it violates Wash. Rev. Code Ann. § 19.86.020, violates a statute that contains a specific legislation declaration of public interest impact, and/or injured persons and had and has the capacity to injure persons. Further, its conduct affected the public interest, including the at least hundreds of thousands of Washingtonians affected by Apple's deceptive business practices.

1332.   As a direct and proximate result of Apple's unfair methods of competition and unfair or deceptive acts or practices, Plaintiff and Washington Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1333.   Plaintiff and Washington Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

## CLAIMS ON BEHALF OF THE WEST VIRGINIA SUBCLASS

## COUNT 74

## WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT

### *W. Va. Code §§ 46A-6-101, et seq.*

1334.   The West Virginia Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the West Virginia Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1335.   Plaintiff and West Virginia Subclass members are "consumers," as defined by W. Va. Code § 46A-6-102(2).

1336.   Apple engaged in "consumer transactions," as defined by W. Va. Code § 46A-6-102(2).

1337.   Apple advertised, offered, or sold goods or services in West Virginia and engaged in trade or commerce directly or indirectly affecting the people of West Virginia, as defined by W. Va. Code § 46A-6-102(6).

1338.   Apple received notice pursuant to W. Va. Code § 46A-6-106(c) concerning its wrongful conduct as alleged herein by Plaintiff and West Virginia Subclass members. However, sending pre-suit notice pursuant to W. Va. Code § 46A-6-106(c) is an exercise in futility for Plaintiff, because, despite being on knowledge of the deceptive acts and practices

complained of herein in this lawsuit as of the date of the first-filed lawsuit in December 2017, Apple has not cured its unfair and deceptive acts and practices.

1339.   Apple engaged in unfair and deceptive business acts and practices in the conduct of trade or commerce, in violation of W. Va. Code § 46A-6-104, as described herein.

1340.   Apple's unfair and deceptive acts and practices also violated W. Va. Code § 46A-6-102(7), including:

a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

b.   Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another;

c.   Advertising goods or services with intent not to sell them as advertised;

d.   Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

e.   Using deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; and

f.   Advertising, displaying, publishing, distributing, or causing to be advertised, displayed, published, or distributed in any manner, statements and representations with regard to the sale of goods, which are false, misleading or deceptive or which omit to state material information which is necessary to make the statements therein not false, misleading or deceptive.

1341.   Apple's unfair and deceptive acts and practices were unreasonable when weighed against the need to develop or preserve business, and were injurious to the public interest, under W. Va. Code § 46A-6-101.

1342.   Apple's acts and practices were additionally "unfair" under W. Va. Code § 46A-6-104 because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

1343.   The injury to consumers from Apple's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury.  The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

1344.   Consumers could not have reasonably avoided injury because Apple's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making.  By withholding important information from consumers, Apple created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

1345.   Apple's business practices had no countervailing benefit to consumers or to competition.

1346.   Apple's acts and practices were additionally "deceptive" under W. Va. Code § 46A-6-104 because Apple made representations or omissions of material facts that misled or were likely to mislead reasonable consumers, including Plaintiff and West Virginia Subclass members.

1347.   Apple intended to mislead Plaintiff and West Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

1348.   Apple representations and omissions were material because they were likely to deceive reasonable consumers.

1349.   Had Apple disclosed to Plaintiff and West Virginia Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in

business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the West Virginia Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1350.   Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

    a.  Possession of exclusive knowledge regarding the Defect in its Devices;

    b.  Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

    c.  Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

    d.  Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1351.   Apple's omissions were legally presumed to be equivalent to active misrepresentations because Apple intentionally prevented Plaintiff and West Virginia Subclass members from discovering the truth regarding Apple's Device Defect and operating system throttling capabilities.

1352.   Apple acted intentionally, knowingly, and maliciously to violate West Virginia's Consumer Credit and Protection Act, and recklessly disregarded Plaintiff and West Virginia Subclass members' rights.  Apple's unfair and deceptive acts and practices were likely to cause serious harm, and Apple knew that its deceptive acts would cause harm based upon its business practices and exclusive knowledge of the omissions and misrepresentations herein.

