Clerk of the Court
May 2, 2020
Page 1 of 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EDWARD W. ORR**
**DARLENE D. ORR**
122 Ridge Road
Terryville, CT 06786

# Sent via Certified Mail:[1]
## 7015 3010 0000 4384 3212

FILED

MAY 11 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

May 2, 2020

Clerk of the Court
United States District Court for the
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

**SUBJECT:**   *IN RE APPLE INC. DEVICE PERFORMANCE LITIGATION*, CASE NO. 18- MD-2827-EJD

## OBJECTION TO CONFLICT OF INTEREST OF COTCHETT PITRE & MCCARTHY, LLP; REQUEST FOR DISQUALIFICATION OF PLAINTIFFS' COUNSEL

---

[1] Please note that, per communications from the Court to Orr (including, but not limited to, an email to Orr from the Court, via Ms. Kathleen Shambaugh [Chief Deputy of Operations]), Orr was specifically instructed to mail his Objection to the San Francisco address above, rather than to the San Jose address below.

Clerk of the Court
United States District Court for the
Northern District of California
San Jose Division
280 South 1st Street
San Jose, CA 95113

The undersigned intend to appear at the Final Fairness Hearing, and respectfully request permission from the Court to speak.

Page 1 of 55

Clerk of the Court
May 2, 2020
Page 2 of 55

(THE       OBJECTORS'       CONTACT
INFORMATION IS AS FOLLOWS:  Edward W.
Orr   and   Darlene D.  Orr;  122  Ridge  Road;
Terryville, CT 06786 [Telephone: 203-658-4977]
[Email eanddorr2@gmail.com])

**Signatures of the Objectors are shown at the
conclusion of this cover letter, in which reasons
for objection are delineated.**

**Please note that proof of class membership is
shown in the attached Exhibit "R."**

Dear Sir or Madam:

1.  Cotchett, Pitre & McCarthy, LLP have two major conflicts of interest, any
    one of which constitutes more than sufficient grounds for disqualification.[2]

2.  In the first place, it is not fair for Cotchett, Pitre & McCarthy, LLP to
    represent Apple in another case, when it is fighting Apple in the instant case.

3.  As shown in Exhibits "A," "B," "C," "D," "E,", "F," "G," "H," "I," and "S,
    "W," and "X" below, the Plaintiffs' attorneys – Cotchett, Pitre & McCarthy,
    LLP – not only have a very major conflict of interest, <u>as the firm has
    apparently actually represented (and still represents)</u>[3] Apple (in IN RE:

---

[2] Under this Court's rules and/or under California Rules for Professional Conduct (please see attached
Exhibit "T"); ABA Model Rules for Professional Conduct (Rule 1.16 "Declining or Terminating
Representation") (please see Exhibit "U");  three additional ABA Model Rules for Professional
Conduct (Rule 1.17 "Conflict of interest: Current Clients"), Rule 1.7: "Conflict of Interest: Current
Clients – Comment", Rule 1.8: "Current Clients: Specific Rules" (please see Exhibit "V"), et al.

[3] Please note, also, that as shown in one or more exhibits, it is also quite significant that often the
"Direct" and "Indirect" purchaser case details in the <u>Lithium</u> case were often interwoven together, and

Clerk of the Court
May 2, 2020
Page 3 of 55

LITHIUM ION BATTERIES ANTITRUST LITIGATION: Case No. 4:13-md-02420-YGR (MDL) (Northern District California)), but the firm has apparently also had numerous occasions of unfair and unwarranted access to numerous confidential files relating to Apple's battery business (and other aspects of Apple's business), even going so far as to have access to aspects of joint discovery (regarding both direct and indirect purchasers) about Apple's batteries, systems, and/or related – all of which is not only unfair, but which may possibly help account for the firm's highly unusual and extremely cavalier attitude[4] in this case – an attitude which has even gone so far as to garner formal sanctions[5] from the Honorable Judge Edward Davila.

---

on purpose, by the court and/or by the parties, etc.  Numerous exhibits illustrate Cotchett, Pitre & McCarthy, LLP's integral involvement in representing Apple.

[4] An attitude which is unfair to both Plaintiffs and to Apple.

[5] Excerpts from the Court's Order (ECF-350) follow:

> The Court expressed its disappointment with the parties, and with Mr. Cotchett and Mr. Molumphy in particular, at the hearing held on May 30, 2019. This order follows.

> Apple moves the Court to disqualify Mr. Cotchett and Mr. Molumphy as Co-Lead Counsel for Plaintiffs and to prohibit them from accessing material produced and designated by Apple as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under the stipulated protective order ("Protected Material"). See Dkt. No. 224 (the "Protective Order"). At oral argument, Apple requested that, in the alternative, the Court at least fashion a strong sanction to "send[] a message." See May 30, 2019 Hr'g. Tr. at 18:1-5. The allegations underlying Plaintiffs' claims, which are not pertinent to this motion, are recounted in the Court's previous orders on Apple's motions to dismiss. See Dkt. Nos. 219, 315.

> A court may disqualify counsel when that court finds "(1) a clear violation of the professional rules of conduct, (2) which affects the public view of the judicial system or the integrity of the court, and (3) which is serious enough to outweigh the parties' interests in counsel of their choice." Hernandez v. Best Buy Stores, L.P., 2015 WL 7176352, at *3 (S.D. Cal. Nov. 13, 2015) (citations omitted). Sanctions under Federal Rule of Civil Procedure 37 are appropriate "where a party has violated a discovery order, including a protective order." Life Techs. Corp. v. Biosearch Techs., Inc., 2012 WL 1600393, at *8 (N.D. Cal. May 7, 2012). "A court need not find bad faith before imposing sanctions for violations of Rule 37." Oracle

Clerk of the Court
May 2, 2020
Page 4 of 55

*USA, Inc. v. SAP AG*, 264 F.R.D. 541, 545 (N.D. Cal. 2009). "On motion or on its own, the court may issue any just orders, including those authorized by Rule 37, if a party or its attorney: . . . fails to obey a . . . pretrial order." Fed. R. Civ. P. 16(f)(1). A court may also "may issue sanctions under its inherent power, but only upon a showing of bad faith." *Life Techs.*, 2012 WL 1600393, at *9....

... The Court now turns to Mr. Cotchett and Mr. Molumphy. Unlike Mr. Cotchett, Mr. Molumphy did not directly quote from Protected Material, but rather related information derived from Protected Material in an effort to describe how the Second Amended Complaint differed from the previous complaint. *See* May 30, 2019 Hr'g. Tr. at 33:17-23, 34:9-25. While the Court finds that his actions violated the Protective Order, the Court will give Mr. Molumphy the benefit of the doubt that his violation was not willful but arose out of a "difference in understanding as to § 14.7." *Id.* at 33:1-2. The facts relating to Mr. Cotchett are different though. Mr. Cotchett signed the administrative motion to file the Confidential Documents under seal, indicating that he knew they were Protected Material. Dkt. No. 279. At the March 7, 2019 hearing, he quoted directly from them. And at the May 30, 2019 hearing—after the conferences between the parties on this matter and full briefing on the instant Motion for Sanctions—he again began to read aloud from Protected Material. Mr. Cotchett's actions, if not willful, display a fundamental lack of understanding of the Protective Order.

However, the Court finds that disqualifying Mr. Cotchett and Mr. Molumphy or prohibiting them from accessing Protected Material would be too severe a sanction at this time. Instead, the Court orders as follows: Plaintiffs shall not submit any billing requests for any work related to this issue including but not limited to reviewing Apple's motion and reply, preparing Plaintiffs' opposition, or preparing or attending the May 30, 2019 hearing. Should this litigation result in an award of attorneys' fees to Plaintiffs, the Court will deduct from that award all of Apple's costs and fees related to this issue, including but not limited to preparing its motion and reply, reviewing Plaintiffs' opposition, and preparing for and attending the May 30, hearing. Going forward in this litigation, Mr. Cotchett will not argue motions before this Court without the Court's prior permission. He shall file such requests for permission before the hearing. The Court admonishes Mr. Molumphy to abide by the Protective Order and the Court's interpretation of § 14.7 during all future appearances before the Court. Further disclosure of Protected Material by any party or attorney will be grounds for greater sanctions.

**IT IS SO ORDERED.**

Dated: June 14, 2019

_____
EDWARD J. DAVILA
United States District Judge

Clerk of the Court
May 2, 2020
Page 5 of 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT "A":**

ECF-257:[6] (in <u>IN RE: LITHIUM ION BATTERIES ANTITRUST</u>
<u>LITIGATION</u>) (HEREAFTER REFERENCED AS "<u>LITHIUM</u>")

As a matter of background here, please note that Cotchett, Pitre &
McCarthy, LLP apparently represented (and still represents) Apple in
the aforementioned case, with such representation being against
numerous defendants, one of which is Samsung SDI America, Inc., as
shown in the excerpt (page 19 of 73) below:

> For example, Defendant Samsung SDI America, Inc.
> stationed sales and marketing personnel in Los
> Angeles, Chicago, Austin, and Houston to be
> responsible for Dell [as a Plaintiff], **APPLE [AS
> A PLAINTIFF]**, Lab126 [as a Plaintiff],
> Garmin [as a Plaintiff], Palm [as a Plaintiff], Black &
> Decker [as a Plaintiff], Hewlett-Packard ("HP") [as a
> Plaintiff], Motorola [as a Plaintiff], and other
> accounts [as Plaintiffs].

> <u>Those United States-based personnel reported to Y.A.</u>
> <u>Oh, who served simultaneously as the President of</u>
> <u>Samsung SDI America, Inc.</u> and as the Vice President
> for North America of Samsung SDI Co., Ltd. Sanyo

---

[6] This document was formally designated as "Direct Purchaser Plaintiffs' Consolidated Amended Complaint…," and, as mentioned previously, please note the following:

> As shown in one or more exhibits, it is also quite significant that often the "Direct" and "Indirect" purchaser case details in the <u>Lithium</u> case <u>were often</u> <u>interwoven together, and on purpose, by the court and/or by the parties, etc.</u>

similarly stationed sales and engineering personnel in Texas to support the HP and Dell accounts, and in Chicago to support the Motorola and Black & Decker accounts.

Sony also responded to its United States customers' demands for lower prices by dispatching business and engineering personnel to its offices in the United States.

65. The activities of Defendants in connection with the production, sale, and/or importation of Lithium Ion Batteries and Lithium Ion Battery Products, and the conduct of Defendants and their co-conspirators as alleged in this Complaint:

   (a)   constituted   United   States   domestic interstate trade or commerce;

   (b) constituted United States import trade or import commerce; and/or

   (c) were within the flow of and had a direct, substantial, and reasonably foreseeable effect on United States domestic trade or commerce and/or   United   States   import   trade   or commerce.

Given the marketing, importation, and sales by Defendants of Lithium Ion Batteries and Lithium Ion Battery Products in the United States, **and the volume of affected commerce**, as alleged in this Complaint, such effects were direct and substantial.

[Underlining; emphasis; capitalization of the word "Apple"; and internal paragraph division supplied.]

