# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

|  |  |
|---|---|
| **IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION**<br><br>This document relates to:<br>ALL ACTIONS | **Case No. 5:18-md-02827-EJD**<br><br>**OBJECTION OF CLASS MEMBERS SARAH FELDMAN AND HONDO JAN TO CLASS PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED SETTLEMENT, AND PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND SERVICE AWARDS** |

## OBJECTION

## I. INTRODUCTION AND OBJECTION PREREQUISITES

a.  <u>Introduction</u>

In the captioned matter, class members/objectors Sarah Feldman and Hondo Jan object to PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, certification of the Rule 23(b)(3) class, and PLAINTIFF'S NOTICE OF MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS, Docket Entry No. 468 ("Fee Motion"), on the grounds that:

(1)     The request for the service awards represents an attempt to secure preferential payments for the named plaintiffs.  This renders the named plaintiffs conflicted and inadequate to represent the absent class members.  Therefore, unless the requests for service awards are withdrawn, the settlement class may not be certified for lack of adequate representation, and the settlement must be rejected.

(2)     The class definition is broader than the class of persons eligible to receive settlement benefits due to the claim form's requirement that class members declare under pain of penalty of perjury that the subject devices are currently owned and the devices were three years ago slowed by the subject software updates – matters not addressed by the class definition. The claim form is overly burdensome because it requires class member claimants to attest to something that is irrelevant (current ownership) and something already alleged by the Second Amended Complaint and well known to defendant Apple (the performance issues).

(3)     The Fee Motion seeks a common fund percentage fee of $87,730,000 out of a mega-fund settlement of between $310,000,000 and $500,000,000. The sought fee is equal to 28.53% of the minimum (and highly likely) settlement fund amount and 17.5% of the maximum (and highly unlikely) settlement fund amount, and substantially exceeds a reasonable common fund fee in this case.

(4)     Class Counsel's lodestar calculation includes thousands of hours purportedly spent by named, but uncategorized, professionals.[1] This makes impossible an informed analysis of whether their claimed hours or their rates are reasonable.

(5)     Class Counsel's lodestar calculation includes thousands of hours purportedly spent by individuals designated as "staff" or "project" attorneys, with a combined lodestar of $4,043,455.[2] Objectors believe the actual amount paid on

---

[1] See Cotchett, Pitre loadstar rate/time sheet. ECF 469-3, p. 6 of 71.

[2] This amount does not include $85,660 for "attorneys" not designated as a "partner," "associates," or "of counsel," for the Robbins Geller firm. ECF 469-32, p. 6 of 36.

an hourly basis to these attorneys is a modest fraction of the "rate" being charged the class. The "rate" shown for such staff/project attorneys has already been multiplied between five and ten times prior to its inclusion on Class Counsel's rate sheets, and when subjected to the requested lodestar multiplier of 2.2, would provide Class Counsel with an effective profit on the cost of these staff/project attorneys of between 800% and 2,100%.[3] The "rates" shown in Class Counsel's lodestar time/rate sheets do not indicate any real rate ever charged to ordinary clients, but have built-in multipliers for charging the class for their time. Any additional lodestar multiplier renders these staff/project attorneys' fees a windfall to Class Counsel.

(6)     Class Counsel's lodestar includes thousands of hours spent by paralegals at hourly rates of $125 to $450 per hour. These "market rates" shown in Class Counsel's lodestar time/rate sheets do not indicate any real rate ever charged to ordinary clients, but have substantial built-in multipliers for charging the class for their time. Any additional lodestar multiplier magnifies the windfall to Class Counsel.

(7)     The Fee Motion seeks service awards for named plaintiffs, which awards have no statutory basis and are inconsistent with controlling authority long ago established by *Trustees v. Greenough*, 105 U.S. 527 (1992) and *Central Railroad & Banking  Co. v. Pettus*, 113 U.S. 116 (1885).

---

[3]  The average hourly pay rate to staff/project attorneys is assumed to be $42, and Class Counsel's minimum charge rate for staff/project attorney time is $185 and its maximum charge is $850.  ECF 469-34, p. 6 of 20, and ECF 469-30, p. 9 of 47.

(8)     The Fee Motion seeks service awards for named plaintiffs, of which there are more than 130, but only very few of whom provided services supportive of the class settlement.  Named plaintiffs should not be compensated for unsuccessful state claims.  Objectors oppose any service award not merited by the service actually performed by respective class plaintiffs.

b.     <u>Class Membership/Standing</u>

Objector Sarah Feldman is a Settlement Class Member of the putative Rule 23(b)(3) Settlement Class in the captioned matter.  ECF 429, p. 2, and ECF 416, p. 5-6, ¶ 1.31 and 1.32.  She has submitted a claim in the proposed settlement and has been assigned Claim ID SMRT01857616 on an iPhone 6, Serial No. F18PF*****.  *See Exhibit A*.  As a Settlement Class Member, Sarah has standing to object to the proposed settlement, and the Fee Motion, including without limitation as to Class Counsel's sought fee and named plaintiffs' sought service awards, and her objection applies to the entire class.

Objector Hondo Jan is a Settlement Class Member of the putative Rule 23(b)(3) Settlement Class in the captioned matter.  ECF 429, p. 2, and ECF 416, p. 5-6, ¶ 1.31 and 1.32.  He has submitted a claim in the proposed settlement, and has been assigned Claim ID SMRT02027222 on an iPhone 6S, Serial No. FK2QR*****.  *See Exhibit B*.  As a Settlement Class Member, Hondo has standing to object to the proposed settlement, and the Fee Motion, including without limitation as to Class Counsel's sought fee and named plaintiffs' sought service awards, and his objection applies to the entire class.

c. <u>Objectors' Personal Contact Information</u>

Sarah Feldman: 812 Haight Avenue, Alameda, CA 94501; telephone: 510-325-6523.

Hondo Jan: 5464 Carlsbad Boulevard, Carlsbad, CA 92008; telephone: 619.922.7818.

Objectors should be contacted through their counsel. See below.

d. <u>Identification of Objector's Counsel</u>

Objectors are represented by attorneys Kendrick Jan and John Pentz. Attorney Jan is licensed to practice law in the State of California and a member of the bar of the United States District Court, Northern District of California; his contact information is: Kendrick Jan, Attorney, Kendrick Jan, APC, 402 West Broadway, Suite 1520, San Diego, California 92101; telephone: 619.231.7702. Attorney Pentz is licensed to practice law in the State of Massachusetts and the Ninth Circuit, and is seeking admission to the United States District Court, Northern District of California, *pro hac vice* in the captioned matter; his contact information is: John Pentz, Attorney, 18 Widow Rites Lane, Sudbury, Massachusetts, 01776; telephone: 978.261.5725. (Note: This objection is prepared and submitted with assistance of counsel.)

e. <u>Notice of Intent to Appear at Fairness Hearing</u>

Objectors Sarah Feldman and Hondo Jan intend to appear through counsel at the December 4, 2020, final approval hearing ("Fairness Hearing") to provide perspective and argument in support of this objection.

f.      Objectors Do Not Intend to Call Witnesses

Objectors Sarah Feldman and Hondo Jan do not intend to call witnesses at the December 4, 2020, Fairness Hearing.

## II.      THE PREFERENTIAL PAYMENTS TO THE NAMED PLAINTIFFS ARE PROHIBITED AND CREATE A CONFLICT BETWEEN THE NAMED PLAINTIFFS AND ABSENT CLASS MEMBERS.

Class Counsel has requested that the 132 class representatives receive "service awards" in the amount of either $3,500 or $1,500, depending upon whether the class representative was deposed, for a total amount of $216,000.  Class Counsel asserts that such awards are "fairly typical" in class actions, and even suggests that there is a benchmark for such awards below which they are "presumptively reasonable."   Memorandum of Points and Authorities, ECF 468, p. 28.  While it is true that such awards have become commonplace in the Ninth Circuit and elsewhere, the United States Court of Appeals for the Eleventh Circuit recently clarified that such awards are without authorization from the United States Supreme Court, and therefore are and have always been improper.  *See Johnson v. NPAS Sols. LLC*, 2020 U.S. App. LEXIS 29682 (11th Cir., Sept. 17, 2020).  As the Eleventh Circuit put it, the ubiquity of incentive awards is the product of "inertia and inattention," and "we are not at liberty to sanction a device or practice, however widespread, that is foreclosed by Supreme Court precedent."  *Id*. at *27.

The two landmark cases that first authorized recovery of attorney's fees from a common fund, *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad & Banking Co. v. Pettus* (1885), specifically prohibit recovery of any amounts by representative plaintiffs for personal services and private expenses.  *Johnson, supra* at **21-22.  These two seminal cases have been ignored by modern courts when rationalizing

awards to lead plaintiffs, whether as a bounty for obtaining a settlement, compensation for hours spent on litigation tasks, or exposure to reputational risk. None of these rationales can surmount the constraints established by *Greenough* and *Pettus*, which plainly prohibit compensating named plaintiffs for personal services, but allow reasonable compensation for the legal services of plaintiff's counsel.

While there are Ninth Circuit decisions approving incentive or service awards to lead class action plaintiffs, those decisions should yield to the controlling Supreme Court precedent of which we are reminded by the Eleventh Circuit in *Johnson*. Just as with the decision of the Second Circuit cited by the *Johnson* court in footnote 8 of its opinion, *id*. at *25, the decisions of the Ninth Circuit should be regarded as unpersuasive because they do not grapple with *Greenough* and *Pettus*, nor do they cite to any original authority for such awards. The class action industry has simply grown to expect that service awards will be given, and the courts have commonly stopped asking about the legal basis for such awards. Somehow, that for which there was no statutory or case authority became commonplace, and routine has now become the justification for these awards that have been "created out of whole cloth." *Id*. at *27. *See also In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) ("To the extent that incentive awards are common, they are like dandelions on an unmowed lawn – present more by inattention than by design.").

The Eleventh Circuit held that a preferential payment to a named plaintiff that was hundreds of times greater than the average class member's recovery created a conflict of interest that rendered the entire settlement void. The same is true here. The proposed $3,500 "service awards" are 140 times, and the proposed $1,500 awards 60 times, as large

each class member's "negotiated" $25 recovery. These proposed payments divorce the named plaintiffs' interests from the interests of the absent class members.

There are two ways to remedy this conflict. If $1,500 is indeed the fair compensation necessary to induce the named plaintiffs to release their claims, then every class member who submits a claim ought to receive this same amount. If $25 is a fair approximation of each class member's damages, then the named plaintiffs must be satisfied with this same payment, and nothing more. Under no circumstances may the named plaintiffs receive $1,500, $3,500, or any amount greater than that to which they are entitled on their individual settlement claims, unless all other claimants receive the same amount.

The request for the service awards represents an attempt to secure preferential payments for the named plaintiffs, which renders the named plaintiffs conflicted and inadequate to represent the absent class members. Therefore, unless the requests for service awards are withdrawn, the settlement class may not be certified for lack of adequate representation, and the settlement must be rejected.[4]

---

[4] Even if service awards were not entirely foreclosed by *Greenough* and *Pettus*, the requested awards in this case are excessive and abusive. Class Counsel has requested an incentive award for each of the state representatives, at a total cost of at least $75,000, even though the court dismissed each of the state consumer protection act claims that the state plaintiffs added to this litigation. Because the only purpose of having a separate named plaintiff from each state was to provide standing for the consumer protection act claims, each of which was dismissed, there was no benefit conferred by forty-nine of the fifty state plaintiffs.

**III.    THE REQUIRED CLAIM FORMS ARE UNDULY RESTRICTIVE, AND
CREATE A MISMATCH BETWEEN THE CLASS DEFINITION AND
AVAILABILITY OF BENEFITS.**

The Rule 23(b)(3) class is defined as being made up of "All former or current U.S.
owners of iPhone 6, 6 Plus, 6s, 6s Plus, 7, 7 Plus, and SE devices running iOS 10.2.1 or
later (for iPhone 6, 6 Plus, 6s, 6s Plus, and SE devices) or iOS 11.2 or later (for iPhone 7
and 7 Plus devices), and who ran these iOS versions before December 21, 2017."  ECF
429, p. 2 of 6.

The claims form requires a statement under penalty of perjury that the class member
"experienced diminished performance on my iPhone … when running [a particular
operating system] … before December 21, 2017."  *See Exhibit C.*  The "diminished
performance" component of the claim is built into the controlling complaint, but is
something that occurred nearly three years ago.  A requirement that a claimant state under
penalty of perjury that his/her cell phone slowed down three years ago is an unnecessary
and burdensome requirement of the claim form – one not contemplated by the class
definition.

The Federal Judicial Center's Pocket Guide for Judges warns about this kind of
unduly burdensome claim form:

> If the claims process deters class members from filing claims, the settlement
> may have less value to the class than the parties assert. Obtaining complete
> information about claims presented via an unimpeded process will assist
> you in determining the full value of the settlement and hence its
> reasonableness, fairness, and adequacy to the class. Avoid imposing
> unnecessary hurdles on potential claimants. First, consider whether a claims
> process is necessary at all. The defendant may already have the data it needs
> to automatically pay the claims of at least a portion of class members who
> do not opt out. Necessary claim forms should be as simple and clear as

possible and should avoid redundancy. Be careful to avoid claim forms that scare class members away with confusing questions and onerous proof requirements.

Managing Class Actions: A Pocket Guide for Judges (3rd Ed. 2010). *See Exhibit D.*

The claim form in this case presents a prime example of the kinds of unnecessary hurdles claim that the authors of the Pocket Guide were referring to. There is no need for class members to attest under oath that their devices were slowed, since that is alleged in the Complaint on behalf of *all class members*. If their devices were not slowed, there is no Article III jurisdiction over their claims and they may not be included in the class definition.

As well, the claim form, both in electronic or hard copy, requires a class member claimant to declare under penalty of perjury that the *class member is now the owner of a subject Apple device, not that the class member was at relevant times the owner of a subject Apple device*. *See Exhibit C.* The claim form's attestation of current ownership is irrelevant. The relevant issue is who owned the phone at the time that it was updated with IOS 11.2, and had their phone's performance adversely affected.

A practical way to attain the Maximum Class Settlement Amount (see below) in this case is simply to require that Apple, which has all necessary data, make apportioned distributions to all class members who have not opted out of the settlement.

