THEODORE J. BOUTROUS, JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
CHRISTOPHER CHORBA, SBN 216692
  cchorba@gibsondunn.com
DIANA M. FEINSTEIN, SBN 302626
  dfeinstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:   213.229.7000
Facsimile:   213.229.7520

WESLEY SZE, SBN 306715
  wsze@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
Telephone:   650.849.5300
Facsimile:   650.849.5333

*Attorneys for Defendant Apple Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. DEVICE PERFORMANCE LITIGATION <br><br> This Document Relates To: <br><br> ALL ACTIONS. | CASE NO. 5:18-md-02827-EJD <br><br> **PUTATIVE CLASS ACTION** <br><br> **DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS** <br><br> Judge:        Hon. Edward J. Davila <br> Courtroom:  4, Fifth Floor <br> Date:         December 4, 2020 <br> Time:         10:00 a.m. |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     STATEMENT OF THE ISSUE TO BE DECIDED ................................................. 3

III.    BACKGROUND ...................................................................................................... 3

     A.      Apple's Performance Management Feature And The Claims In This Case ................ 3

     B.      The Appointment Of Plaintiffs' Counsel ..................................................... 4

     C.      The Litigation Conducted To Date ............................................................. 5

     D.      The Parties' Settlement .............................................................................. 6

     E.      Settlement Notice ....................................................................................... 7

     F.      Request For Attorneys' Fees And Objections ............................................ 7

IV.     LEGAL STANDARD .............................................................................................. 8

V.      ARGUMENT ........................................................................................................... 9

     A.      A Reasonable Lodestar Would More Than Adequately Compensate Plaintiffs' Counsel ................................................................................................. 9

          1.      *This Is Not A "Rare And Exceptional" Case That Requires Adjusting The Lodestar.* ................................................................... 10

          2.      *Calculating Fees As A Percentage Of The Floor Does Not Lead To A Reasonable Award For Several Reasons.* ....................................... 14

          3.      *Plaintiffs' Counsel's Own Clients Object To The Excessive Fee Request.* .............................................................................. 17

     B.      Plaintiffs' Counsel Have Not Provided Adequate Documentation To Assure This Court And The Class That Their Lodestar Is Reasonable .................... 18

     C.      Even Plaintiffs' Counsel's Limited Supporting Documentation Strongly Indicates Their Lodestar Contains Excessive, Redundant, And Unnecessary Hours ........................................................................................... 20

     D.      Any Award Of Fees Must Be Further Reduced As Required By The Sanctions Order ........................................................................................... 24

VI.     CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adderley v. NFLPA*,
    No. 07-943-WHA, 2009 WL 4250792 (N.D. Cal. Nov. 23, 2009) ..........................................21, 22

*Alexander v. FedEx Ground Package Sys., Inc.*,
    No. 05-38-EMC, 2016 WL 3351017 (N.D. Cal. June 15, 2016).........................................................16

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
    421 U.S. 240 (1975).........................................................................................................................8

*In re Anthem, Inc. Data Breach Litig.*,
    No. 15-2617-LHK, 2018 WL 11195115 (N.D. Cal. Feb. 2, 2018)..............................................21

*In re Anthem, Inc. Data Breach Litig.*,
    No. 15-2617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018)..............................................21

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011)........................................................................8, 10, 11, 15, 16

*Bodon v. Domino's Pizza, LLC*,
    No. 09-2941, 2015 WL 3889577 (E.D.N.Y. June 4, 2015) .........................................................15

*Brazil v. Dell Inc.*,
    No. 07-1700-RMW, 2012 WL 1144303 (N.D. Cal. Apr. 4, 2012)...............................................14

*Class Plaintiffs v. Jaffe & Schlesinger, P.A.*,
    19 F.3d 1306 (9th Cir. 1994)......................................................................................................23

*Create-A-Card, Inc. v. Intuit, Inc.*,
    No. 07-6452-WHA, 2009 WL 3073920 (N.D. Cal. Sept. 22, 2009) ...........................................14

*In re Critical Path, Inc.*,
    No. 01-551-WHA, 2002 WL 32627559 (N.D. Cal. June 18, 2002) ............................................22

*Cunningham v. Cnty. of L.A.*,
    879 F.2d 481 (9th Cir. 1988)...............................................................................................2, 10

*Democratic Party of Wash. State v. Reed*,
    388 F.3d 1282 (9th Cir. 2004).....................................................................................................19

*Fischel v. Equitable Life Assur. Soc'y of U.S.*,
    307 F.3d 997 (9th Cir. 2002).......................................................................................................17

*Garcia v. Resurgent Cap. Servs., L.P.*,
    No. 11-1253-EMC, 2012 WL 3778852 (N.D. Cal. Aug. 30, 2012) ............................................19

*Gates v. Deukmejian*,
    987 F.2d 1392 (9th Cir. 1992)........................................................................................................9

*Gonzalez v. City of Maywood*,
    729 F.3d 1196 (9th Cir. 2013)......................................................................................................19

Gibson, Dunn &
Crutcher LLP

*Gray v. BMW of N. Am., LLC*,
    No. 13-3417, 2017 WL 3638771 (D.N.J. Aug. 24, 2017) ............................................15

*Gutierrez v. Wells Fargo Bank, N.A.*,
    No. 07-5923-WHA, 2015 WL 2438274 (N.D. Cal. May 21, 2015) ..................................12, 16, 17

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)..........................................................................10

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)................................................................................2, 9, 11, 12, 19

*In re Heritage Bond Litig.*,
    No. 02-1475, 2005 WL 1594389 (C.D. Cal. June 10, 2005) .........................................18

*In re High-Tech Emp. Antitrust Litig.*,
    No. 11-2509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015).................................16, 21

*In re HP Printer Firmware Update Litig.*,
    No. 16-5820-EJD, 2019 WL 2761287 (N.D. Cal. June 28, 2019)..................................11, 12

*In re Infospace, Inc.*,
    330 F. Supp. 2d 1203 (W.D. Wash. 2004) ..............................................................14

*Kakani v. Oracle Corp.*,
    No. 06-6493-WHA, 2007 WL 4570190 (N.D. Cal. Dec. 21, 2007)................................14

*Kay Co. v. Equitable Prod. Co.*,
    749 F. Supp. 2d 455 (S.D.W. Va. 2010) ................................................................14

*Kerr v. Screen Extras Guild, Inc.*,
    526 F.2d 67 (9th Cir. 1975)..............................................................................10

*In re Magsafe Apple Power Adapter Litig.*,
    No. 09-1911-EJD, 2015 WL 428105 (N.D. Cal. Jan. 30, 2015).....................................13

*Moore v. Verizon Commc'ns Inc.*,
    No. 09-1823-SBA, 2014 WL 588035 (N.D. Cal. Feb. 14, 2014) ...................................17

*Morales v. City of San Rafael*,
    96 F.3d 359 (9th Cir. 1996)..............................................................................10

*Munoz v. UPS Ground Freight, Inc.*,
    No. 07-970-MHP, 2009 WL 1626376 (N.D. Cal. June 9, 2009).....................................17

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015)............................................................................10

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-2143-RS, 2016 WL 11704906 (N.D. Cal. Apr. 14, 2016).................................21

*Stonebrae, L.P. v. Toll Bros., Inc.*,
    No. 08-221-EMC, 2011 WL 1334444 (N.D. Cal. Apr. 7, 2011) ...................................11, 12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. 07-1827-SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) .....................................17

Gibson, Dunn &
Crutcher LLP

iv

*Velez v. Wynne*,
    220 F. App'x 512 (9th Cir. 2007) ................................................................................10

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002)...............................................................................17

*Vogel v. Harbor Plaza Ctr., LLC*,
    893 F.3d 1152 (9th Cir. 2018)...............................................................................19

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994)........................................................3, 4, 14, 15, 16, 17

*Welch v. Metro. Life Ins. Co.*,
    480 F.3d 942 (9th Cir. 2007).................................................................................18

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    445 F. Supp. 3d 508 (N.D. Cal. 2020) ..................................................................19

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-2752-LHK, 2020 WL 4212811 (N.D. Cal. July 22, 2020) .................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

# I.  INTRODUCTION

Although Apple and Plaintiffs' counsel agree that the proposed settlement and relief provided to class members is fair, reasonable, and adequate, and that the settlement should receive final approval pursuant to Rule 23, the parties disagree on Plaintiffs' counsel's Motion for Attorneys' Fees.  Through that Motion, Plaintiffs' counsel ask for a windfall that exceeds their already-inflated lodestar, seeking an amount ($87,730,000) that is untethered to the results achieved in this case, the work actually performed, or any relevant benchmark in the Ninth Circuit or this District.  Worse, Plaintiffs' counsel's request would diminish the actual settlement amount in this case by at least $23 for each class device (and possibly even more), taking money out of the pockets of the very group that Plaintiffs' counsel represent.