1353.   As a direct and proximate result of Apple's  unfair and deceptive acts or practices and Plaintiff and West Virginia Subclass members' purchase of goods or services, Plaintiff and West Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including

from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1354.   Apple's violations present a continuing risk to Plaintiff and West Virginia Subclass members as well as to the general public.

1355.   Plaintiff and West Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $200 per violation under W. Va. Code § 46A-6-106(a), restitution, injunctive and other equitable relief, punitive damages, and reasonable attorneys' fees and costs.

**CLAIMS ON BEHALF OF THE WISCONSIN SUBCLASS**

**COUNT 75**

**WISCONSIN DECEPTIVE TRADE PRACTICES ACT**

*Wis. Stat. § 100.18, et seq.*

1356.   The Wisconsin Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Wisconsin Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1357.   Apple is a "person, firm, corporation or association," as defined by Wis. Stat. § 100.18(1).

1358.   Plaintiff and Wisconsin Subclass members are members of "the public," as defined by Wis. Stat. § 100.18(1).

1359.   With intent to sell, distribute, or increase consumption of merchandise, services, or anything else offered by Apple to members of the public for sale, use, or distribution, Apple made, published, circulated, placed before the public or caused (directly or indirectly) to be made, published, circulated, or placed before the public in Wisconsin advertisements, announcements, statements, and representations to the public which contained assertions, representations, or statements of fact which are untrue, deceptive, and/or misleading, in violation of Wis. Stat. § 100.18(1).

1360.   Apple also engaged in the above-described conduct as part of a plan or scheme, the purpose or effect of which was to sell, purchase, or use merchandise or services not as advertised, in violation of Wis. Stat. § 100.18(9).

1361.   Apple intended to mislead Plaintiff and Wisconsin Subclass members and induce them to rely on its misrepresentations and omissions.

1362.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1363.   Apple had a duty to disclose the above-described facts due to the circumstances of this case.  Apple's duty to disclose arose from its:

a.   Possession of exclusive knowledge regarding the Defect in its Devices;

b.   Possession of exclusive knowledge regarding the operating software it developed to throttle performance in its Devices as a result of the Defect;

c.   Active concealment of the Defect in its Devices and purpose of the throttling operating software; and

d.   Incomplete representations about its Devices, Device performance, battery life of Devices, and the throttling software.

1364.   Apple's failure to disclose the above-described facts is the same as actively representing that those facts do not exist.

1365.   Apple acted intentionally, knowingly, and maliciously to violate the Wisconsin Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Wisconsin Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1366.   As a direct and proximate result of Apple's deceptive acts or practices, Plaintiff and Wisconsin Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not

receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1367.   Apple had an ongoing duty to all Apple customers to refrain from deceptive acts, practices, plans, and schemes under Wis. Stat. § 100.18.

1368.   Plaintiff and Wisconsin Subclass members seek all monetary and non-monetary relief allowed by law, including damages, reasonable attorneys' fees, and costs under Wis. Stat. § 100.18(11)(b)(2), injunctive relief, and punitive damages.

## CLAIMS ON BEHALF OF THE WYOMING SUBCLASS

## COUNT 76

## WYOMING CONSUMER PROTECTION ACT

### *Wyo. Stat. Ann. §§ 40-12-101, et seq.*

1369.   The Wyoming Plaintiff(s) identified above ("Plaintiff," for purposes of this Count), individually and on behalf of the Wyoming Subclass, repeats and alleges Paragraphs 1-472, as if fully alleged herein.

1370.   Apple is a "person" as defined by Wyo. Stat. Ann. § 42-12-102(i).

1371.   Plaintiff and Wyoming Subclass members engaged in "consumer transactions" as defined by Wyo. Stat. Ann. § 40-12-102(ii).

1372.   Apple is engaged in an "uncured unlawful deceptive trade practice" in accordance with Wyo. Stat. Ann. § 40-12-105 in that it had actual notice of its deceptive acts and practices when the first-filed case in this multidistrict litigation was filed in December 2017; however, it has not offered to adjust or modified the consumer transactions at issue in this case, nor has it offered to rescind the consumer transactions.  Accordingly, although notice was sent to Apple pursuant to Wyo. Stat. Ann. § 40-12-109, notice is an exercise in futility for Plaintiff.