On page 44 of 73 of this same document, Apple is again very prominently mentioned, as will be shown in just a moment, in an example mentioning additional defendants working against Apple – keeping in mind that Cotchett, Pitre & McCarthy, LLP was (and still is) working for Apple and was (and still is) representing Apple (!):

IN FACT, IN AN UPCOMING EXHIBIT (EXHIBIT "B"), WHICH IS COTCHETT, PITRE & MCCARTHY, LLP'S VERY OWN "FIRM RESUME," THE FIRM ITSELF PROUDLY STATES, ON PAGE 2 THEREOF:

"*In re Lithium Batteries Antitrust Litigation* USDC, Northern District of California:

The Court appointed CPM as Co-Lead Counsel on behalf of direct purchasers **[SUCH AS APPLE, AS SHOWN PREVIOUSLY]** of lithium-ion rechargeable batteries that defendants allegedly conspired to fix the price.

[Underlining supplied]

Shown below, as proof positive of the fact that Apple itself was being represented by Cotchett, Pitre & McCarthy, LLP, is a direct statement

thereof, from page 44 of 73 in Exhibit "A" (this document was formally designated as "Direct Purchaser Plaintiffs' Consolidated Amended Complaint..."):

> Defendants' collusive conduct continued into 2010 when **<u>Apple</u>** attempted to purchase a specific type of Lithium Ion Battery for use in its popular iPad. Initially, LG and Samsung both contemplated selling Lithium Ion Batteries to Apple in the low $0.40 range. Rather than compete with each other, Young Sun Kim of LG Chem, Ltd. directed "Donny" Lee of LG Chem America, Inc. to speak to his counterpart at Samsung (who was also in the United States at the time).

[Emphasis and underlining supplied]

**<u>EXHIBIT "B":</u>**

AS MENTIONED ABOVE, THIS IS COTCHETT, PITRE & MCCARTHY, LLP'S VERY OWN "FIRM RESUME," WHERE THE FIRM ITSELF PROUDLY STATES, ON PAGE 2 THEREOF:

> *"In re Lithium Batteries Antitrust Litigation*
> **USDC, Northern District of California:**

Clerk of the Court
May 2, 2020
Page 9 of 55

The Court appointed CPM as Co-Lead Counsel <u>on behalf of</u> <u>direct purchasers</u> **[SUCH AS APPLE, AS SHOWN** **PREVIOUSLY]** <u>of lithium-ion rechargeable batteries</u> that defendants allegedly conspired to fix the price.

[Underlining supplied]

**EXHIBIT "C":**

This is ECF-475, from *In re Lithium Batteries Antitrust Litigation;* **"ORDER ON JOINT DISCOVERY LETTER...," IN WHICH IT IS CLEARLY STATED, ON PAGE 1 OF 4, "...THE PARTIES SUBMITTED A JOINT DISCOVERY LETTER BRIEF...."**

This means that Cotchett, Pitre & McCarthy, LLP was (and still is, by virtue of the fact that the case is still ongoing) involved with representing Apple.

Such representation is obviously unacceptable in light of Cotchett, Pitre & McCarthy, LLP's role in bringing suit against Apple in *IN RE APPLE INC. DEVICE PERFORMANCE LITIGATION*, CASE NO. 18- MD-2827-EJD.

Given Cotchett, Pitre & McCarthy, LLP's <u>dual roles in representing Apple</u> in the *Lithium* case, and <u>fighting against Apple</u> in *IN RE APPLE INC. DEVICE*

1

2    *PERFORMANCE LITIGATION*, CASE NO. 18- MD-2827-EJD, the firm

3    should be disqualified from <u>both</u> cases.

4

5    **EXHIBIT "D":**

6

7    This exhibit contains the first three pages of the 78-page ECF-512, from ***In re***

8    ***Lithium Batteries Antitrust Litigation:*** **"OMNIBUS ORDER RE:**

9

10   **MOTIONS TO DISMISS THE SECOND <u>CONSOLIDATED</u>**

11   **AMENDED COMPLAINTS OF <u>DIRECT AND INDIRECT</u>**

12   **PURCHASER PLAINTIFFS."**

13

14   This shows quite well many aspects of the interconnected nature of the

15   "Direct and Indirect" purchasers.

16

17   Accordingly, regardless of how Cotchett, Pitre & McCarthy, LLP might wish

18   to depict its involvement, it was very much involved with Apple –

19   representing Apple as a plaintiff – <u>AND WHETHER OR NOT APPLE WAS</u>

20   <u>A "NAMED" PLAINTIFF PER SE OR NOT IS COMPLETELY</u>

21   <u>IMMATERIAL, GIVEN THE FOLLOWING TWO CONCOMITANT</u>

22   <u>FACTORS:</u>

23

24

25

26

27

28

Clerk of the Court
May 2, 2020
Page 11 of 55

1. <u>THE VERY EXTENSIVE INVOLVEMENT OF APPLE AND THE LARGE AMOUNT OF MONEY AT STAKE; AND</u>[7]

---

[7] The principle of lawyer-client confidentiality applies to information a lawyer acquires by virtue of the representation, <u>whatever its source, and encompasses matters communicated in confidence by the client, and therefore protected by the lawyer-client privilege, matters protected by the work product doctrine, and matters protected under ethical standards of confidentiality, all as established in law, rule and policy.</u> (See *In the Matter of Johnson* (Rev. Dept. 2000) 4 Cal. State Bar Ct. Rptr. 179; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 621 [120 Cal.Rptr. 253].) The lawyer-client privilege and work-product doctrine apply in judicial and other proceedings in which a lawyer may be called as a witness or be otherwise compelled to produce evidence concerning a client. A lawyer's ethical duty of confidentiality is not so limited in its scope of protection for the lawyer-client relationship of trust and prevents a lawyer from revealing the client's information even when not subjected to such compulsion. Thus, a lawyer may not reveal such information except with the informed consent of the client or as authorized or required by the State Bar Act, these rules, or other law.

In *Walker v. Apple, Inc.*, 2016 WL 5404080 (Cal. App. Unpub. Sept. 28, 2016), Walker is a former non-exempt employee of the Carlsbad Apple store. Represented by Law Firm, she brings this class action against Apple for failure to furnish final wage statements in violation of California labor laws. Meg Karn, a manager at the Carlsbad store will be a likely witness in this case regarding Apple's compliance with those laws. <u>The problem is that Karn is an unnamed member of the class in another case ("Other Case") brought by Law Firm nine months before this case.</u> The Other Case is a wage-and-hour class action dealing with meal and rest period violations. For a time, Karn was a non-exempt employee making her a member of the class in the Other Case.

<u>Apple moved to disqualify Law Firm in this case.</u>

<u>The trial judge granted the motion.</u>

<u>In this opinion the appellate court affirmed.</u>

**<u>The court based its holding on the fact that Law Firm knew of Karn's role as a manager and probable witness in this case. *She did not have the usual anonymity attributed to unnamed class members and should be deemed a client of Law Firm*</u>**.

Thus, the likelihood that Law Firm would have to cross examine Karn in this case created the conflict.

Sometimes the question of whether a class lawyer may undertake a representation adverse to a class member who has not individually retained the lawyer can be a difficult issue. <u>If such a class member is treated as a client for the purpose of applying the conflict of interest rules, it follows that, absent informed consent (when permissible), the lawyer may ordinarily not act adversely to the class member while the class action is pending, and after it ends may act adversely to the class member only in a matter that is not substantially related.</u> DR 5-105, 5-108; see *Fuchs v. Schick*, No. 01 Civ. 10224, 2002 U.S. Dist. Lexis 6212 (S.D.N.Y. Apr. 10, 2002) (treating as a former client a class member who participated actively in the class action).

Clerk of the Court
May 2, 2020
Page 12 of 55

<u>Use of information relating to the representation to the disadvantage of the client violates the lawyer's duty of loyalty. This applies when the information is used to benefit either the lawyer or a third person, such as another client or business associate of the lawyer.</u> For example, if a lawyer learns that a client intends to purchase and develop several parcels of land, the lawyer may not use that information to purchase one of the parcels in competition with the client or to recommend that another client make such a purchase. The Rule does not prohibit uses that do not disadvantage the client. For example, a lawyer who learns a government agency's interpretation of trade legislation during the representation of one client may properly use that information to benefit other clients. Paragraph (b) <u>prohibits disadvantageous use of client information</u> unless the client gives informed consent, except as permitted or required by ABA Rules. See Rules 1.2(d), 1.6, 1.9(c), 3.3, 4.1(b), 8.1 and 8.3.

A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

The classic conflict of interest arises "when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283, fn. 2 ("*Flatt*") (quoting ABA Canon of Professional Ethics (1908), Canon 6; see also ABA Model Rules Prof. Conduct, rule 1.738 & 1.9; ABA Model Code Prof. Responsibility, DR 5-101).)

In addition, please note that a defendant creates the conflict of interest between a plaintiff's former attorney and future claimants arising out of the same transaction by hiring the former plaintiff's attorney to advise the defendant on the suit's subject matter after the attorney has finished representing the plaintiffs. *See* Yvette Golan, *Restrictive Settlement Agreements: A Critique of Model Rule 5.6(b)*, 33 Sw. U. L. Rev. 1, 9 (2003).

Conflict-of-interest rules do not purport to regulate circumstances that are common to *all* lawyers, but only circumstances that are unique to *specific* lawyers. In other words, conflict of- interest doctrine in law does not address the largely unavoidable conflicts, but only those that can be avoided or removed, by permitting (or requiring) clients to seek out other lawyers, that is, lawyers who are not burdened with a particular conflict of interest. <u>As a result, returning to the class action context, class counsel who has a unique conflict (for example, a lawyer who had a prior relationship with the defendant) is governed by conflict-of-interest doctrine,</u> but lawyers with unavoidable conflicts (for example, conflicts arising from potentially enormous fees or simultaneous negotiation of a class settlement and class counsel's attorneys fees) are not.

**The New Conflict of Interest Rule — It Touches Each New Client; Each New Matter**

According to Edward McIntyre (in "The New Conflict of Interest Rule — It Touches Each New Client; Each New Matter," at https://www.sdcba.org/index.cfm?pg=FTR-Nov-2018-1):

On November 1, 2018, <u>new and revised Rules of Professional Conduct</u> become effective for all California lawyers. One, rule 1.7 — that each of us will have to address, perhaps every day — is a complete revision of the current conflict of interest rule, rule 3-310.

Clerk of the Court
May 2, 2020
Page 13 of 55

Rule 1.7(a) prohibits the representation of a client if the representation is directly adverse to another client in the same or a separate matter—without the informed written consent of each client. So far, not a dramatic change.

Such direct adversity, however, <u>includes not only acting as an advocate in one matter against a person the lawyer represents in some other matter, even when they are unrelated, but direct adversity can also arise, for example, when a lawyer cross-examines a non-party witness who is the lawyer's client in another matter, if the examination is likely to harm or embarrass the witness.</u> Similarly, direct adversity can arise in business transactions when a lawyer represents two or more partners in a partnership whose interests turn from amiable to conflicted.