## IV. CLASS COUNSEL SHOULD RECEIVE NO MORE THAN THE AVERAGE 17.8% COMMON FUND PERCENTAGE FEE IN MEGAFUND RECOVERIES OF $250 MILLION OR MORE.

a. <u>Maximum and Minimum Settlement Amounts</u>:

The Settlement Agreement and Release ("Settlement Agreement") provides for a Maximum Class Settlement Amount of $500,000,000 and a Minimum Class Settlement Amount of $310,000,000. Any settlement of more than the minimum $310,000,000

amount would require that approximately 8.8 million claims be timely made, and in order to receive the maximum $500,000,000 settlement more than 16.4 million claims would have to be timely made.  According to Class Counsel, it now appears that far fewer than 8.8 million claims will be made, thus the actual common fund settlement amount will be the $310,000,000 minimum settlement amount.

b.      Calculating a Reasonable Fee:

This Court may choose between a lodestar method and a percentage of fund method in calculating a reasonable common fund fee payable to Class counsel.  *Six (6) Mexican Workers v. Arizona Citrus Growers* (9th Cir. 1990) 904 F.2d 1301, 1311.  Class Counsel seeks a common fund percentage fee, but has submitted its lodestar in support of its fee motion.   (i.e., Class counsel describes a "lodestar cross-check further supports the reasonableness of the requested fee."   ECF 468, p. 3.)

c.      The Requested Fee:

Class Counsel seeks a fee of $87,730,000, which is 28.3% of the $310,000,000 minimum settlement amount, and 59% higher than the average fee for a settlement in this megafund range.  *See* Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies 811 at p. 839 (mean percentage fee for settlements between $250 million and $500 million is 17.8%).

d.      Megafund Fees.

Class Counsel references this Circuit's use of a 25% benchmark as a "starting point for analysis," but entirely ignores that "for example, where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead."  *In re*

11

*Bluetooth Headset Products Liability Litigation*, 654 F. 3d 939, 942-943 (9th Cir. 2011). Further, if "standard calculations yield an unjustifiably disproportionate award, adjust the lodestar or percentage accordingly." *Id*., at 945.

Class Counsel requests an attorney's fee of 28.3% of the minimum guaranteed – and nearly certain – $310,000,000 settlement amount, or $87,730,000. Class Counsel seeks this unjustifiably high fee even though this Circuit recognizes that fee percentages should decrease as settlement amounts rise above $100 million. A $310 million class action settlement is clearly in the megafund category that – barring exceptional circumstances which do not here exist – requires the percentage fee to be substantially less than 25%. This case settled just a little over two years after it was filed, and – whether due to poor notice or an overly burdensome claims process - very few class members have filed claims. As a consequence, the settlement fund does not warrant anything close to a 28.3% fee. Instead, Class Counsel warrant a fee at or below the applicable 17.8% average for such a recovery.

Class Counsel's fee in this case should be governed by *In re: Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291 (9th Cir. 1994), another megafund case in which the Ninth Circuit upheld the district court's refusal to approve a 13.6% fee:

> We agree with the district court that there is no necessary correlation between any particular percentage and a reasonable fee. With a fund this large, picking a percentage without reference to all the circumstances of the case, including the size of the fund, would be like picking a number out of the air…[W]e agree with the district court that the 25 percent "benchmark" is of little assistance in a case such as this… It is not difficult to demonstrate why courts cannot rationally apply any particular percentage – whether 13.6 percent, 25 percent or any other number – in the abstract, without reference to all the circumstances of the case.

*Id*. at 1297-1298.

Unlike class counsel in *Wash Pub. Power, supra*, Lead Counsel here are requesting a percentage fee *higher* than the 25% benchmark in a case that settled in approximately two years for $310 million. As the amount of a recovery increases, the percentage applied to class counsel's attorney's fees should drop down below the 25% benchmark, not go up beyond the benchmark. "[W]here awarding 25% of a 'mega-fund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the bench-mark percentage or employ the lodestar method instead." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). *See also In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp. 3d 508, 526 (ND CA 2020) (data supports principle that larger common funds weigh in favor of fee awards below the 25 percent benchmark; for $240 million settlement, the range is 18% to 22%).

The Ninth Circuit in *Wash. Pub. Power* found that the election of *any* percentage amount is necessarily arbitrary in the context of a megafund settlement measured in the hundreds of millions. 19 F.3d at at 1297 ("Class counsels' data, intended to demonstrate that the percentage they request is far less than the norm, aptly demonstrate the virtually impossible task of setting any particular percentage as a proper one… Class Counsel could just as easily have requested 3.6 percent or 36.1 percent").

Class Counsel's fee should not exceed 17.5% of the actual settlement amount, which is almost exactly the market rate for a settlement of this size, according to Brian Fitzpatrick. *See An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies 811 at p. 839 (mean percentage fee for settlements between $250 million and $500 million is 17.8%). A 17.5% fee here results in a fee of

$54,250,000, which represents a more than generous multiplier of Class Counsel's time, especially after contract and discovery attorneys are billed to the class at reasonable rates.

e.   Percentage Fee Factors

(1)   Results Achieved:   The negotiated per claim recovery in the subject settlement, "subject to pro-rata increase or decrease," is $25, representing greater than 50% of the $46 "maximum per device damage amount" as calculated by "Plaintiffs damage consultant." ECF 468, p. 9. It is unclear how these damages were calculated, but it is clear that many representative plaintiffs are involved in this case because the statutory damages permissible in their home state is up to $1,500 per incident.[5] When considered in view of these statutory damages, the negotiated recovery is quite modest.

As well, if the whole of the case circumstances are examined, something is clearly amiss in either the notice program or the registration of claims. As of late afternoon on Sunday, October 4, the total number of submitted claims appears to be 2,027,222.[6] The notice plan has not achieved a satisfactory result.

(2)   Risk of Litigation:   The defendant has the largest market cap of any corporation in the world. Apple's attorneys are highly qualified, litigation savvy, and aggressive. There is always a risk in picking on Apple by way of a civil filing.

---

[5]  E.g. Alaska statutes provide for statutory damages of $500, and Washington, D.C., statutes provide statutory damages of $1,500. ECF 244, p. 206 and 215.

[6]  This number is based on the number assigned to the claim submitted by objector Hondo Jan on October 4, 2020, at 4:39PM (PST). Additional claims may have been received in hard-copy form and additional claims may be made prior to the close of the claims period on October 6, 2020.

On the other hand, Apple intentionally slowed the processes of its aging products in an effort to drive sales of new products. The fact that Apple thought it sensible to settle this case in so short a period suggests the litigation was not so risky as Class Counsel suggests.

(3)     Skill of Counsel/Quality of Work:  Class Counsel are likewise highly qualified, litigation savvy, and aggressive, but the filing of 50 different cases around the country did nothing to enhance the settlement – though it did substantially increase their lodestar. Class Counsel, should not be compensated for hours worked that did not benefit the class. *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983) (If plaintiff has achieved only partial or limited success, including all hours spent on litigation as a whole in lodestar is improper. "[W]ork on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved.")

(4)     Benefits generated by Class Counsel beyond the Settlement Fund:  None.

(5)     Comparisons between proposed fee and market rate:  Class Counsel seeks a fee 59% higher than market average. The sought fee is wildly exaggerated when compared with the applicable market rate.

(6)      Burdens of litigation of Class Counsel:  While Class Counsel has been operating on a contingency basis, the length of litigation was extremely brief, and only relatively modest expenses were incurred. It is unlikely Class Counsel suffered any meaningful opportunity cost by way of foregone work; rather, Class Counsel used in-house paralegals and scores of project attorneys such as would not inhibit taking on new cases for firm associates and partners. See below.

(7)     Lodestar cross-check:  While not mandatory, the Ninth Circuit encourages District Courts to utilize Class Counsel's lodestar to cross-check a common fund percentage fee for reasonableness.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050.  ("[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award.")  Class Counsel's lodestar is padded by thousands of hours of project attorney and paralegal time billed at between $175 and $895 per hour.  Substantial multipliers are built into these rates, and no lodestar multiplier for the time/rates of project attorneys or paralegals is warranted.  (See below.)

## V.     Class Counsel Billed Its Contract, Staff, and Project Attorneys at Excessive Rates.

Class Counsel state in their fee papers that they reviewed and coded over 7 million pages of documents, leading to their claimed lodestar of $36.4 million.  An enormous portion of this lodestar was generated by contract or project attorneys who were likely paid no more than $42/hour.  For example, for the lead counsel firm Kaplan Fox and Kilsheimer LLP, seven so-called "Staff/Project Attorneys" billed a total of $3.65 million, calculated at rates of between $230 and $425/hour.  None of these attorneys is a permanent employee of the firm.  Only one of the seven Staff/Project Attorneys' bios – Walter Howe – appears on the firm's website.

Class Counsel cite Judge Tigar's decisions throughout their fee memo, but they have overlooked Judge Tigar's most recent decision in a case in which class counsel made liberal use of contract and staff attorneys.  See *In re Wells Fargo & Co. Shareholder Derivative Litig*., 445 F. Supp. 3d 508 (ND CA 2020).  In *Wells Fargo*, Judge Tigar issued an order to show cause why he should not appoint an expert to determine the true market

rate for contract and staff attorneys, which was intended to "determine what actual clients typically pay for contract attorneys' services when a law firm utilizes those contract attorneys' services…" *Id.* at 529. In the face of class counsel's failure to provide any data to support a true market rate, Judge Tigar required that all contract attorneys be billed to the class at their actual cost, or $42.50/hour. *Id.* at 531.[7]

Here, while Class Counsel claim to have incurred a lodestar of $36.4 million, it is likely that at least $10 million of that figure was generated by staff attorneys, contract attorneys and project attorneys performing rote document review, or firm associates performing the same work that could have been performed far less expensively by staff/project/contract attorneys. For Kaplan Fox & Kilsheimer alone, recalculating the "Staff/Project" attorneys at the rate they were actually paid, or something in the neighborhood of $42/hour, reduces their overall lodestar by approximately $3.2 million. Similar recalculations for the other firms that have not produced sufficient detail to determine what portion of their lodestar is made up of routine document review and coding would likely reduce the overall lodestar to less than $26 million. In any event, Class Counsel's lodestar is no more than $33.2 million once Kaplan Fox's contract attorney time is recalculated at market rates.[8]

---

[7] Judge Tigar also endorsed a rule requiring contract attorneys to be treated as a cost, but noted that no court has yet required that. *Id.* at 528. That precise issue is now before the Ninth Circuit in the appeal of Edward Cochran, No. 20-15898.

[8] Objectors use the rate of $42/hour because that was the average rate actually paid to contract and staff attorneys in the *Wells Fargo Derivative* case, which class counsel in *Wells Fargo* disclosed in their papers. Class Counsel here have not disclosed that amount, and the Court should require them to do so, perhaps through an order to show cause similar to the one issued by Judge Tigar. In any event, unless Class Counsel prove that they paid their contract, project and staff attorneys something more than the average amount of

Cross-checking the 17.5% fee by a $33.2 million lodestar results in a lodestar multiplier of 1.63, a more than adequate bonus to account for risk and quality. If the true lodestar were recalculated to treat all document review and coding time as an expense to be billed at cost, and to eliminate unsuccessful lodestar generated in pursuit of the state consumer protection claims, the true lodestar would likely fall to $26 million or less, meaning that the true lodestar multiplier here is greater than 2 – or just about what Class Counsel request in their fee motion.

## VI. CLASS COUNSEL BILLED ITS PARALEGALS AT EXCESSIVE RATES AND NO LODESTAR MULTIPLIER OF PARALEGAL RATES IS JUSTIFIED.

Class Counsel's lodestar includes time spent by paralegals billed at rates of between $125[9] and $450[10] per hour. The "market rates" shown in Class Counsel's lodestar time/rate sheets do not indicate any real rate ever charged to ordinary clients, but have built in multipliers for charging the class for their time. Any additional lodestar multiplier renders these paralegals' fees an unreasonable charge to the class and a windfall to Class Counsel.

$42/hour revealed in *Wells Fargo*, the Court should use that figure to recalculate their lodestar.

[9] Girardi Keese billed a single paralegal at $125/hour for a total of $987.50. ECF 469-19, p. 6 of 9.

[10] Levin Sedran & Berman LLP billed seven paralegals at $450/hour for a total of $366,525. This does not include the $475/hour billed for it otherwise undesignated "staff." ECF 469-30, p. 9 of 47.

Further, of the 81 paralegals who performed services in the captioned matter, 21 paralegals were charged at rates at or below the Laffey Matrix[11] permissible rate (with combined fees of $101,464.50), while 60 were charged at rates up to 2.2 times the Laffey Matrix rate (with combined fees of $850,454.00).

Both the paralegal market rates reflected in Class Counsel's time/rate sheets (i.e., $125-$450/hour) and the permissible updated Laffey Matrix rate ($206/hour), include very substantial mark-ups of approximately four to nine times Class Counsel's actual cost of employing these personnel.[12]  As contemplated by the Supreme Court in *Kalima Jenkins*, payment of a reasonable "market rate," without a lodestar multiplier, adequately compensates Class Counsel for the work performed by their paralegals.  Any attorney's fee award that considers an additional multiplier of a paralegal's market rate provides an unsupportable windfall to Class Counsel.

---

[11] The Laffey Matrix is described as "the primary tool for assessing legal fees in the Washington-Baltimore area."  The Laffey Matrix has been used in this Northern District to support an award of reasonable fees.  See *Kempf v. Barrett Business Services, Inc.* (N.D. Cal., Nov. 20, 2007, No. C-06-3161 SC) 2007 WL 4167016, *aff'd* (9th Cir. 2009) 336 Fed.Appx. 658, *Chanel, Inc. v. Doan* (N.D. Cal., Mar. 13, 2007, No. C 05 03464 VRW) 2007 WL 781976.  A copy of the updated Laffey Matrix is attached hereto as *Exhibit E.*

[12] Objectors apply a reasonable paralegal pay rate to be between $32 and $50 per hour.  See *Occupational Employment and Wages, May 2019, 23-2011 Paralegals and Legal Assistants*, U.S. Bureau of Labor Statistics, May, 2019, https://www.bls.gov/oes/current/oes232011.htm

## VII.  CONCLUSION

For the foregoing reasons, this Court should (1) decertify the settlement class and deny approval to the settlement unless the requests for service awards are withdrawn, or unless all claiming class members receive at least $1,500; (2) disapprove the settlement for failure to compensate all class members; (3) disapprove the settlement for failure of the claim form to comport with class definition; (4) disapprove the settlement due to the improper barriers to the making of claims created by the claim form; (5) award Class Counsel a fee of no more than $54.25 million, (6) require that contract, staff and project attorneys be treated as a cost and billed at their market rate, and the revised lodestar cross-check reconsidered accordingly, and (7) that paralegals be treated as an expense and billed at no more than a permissible (adapted Laffey Matrix) market rate.

Respectfully submitted,

Sarah Feldman and Hondo Jan
By their attorneys:

Dated:  October 5, 2020

*s/ Kendrick Jan*
Kendrick Jan, APC
402 West Broadway, Suite 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

John J. Pentz, Esq., *pro hac vice pending*
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed with the Clerk of Court using CM/ECF on October 5, 2020, and as a result has been served on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.