Not surprisingly, the settlement class members have responded negatively to Plaintiffs' counsel's excessive fee demand.  Class members have sent dozens of letters to this Court, and by far the most frequent complaint has been the exorbitant fee request:

- "I object to the excessive amount of the settlement going to attorneys.  …  This is irrationally excessive and absurdly out of proportion to the work involved."  (Dkt. 505.)

- "I … would like to protest the excessive attorneys' fees and expenses, seemingly self-awarded for the vast majority of injured parties.  I hope that the court will determine that these costs are unjustified and should be scaled back dramatically."  (Dkt. 453.)

- "You are being asked to award $87 million to attorneys based upon the representation of those attorneys that the time they spent was all reasonable and the result is worth this price.  It is a patently outrageous amount … .  The plaintiff's attorneys are, for purposes of this motion, not representing anyone except themselves."  (Dkt. 498.)

- "I am protesting … Class Counsel's request for Attorney's Fees … .  This is an exorbitant amount.  …  How can any reasonable person feel this is just compensation."  (Dkt. 443.)

- "If attorneys are allowed to collect such excessive fees as suggested by the maximum allowed in this settlement, the attorneys will enrich themselves at the expense of the plaintiffs, whose settlement will need to be reduced to cover the excessive fees.  …  The maximum attorney's fees … would enrich the attorneys by amounts well beyond reasonable and at the plaintiffs' expense."  (Dkt. 472.)

- "I object to the excessive attorney fees.  These large sums gained by lawyers and their businesses continue to motivate greedy attorneys in filing these class action suits.  …  The individuals who are truly affected by these events should collect more money."  (Dkt. 460.)

(*See also generally* Dkts. 435, 437–38, 445, 451, 455, 461–63, 474–75, 478, 480–81, 484–85, 489,

Gibson, Dunn &
Crutcher LLP

492–93, 496, 499, 501–02, 503, 506–07.)

For this claims-made settlement, the Court's determination of the fee should focus on a reasonable lodestar, which represents the actual work Plaintiffs' counsel reasonably expended on this litigation. This is not a "rare [and] exceptional case[]" in which an upward departure from the lodestar is appropriate. *Cunningham v. Cnty. of L.A.*, 879 F.2d 481, 488 (9th Cir. 1988). In particular, the size of the proposed settlement is a function of the large number of devices at issue, rather than the result of any specific skill or expertise of Plaintiffs' counsel, and the many law firms that vied to represent the class demonstrates that the plaintiffs' bar viewed this matter as a lucrative and desirable—rather than risky and precarious—engagement. After two motions to dismiss and an amendment to the consolidated complaint, this Court dismissed most of Plaintiffs' key claims with prejudice, holding that their "defect" claims were "far too sweeping," that Plaintiffs had failed to plead any actionable fraud theory, and that there was no legal basis to bring claims for the unrelated devices (such as iPhone 5, 5c, 5s, and iPad devices) that Plaintiffs attempted to include in this litigation. (*See* Dkts. 219, 331.) The parties subsequently reached resolution and the litigation never progressed to the phases that entail the most risky, time-intensive, and difficult endeavors.

None of the Ninth Circuit's factors justifies an upward departure from Plaintiffs' counsel's lodestar. If anything, even the most cursory review of Plaintiffs' counsel's bare-bones supporting documentation raises significant concerns that their lodestar includes "excessive, redundant, or otherwise unnecessary" hours. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). As explained below, the supporting documents demonstrate significant deficiencies, including evidence of excessive, redundant, or otherwise unnecessary work that should be stricken. The 68,731 hours that counsel claim they spent on this litigation is orders of magnitude greater than what has been expended in other, far larger and more complex cases. (*Infra* pp. 20–21.) By including nearly 10,000 hours and nearly $4 million in fees attributable to JCCP Counsel, the lodestar also violates the plain terms of the settlement, which prohibits JCCP Counsel from "mak[ing] an independent claim for attorneys' fees or expenses." (Dkt. 416 ¶ 9.1.) Plaintiffs' counsel's lodestar is excessive and should be rejected as presented.

The Court also should reject Plaintiffs' counsel's suggestion that their $87,730,000 fee request is reasonable when measured as a "percentage of the fund." (Mot. at 4.) A percentage method is

inappropriate in this case because this is a *claims-made* settlement and there is no "common fund." And for large settlements like this one, there is "no necessary correlation between any particular percentage and a reasonable fee," and mechanically applying the 25% benchmark percentage (or something close to it) "would be like picking a number out of the air." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1297 (9th Cir. 1994). There is no reason to base fees on a percentage method, and doing so would be both unfair to the class members—whose recovery would be reduced—and inconsistent with the claims-made settlement structure—which does not involve a common fund.

The Court should deny Plaintiffs' counsel's request and award no more than a reasonable lodestar for the amount actually and reasonably expended on behalf of the settlement class (without a multiplier or artificial and inflated "percentage-of-the-fund"). The Court should require Plaintiffs' counsel to substantiate their lodestar (without delaying the schedule for final approval), and it must deduct at least $7,100,000 to remove the excessive and duplicative amounts identified below (*infra* pp. 20, 23–25). Awarding more than that would result in a windfall to Plaintiffs' counsel and a substantial reduction of each class member's recovery. Finally, any award of fees must be reduced as required under this Court's order imposing sanctions against Plaintiffs' counsel for their courtroom misconduct. (*See* Dkt. 350 at 6; *infra* p. 24–25.)

## II.  STATEMENT OF THE ISSUE TO BE DECIDED

Are Plaintiffs' counsel entitled to a fee award of $87,730,000—which is $51,321,425 more than the value of their claimed lodestar, unjustified by the results achieved through this litigation, and excessive for the amount of work that was actually performed?

## III.  BACKGROUND

### A.  Apple's Performance Management Feature And The Claims In This Case

This settlement resolves litigation about Apple's development of a software feature that improved power management during peak workloads to prevent unexpected shutdowns on certain iPhone devices. Those devices are powered by lithium-ion batteries, which are consumable components that become less effective with time, number of charge cycles, extreme temperatures, and usage. (*See* Dkt. 417 at 2.) Chemically aged batteries, in turn, are less able to deliver peak energy loads. As a result, when power demands were high in varying temporary conditions—such as

Gibson, Dunn &
Crutcher LLP

environmental temperature, state of charge, and customer usage—some customers experienced unexpected shutdowns of their older-model iPhones. (*Id.*) Faced with this complex technological problem, Apple's engineering teams worked responsibly, rapidly, and successfully to address it in a way that delivered a better experience for customers.

In January 2017, Apple released iOS 10.2.1, an operating system upgrade that included a performance management feature that dynamically managed the performance of certain iPhones and successfully reduced the frequency of unexpected shutdowns. (Dkt. 176 at 1.) Apple extended this performance management feature to additional iPhone models through iOS 11.2, which it released in November 2017. (*Id.*) This solution benefited customers by prolonging the life of devices. Several class members took the time to write to the Court to defend Apple's conduct: "Apple was honestly trying to make sure their devices worked as well as they could as the batteries aged" and "to ensure good customer experiences" (Dkt. 441); any supposed "slowdowns [class members] might've experienced [were] completely acceptable" (Dkt. 456); the feature was "a reasonable design tradeoff for Apple engineers to make" (Dkt. 479); and many class members "never experienced any slowdown in performance" (*id.*). But many lawsuits ensued nonetheless, and the Judicial Panel on Multidistrict Litigation centralized them in this multidistrict proceeding.

**B.    The Appointment Of Plaintiffs' Counsel**

After consolidation, three competing motions for appointment of interim lead counsel were filed. (*See* Dkts. 30, 35, 38.) During the lead counsel appointment hearing, the Court warned that it would be "important … to find a leadership team that will [ensure] efficiencies in costs, efficiencies in communications, and efficiencies in the litigation." (Chorba Decl., Ex. A at 15:15–22.) Although it "express[ed] no view as to which particular lawyer and/or firm should serve as interim lead counsel," Apple raised "significant concerns" about "complex and unwieldy lead counsel structures," noting that "sprawling leadership structure[s]" would "represent the very 'overstaffing' and 'ungainly counsel structure[s]' that the Federal Rules specifically warn against." (Dkt. 78 at 2–3 (citing Fed. R. Civ. P. 23(g)(2) adv. comm. note (2003 amends.)); *see also* Chorba Decl., Ex. A at 46:24–47:15 (Apple's counsel raised concerns about "efficiency and making sure there's coordination" to avoid "attorney's fees that just start to accumulate" and result in a "lodestar [that] gets larger and larger").)