1373.   Apple advertised, offered, or sold goods or services in Wyoming, and engaged in trade or commerce directly or indirectly affecting the people of Wyoming.

1374.   Apple engaged in deceptive acts and practices in the conduct of trade or commerce, in violation of the Wyoming Consumer Protection Act, Wyo. Stat. Ann. §§ 40-12-101, *et seq*., including:

    a.   Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;

    b.   Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

    c.   Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

1375.   Apple's representations and omissions were material because they were likely to deceive reasonable consumers.

1376.   Apple intended to mislead Plaintiff and Wyoming Subclass members and induce them to rely on its misrepresentations and omissions.

1377.   Had Apple disclosed to Plaintiff and Wyoming Subclass members that it misrepresented the Devices and operating software, omitted material information regarding the Defect, omitted material information regarding the operating software, and was otherwise engaged in deceptive, common business practices, Apple would have been unable to continue in business and it would have been forced to disclose the uniform Defect in its Devices.  Instead, Apple represented that its Devices were continually improving in speed and battery life and performed better than other devices on the market.  Plaintiff and the Wyoming Subclass members acted reasonably in relying on Apple's misrepresentations and omissions, the truth of which they could not have discovered.

1378.   Apple acted intentionally, knowingly, and maliciously to violate the Wyoming Consumer Protection Act, and recklessly disregarded Plaintiff and Wyoming Subclass members' rights.  Apple's knowledge of the Devices' performance issues, and release of software to throttle phone performance, put it on notice that the Devices were not as it advertised.

1379.   As a direct and proximate result of Apple's deceptive acts and practices, Plaintiff and Wyoming Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Devices, and increased time and expense in dealing with Device performance issues.

1380.   Apple's deceptive acts and practices caused substantial injury to Plaintiff and Wyoming Subclass members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

1381.   Plaintiff and the Wyoming Subclass seek all monetary and non-monetary relief allowed by law, actual damages, injunctive relief, attorneys' fees, costs, and any other relief that is just and proper.

### PRAYER FOR RELIEF

1382.   WHEREFORE, Plaintiffs, individually and on behalf of all other class members, respectfully request that the Court enter an Order:

a.   Declaring that this action is a proper class action, certifying the Classes and/or Subclasses as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.   Enjoining Apple from continuing the unfair business practices alleged in this Complaint;

c.   Ordering Apple to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other class members, as allowable by law;

d.   Ordering Apple to pay both pre- and post-judgment interest on any amounts awarded;

e.   Ordering Apple to pay attorneys' fees and costs of suit; and

f.   Ordering such other and further relief as may be just and proper.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

DATED:  November 30, 2018

_s/ Laurence D. King_
Laurence D. King

Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Mario M. Choi (SBN 243409)
**KAPLAN FOX & KILSHEIMER LLP**
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone:  415-772-4700
Facsimile:  415-772-4707
lking@kaplanfox.com
mgeorge@kaplanfox.com
mchoi@kaplanfox.com

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (*pro hac vice*)
Donald R. Hall (*pro hac vice*)
David A. Straite (*pro hac vice*)
Aaron L. Schwartz (*pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
ffox@kaplanfox.com
dhall@kaplanfox.com
dstraite@kaplanfox.com
aschwartz@kaplanfox.com

DATED:  November 30, 2018

_s/ Joseph W. Cotchett_
Joseph W. Cotchett

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Stephanie D. Biehl (306777)
Brian Danitz (247403)
Gina Stassi (261263)
**COTCHETT, PITRE & MCCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
Facsimile: 650-697-05777
jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com
sbiehl@cpmlegal.com
bdanitz@cpmlegal.com
gstassi@cpmlegal.com

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Laurence D. King, attest that concurrence in the filing of this document has been obtained from the other signatory.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30th day of November 2018, at San Francisco, California.


/s/ *Laurence D. King*
Laurence D. King