Rule 1.7(b) *prohibits the representation of a client* — again without that client's informed written consent—if the lawyer's representation will be

"*materially limited* by the lawyer's responsibilities to or relationships with"

    (1)  <u>another client;</u>

    (2)  <u>a former client;</u>

    (3)  <u>a third person</u>; or

    (4)  <u>by the lawyer's own interests.</u>

<u>This is wholly new; broad in scope; and will require a searching examination of a significant matrix of relationships and the exercise of substantial judgment for each new client and each new matter.</u>

Paragraphs (a) and (b) apply to <u>every type of representation, including the concurrent representation of multiple parties in litigation, or in a single transaction, or in some other common enterprise or legal relationship.</u> For example, the formation of a partnership for several partners; or a corporation for several shareholders; or the preparation of a pre-nuptial agreement or joint or reciprocal wills for a husband and wife.

Thus, under rule 1.7 (b), even if there is no direct adversity—which is addressed by rule 1.7(a)—<u>informed written consent is required if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be *materially limited* as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal.</u>

By way of example, a lawyer's obligations to two or more clients seeking to form a joint venture may materially limit the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to the other client(s). <u>Thus the critical questions are: what is the likelihood that a difference in interests exists or will arise and, if it does, whether it will foreclose courses of action that the lawyer should reasonably pursue or recommend on behalf of each client.</u>

Clerk of the Court
May 2, 2020
Page 14 of 55

2. THE FACT THAT COTCHETT, PITRE &
MCCARTHY, LLP MOST DEFINITELY ALSO
HAD NUMEROUS OCCASIONS OF UNFAIR AND
UNWARRANTED ACCESS TO NUMEROUS
CONFIDENTIAL FILES AND/OR INFORMATION
SOURCES RELATING TO APPLE'S BATTERY

These are but a couple of examples. Quite obviously, the risk that a lawyer's representation may be materially limited may also arise from present or past relationships between the lawyer, or another member of the lawyer's firm, with a party, a witness, or another person who may be substantially affected by the resolution of the matter.

Even if no significant risk of a material limitation in the representation arises under rule 1.7 (b), rule 1.7(c) requires written disclosure—but not the client's informed written consent—where the lawyer has or knows that another lawyer in the firm has a (1) legal; (2) business; (3) financial; (4) professional; or (5) personal relationship with or responsibility to a party or witness in the same matter—before the lawyer can represent the client. This is similar to the disclosure requirements of current rule 3-310 (B)

Finally, even if the lawyer complies with rule 1.7(a)-(c), rule 1.7(d) prohibits the representation unless the lawyer reasonably believes (1) that she or he will be able to provide competent and diligent representation; (2) the representation is not prohibited by law; and (3) the representation does not involve the assertion of a claim by one client against another represented by the lawyer in the same litigation or other proceeding before a tribunal. This provision is also new and expressly incorporates the competence rule (rule 1.1) and the diligence rule (rule 1.3) into the conflict of interest rule, as well as the dictates about unwaivable conflicts in *Flatt v. Superior Court* (1994) 5 Cal 4th 275.

Not only does a conflict of interest analysis attend each new matter and each new client, but we have to bear in mind that the Rules of Professional Conduct are not solely focused on lawyer discipline. They also have a substantial role in defining "duty" for purposes of a lawyer's claimed breach of fiduciary duty. *Mirabito v. Liccardo* (1992) 4 Cal.App.4th 41, 45-47.

While avoiding conflicts of interest has always been of critical importance, the need for adequate investigation, disclosures and consent prior to a representation—and throughout—has only been heightened under the new and revised rules. [Underlining and emphasis supplied]

Page 14 of 55

Clerk of the Court
May 2, 2020
Page 15 of 55

1
2
3    BUSINESS   (AND/OR   OTHER   ASPECTS   OF
4    APPLE'S BUSINESS), even going so far as to have access
5    to aspects of joint discovery (regarding both direct and indirect
6    purchasers) about Apple's batteries, systems, and/or related – all
7    of which is not only unfair, but which may possibly help
8    account for the firm's highly unusual and extremely cavalier
9    attitude in this case – an attitude which has even gone so far as
10   to garner formal sanctions from the Honorable Judge Edward
11   Davila:[8]
12
13
14   **EXHIBIT "E":**
15
16   This exhibit is more evidence of the above.
17
18   It comes from the aforementioned Lithium case, and is entitled as follows on
19   the court record:
20
21
22   STIPULATION WITH PROPOSED ORDER Regarding
23   Indirect Purchaser Plaintiffs' Rule 30(b)(6) **Deposition of**
24   **Apple   Inc.   filed   by   Indirect   Purchaser**
25   **Plaintiffs, Apple Inc.  Modified on 5/1/2018**
26
27   _____
     [8] Ibid.
28

Page 15 of 55

[Emphasis and underlining supplied]


**EXHIBIT "F":**


This exhibit is more evidence of the above.


It comes from the aforementioned <u>Lithium</u> case, and is not simply the above "Proposed Order," but it is the actual Order (ECF-2281) signed by the Honorable Judge Donna M. Ryu.


**EXHIBIT "G":**


Yet additional evidence of the above is shown here.


This exhibit shows the court's appointment (in the <u>Lithium</u> case) of Cotchett, Pitre & McCarthy, LLP as, for instance, "Interim Lead Class Counsel for **Indirect** [underlining and emphasis supplied] Purchaser Plaintiffs."


Please keep in mind <u>the interconnected nature of the Direct and Indirect</u> <u>purchasers</u> (involving everything from discovery to you-name-it), and also the fact that – from time to time – the "direct" and "indirect" terms were (and are) often interchanged, a prime example thereof being Cotchett, Pitre & McCarthy, LLP's very own firm resume, which stated, "The Court appointed

Clerk of the Court
May 2, 2020
Page 17 of 55

CPM as Co-Lead Counsel on behalf of **direct** [underlining and emphasis supplied] purchasers of lithium-ion rechargeable batteries that defendants allegedly conspired to fix the price."

"Direct" or "Indirect"?

What's the difference – especially when both the Lithium court itself and most participants therein seemed almost constantly to be dealing with both interchangeably?

Indeed, from the perspective of Cotchett, Pitre & McCarthy, LLP, the firm most definitely had access to all sorts of things that would – from a conflict-of-interest perspective – preclude its later taking a case in which it was supposed to be suing Apple.

Furthermore, with or without the mention of "batteries," Cotchett, Pitre & McCarthy, LLP had absolutely no business taking the instant Apple case.

But now that it has taken the Apple case, *it has an irrevocable conflict of interest in two cases, and must withdraw from both.*

Exhibit "G" comes from the aforementioned Lithium case, and is entitled as follows on the court record:

Clerk of the Court
May 2, 2020
Page 18 of 55

ORDER APPOINTING INTERIM CO-LEAD COUNSEL
AND LIASON COUNSEL FOR DIRECT PURCHASER
PLAINTIFFS AND APPOINTING INTERIM CO-LEAD
COUNSEL AND LIASON COUNSEL FOR INDIRECT
PURCHASER PLAINTIFFS re 147 Proposed Order.
Signed by Judge Yvonne Gonzalez Rogers on 5/17/2013.

**EXHIBIT "H":**

This is a press release from one of Plaintiffs' attorney firms in the <u>Lithium</u>
case – <u>with mention of Apple on page 2 thereof.  (Please note that Apple was</u>
<u>integrally involved from both "direct" and "indirect" standpoints</u>.)

**EXHIBIT "I":**

In addition to the civil case in Lithium matter, there existed also one or more
criminal cases.

This is a plea agreement from one of the criminal cases; on page six thereof is
mentioned the civil case (<u>In re Lithium Batteries Antitrust Litigation</u>… a case
<u>in which Cotchett, Pitre & McCarthy, LLP was, and is, apparently still</u>
<u>representing Apple</u>).

Clerk of the Court
May 2, 2020
Page 19 of 55

**EXHIBIT "S":**

This is simply one of the latter documents (dated 3-02-2020) in one segment of the still-ongoing <u>Lithium</u> civil case set (involving multiple – and integrated – cases, of course).

**EXHIBIT "W":**

Shown below are multiple excerpts from a court transcript of 8-8-14 (ECF-502) in the <u>Lithium</u> case, illustrating beyond a doubt<u> that Apple's role was/is that of Plaintiff, and a very major plaintiff at tha</u>t:

> MR. KESSLER [FOR ONE OF THE DEFENDANTS]: WE CAN THINK OF WHO THE RIGHT DIRECT PLAINTIFFS ARE. ONE GROUP WOULD BE THE PACKERS WHO THERE'S NO DISPUTE THEY SAID IN THEIR BRIEF ARE NOT OWNED OR CONTROLLED, ARE COMPLETELY INDEPENDENT.
>
> **ANOTHER GROUP WOULD BE COMPANIES LIKE DELL OR HP OR A TELEPHONE MANUFACTURER [SUCH AS APPLE]** WHO MAY HAVE BOUGHT THE BATTERIES DIRECTLY FROM ONE OF THE DEFENDANTS AND WHO KNOWS THE CHAIN OF CONTROL FOR THE CELLS, AND THEY MIGHT BE THERE . . .
>
> [Pages 6 - 7; emphasis and underlining supplied]

Clerk of the Court
May 2, 2020
Page 20 of 55

MR. FRIEDMAN [FOR ONE SET OF THE PLAINTIFFS]: I APOLOGIZE, BUT I'M GOING TO GIVE YOU THE ANSWER, MAYBE MORE THAN YOU WANT, SO WHAT HAPPENS IS DELL ONE OF THE LARGEST WORLDWIDE COMPUTER SALES, OKAY?... **AND THEN APPLE BECAME A GREATER AND GREATER PERCENTAGE OF THE MARKET ESPECIALLY WHEN YOU'RE NOW TALKING ABOUT FIXING THINGS THAT GO INTO IPHONES AND IPADS, WHICH MAKE UP A LARGE SHARE OF THE GLOBAL MARKET. SO YOU HAVE OEM'S IN THE UNITED STATES THAT MAKE UP A VERY SIGNIFICANT SHARE OF WORLDWIDE SALES, CLEARLY OF U.S. SALES**, BUT ARE MATERIAL IN WORLDWIDE SALES. AND SO WHAT YOU HAVE IS A LOT, YOUR HONOR, THAT GOES INTO ANALYZING, SAYING, **WHEN YOU SET PRICES FOR HP, DELL, APPLE, WHICH ARE U.S. COMPANIES, YOU'RE DRIVING THE PRICES FOR THE WORLD.**

AND SO IT BECOMES EXTREMELY IMPORTANT IN OPERATIONALIZING THE CONSPIRACY THAT IS NOT GOING TO JUST IMPACT JUST U.S. SALES BUT ARE GOING TO BE EFFECTIVE GLOBALLY...

[Page 87; emphasis and underlining supplied]

In addition, this transcript illustrates quite well that, given the simultaneous presence of multiple attorneys each for both direct and indirect purchasers, there was often little or no demarcation between the direct and indirect purchasers, especially in regard to information flow, discovery, etc.

Clerk of the Court
May 2, 2020
Page 21 of 55

(Note:  On page 2 is shown proof of <u>Cotchett, Pitre & McCarthy, LLP's presence</u> in court, <u>with both direct and indirect cases being handled SIMULTANEOUSLY at the hearing</u>, and showing the participation of an attorney named "Steven N. Williams" for the firm Cotchett, Pitre & McCarthy, LLP.)