By: <u>*s/ Kendrick Jan*</u>

EXHIBIT A

 Gmail

**John Pentz <jjpentz3@gmail.com>**

---

## Fwd: Claim Completed for the Smartphone Performance Settlement
1 message

**Sarah Feldman** <sarahlfeldman@yahoo.com>
To: jjpentz3@gmail.com

Wed, Sep 23, 2020 at 5:16 PM

Sent from my iPhone

Begin forwarded message:

> **From:** Claim Confirmation Email <Confirmation@SmartphonePerformanceSettlement.com>
> **Date:** September 23, 2020 at 2:01:36 PM PDT
> **To:** "SARAHLFELDMAN@yahoo.com" <SARAHLFELDMAN@YAHOO.COM>
> **Subject: Claim Completed for the Smartphone Performance Settlement**

Dear **SARAH FELDMAN**,

You have successfully submitted a Claim.

YOUR CLAIM DETAILS
Submitted Claim ID: **SMRT01857616**
Confirmation Code: **34544011**

NAME AND CONTACT INFORMATION
Name: **SARAH FELDMAN**
Street Address 1: 812 HAIGHT AVE
Street Address 2:
City: **ALAMEDA**
State: **CA**
Zip Code: **94501**
Email Address: SARAHLFELDMAN@YAHOO.COM

ADDITIONAL FIELDS
Apple ID: SARAHLFELDMAN@YAHOO.COM
Serial Number: **F18PF*****
Payment Method: **MAILED CHECK**
Device and iOS Version: **IPHONE 6, 6 PLUS, 6S, 6S PLUS, SE - IOS 10.2.1 OR LATER**
I experienced diminished performance on my iPhone: **YES**
I declare under penalty of perjury that the information above is true and correct to the best of my knowledge and belief.: **YES**
Device Type: **IPHONE 6**

Signature: **SARAH FELDMAN**
Date: **9/23/2020**

If you have any questions regarding your Claim, please provide the Submitted Claim ID listed above and email us at: Questions@SmartphonePerformanceSettlement.com.

Thank You,
Claims Administrator
Smartphone Performance Settlement
www.SmartphonePerformanceSettlement.com

EXHIBIT A

EXHIBIT B

 Gmail

Hondo Jan <hondojan@gmail.com>

# Claim Completed for the Smartphone Performance Settlement

1 message

**Claim Confirmation Email** <Confirmation@smartphoneperformancesettlement.com>
To: HONDOJAN@gmail.com

Sun, Oct 4, 2020 at 4:39 PM

Dear **HONDO JAN**,

You have successfully submitted a Claim.

<u>YOUR CLAIM DETAILS</u>
Submitted Claim ID: **SMRT02027222**
Confirmation Code: **76592587**

<u>NAME AND CONTACT INFORMATION</u>
Name: **HONDO JAN**
Street Address 1: **5464 CARLSBAD BLVD**
Street Address 2:
City: **CARLSBAD**
State: **CA**
Zip Code: **92008**
Email Address: **HONDOJAN@GMAIL.COM**

<u>ADDITIONAL FIELDS</u>
Apple ID: **SPACEMAMBO101@YAHOO.COM**
Serial Number: **FK2QR*****
Payment Method: **MAILED CHECK**
Device and iOS Version: **IPHONE 6, 6 PLUS, 6S, 6S PLUS, SE - IOS 10.2.1 OR LATER**
I experienced diminished performance on my iPhone: **YES**
I declare under penalty of perjury that the information above is true and correct to the best of my knowledge and belief.:
**YES**
Device Type: **IPHONE 6S**

Signature: **HONDO JAN**
Date: **10/4/2020**

If you have any questions regarding your Claim, please provide the Submitted Claim ID listed above and email us at:
Questions@SmartphonePerformanceSettlement.com.

Thank You,
Claims Administrator
Smartphone Performance Settlement
www.SmartphonePerformanceSettlement.com

EXHIBIT B

EXHIBIT C

| **PROOF OF CLAIM AND RELEASE** | | |
|---|---|---|
| Your claim must be submitted online or **received by** mail no later than **October 6, 2020** | In re Apple Inc. Device Performance Litigation<br>1650 Arch Street, Suite 2230<br>Philadelphia, PA 19103<br><br>www.SmartphonePerformanceSettlement.com | **APP** |

## Claim Form and Instructions

### INSTRUCTIONS

Please read these instructions carefully. If you need assistance completing the Claim Form, please visit www.SmartphonePerformanceSettlement.com and go to the FAQ page, or reference the Class Notice available on the Important Documents page. If you still have questions, you may send an email to the Claims Administrator at: Questions@SmartphonePerformanceSettlement.com.

**Deadline and Submission Method.** Claim Forms must be either submitted online or printed, mailed and **received by** the Claims Administrator via U.S. mail by no later than **October 6, 2020**.

**Eligibility.** The Settlement will provide a cash payment if you are the owner of an eligible device and experienced diminished performance when running a certain version of iOS prior to December 21, 2017. See below for details.

Eligible devices and iOS versions:

- iPhone 6, 6 Plus, 6s, 6s Plus, or SE device running iOS 10.2.1 or later
- iPhone 7 and 7 Plus running iOS 11.2 or later

You are limited to one cash payment per device. If you are the owner of more than one eligible device, you must fill out a separate Claim Form for each device.

Unless you request exclusion from the class as explained in the Class Notice, you will be bound by the Settlement Agreement and Release and the Final Judgment even if you do not submit the Claim Form.

You must fill out and submit a complete and accurate Claim Form so that it is **received by October 6, 2020**. If your Claim Form is incomplete, contains false information, or is not **received by** the deadline, your claim will be rejected, and you will waive all rights to receive a payment under this Settlement. The Claims Administrator may contact you to request more information to verify your claim. The information you provide will be treated as confidential and used for the purpose of this Settlement only.

Please retain a copy of this Claim Form for your records.

EXHIBIT C

| | | |
|---|---|---|
| **PROOF OF CLAIM AND RELEASE** | | |
| Your claim must be submitted online or **received by** mail no later than **October 6, 2020** | In re Apple Inc. Device Performance Litigation<br>1650 Arch Street, Suite 2230<br>Philadelphia, PA 19103<br><br>www.SmartphonePerformanceSettlement.com | **APP** |

<u>**CLAIM FORM**</u>

Please accurately complete this Claim Form and deliver it to the Claims Administrator via U.S. mail to the address above so that it is **received by no later than October 6, 2020.** If your Claim Form is incomplete, contains false information, or is not **received by** the deadline, your claim will be rejected, and you will waive all rights to receive a payment under this Settlement. The information you provide will be treated as confidential and used for the purpose of this Settlement only. If you prefer, you may submit a Claim Form electronically at www.SmartphonePerformanceSettlement.com.

*Please type or print clearly in blue or black ink.*

**Step 1—REQUIRED CLAIMANT INFORMATION**

First Name: _____    Last Name: _____

Mailing Address: _____

City: _____    State: _____    Zip: _____

Email Address: _____

Apple ID: _____

iPhone Serial Number***: _____

Claim ID (if you have one): _____

      *** You can find your Serial Number on your iPhone in Settings > General > About. If you no longer have your iPhone, you can check the barcode on your device's original packaging or refer to the original receipt or invoice.

**Step 2—DEVICE AND iOS VERSION (Please check only one option.)**
- ☐ I am the owner of an iPhone 6, 6 Plus, 6s, 6s Plus, or SE device that ran iOS 10.2.1 or later prior to December 21, 2017.
- ☐ I am the owner of an iPhone 7 or 7 Plus device that ran iOS 11.2 or later prior to December 21, 2017.

**Step 3—DECLARATION UNDER PENALTY OF PERJURY, SIGNATURE & DATE**
- ☐ I experienced diminished performance on my iPhone 6, 6 Plus, 6s, 6s Plus, or SE device when running iOS 10.2.1 or later before December 21, 2017 <u>OR</u> my iPhone 7 or 7 Plus when running iOS 11.2 or later before December 21, 2017.

I declare under penalty of perjury that the information above is true and correct to the best of my knowledge and belief. I understand that my claim is subject to audit, review, and validation using all available information.

_____    _____
SIGNED                                                                                              DATED

Please retain a copy of this Claim Form for your records.

EXHIBIT C

EXHIBIT D

# Managing Class Action Litigation:
## A Pocket Guide for Judges

*Third Edition*

Barbara J. Rothstein & Thomas E. Willging

Federal Judicial Center
2010

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop educational materials for the judicial branch. While the Center regards the content as responsible and valuable, it does not reflect policy or recommendations of the Board of the Federal Judicial Center.

EXHIBIT D

EXHIBIT D

# Contents

Preface,  v

Introduction,  1

I.   Determining Federal Jurisdiction,  3
    A.  Burdens of proof,  4
    B.  Amount in controversy,  4
    C.  Home-state exception,  5
    D.  Local-controversy exception,  5
    E.  Discretionary jurisdiction,  6

II.  Selection of Counsel,  6
    A.  Single-lawyer model,  7
    B.  Private ordering,  7
    C.  Selection by the judge,  8
    D.  Empowered plaintiff model,  8
    E.  Competitive bidding,  8

III. Timing and Significance of Class Certification,  9
    A.  Timing,  9
    B.  Class certification,  9
    C.  Defining the class,  9
    D.  Multiple class actions,  10
    E.  Notice,  11

IV.  Settlement Review: Risks and Issues,  11
    A.  Judge's role,  12
    B.  Obtaining information about the settlement,  13
    C.  Hot button indicators,  17
    D.  Preliminary review of the proposed settlement,  23
    E.  Warning about claims services,  25
    F.  Notice issues,  26
    G.  Claims processes and response handling,  30
    H.  Fairness hearing,  31

V.   Attorney Fee Issues,  33
    A.  Evaluating monetary and nonmonetary results achieved,  33
    B.  Methods of calculating fees,  35
    C.  "Mega" cases,  36
    D.  Objectors,  36
    E.  Role of government actors,  36

VI.  Coordination with State Judges,  38

VII. Use of Special Masters and Court-Appointed Experts,  39

Conclusion,  39

Bibliography,  40

Case Annotations by Topic,  42

EXHIBIT D

EXHIBIT D

# Preface

This pocket guide is designed to help federal judges manage the increased number of class action cases filed in or removed to federal courts as a result of the Class Action Fairness Act of 2005 (CAFA). The 2005 legislation expresses congressional confidence in the abilities of federal judges to ensure "fair and prompt recoveries for class members with legitimate claims" and to provide appropriate "consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2(b). This third edition includes an expanded treatment of the notice and claims processes. Revisions are concentrated in parts III and IV.

CAFA also calls on the judiciary to develop and implement "best practices" for achieving the goals of ensuring that settlements are fair to class members and ensuring that class members are the primary beneficiaries of any settlement. This guide is part of the federal judiciary's continuing effort to achieve those goals. This edition also carries over from the second edition suggestions based on recent empirical research indicating that the administration of settlements has been less than transparent, especially regarding the disclosure of claims rates and actual payments to class members, to the detriment of litigants and policy makers.

A note of appreciation goes to Judge D. Brock Hornby (D. Me.) for his detailed suggestions and outline of topics, which served as a catalyst and road map for the original publication. Todd Hilsee, a class action notices expert with The Hilsee Group, supplied pro bono assistance in improving the sections on notices and on claims processes. We are also grateful to Jared Bataillon, who contributed valuable research assistance for this third edition.

I hope you find this guide useful in meeting the challenges Congress has entrusted to us in managing class action litigation.

Barbara Jacobs Rothstein
Director, Federal Judicial Center

EXHIBIT D

EXHIBIT D

# Introduction

Federal Judicial Center materials, particularly the *Manual for Complex Litigation, Fourth* (MCL 4th), have devoted considerable attention to class actions, perhaps yielding more information than busy judges can absorb. Hence, the need for a pocket guide. In enacting the Class Action Fairness Act of 2005 (CAFA) (Pub. L. No. 109-2, 119 Stat. 4 (2005)), Congress found both that class actions "are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties" and that "abuses in class actions undermine the National judicial system . . . in that State and local courts are . . . keeping cases of national importance out of Federal courts." 28 U.S.C. § 1711 note (2009). This guide can assist you in discharging the responsibilities those cases entail. The guide distills the elements of CAFA's federal jurisdictional changes and many of the most important practices for managing class actions found in the MCL 4th, and it provides citations to cases decided after publication of the MCL 4th to illustrate many points. For your convenience, cross-references to the MCL 4th are also provided in the guide. Cases and other references are presented in the Bibliography and Case Annotations by Topic at the end of the guide.

As Congress found, class action litigation allows for the resolution of many claims that might otherwise evade legal enforcement. Class actions may also help regulators control conduct that threatens to harm various markets. Securities and other consumer class actions serve to enforce regulatory standards designed to deter fraudulent marketplace conduct that might otherwise escape regulation. Members of Congress and others who assert class actions' general utility also point, however, to abuses that threaten to undermine their usefulness. Critics single out cases in which the benefits accruing to the class as a whole and to the public seem minimal.

Class actions demand that judges play a unique role. There is no such thing as a simple class action. Every class action has hidden hazards that can surface without warning. Your role includes anticipating the consequences of poorly equipped class represen-

EXHIBIT D

tatives or attorneys, inadequate class settlement provisions, and overly generous fee stipulations. The high stakes of the litigation heighten your responsibility, and what's more, you cannot rely on the adversaries to shape the issues that you must resolve in the class context. Indeed, you have to decide first which individuals on the plaintiff side—class representatives and class counsel—can represent the class adequately and whom you should appoint to do so. And, once the adversaries agree on a settlement, you must decide—largely without any clash of views from class counsel, class representatives, or the defendant—whether that settlement is fair, reasonable, and adequate to satisfy the interests of the class as a whole. This guide attempts to clarify the class action standards that inform those decisions and to make the application of those standards more transparent and available to judges and to policy makers faced with the task of improving them. It is designed to help you determine when class representatives and counsel are "adequate" and whether a settlement's terms are "fair" to the class as a whole, "reasonable" in relation to the class's legitimate claims, and "adequate" to redress class members' actual losses.

Recent empirical research indicates that class action settlement administration has often not produced the transparent information that judges and policy makers need for reviewing class action settlements and setting clear standards for such reviews. Nicholas M. Pace & William B. Rubenstein, How Transparent Are Case Outcomes: Empirical Research on the Availability of Class Action Claims Data (RAND Corp. 2008). Not only are data about class member claims rates and actual recoveries not available to judges attempting to evaluate the benefits of a settlement to the class, but information needed to determine which claims rates are acceptable is not available to judges and policy makers concerned with setting standards for future cases. This guide discusses remedies for these deficiencies.