The Court appointed Cotchett, Pitre & McCarthy LLP and Kaplan Fox & Kilsheimer LLP as interim co-lead counsel.  (Dkt. 99.)  In addition, the Court appointed attorneys from 23 firms to the Plaintiffs' Executive Committee, and attorneys from an additional 14 firms to the Steering Committee.  (*Id.* at 4–7.)  In appointing 39 law firms, the Court acknowledged Apple's concerns about potential duplication of efforts and inefficiency:  "At first blush, the structure … may seem larger than necessary."  (*Id.* at 2.)  But it was persuaded to the adopt the proposed structure based on Plaintiffs' counsel's "representations that it will be in the best interests of the plaintiffs and provide the requisite cost savings," and their "assurances that the proposed structure is designed to secure an efficient and beneficial result for the plaintiffs."  (*Id.* at 2–3.)  The Court expected that counsel would "avoid unnecessary duplication and unproductive efforts" and "remain committed to efficiency."  (*Id.* at 3, 8.)

**C.    The Litigation Conducted To Date**

Plaintiffs' counsel filed a consolidated complaint on July 2, 2018, which asserted 76 causes of action on behalf of a putative worldwide class.  (*See* Dkt. 145.)  After two motions to dismiss and an amendment to the consolidated complaint, Apple substantially narrowed the claims.  While Plaintiffs had alleged that all iPad and iPhone devices were "defective" because of an alleged "mismatch" between the devices' hardware and software, and that Apple committed fraud, breached contractual obligations, and violated consumer protection laws, the Court dismissed most of Plaintiffs' claims, holding that their "defect" theory was "far too sweeping" because it complained about "the normal battery aging process" and because it is "common sense" that consumers "are fully aware of the facts regarding software capability and battery capacity."  (Dkt. 219 at 33; Dkt. 315 at 34 (holding that "Plaintiffs acknowledge that their phones functioned as expected when purchased," and that they "concede that the 'defect' is the normal aging of the battery")).)  The three remaining "computer intrusion" claims that survived Apple's pleadings challenges were the claims under the federal Computer Fraud and Abuse Act ("CFAA"), trespass to chattels, and the California Comprehensive Computer Data Access and Fraud Act.  (*See* Dkt. 347.)

While pursuing discovery, the parties also explored potential resolution.  Following several submissions, presentations, formal mediation sessions, and telephone conferences with the mediator, there was a mediator's proposal in September 2019, which the parties accepted.  (*See* Dkt. 470-1 ¶ 9.)

1    When the settlement was reached, the parties had conducted thorough, but limited, discovery, which

2    focused on document productions, written discovery, and depositions of a few Apple employees.

3        As litigation of this federal action progressed, Apple also defended a parallel consolidated state

4    case in the California Superior Court (the "JCCP") after the court refused to stay that duplicative action.

5    (Chorba Decl. ¶¶ 2–4.)  There was no separate discovery in the JCCP, and there was one round of

6    demurrer briefing after this Court's first motion-to-dismiss ruling.  A second demurrer was pending

7    when the parties reached this settlement to extinguish the MDL and the JCCP.  (Dkt. 471-2 ¶¶ 22, 26.)

8    **D.    The Parties' Settlement**

9        The parties reached a settlement to resolve all pending civil litigation in the United States.  (*See*

10   Dkt. 416.)  In exchange for a general release and waiver of all claims that were, or could have been,

11   brought against it, Apple agreed to provide monetary compensation to each class member who

12   submitted a valid claim.  The proposed settlement does not include injunctive relief.

13       The Motion incorrectly characterizes the proposal as a "common fund" settlement.  (*See, e.g.*,

14   Mot. at 3.)  In fact, the parties negotiated a *claims-made* settlement.  Under this structure, Apple has

15   agreed to pay approximately $25 per device to class members who submit valid claims and attest, under

16   penalty of perjury, that they experienced diminished performance while using an affected iPhone

17   device on or before December 21, 2017.  (*See* Dkt. 416 ¶¶ 5.1, 6.3.)  Unlike a common fund settlement,

18   the amount of the proposed settlement depends on the actual number of valid claims.  If the aggregate

19   value of the valid claims submitted falls below $310 million (which is now very likely), Apple will

20   increase each claimant's payment on a *pro rata* basis to ensure a minimum settlement amount of $310

21   million, after deducting the costs of notice and settlement administration and any award of attorneys'

22   fees, costs, and service awards.  (*Id.* ¶¶ 5.3–5.3.3.)[1]  Accordingly, every dollar awarded to Plaintiffs'

23   counsel in fees or expenses is a dollar taken away from the class members who submitted valid claims.

24   Pursuant to the proposed settlement, Apple will tender 50% of any fee award within 14 days of final

25   approval, with the remainder of the fees tendered 75 days after the Effective Date.  (*Id.* ¶ 8.3.)

26

27   [1]  Conversely, if the aggregate value of the valid claims submitted were to exceed $500 million, which
     the parties do *not* anticipate, then each claimant's payment would have been reduced on a *pro rata*

28   basis to ensure the aggregate settlement amount paid to the class does not exceed $500 million,
     exclusive of administration costs, attorneys' fees, costs, and service awards.  (Dkt. 416 ¶ 5.2.)
     Given the claims submitted to date, the parties do not expect this scenario to occur.

6

DEFENDANT'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 5:18-MD-02827-EJD

1    The proposed settlement also permits Plaintiffs to apply to the Court for the payment of service

2    awards of $3,000 to each Named Plaintiff who was deposed and $1,500 each for all other Named

3    Plaintiffs.  (Dkt. 416 ¶ 8.4.)  As required by the settlement agreement and binding mediation, Apple

4    takes no position on Plaintiffs' request for Named Plaintiff service awards.

5    **E.    Settlement Notice**

6    The parties have diligently worked with the Settlement Administrator to notify the class of the

7    proposed settlement.  The Settlement Administrator sent direct notice to ***99%*** of the class members,

8    either through e-mail or postcard.  (Dkt. 470-2 ¶ 12.)  A settlement website and toll-free telephone

9    number have been established, which received millions of page views and thousands of calls,

10   respectively, and the settlement has attracted significant media coverage.  (*Id.* ¶¶ 17–25.)  And as

11   directed by the Court, the parties also extended the claims submission, objection, and opt-out periods,

12   giving some putative settlement class members up to 92 days to respond to the settlement notice, which

13   is considerably more than this District's guidance of at least 35 days.  (*See id.* ¶ 6.)  The parties also

14   provided a second round of direct notice to all settlement class members who had not already submitted

15   a claim or opted out.  (*Id.* ¶¶ 13–16.)  Following the second notice, and as of October 5, there have

16   been a total of 2.2 million claims, with additional claims that will be submitted and processed before

17   the claims deadline.  (Chorba Decl. ¶ 13.)  Today is the deadline to submit claims.

18   **F.    Request For Attorneys' Fees And Objections**

19   Plaintiffs' counsel filed their Motion for Attorneys' Fees, Expenses, and Service Awards on

20   August 26, 2020.  (Dkt. 468.)  In their Motion, Plaintiffs' counsel represent that 275 timekeepers from

21   40 different firms spent 68,731 hours litigating this matter (including 9,679 hours for the JCCP),

22   generating a total claimed lodestar of $36,408,575.  (Dkt. 471 ¶ 65; Dkt. 471-2, Ex. 2 ¶ 42; *see* Mot.

23   at 15.)  The documentation Plaintiffs' counsel submitted in support of the Motion summarizes the total

24   number of hours each timekeeper spent, but it does not apportion the hours into specific task codes (or

25   categories of tasks), making it impossible to determine the allocation of time devoted to litigation tasks

26   like document review, pretrial motions, or settlement, and whether that allocation is reasonable.

27   In their Motion, Plaintiffs' counsel ask for a fee award of $87,730,000—$51,321,425 *more* than

28   their claimed lodestar.  Based on the anticipated final claims rate of approximately 2.1%, if the Court

grants Plaintiffs' counsel's full requested fees of $87,730,000 instead of their claimed lodestar, the recovery for each class device would decrease by about $23, from $117 to $94.  In other words, by asking for *2.4 times* more than their lodestar, Plaintiffs' counsel seek to take at least $23 away from each valid claim.  The difference would be even more significant once the Court reduces the excessive fees that Plaintiffs' counsel incorporated into their lodestar.

Class members have opposed Plaintiffs' counsel's request for attorneys' fees.  To date, they have sent more than 77 letters to the Court regarding the settlement.  (*See* Dkts. 418, 423, 432–67, 472–513.)  Many individuals expressed support for Apple and questioned why this lawsuit was filed in the first place.  (*See* Dkts. 441, 445, 451, 456, 479, 484, 492, 496.)  And of those objecting to the settlement, by far the most frequent complaint has been the excessiveness of the requested attorneys' fees.  (*See* Dkts. 435, 437–38, 443, 445, 453, 455, 460–63, 472, 474–75, 478, 480–81, 484–85, 489, 492–93, 496, 498–99, 501–03, 505–07, 512–13.)  Class members have described Plaintiffs' counsel's fees request as "[r]idiculous!!!!!!!!!" (Dkt. 438), "patently outrageous" (Dkt. 498), "irrationally excessive" (Dkt. 505), and "outlandish" (Dkt. 478), and they have expressed their concern that granting Plaintiffs' counsel's request "would enrich the attorneys by amounts well beyond [what is] reasonable and at the plaintiffs' expense" (Dkt. 472) and constitute "unreasonably high windfalls" (Dkt. 493).