## EXHIBIT "X":

Shown below are several excerpts[9] from Cotchett, Pitre & McCarthy, LLP's work in the <u>Lithium</u> case, indicating **many millions of units of batteries used by Apple, keeping in mind that Apple is a major Plaintiff in the overall case**!

Such many millions of units would certainly translate to many millions of dollars, if not possibly to tens of millions of dollars or more.

Cotchett, Pitre & McCarthy, LLP is representing Apple in regard to major amounts of money:

> Defendants are the dominant suppliers of Lithium Ion Batteries to the major U.S.-based computer manufacturers, such as <u>HP, Dell, and **Apple,**</u> as well as other massive computer manufacturers whose products are leading brands in the U.S.

> The following chart from a leading battery industry research and consulting company, Avicenne Energy, details many Defendants' shares of the leading computer manufacturers' Lithium Ion Battery needs for portable computers in 2011.

---

[9] 3-18-2016; ECF-1168 (one of the Complaints) in <u>Lithium.</u>

Page 21 of 55

Clerk of the Court
May 2, 2020
Page 22 of 55

380. The leading portable computer manufacturers, many of whom are listed above, dominate the United States market. The following chart illustrates their market shares of Laptop sales as well as estimates the percentage of sales of portable computers within each company's market share:

[Page 135; underlining and emphasis supplied]

Defendants are the world's largest manufacturers of Lithium Ion Batteries (defined below), and include multinational corporations Samsung, LG, Sanyo, Sony, Panasonic, NEC, Toshiba and Hitachi. "Lithium Ion Batteries," or "LIBs," are battery cells which are rechargeable and which utilize lithium ion technology.

Lithium Ion Batteries are sometimes also referred to as secondary batteries. Lithium Ion Batteries power virtually every laptop computer, cellphone, smartphone, digital music player (e.g., iPods), tablet device (e.g., iPads), digital camera and camcorder, and cordless power tool used today. Defendants control a substantial majority of **the $16 billion annual market for Lithium Ion Batteries**, dominating sales to original equipment manufacturers ("OEMs") such as Dell, HP, **Apple** and virtually every other household name manufacturer of consumer electronics.

[Page 6; underlining and emphasis supplied]

## 46.   **Apple Inc., a major purchaser of Defendants' Lithium Ion Batteries during the Class period,** presently states on its website: "Lithium-ion Batteries. Rechargeable lithium-based technology currently provides the best performance for your Apple notebook computer, iPod,

Clerk of the Court
May 2, 2020
Page 23 of 55

iPhone or iPad. You can also find this standard battery technology in many other devices. Apple batteries share the characteristics common to lithium-based technology in other devices."…

[Page 20; underlining and emphasis supplied]

The parties further collusively communicated regarding NEC's detailed projected production figures, broken down by "Capacity/Month (# of Lines)" for NEC lines in Tochigi, Japan, Xiamen, China, and Wujiang, China.

The parties further collusively communicated regarding NEC's "Plan to supply prismatic batteries **to Apple** (I-pod: hard disk type)" and "Entry into the Polymer Battery (pouch battery) Market - **0.3 million units / month per line capacity for 3 lines; operating in Wujiang, China."**

[Page 49; underlining and emphasis supplied]

**Please note that the above 300,000 units per month for three lines would be 900,000 units per month — or 10,800,000 battery units per year.**

**We are now into tens of millions of batteries for Apple per year, representing only a small part of Apple's interests in the case.**

Clerk of the Court
May 2, 2020
Page 24 of 55

**THIS IS VERY MAJOR APPLE BUSINESS IN BATTERIES, SO OBVIOUSLY APPLE HAD MORE THAN AMPLE INTEREST FROM A PLAINTIFF'S PERSPECTIVE.**

Copious information regarding Apple's battery business (see numerous references, including below) was accessed, and not necessarily information limited at in any respect whatsoever to pricing, either, as obviously performance parameters had to be included:

166. A September 14, 2010 internal LG email thread with the subject line **"Apple line allocation for Apple** – K93 price response" from Yongsun Kim includes **detailed information on Apple negotiations,** LG and SDI.

**On information and belief, "K93" refers to Apple's tablet, the iPad.**

The email thread also refers to several meetings between the competitors. The email thread demonstrates an arrangement between SDI and LG regarding allocating sales **to Apple.** One email to LG Vice President Yong Wook Chung from Young Sun Kim, General Manager, states that after "checking [with] SDI today . . . **it would be better just to observe the progress"** regarding an Apple deal.

Another message from Kim explains, "[b]ased on LGC's logic, prices should be matched. . . .[W]e need to consider action plans after checking competitors' information once again."…

…168. **On November 15, 2010, Dong Woo Lee followed up: "Talked to Senior Manager Park Jong Seon of SDI sales (used to be in charge of Apple) who has been seconded to Cupertino Office since last week, over the phone today, but couldn't talk long as he is now on a business trip.**

**It is likely that we can meet and talk properly once he comes back to Cupertino." Lee then added what was discussed over the phone: "1) [h]ave been asked recently to increase volume, like us, regarding K93;**

**2)  [h]ave been requested for supply of 2M/M  or  more  ([s]eems  to  be  more than that)**;

3) and it is also difficult for SDI to deliver all the requested volume; [w]as told that it had been thought that it would be impossible to supply all since Apple does over forecast every time, regarding too much total volume." Next day, Lee

Clerk of the Court
May 2, 2020
Page 26 of 55

updated his previous mail by stating, "Was told that the business tripsite is currently Atlanta, fyi."

169. In late 2010, Samsung and LG, including directly through LG's San Jose, California office, in furtherance of Defendants' conspiracy, expressly agreed on price levels to be charged for sales to Apple computer relating to Apple's iPad. Specifically, on December 1, 2010, at 5:03 PM, LG Chem America, Inc.'s Dong Woo Lee, a/k/a "Don Lee" or "Donny," emailed several LG executives from his San Jose, California office located at 2450 N. First St. #400.

He wrote to Young Wook Chung a/k/a (Andrew (Y.O.) Chung) and four others that, regarding "K93 related information – D Company Meeting," that "I update the mutually shared K93-related information [meaning iPad information] at the meeting with D Company [meaning Samsung SDI America] today. 1. Price: $0.42~43/Wh range. We said that our price is a little bit higher than $0.38, and told them not to cut the price since we currently plan to increase the price to $0.42 level."

[Pages 64 – 65; underlining and emphasis supplied]

192. In December 2010, John Oh (Head of SDIA) communicated with employees of LGCAI regarding pricing plans for Apple. John Oh "promised to commit" to LG Chem's proposed plan to raise prices to Apple by 10%. In an LG Chem email about LG Chem's conversations with John Oh regarding pricing to Apple, YW Chung (of LG Chem Korea) reiterated to LGCAI employee Donny Lee (who had been in contact with John Oh), to "reassure [SDI's John Oh] . . . and when you have conversations with them [SDI], never

leave any written evidence" [yet other forms of evidence were available; also, other firms left evidence, etc.]

In another email string between Donny Lee [LGCAI] and others at LG Chem in Korea, Lee reports on a meeting with John Oh regarding the Apple K93 contract. In the email, Lee confirms discussion with John Oh about the need to increase pricing to Apple.

[Page 71]

...Dynapack states on its website that it was founded in 1998 and at that time it's "[m]ain operating items include Ni-MH BatteryPack, Li-ION BatteryPack for Notebook and CellPhone."...

A February 2010 news report indicated that Dynapack "is expected to ship **over 6 million battery packs to Apple** for the entire year."

76 An April 2005 news report stated that "Dynapack will aim to ship 4.53 million battery modules to raise market share to 8.24% this year from last year's 5.8%."

[Pages 119 – 120; underlining and emphasis supplied]

Clerk of the Court
May 2, 2020
Page 28 of 55

As shown above, <u>six million battery packs (per year), to Apple</u> are mentioned.

Six million is a very large number.

Clearly, Cotchett, Pitre & McCarthy LLP's <u>involvement representing the interests of Apple was by no means whatsoever of a minor nature.</u>

...**Samsung produced an amendment to a "Master Goods Agreement"** <u>**that it entered into with APPLE INC. appearing to indicate that "California law" would govern**</u> **any disputes between them.**

489. <u>**If the Court were to determine that California law should not apply nationwide,**</u>

<u>**If the Court declines to certify the above nationwide class under California, IPPs propose certification of a class, under California law, of the following nineteen states**</u>: Arizona, California, Florida, Illinois, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New York, Oregon, South Dakota, Tennessee, West Virginia, and Wisconsin. This is because the law of these thirty states is harmonized so there is no true conflict of law here.

[Page 167; underlining and emphasis supplied]

Clerk of the Court
May 2, 2020
Page 29 of 55

482. **It is appropriate to apply California antitrust law to purchasers of Lithium Ion Batteries and Lithium Ion Battery Products** in all fifty states – that is, nationwide. Nationwide application of California law is proper because three of six U.S.-based defendants (Sony Electronics, Inc., Samsung SDI America, Inc., and Sanyo North America Corp.), are headquartered in California, conspiratorial acts occurred in California, and the conspirators targeted their price-fixing activities **at large purchasers of Lithium Ion Batteries and Lithium Ion Battery Products in California, such as HP and Apple.**[10]

[Page 165; underlining and emphasis supplied]

4.     In addition to the above, Exhibits "J," "K," "L," "M," and "N"[11] help illustrate the aforementioned conflict:

**EXHIBIT "J":**

This exhibit contains, among other things, one or more pieces of correspondence from the year 2017 with Attorney Stephen Zalkind, who recommended Attorney Joseph Cotchett (also Attorney John Keker [of another firm, Keker, Van Nest &

---

[10] [Firms, of course, that could have claims, direct and/or indirect.]

[11] Please note that, as a general note, and because of space considerations, one or more letters and/or pieces of correspondence may not contain copies of one or more internally referenced exhibits and/or related.

Clerk of the Court
May 2, 2020
Page 30 of 55

Peters LLP], et al) to Edward and Darlene Orr, in regard to an ADT-related case, with the excerpt shown below illustrating a portion of the pertinent background of Edward Orr (who holds a patent in regard to lithium battery-related technology, in addition to having authored a chemistry textbook, along with in excess of 115 publications, etc.):

### RE: THANK YOU (REFERRALS TO JOSEPH COTCHETT, JOHN KEKER, ET AL)

Dear Attorney Zalkind:

As discussed, because of my patent in regard to lithium battery technology, I had mentioned hearing of cases coming through in regard to Apple and the interrelated power, access, data, and related issues, etc.

Attached is, per your inquiries, information on one case, along with other background materials.

Thanks again for the time that you spent with me. I checked with members of my family about Maggie (the aunt that I mentioned), and she had met quite often with the DC judge with whom you had clerked.

I also met with Judge Bryant, but Maggie actually knew him way back when he was an elevator boy!

Thanks again, and I'll be sure to, as requested, give you an update[12] regarding the ADT matter after contacting your colleagues from way back (Joseph Cotchett, John Keker, et al)....

Sincerely,

---

[12] [FOOTNOTE FROM ORIGINAL] As discussed, matters such as this progress tend to "progress" incredibly slowly, or, as they say, at a snail's pace, so I anticipate, as mentioned during our most recent conversation, being able to get back to you (at least in regard to anything resembling a more comprehensive update) in twelve to eighteen months or thereabouts.