Now that CAFA is on the books and Federal Rule of Civil Procedure 23 has been amended, you can expect to encounter the following class action responsibilities:

- applying CAFA's federal jurisdiction and removal rules, such as its $5 million amount in controversy for the class

EXHIBIT D

as a whole, minimum diversity of citizenship between class members and defendants, and complex set of rules regarding federal jurisdiction when the "primary" or "significant" defendants are local citizens (discussed in part I);

- appointing counsel who have the professional skills, legal support staff, and financial resources needed to provide the class with adequate representation (discussed in part II);
- determining when and how to decide class certification motions (discussed in part III);
- establishing effective standards and procedures for evaluating the actual value to the class of proposed settlements and for determining whether the settlements are fair, reasonable, and adequate for class members (discussed in part IV);
- assessing reasonable attorney fees for class counsel by ensuring that fee awards are commensurate with the value of the results to the class as a whole (discussed in part V);
- coordinating with state judges the management of competing and overlapping class actions (discussed in part VI); and
- deciding when to use special masters and court-appointed experts to assist in managing class actions and reviewing settlements (discussed in part VII).

## I. Determining Federal Jurisdiction

CAFA provides expanded, but not unlimited, federal jurisdiction over class actions. *See* 28 U.S.C. § 1332(d). Before you invest time and energy in managing a class action, your first order of business is to determine whether you have jurisdiction. For a comprehensive show cause order form with a checklist of jurisdictional and removal issues, see *Tam v. Indymac Bank,* No. 2:8CV06458, 2008 WL 4793676 (C.D. Cal. Oct. 30, 2008).

Under CAFA, federal district courts have original jurisdiction over class actions in which the aggregate amount in controversy exceeds $5 million and in which there is "minimal diversity of citizenship," which means whenever "any member of a class of plaintiffs is a citizen of a State different from [that of] any defendant." 28 U.S.C. § 1332(d)(2). But federal jurisdiction is not available if

EXHIBIT D

"the number of members of all proposed plaintiff classes in the aggregate is less than 100," 28 U.S.C. § 1332(d)(5)(B), or if "the primary defendants are states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief," 28 U.S.C. § 1332(d)(5)(A), presumably because the sovereign immunity defense may preclude federal judicial remedies. Moreover, for cases that do meet CAFA's jurisdictional standards, exceptions may apply, as discussed below.

## A. Burdens of proof

Courts have generally ruled that even under CAFA, the proponent of federal jurisdiction—the plaintiff in original federal filings and the defendant in removed actions—bears the burden of demonstrating federal jurisdiction.

CAFA, which was a product of congressional compromise, sets out a number of exceptions to federal jurisdiction. Courts have been clear that the party opposing federal jurisdiction has the burden of establishing that the case falls within a statutory exception.

## B. Amount in controversy

In an original federal action, the plaintiff need only show the possibility that the amount in controversy, including statutory and punitive damages as well as statutory attorney fees, will exceed $5 million. Once the proponent of federal jurisdiction has established the possibility that the amount in controversy exceeds $5 million, only legal certainty that the judgment will be less precludes federal jurisdiction. So, unless there is a dispute regarding the amount in controversy or it is evident that the $5 million amount could not possibly be satisfied, you can accept well-pleaded allegations that $5 million or more is at stake.

In a case removed from a state court, courts continue to hold that the plaintiff is the master of the complaint and courts are compelled to accept a plaintiff's allegations that the amount in controversy is less than $5 million unless a defendant shows to a legal certainty that damages of more than that amount will be established. Moreover, the party challenging federal jurisdiction generally has to provide more than allegations; indeed, that party

EXHIBIT D

must provide competent evidence of the facts supporting the challenge.

Where the plaintiff has not pleaded a cap on damages, costs, and attorney fees, the court may have to resolve disputes about the amount in controversy. A defendant who removes a case has the burden of showing not only the possible stakes of the litigation but also a reasonable probability that the stakes exceed the $5 million mark. Generally, information alleged in the notice of removal, perhaps supplemented by declarations or affidavits, will suffice.

## C. Home-state exception

Section 1332(d)(4)(B) of title 28 of the U.S. Code provides that a court must decline to exercise jurisdiction over a class action in which "two-thirds or more of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed." As discussed above, the objecting party, typically the plaintiff, has the burden of proving that this exception applies. Proof of an exception, however, requires more than an allegation and may require affidavits and evidence. For an example of an apparently efficient way of producing proof of citizenship for class members in the form of a questionnaire, see *Martin v. Lafon Nursing Facility of the Holy Family, Inc.,* 548 F. Supp. 2d 268, 273–78 (E.D. La. 2008). CAFA states that for the exception to apply, all primary defendants must be citizens of the home state, but does not define the term "primary defendant."

## D. Local-controversy exception

Section 1332(d)(4)(A) of title 28 of the U.S. Code creates what has been called the "local-controversy exception" to CAFA jurisdiction. CAFA spells out four elements that make up the exception:

1. two-thirds of the class members are citizens of the original forum state;
2. plaintiffs seek "significant relief" (another undefined term) from at least one defendant who is a citizen of the forum state;

EXHIBIT D

3.  "principal injuries resulting from the alleged conduct . . . were incurred" in the forum state; and
4.  no other class action asserting similar allegations against any of the defendants has been filed within three years preceding the filing.

Few appellate opinions apply or interpret the above terms, but the exception as a whole has been viewed narrowly. A defendant from whom "significant relief" is sought appears to be less central to the litigation than a "primary defendant" referred to in the home-state exception. Likewise, the term "principal injuries" calls for an interpretation that almost all of the injuries occurred within the state.

## E. Discretionary jurisdiction

Under CAFA, a federal court may "in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction" over a class action in which more than one-third but less than two-thirds of the class members are citizens of the original forum state. 28 U.S.C. § 1332(d)(3). The Act lays out six factors for a court to consider before exercising its discretion, starting with "whether the claims asserted involve matters of national or interstate interest" and proceeding to factors related to the forum state's legal self-interest and nexus to the class members and harms alleged. Like the other exceptions, these provisions have been interpreted and applied by few appellate courts. One of the few cases to expand on the statutory language is *Preston v. Tenet Healthsystem Memorial Medical Center, Inc.,* 485 F.3d 804, 822–24 (5th Cir. 2007), which concluded that a class action lawsuit involving Hurricane Katrina-related injuries did not affect a "national interest."

# II. Selection of Counsel

Attorneys representing classes are in a position to control the litigation process far more than attorneys representing individual clients. The class action device enhances the role of such lawyers by virtue of the fact that even the approved class representatives do not have legal control over the litigation. Your power to appoint

EXHIBIT D

counsel and approve or reject a class settlement may be the only checks and balances on the power of attorneys for the class.

There are at least five approaches to selection of counsel in class action litigation. Note that in multidistrict litigation (MDL), the transferee judge has the authority to appoint lead and liaison counsel regardless of whether class claims are involved. *See* MCL 4th § 10.22. Whatever approach you use, it is important to make clear to counsel at the outset the content and form of records you require to support applications for awards of fees and expenses or for a lodestar cross-check. *See* part V, "Attorney Fee Issues," below, and MCL 4th § 14.21. You may find it useful to instruct class counsel that all lawyers should submit fee and expense requests in a similar format—one that will be accessible to the court.

## A. Single-lawyer model

In the typical class action, the lawyer who filed the case will be the only logical choice for appointment as class counsel. That lawyer may have investigated the case independently or may have spoken with government regulators, investigative journalists, or other public information sources. In those cases, the task of selecting counsel consists of determining that the filing attorney satisfies Rule 23(g) standards, that is, has the requisite knowledge of the substantive law, class action legal experience, and financial and staff resources to represent the class adequately. That attorney, of course, must not have a conflict of interest with the class.

## B. Private ordering

In high-stakes, high-profile class action litigation, entrepreneurial plaintiff attorneys often compete to play the lead role. This competition may be heightened when the case piggybacks on a case investigated and perhaps litigated or prosecuted by a governmental entity. Nonetheless, substantial resources may be necessary to finance the expenses of the litigation. Most often, attorneys in such cases attempt to resolve the competition by "private ordering," that is, by agreeing to divide the labor, expenses, and fees. To safeguard the interests of the class and to prevent unnecessary litigation and overstaffing, you may want to review those agreements (which will

EXHIBIT D

be subject to disclosure upon settlement in any event). MCL 4th § 21.272.

### C. Selection by the judge

In the absence of private ordering, you will have to select among competing counsel by reviewing submissions based on the factors identified in Federal Rule of Civil Procedure 23(g)(1)(C). That section explicitly permits you to include in the order of appointment "provisions about the award of attorney fees or nontaxable costs." Few judges have unilaterally imposed strict limits on fees in the order of appointment. Consider, however, requesting that counsel submit ex parte or under seal a proposed budget for fees in the case. The budget would serve as an *ex ante* record of the projected time and expense the case might require; judicial review of a proposed fee award at the end of the case would still be necessary, but would most likely be easier.

### D. Empowered plaintiff model

As mentioned earlier, Rule 23(g) presents explicit criteria and a procedure for appointing counsel to represent the class. For securities class actions, the Private Securities Litigation Reform Act (PSLRA) directs you to employ a special procedure for selecting an "empowered" lead plaintiff (presumptively one with sizable claims), who, in turn, has the right to select and retain class counsel, subject to your approval.

### E. Competitive bidding

In a very narrow set of cases, a few courts have used competitive bidding to select counsel. After an intensive study, a task force in the Third Circuit concluded that competitive bidding "should be an exception to the rule that qualified counsel can be selected either by private ordering or by judicial selection of qualified counsel . . . ." Third Circuit Task Force, *Report on Selection of Counsel,* 74 Temp. L. Rev. 689, 741 (2001).

EXHIBIT D

# III. Timing and Significance of Class Certification

## A. Timing

The 2003 amendments to Rule 23(c)(1) give you flexibility by allowing you to consider class certification "at an early practicable time." Considering this rule, you should feel free to ignore local rules calling for specific time limits; such local rules appear to be inconsistent with the federal rules and, as such, obsolete. *See* MCL 4th § 21.133. The amended rule allows you to rule on motions to dismiss or for summary judgment before ruling on class certification.

## B. Class certification

Given the flexibility in the rules, the most efficient practice is to rule on motions to dismiss or for summary judgment before addressing class certification.

Determining whether a proposed class meets Rule 23 certification requirements demands a rigorous analysis. You have discretion to decide on both the extent of discovery and whether or not to hold a hearing to determine whether the requirements have been met. You need to make factual and legal determinations with respect to the requirements of Rule 23.

Ruling on class certification may prove to be unnecessary. The most important actions you can take to promote settlement are to rule on dispositive motions and then, if necessary, rule on class certification.

If the parties decide to talk about settlement before you make any ruling on class certification, they may urge you to certify a class for settlement purposes only—a *settlement class*—as opposed to certifying a *litigation class* for a possible trial. *See* section IV.C.8 below; *see also* MCL 4th § 21.131–.132.

## C. Defining the class

Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and

9

EXHIBIT D

(3) entitled to notice in a Rule 23(b)(3) action. The definition must be precise, objective, and ascertainable. For example, the class may consist of those persons and companies that purchased specified products or securities from the defendants during a specified period, or it may consist of all persons who sought employment with, or who were employed by, the defendant during a fixed period. *See* MCL 4th § 21.222. Your certification order should specify those who are excluded from the class, such as residents of particular states, persons who have filed their own actions or are members of another class, and officers and directors of the defendants.

Consider also whether the class definition captures all individuals or entities necessary for the efficient and fair resolution of common questions of fact and law in a single proceeding. If the class definition fails to include a substantial number of persons with claims similar to those of the class members, it is questionable. A broader class definition or definition of a separate class might be more appropriate. Feel free to suggest broader or narrower definitions that would make a proposed class more manageable. If the class definition includes people with similar claims but divergent interests or positions, subclasses with separate class representatives and counsel might suffice. *See* MCL 4th § 21.23.

*Issues classes* are classes certified for particular issues or elements of claims or defenses. Though controversial and subject to conflicting rules in different circuits, issues classes "may enable a court to achieve economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action." MCL 4th § 21.24. The test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication.

### D. Multiple class actions

Finally, consider class certification in the context of duplicative or overlapping class action litigation pending in other federal and state courts. Be sure to "obtain complete information from the parties about other pending or terminated actions in federal or state courts relating to the claims presented." MCL 4th § 21.25. At

EXHIBIT D

the outset of any class action, consider entering a standing order that requires counsel to inform the court promptly of any related class actions. Communication and administrative coordination with other judges will often be necessary. Other things being equal, federal judges should exercise federal jurisdiction over classes of nationwide scope; actions limited to single states can be carved out of any national certification.

### E. Notice

If you certify a class for litigation purposes, be prepared to decide on notice and allow members of Rule 23(b)(3) classes the opportunity to opt out before the trial. In fact, whether adequate notice *can* be given may be a significant factor in determining manageability as part of your class certification decision. *See In re* Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76, 107–09 (2007). Class members, particularly unknown ones, must be able to understand that they are included. This could be a problem, for example, if the class member must recall making modest retail purchases in certain places, or know that a certain component is contained in a product. For a discussion of general notice and communication factors, see section IV.F, "Notice issues," below, as well as the "Notice Checklist and Plain Language Guide" available at the Class Action Notices Page at www.fjc.gov. The Federal Judicial Center provides examples of illustrative class certification notices on our website.

## IV. Settlement Review: Risks and Issues

Reviewing proposed settlements and awarding fees are usually the most important and challenging assignments judges face in the class action arena. Unlike settlements in other types of litigation, class action settlements are not an unequivocal blessing for judges. Rule changes, precedent, recent legislation, and elemental fairness to class members direct you not to rubber-stamp negotiated settlements on the basis of a cursory review. Current rules, particularly Federal Rule of Civil Procedure 23, unambiguously place you in the position of safeguarding the interests of absent class members by scrutinizing settlements approved by class counsel. Recognizing

EXHIBIT D

the importance of this, the California panel dealing with complex litigation has drafted guidelines specifying content for motions for preliminary and final approval of proposed class settlements. *See* California Superior Court, Guidelines for Motions for Preliminary and Final Approval of Class Settlement (Draft May 3, 2010).

Be aware that adversarial clashes usually end with the settlement. Indeed, most settlements preclude the parties and attorneys from opposing the settlement's provisions, especially the stipulations about attorney fees. Thus, you need to take independent steps to get the information you will undoubtedly need to review a settlement agreement.

## A. Judge's role

The judge's assigned task of approving or disapproving a class settlement presents exceptional challenges. Some courts "have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class" and to impose "the high duty of care that the law requires of fiduciaries." Reynolds v. Beneficial National Bank, 288 F.3d 277, 280 (7th Cir. 2002).

Because the class itself typically lacks the motivation, knowledge, and resources to protect its own interests, and because settling counsel for both plaintiff and defendant have little or no incentive to offer information adverse to the settlement, you need to examine critically the class certification elements, the proposed settlement terms, the proposed notice plan, and the procedures set out for implementing the proposed settlement. *See* MCL 4th § 21.61. You need to identify possible sources of information about the settlement and use them to obtain, for example, agreements or understandings among counsel, the views and experiences of objectors, and the complete terms of the settlement. The next section (IV.B) discusses all of those informational sources.