## IV.  LEGAL STANDARD

The Court has "an independent obligation to ensure that the [attorneys' fee] award, like the settlement itself, is reasonable." *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011).  "The reasonableness of any fee award must be considered against the backdrop of the 'American Rule,' which provides that courts generally are without discretion to award attorneys' fees to a prevailing plaintiff unless … 'the successful litigants have created a common fund for recovery or extended a substantial benefit to a class.'" *Id.* (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 275 (1975) (Brennan, J., dissenting)).

Although district courts have discretion over the appropriate method to calculate a reasonable fee award, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," because "[t]his calculation provides an objective basis on which to make an initial estimate of the value of a

1  lawyer's services." *Hensley*, 461 U.S. at 433.  However, the Court should exclude from this calculation

2  any "hours that were not 'reasonably expended,'" such as those that are "excessive, redundant, or

3  otherwise unnecessary." *Id.* at 434.  "[W]hen faced with a massive fee application, the district court

4  has the authority to make across-the-board percentage cuts either in the number of hours claimed or in

5  the final lodestar figure as a practical means of trimming the fat from a fee application."  *Gates v.*

6  *Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992) (quotation marks omitted).

## V.  ARGUMENT

8        The Court should reject Plaintiffs' counsel's excessive fee request and award no more than a

9  *reasonable* lodestar.  No multiplier is warranted here based on Ninth Circuit precedent; nor should the

10  Court award a "percentage of the fund," because doing so would be inconsistent with the structure of

11  this claims-made settlement and would result in a windfall to Plaintiffs' counsel.  Instead, an award of

12  a reasonable, properly substantiated lodestar would more-than-adequately compensate counsel for their

13  time and effort on this case.

14        As it stands, however, Plaintiffs' counsel have not met their burden to adequately substantiate

15  their lodestar.  Even the limited documentation shows that the lodestar is inflated with exactly the type

16  of "excessive, redundant, and otherwise unnecessary" fees and costs that courts routinely decline to

17  award.  As just a few examples, Plaintiffs' counsel's purported lodestar includes (a) $350,000 billed

18  by attorneys working on a "Trial Preparation Committee" (in a case that never came close to trial);

19  (b) nearly $2,000,000 by attorneys in a "Third-Party Discovery Committee" (on a case with virtually

20  no third-party discovery); (c) $500,000 by "International Liaison Counsel" (even though the settlement

21  class does not include non-U.S. individuals); and (d) nearly $4 million in fees for time billed by JCCP

22  Counsel (even though both caselaw and the terms of the settlement forbid such a request).

23        To be clear, the Court should reject *all* excessive and unnecessary fees and costs, but Plaintiffs'

24  counsel's inadequate documentation filed in support of their purported lodestar has deprived Apple,

25  class members, and—if not timely and adequately supplemented—the Court the opportunity to give

26  Plaintiffs' counsel's lodestar the scrutiny it is due.

27  **A.    A Reasonable Lodestar Would More Than Adequately Compensate Plaintiffs' Counsel**

28        Plaintiffs' counsel have offered no reason for this Court to award attorneys' fees more than their

1  lodestar.  There are no factors that warrant any upward adjustment to the lodestar, and Plaintiffs'

2  counsel's request to calculate fees based on a percentage method would lead to an unreasonably large

3  and arbitrary fee award in this case.

4  **1.    *This Is Not A "Rare And Exceptional" Case That Requires Adjusting The Lodestar.***

5  As the Ninth Circuit has held, "[t]here is a strong presumption that the lodestar figure represents

6  a reasonable fee."  *Morales v. City of San Rafael*, 96 F.3d 359, 363 n.8 (9th Cir. 1996).  Thus, "[i]n

7  ordinary cases, a plaintiff's 'degree of success' or the 'results obtained' should be adequately accounted

8  for in the lodestar."  *Cunningham*, 879 F.2d at 488.  That is because the lodestar is calculated using

9  market rates, and therefore accounts for the normal profit margin that the market has determined is

10 reasonable for the time that the attorneys expended.  Accordingly, "[o]nly in rare or exceptional cases

11 will an attorney's *reasonable* expenditure of time on a case not be commensurate with the fees to which

12 he is entitled.  Adjustments to the lodestar based on 'results obtained' must be supported by evidence

13 in the record demonstrating why such a deviation from the lodestar is appropriate."  *Id.*; *see also Velez*

14 *v. Wynne*, 220 F. App'x 512, 514 (9th Cir. 2007) (same).

15 There are at least four factors courts should consider when determining whether an adjustment

16 to a lodestar is appropriate, including "the quality of the representation, the benefit obtained for the

17 class, the complexity and novelty of the issues presented, and the risk of nonpayment."  *Hanlon v.*

18 *Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d

19 67, 70 (9th Cir. 1975)); *Bluetooth*, 654 F.3d at 941–42.[2]  Applying these factors here confirms that

20 there are no "rare or exceptional" circumstances to justify an increase to Plaintiffs' counsel's lodestar—

21 let alone an increase of $52 million, which would be a windfall enrichment to Plaintiffs' counsel, costly

22 to class members, and inconsistent with the claims-made structure of this settlement.

23 (a)  <u>Benefit Obtained for the Class</u>.  Even though "[f]oremost amongst th[e] considerations …

24 is the benefit obtained for the class," Plaintiffs' counsel have made their weakest showing on this factor.

25

26 [2]  These factors are substantially similar to the factors the Ninth Circuit applies to "the percentage of
    the fund method," which include: "the extent to which class counsel achieved exceptional results
27   for the class, whether the case was risky for class counsel, whether counsel's performance generated
     benefits beyond the cash settlement fund, the market rate for the particular field of law (in some
     circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration,
28   foregoing other work), and whether the case was handled on a contingency basis."  *In re Online
     DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015) (quotation marks omitted).

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 5:18-MD-02827-EJD

*Bluetooth*, 654 F.3d at 942. The Supreme Court has "instructed district courts to … 'award only that amount of fees that is reasonable in relation to the results obtained.'" *In re HP Printer Firmware Update Litig.*, No. 16-5820-EJD, 2019 WL 2761287, at *4 (N.D. Cal. June 28, 2019) (quoting *Hensley*, 461 U.S. at 436, 440). "Courts have relied on this factor to substantially reduce requested lodestars in light of the results achieved." *Id.* (citing cases). "If the plaintiff had only partial or limited success, then a fully compensatory fee may be excessive." *Stonebrae, L.P. v. Toll Bros., Inc.*, No. 08-221-EMC, 2011 WL 1334444, at *17 (N.D. Cal. Apr. 7, 2011).

This factor does not support the requested award because Plaintiffs had limited success on their claims "in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 440. Whereas Plaintiffs' consolidated complaint brought wide-reaching, sprawling fraud and "defect" claims—which purported to cover nearly every "iPhone 5, 5s, 5c, 6, 6s[,] 6 Plus, 6s Plus, SE, 7, 7 Plus, and the Apple iPad, including the Fourth Generation, Mini, Air, Mini 2, Update to Fourth Generation, Air 2, Mini 3, Mini 4, Pro, and 9.7-Inch Pro, Fifth Generation, 10.5-Inch Pro, 12.9-Inch Pro, and Sixth Generation" devices in the United States and 40 foreign countries (Dkt. 145 ¶ 455 & n.70)—only a sliver of those claims survived. In fact, Plaintiffs' key fraud claims and "defect" theories were dismissed with prejudice, and only a narrow set of computer intrusion claims relating to a subset of the iPhone devices survived dismissal. (*See* Dkt. 315 at 36–37 (dismissing, with prejudice, Plaintiffs' claims based on battery "defect" theory, affirmative misrepresentation theory, omissions theory, iPhone 5/5c/5s devices, section 1030(a)(5)(C) of the CFAA, and breach of contract).) Plaintiffs' counsel acknowledged that they "faced significant risk" if they tried to litigate the "computer intrusion" claims, and effectively gave up on their attempts to maintain a "worldwide class," which they admitted would be unprecedented and "questionable at best." (Dkt. 415 at 13–16; *see also* Dkt. 470 at 10 (Plaintiffs' counsel admitting "it is not an overstatement to say that Named Plaintiffs faced significant risk").)