Clerk of the Court
May 2, 2020
Page 31 of 55

Edward W. Orr/DDO

## EXHIBITS "K," "L," AND "M":

These exhibits contain, among other things, several pieces of correspondence from the year 2017 and 2018 with Attorney Joseph Cotchett and/or Attorney Nanci Nishimura (also of Cotchett, Pitre & McCarthy), et al.

One of numerous pertinent excerpts is shown below:

> **RE: YOUR FIRM'S APPLE CONFLICT IS SEPARATE FROM ADT: THE REFERRAL FROM YOUR COLLEAGUE, ATTORNEY STEPHEN ZALKIND**
>
> Dear Attorney Cotchett:
>
> Per follow-up with Attorney Zalkind, he suggested that I forward to you general background information about the ADT[13] class action, namely, the fact that the case itself is not
>
> ---
>
> [13] [FOOTNOTE FROM ORIGINAL] Please see attached docket, etc. Your colleague Attorney Zalkind had mentioned that the peripheral involvement of certain ADT-related security breaches and/or data breaches (involving firms as diverse as Apple, Comcast, Yahoo, et al – firms which are/will be apparently involved in other litigation, etc.) occurring in relation to 110 Woodridge seemed peripheral enough not to interfere with ADT, at least from a conflict-of-interest perspective.
>
> Accordingly, he recommended that I contact you regarding the ADT matter, in which my wife and I are objecting on behalf of the handicapped.
>
> Your firm's Apple conflict is separate. Unless you also have a direct conflict with ADT, hopefully, you will be able to consider representation.
>
> Attorney Zalkind said that he is too far away geographically; otherwise, he would consider representing us.

Clerk of the Court
May 2, 2020
Page 32 of 55

integrally involved with Apple, a firm with which your firm would apparently have a conflict, as you currently represent Apple's interests in the ongoing Lithium[14] case.

As mentioned previously, much is at stake in the ADT case for millions of handicapped individuals.

I look forward to hearing from you and/or your staff after the holiday season.

Sincerely,

Edward W. Orr

**EXHIBIT "N":**

This exhibit contains, among other things, one or more pieces of correspondence from the year 2019 with Attorney Stephen Zalkind, who, as mentioned previously, recommended Attorney Joseph Cotchett (also Attorney John Keker [of another firm, Keker, Van Nest & Peters LLP], et al) to Edward and Darlene Orr, in regard to an ADT-related case.

One of numerous pertinent excerpts is shown below:

RE: THANK YOU (REFERRALS TO JOSEPH COTCHETT,
JOHN KEKER, ET AL)

---

[14] [FOOTNOTE FROM ORIGINAL] As discussed with Attorney Zalkind, I have patents in the industry (along with my having authored a chemistry textbook), and I collaborated with the lithium-battery pioneer John Broadhead (formerly of Bell Labs).

Clerk of the Court
May 2, 2020
Page 33 of 55

Dear Attorney Zalkind:


### RE:  FOLLOW-UP (REFERRALS TO JOSEPH COTCHETT,  JOHN KEKER, ET AL)


Dear Attorney Zalkind:

Once again, I really appreciate all of your advice during the holidays last December and this January.   As you had requested that I update you regarding the status of the referrals (that you so kindly made!), I wanted to write to you with the latest news about whatever progress may or may not have been made. (By the way, I found your mention in Search and Destroy!)[15]

First of all, you had mentioned that "people sometimes change over time," so I shouldn't necessarily expect a great response to asking for help for the handicapped from individuals who are not exactly at the start of their careers anymore.   I understand, of course, that your dealings with Joseph Cotchett and John Keker were primarily long ago, but I took your advice and contacted them.

Did you know that Joseph Cotchett was actually formally sanctioned[16] by the Court in the Apple Inc. Device Performance Litigation case (IN WHICH MR. COTCHETT IS NOW GOING AGAINST APPLE)?

---

[15] [FOOTNOTE FROM ORIGINAL] Judge Bryant's meetings with the Jewish partisan Avigdor Klimtka were also quite interesting, as the latter was a member of my family.  I've enclosed a few interesting attachments related to this, and also related to M. Macri, L. Garrett (numerous interactions via Macri, including surveillance, etc.), S. Specter, et al. Incidentally, congratulations on your apparent victory in regard to the case with the $25,000 gate, and the winery, etc.

[16] [FOOTNOTE FROM ORIGINAL] Attached are several items, including, but not limited to, the Court's sanctions (ECF-350), plus other items, ECF-317, ECF-313, other background info, etc.  I also left a telephone message for your offices with more info. (Your fax machine did not appear to be operational at the time. I was informed by your assistant and/or the answering service that the "235 New York Ranch..." address above was still active.)

Clerk of the Court
May 2, 2020
Page 34 of 55

What about his simultaneous representation of Apple in the Lithium case?

Would additional sanctions be necessary?

It was embarrassing for me to hear of it, especially after you had shared with me several accolades for Mr. Cotchett.

You were correct, and, once again, like you emphasized, the peripheral Apple/Comcast/Yahoo (et al) matters that we discussed do not seem to pose any conflict of interest for Joseph Cotchett's current representation of Apple, meaning that unless he has dealings with ADT per se, then his working on behalf of Apple's interests in regard to the Lithium case will represent no problem.

But, unfortunately, Joseph's firm has a direct conflict with ADT per se via a division Joe represents, at least according to multiple members of his firm.

In regard to John Keker, the nature of the ADT matter would not fit, but they made several recommendations and referrals.

Much correspondence and many dozens of calls ensued.

One thing led to another, and the Jewish Federation of Northern California became quite involved on behalf of the handicapped        in        the        ADT        (also Apple/Comcast/Yahoo/Lithium/ et al) and related matters!

The Federation did numerous things, among which was contacting Attorney Stephen Winick, who graciously appeared in court for us before Judge Tigar.

I've enclosed several items, as you had requested follow-up.

Because of my patent in regard to lithium battery technology (and also the chemistry textbook I authored), the Federation was able to make some progress in general in regard to several issues, but the ADT matter per se was just too time-intensive for Attorney Winick to keep going for years.  The judge was extremely complementary, though, and some of the in-court exchange is shown below, along with additional descriptive info:

Clerk of the Court
May 2, 2020
Page 35 of 55

1.     Judge Tigar made it exceedingly clear that claims such as those arising from actions perpetrated against the undersigned (one of whom is physically handicapped) are indeed important.   They should not be overlooked or underestimated.   And, furthermore, they should be heard fully in court.   In fact, Judge Tigar made several additional — and very pertinent — statements to our Counsel, as shown below (please note that all of Judge Tigar's comments are excerpted from ECF 153[17] in *ADT*) :

THE COURT: Are you representing Mr. Orr on a pro bono basis because the Jewish Federation thought you might do that?

They just called you?

MR. WINICK: Yes.

THE COURT: You take all the time you need.

SOURCE:  Judge Jon S. Tigar to our Counsel [2-1-18/p. 7 of the *ADT* transcript].

It is also instructive to mention the fact that, far from being a so-called "Plaintiffs' Attorney," Mr. Winick was the precise opposite, and therefore made an exception in Mr. Orr's case because of the egregious conduct of the Defendants:

MR. WINICK: …Let me start by just giving you a quick introduction as to how I got here. I'm usually on the defense side of class actions.

THE COURT: Weren't you a partner at Sheppard Mullin at one point?

MR. WINICK: I was.

---

[17] [FOOTNOTE FROM ORIGINAL] ECF 153 in *ADT* is also the source of all other *ADT* case-transcript excerpts.

Clerk of the Court
May 2, 2020
Page 36 of 55

SOURCE: *ADT* transcript [2-1-18/p. 5 - 6].....

In the interlinked *ADT* case, the Honorable Jon S. Tigar went on to state:

THE COURT: Well, let's freeze right there for a moment. Because as I'm taking in this information, one of the things I'm thinking is:

What am I going to do next?

And I -- I have been surprised -- pleasantly, in some ways, because of course it's nice to lead a life that isn't filled with boring redundancy -- but I was surprised by the complexity and density of the objection that I received today.

**It also seems to me that Mr. Orr may exercise his right to seek appellate review of whatsoever decision I make.**

And so it's important that whatever decision I make be not only correct, but sufficiently well-supported that a reviewing court can look at the decision and determine for itself whether it was correctly made and adequately supported....

What are the obligations on me, as the judge, who sits as a quasi-fiduciary for the class?

Should I give Mr. Winick a chance to put in something that summarizes in writing the presentation that he made today?

Will the lawyers for the parties think, oh, now I'm embroiled, and I have stepped in and I have given the objector an additional chance to put his oar in the water that he didn't have?

But if I don't do that, how am I going to decide this issue?

I have now had my attention directed to specific exhibits within the objector's materials that are supposed to be helpful.

So if I ask you:  Is it going to show this?  And you say: Well, if you look at that, it's not going to be not clear, "not clear" is not good for me.

MR. LEVINE [Counsel for Defendant]: I guess –

THE COURT: Let me finish.

MR. LEVINE: Sorry, Your Honor.

THE COURT: If all the parties leave me with at the end of this process is: You go back in chambers and you figure it out, and then you sign an order that is likely to be appealed, I'll do it.  But I'm looking for clarity.

SOURCE:  *ADT* transcript [2-1-18/p. 28 – 29; underlining and emphasis supplied].

Mr. Winick, in describing certain claims of the handicapped, stated to the *ADT* Court.

MR. WINICK [Counsel for the Objectors]: …[G]iven the evidence that's been presented to you, you can reach the conclusion that the settlement is not fair, reasonable, or adequate, and that the class representatives are not typical of the handicapped, disabled members….

What's particularly missing from the evidence that class counsel and defendants have given you?

One, there's no mention that they even attempted to evaluate handicapped members' claims.

Secondly, they never attempted to evaluate profits and revenues that were enjoyed by [the Defendant] from handicapped members.

It doesn't appear that they looked at this analysis at all.

And I don't believe that they evaluated whether or not [the Defendant] -- whether or not the handicapped members would

Clerk of the Court
May 2, 2020
Page 38 of 55

1

2       even have purchased the system, given their vulnerability, had
        they known that the systems were subject to lots of problems.

3

4           SOURCE:    *ADT*  transcript  [2-1-18/p.  20;  underlining
            supplied].

5

6

7           MR. WINICK:  Mr. Orr will tell you that he would never have
            purchased a system that he knew was vulnerable [**to not**

8           **functioning correctly; and/or to not being accessible**

9           **enough for the disabled customer to utilize the product;**
            **etc. --- as was the case in both *ADT* and *Comcast*]**

10
            In fact, he had personal problems, himself. You're in a
11          wheelchair [and you're vulnerable, and the product does not
            operate properly, etc.].
12

13
            SOURCE:    *ADT*  transcript  [2-1-18/p.  15;  underlining and
14          emphasis supplied].

15

16
            MR. WINICK: But, but I can tell you a couple of different
17          things about the handicapped population.

18          Number one is, at Document 141 at Page 35, there's a study
19          from  the  University  of  New  Hampshire  2016  Disability
            Statistics Report, that says that 12.6 percent of the United
20          States is disabled.