Reviewing a proposed settlement calls for you to use your traditional judging skills. The central questions relate to the merits of the claims and defenses:

- What are the class claims?
- How strong are they?

- What is the range of values of a successful claim?
- How likely is the class to succeed on each claim in further litigation, including trial?

You may decide to avoid a definitive statement on the merits because the settlement may fail and the case may come to trial. Nonetheless, it seems absolutely necessary to obtain information and arguments from the parties about their assessment of the probabilities of success and their projection of a realistic range of possible recoveries. *Reynolds,* 288 F.3d at 284–85, discusses this approach further. While party submissions may influence your judgment about the merits, keep in mind that the parties have their own interests in supporting the settlement. You may need to search elsewhere for information that will allow you to take an independent and hard look at the merits of the claims and defenses.

## B. Obtaining information about the settlement

The key to reviewing a settlement is to obtain information about

- the settlement's terms;
- the merits of the class members' claims;
- the reasons for settling those claims;
- the settlement's benefits to the class;
- the number of claims actually filed by class members;
- the amount of the settlement that is likely to be distributed to class members;
- the reasons for any opposition to the settlement; and
- the effect of the settlement on other pending litigation.

This section presents a number of suggestions for gathering settlement information, starting with a provision from amended Rule 23.

### 1. Rule 23(e)(3) agreements and prior individual settlements

Federal Rule of Civil Procedure 23(e)(3) directs the parties to "file a statement identifying any agreement made in connection with the proposed settlement." Let the settling parties know that you expect them to provide the full settlement agreement as well as an informative summary of other agreements, such as settlement agreements for claims similar to those of class members; side un-

EXHIBIT D

derstandings about attorney fees; and agreements about filing future cases, sealing of discovery, and the like. *See* MCL 4th § 21.631. The idea is to identify documents that directly or implicitly suggest the attorneys' perceptions of the value of the class claims and that may point to funds that might otherwise be available to compensate the class, including attorney fees and payments to objectors.

Consider directing the parties to provide additional information to aid your assessment of the settlement. Often, information about related parallel and overlapping cases, including amounts paid to individual plaintiffs or claimants, will shed light on the value of the class's claims. If prior settlements were confidential, direct the parties to provide information for you to review in camera. Pressing the parties to provide objective information about the merits and value of the individual claims should advance your effort to pin down the merits and value of the class claims. Make sure the parties identify and justify any differences in treatment of various types of class members. Expert evaluations of the costs and present monetary value of all aspects of the settlement to the class may be available. Ask counsel what information they used to satisfy their professional obligation to advise their clients about the value of the proposed settlement.

## 2. Preliminary review hearing

Holding a preliminary review hearing will afford you another opportunity to obtain information. If you are deciding whether to certify a class at this stage, direct the parties to give you all the information and arguments needed to apply the Rule 23(a) and (b) criteria. How numerous is the class? What are the common questions of law and fact, and do they predominate? Why is the class action superior to other forms of adjudication?

At the preliminary hearing stage, determine whether the notice to the class will reach a high percentage of the members (see section IV.F below), and whether it should include claims forms and instructions for completing the claims process before the final hearing. Establishing a claims procedure at this stage can provide you with valuable information about class members' rate of presenting claims, information that is often essential in identifying

EXHIBIT D

the true size of the settlement fund, and in making your fairness determination. An early claims procedure might also simplify administrative costs, as discussed below in section IV.B.4. The benefits of any early claims procedure need to be weighed against the possibility that you will decide not to approve the settlement.

### 3. Subclasses

Information gleaned from reviewing class certification papers should also inform you about any need for subclasses to represent separate interests. *See* MCL 4th § 21.23. The preliminary review hearing is usually the last practical opportunity to create subclasses. Appointing counsel for subclasses will generally have the practical effect of sending the parties back to the negotiating table to deal with the interests of the new subclasses.

### 4. Prior action by government entities

When a government regulator has sought or obtained a monetary remedy for a class, examine the description of the intended beneficiaries for a class and decide whether you should define the class to be certified in the same way. Aligning the class definition with the description of the beneficiaries in the governmental action will most likely produce efficiencies in notifying the class, reviewing the settlement, distributing the proceeds, and evaluating requests for fees.

Typically, public enforcement actions result in a consent decree, but the government agency may have the statutory power to order rescission of agreements and restitution or disgorgement of profits from illegal activities, as the court recognized in *In re First Databank Antitrust Litigation,* 209 F. Supp. 2d 96, 98 (D.D.C. 2002). When an agency action or criminal prosecution against a business or its officers is successful, a private class action may well follow on its heels. In the context of an agency action, the class action can serve as the vehicle for distributing monetary relief to the class. In *In re First Databank,* for example, the Federal Trade Commission (FTC) got the defendant to agree to a $16–19 million figure for the disgorgement remedy. Private plaintiffs increased that amount by $8 million, and the final disgorgement figure was expressly

EXHIBIT D

declared to be for the purpose of settling the private class action lawsuits. As discussed in connection with attorney fees below in section V.E, asking the parties to be clear about which entity produced which portion of the award will simplify your decisions on attorney fees.

### 5. Appraisal of settlement

Your appraisal of the settlement should focus on the value actually distributed to the class—based on the number and percentage of class members who have filed a claim. As discussed below in section IV.C.4, strict eligibility requirements and cumbersome claims procedures often discourage class claims and might reduce the total amount paid to class members, making the stated value of the settlement fund illusory. Because there is no clear standard for predicting class response rates, consider calculating any attorney fee award as a percentage of the amount of the settlement fund that has already been distributed to the claimants—even if that means deferring final determination of all or part of the fee award until the claims process is complete.

At or after the preliminary review hearing and after reviewing the sources of information discussed above, consider whether you need an expert's appraisal of the value of nonmonetary or contingent monetary components of the settlement. If so, this is the time to appoint an expert, special master, magistrate judge, or other judicial adjunct, as discussed below in part VII. As a practical matter, waiting for objections or for the settling parties' presentations at the fairness hearing will be too late. *See* MCL 4th § 21.644.

### 6. Information from objectors

Before and during the fairness hearing, you might receive written objections and testimony from objectors. Objectors might contribute to your review in various ways. Attorneys who represent competing or overlapping classes, such as those in state actions, may have useful information on the value of the underlying claims. Similarly, attorneys representing individual claimants who seek a better recovery for their alleged injuries may help you identify the

EXHIBIT D

strengths and weaknesses of the settlement and the trade-offs that led to the agreement. They may represent class members in state court actions with strong state law claims, which would be released by the settlement you are faced with.

Be sure to monitor any separate agreements to settle the claims of these objectors. If objectors settle for the same per capita amount as the class, that tends to validate the settlement (assuming that other factors are equal). If they settle for more than the class members, ask the settling parties to justify the differential. A higher settlement for objectors with similar damage claims might signify that the class members did not receive full value for their claims.

Institutional "public interest" objectors may bring a different perspective. Watch out, though, for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests. Rule 23 gives you authority to scrutinize as part of the overall class settlement any side agreements to "buy out" such objectors.

Generally, government bodies such as the FTC and state attorneys general, as well as nonprofit entities, have the class-oriented goal of ensuring that class members receive fair, reasonable, and adequate compensation for any injuries suffered. They tend to pursue that objective by policing abuses in class action litigation. Consider allowing such entities to participate actively in the fairness hearing. *See* MCL 4th § 21.643.

## C. Hot button indicators

Some settlement terms show their potential unfairness on their face; we call them "hot button indicators." At the preliminary review stage, signaling your concerns about a proposal containing one or more of such indicators may allow you and the parties to create a notice and hearing process that will correct any deficiencies without the need for multiple hearings. Hot button indicators include any remedy to which you cannot confidently assign a cash value.

EXHIBIT D

### 1. Coupons

CAFA calls for judicial scrutiny of coupon settlements and restricts the use of unredeemed coupons in calculating fees for class counsel. *See* 28 U.S.C. § 1712 (2008). It is important to discern whether attorney fees are being calculated using the face value of the coupons instead of the value of coupons actually redeemed. Determine whether the proposed coupons

- are transferable;
- have a secondary market in which they can be discounted and converted to cash;
- compare favorably with bargains generally available to a frugal shopper; and
- are likely to be redeemed by class members.

Coupon settlements were rare even before the passage of CAFA. Occasionally, you may find that transferable coupons have some value to a class of repeat users of a product or service, as they did in *In re Mexico Money Transfer Litigation,* 267 F.3d 743, 748 (7th Cir. 2001). Determining the precise value to the class of the rare beneficial coupon settlement, though, calls for hard data on class members' redemption of the coupons.

### 2. Negative options

Watch for a variant of the coupon settlement—the negative option, which is a gift or benefit that requires the recipient to take affirmative action to cancel it before a continuing obligation to pay arises. The FTC has aptly termed the negative option a "promotional gimmick." For example, in a California state class action, plaintiffs alleged fraud and deceptive and unfair business practices against a company selling DVD subscription services. The parties agreed to settle these claims for a one-month membership upgrade for current members and a "free" one-month membership for past members who had canceled. The catch was that both of these "benefits" would continue until the class member took affirmative steps to cancel the membership. In other words, the free service was converted automatically into an obligation to pay for future services. Apparently as a result of the FTC's amicus curiae participation, the parties renegotiated the settlement to remove

EXHIBIT D

the automatic renewal feature and the court approved a revised settlement. Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 418–21 (Cal. Ct. App. 2008). For a general definition of negative options and the FTC regulations governing them, see *Use of Prenotification Negative Option Plans,* 16 C.F.R. pt. 425 (2008).

### 3. *Cy pres* relief ("fluid recovery")

The term "*cy pres*" has migrated from the trust field into the sometimes less appropriate realm of class action litigation. Literally, *cy pres* means "as near as possible" to the original purpose. In the class action context, recovery for individual class members is sometimes not possible or practical. In these instances, the class is so large and the potential recovery per class member so small that the cost of administering a single claim would exceed the benefit to any individual. Individual reimbursement for taxi fare overcharges is a classic example.

*Cy pres* relief must come as close as possible to the objective of the case and the interests of the class members. Question whether the class members might feasibly obtain a personal benefit. Look for evidence that proof of individual claims would be burdensome or that distribution of damages would be costly. If individual recoveries do not seem feasible, examine the proximity or distance between the *cy pres* recipient's interests or activities and the particular interests and claims of the class members. When *cy pres* relief consists of distributing products to charitable organizations or others, press for information about whether the products in question have retained their face value or might be out-of-date, duplicative, or of marginal value. In the end, *cy pres* awards may be an excellent way to avoid the restrictive claims processes and reversion clauses discussed in the next section.

### 4. Restrictions on claims/reversion of unclaimed funds to defendants

Limits on the amount of recovery per claimant, strict eligibility criteria for claimants, or other procedural or substantive obstacles to honoring claims from class members may dramatically reduce the apparent value of a settlement. Coupled with a provision that

EXHIBIT D

any unclaimed funds revert to the defendant at the end of the claims period (a provision that is generally disfavored, as discussed in the next paragraph), restrictions on eligibility are likely to substantially diminish the overall value of a settlement to the class. The addition of a "clear sailing" agreement (i.e., a stipulation that attorney fees based on the inflated settlement figure will not be contested) to an agreement with a reversion clause adds decibels to the alarms set off by the reversion clause. Some courts treat the combination as creating a presumption of unfairness.

A reversion clause creates perverse incentives for a defendant to impose restrictive eligibility conditions and for class counsel and defendants to use the artificially inflated settlement amount as a basis for attorney fees. Instead of approving a settlement with a reversion clause, consider encouraging the parties to use an alternative approach, such as distributing the entire settlement fund to the class members who file claims. Prorating the fund in that way avoids the possibility of unclaimed funds and is a standard practice in securities class settlements. For a discussion of alternative ways of prorating a settlement fund, see Francis E. McGovern, *Distribution of Funds in Class Actions-Claims Administration*, 35 J. Corp. L. 123 (2009).

To align plaintiff counsel's interests with those of the class, to discourage the use of a reversion clause, and to negate the effect of a clear sailing agreement, consider linking the award of attorney fees to the value of the funds distributed to the class or the coupons redeemed by the class (see section V.B below).

### 5. Collusion: "Reverse auctions" and the like

An imbalance between the cash value of the settlement to the class as a whole and the agreed amount of attorney fees is a prime indicator of collusion by settling attorneys. For example, in a settlement with both monetary and nonmonetary relief, if the attorneys receive the lion's share of the cash and the class receives primarily nonmonetary relief, including future warrants, coupons, and the like, you should look for solid information to justify the imbalance. Likewise, you should scrutinize an agreement that provides that attorneys receive a noncontingent cash award and that class

EXHIBIT D

benefits are contingent on settlement approval and claims made. *See* MCL 4th § 21.71.

"Reverse auction" is the label for a defendant's collusive selection of the weakest attorney among a number of plaintiff attorneys who have filed lawsuits dealing with the same subject matter; in other words, a reverse auction is the "sale" of a settlement to the *lowest* bidder among counsel for competing or overlapping classes. *See* MCL 4th § 21.61, text at n.952 and sources cited therein. For a recent example of a district court's thorough analysis of a proposed settlement with reverse auction principles at the forefront, see *Figueroa v. Sharper Image Corp.,* 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007). In *Figueroa,* the court rejected a "Third Amended Settlement Agreement" in part because the defendant "selected counsel confronted with a most precarious position . . . and then proceeded to offer and convince Class Counsel to accept highly undesirable terms to settle the case." Determining whether a reverse auction might have occurred requires information about all litigation dealing with the subject of the dispute.

Another major indicator of a reverse auction is a difference between the apparent value of the class claims on the merits and the value of the settlement to class members. A typical element of a reverse auction is a promise to pay attorneys more than a reasonable value for the time they invested in negotiating the settlement. Generally, the overpayment of the attorneys originates in an underpayment of what the class should receive based on an objective assessment of the merits of the class claims.

Sometimes, the settlement will be with an attorney who has not been involved in litigating the class claims that other attorneys have been pursuing, an especially suspicious circumstance. Questionable settlements between class counsel and the same defendant in unrelated cases may suggest a continuing collusive relationship.

## 6. Injunctive relief

Question whether injunctive relief will truly benefit class members in the case at hand. In many cases, by putting an end to illegal practices, an injunction will benefit more class members than a small award. It will also avoid clogging the judicial system with

EXHIBIT D

the administration of small awards to thousands of class members. But it is important to press the parties to identify such cases clearly and justify the remedy and fees. Ask yourself—and perhaps the parties—the following questions:

- How much is the injunction worth to the class as a practical matter?
- What is the dollar value the relief might yield?
- What is the real cost to the defendant?
- Does the injunctive relief do more than restate the obligation that the defendant already has under existing law or under a decree entered by a regulatory body?
- Are there viable damage claims that class counsel has not pursued?
- Might an emphasis on injunctive relief and proposed certification of a Rule 23(b)(2) class amount to a tactical move to avoid more stringent certification requirements and opt-out rights associated with a damages class under Rule 23(b)(3)?