The Court should also not be swayed by the size of the minimum settlement amount when assessing the benefits obtained for the class. (*See* Mot. at 6–7, 15–16.) This amount is a direct function of the number of devices at issue, and not the result of any particular skill that Plaintiffs' counsel demonstrated or any complexity in this case. Their work in litigating this case to a precertification settlement would have been the same, regardless of whether there were 10,000, 100,000, 1,000,000, or

1    more devices at issue.  In sum, "the large size of the recovery is due to the large size of the class rather

2    than counsel's specialized skill and efforts," and therefore is not a basis to apply a multiplier.  *Gutierrez*

3    *v. Wells Fargo Bank, N.A.*, No. 07-5923-WHA, 2015 WL 2438274, at *5 (N.D. Cal. May 21, 2015).

4         Plaintiffs' counsel also argue they achieved a good result because $25 per device is "substantial

5    relative to" the $18 to $36 of per-device damages that their consultant estimated.  (Mot. at 1 n.3, 7.)

6    But they offer nothing to substantiate this estimate is correct (which Apple disputes), and a "reduced

7    fee award [is nonetheless] appropriate if" the relief is "still 'limited in comparison to the scope of the

8    litigation as a whole.'"  *Stonebrae*, 2011 WL 1334444, at *17 (quoting *Hensley*, 461 U.S. at 440).

9    Further, most of the benefit provided to the putative class arose from Apple's own efforts, rather than

10   anything this lawsuit accomplished.  Long before the settlement was reached, Apple had already

11   voluntarily undertook multiple initiatives to address customer concerns.  In addition to providing more

12   information about iPhone battery health and performance on its website, Apple significantly reduced

13   prices to all customers for out-of-warranty battery replacements in 2018 and offered a $50 credit per

14   device to each customer who had purchased an out-of-warranty battery replacement for iPhone 6 and

15   later devices during the previous year.  *See* https://support.apple.com/iphone-out-of-warranty-battery-

16   replacement-credit.  Millions of customers participated in these initiatives.  Apple also developed a

17   new battery health user interface in iOS 11.3, which gave users unprecedented visibility and control

18   into the battery health and performance management of their iPhone devices.  *See*

19   https://support.apple.com/en-us/HT208387.  Apple extended these benefits even before Plaintiffs'

20   counsel's work on this lawsuit began.  Thus, even absent this litigation, Apple extended meaningful

21   benefits to customers to address their concerns, and Plaintiffs' counsel's work in this lawsuit was not

22   responsible for any of these benefits.  *See HP Printer Firmware*, 2019 WL 2716287, at *4 (holding

23   that defendant's commitment to not reactivate challenged technology and the replacement of

24   technology with newer software updates demonstrated that plaintiffs' purported nonmonetary benefit

25   "added very little value to the settlement" and did not "justify … a high fee award").

26        If anything, Plaintiffs' counsel (and other lawyers jockeying for a leadership role) attempted to

27   *prevent* Apple from taking steps to deliver these benefits.  For example, at the very outset of this

28   litigation, co-lead counsel tried to obstruct Apple from informing its customers about the battery

replacement program, contending that Apple was somehow trying to force putative class members to waive certain claims in the MDL. (*See generally* Dkt. 174.) Apple had explained repeatedly that it did not intend for participation in either program to affect any right, claim, or interest of the Named Plaintiffs or putative class members regarding purchases of their devices or installation of an iOS update. (*See* Dkt. 187 at 1; Dkt. 187-1 ¶¶ 6–8.) (For the record, as Apple promised then, those individuals who availed themselves of a $29 battery replacement (or credit for a replacement before the program was announced) are fully eligible to make a claim through this settlement.)

(b) Quality of Representation. There is nothing noteworthy to justify an increase based on the quality of representation of Plaintiffs' counsel. If anything, the opposite is true—Plaintiffs' counsel were *sanctioned* because two of their lead attorneys violated the protective order. (*See* Dkt. 350.) Moreover, the attorneys' fee request has drawn an overwhelmingly negative response from class members, underscoring that many class members do not believe that the quality of Plaintiffs' counsel's representation justifies the award that they are seeking. The record before the Court includes dozens of letters from class members that raise vociferous objections about the reasonableness of the fee request, and not a single class member wrote to the Court supporting or defending Plaintiffs' counsel's fee request. (*See, e.g.*, Dkt. 437 (class member questioning whether the "amount of attorney's fees … reasonably reflect fair compensation for the investment of attorney time and fair compensation for the risk incurred in representing the class on a contingency basis"); *see supra*, pp. 1–2.)

(c) Complexity / Novelty of the Issues. These factors also do not favor an upward adjustment to Plaintiffs' counsel's lodestar. As noted above, the case settled after pleadings-stage challenges, and there were no expert reports exchanged, no motions for summary judgment, and no class certification proceedings. The tasks that Plaintiffs' counsel undertook—such as "developing … facts and legal claims," "pursu[ing] discovery," and "depos[ing] [Apple's] employees" (Mot. at 9)—are tasks that attorneys do in "all of their cases," and there is "no indication that this particular case was unique and novel in its facts, resolution, or efforts." *In re Magsafe Apple Power Adapter Litig.*, No. 09-1911-EJD, 2015 WL 428105, at *14 (N.D. Cal. Jan. 30, 2015) (rejecting multiplier because "the risks and challenges encountered by class counsel in this matter are not unique to this particular matter").

(d) Risk of Nonpayment. Nor does this factor weigh in favor of increasing the lodestar. "The

riskiness of a case has a direct correlation on its 'undesirability,'" and the feeding frenzy to litigate this case refutes any suggestion that this matter presented a risk of nonpayment. *Kakani v. Oracle Corp.*, No. 06-6493-WHA, 2007 WL 4570190, at *4 (N.D. Cal. Dec. 21, 2007). Here, 81 firms filed lawsuits, 4 applied to serve as lead counsel, those applications consisted of 51 firms and 74 lawyers, and 40 different firms and 275 timekeepers worked on this case. (*See* Dkts. 30, 35, 38.) As one class member explained: "I'm not so sure there is as much 'contingency' in this case to begin with, and … I'm not so sure [Plaintiffs' counsel] take on many or any cases that they are not pretty certain are going to pay off—the question truly being, simply, how much and how soon." (Dkt. 498.)

The early settlement also minimized risk of nonpayment. The parties engaged a respected mediator after the Court's order on the first motion to dismiss, and they were able to accept a mediator's proposal several months later. (Dkt. 470-1 ¶¶ 8–9.) By reaching a settlement "relatively early in the case," Plaintiffs' counsel greatly reduced their risk of nonpayment by avoiding the most time-intensive and risky stages of litigation such as class certification, summary judgment, and trial. *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp. 2d 455, 466 (S.D.W. Va. 2010); *see In re Infospace, Inc.*, 330 F. Supp. 2d 1203, 1215 (W.D. Wash. 2004).

**2.    *Calculating Fees As A Percentage Of The Floor Does Not Lead To A Reasonable Award For Several Reasons.***

Next, Plaintiffs' counsel attempt to justify their $87,730,000 fee request as reasonable by using the "percentage-of-the-fund" calculation, and concluding that this award would correspond to 28.3% of the $310 million settlement "floor." (Mot. at 4.) But this argument rests on a faulty premise and it also ignores the impropriety of relying on a percentage method of calculation in a "formulaic or mechanical fashion." *Wash. Pub. Power Supply*, 19 F.3d at 1294 n.2. Plaintiffs' counsel cannot justify their excessive request with the "percentage-of-the-fund" method for several reasons:

*First*, Plaintiffs' counsel's reliance on the percentage-of-the-*fund* method is misplaced because there is no "common fund." Instead, this is a *claims-made* settlement. (*See* Dkt. 415 at 16; Dkt. 416 ¶ 5.1.) Many courts have correctly recognized that a lodestar approach is more reasonable when class members are paid "on a claims-made basis." *Brazil v. Dell Inc.*, No. 07-1700-RMW, 2012 WL 1144303, at *1 (N.D. Cal. Apr. 4, 2012); *see Create-A-Card, Inc. v. Intuit, Inc.*, No. 07-6452-WHA,

2009 WL 3073920, at *1 (N.D. Cal. Sept. 22, 2009) (declining to apply percentage method where the fee award "will come directly from defendant as opposed to from a fund created by the settlement"); *Bodon v. Domino's Pizza, LLC*, No. 09-2941, 2015 WL 3889577, at *6 (E.D.N.Y. June 4, 2015) (lodestar method "better accommodates the policy concerns in settling class actions on a claims-made basis"); *Gray v. BMW of N. Am., LLC*, No. 13-3417, 2017 WL 3638771, at *5 (D.N.J. Aug. 24, 2017) ("[A] 'claims-made' settlement … usually calls for application of the lodestar method.").

Nor should this settlement be considered a "constructive" common fund, which the Ninth Circuit has defined as "private agreements to structure artificially separate fee and settlement arrangements" to "circumvent the 25% benchmark requirement on 'what is in economic reality a common fund situation.'" *Bluetooth*, 654 F.3d at 943. That is not the case here—the settlement amount is based on the number of claims submitted, and the settlement contemplates that any award of fees would be paid by Apple on top of the amounts paid to class members.