21          And the Census Department, which is Document 141-1 at
22          Page 20, estimates it at 19 percent.

23          Twelve point six, 19 percent.  Let's assume 10 percent.

24
            SOURCE:    *ADT*  transcript  [2-1-18/p.  17;  Underlining
25          supplied].

26

27

28

Clerk of the Court
May 2, 2020
Page 39 of 55

Mr. Winick, let me say something. It's in part for your benefit, but it's also for the benefit of everyone else if in the courtroom, including the member of the public who is sitting there.

I don't know what's going to happen with this objection. But I admire you for taking this case on pro bono after getting a phone call from an organization you trust…"

SOURCE:  Judge Jon S. Tigar to our Counsel [2-1-18/p. 46 of the *ADT* transcript].

And I appreciate, by the way, that from ADT's standpoint and the plaintiffs' standpoint, you've been to court a few times.

Today was final approval.

You're experiencing the expectations delta that comes with a last-minute wrinkle.

So we can all just acknowledge that, and let that go.

That train left the station.

SOURCE:  Judge Jon S. Tigar to the Defendant [2-1-18/p. 37 of the *ADT* transcript. [Underlining supplied.][18]

---

[18] [FOOTNOTE FROM ORIGINAL] More details about ADT were in my phone message. By the way, in regard to the Lithium case, there were/are numerous problems with the case, with multiple appeals; all sorts of recordkeeping problems on the part of administrators; you-name it; etc.

In regard to the prior letter, and the ground-breaking Keaton Harvey/Apple case (with Apple as defendant), there was apparently a connection to a Mr. Nierlich (part of Apple Counsel in "Performance Litigation" / Gibson Dunn), and apparently Mr. Nierlich, the Court, and others were taken by surprise by some of the sanctionable actions of Cotchett, et al.

It seems that the above Mr. Nierlich is with the same firm that actually represented NEC in one of the numerous actions in the Lithium matter. It seems he should have raised certain flags about Cotchett, given his

Clerk of the Court
May 2, 2020
Page 40 of 55

1
2
3          Once again, thank you very much, Attorney Zalkind, and I
4          appreciate all of the time that you spent with me, and all of the
           recommendations.
5
           Sincerely,
6
           Edward W. Orr/DDO
7
8        Additional information regarding Shanin Specter, Esq., of Kline & Specter,
9
10   P.C. (who represented the undersigned, and wrote to five Commissioners of the
11   Pennsylvania Public Utility Commission (PUC) on May 6, 2016, regarding a
12   Comcast-related matter) was also included.
13       A member of the Board of the Jewish Braille[19] Institute (JBI), along with a
14   member of Wellesley-in-Philadelphia (WIP), assisted in recommending the
15   undersigned to Mr. Specter's firm.
16       Attorney Specter referenced one or more alleged equipment failures and/or
17   malfunctions which were then confirmed by Darryl Lawrence, an attorney and
18   Consumer Advocate for the Commonwealth of Pennsylvania.
19       Attorney Specter's letter clarified numerous very serious problems and
20   misunderstandings that had persisted for many years.
21
22       According to Stanford University,[20] "Shanin Specter is a preeminent
23   American trial lawyer. Beyond winning substantial monetary compensation for his
24
25          (Nierlich's) presence in both the Lithium and the Apple Performance
            matters. Too bad he didn't speak up.
26
27   [19] Edward Orr's severe spinal cord injuries resulted in handicaps affecting movement, vision, hearing,
     (as described in part in a Jewish Braille Institute publication of 2004 [attached as part of Exhibit
     "WW"/addendum to ADT, et al; Mr. Orr is featured on page 3 of "Focus on JBI"]), etc.
28

Page 40 of 55

Clerk of the Court
May 2, 2020
Page 41 of 55

clients, many of Specter's cases have prompted changes that provide a societal

benefit...."


As a result of Attorney Specter's letter of May 6, 2016 – and the changes it

brought forth – the Jewish Federation of Northern California contacted[21] Steven

Winick, Esq., who then went on to represent pro bono the undersigned as Objectors

in a Comcast-related class-action suit.


The name of the aforementioned suit is *Michael Edenborough v. The ADT

Corporation and ADT, LLC d/b/a ADT Security Services*, Case No. 16-cv-02233-

JST; USDC ND California, hereinafter referred to as *ADT*.


The Honorable Jon S. Tigar overtly discussed, with Attorney Winick, and in

open court, issues of societal benefit and the Jewish Federation's having contacted

Mr. Winick (ECF 153 in *ADT*) in regard to representing the undersigned in the

Comcast-related ADT matter.

---

[20] Source: Stanford University (where Attorney Specter has taught for several years) website: https://law.stanford.edu/directory/shanin-specter2/. "Since 2000, Specter has served as an Adjunct Professor of Law at the University of Pennsylvania Law School. Since 2015, Specter has also taught at UC Hastings College of Law, UC Berkeley School of Law and Stanford Law School." (Ibid.)

[21] This was after the undersigned had been advised, because of timing considerations, to write and submit an Objection pro se – after which The Jewish Federation of Northern California promptly contacted Attorney Winick, who then filed a "Notice of Appearance" in the Comcast-related case (ECF 145 in *ADT*) and represented us pro bono in Court.

Judge Tigar engaged Attorney Winick in extensive dialogue in Court (the aforementioned ECF 153), in which the Court was very complimentary of both Mr. Winick and the rights of handicapped clients such as the undersigned Mr. Orr.

The subject of Attorney Shanin Specter (and/or his letter or related) occupies more than two hundred (200) pages[22] of the exhibits in the Comcast-related (also

---

[22]Exhibits including, but not limited to, the following:

ECF 132-4 (in Case No. 16-cv-02233-JST); Page 18 of 36; multiple mentions of Attorney Shanin Specter /comparative *Goretzka* / et al.

ECF 132-3; Page 63 of 74; email to Citizen's Advisory Council, including coverage of 5-6-16 letter from Kline & Specter, written on behalf the undersigned (Please see also related materials regarding Kline & Specter's letter at the publicly available website of the PA Department of Environmental Protection [please note that the typist from the Citizen's Advisory Council missed a few words, garbled a couple of sentences, and misspelled several names, including, but not limited to, that of Shanin Specter:http://files.dep.state.pa.us/PublicParticipation/Citizens%20Advisory%20Council/CAC PortalFiles/Meetings/2016_10/6.21.16%20MINUTES.pdf)

ECF 132-3; Pages 64 - 65 (of 74); includes comparative Kline & Specter letter of 1-11-12 to five PUC Commissioners; also various email content; etc.

ECF 132-3; Pages 66 - 74 (of 74); includes related Kline & Specter exhibits, data, photographs, etc. (Please note also that, in regard to "ECF page-display parameters," certain ECF pages [such as several enumerated in this particular paragraph] may consist of special four-in-one page-display formats in order to conserve space.)

ECF 132-3; Pages 60 – 62 (of 74); includes correlated map(s); EmergAlerts Incident Notification; three-page chart overviewing situation at 110 Woodridge, regarding electrical tower, abandoned well, abandoned mine, mine fire, intersecting mine shafts at well and tower, equipment of various types, etc.; photographs; third-party witnesses (J. Keefer et al [also E. Wolfing], of Columbia Gas) confirming the undersigned's statements; Duquesne University study of water at 110 Woodridge; etc.

ECF 132-2; Page 37 of 106; additional witness confirming both the undersigned's statements and Attorney Specter's support of the undersigned.

ECF 132-2; Page 35 of 106; additional witness confirming both the undersigned's statements and Attorney Specter's support of the undersigned.

ECF 132-4; Pages 27 and 28 of 106; article concerning 200,000-plus (later data show in excess of 750,000) abandoned – and dangerous – wells in merely one state (Pennsylvania) in the tri-state region; map(s); additional information; etc.

(Please note that such data as shown above are quite pertinent to the Comcast Objection, as will be shown in subsequent portions of the Objection.)

Clerk of the Court
May 2, 2020
Page 43 of 55

with interrelationships to Apple, Yahoo, et al) case brought before the Honorable Jon

S. Tigar.[23]

---

ECF 132-4; Pages 33 - 76 (of 106); numerous expert witnesses and data confirming both the undersigned's statements and Attorney Specter's support of the undersigned.

ECF 141; Pages 29 - 76 (of 98); official statistics regarding the disabled.

ECF 132-5; USPS Green card proving the filing of pertinent information with the FCC (Federal Communications Commission); please note that multiple filings occurred, and that this is only one green card of multiple.

[23] In regard to Attorney Specter, the Jewish Federation of Northern California – and the latter's recommendation of Attorney Winick to represent the undersigned and to clarify matters – please see the following excerpt from pages 57 – 63 of ECF 132 in the Comcast-associated *ADT* proceedings (3:16-cv-02233-JST Filed 01/02/18) with the Honorable Jon S. Tigar:

"FURTHERMORE, A VERY MAJOR PORTION OF THE AFOREMENTIONED HARM WAS A DIRECT RESULT OF THE UNDERSIGNED'S (EDWARD ORR'S) COMMUNICATION TO THE POLICE AND/OR OTHER EMERGENCY SERVICE PERSONNEL THAT [A SECURITY SYSTEM]  HAD BEEN JAMMED AND/OR DISRUPTED, WHEREUPON THE POLICE SUMMARILY SAID THAT THIS "WAS IMPOSSIBLE," AS "[THE SECURITY SYSTEM] SYSTEM CANNOT BE JAMMED" (<u>ACCORDING TO THE POLICE [WHO WERE LATER PROVEN TO BE INCORRECT]</u>) AND THAT THE UNDERSIGNED (EDWARD ORR) "MUST BE LYING" (<u>ACCORDING TO THE POLICE [WHO WERE LATER PROVEN TO BE INCORRECT]</u>).

"ACCORDINGLY, EDWARD ORR (WHO IS SEVERELY PHYSICALLY HANDICAPPED [SEVERE SPINAL CORD INJURIES, WITH SIGNED STATEMENTS BY MULTIPLE PHYSICIANS, INCLUDING NEUROSURGEON DR. ERIC WOODARD, OF HARVARD UNIVERSITY; AND THE RENOWNED DR. DAVID KATZ, OF YALE UNIVERSITY], AND WHO --- ALONG WITH HIS WIFE DARLENE --- HAD PURCHASED THE [SECURITY] SYSTEM BECAUSE EDWARD WAS SOMETIMES PHYSICALLY INCAPABLE OF BEING ABLE TO REPORT EMERGENCIES), WAS ARRESTED BECAUSE THE POLICE FALSELY CLAIMED THAT ORR WAS LYING ABOUT THE [SECURITY] SYSTEM.

"(PRIOR TO THIS, ALSO, THE POLICE HAD REPEATEDLY SCOFFED AT --- AND POKED FUN AT --- ANY CONTENTION WHATSOEVER THAT A SECURITY SYSTEM...COULD BE HACKED, WHEN THE HANDICAPPED ORR AND HIS WIFE HAD REPEATEDLY REPORTED EXCEEDINGLY SEVERE SECURITY SYSTEM INTERFERENCE THAT WAS LATER CONFIRMED AS HACKING-RELATED.)