Consider whether you need independent expert advice to place a value on the relief offered, as discussed below in part VII.

### 7. Release of liability without remedy

A natural impulse on the part of settling parties is to attempt to expand the class and release claims of those on the periphery of the class, such as the spouses and children of class members, without providing any direct benefit to those individuals. At times parties have attempted to release a damages remedy without making any correlative payment to class members, as the parties attempted to do in *Reynolds,* 288 F.3d at 283–84. Unpled claims against outside parties (e.g., medical malpractice claims in a class action against a pharmaceutical manufacturer) are sometimes swept into the settlement. The settlement should compensate class members or their families for the value of such claims. As a general rule, the release of claims by a subclass should be linked with specific remedies, such as payments to the subclass or increased payments to class members based, for example, on their family status.

EXHIBIT D

8. Settlement class actions

Certification of class actions solely for the purpose of settlement at an early stage of the litigation generally makes meaningful judicial review more difficult and more important. MCL 4th § 21.612. Parties frequently agree to settle class actions before a judge has decided that a class can be certified under Rule 23. The parties then jointly seek certification in the context of the settlement. Often, the parties' agreement that a class can be certified is conditioned on judicial approval of the settlement. The Supreme Court has ruled that agreement of the parties does not lessen the need for a judge to determine whether all of Rule 23's certification standards other than manageability have been met. Amchem Products, Inc. v. Windsor, 521 U.S. 591, 620 (1997); MCL 4th § 21.132.

### D. Preliminary review of the proposed settlement

Judicial review of a proposed class settlement generally requires two hearings: one preliminary and one final. MCL 4th § 21.632. If you haven't already certified a class, you should determine during the preliminary fairness review whether the proposed class meets the standards of Rule 23(a) and (b). By doing this, you can avoid unnecessarily using scarce judicial and party resources to schedule a fairness hearing for a class that doesn't meet Rule 23 certification standards.

If you decide to certify the proposed class, be aware that courts, following the Supreme Court's lead in *Amchem,* have ruled that the settlement terms of a settlement class action need careful scrutiny. Often, such a settlement comes early in the litigation, so you may have to probe to uncover the strengths and weaknesses of the parties' claims and defenses as well as the character of their negotiations. There may be conflicts among groups within the proposed class. Question whether the claims of class members are homogeneous. If they are not, explore the possibility of creating subclasses and sending the parties back to renegotiate and take into account the differing interests of class members.

Preliminary review of the proposed settlement affords you an opportunity to express any concerns you may have about the "hot button indicators" discussed above in section IV.C. You don't have

the power to decide what must be in a settlement agreement, but you do have the opportunity to state your concerns about provisions—or the absence of provisions—that would make a difference in your decision about whether to approve a proposed settlement. If you have such concerns, consider allowing the parties some time to respond to them by renegotiating the settlement so that the class notice can refer as closely as possible to a final settlement. If you hold back your concerns and reject a settlement at the final fairness hearing, the parties will most likely have to incur the considerable expense of sending new notices of any revised settlement to the class.

Consider seeking preliminary input into the fairness, reasonableness, and adequacy of the proposed settlement. For example, one judge permitted counsel pursuing independent state class actions against the same defendants to intervene as "an offsetting influence" to the loss of adversarial opposition from the parties. *In re* Lupron Marketing & Sales Practices Litigation, 345 F. Supp. 2d 135, 138 n.5 (D. Mass. 2004). Participation by such plaintiffs' counsel provided the judge with a unique opportunity to receive an informed assessment by nonsettling plaintiffs of the value of the case and the prospects for success at trial. Absent such an opportunity, consider asking the parties or others to provide preliminary information supporting the proposal.

Though not necessarily unfair, *conditional settlements* present a special problem to the class and the judge. Sometimes, a defendant resists settlement unless it can be assured that the number of class members opting out of the proposed settlement will not exceed a certain number that is specified but not widely disclosed. To avoid unduly delaying the settlement review, you may decide to press the parties to set a reasonable cutoff date for the defendant's decision about whether to proceed with the settlement, say thirty days after the end of the opt-out period. MCL 4th § 21.652. In any event, you should require the defendant to make an election before the fairness hearing.

Remember that any preliminary "approval" or other endorsement of the proposed settlement should not appear to be a commitment to approve the settlement in the end. Any preliminary

EXHIBIT D

finding should be that the proposed settlement is within the range of reasonableness; such a finding is not a final judgment that the proposal is fair, reasonable, and adequate as shown by evidence at the fairness hearing. Reserve that judgment and expect to be informed by counsel for the class and counsel for the defendants (maybe in response to your pointed questions), and by class members, objectors, lawyers from similar litigation, or, perhaps, your own expert or special master. Bring an inquiring mind to the preliminary review hearing and, as noted above, seek out the information you need to decide whether the settlement is fair, reasonable, and adequate.

Once you are satisfied that the proposed settlement warrants your preliminary approval, review the parties' proposed plan for notice and hearing. Generally, counsel will present the settlement proposal and a notice plan at the same time. The purpose for reviewing the notice plan at this stage is "to determine whether any defects in the proposed notice or other formal or substantive irregularities exist that warrant withholding notice." American Law Institute, Principles of Aggregate Litigation § 3.03(a) (2010) Before reviewing the proposed notice plan, consider whether you want to direct that class members' claims for monetary relief be filed in response to the notice and before the final review hearing (see section IV.B.2 above) The class's response to the settlement will help you analyze the settlement's value and evaluate its adequacy as seen through the eyes of class members deciding their own interests. Knowing the claims rate will also provide a basis for your assessment of requests for attorney fees. In any event, to remedy the current lack of knowledge about claims rates and class member recoveries, judges should routinely order the parties to report such information to the court and place it in the public record.

## E. Warning about claims services

Consider also whether you want to direct the parties to include in the notice and claims form some provisions that warn class members about the potential pitfalls in dealing with claims filing services, a cottage industry that offers to gather and file claims for

EXHIBIT D

class members. Such services can increase the claims rate and provide a service to class members, but they do not generally add any value to a claim. The worst pitfall is that some claims services have absconded with funds. Protections in the form of requiring claims filing services to register with the court and maintain funds in a trust account may be in order.

### F. Notice issues

Opt-out notice binds class members by their silence, so you will want to focus on ensuring adequate notice. This pocket guide emphasizes notice issues because notices that fail to reach class members, or that confuse them, are all too common. They result in very low participation rates and discredit the class action procedure.

This section highlights some of the key notice issues. The "Notice Checklist and Plain Language Guide," available at the Class Action Notices Page at www.fjc.gov, details important considerations for notice to class members in several areas.

### 1. Notice to government regulators

CAFA requires that within ten days after a proposed settlement is filed in court, each participating defendant must serve notice of specified settlement-related papers on (1) the U.S. Attorney General or, in the case of a depository institution, the primary federal regulatory official *and* (2) the primary state regulatory official (or, if none, the attorney general) of each state in which a class member resides. 28 U.S.C. § 1715 (2008). The idea is to encourage government regulators to participate in reviewing settlements and lend their expertise (and perhaps an adversarial note) to the fairness hearing. You may want to consider extending an express invitation—to the preliminary approval hearing and to the fairness hearing—to any regulatory body you have found to be effective in dealing with the subject matter in question.

The Federal Trade Commission has extensive statutory authority and expertise in dealing with antitrust, unfair competition, and consumer protection matters. *See generally* FTC, Fulfilling the Original Vision: The FTC at 90 (Apr. 2004) (available at http://ftc.gov/os/2004/04/040402abafinal.pdf). CAFA does not

specify the FTC as an agency that must receive notice, but consider adding the FTC to the notice list in consumer and trade practice litigation, including antitrust actions. The FTC has created a "Class Action Fairness Project," which channels FTC resources into reviewing proposed settlements as well as class counsel requests for attorney fees. Since defendants have made copies of—or electronic links to—the required settlement documents for other agencies, it will be no burden on them to send notice to the FTC or other consumer protection entities in appropriate cases.

## 2. Notice to the class

Notices are usually the only way to communicate with unnamed class members and enable them to make informed decisions about whether to participate in a class action settlement, or to exercise their due process rights to be heard before final approval of the settlement. Your primary goals are that the notice reach as many class members as possible, preferably by individual notification (*see* Rules 23(c)(2) and 23(e)(1) and MCL 4th § 21.312), and that the recipients see it, recognize its connection to their lives and self-interests, read it, and act on it. *See* Todd B. Hilsee et al., *Do You Really Want Me To Know My Rights?* 18 Geo. J. Legal Ethics 1359 (2005).

The first challenge is to *reach* a high percentage of class members. Notice plans that appear reasonable may in fact reach only a small percentage of class members. Before approving a notice plan, consider asking for calculations to demonstrate the "reach"—i.e., the net percentage of class members who will receive or otherwise be exposed to a notice. You can use reach statistics to substantially improve the net reach to class members. The norm is in the 70–95% range. Consider asking whether the proposed notice plan was created by a vendor who will be paid to implement it if approved. If so, consider obtaining an independent analysis of the notice plan's adequacy before approving the plan. Competing vendors may cut corners to win the business, but you must find the "best notice that is practicable under the circumstances." Rule 23(c)(2)(B). To satisfy due process, the notice must reflect a "de-

EXHIBIT D

sire to actually inform." *See* Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306 (1950).

Be certain the notice plan includes individual notice to all "reasonably identifiable" class members under Rule 23(c)(2). The plan should take steps to update addresses before mailing and provide for re-mailing notices to better addresses when returned as undeliverable. *See* Jones v. Flowers, 547 U.S. 220 (2006). The U.S. population is highly mobile today, so class lists compiled for business purposes may be out of date.

Next, it is important to give the class member a reason to *read* the notice. In a world in which junk mail and spam can easily drown out important messages, you may need to press the parties to look beyond the formal legal requirements and find a way to communicate the gist of a class action notice in an attention-getting and understandable format. Rule 23(c)(2)(B) commands that notices "clearly and concisely state in plain, easily understood language" the elements of class action notices. Boilerplate legal language almost never does the job. With help from linguists, communications specialists, a notice expert, and focus groups, the Federal Judicial Center prepared several illustrative notices. See the Class Action Notices Page at www.fjc.gov; there you can also see the "Notice Checklist and Plain Language Guide," which explains important features of the illustrative notices. For a handy booklet on notice principles, see Rust Consulting, Inc. & Kinsella Media, LLC, *Plain Language Primer for Class Action Notice* (undated) (available at http://www.kinsellamedia.com/Knowledge_Sharing.aspx).

The headline of a notice should tell potential class members at a glance why they should—or should not—bother to read the notice; what the notice is about; and what benefit the reader might gain from reading the notice. For example, a notice of an asbestos settlement might start with this headline: "If you have been exposed to an asbestos product, you may have a claim in a proposed class action settlement" and provide enough information to identify potential benefits and options as well as referral to a website or a toll-free telephone number for additional information. The goal is to get class members to read the notice and make an informed

EXHIBIT D

decision about exercising any of their rights before being bound by the court's judgment.

A picture of asbestos insulation in a notice may trigger an association in the reader's mind. Those who recognize their own circumstances are likely to read on, contact a website, or call a toll-free telephone number. Nonmembers of the class will have a good reason for adding the notice to the junk mail pile.

A short-form, single-page (or shorter) "summary" notice with headlines can communicate all the required elements of Rule 23 and can tell the reader how to get additional information. Formal case captions should not be used in the summary notice as they are a turn-off to lay people. Legal terms of the settlement tend to confuse lay readers and should be confined to the settlement agreement posted at the website. While "legalese" has been reduced in recent years, much improvement is still needed. *See* Shannon R. Wheatman & Terri R. LeClerq, Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements (2010).

"Plain English" notices may not be enough. Truly global settlements will include class members whose native language is not English and who may not be citizens of an English-speaking country. Note that the FJC's illustrative class action notices on its website include an example of a Spanish language notice. For a recent and colorful example of a global format for class settlements, which is translated into numerous languages and complete with flags for each country, see the settlement administration website for *In re Royal Ahold Securities and Erisa Litigation,* http://www.aholdsettlement.com.

Make sure the notice plan takes into account any cultural and language barriers to notifying class members. For example, the class actions involving assets of Holocaust victims demanded a far-reaching notice campaign to notify the many dispersed Jewish survivors as well as gays, Jehovah's Witnesses, and Romani ("gypsy") migrants. The judge approved a "multifaceted plan" that included "worldwide publication, public relations (i.e., 'earned media'), Internet, and grass roots community outreach." *In re* Holocaust Victims Assets Litigation, 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000). As the judge in the Holocaust victims' class actions was,

EXHIBIT D

be alert to cultural differences that might affect the attention recipients will give to the proposed notices. A class of migrant farm workers, for example, might rely on radio more often than urban factory workers would. A class of people challenging searches and seizures as unreasonable might respond differently to official court notices than, say, people who have never been arrested.

## G. Claims processes and response handling

If the claims process deters class members from filing claims, the settlement may have less value to the class than the parties assert. Obtaining complete information about claims presented via an unimpeded process will assist you in determining the full value of the settlement and hence its reasonableness, fairness, and adequacy to the class. Avoid imposing unnecessary hurdles on potential claimants.

First, consider whether a claims process is necessary at all. The defendant may already have the data it needs to automatically pay the claims of at least a portion of class members who do not opt out. Necessary claim forms should be as simple and clear as possible and should avoid redundancy. Be careful to avoid claim forms that scare class members away with confusing questions and onerous proof requirements.

If you anticipate or find evidence of a low claims rate, ask counsel whether they have considered alternatives that might enhance the reach of the claims process and tailor it to the characteristics of class members, such as using surveys to determine reasons for nonresponses, improving the clarity of the claims forms, and adding outreach programs. *See* Francis E. McGovern, Distribution of Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123 (2009).

Class counsel should be available to answer class members' questions. The parties commonly agree to seek the appointment of a qualified claims administrator to receive and process claims and handle a toll-free telephone number call center staffed by trained agents. In less complex matters, settlement administrators can place scripted answers to callers' frequently asked questions

EXHIBIT D

about the settlement on an automated phone system and on the Internet.

## H. Fairness hearing

### 1. Participation rates: opt-outs

The typical class action settlement notice will most likely yield an apathetic response, and few objectors or opt-outs. Two empirical studies found that about one in a thousand (0.1%) class members opted out of a proposed settlement. Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004); Thomas E. Willging et al., Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996) [hereinafter Willging et al., Empirical Study of Class Actions (1996)].