Here, there have been 2.2 million claims submitted, with additional claims that will be submitted before today's deadline. (Chorba Decl. ¶ 13.) Awarding $87,730,000 would be akin to having each class member pay $39 for their attorneys, even though Plaintiffs' counsel only negotiated $25 of benefit in the claims-made settlement. It is unreasonable to pay $1.57 to an attorney for every $1.00 in recovery. That each individual's recovery may increase on a *pro rata* basis is irrelevant—otherwise, Plaintiffs' counsel could claim they secured *more* "benefit" to the class by *depressing* the claims rate. This scenario underscores why it makes no sense to use the "percentage-of-the-fund" method when evaluating fee requests in claims-made settlements.

*Second*, even if the Court analyzes this settlement as a "constructive" common fund, Plaintiffs' counsel's request for an award equal to 28.3% of the "constructive" common fund is still grossly excessive. As their own authorities demonstrate, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method" to determine the *reasonableness* of attorneys' fees. *Bluetooth*, 654 F.3d at 942. Here, any way you slice it, an $87,730,000 fee award is unreasonable. For a settlement of this size, the Ninth Circuit has recognized that "there is no necessary correlation between any particular percentage and a reasonable fee." *Wash. Pub. Power Supply*, 19 F.3d at 1297. "With a fund this large, picking a percentage … would be like picking a number out of the air." *Id.*; *see also*

*id.* (noting that "in determining fee awards in class actions, it is especially important that judges not be unduly influenced by the monetary size of the settlement," and applying the "25 percent 'benchmark' is of little assistance" in large settlements). "[W]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *Bluetooth*, 654 F.3d at 941–42.

Consistent with these principles articulated by the Ninth Circuit, district courts have routinely rejected requests to calculate fees as a percentage of the settlement amount in other large settlements— even in "common fund" cases. *See, e.g.*, *In re High-Tech Emp. Antitrust Litig.* ("*HTEAL*"), No. 11-2509-LHK, 2015 WL 5158730, at *7 (N.D. Cal. Sept. 2, 2015) (holding there is "nothing inherently reasonable" in a request for 20.6% of a $415 million settlement); *Gutierrez*, 2015 WL 2438274, at *4 (holding that "blindly adopting the 25-percent benchmark" in a $203 million settlement "would lead to an unreasonable result"); *Alexander v. FedEx Ground Package Sys., Inc.*, No. 05-38-EMC, 2016 WL 3351017, at *2 (N.D. Cal. June 15, 2016) ("[T]ypically the percentage award in [a megafund] case is substantially less than the 25% benchmark applicable to typical class settlements in this Circuit.").

*Third*, applying a percentage method would be inappropriate given the "great disparity between the fees requested and the average recovery of individual class members." *HTEAL*, 2015 WL 5158730, at *8 ("In a case with such a large settlement fund and such a great disparity between the fees requested and the average recovery of individual class members, the Court finds the lodestar method preferable to blind acceptance of percentages that seem largely untethered to the results achieved in this litigation."). Here, awarding the full amount requested under the percentage method, instead of the lodestar, would reduce the payment for each device by $23, from $117 to $94, which is significant. *See Gutierrez*, 2015 WL 2438274, at *4 (rejecting percentage method where doing so would reduce class member recovery from $179 to $134).

*Fourth*, unsurprisingly, Plaintiffs' counsel's request for 28.3% of the $310 million minimum settlement amount far exceeds any other fee award in class settlements of this size. "Although Class Counsel can point to some 'megafund' cases allowing large multipliers, that is far from the norm." *HTEAL*, 2015 WL 5158730, at *8. Thus, the Ninth Circuit and courts in this District have recognized the mounting empirical evidence that "the percentage of an award generally decreases as the amount

of the fund increases." *Wash. Pub. Power Supply*, 19 F.3d at 1297; *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-2752-LHK, 2020 WL 4212811, at *39 (N.D. Cal. July 22, 2020) (citing empirical research showing that "as recovery amount increases, the ratio of the size of the attorneys' fee relative to the size of the recovery … tends to decrease," and concluding a 10.5% recovery was appropriate for a fund of $435 million); *Gutierrez*, 2015 WL 2438274, at *8 (approving fees equal to 9% of the settlement value, citing cases where courts approved fee awards ranging from 2.8% to 16%).

And while Plaintiffs' counsel have cited one decision from this District with a substantial fee award of 28.6% of the fund, that case is not at all analogous.  (*See* Mot. at 11 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827-SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013)).)  That case spanned over six years of intense litigation, including 40 million pages of documents (including many in Japanese, Korean, or Chinese), hundreds of depositions (including 32 in Asia), multiple class certification motions and related appeals, and a dozen summary judgment motions.  *See TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827-SI, 2012 WL 13209696, at *4–5 (N.D. Cal. Nov. 9, 2012). As the special master in that case remarked, "it is hard to conceive of an antitrust case with more complexity than this one."  *Id.* at *5.  Plaintiffs' counsel's comparison to *TFT-LCD Antitrust Litigation* only reveals how unreasonable it would be to apply the same percentage method to this case.

Even if a court believes that counsel is entitled to "some substantial amount beyond what they have spent in prosecuting the case," that finding does "not necessarily justify an award" of a substantial percentage of the settlement value, *Munoz v. UPS Ground Freight, Inc.*, No. 07-970-MHP, 2009 WL 1626376, at *3 (N.D. Cal. June 9, 2009), particularly in a case involving "early settlement, [where] the lodestar calculation may convince a court that a lower percentage is reasonable," *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002).  In such cases, a percentage method may "very well [be] a windfall."  *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

In short, Plaintiffs' counsel have "failed to prove why [a percentage approach] is *preferable*" in this case, *Moore v. Verizon Commc'ns Inc.*, No. 09-1823-SBA, 2014 WL 588035, at *10 (N.D. Cal. Feb. 14, 2014), and awarding 28.3% would be disproportionate.

### 3.    *Plaintiffs' Counsel's Own Clients Object To The Excessive Fee Request.*

The foregoing points demonstrate that there is no legal support for Plaintiffs' counsel's request

for $87,730,000 in fees.  Given the excessive nature of that request, it is not surprising that many class

members have taken the time to write to the Court to complain about the excessive fee request:

- "I do not agree with the attorney fees.  They are about [Plaintiffs' counsel] getting rich instead of paying the public back. … Ridiculous!!!!!!!!!" (Dkt. 438.)

- "I … vehemently object to the excessive attorneys fees applied for. … [Apple's] products have literally changed the lives of more people and business owners than I can even estimate and … [l]awsuits like this where it costs more to defend than settle serve no useful purpose other than to enrich the legal community and eventually pass on these costs to future consumers." (Dkt. 445.)

- "I am protesting the proposed fee of Class Counsel's request for Attorney's Fees [which] is an exorbitant amount. … How can any reasonable person feel this is just compensation." (Dkt. 443.)

- "I … would like to protest the excessive attorneys' fees and expenses, seemingly self-awarded for the vast majority of the injured parties.  I hope that the court will determine that these costs are unjustified and should be scaled back dramatically so that those truly damaged by Apple's action are better compensated." (Dkt. 453.)

- "I object to the excessive attorney fees.  These large sums gained by lawyers and their businesses continue to motivate greedy attorneys in filing these class action suits.  A precedence needs to be set.  The individuals who are truly affected by these events should collect more money." (Dkt. 460.)

- "I object to the current settlement because the amount of attorney's fees is absolutely outrageous.  There is no way to justify the fee. … It does not pass the reasonable test." (Dkt. 461.)

- "I am writing to object to the outlandish fees the attorneys in this case want to collect to settle this case.  They are in no way entitled to such a large fee and it is in huge disproportion to those who were injured." (Dkt. 478.)

(*See generally* Dkts. 435, 437–38, 443, 445, 453, 455, 460–63, 472, 474–75, 478, 480–81, 484–85,

489, 492–93, 496, 498–99, 501–03, 505–07, 512–13.)  This strong opposition supports a reduction.

*See In re Heritage Bond Litig.*, No. 02-1475, 2005 WL 1594389, at *15 (C.D. Cal. June 10, 2005)

("The presence … of objections from the class is also a factor in determining the proper fee award.").