"LATER, THE POLICE DROPPED ALL CHARGES EXCEPT FOR THOSE RELATING TO "REPORTING A FIRE" --- A VERY SMOKY FIRE THAT THE [SECURITY] SYSTEM SHOULD HAVE REPORTED IF IT HAD NOT BEEN JAMMED!

"COPIOUS EVIDENCE OF JAMMING AND/OR INTERFERENCE EXISTED, AND NUMEROUS DOCUMENTS ARE ATTACHED (MORE INFORMATION ABOUT THE EXHIBITS BELOW).

"Because of [the malfunctioning security system], emergency services did NOT arrive early on, and there was considerably more damage both inside and outside the dwelling.

"But, more importantly, because of [the security system], Orr was initially carted off to jail --- WITHOUT his wheelchair, WITHOUT his disability aids, and WITHOUT proper electrolytes, etc.

"Within hours, he lost approximately eleven pounds and nearly died.

"In addition, he was attacked and stabbed in jail, when he was helpless.

"As shown in "Exhibit E" [in the Comcast-associated ADT proceedings (3:16-cv-02233-JST Filed 01/02/18)], a physician has confirmed damage from [the security firm's] actions, and specifically states:

Clerk of the Court
May 2, 2020
Page 44 of 55

5.     Cotchett, Pitre & McCarthy, LLP's actions have harmed both Plaintiffs <u>and</u>

Apple.

This Court has already undertaken various sanctions of two individuals in the

aforementioned firm; and now is to time for sanctions to be increased to the point of

removing the firm altogether.

In ECF 313-4, and as shown below, Mr. Christopher Chorba (of Apple) made

numerous points on behalf of Apple – points which are now worthy of consideration

in the light of Cotchett, Pitre & McCarthy, LLP's newly revealed conflict of interest:

> ...In addition to **your false claim to have conferred with me on
> this topic before the hearing,** you also assert that you complied
> with the Protective Order because your "opposition to Apple's
> motion to dismiss, and my (Cotchett) Declaration attaching certain
> documents prior to argument" somehow satisfied the Protective
> Order's requirement to advise the Court before attempting to
> introduce Protected Material.

> **But this assertion is absurd** — your compliance with the order's
> separate requirement to file Protected Material under seal (which is
> itself an acknowledgment of Apple's designations) cannot justify

'The patient continues to suffer additional irreparable harm, inclusive of that indicated on (please describe)...on or about November 17-20, 2015 [the dates of false arrest and false imprisonment, which were based on erroneous information from the security firm, etc.; both the Allegheny County Police, and the Allegheny County Fire Marshal – along with the Deputy Chief Counsel (R. Young) of the PUC – were all proven to be incorrect]...' (See also Anti-Semitic acts; R. Bowers' interaction with T. Macri; the Jewish partisan Avigdor Klimtka and/or T/M/P. Macri interactions/connections with J. Cannon, C. Cannon, L. Garrett, E. Wiesel, H. Bloom, P. Roth, et al [numerous interactions via Macri, Barham, Spigelmyer, Barlow, Durham, et al, including surveillance, etc.; see also numerous transcripts, FBI links, etc./ see in excess of 217,000 p attached]. See also attached USB drive containing additional pertinent items not enumerated in detail above and/or herein; see also security/data/ADT-related issues/Comcast/Yahoo, et al; see security-interrelated issues involving Apple, Comcast, Yahoo, et al; see also the obvious importance of phones and their batteries to both handicapped and non-handicapped individuals; see "handicap features," for instance, in Exhibits "O," "P," and "Q" in the instant 7015 3010 0000 4384 3212 document.)     See Comcast case: "Numerous other damages also accrued...[ADT/Comcast, et al]."

Clerk of the Court
May 2, 2020
Page 45 of 55

your failure to abide by the order's independent requirement to notify the Court before using "Protected Material at a hearing, pretrial or other proceeding."

*Second*, and even more problematic, you appear to view your personal *disagreement* with Apple's designation of the material you read in open court as an excuse for treating it as public. Again, the Protective Order is clear. It provides an orderly process for challenging designations. (*See generally id.* § 7.) But until that process is concluded, the material must continue to be treated as Protected. (*Id.* § 7.3 ("Until the Court rules on the challenge, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Designating Party's designation.").) You do not get to unilaterally decide what information is, and is not, protected by the Court's order. Any suggestion otherwise is a blatant misunderstanding of your ethical obligations.

*Third*, you assert that I "raised no objection" during the hearing. Once again, **this assertion is demonstrably false**. At the outset of my rebuttal argument, I immediately noted our objection to Judge Davila. I even noted, **on the record**, that we had refrained from interrupting your presentation out of a courtesy to counsel—a professional courtesy that you now attempt to use to argue waiver. (As for your suggestion that my objection was prompted by Apple's in-house counsel, that is also false, irrelevant, and offensive).

**_Finally_, your letter urges me to "consider the action [you] will take against [me] and [my] firm" if we again contest your blatant violation of the Court's order. This statement is difficult to construe as anything other than a threat to punish me (and my firm) for enforcing our client's rights under that order. As you know, the ethics rules and the Court's Guidelines for Professional Conduct prohibit threats intended to secure tactical advantage in civil litigation.** *See* Cal. R. Prof. Conduct 3.10(a) ("A lawyer shall not threaten to present criminal, administrative, or disciplinary charges to obtain an advantage in a civil dispute."); *Lopez v. Banuelos*, No. 11-466, 2013 WL 4815699, at *7 (E.D. Cal. Sept. 6, 2013) ("A veiled threat is as improper as an express threat" under the Rule); *see also* N.D. Cal.

Clerk of the Court
May 2, 2020
Page 46 of 55

Guideline 8(a) ("A lawyer should not draft letters … to create a 'record' of events that have not occurred.").

We intend to vigorously protect Apple's rights in this proceeding, and discuss appropriate measures to ensure your future compliance with the Court's order.

[SOURCE:  Pages 3 and 4 of ECF 313-4; underlining supplied]

6.       While it is highly regrettable for the undersigned – who are Plaintiffs in the instant case – again to have to quote from a brief by Apple in the instant case, it is now necessary to do so, <u>especially given the context of Cotchett, Pitre & McCarthy, LLP's conflict of interest in conjunction with the formal sanctions already promulgated by the Honorable Judge Edward Davila.</u>

Concomitant damage has been done to both the Apple and the Class, with part of the damage to the class having been pointed out, paradoxically, by Counsel for Apple:

Mr. Cotchett's and Mr. Molumphy's misconduct threatens to impair the interests of the class they represent.  While disqualification of an attorney is a substantial sanction, **the bar is lower in the class context because "putative class counsel are subject to a 'heightened standard.'"** *Huston*, 179 F. Supp. 2d at 1167; *see also Palumbo v. Tele-Commc'ns, Inc.*, 157 F.R.D. 129, 132 (D.D.C. 1994) ("The fact that Mr. Snyder and his firm seek to represent a national class of plaintiffs makes the decision to disqualify even more compelling."). "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). **A district court therefore has an "affirmative duty to renew its stringent examination of the adequacy of class representation throughout the entire course of the litigation."** *Pigford v.*

Page 46 of 55

Clerk of the Court
May 2, 2020
Page 47 of 55

*Johanns*, 416 F.3d 12, 27 (D.C. Cir. 2005) (internal quotation marks omitted); *see also Davis v. Abercrombie*, No. 11-CV-144, 2014 WL 7366685, at *3 (D. Haw. Dec. 24, 2014) ("The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process."). It therefore is necessary to consider whether Mr. Cotchett and Mr. Molumphy are capable of effectively representing the interests of the class....

...3. **Deference To Plaintiffs' Preference For Counsel Is Inappropriate Here.**

These violations are sufficient to outweigh Plaintiffs' interest in counsel of their choice. Indeed, it is not even clear to what extent there is such an interest in the class action context. While Mr. Cotchett and Mr. Molumphy were initially retained by individual plaintiff Robert Gilson, their representation of the class occurred only by order of this Court. The traditional respect for a party's chosen counsel arguably does not apply where, as here, Mr. Cotchett's and Mr. Molumphy's representation of the class is a product of this Court's action and not informed client choice.

[SOURCE: Pages 23 – 24 of ECF-313]

7.      Matters have now progressed beyond the necessity for normal sanctions, though.

8.      Not only have Cotchett, Pitre & McCarthy, LLP's actions harmed both Plaintiffs and Apple, **BUT THEIR ACTIONS MAY HAVE PROGRESSED TO THE POINT WHERE THE VERY BASIS OF THIS CLASS ACTION – AT LEAST AS NOW FORMULATED, AND WITH THE EVIDENCE ENTERED**

Page 47 of 55

Clerk of the Court
May 2, 2020
Page 48 of 55

**THEREIN – MAY NEED TO BE TRUNCATED AND BEGUN OVER AGAIN, AS A NEW CASE, EXPRESSLY BECAUSE THE AFOREMENTIONED CONFLICT OF INTEREST MAY RISE TO THE POINT OF IMPORTANT EVIDENCE HAVING TO BE EXCLUDED.**

9.     A conflict of interest of the magnitude described herein is a very serious matter, and the precise course of action to be taken henceforth depends on the answers to numerous questions, including, but not limited to, the following?

- How much unfair access have Cotchett, Pitre & McCarthy, LLP had?

- Will possibly the currently defined Class be able to continue with remaining counsel (after disqualification of Cotchett, Pitre & McCarthy, LLP)?

- Or, alternatively, must the case begin anew, including everything from discovery to class certification phases, et al?

- Given Cotchett, Pitre & McCarthy, LLP's apparent inattention to not only "the big picture," but also the details of the case itself, where does one go from here?

Clerk of the Court
May 2, 2020
Page 49 of 55

- In other words, <u>how much about the case as currently defined can be salvaged</u>?[24]

―――――――――――――

[24] One of many important questions that needs to be answered is obviously this:

How much access – and precisely when and where, and to precisely which documents, and what type of documents, files, media, and so forth – did Cotchett, Pitre, & McCarthy, LLP have access to regarding Apple's business in the <u>Lithium</u> case?

How much of such <u>Lithium</u>-case access involved materials that Cotchett, Pitre, & McCarthy, LLP should never have had access to – especially within the context of the role played by Cotchett, Pitre, & McCarthy, LLP <u>in the instant Apple litigation, where Apple is now on the other side, as a defendant</u>?

One aspect of analyzing matters here is to consider what types of information Apple considers confidential – and one way of defining such "confidential" information is to look at, for instance, the list of items that, in ECF-327 in the instant <u>Apple</u> case (ECF-327 is entitled: JOINT ADMINISTRATIVE MOTION TO FILE UNDER SEAL TRANSCRIPT OF MARCH 7, 2019 HEARING ON APPLE'S MOTION TO DISMISS PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT) that Apple wanted to be "sealed" from public view.

Now, obviously, the firm of Cotchett, Pitre, & McCarthy, LLP was allowed to see numerous such items **AFTER** COTCHETT, PITRE, & MCCARTHY, LLP WAS APPOINTED COUNSEL FOR PLAINTIFFS IN THE INSTANT APPLE CASE.

BUT WHAT IF COTCHETT, PITRE, & MCCARTHY, LLP SAW SUCH CATEGORIES OF INFORMATION **BEFORE** BEING APPOINTED TO COUSEL IN THE INSTANT CASE?