Counsel may argue that a low percentage of opt-outs demonstrates class members' agreement with the settlement, but in some cases that argument seems misplaced. Opt-out rates vary according to the type of case and the amount of the individual recovery. Class members are considerably more likely to opt out of mass tort, employment, and commercial litigation, where individual recoveries are generally higher, and less likely to opt out of consumer cases, where individual recoveries are generally lower and individual litigation less viable.

### 2. Participation rates: objections

Do not expect class representatives or other class members to attend the fairness hearing or file written objections. A 1996 FJC study found that only about a quarter to a half of the class representatives attended the fairness hearing. Willging et al., Empirical Study of Class Actions (1996).

The FJC study also found that in about half of the class actions, not a single member filed a written objection. Written objections documented in the FJC study most frequently challenged the amount of the attorney fees requested. In second place was a related objection: that the settlement was inadequate to compensate class members for their losses, perhaps because the lawyers

EXHIBIT D

received more than their fair share. Next in line was the objection that the settlement favored some subclasses over others. These findings suggest that a substantial portion of the fairness hearing will focus on attorney fee issues.

### 3. Conducting the fairness hearing

It is essential to conduct a hearing even if no one other than the attorneys for the settling parties participates, because the hearing is your primary opportunity to focus on the terms of the settlement. You alone are charged with deciding whether the settlement is fair to the class members, reasonable in relation to the merits of their claims, and adequate to redress any injuries suffered. Rule 23 and the MCL 4th call for the judge to conduct an independent analysis of the settlement terms. Review the list of "hot button indicators" discussed in section IV.C above and be prepared to ask counsel hard questions about the value of the settlement to the class. In addition, the MCL 4th contains a checklist of fifteen more routine factors that might inform your decision about whether the settlement is superior to continued litigation of the class claims. MCL 4th § 21.62. The manual also discusses benchmarks for applying the fifteen factors.

If objectors and unrepresented class members appear at the fairness hearing, it is important to permit them to fully voice their concerns. For class members who feel strongly enough about their injuries to appear, the fairness hearing is their "day in court." Judges in settlements involving tort claims, such as the Agent Orange litigation and the silicone gel breast implant litigation, have held multiple days of hearings to accommodate the interests of class members.

You will, of course, want to eliminate unnecessary repetition. Setting time limits is a must. Be sure to notify participants in advance about how much time they will have. Note that having a group of class members gives you a chance to ask questions of all present, akin to conducting a voir dire of a jury venire. Such a group examination may be an efficient mechanism for getting a clear sense of the similarities and differences among class members' claims.

EXHIBIT D

Finally, Rule 23 and good practice both require specific findings as to how the settlement meets or fails to meet the statutory requirements. In these times of heightened visibility of class action rulings, appellate review of settlements is not pro forma even when the court affirms the district court's findings and conclusions.

# V. Attorney Fee Issues

As discussed in part II above, Rule 23(g) requires you to appoint class counsel at an early stage of the litigation. When appointing counsel, consider entering an order with express provisions about the standards and procedures you expect to use in reviewing requests for attorney fees and costs. Rule 23(g)(1)(C). At the least, you should inform counsel about whether to keep time records to support using a lodestar cross-check, as discussed below. In addition, appointing counsel gives you a natural opportunity to discuss cost-saving measures, such as limiting travel expenses and discouraging the use of senior partners to do legal research. *See* MCL 4th § 14.21. Perhaps from the outset of the litigation, but at least at the fee determination stage, "the district judge must protect the class's interest by acting as a fiduciary for the class." *In re* Rite Aid Corp. Securities Litigation, 396 F.3d 294, 307 (3d Cir. 2005).

## A. Evaluating monetary and nonmonetary results achieved

The 2003 Committee Note to Rule 23(h) gives the following guidance for determining attorney fees based on the creation of a monetary fund for the common benefit of the class: the "fundamental focus is the result actually achieved for class members."

In cases involving monetary benefits, do not be misled by party valuations of the settlement that presume a 100% claims rate by class members. Insist on actual information on claims filed to determine the benefit to class members and use that information both to place a value on the settlement and to award attorney fees, as the district judge did in *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 50–53 (D. Me. 2005). That value—plus the value of any nonmonetary relief—serves as the starting point for applying the

EXHIBIT D

percentage-of-value method in determining appropriate attorney fees (discussed below).

Likewise, in cases in which the benefit to the class is nonmonetary (coupons, discounts, warrants, injunctions, and the like), determining the actual value to the class requires looking beyond the face value of nonmonetary or contingent benefits. Redemption data or other evidence of class use is essential. In some cases, particularly settlements involving injunctive or declaratory relief, you might use expert valuations based on reliable, objective standards. In other cases, perhaps a majority, the only reliable test of the benefit to the class will be evidence of class members' use or redemption of the coupons, warrants, or other nonmonetary scrip. *See* MCL 4th § 21.71; *see also* Class Action Fairness Act, 28 U.S.C. § 1712(a) (2008) (coupon settlements). In such cases, it is especially important to link the amount of any attorney fees with the actual benefit to the class.

A direct way to ensure that you have sufficient information to determine attorney fees in cases with nonmonetary benefits is simply to hold back the portion of any attorney fee awards that is linked with coupons, discounts, or other nonmonetary benefits until after the redemption period has ended and the value of the benefits can be established by calculating class members' actual use. For example, the court expressly reserved the determination of any attorney fees to be paid to plaintiffs' counsel until after the parties had provided the court with information concerning the distribution of benefits in *Strong v. BellSouth Telecommunications, Inc.*, 173 F.R.D. 167 (W.D. La. 1997), *aff'd,* 137 F.3d 844, 848 (5th Cir. 1998). Note that redemption of a coupon does not automatically mean the member received a benefit. If similar discounts are provided to consumers outside of the class, the benefit to the class might be less than the face amount of the coupon—or perhaps no benefit at all.

In some class actions involving injunctive relief, the injunctive relief can be assigned a monetary value on the basis of objective criteria. For example, an injunction against an overcharge may be valued at the amount of the overcharge multiplied by the number of people likely to be exposed to the overcharge in the near fu-

EXHIBIT D

ture. Or an injunction against a fraudulent sales practice might be valued by examining the amount of past sales attributable to the practice and projecting that value for a reasonable period of time, perhaps the life of the practice before the injunction. Other forms of injunctive relief, such as orders designed to end discrimination in public accommodations, may be more difficult to value. In such cases it may be necessary to calculate fees by using a lodestar approach.

The take-away line is this: Do not award fees until you know the true value of the settlement.

## B. Methods of calculating fees

Courts use two methods to calculate fees for cases in which the settlement is susceptible to an objective evaluation. The primary method is based on a percentage of the actual value to the class of any settlement fund plus the actual value of any nonmonetary relief. The second method is based on a lodestar calculation in which the court multiplies the reasonable number of attorney or paralegal hours actually expended by the hourly market rate for those services. For cases in which nonmonetary relief cannot be evaluated with confidence, the lodestar method may be the only reasonable alternative.

While most courts of appeals now permit district courts to use the percentage-of-value method (MCL 4th § 14.121), their decisions often direct district courts in their circuit to supplement the percentage method with a lodestar cross-check to see if the hourly rate is reasonable and to provide the appellate courts with a basis for reviewing the reasonableness of the fee award. The cross-check requires "neither mathematical precision nor bean-counting"; it allows you to "rely on summaries submitted by the attorneys and [you] need not review actual billing records." *In re* Rite Aid Corp. Securities Litigation, 396 F.3d 294, 306–07 (3d Cir. 2005).

Another type of cross-check involves examining the defendants' attorney fee records as a measure of what might be a reasonable number of hours or a total payment. In general, judges should avoid rigid adherence to a benchmark percentage and instead tailor their fee award to the realities of the class litigation before

35

EXHIBIT D

them. Sometimes huge settlements do not warrant a standard percentage, as the next section discusses.

## C. "Mega" cases

In "mega" cases, be prepared to see attorney requests for truly huge amounts, up to hundreds of millions of dollars. In such cases, of course, the monetary recovery to the class typically is also in the hundreds of millions of dollars, even in the billions. *See, e.g., In re* Prudential Insurance Co. of America Sales Practices Litigation, 148 F.3d 283, 339–40 (3d Cir. 1998). In such cases, you should be looking at a percentage of recovery far less than the typical range and perhaps as low as 4%. MCL 4th § 14.121. Generally, as the total recovery increases the percentage allocated to fees should decrease. Consider using a sliding scale to advance the goal of awarding reasonable fees in relation to the hours expended. MCL 4th § 14.121, text at nn.497–99; *see also In re* Rite Aid Corp., 396 F.3d at 302–03 (discussing the pros and cons of sliding scales). As noted above in part II, asking attorneys at the outset of the litigation to maintain time records will be helpful in implementing a lodestar cross-check for cases of this magnitude.

## D. Objectors

Objectors may qualify for fees because of their contribution to the common fund available to the class. As occurred in *Bowling v. Pfizer,* 922 F. Supp. 1261, 1285 (S.D. Ohio 1996), by reducing attorney fees, objectors often increase funds available for the common settlement fund. The 2003 Committee Note to Rule 23(h) expressly recognizes the benefits that objectors may provide to the class. But be wary of self-interested professional objectors who often present rote objections to class counsel's fee requests and add little or nothing to the fee proceedings.

## E. Role of government actors

Often in consumer or commercial class action litigation, government regulators, such as the FTC, the Securities and Exchange Commission (SEC), or a state or the federal Attorney General's office, will lay the groundwork for class action litigation. In pursuing

EXHIBIT D

public goals of advancing fair competition, protecting consumers, and policing the marketplace against false and misleading information, such agencies may invest substantial resources in investigating a defendant's alleged malfeasance. For example, in *In re First Databank Antitrust Litigation,* 209 F. Supp. 2d 96, 97 (D.D.C. 2002), the FTC "expended over 25,000 hours of investigators' time, obtained production of and reviewed some 400 boxes of documents produced in response to approximately 40 subpoenas, and conducted 20 investigational hearings and over 60 interviews."

In quantifying the risk undertaken by plaintiffs' counsel in bringing a class action, scrutinize the activities of government actors that may have facilitated or enhanced the outcome (see section IV.B.4 above). Where a government body has obtained a guilty plea, criminal conviction, or civil judgment against a defendant, class counsel in a "piggyback" class action arising out of the same set of facts face a reduced risk of loss and a reduced burden of discovery and trial. A reasonable attorney fee in such cases may be a percentage of the value that the class counsel adds to the settlement that would not have been available to the class but for the counsel's work, as happened in *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1272 (D.C. Cir. 1993). Likewise, in *In re First Databank,* 209 F. Supp. 2d at 98, the court limited the private plaintiff attorneys' fee to a percentage of the value the attorneys added to the FTC's proposed settlement.

In some cases, such as *In re First Databank,* the government actor might participate as an intervenor or as a friend of the court in addressing the attorney fee issues. If the agency does not intervene on its own initiative, consider inviting it to participate in the fee proceedings as an intervenor or friend of the court.

On the other hand, private class action litigation may pave the way for government enforcement or serve as a substantial deterrent in its own right. In such cases, take into account in awarding attorney fees any groundbreaking work of plaintiffs' counsel.

EXHIBIT D

# VI. Coordination with State Judges

Most class actions of any size and scope will have federal jurisdiction based on minimal diversity and, if originally filed in state court, will most likely be removed to federal court. Coordination among federal courts will often, but not always, proceed through the MDL process, at least for major cases. Some overlapping class actions may be filed in state courts (for example, in cases filed on behalf of a class of primarily in-state plaintiffs against an in-state defendant), but federal courts lack jurisdiction only in cases in which a primary or significant defendant is a citizen of the forum state. The first step in determining jurisdiction is to ask the parties whether competing or overlapping proposed or certified class actions exist in other courts. A defendant should be aware of any other litigation against it and should inform the court about competing or overlapping state class actions.

Judges have developed various practices, with various levels of formality, for coordinating their efforts with their state judge counterparts. Informal practices include personal meetings, telephone calls, and e-mail communications to exchange information about scheduling and to coordinate discovery, rulings on class certification, and other procedural matters. In more formal contexts, judges may share a special master with state judges, sit jointly and hear evidence and argument on motions, or even hold a national conference or a set of meetings about the litigation.

Generally, state judges have responded to requests for coordination in a spirit of cooperation. The key is to identify the cases and judges and initiate communication. Coordination in areas like discovery should take into account the pressure a state judge might experience from state lawyers eager to present their cases at trial or, at a minimum, to share in any common fund that their efforts help create. Only in the rarest instance will you ever need to issue an injunction to protect federal jurisdiction, usually when you are seeking to insulate a national settlement from contrary rulings in competing or overlapping class actions in state court. *See* MCL 4th §§ 21.42 and 20.32.

EXHIBIT D

# VII. Use of Special Masters and Court-Appointed Experts

Special masters, court-appointed experts, and other judicial adjuncts with special expertise may be useful in a variety of contexts in class action litigation. Specifically, judges have appointed special masters to oversee discovery and resolve disputes in cases in which the number and complexity of documents might generate a large number of disputes. *See* MCL 4th § 11.424. The emergence of electronic discovery and of a new industry of party experts on electronic discovery may increase the need for the court to appoint a discovery master. Judges have also used magistrate judges, special masters, court-appointed experts, technical advisors, and other adjuncts to assist them in evaluating class settlements (*see* MCL 4th § 21.644) and have appointed special masters or other adjuncts to administer settlements and participate in resolving claims via alternative dispute resolution (ADR) or other methods (*see* MCL 4th § 21.661).

Occasionally, judges have appointed special masters to devise trial plans. *See* MCL 4th § 21.141. In class actions involving disputed scientific evidence, you may want to appoint an expert to present a perspective on disputed issues that is less adversarial than what the parties' experts present. *See, e.g.,* MCL 4th § 22.87. Federal Rules of Civil Procedure 23(h)(4) and 53(a)(1)(C) expressly authorize using special masters to review attorney fee requests. *See* MCL 4th § 21.727. In many class actions, however, the trial judge may find that the information learned by participating in pretrial matters, such as resolving discovery disputes, will greatly enhance the judge's ability to make an informed assessment of a class settlement.

## Conclusion

If this guide has served its purpose, it has helped you analyze and manage the major aspects of class action litigation. By anticipating and paying serious attention to reviewing settlements and requests for attorney fees, you should be able to fulfill your role as a fidu-

EXHIBIT D

ciary for a class whose counsel and representatives have decided to settle on a particular outcome.