## B.    Plaintiffs' Counsel Have Not Provided Adequate Documentation To Assure This Court And The Class That Their Lodestar Is Reasonable

The Court should also not award any fees to Plaintiffs' counsel, even under the lodestar method,

because they have not discharged their "burden of documenting the appropriate hours expended in the

litigation and … submit[ting] evidence in support of those hours worked."  *Welch v. Metro. Life Ins.*

*Co.*, 480 F.3d 942, 948 (9th Cir. 2007).  The Court has the "*duty* to ensure that claims for attorneys' fees are reasonable, and a district court does not discharge that duty simply by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018) (quotation marks and citation omitted).  At a minimum, this requires the fee applicant to provide "sufficient details" of their billing records that enable "'the court to judge whether the work was an appropriate basis for fees.'" *Garcia v. Resurgent Cap. Servs., L.P.*, No. 11-1253-EMC, 2012 WL 3778852, at *9 (N.D. Cal. Aug. 30, 2012) (quoting *Democratic Party of Wash. State v. Reed*, 388 F.3d 1282, 1286 (9th Cir. 2004)).  "[A] reasonable number of hours equals the number of hours which could reasonably have been billed to a private client," *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013), and the Court must ensure that counsel "exercised 'billing judgment,'" *Vogel*, 893 F.3d at 1160.  A court must reduce a fee award if the hours are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 437.

In this case, the records that Plaintiffs' counsel offered to support their fee request are insufficient and do not allow the Court to determine whether the hours were reasonably expended. They have only provided a very summary tabulation of the hours worked by each timekeeper, along with name, firm affiliation, job title (and in some cases, years of experience), and hourly billing rate. (*See generally* Dkt. 469-1 to 469-42.)  Plaintiffs' counsel have not indicated which timekeepers are contract lawyers, whose contributions to the lodestar should be priced at the rate at which they were actually paid.  *See In re Wells Fargo & Co. S'holder Deriv. Litig.*, 445 F. Supp. 3d 508, 531 (N.D. Cal. 2020) (incorporating contract attorneys' time into the lodestar at $42.50 per hour).  Nor have they provided any explanation of *how* those hours were incurred, such as by apportioning each timekeeper's hours by task code (e.g., time spent on briefing, attending hearings, attending depositions, or conducting discovery), leaving one to guess whether and how each timekeeper's hours were reasonably incurred for the benefit of the class.  As just one example of why this matters, Plaintiffs' counsel suggested that briefing would be led by just two attorneys on the "Law and Briefing Committee." (Chorba Decl., Ex. A at 42:6–11.)  But Plaintiffs' counsel now suggest that the hours worked by these two "Law and Briefing Committee" attorneys and their firms contributed just *2%* to the overall lodestar. Considering Plaintiffs' counsel's reliance on "extensive motion practice" as one of the key tasks

performed in this case (*see, e.g.*, Mot. at 2, 16), this begs the question of how the remaining 98% of hours in the lodestar were allocated.  As another example, the two law firms appointed to chair the "Third-Party Discovery Committee" apparently worked more than 3,400 hours (equating to $2 million in fees) (*see* Dkt. 99 at 12; Dkt. 469-40), even though the third-party discovery yielded fewer than 1,000 pages of documents (*see* Chorba Decl. ¶ 6).  And the two law firms appointed to chair the "Trial Preparation Committee" logged nearly 1,000 hours or $353,495 in fees (*see* Dkt. 99 at 13; Dkt. 469-40), even though this case settled well before the Court even set a class certification hearing (let alone any trial date).  These are not fees that Plaintiffs' counsel can fairly ask the class members to pay.

Although the lodestar, and not a "percentage-of-the-fund" or multiplier, should supply the foundation for any fee award in this case, Plaintiffs' counsel have not met their burden of substantiating a reasonable lodestar request.  The Court should require further detail, including task codes, to enable a determination of the reasonableness of the lodestar.  Plaintiffs' counsel should be required to do this on the existing schedule to avoid delaying final approval.

**C.    Even Plaintiffs' Counsel's Limited Supporting Documentation Strongly Indicates Their Lodestar Contains Excessive, Redundant, And Unnecessary Hours**

Notwithstanding the insufficient documentation Plaintiffs' counsel offered to support their lodestar, even an award of the lodestar they have presented ($36,408,575) would significantly overcompensate Plaintiffs' counsel, at the expense of the class.

A comparison of the amount here to the same firm's lodestar in *HTEAL* indicates a significant disparity in the number of hours worked relative to the accomplishments.  In *HTEAL*—a novel and highly complex case—class counsel claimed to have spent 36,215 hours on the lawsuit, in which they:

> survived two motions to dismiss; undertook considerable discovery, including taking 93 depositions and defending 14 others, serving 75 document requests, reviewing the resulting 325,000 documents (over 3.2 million pages), serving 28 subpoenas on third parties, reviewing 8,809 pages of documents from those third parties, producing over 31,000 pages of documents in response to Defendants' document requests, and responding to and reviewing 34 subpoenas served by Defendants on third parties; retained four experts to assist in analyzing over 15 gigabytes of employment-related compensation and recruiting data; worked with the experts to produce multiple expert reports; filed a consolidated class action complaint; litigated two rounds of class certification; opposed a Rule 23(f) appeal to the Ninth Circuit; survived five summary judgment motions; prepared for trial; negotiated three settlements; and opposed mandamus in the Ninth Circuit.

*HTEAL*, 2015 WL 5158730, at *10 (numbering omitted); *see also In re Anthem, Inc. Data Breach Litig.*, No. 15-2617-LHK, 2018 WL 3960068, at *22–23 (N.D. Cal. Aug. 17, 2018).  By contrast, here, Plaintiffs' counsel claim to have spent 68,731 hours working on this case—nearly _twice_ as many hours as in *HTEAL*—but with only a fraction of the fruits to show for their claimed labor.  Plaintiffs' counsel took just 10 depositions and defended 9 others; served 24 third-party subpoenas (yielding fewer than 1,000 pages of documents); produced 6,000 pages of documents in response to document requests; did not prepare any expert reports; never litigated class certification or summary judgment issues; never litigated any appeals; and never prepared for trial.  (Chorba Decl. ¶ 6.)  Plaintiffs' counsel's claim that they spent almost "double the time" (68,731 hours vs. 36,215 hours) "despite settling much earlier in the lifespan of the case … provides an additional indication that the hours here may be duplicative or excessive and that a cut of hours is warranted."  *Anthem*, 2018 WL 3960068, at *23.[3]  As another point of comparison, in another class settlement, Cotchett Pitre and Kaplan Fox (the two lead firms here) requested $22.5 million in fees for 60,214 hours of work, which was a 0.83 *negative* multiplier.  *See In re Optical Disk Drive Antitrust Litig.*, No. 10-2143-RS, 2016 WL 11704906, at *2 (N.D. Cal. Apr. 14, 2016).  Plaintiffs' counsel have offered no justification for why they are entitled to $65 million *more* in this case than in *Optical Disk Drive*, given the substantially similar number of hours expended.

In light of the summary nature of Plaintiffs' counsel's submission, there may be other improprieties with Plaintiffs' counsel's request, and Apple reserves the right to supplement its response after Plaintiffs' counsel attempt to substantiate their request.  But even the summary submissions reveal that the lodestar contains excessive, redundant, and unnecessary time:  *First*, **275** timekeepers worked on this case.  Courts routinely recognize that having so many timekeepers assigned to a matter "indicates a likelihood of waste through duplication of effort and time spent getting up to speed on the case."  *Adderley v. NFLPA*, No. 07-943-WHA, 2009 WL 4250792, at *2 (N.D. Cal. Nov. 23, 2009); *In re Anthem, Inc. Data Breach Litig.*, No. 15-2617-LHK, 2018 WL 11195115, at *3 (N.D. Cal. Feb. 2, 2018) (noting "concerns that billing items may be duplicative or inefficient," given counsel's

---

[3]  In *HTEAL*, although counsel requested 20.8% of the $435 million settlement, the court declined to use a percentage method and instead applied the lodestar method to avoid "windfall profits for class counsel."  2015 WL 5158730, at *7.  The court ultimately awarded fees in the amount of $41 million, which represented 10.5% of the $435 million settlement.  *Id.* at *13–14.

"assignment of tasks across 53 law firms and 331 billers"); *In re Critical Path, Inc.*, No. 01-551-WHA, 2002 WL 32627559, at *8 (N.D. Cal. June 18, 2002) ("use of 58 timekeepers led to unnecessary and duplicative work within each firm as well as across the two firms").

*Second*, Plaintiffs' counsel overstaffed hearings, conferences, and depositions.  During the lead counsel appointment process, they pledged to use discretion and not over-staff hearings in this case. Specifically, one of the appointed lead counsel agreed that "[i]t would be foolish and unwise, of course, at every [case management conference], or whatever, if two or three lawyers showed up," and stated there "might be two, maybe three, maybe four at the most" because "[e]conomics plays a very big issue in this." (Chorba Decl., Ex. A at 41:8–11.)  Thus, when the Court approved the class counsel structure, it did so based on Plaintiffs' counsel representation that it would "remain committed to efficiency," and the Court reminded them to "promote the orderly and efficient conduct of this litigation and … avoid unnecessary duplication and unproductive efforts."  (Dkt. 99 at 3, 8.)  Plaintiffs' counsel did not honor that promise:  As the attached Appendix demonstrates (based on the on-the-record appearances), they have had up to 14 attorneys attend a single Court hearing, up to 11 attorneys attend a discovery conference, and up to 7 attorneys attend a deposition.  There is no legitimate basis for so many attorneys to attend these proceedings—especially because many of them required out-of-state travel by attorneys from New York.  *See Adderley*, 2009 WL 4250792, at *2–3 (reducing lodestar that was "bloated by the presence of too many lawyers at trial, hearings and depositions," and finding "excessive fees incurred by the presence of more than two attorneys at depositions and hearings").