SURELY THEY DID SEE CERTAIN SUCH INFORMATION **BEFORE** BEING APPOINTED TO COUNSEL IN THE INSTANT CASE.

HOW MUCH?

WHERE?

WHICH DOCUMENTS?

IN OTHER WORDS, WHATEVER SUCH INFORMATION SEEN BY COTCHETT, PITRE, & MCCARTHY, LLP "WHEN THEY WERE ON THE OTHER SIDE" IS <u>NOT FAIR</u> TO EITHER APPLE OR THE CLASS IN THE INSTANT <u>APPLE</u> CASE – OR, FOR THAT MATTER, AS FAR AS THE BIG PICTURE IS CONCERNED – TO EITHER APPLE OR THE CLASS(ES) IN THE <u>LITHIUM</u> CASE.

Page 49 of 55

Clerk of the Court
May 2, 2020
Page 50 of 55

IN OTHER WORDS, <u>TWO</u> CASES, NOT JUST ONE, HAVE NOW BEEN ADVERSELY AFFECTED, GIVEN COTCHETT, PITRE, & MCCARTHY, LLP'S OVERALL ACTIVITIES.

Shown below are <u>excerpts from ECF-327</u> (pages 3 – 5 of 17) in the instant <u>Apple</u> case, in which various categories of confidential information, from Apple's perspective, are identified:

## [THE COURT NEEDS AN ANSWER TO THE FOLLOWING QUESTION:

## <u>How much information in the following categories did Cotchett, Pitre, & McCarthy, LLP see unfairly before getting involved in the instant Apple case?]</u>

Apple seeks to seal [information and/or documents] that

(1) reflect Apple's confidential research, development, and proprietary commercial information;

(2) contain engineering and technical details;

(3) reference ongoing, nonpublic investigations which Apple has an obligation to keep confidential; and/or

(4) contain personal information about an Apple employee that has no bearing on any alleged relevance of the broader document. Further, the Court has already ruled that much of the same information contained in the transcript passages should be sealed.

### 1. *The Court Already Ruled That Many of the Passages at Issue Should Be Sealed.*

As described in the attached chart, the Court has already ruled on many of the passages at issue in the transcript when it issued its Order Re Motion to Seal Second Amended Complaint (Dkt. 314). For example, page 20:1–9 references an internal Apple report and specific figures from that report. That same report and those same figures were contained in paragraphs 5 and 388 of the SAC, which the Court ruled should be sealed. (Dkt. 314 at 3:18, 4:26.) The attached chart contains the citations for the Court's previous rulings on each paragraph of the SAC that corresponds to a passage in the transcript. The transcript should be treated no differently than the SAC it references.

### 2. Confidential Research, Development, and Proprietary Commercial Information.

Confidential research, development, and other commercial information, including information reflecting Apple's internal policies and procedures, is the type of information regularly protected from disclosure by courts. In sealing this type of information, Courts recognize that the universe of information that is commercially sensitive is significantly broader than engineering drawings and schematics and includes strategic research and development information. *See, e.g., Lucas v. Breg, Inc.*, No. 15-00258, 2016 WL 5464549, at *1 (S.D. Cal. Sept. 28, 2016) ("[C]ourts have been willing to seal court filings containing confidential business material, such as marketing strategies, product development plans, licensing agreements, and profit, cost, and margin data."); *In re Elec. Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008) (sealing "pricing terms, royalty rates, and guaranteed minimum payment terms"); *Algarin v. Maybelline, LLC*, No. 12-3000, 2014 WL 690410, at *3 (S.D. Cal. Feb. 21, 2014) (sealing "a compilation of sales data, market research, consumer research, advertising data and marketing strategy").)

The following page and line numbers contain information that reflects the internal investigation, research, and processes Apple used to address consumer complaints of unexpected power-off events ("UPOs"): 19:20–21, 20:1–9, 20:14–18, 28:5–6, 28:19–25, 29:25–30:3, 30:7–8, 33:24, 36:5–10. The investigation, research, and action processes Apple uses to improve its operating systems, including its efforts to address UPO events is confidential, proprietary information that would provide a roadmap to help Apple's competitors better understand Apple's troubleshooting process. (Nierlich Decl. ¶ 5.) For examples, page 19:20–21 and page 20:1–9, 14–18 of the transcript contain a description of how Apple responded when some consumers complained of UPOs, including which employees were apprised of the issue and what policies and procedures were put in place to investigate. *Id.* The same passages also describe a report commissioned by Apple and the proprietary findings of that report. *Id.* Pages 20:14–18 and 28:5–6 also contain engineering conclusions from confidential reports commissioned by Apple. *Id.* This information was kept highly confidential by Apple and would cause competitive harm if made public. (*Id.* ¶¶ 3, 5, 8.) The Court has already agreed that many of the corresponding SAC passages should remain sealed because they concern "Apple's internal and confidential procedures" and "decision making." (*See* Dkt. 314 at 3–6; *Compare, e.g.*, Tr. at 20:14–18 *with* SAC ¶¶ 388-389.)

### 3. Engineering and Technical Details.

Engineering and technical details, including specific, confidential details of products, business strategies, and internal processes, are frequently sealed. *See, e.g., Opperman v. Path, Inc.*, No. 13-00453-JST, 2017 WL 1036652, at *4 (N.D. Cal. Mar. 17, 2017) (sealing details about a party's "internal review processes"); *Reilly v. MediaNews Grp. Inc.*, No. 06-04332 SI, 2007 WL 196682, at *2, 4 (N.D. Cal. Jan. 24, 2007) (sealing documents that, if public, would "allow competitors to anticipate and react to actions taken by defendants in the future"); *Stanislaus Food*

Clerk of the Court
May 2, 2020
Page 52 of 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

10.     Because of the nature of Cotchett, Pitre & McCarthy, LLP's conflict of interest in the <u>Lithium</u> case (a case involving, of all things, Apple's <u>batteries</u>), most likely the instant case (involving, of all things, Apple's <u>batteries</u>) will have to start over from the very beginning.

11.     Cotchett, Pitre & McCarthy, LLP have <u>two</u> major conflicts of interest, any one of which constitutes more than sufficient grounds for disqualification.

12.     In the first place, it is not fair for Cotchett, Pitre & McCarthy, LLP to represent Apple in another case, when it is fighting Apple in the instant case.

13.     As shown in Exhibits "A," "B," "C," "D," "E," "F," "G," "H," "I," and "S," "W," and "X," the Plaintiffs' attorneys – Cotchett, Pitre & McCarthy, LLP – not only have a very major conflict of interest, <u>as the firm has apparently actually</u>

*Prods. Co. v. USS-POSCO Indus.*, No. 09-00560, 2012 WL 6160468, at *6 (E.D. Cal. Dec. 11, 2012) (sealing discovery documents containing "business and pricing strategies" and details of how "Defendants intend[ed] to compete in the tin mill market."); *Phillips*, 307 F.3d at 1211; *Mezzadri*, 2015 WL 12564223, at *2.

The following page/line numbers contain engineering and technical details that should remain sealed: 20:1–9, 20:14–18, 28:5–6, and 33:24. For example, page 20:1–9; page 20:14–18; page 28:5–6; and page 33:24 contain engineering conclusions—including data about the numbers of devices experiencing UPOs—from confidential reports commissioned by Apple. (Nierlich Decl. ¶ 6.) Unsealing this information would reveal data that Apple spent significant resources collecting and would place Apple at a significant competitive disadvantage. (*Id.* ¶¶ 3, 6, 8.) The Court has already sealed the SAC paragraphs that contain all the same engineering and technical details in these transcript passages. (See Dkt. 314 at 3:18, 4:26–5:3, 5:16 (sealing SAC ¶¶ 5, 388, 389, 396).)

Clerk of the Court
May 2, 2020
Page 53 of 55

represented (and still represents)[25] Apple (in the Lithium case), but the firm has apparently also had numerous occasions of unfair and unwarranted access to numerous confidential files relating to Apple's battery business (and other aspects of Apple's business), even going so far as to have access to aspects of joint discovery (regarding both direct and indirect purchasers) about Apple's batteries, systems, and/or related – all of which is not only unfair, but which may possibly help account for the firm's highly unusual and extremely cavalier attitude in this case – an attitude which has even gone so far as to garner formal sanctions from the Honorable Judge Edward Davila.

14.     Unfortunately, the type of violation described above is much more harmful than what happened a few months ago when Apple[26] requested sanctions against Cotchett, Pitre & McCarthy, LLP, and when the Court granted those sanctions in part.

---

[25] Please note, also, that as mentioned previously, and as shown in one or more exhibits, it is also quite significant that often the "Direct" and "Indirect" purchaser case details in the Lithium case were interwoven together, and on purpose, by the court and/or by the parties, etc. Numerous exhibits illustrate Cotchett, Pitre & McCarthy, LLP's integral involvement in representing Apple.

[26] Back then, the damage was far from fatal to the case in its present form. The case could continue, and Apple itself stated the following (page 24 of ECF-313):

> Nor will there be any prejudice to the class if Mr. Cotchett and Mr. Molumphy are terminated from their appointment as class counsel. This Court has already appointed Mr. King from Kaplan Fox & Kilsheimer LLP as Interim Co-Lead Counsel. (Appointment Order at 4. GOTOSFCY4187) In so doing, the Court noted Mr. King's and his firm's "extensive knowledge of and experience in prosecuting complex litigation and class actions." (Id.) The Court further appointed twenty-three attorneys to the Plaintiffs' Executive Committee (id. at 4–6), and fourteen attorneys to the Steering Committee (id. at 6–7). There is no scarcity of qualified attorneys on Plaintiffs' side competent to represent the class's interests.

Clerk of the Court
May 2, 2020
Page 54 of 55

The Court's Order is obviously part of the record, and has been discussed herein, but it is quite interesting that the Honorable Judge Edward Davila reportedly stated the following (at least according to Alaina Lancaster, in an article published on May 30, 2019, approximately two weeks before the Court's subsequent Order of 6-14-19 [ECF-350]):[27]

> "The remedy here — I think it's a good remedy — is remove those two counsel," said Judge Edward Davila of the Northern District of California.

15.     In light of all that has happened, more than mere "removal" of two individuals is now necessary.

16.     This time around, things are much different.

17.     Too much damage had been done, and most likely there will be no reason to believe that unfair prejudice has not occurred.

18.     Accordingly, the undersigned respectfully request that the Court exercise its discretion to resolve this matter.

---

[27] As accessed at  https://www.law.com/therecord_er/2019/05/30/judge-disappointed-over-sanctions-in-alleged-apple-iphone-throttling-case/#

Clerk of the Court
May 2, 2020
Page 55 of 55

Sincerely,

Edward W. Orr                    Darlene D. Orr

122 Ridge Road
Terryville, CT 06786

Telephone: 203-658-4977

CRS/DDO:fw7269872

Enc.: As described and/or referenced herein[28]

---

[28] The undersigned also hereby state that, as a result of the aforementioned and repeated ADT-interrelated issues and their aftermath, in combination with the events of the current State of National Emergency, the undersigned have proofread this document to the best of their ability under the constraints at hand, including, but not limited to, time constraints, et al.  It is hoped that all page references and related are correct, and we have proofread this document four times.  We have submitted this document in good faith.