## Bibliography

American Law Institute, Principles of Aggregate Litigation (2010)

California Superior Court, Guidelines for Motions for Preliminary and Final Approval of Class Settlement (Draft May 3, 2010)

Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues,* 57 Vand. L. Rev. 1529 (2004)

Federal Judicial Center, Manual for Complex Litigation, Fourth (MCL 4th) (2004)

Federal Trade Commission, Fulfilling the Original Vision: The FTC at 90 (April 2004), http://ftc.gov/os/2004/04/040402abafinal.pdf

Deborah Hensler et al., Class Action Dilemmas: Pursuing Public Goals for Private Gain (RAND Corp. 2000)

Todd B. Hilsee, Shannon R. Wheatman & Gina M. Intrepido, *Do You Really Want Me To Know My Rights? The Ethics Behind Due Process in Class Action Notice Is More Than Just Plain Language: A Desire to Actually Inform*, 18 Geo. J. Legal Ethics 1359 (2005)

Alan Hirsch & Diane Sheehey, Federal Judicial Center, Awarding Attorneys' Fees and Managing Fee Litigation (2d ed. 2005)

Laural L. Hooper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study,* 209 F.R.D. 519 (Federal Judicial Center 2001)

Emery G. Lee III & Thomas E. Willging, *The Impact of the Class Action Fairness Act on the Federal Courts: An Empirical Analysis of Filings and Removals,* 156 U. Pa. L. Rev. 1723 (2008)

Emery G. Lee III & Thomas E. Willging, Federal Judicial Center, Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions (2008)

EXHIBIT D

Francis E. McGovern, Distribution of Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123 (2009)

Nicholas M. Pace & William B. Rubenstein, How Transparent Are Case Outcomes: Empirical Research on the Availability of Class Action Claims Data (RAND Corp. 2008)

Barbara J. Rothstein, John Beisner, Elizabeth J. Cabraser & Jay Tidmarsh, *The Class Action Fairness Act of 2005: An Overview of Legal and Case Management Issues* (Federal Judicial Center Broadcast, Apr. 1, 2005) (outline and videotape available from the FJC's Information Services Office)

Rust Consulting, Inc. & Kinsella Media, LLC, Plain Language Primer for Class Action Notice (undated), http://www.kinsella media.com/Knowledge_Sharing.aspx

Rust Consulting, Inc., Class Action Settlements: What You Should Know About Claim Filing Services (undated), http://www.rust consulting.com/pdfs/ClaimFilingServices.pdf

William W Schwarzer, Nancy E. Weiss & Alan Hirsch, *Judicial Federalism in Action: Coordination of Litigation in State and Federal Courts,* 78 Va. L. Rev. 1689 (1992)

Symposium, *Fairness to Whom? Perspectives on the Class Action Fairness Act of 2005,* 156 U. Pa. L. Rev. 1439 (2008)

Third Circuit Task Force, *Report on Selection of Class Counsel,* 74 Temp. L. Rev. 689 (2001)

Sarah S. Vance, *A Primer on the Class Action Fairness Act of 2005,* 80 Tul. L. Rev. 1617 (2006)

Shannon R. Wheatman & Terri R. LeClercq, Majority of Class Action Publication Notices Fail to Satisfy Rule 23 Requirements (2010) (unpublished manuscript on file with the Federal Judicial Center)

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Federal Judicial Center, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules (1996); *see also* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *An Empirical Analysis of Rule 23 to*

EXHIBIT D

*Address the Rulemaking Challenges,* 71 N.Y.U. L. Rev. 74 (1996) (later version of same report with fewer tables and figures)

Thomas E. Willging & Shannon R. Wheatman, Federal Judicial Center, An Empirical Examination of Attorneys' Choice of Forum in Class Action Litigation (2005)

# Case Annotations by Topic

## *Determining federal jurisdiction*

Tam v. Indymac Bank, No. 2:8CV06458, 2008 WL 4793676 (C.D. Cal. Oct. 30, 2008) (comprehensive show cause order with a checklist of jurisdictional and removal issues)

### Burdens of proof

Blockbuster v. Galeno, 472 F.3d 53, 56–58 (2d Cir. 2006) (CAFA did not alter long-standing burden-of-proof rule)

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 813 (5th Cir. 2007) ("'once federal jurisdiction has been established [under CAFA] the *objecting* party bears the burden of proof as to the applicability of any express statutory exception under §§ 1332(d)(4)(A) and (B) [the local controversy and home state exceptions]'") (quoting Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1024 (9th Cir. 2007) (alterations in original))

Spivey v. Vertrue, Inc., 528 F.3d 982, 985–86 (7th Cir. 2008) (defendant satisfied its burden of proof by showing more than $5 million was at stake, or "in controversy")

### Amount in controversy

Brill v. Countrywide Home Loans, 427 F.3d 446, 448 (7th Cir. 2005) ("Once the proponent of jurisdiction has set out the amount in controversy, only a 'legal certainty' that the judgment will be less forecloses federal jurisdiction.")

Gene & Gene LLC v. Biopay LLC, 541 F.3d 318, 324 (5th Cir. 2008) ("Gene's complaint held open the possibility of treble damages, depending on the state of the proof.")

EXHIBIT D

Hart v. FedEx Ground Package Sys., Inc., 457 F.3d 675, 682 (7th Cir. 2006) (party challenging federal jurisdiction must provide competent proof of the facts supporting the challenge)

Lowdermilk v. United States Bank Nat'l Ass'n, 479 F.3d 994, 999–1000 (9th Cir. 2007) (plaintiff is the master of its complaint, and courts must accept damages allegations unless defendant can show a legal certainty of greater damages)

Home-state exception

Martin v. Lafon Nursing Facility of the Holy Family, Inc., 548 F. Supp. 2d 268, 273–78 (E.D. La. 2008) (discussing use of a questionnaire to establish residence and intent)

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 813–18 (5th Cir. 2007) (discussing affidavits and evidence submitted to support proof of citizenship of class members in applying discretionary exception to CAFA)

Summerhill v. Terminix, No. 4:08CV659, 2008 WL 4809448 (E.D. Ark. Oct. 30, 2008) (applying statutory requirement that all primary defendants must be citizens of the home state for the exception to apply)

Discretionary jurisdiction

Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 822–24 (5th Cir. 2007) (class action involving Hurricane Katrina-related injuries did not affect national interests under CAFA)

## Timing and significance of class certification

Class certification

General Telephone Co. v. Falcon, 457 U.S. 147, 161 (1982) ("[A] class action may only be certified if the trial judge is satisfied, after a vigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.")

Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 594 (9th Cir. 2010) ("[D]istrict courts are not only at liberty to but must perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often . . . require

EXHIBIT D

looking behind the pleadings to issues overlapping with the merits of the underlying claims.")

Notice

*In re* Vivendi Universal, S.A. Securities Litigation, 242 F.R.D. 76, 107–09 (2007)

Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 176 (1974)

## Settlement review: risks and issues

Judge's role

Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 280 (7th Cir. 2002)

Prior action by government entities

*In re* First Databank Antitrust Litig., 209 F. Supp. 2d 96 (D.D.C. 2002)

Appraisal of settlement

Acosta v. Trans Union, LLC, 243 F.R.D. 377, 391 (C.D. Cal. 2007) (reducing the number of claims rendered a portion of the settlement "illusory")

Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561, 574–75 (E.D. Pa. 2001) (settlement appraisal focused on the value actually distributed to the class based on the number of claims actually filed)

Information from objectors

O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 295 (E.D. Pa. 2003) (referring to "'canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests'" (quoting Shaw v. Toshiba Am. Info. Sys., 91 F. Supp. 2d 942, 973 (S.D. Tex. 2000))

EXHIBIT D

### Hot button indicators

Coupons

> *In re* Compact Disc Minimum Advertised Price Antitrust Litig., 292 F. Supp. 2d 184, 186–88 (D. Me. 2003) (comparing settlement discounts with discounts available to frugal shoppers)
>
> *In re* General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 809–10 (3d Cir. 1995) (rejecting coupon settlement based in part on absence of a secondary market in which coupons could be converted to cash)
>
> *In re* Mexico Money Transfer Litig., 267 F.3d 743, 748 (7th Cir. 2001) (coupons may be of value to repeat users of a product or service)

Negative options

> Chavez v. Netflix, Inc., 75 Cal. Rptr. 3d 413, 418–21 (Cal. Ct. App. 2008) (tying together a proposed "benefit" with an automatic paid renewal of that "benefit" is grounds for rejection of a proposed settlement)

*Cy pres* relief ("fluid recovery")

> Molski v. Gleich, 318 F.3d 937, 954 (9th Cir. 2003) (rejecting proposed *cy pres* award after examining proposed settlement for evidence that "proof of individual claims would be burdensome or that distribution of damages would be costly")
>
> Powell v. Georgia-Pac. Corp., 119 F.3d 703 (8th Cir. 1997) (examining the relationship between the class members' interests and those of the proposed *cy pres* recipient)

Restriction on claims/reversion of unclaimed funds to defendants

> Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283 (7th Cir. 2002) (restrictions on eligibility may diminish the value of the settlement to the class)

Collusion: "Reverse auctions" and the like

> Acosta v. Trans Union, LLC, 243 F.R.D. 377, 399 (C.D. Cal. 2007) ("The Court is hesitant to classify the Settlement as the product of a 'reverse auction,' but cannot avoid the con-

EXHIBIT D

clusion that the process by which it was reached is strikingly similar.")

Figueroa v. Sharper Image Corp., 517 F. Supp. 2d 1292, 1321 (S.D. Fla. 2007) (class settlement rejected where defendants selected the most vulnerable plaintiff attorney and convinced that attorney to accept terms unfavorable to the class)

Injunctive relief

Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 615–23 (9th Cir. 2010) (discussing injunctive relief)

Release of liability without remedy

Reynolds v. Beneficial Nat'l Bank, 288 F.3d 277, 283–84 (7th Cir. 2002) (releasing a damage remedy without payment to class members is not acceptable)

Settlement class actions

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (Rule 23 standards, with the exception of manageability, apply to certification of settlement class actions)

### Preliminary review of proposed settlement

*In re* Lupron Mktg. & Sales Practices Litig., 345 F. Supp. 2d 135, 138 n.5 (D. Mass. 2004) (permitting plaintiff counsel in independent state class actions against same defendants to intervene and provide adversarial opposition to a proposed settlement)

Notice to the Class

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974)

Mullane v. Central Hanover Bank and Trust Co. 339 U.S. 306 (1950)

Jones v. Flowers, 547 U.S. 220 (2006)

*In re* Holocaust Victims Assets Litig., 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000) (describing multifaceted notice plan)

EXHIBIT D

## Conducting the fairness hearing

*In re* Cendant Corp. Litig., 264 F.3d 201 (3d Cir. 2001) (appellate review of class settlement)

## Attorney fee issues

*In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir. 2005) (stating that "the district judge must protect the class's interest by acting as a fiduciary for the class")

Evaluating monetary and nonmonetary results achieved

Bowling v. Pfizer, 132 F.3d 1147, 1151–52 (6th Cir. 1998) (reserving a portion of attorney fee decision until administration of the class settlement is complete)

Fleury v. Richemont N. Am., Inc., No. 05-4525, 2008 WL 3287154, at *6 (N.D. Cal. Aug. 6, 2008) (reserving attorney fee decision)

*In re* Auction Houses Antitrust Litig., No. 00-Civ.-0648, 2001 WL 170792, at *3–*5, *15–17 (S.D.N.Y. 2001) (awarding fees in part in the form of warrants)

Schwartz v. Dallas Cowboys Football Club, Ltd., 157 F. Supp. 2d 561 (E.D. Pa. 2001) (value distributed to the class based on the number of claims actually filed represents the starting point for calculation of attorney fee award)

Strong v. BellSouth Telecomm., Inc., 173 F.R.D. 167 (W.D. La. 1997), *aff'd,* 137 F.3d 844, 848 (5th Cir. 1998) (reserving attorney fee decision until court receives information about actual distribution of settlement benefits to class members)

Sylvester v. CIGNA Corp., 369 F. Supp. 2d 34, 50–53 (D. Me. 2005) (using information about actual claims by class members to evaluate settlement and award attorney fees)

Methods of calculating fees

*In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306–07 (3d Cir. 2005) (lodestar cross-check does not require actual billing records)

EXHIBIT D

"Mega" cases

> *In re* Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 339–40 (3d Cir. 1998) (describing large class settlements)
>
> *In re* Rite Aid Corp. Sec. Litig., 396 F.3d 294, 302–03 (3d Cir. 2005) (discussing pros and cons of sliding scales for fee awards)

Objectors

> Bowling v. Pfizer, 922 F. Supp. 1261, 1285 (S.D. Ohio 1996) (objectors to fees were awarded fees for adding to the common fund)

Role of government actors

> *In re* First Databank Antitrust Litig., 209 F. Supp. 2d 96, 97–98 (D.D.C. 2002) (documenting time and effort of government agency; participation in class litigation by government agency)
>
> Swedish Hosp. Corp. v. Shalala, 1 F.3d 1261, 1272 (D.C. Cir. 1993) (reasonable attorney fee is a percentage of the value added to the class settlement beyond the amount attributable to the government agency)

**The Federal Judicial Center**

**Board**

The Chief Justice of the United States, Chair
Judge Susan H. Black, U.S. Court of Appeals for the Eleventh Circuit
Judge David O. Carter, U.S. District Court for the Central District of California
Magistrate Judge John Michael Facciola, U.S. District Court for the District of Columbia
Judge James B. Haines, Jr., U.S. Bankruptcy Court for the District of Maine
Judge Edward C. Prado, U.S. Court of Appeals for the Fifth Circuit
Judge Loretta A. Preska, U.S. District Court for the Southern District of New York
Judge Philip M. Pro, U.S. District Court for the District of Nevada
James C. Duff, Director of the Administrative Office of the U.S. Courts

**Director**

Judge Barbara J. Rothstein

**Deputy Director**

John S. Cooke

**About the Federal Judicial Center**

The Federal Judicial Center is the research and education agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and seven judges elected by the Judicial Conference.

The organization of the Center reflects its primary statutory mandates. The Education Division plans and produces education and training programs for judges and court staff, including satellite broadcasts, video programs, publications, curriculum packages for in-court training, and Web-based programs and resources. The Research Division examines and evaluates current and alternative federal court practices and policies. This research assists Judicial Conference committees, who request most Center research, in developing policy recommendations. The Center's research also contributes substantially to its educational programs. The two divisions work closely with two units of the Director's Office—the Systems Innovations & Development Office and Communications Policy & Design Office—in using print, broadcast, and online media to deliver education and training and to disseminate the results of Center research. The Federal Judicial History Office helps courts and others study and preserve federal judicial history. The International Judicial Relations Office provides information to judicial and legal officials from foreign countries and assesses how to inform federal judicial personnel of developments in international law and other court systems that may affect their work.

EXHIBIT D

EXHIBIT E

# LAFFEY MATRIX

History

Case Law

Expert Opinions

See the Matrix

Contact us

Home

Links

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/20- 5/31/21 | 1.015894 | $206 | $378 | $465 | $672 | $759 | $914 |
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |

EXHIBIT E

| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

\* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

\*\* The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

EXHIBIT E