*Third*, Plaintiffs' counsel inflated their lodestar by unnecessarily soliciting and including more than 120 named plaintiffs in the consolidated complaints, which, in their words, required a "significant amount of work" to "research[] and respond[] to Defendant's interrogatories," "collect documents," and "assist[] in the collection of Named Plaintiffs' documents."  (Dkt. 471 ¶ 29.)  This extra work was unnecessary.  During the Rule 23(g) hearing, one member of Plaintiffs' counsel reassured the Court that "there will not be what happened" in another large matter, which involved "plaintiffs around the country [from] 51 different jurisdictions, [who] had to be vetted, had to get discovery from, had to participate in plaintiff's depositions." (Chorba Decl., Ex. A at 76:13–18.)  But that is exactly what happened here, and the vast majority of the 120 Named Plaintiffs have contributed nothing for the

class's benefit, except generating more work for Plaintiffs' counsel.

*Fourth*, the lodestar should exclude the 9,679 hours logged by JCCP Counsel, whose work on the parallel action increased inefficiency and duplication without any benefit to the class members. The MDL class includes *all* eligible customers in the United States—including Californians—who have been fully represented by the Plaintiffs' counsel that this Court appointed. The Ninth Circuit has recognized that counsel who litigate a parallel state action are not entitled to a fee award where state counsel do "not formally represent[] [the federal] class," and "whose activities in representing others incidentally benefit the class." *Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1309 (9th Cir. 1994). Apple warned of the risks that JCCP Counsel would be duplicating efforts, and they litigated at their own peril. (*See* Chorba Decl. ¶ 3.) The Court should therefore deduct 9,679 hours ($3,993,154.55) from the lodestar. (*See* Dkt. 471-2 ¶ 42.) To be clear, Apple agreed in the settlement that the MDL attorneys may "allocate from the Court's award of Attorneys' Fees and Expenses, if any, to JCCP Counsel an appropriate amount of attorneys' fees and expenses" (Dkt. 416 ¶ 8.2)—but the settlement does *not* permit JCCP Counsel to "make an independent claim for attorneys' fees" (*id.* ¶ 9.1). But that is exactly what Plaintiffs' counsel have done by adding work performed by JCCP Counsel *on top of* the lodestar for work performed from the MDL. This request violates the settlement: Plaintiffs' counsel may share a portion of their fee award with JCCP Counsel, but they may not increase their fee request above what they would otherwise be entitled to in order to compensate the JCCP Counsel.

*Fifth*, there is no basis to include $547,037 in fees from "International Liaison Counsel." (*See* Dkt. 469-40.) It is unclear what contributions these attorneys made on behalf of the class. Non-U.S. individuals are not part of the settlement class, and—despite the responsibility of "International Liaison Counsel" to "avoid management difficulties" resulting from Plaintiffs "residing outside the United States" (Dkt. 99 at 10)—these attorneys could not even secure the signature of certain non-U.S. plaintiffs named in the complaint in the settlement agreement, including Corporación Nacional de Consumidores y Usuarios de Chile (Conadecus). These attorneys have suggested that they intend to pursue claims on behalf of Conadecus even after the resolution of the MDL (which Apple disputes, *see* Dkt. 416 ¶ 10.1 & App'x "A"). The Court should therefore not award any fees to this counsel.

*Sixth*, counsel have not included sufficient documentation to support $995,244.93 in out-of-

pocket costs.  The information provided simply lists the costs by category (*e.g.*, Dkt. 469-3, Ex. B), without identifying the specific reason for the costs.  This raises many unanswered questions.  For example, all Court hearings and depositions occurred in this District, so why did Cotchett Pitre (a firm located in this District) incur $4,015.50 in "Travel-Airfare," $4,545.04 in "Travel-Hotel," $697.27 in "Travel-Mileage," and $9,062.91 in "Meal" expenses?  (*Id.*)  Why did that firm incur $43,416.80 in costs for "Photocopies" (which is 30 times more than what any other firm spent on "Photocopies")? (*Id.*)  And what are the "Miscellaneous" expenses, which total $15,413.70 on top of the itemized amounts?  As these costs would come out of class members' pockets, Plaintiffs' counsel should provide a thorough explanation of the actual, out-of-pocket costs, and how those expenses benefited the class. This deficiency is inexplicable given that Plaintiffs' counsel designated an "Executive Committee Chair" who supposedly spent 265 hours to ensure the "effective[], efficient[], and economical[]" pursuit of the case without "unnecessary expenditures of time and expense."  (Dkt. 99 at 8–9.)

\* \* \* \* \* \*

In sum, Apple and class members agree that Plaintiffs' counsel's lodestar is extremely high, thinly supported, and disproportionate to the work performed.  The Court should reject the fee request as presented and direct Plaintiffs' counsel to provide the information necessary to justify a reasonable award.  They should make this submission immediately, so that there is no delay in calculating the per-claim amounts and finalizing the settlement after the hearing on December 4.  At a minimum, however, the Court should deduct at least $7,100,000 from the lodestar and costs.  (Apple reserves the right to identify other deductions based on any supplemental information provided by Plaintiffs' counsel.)

**D.     Any Award Of Fees Must Be Further Reduced As Required By The Sanctions Order**

Finally, the Court should scrutinize and adjust any final fee award to ensure it is consistent with the Court's order regarding sanctions.  (*See* Dkt. 350.)  *First*, the Court ordered that Plaintiffs' counsel must not "submit any billing requests for any work related to [the sanctions] issue."  (*Id.* at 5.)  Yet Plaintiffs' counsel do not state anywhere in their Motion (or the more than 1,200 pages of exhibits and declarations filed in support of it) that they complied with this requirement.  This omission is most conspicuous in the declarations submitted by the two sanctioned attorneys.  (*See* Dkts. 469-3, 471.) When Apple's counsel asked Plaintiffs' counsel to confirm compliance with the sanctions order and to

suggest filing a supplement, they responded only that they "complied with all Court orders including the [sanctions] one." (Chorba Decl. ¶ 8 & Ex. B.) The Court, Apple, and class members should not be forced to assume that Plaintiffs' counsel—who have already been sanctioned for violating a Court order—complied with the Court's sanctions order without an on-the-record explanation, statement of compliance in a sworn declaration, and supporting documentation.

*Second*, consistent with the sanctions order, after the Court determines an appropriate award of attorneys' fees to Plaintiffs' counsel, it should "deduct from that award all of Apple's costs and fees related to [the sanctions] issue, including but not limited to preparing its motion and reply, reviewing Plaintiffs' opposition, and preparing for and attending the May 30[] hearing." (Dkt. 350 at 6.) Apple incurred $205,591.60 in attorneys' fees and $5,030.09 in expenses in connection with the work performed by its counsel on the sanctions motion. (*See* Chorba Decl. ¶ 11.) The hours spent and expenses incurred by Apple in addressing Plaintiffs' counsel's sanctioned misconduct reflect the severity and importance of their violation of the Stipulated Protective Order, as recognized by the Court at the May 30 hearing. (*Id.*, Ex. C at 46:5–6 (Court: "[It's] a very important point when cases involve this protected material that is protected for a reason.").) The Court should enforce this order and deduct $210,621.69 from any final fee award, so that those funds may be distributed to the class.

## VI.  CONCLUSION

Class members have opposed Plaintiffs' counsel's request for $87,730,000 in fees and $995,245 in costs as "irrationally excessive," "exorbitant," and "outrageous." There is no factual or legal basis to award anything approaching this amount. Instead, any fee award should be based on a reasonable, adequately supported lodestar that reflects hours that were reasonably and necessarily incurred for the benefit of the class—and not any multiplier or "percentage of the fund." Plaintiffs' counsel should be required to provide sufficient documentation to support the reasonableness of their lodestar in advance of the December 4 hearing. At a minimum, any award of fees and costs should be reduced by at least $7,100,000 for the excessive, redundant, or otherwise improper fees and costs.

DATED:  October 6, 2020               GIBSON, DUNN & CRUTCHER LLP

                                      By:  _____/s/ Christopher Chorba_____
                                               Christopher Chorba

                                      *Attorneys for Defendant Apple Inc.*

DEFENDANT'S OPPOSITION TO MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS
CASE NO. 5:18-MD-02827-EJD

Gibson, Dunn &
Crutcher LLP