Theodore H. Frank (SBN 196332)
HAMILTON LINCOLN LAW INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street NW, Suite 300
Washington, DC 20006
Voice: 703-203-3848
Email: ted.frank@hlli.org

*Attorneys for Objector Anna St. John*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: APPLE, INC. DEVICE PERFORMANCE LITIGATION, | Case No. 5:18-md-02827-EJD |
| This Document Relates to: ALL ACTIONS | **OBJECTION OF ANNA ST. JOHN TO PLAINTIFFS' ATTORNEYS' FEES REQUEST (CORRECTED)** |
| | Judge: Hon. Edward J. Davila |
| | Courtroom: 4, 5th Floor |
| | Date: December 4, 2020 |
| | Time: 10:00 A.M. |

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................................i

TABLE OF AUTHORITIES ............................................................................................................ii

INTRODUCTION ...........................................................................................................................1

I.      Anna St. John is a member of the proposed settlement class and has standing to object. ...................1

II.     The district court has a fiduciary duty to the absent class members. ........................................2

III.    A percentage-of-recovery analysis does not support the requested fee. ......................................3

        A.      Class counsel's fee should depend upon the class's ultimate recovery.........................................4

        B.      Class counsel should be awarded no more than 17.7% of the actual class recovery,
                which would likely return over $35 million to the class................................................. 10

IV.     The lodestar crosscheck does not support class counsel's fee request. ..................................... 14

        A.      The lodestar is overstated by at least $1.52 million because contract and staff
                attorneys billed at exorbitant rates. ........................................................................ 15

        B.      Insufficient detail exists to evaluate the appropriateness of hours billed, but the sheer
                number of billers suggests duplication. ..................................................................... 18

        C.      Only a modest risk multiplier is appropriate here because plaintiffs' counsel bore little
                risk of non-payment. ........................................................................................ 22

CONCLUSION............................................................................................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-cv-7126,
2018 U.S. Dist. LEXIS 202526 (S.D.N.Y. Nov. 29, 2018) .......................................................... 13

*Alexander v. FedEx Ground Package Sys.*, No. 05-cv-00038,
2016 WL 3351017 (N.D. Cal. June 15, 2016) ..................................................... 10, 11, 12, 14

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ............................................................................... 13

*In re Anthem Inc. Data Breach Litig.*,
2018 WL 3960068, 2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17, 2018) ....... 4, 12, 16, 17, 19, 20, 21

*Ark. Teacher Ret. Sys. v. State St. Bank*,
2018 U.S. Dist. LEXIS 111409 (D. Mass. May 14, 2018) ......................................................... 16

*Ark. Teacher Ret. Sys. v. State St. Bank & Trust Co.*,
2020 WL 949885, 2020 U.S. Dist. LEXIS 33552 (D. Mass. Feb. 27, 2020)........................................ 12, 16

*Banas v. Volcano Corp.*,
47 F. Supp. 3d 957 (N.D. Cal. 2014) ................................................................................. 17

*In re Beacon Assocs. Litig.*, No. 09 Civ. 777,
2013 WL 2450960 (S.D.N.Y. May 9, 2013) .......................................................................... 17

*In re Bluetooth Headset Products Liability Litigation*,
654 F.3d 935 (9th Cir. 2011) ............................................................................... 3, 14, 15, 23

*Blum v. Stenson*,
465 U.S. 886 (1984) .................................................................................................. 15-16

*In re Cardinal Health Inc. Secs. Litig.*,
528 F. Supp. 2d 752 (S.D. Ohio 2007)................................................................................. 9

*In re Cendant Corp. Prides Litig.*,
243 F.3d 722 (3d Cir. 2001) ........................................................................................... 20

*In re Charles Schwab Corp. Secs. Litig.*, No. C 08–01510 WHA,
2011 WL 1481424 (N.D. Cal. Apr. 19, 2011) ........................................................................ 12

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
424 F. Supp. 3d 456 (E.D. La. 2020).................................................................................. 13

*In re Citigroup Inc. Bond Litig.*,
988 F. Supp. 2d 371 (S.D.N.Y. 2013)....................................................................... 10, 18, 20, 21

*In re Continental Ill. Sec. Litig.*,
962 F.2d 566 (7th Cir. 1992)............................................................................................ 3

*Dennis v. Kellogg Co.*,
697 F.3d 858 (9th Cir. 2012) .......................................................................................... 22

*Dial Corp. v. News Corp.*,
 317 F.R.D. 426 (S.D.N.Y. 2016) ................................................................................ 13, 17

*In re Domestic Drywall Antitrust Litig.*,
 2018 WL 3439454 (E.D. Pa. July 17, 2018) .................................................................... 13

*In re Dry Max Pampers Litig.*,
 724 F.3d 713 (6th Cir. 2013) .............................................................................................. 2

*In re EasySaver Rewards Litig.*, No. 09-cv-02094-BAS-WVG,
 2020 U.S. Dist. LEXIS 77483 (S.D. Cal. May 1, 2020) ................................................... 2

*In re First Fidelity Secs. Litig.*,
 750 F. Supp. 160 (D.N.J. 1990) ....................................................................................... 10

*Fishman v. Tiger Nat. Gas Inc.*,
 2019 WL 2548665 (N.D. Cal. Jun. 20, 2019) ................................................................... 8

*Fraley v. Facebook, Inc.*,
 2014 WL 806072 (N.D. Cal. Feb. 27, 2014) ..................................................................... 8

*Fraser v. Asus Computer Int'l*,
 2012 WL 6680142, 2012 U.S. Dist. LEXIS 181315 (N.D. Cal. Dec. 21, 2012) ............ 14

*Good v. W. Virginia-American Water Co.*,
 2017 WL 2884535, 2017 U.S. Dist. LEXIS 104242 (S.D. W. Va. July 6, 2017) ........... 13

*In re Google, Inc. Cookie Placement Consumer Privacy Litig.*, No. 12-md-2358,
 2017 U.S. Dist. LEXIS 14646 (D. Del. Feb. 2, 2017),
 *rev'd on other grounds* 934 F.3d 316 (3d Cir. 2019) .................................................... 21

*In re Google LLC St. View Elec. Communs. Litig.*, No. 10-md-02184-CRB,
 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) .............................................. 21

*Grice v. Pepsi Beverages Co.*,
 363 F. Supp. 3d 401407 (S.D.N.Y. 2019) ...................................................................... 13

*Gutierrez v. Wells Fargo, NA*, No. C 07–05923 WHA,
 2015 WL 2438274, (N.D. Cal. May 21, 2015) ......................................................... 2-3, 12

*In re Heritage Bond Litig.*,
 2005 WL 1594403, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ............... 20

*In re High-Tech Employee Antitrust Litigation* ("*High-Tech*"), No. 11-CV-02509-LHK,
 2015 WL 5158730, 2015 U.S. Dist. LEXIS 118052 (N.D. Cal. Sept. 2, 2015) ............ 11, 20, 21

*In re HP Inkjet Printer Litig.*,
 716 F.3d 1173 (9th Cir. 2013) ............................................................................................ 4

*IL Fornaio (America) Corp. v. Lazzari Fuel Co., LLC*, No. 13-cv-05197,
 2015 U.S. Dist. LEXIS 66145 (N.D. Cal. May 20, 2015) ............................................... 14

*In re Indymac Mortgage-Backed Secs. Litig.*,
 94 F. Supp. 3d 517 (S.D.N.Y. 2015) ............................................................................... 13

*Intel Corp. v. Terabyte Int'l, Inc.*,
  6 F.3d 614 (9th Cir. 1993) ................................................................................................. 18

*In re Initial Public Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................................... 13

*In re Johnson & Johnson Derivative Litig.*, No. 11-2511(FLW),
  2013 WL 6163858 (D.N.J. Nov. 25, 2013) ....................................................................... 22

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
  2015 WL 1284380 (E.D. Pa. Oct. 15, 2015) ..................................................................... 13

*Kmiec v. Powerwave Tech.*, No. 12-00222-CJC,
  2016 WL 5938709 (C.D. Cal. Jul. 11, 2016) ....................................................................... 8

*Laffitte v. Robert Half Int'l*,
  376 P.3d 672 (Cal. 2016) ..................................................................................................... 3

*Lane v. Wells Fargo Bank, N.A.*,
  2013 WL 3187410, 2013 U.S. Dist. LEXIS 87669 (N.D. Cal. Jun. 21, 2013) .................. 20

*In re LendingClub Secs. Litig.*,
  2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) .................................................................. 13

*Lewis v. Silvertree Mohave Homeowners' Ass'n, Inc.*, No. C 16-03581 WHA,
  2017 WL 5495816 (N.D. Cal. Nov. 16, 2017) .................................................................. 15

*In re Lidoderm Antitrust Litigation*,
  2018 WL 4620695, 2018 U.S. Dist. LEXIS 162425 (N.D. Cal. Sep. 20, 2018) ............... 12

*In re LinkedIn User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ......................................................................................... 4

*MacDougal v. Catalyst Nightclub*,
  58 F. Supp. 2d 1101 (N.D. Cal. 1999) .............................................................................. 22

*In re MagSafe Apple Power Adapter Litig.*,
  2015 WL 428105, 2015 U.S. Dist. LEXIS 11353 (N.D. Cal. Jan. 30, 2015) .................... 21

*In re MagSafe Apple Power Adapter Litig.*,
  571 F. App'x 560 (9th Cir. 2014) ...................................................................................... 23

*McLaughlin v. IDT Energy*,
  2018 WL 3642627 (E.D.N.Y. July 30, 2018) ................................................................... 12

*In re Mercury Interactive Corp. Sec. Litig.*,
  618 F.3d 988 (9th Cir. 2010) ................................................................................... 2, 15, 22

*Morris v. Fid. Invs.*,
  2019 WL 4040069 (N.D. Cal. Aug. 26, 2019) .................................................................... 8

*Myles v. AlliedBarton Security Svcs.*, LLC, No. 12-5761 JD,
  2014 WL 6065602 (N.D. Cal. Nov. 12, 2014) .................................................................... 8

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................................ 10

*In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ..................................................................... 11

*Nevarez v. Forty Niners Football Co.*, No. 16-CV-07013-LHK,
   2020 U.S. Dist. LEXIS 131491 (N.D. Cal. Jul. 23, 2020) ................................................ 17

*New York State Teachers' Ret. Sys. v. GM Co.*,
   315 F.R.D. 226 (E.D. Mich. 2016) .................................................................................... 13

*Nitsch v. DreamWorks Animation SKG Inc.*,
   2017 WL 2423161 (N.D. Cal. June 5, 2017) .................................................................... 11

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................................. 3

*In re Online DVD*,
   779 F.3d 934 (9th Cir. 2015) .............................................................................................. 8

*Pearson v. NBTY, Inc.*,
   772 F.3d 778 (7th Cir. 2014) .............................................................................................. 8

*Perdue v. Kenny A.*,
   559 U.S. 542 (2010) .................................................................................................... 22, 23

*Piambino v. Bailey*,
   757 F.2d 1112 (11th Cir. 1985) ......................................................................................... 3

*Redman v. RadioShack Corp.*,
   768 F.3d 622 (7th Cir. 2014) .............................................................................................. 8

*In re Resistors Antitrust Litig.*,
   2019 WL 5298143, 2019 U.S. Dist. LEXIS 174399 (N.D. Cal. Sept. 6, 2019) ......... 18, 19

*Rodman v. Safeway Inc.*,
   2018 WL 4030558, 2018 U.S. Dist. LEXIS 143867 (N.D. Cal. Aug. 22, 2018) ................ 3

*Roes v. SFBSC Mgmt., LLC*,
   944 F.3d 1035 (9th Cir. 2019) ........................................................................................... 6

*Rose v. Bank of Am. Corp.*,
   2014 WL 4273358, 2014 U.S. Dist. LEXIS 121641 (N.D. Cal. Aug. 29, 2014) ... 15, 20, 21

*Rosenfeld v. DOJ*,
   904 F. Supp. 2d 988 (N.D. Cal. 2012) ............................................................................. 17

*SEC v. Kirkland,* No. 6:06-cv-183,
   2008 U.S. Dist. LEXIS 123308 (M.D. Fla. June 30, 2008) ...............................................

*Seijas v. Republic of Arg.*,
   2017 WL 1511352 (S.D.N.Y. Apr. 27, 2017) ..................................................................... 8

*Silverman v. Motorola Solutions, Inc.*,
739 F.3d 956 (7th Cir. 2013)................................................................................................. 23

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003).................................................................................................. 1

*Tait v. BSH Home Appliances Corp.*,
2015 WL 4537463 (C.D. Cal. July 27, 2015) ........................................................................ 4

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008) .................................................................................. 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ....................................................................... 12

*In re Transpacific Passenger Air Transportation Antitrust Litig.*,
2015 WL 3396829 (N.D. Cal. May 26, 2015).......................................................................... 8

*United States ex rel. Palmer v. C&D Techs., Inc.*,
2017 WL 1477123 (E.D. Pa. Apr. 25, 2017) ....................................................................... 17

*In re Urethane Antitrust Litig.*,
2016 WL 4060156 (D. Kan. July 29, 2016) ......................................................................... 13

*Ursic v. Bethlehem Mines*,
719 F.2d 670 (3d Cir. 1983) ................................................................................................ 21

*In re Vitamins Antitrust Litig.*,
2001 WL 34312839 (D.D.C. July 16, 2001) ........................................................................ 13

*In re Volkswagen & Audi Warranty Extension Litig.*,
89 F. Supp. 3d 155 (D. Mass. 2015). .................................................................................... 8

*In re Wash. Pub. Power Supply Sys. Sec. Litig.* ("*WPPSS*"),
19 F.3d 1291 (9th Cir. 1994)............................................................................. 2, 3, 13, 14, 22

*In re Wells Fargo & Co. Shareholder Derivative Litig.*, No. 16-cv-5541-JST,
2020 U.S. Dist. LEXIS 63631 (N.D. Cal. Apr. 7, 2020) ................................................... 2, 17

*Wells Fargo Sec. Litig.*,
157 F.R.D. 467 (N.D. Cal. 1994). .......................................................................................... 9

*Williams v. MGM-Pathe Communs. Co.*,
129 F.3d 1026 (9th Cir. 1997) ............................................................................................... 9

*Wininger v. SI Mgmt. L.P.*,
301 F.3d 1115 (9th Cir. 2002) ............................................................................................. 14

*Wolph v. Acer Am. Corp.*,
2013 WL 5718440, 2013 U.S. Dist. LEXIS 151180 (N.D. Cal. Oct. 21, 2013) .................... 20

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-02752-LHK,
2020 U.S. Dist. LEXIS 129939 (N.D. Cal. Jul. 22, 2020) ....................................... 10, 12, 13, 20

*Yamada v. Nobel Biocare Holding AG,*
    825 F.3d 536 (9th Cir. 2016) .................................................................................................. 19

**Rules**

Advisory Committee Notes on 2003 Amendments to Rule 23 ........................................................ 3, 9

Fed. R. Civ. Proc. 23(d) .............................................................................................................. 22

Fed. R. Civ. Proc. 23(f) .............................................................................................................. 20

Fed. R. Civ. Proc. 23(h) ...................................................................................................... 3, 4, 9, 15


**Other Authorities**

Elizabeth Chamblee Burch, *Publicly Funded Objectors,*
    19 Theoretical Inquiries in Law 47, (2018) ........................................................................ 1-2

Theodore Eisenberg & Geoffrey P. Miller,
    *Attorney Fees and Expenses in Class Action Settlements: 1993–2008,*
    7 J. Empirical Legal Stud. 248 (2010) ........................................................................ 10, 11

Theodore Eisenberg, Geoffrey P. Miller & Roy Germano,
    *Attorneys' Fees in Class Actions: 2009-2013,* 92 N.Y.U. L. Rev. 937 (2017) ................. 4, 11

Andrea Estes, *Critics hit law firms' bills after class-action lawsuits,*
    Boston Globe (Dec. 17, 2017) .................................................................................................2

Federal Judicial Center,
    Manual for Complex Litigation—Fourth (2004) ................................................................ 11

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,*
    7 J. Empirical L. Stud. 811 (2010) ...................................................................................... 10

Tiffany Janowicz, *Settlement Administration: Impacting Claims Filing Rates,*
    Strafford (Feb. 18, 2014) .........................................................................................................5

Jones Day, *An Empirical Analysis of Federal Consumer Fraud Class Action Settlements* (2010-2018) ..........................6

Stuart Logan, et al., *Attorney Fee Awards in Common Fund Class Actions,*
    24 Class Action Reports (March-April 2003) ................................................................10-11

Vaughn R. Walker, & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial
    Misgivings About Reasonable Fees in Common Fund Cases,*
    18 Geo J. Legal Ethics 1453 (2005) .................................................................................... 15

**INTRODUCTION**

Co-lead counsel propose to pay themselves $87,730,000, or 28.3% of the purported $310 million settlement value in this case, well above the 25% benchmark in this Circuit, especially given that the settlement is a megafund. Such an award would provide a windfall for counsel—an admitted 2.41 multiplier, and likely higher—in a case where counsel has submitted sprawling billing from over 304 individuals across 47 different law firms.

Plaintiffs cite a string of abnormally large fee awards to support their request, but representative empirical surveys show that a fee award between 15 and 20% is typical of a settlement of this size. Here, Objector St. John recommends a generous fee award of 17.7%, which results in over $35 million being retained by the consumer class. And the court would be justified lowering the fee award below 17.7%, because even that fee award provides a sizable multiplier on exaggerated billing for relatively low-risk litigation, as confirmed by the scores of firms who lined up for work in this case.

Finally, the risk multiplier is unwarranted because most time billed in the case occurred after the Federal Reserve served letters on the directors, when relatively little risk remained that Apple would not settle.

The botched notice program and exceptionally poor take rate for claims has cost class members over $200 million, and is another reason to refuse to grant the full fee request.

## I.   Anna St. John is a member of the proposed settlement class and has standing to object.

Objector St. John is a U.S. resident who owns an iPhone 6s that ran iOS 10.2.1 or later before December 21, 2017. *See* Declaration of Anna St. John, ¶¶ 2-3. Her full name is Anna Elizabeth Wagner St. John, her business address is Hamilton Lincoln Law Institute, 1629 K St. NW, Suite 300, Washington, DC 20006, and her telephone number is (917) 327-2392. *Id.* at ¶ 2. She does not fit within any of the exclusions to the proposed class. *Id.* at ¶ 4. She has submitted a claim through the settlement website. *Id.* at ¶ 6. Thus, St. John has standing to object to plaintiffs' fee request. Fed. R. Civ. P. 23(h)(2); *Stetson v. Grissom,* 821 F.3d 1157, 1164 (9th Cir. 2016).

Hamilton Lincoln Law Institute's Center for Class Action Fairness ("CCAF") represents St. John *pro bono*, and CCAF attorney Theodore H. Frank intends to appear at the fairness hearing on her behalf. St. John Decl. ¶ 8. CCAF represents class members *pro bono* where class counsel employs unfair procedures to benefit

themselves at the expense of the class. Since it was founded in 2009, CCAF has "develop[ed] the expertise to spot problematic settlement provisions and attorneys' fees." Elizabeth Chamblee Burch, *Publicly Funded Objectors*, 19 THEORETICAL INQUIRIES IN LAW 47, 55-57 & n.37 (2018). Over that time CCAF has recouped more than $200 million for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. *See e.g., In re Wells Fargo & Co. Shareholder Derivative Litig.,* No. 16-cv-5541-JST, 2020 U.S. Dist. LEXIS 63631 (N.D. Cal. Apr. 7, 2020) (reducing fees by more than $15 million and proportionally increasing shareholder recovery); *see also In re EasySaver Rewards Litig.*, No. 09-cv-02094-BAS-WVG, 2020 U.S. Dist. LEXIS 77483 (S.D. Cal. May 1, 2020) (reducing fees by 40%); *see generally* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE (Dec. 17, 2017) (more than $100 million at time). St. John brings this objection through CCAF in good faith to protect the interests of the class. St. John Decl. ¶ 9. Her objection applies to the whole class; she adopts any objections not inconsistent with this one.

## II.     The district court has a fiduciary duty to the absent class members.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 715 (6th Cir. 2013). Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations." *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.* To guard against this danger, a district court must act as a "fiduciary for the class . . . with 'a jealous regard'" for the rights and interests of absent class members. *Mercury Interactive*, 618 F.3d at 994 (quoting *In re Washington Pub. Power Supply Sys. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994) ("*WPPSS*")).

St. John's objection invokes this special fiduciary role of this Court because St. John challenges class counsel's excessive and unreasonable fee request. At the fee-setting stage, the relationship between class counsel and the class turns directly and unmistakably adversarial because counsel's "interest in getting paid the most for its work representing the class [is] at odds with the class' interest in securing the largest possible recovery for its members." *Id.* Given this natural adversity, there can be no deference to class counsel's recommendation.

Moreover, "in most common-fund cases, defendants have little interest in challenging class counsel's timesheets." *Gutierrez v. Wells Fargo, NA*, No. 07-cv-05923 WHA, 2015 WL 2438274, at *6, 2015 U.S. Dist. LEXIS 67298, at *16 (N.D. Cal. May 21, 2015). No individual class member has the financial incentive to object to an exorbitant fee request either; "[h]is gain from a reduction, even a large reduction, in the fees awarded the lawyers would be minuscule." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). The district court (and good-faith public-minded objectors) serve as the last line of defense against overreaching fee requests.

"Public confidence in the fairness of attorney compensation in class actions is vital to the proper enforcement of substantive law." *Laffitte v. Robert Half Int'l*, 376 P.3d 672, 688-92 (Cal. 2016) (Liu, J., concurring). Exorbitant fees erode public confidence in the class action device. To prevent that erosion, it is "it is important that the courts should avoid awarding 'windfall fees' and that they should likewise avoid every appearance of having done so." *Piambino v. Bailey*, 757 F.2d 1112, 1144 (11th Cir. 1985); *see also WPPSS*, 19 F.3d at 1298 (differentiating "reasonable" from "windfall" fees in megafund cases). "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

## III. A percentage-of-recovery analysis does not support the requested fee.

"While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. P. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011). The benchmark for a reasonable award in the Ninth Circuit in a case alleging economic injury is 25% of the class benefit. *Id.* at 942. However, "to avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases." *Rodman v. Safeway Inc.*, 2018 WL 4030558, 2018 U.S. Dist. LEXIS 143867, *10-11 (N.D. Cal. Aug. 22, 2018) (cleaned up); *see also Bluetooth*, 654 F.3d at 942 (suggesting downward departure from the benchmark to prevent "windfall profits" in "mega-fund" settlements).

Plaintiffs assert that "in most common fund cases, the [fee] award exceeds the benchmark." Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Attorneys' Fees, Expenses, and Service Awards ("Fee Motion") (Dkt. 468) at 11 (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)). At least in this district, the statement is false. Eisenberg, Theodore, Geoffrey P. Miller and Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 950 tbl. 2 (2017) (listing a median fee award of 25% in this district); *see e.g., In re LinkedIn User Privacy Litig.,* 309 F.R.D. 573, 591 (N.D. Cal. 2015) (Davila, J.) (refusing to depart upward from the benchmark even where settlement at issue was only $1.2 million and class counsel's lodestar exceeded the amount they were requesting).

 By their calculation, plaintiffs request 28.3% of the $310 million settlement "floor." Fee Motion 1, 6. While a request of 28.3% exceeds the benchmark in its own right, the request is in fact even more excessive because (1) the class and fund size create economies of scale that warrant a reduced percentage; (2) the percentage omits $1 million in litigation expenses paid in addition to the fees; and (3) the class benefit should not include notice and administration costs. Properly calculated, plaintiffs are seeking a Rule 23(h) award of approximately 30% of class recovery.[1] But, as explained below, a reasonable fee and expense award is no more 17.7% of actual class recovery. Therefore, if *and only if* sufficient class members submit a claim to exhaust the $500 million settlement "ceiling" can plaintiffs' fee request then reasonably be awarded in full. However, if, as is probable, the settlement fund is so poorly subscribed that class members recover only $297.25 million (the $310 million "floor" less $12.75 million in administrative costs), class counsel should only be awarded $52.7 million, thereby returning more than $35 million to the class.

**A.    Class counsel's fee should depend upon the class's ultimate recovery.**

As plaintiffs recognize, awarding fees on percentage-of-the-fund basis is superior to employing a base lodestar methodology because it better "align[s] the lawyers' interests" with the class's interest. Fee Motion 5 (quoting *Tait v. BSH Home Appliances Corp.*, 2015 WL 4537463, at *11 (C.D. Cal. July 27, 2015)). "By tying the award to the recovery of the Class, Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result." *In re Anthem Inc. Data Breach Litig.*, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018); *accord In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1178 (9th Cir. 2013) (observing

---

[1] $88,725,244.93/$297,250,000.

that courts "ensure faithful representation" by "tether[ing] the value of an attorneys' fees award to the value of the class recovery" and thereby "tying together the interests of class members and class counsel").

Plaintiffs' fee motion immediately goes astray, however, by requesting a static fee award of $87.73 million, regardless of whether the class recovers $500 million (the settlement ceiling) or only $297.25 million (the probable settlement floor).[2] Contrary to plaintiffs' suggestion, the class benefit is not "fixed" and certainly not fixed at the designated "Minimum Class Settlement Amount of $310 million." *Contra* Fee Motion 5.

Despite disseminating notice to more than 95 million potential class members, the administrator received a total of just 1.4 million claims as of August 26. Declaration of Settlement Administrator, Dkt. 470-2 ¶¶ 6, 11, 26. Perhaps this low rate has occurred because notice predominantly landed in the class member spam folders. *See* St. John Decl. ¶ 7; discussed *infra*. Whatever the reason, the class will not receive $500 million. To reach the $310 million recovery presumed by plaintiffs, an **11 million more claims** would need to arrive in the final six weeks of the claims period. This is not realistic.

Instead, based on its current trajectory the settlement will almost certainly be extremely undersubscribed. By operation of the settlement, this will mean that instead of Apple paying the notice and administration costs on top of the common fund, $12.75 million (or more) will be drawn from the fund and will thus **reduce** the class's ultimate recovery by that same amount. *Compare* Settlement ¶ 5.3.1 *with* Settlement ¶ 6.1. If Class Counsel's fee award were tied to actual class recovery, counsel would have an incentive to ensure enough claims are filed to avoid this unfavorable result. Likewise, Class Counsel would have an incentive to fight for class members during administration; the settlement permits both Apple and Class Counsel to contest claims determinations. Settlement ¶ 6.11. A static fee request like plaintiffs have submitted makes counsel indifferent to the class's welfare and fails to provide the proper incentive.[3] This is not merely an abstract concern; the class has already suffered prejudice from the misalignment of interests resulting from class counsel's static fee request. Even though a potential $500 is available through the claims process, the take rate hovers at an exceptionally low—given the potential reward—1.5%. *See* Tiffany Janowicz, *Settlement*

---

[2] In fact, there is some possibility that the class recovers less than $297.25 million if the administrator incurs postage costs over and above the $12.75 million administrative costs set aside. Settlement ¶ 5.3.1.

[3] In settlements where claimants are paid *pro rata* from a fixed common fund, and the aggregate class recovery does not depend upon the claims rate, a static fee request is unobjectionable.

*Administration: Impacting Claims Filing Rates*, at 24, http://media.straffordpub.com/products/crafting-class-settlement-notice-programs-due-process-reach-claims-rates-and-more-2014-02-18/presentation.pdf (Feb. 18, 2014) (presenting administration data that shows how claims rates vary depending upon the amount available, from 0-3% at $5, to 5-10% at $100, to 8-15% at $500); *see also Roes v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1046 n.7 (9th Cir. 2019) (18.5% claims rate where "class members stood to receive hundreds of dollars"); Jones Day, *An Empirical Analysis of Federal Consumer Fraud Class Action Settlements* (2010-2018), at 7, https://www.jonesday.com/-/media/files/publications/2020/04/empirical-analysis-consumer-fraud-class-action/files/empirical-analysis-of-federal-consumer-fraud/fileattachment/empirical-analysis-of-federal-consumer-fraud.pdf (Apr. 2020) (surveying claims rates in 40 settlements and theorizing that the relatively high participation rates in two settlements were "likely due to the large cash payments offered"); Declaration of Jennifer M. Keough, *Finerman v. Marriott Ownership Resorts, Inc.*, No. 14-cv-1154, Dkt. 219 (M.D. Fla. Aug. 3, 2018) (attesting to an 18% claims rate where average claim approached $500). So why does the claims rate reflect a settlement offering $10 or less rather than one offering up to $500?

The substandard claims rate is not happenstance.  It is a function of the defective email notice program in this case. *See Roes*, 944 F.3d at 1046 n.7 (low response rate "provides further indication that class members may not have received adequate notice of the settlement"). Including St. John, multiple class members have found that their class notice was filtered into their email spam folders. Frank Decl. ¶ 10. Angeion Group, the administrator, is well aware that spam filters pose a problem to an email notification program. For example, in the pending *In re Google Plus Profile Litig.*, 18-cv-06164-EJD (N.D. Cal.), Angeion founder Steven Weisbrot averred that the class notice program would be "design[ed]" "to avoid many common 'red flags' that might otherwise cause a potential Settlement Class Members' [sic] spam filter to block or identify the email notice as spam." Declaration of Steven Weisbrot, *Google Plus*, Dkt. 57-6 at 6 (Frank Decl. Ex. A). To that end, Mr. Weisbrot declared that the administrator would "work closely with Defendant to determine the most efficient way to send the emails." *Id.* at 5. Ultimately, the class notices in *Google Plus* were disseminated from a Google domain and thereby avoided class members' spam filters. *See* Frank Decl. ¶ 16 & Ex. B to Frank Decl. (*Google Plus* Notice).

The settlement administration materials submitted in this case display no apparent awareness of the spam problem. The settlement administration protocol (Dkt. 416-7) concerns itself chiefly with claims

processing protocols. Angeion sent the emails directly rather than coordinating with the defendant to evade spam filters by sending it from an Apple domain. Angeion's post-notice declaration does not indicate any awareness that the notice program has been beset with spam folder troubles. Dkt. 470-2. The difference has been stark: while the *Google Plus* settlement provides only a $7.5 million common fund to be distributed *pro rata* to claimants among 53 million class members—over 1.5 million *Google Plus* class members have filed claims to that settlement as of September 28, even though their claims are currently worth only perhaps $3 each. Frank Decl. ¶ 17. This settlement covers almost twice as many class members and offers over sixty times as much money per claim (currently >$150 vs. $2.50 in *Google Plus*)—yet it has fewer claims than the relatively small *Google Plus* settlement fund.

Not only has notice been poor, claims may have been throttled by settlement administration decisions. For example, another class member (the undersigned) received direct notice of the settlement in his spam folder, but the settlement site rejected his valid serial number. *Id.* ¶¶ 10-11. Other objectors have written the court to provide their similar experiences of valid serial numbers being rejected. *See* Dkt. 435; 447; and 454. Perhaps not all valid serial numbers were provided to the administrator; the parties should investigate and advise the Court on this issue. Additionally, the claims forms require class members to declare under penalty of perjury that they currently own a relevant iPhone device. *Id.* ¶¶ 20-21. Yet the settlement is supposed to provide benefits to all *class members* "former or current U.S. owners of iPhone 6, 6 Plus, 6s, 6s Plus, 7, 7 Plus, and SE devices running iOS 10.2.1 or later…" Dkt. 416 at 5-6. Presumably, the parties agreed to this notice requirement through sloppy drafting—but it's sloppy drafting that prevents likely millions of class members from filing claims without committing perjury. The restrictive notice appears unchanged on the settlement website, so has marred the entire claims period.[4]

The notice and subsequent claims process shortcomings are traceable back to class counsel's financial indifference as to whether their clients receive $297.25 million or $500 million. Class counsel's static fee request of 28.3% of $310 million is thus not a reasonable award. Notwithstanding the failure of the claims administration process, class counsel still seek to include those costs in the denominator for the purpose of

---

[4] Claims form (last visited October 6, 2020) available online at: https://angeion-public.s3.amazonaws.com/www.SmartphonePerformanceSettlement.com/docs/Claim+Form.pdf (archived at: https://archive.vn/gKAbK).

calculating their fee request. Although the court has discretion to include administrative expenses in the denominator,[5] the better approach is to exclude them. "[T]hose costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members." *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (excluding administration expenses in fee calculation because such expenses are "costs, not benefits").

Several courts in this district have agreed before and after *Online DVD*, observing that "[i]t is only commonsense that a percentage-based fee should be based on the amount actually recovered by the class (directly or through cy pres) and not include a percentage of the sums going to pay costs." *Fraley v. Facebook, Inc.*, 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014); *In re Transpacific Passenger Air Transportation Antitrust Litig.*, 2015 WL 3396829 (N.D. Cal. May 26, 2015) (describing "longstanding preference" for basing fees on the net settlement fund); *Fishman v. Tiger Nat. Gas Inc.*, 2019 WL 2548665 (N.D. Cal. Jun. 20, 2019) (declining to award 25% of the gross fund; awarding 25% of the net fund instead); *Morris v. Fid. Invs.*, 2019 WL 4040069 (N.D. Cal. Aug. 26, 2019) (awarding 25% net of expenses). Put simply, attorneys' fees should be calculated based on the class benefit. "[F]ees paid to the settlement administrator—do[] not constitute a benefit to the class members." *Myles v. AlliedBarton Security Svcs.*, LLC, No. 12-5761 JD, 2014 WL 6065602, at *5 (N.D. Cal. Nov. 12, 2014).

If notice and administration expenses are included when calculating attorneys' fees, class counsel is being awarded a commission on those costs. *See Kmiec v. Powerwave Tech.*, No. 12-00222-CJC, 2016 WL 5938709, at *5 (C.D. Cal. Jul. 11, 2016) (finding "no principled reason to calculate a fee" by giving counsel a commission their costs); *Seijas v. Republic of Arg.*, 2017 WL 1511352, at *11 (S.D.N.Y. Apr. 27, 2017) ( "no justification" for awarding counsel a portion of its expenses as a fee for that result and thus calculating the fee award as a percentage of the net fund). "Counting administration fees as part of the settlement valuation for attorneys' fees purposes might also inadvertently incentivize the establishment of costly and inefficient administration procedures which would inflate the benefits valuation without increasing actual benefit for class members." *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 170 (D. Mass. 2015).

---

[5] *In re Online DVD*, 779 F.3d 934, 953 (9th Cir. 2015).

Instead, if class counsel is paid *after* administration expenses are deducted, class counsel is incentivized to optimize settlement administration expenses. *In re Cardinal Health Inc. Secs. Litig.*, 528 F. Supp. 2d 752, 771 (S.D. Ohio 2007) ("The net recovery more truly approximates the amount of money that benefits the Class. Because the percentage approach is meant to align the attorneys' fees with the amount of money the class receives, the net recovery is a more appropriate metric."). This also promotes judicial efficiency because when class counsel's incentives are aligned to optimize expenses, courts do not have to waste resources monitoring settlement administration expenses for cost overruns. "Put another way, incentives to minimize expenses and to allocate resources properly go much farther toward cost efficiency than can *post hoc* judicial review." *Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994).

Under Rule 23(h), appended to Rule 23 in 2003, the Court's "fundamental focus is the result *actually achieved* for class members" 2003 Advisory Committee Notes to Amendments to Rule 23(h) ((emphasis added)). "In many instances, the court may need to proceed with care in assessing the value conferred on class members [including] scrutiniz[ing] the manner and operation of the any applicable claims procedure…[and] defer[ring] some portion of the fee until actual payouts are known." *Id.* Such focus leads to fair results for both class and counsel. Before Rule 23(h), the Ninth Circuit held that it was unreasonable to reduce a fee request by 99.78% to tether the fee award to the amounts claimed by class members. *Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997) (reversing a fee award of $3,300). Under St. John's proposal, however, class counsel still stands to earn a 1.51 multiplier for its sprawling 47-firm fee request. And, unlike in *Williams*, any reduction will benefit absent class members because the attorneys' fee award in this case comes from the common fund, not simply revert to the putative wrongdoer.

Especially here, where the feeble class notice procedure left millions of class members in the dark, and where a superior claims rate would have led to Apple paying the notice *on top of* the common fund, the Court should decline to include the costs of administration in the denominator for purposes of awarding fees. Counsel should be awarded a percentage of the actual recovery of class members, whether that is $500 million cap or (more likely) near the $297.25 million floor. For reasons described in the next section, 17.7% of the amount claimed is a reasonable award; the requested 28.3% is not.

**B.     Class counsel should be awarded no more than 17.7% of the actual class recovery, which would likely return over $35 million to the class.**

Class counsel seek a fee award of 28.3% in this multi-hundred-million-dollar mega-fund settlement. The request greatly exceeds the median size fee award in a settlement of this size and should be denied. St. John proposes instead a 17.7% fee award, which is generous in light of the administration problems flagged above.

Because of economies of scale, a reasonable fee award should utilize sliding scale percentage to prevent a windfall for plaintiffs' attorneys at the expense of the class. *See, e.g., Alexander v. FedEx Ground Package Sys.,* No. 05-cv-00038, 2016 WL 3351017 (N.D. Cal. Jun. 15, 2016). "[R]ote application of the 25% benchmark" is inappropriate because it will "produce a windfall for Class Counsel because the recovery in the instant case is largely a function of the size of the Settlement Class." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.,* No. 16-md-02752-LHK, 2020 U.S. Dist. LEXIS 129939, at *97 (N.D. Cal. Jul. 22, 2020). "In many instances the increase [in fund size] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 486 (S.D.N.Y. 1998). (quoting *In re First Fidelity Secs. Litig.,* 750 F. Supp. 160, 164 n.1 (D.N.J. 1990)). "It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case." *Id.* Thus, "[i]n cases with exceptionally large common funds, courts often account for these economies of scale by awarding fees in the lower range." *In re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371, 374 (S.D.N.Y. 2013) (cleaned up). "The existence of a scaling effect—the fee percent decreases as class recovery increases—is central to justifying aggregate litigation such as class actions. Plaintiffs' ability to aggregate into classes that reduce the percentage of recovery devoted to fees should be a hallmark of a well-functioning class action system." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 263 (2010).

Empirical research shows that in class actions "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent." Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 838 (2010). In class actions in which the settlement equaled $250-$500 million, the median fee award was 19.5% and the mean was 17.8%. *Id.* at 839. At $100-$250 million, the median award is 16.9% and the mean is 17.9%. Other surveys support this analysis. *E.g.,* Logan, Stuart, et al., *Attorney Fee Awards in Common*

*Fund Class Actions*, 24 Class Action Reports (March-April 2003) (empirical survey showed average recovery of 15.1% where recovery exceeded $100 million); Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7 (mean percentage fee in 68 class action settlements with recovery above $175.5 million was 12% and median award was 10.2% with standard deviation of 7.9%).[6] A reasonable award for class counsel in this case is no more than 17.7% of the class recovery, or about $52.6 million if the class only recovers the expected $297.25 million floor. Such an award would appropriately compensate class counsel for the sizable $297.25 million fund that the settlement created.

Percentage awards in megafund cases are "substantially less than the 25% benchmark applicable to typical class settlements in this Circuit." *Alexander*, 2016 WL 3351017, at *2-3 (awarding fees 16.4% of $226 million common fund). For example, in *In re High-Tech Employee Antitrust Litigation* ("*High-Tech*"), this Court rejected a 19.5% fee request and instead awarded 9.8% of a $415 million settlement because empirical research showed a 10.2% median for megafund cases over $175 million. No. 11-CV-02509-LHK, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015) (citing Eisenberg & Miller, 7 J. EMPIRICAL LEGAL STUD. at 265 tbl.7). And following *High-Tech*, in *Nitsch v. DreamWorks Animation SKG Inc.*, this Court awarded 11% of $150 million settlement in order to avoid "windfall profits" to class counsel where class counsel "achieved economies of scale." 2017 WL 2423161, at *12 (N.D. Cal. June 5, 2017).

The fact that *High-Tech* and *Nitsch* were antitrust cases only underscores why the requested 28% percentage here is so excessive. An antitrust case is "arguably the most complex action to prosecute." *In re NCAA Athletic Grant-in-aid Cap Antitrust Litig.*, No. 4:14-md-2541-CW, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017) (cleaned up). By contrast, this case involved much less risk as demonstrated by the sheer number of complaints brought in federal and state court regarding this matter. *See* Ex. A to Stipulation of Settlement, Dkt. 416 at 154-55 (cataloging 67 federal cases consolidated in the MDL). That so many firms were lining up to bring this case and later, to be involved in this MDL reflects the minimal risk involved. *See* section **Error!**

---

[6] *See also* Theodore Eisenberg, Geoffrey P. Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937, 947 (2017) (noting that mean and median for cases over $100 million ranged from 16.6% to 25.5%, but that such variation was "probably due to significantly smaller number of very large cases in [the] data set"); Federal Judicial Center, Manual for Complex Litigation—Fourth 188–89 (2004) (noting survey where "class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%").

**Reference source not found.**, *infra; see also In re Anthem Inc. Data Breach Litig.*, 2018 WL 3960068, at *27 (N.D. Cal. Aug. 17, 2018) (lack of risk evidenced by "18 separate motions to serve as lead counsel in this action.") (internal quotations and alterations omitted); *McLaughlin v. IDT Energy*, 2018 WL 3642627, at *20 (E.D.N.Y. July 30, 2018) (lack of risk "evidenced by the fact that plaintiffs' lawyers in three states filed separate actions"). Had there been competitive bidding for the lead counsel role, there is no reason to believe that the best fee bid would have exceeded 18% of an enormous class and an expected fund this large.

Other judges in this District also award lower percentages in megafund cases. *See Gutierrez*, 2015 WL 2438274, at *5 (rejecting 25% of $203 million; awarding only 9% in action alleging unfair banking practices) (Alsup, J.); *Alexander*, 2016 WL 3351017, at *2-3 (22% of a $226 million megafund settlement over wage-and-hour claims is "well above the typical range"; awarding instead 16.4%, "consistent with the higher end of awards in megafund cases") (Chen, J.); *In re Charles Schwab Corp. Secs. Litig.*, No. C 08–01510 WHA, 2011 WL 1481424, at *8 (N.D. Cal. Apr. 19, 2011) (awarding attorneys' fees of 9.25% where fund equaled $235 million) (Alsup, J.).

Nevertheless, class counsel argue that this Court should depart *upward* from the 25% benchmark. Fee Motion 11-12. Class counsel do not rely on a single empirical study in support of their fee request. *See Ark. Teacher Ret. Sys. v. State St. Bank & Trust Co.*, 2020 WL 949885, 2020 U.S. Dist. LEXIS 33552, at *27-*28 (D. Mass. Feb. 27, 2020) (castigating class counsel for misleading the court by claiming that a 25% fee of a $300 million was "right in line" with Fitzpatrick's empirical survey).Instead, class counsel cite roughly a dozen outlier megafund settlements, most outside this Circuit, where courts awarded above-benchmark fees. Fee Motion 11-12. The in-circuit cases are readily distinguished because of the fact that they involved significantly lower lodestar multipliers than that proposed here. *Compare* Fee Motion 15 (requesting 2.41 multiplier); *with In re Lidoderm Antitrust Litigation*, 2018 WL 4620695, 2018 U.S. Dist. LEXIS 162425 (N.D. Cal. Sep. 20, 2018) (awarding 33.3% of $105 million fund, amounting to a multiplier of 1.37); *and Anthem*, 2018 WL 3960068 (awarding 27% of $115 million fund, amounting to a multiplier "slightly over 1.0");[7] *and In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (awarding 28.6%, where lodestar "was within

---

[7] Actually, because the *Anthem* court first reduced class counsel's proposed lodestar by nearly $8 million, the 27% award "constituted a negative multiplier of 0.82 of the Anthem plaintiffs' proposed lodestar." *In re Yahoo!, Inc. Customer Data Sec. Breach Litig.*, 2020 U.S. Dist. LEXIS 129939, at *151 (N.D. Cal. Jul. 22, 2020).

1%" of the requested award). And the out-of-circuit cases are generally antitrust or older cases, many awarded without opposition,[8] some awarded after plaintiffs won enormous litigated verdicts,[9] and another again supported by a modest lodestar multiplier.[10]

More importantly, these cases to show why, "isolated string cites to cases in which class counsel received a higher percentage of the settlement are not particularly meaningful." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 2018 WL 6250657; 2018 U.S. Dist. LEXIS 202526, at *14 (S.D.N.Y. Nov. 29, 2018); *see also Yahoo!, Inc*, 2020 U.S. Dist. LEXIS 129939, at *150-*51 (N.D. Cal. Jul. 22, 2020) (criticizing plaintiffs' fee expert for "cherry-pick[ing] a smaller range of settlements" "specifically to produce a high percentage rate"). Divorced from the relevant case context, each citation is "like picking a number out of the air." *WPPSS*, 19 F.3d at 1297. It is as easy to cite an equally lengthy list of cases on the other side, counseling a much lower award.[11] The better approach is not cherry-picking but looking at the "empirical studies cited above, which together survey hundreds of cases, [and] paint a far more comprehensive picture of the average percentage awarded to counsel in common fund settlements, thereby minimizing any potential sampling biases." *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019); *Yahoo! Data Breach*, 2020 U.S. Dist. LEXIS 129939, at *151 (finding fee expert's "two published law review articles, which have no connection to the instant case, to be more reliable guides as to the average percentages of recovery awarded in similar cases" than a selected sample)

---

[8] *In re Domestic Drywall Antitrust Litig.,* 2018 WL 3439454 (E.D. Pa. July 17, 2018); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2015 WL 1284380 (E.D. Pa. Oct. 15, 2015); *In re Vitamins Antitrust Litig.,* 2001 WL 34312839 (D.D.C. July 16, 2001).

[9] *In re Urethane Antitrust Litig.*, 2016 WL 4060156 (D. Kan. July 29, 2016); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006).

[10] *In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009).

[11] *Yahoo Data Breach*, 2020 U.S. Dist. LEXIS 129939 (refusing to award 25.5% of $117.5 million; instead awarding 19.4% of fund); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 499-500 (E.D. La. 2020) (declining to award 30% of $248 million; awarding 19%); *In re LendingClub Secs. Litig.*, 2018 WL 4586669 (N.D. Cal. Sept. 24, 2018) (awarding 13.1% of $125 million); *New York State Teachers' Ret. Sys. v. GM Co.*, 315 F.R.D. 226 (E.D. Mich. 2016) (awarding 7% of $300 million); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437 (S.D.N.Y. 2016) (refusing to award 30% of $244 million; instead awarding 20% of fund); *In re HP Secs. Litig*, No. 3:12-CV-05980-CRB, 2015 U.S. Dist. LEXIS 193707 (N.D. Cal. Nov. 13, 2015) (awarding 11% of $100 million settlement based upon a fee grid which varied based upon the amount recovered and the point during the litigation at which the settlement was achieved); *In re Indymac Mortgage-Backed Secs. Litig.*, 94 F. Supp. 3d 517, 523-25 (S.D.N.Y. 2015) (cataloging authorities and reducing 13% fee request to 8.2% of $346 million); *Good v. W. Virginia-American Water Co.*, 2017 U.S. Dist. LEXIS 104242, 2017 WL 2884535 (S.D. W. Va. July 6, 2017) (criticizing a megafund fee request of 30% and denying preliminary approval).

Plaintiffs' fee motion repeatedly touts the "exceptional result" achieved by the settlement, with the default $25 payment representing between 54-137% of per iPhone damages by the calculation of plaintiffs' expert. Fee Motion 7, 16, 18. Putting aside the inherent reliability concerns of expert valuations used for purposes of supporting settlement proposals and fee awards,[12] this characterization has larger problems. First, there is no "$25 per device recovery." *Contra* Fee Motion 18. On a class member basis, the recovery, even assuming the $500 million settlement ceiling was somehow reached, amounts to only approximately $5 a head in this 95 million-person class or 10-28% of plaintiffs' expert's calculated potential recovery. On a per *device* basis, the recovery is even less.

Second, the "high" settlement payments are afforded only as a direct consequence of the enervated claims process that has, of last report, resulted in only approximately 1.4 million (unverified) claims from the notification of 95 million class members, a take rate of less than 1.5%. Declaration of Settlement Administrator, Dkt. 470-2 ¶¶ 6, 11, 26. A substandard claims rate offsets the value of the settlement recovery on a per iPhone basis, and weighs in favor of a decrease in the percentage awarded. *See, e.g. IL Fornaio (America) Corp. v. Lazzari Fuel Co., LLC*, No. 13-cv-05197, 2015 U.S. Dist. LEXIS 66145 (N.D. Cal. May 20, 2015) (departing downward to 20% from the requested 25% when class counsel had resorted to a claims-made process and then received a tepid class response).

Class counsel's fee should not exceed 17.7% of the class's recovery ($52.6 million if the class only recovers the expected $297.25 million floor), which would increase relief to the class by more than $35 million.

## IV. The lodestar crosscheck does not support class counsel's fee request.

The lodestar cross-check should "confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate." *Bluetooth*, 654 F.3d at 945. "[I]n megafund cases, the lodestar cross-check assumes particular importance." *Alexander*, 2016 WL 3351017, at *2; *see also WPPSS*, 19 F.3d at 1298 (describing how percentage-based awards become particularly arbitrary in a megafund context).

The crosscheck helps uncover the "disparity between the percentage-based award and the fees the lodestar method would support." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1124 n.8 (9th Cir. 2002). "[C]ourts

---

[12] *See, e.g., Fraser v. Asus Computer Int'l*, 2012 WL 6680142, 2012 U.S. Dist. LEXIS 181315, at *12-*14 (N.D. Cal. Dec. 21, 2012) (expressing skepticism of expert report introduced to justify the value of the settlement payments in relation to the value of plaintiffs' claim).

making common fund fee awards are ethically bound to perform a lodestar cross-check." Vaughn R. Walker & Ben Horwich, *The Ethical Imperative of a Lodestar Cross-Check: Judicial Misgivings About Reasonable Fees in Common Fund Cases*, 18 GEO J. LEGAL ETHICS 1453, 1454 (2005).

Here, plaintiffs' failure to submit any meaningful breakdown of aggregated lodestar information to class members,[13] let alone itemized billing records, deprives objectors of the opportunity to conduct a full lodestar review that is contemplated under Rule 23(h). *See Mercury Interactive*, 618 F.3d at 994 ("Allowing class members an opportunity thoroughly to examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported is essential for the protection of the rights of class members."). Even so, that which was provided confirms the excessiveness of plaintiffs' fee request. The lodestar here is overstated by millions of dollars because the document review was performed by contract and staff attorneys that charged exorbitant billing rates. When appropriate rates are given to staff and contract attorneys, the requested lodestar multiplier increases to 2.51. The true multiplier is likely even higher because lodestar must be based on "hours *reasonably* expended" (*Bluetooth*, 654 F.3d at 944 (emphasis in original)), and the involvement of 41 firms in the MDL and another 6 firms in the parallel JCCP action portends near-certain duplication of effort. Again, the extent of overstatement cannot be determined due to the insufficient billing summaries submitted by class counsel. Even if the bloated rates and hours could be credited in full, the 2.41 lodestar multiplier is excessive given the low amount of risk in this case.

**A.     The lodestar is overstated by at least $1.52 million because contract and staff attorneys billed at exorbitant rates.**

The lodestar materially overstates the value of counsel's services. Lodestar is calculated by multiplying the "number of hours reasonably expended on the litigation by a reasonable hourly rate." *Lewis v. Silvertree Mohave Homeowners' Ass'n, Inc.*, No. C 16-03581 WHA, 2017 WL 5495816, at *3 (N.D. Cal. Nov. 16, 2017). "The reasonableness of an hourly rate should be determined based on the rates prevailing in the community for 'lawyers of reasonably comparable skill, experience and reputation.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S.

---

[13] For example, when lodestar is used for crosscheck purposes, it can be sufficient to provide categorical breakdowns of type of task. *See, e.g., Rose v. Bank of Am. Corp.*, 2014 WL 4273358, 2014 U.S. Dist. LEXIS 121641 (N.D. Cal. Aug. 29, 2014) (Davila, J.) (noting counsel's declaration broke down hours by categories such as "Initial case investigation, motions practice, discovery, settlement negotiations and mediations, drafting settlement and motion for approval papers, and overseeing settlement administration").

886, n.11 (1984)). Plaintiffs billed both contract and staff attorneys at hourly rates exorbitantly higher than market rates. Reducing the hourly rates for this work to the prevailing market rate would reduce the purported lodestar by perhaps $1.52 million.

A large chunk of the claimed lodestar in this case—$4,090,863 or 12.6% of the proffered lodestar—derives from contract and staff attorney time. It appears at least 25 such attorneys are being billed across nine different firms.[14] At least some of these appear to be contract attorneys, which is curious because class counsel originally assured that "Co-lead counsel do not anticipate ever hiring contract attorneys," Dkt. 110 at 2, and Case Management Order No. 3 appears to prevent non-co-lead counsel from hiring contract attorneys at all. Dkt. 148 at 9. Yet, now Class Counsel seeks time for contract attorneys employed by other firms: for example, Attorney Labrado (Blood Hurst) appears to be a contract attorney never employed by the firm and listed at a rate of $400/hour. Dkt. 469-8, Ex. A. Such rate is well above "reasonable hourly rate." "As a general matter, contract attorneys are 'attorneys who are not permanent employees of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action,' whereas staff attorneys are 'non-partnership-track attorneys working on an hourly basis.'" *In re Anthem, Inc. Data Breach Litig.*, 2018 U.S. Dist. LEXIS 140137, at *124. "To permit marked-up rates and then add a multiplier on contract attorneys is an unfair burden on class funds." Report of Special Master, *Ark. Teacher Ret. Sys. v. State St. Bank*, 2018 U.S. Dist. LEXIS 111409, *248 (D. Mass. May 14, 2018), *report adopted in part* 2020 WL 949885, 2020 U.S. Dist. LEXIS 33552, at *160 (D. Mass. Feb. 27, 2020) (cutting class counsel's contract attorney hourly from $415-$515 to $200).

The best measure of the market rate is to review what *paying clients* are willing to pay. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008). In today's legal market, paying clients refuse to tolerate law firms treating gigantic document review projects as a profit center, or in other words "a trough where herds of lawyers try to muscle their way to the front to quench their thirst without explanation and with no

---

[14] This objection refers to the individuals only by their last names. Contract and staff attorneys appear to include: Labrado (Blood Hurst), Johnson (Cohen Milstein), Guo (Derek Howard), Cho (Grant Eisenhofer), Borrow, Dewey, Fraser, Fox, Howe, Roney, Thomas, Tones, Trinh (Kaplan Fox), Wright (Keller Rohrback), Ekechuku, Grubnik, Hunter, Suarez (Levi & Korsinsky), Garra, Montalvo, Phillips, Sarpy (Robbins Geller), Ali, Nagakawa, Schwieger (Zimmerman Reed).

appreciation of moderation." *United States ex rel. Palmer v. C&D Techs., Inc.*, 2017 WL 1477123, at *6 (E.D. Pa. Apr. 25, 2017). The best practice is to bill the contract attorneys at cost. In *Dial Corp. v. News Corp.*, the district court commended class counsel for treating contract attorney work as an expense, charging the 25,000 hours at $39/hour with no mark-up applied. 317 F.R.D. 426, 430 n.2 & 438 (S.D.N.Y. 2016); *see also In re Beacon Assocs. Litig.*, No. 09 Civ. 777, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 980 (N.D. Cal. 2014) (awarding contract attorney time as "costs" at billing rate of $47 to $59 per hour). Class counsel have not met their burden to prove the reasonableness of $350 or $400/hour. *See Wells Fargo & Co. S'holder Derivative Litig.*, 2020 U.S. Dist. LEXIS 63631, at *42-*52 (incorporating contract attorneys' time into the lodestar at the "$42.50 per hour average they were actually paid" because plaintiffs didn't bear their burden to show a different market rate).

The lack of detailed billing prevents St. John from differentiating between contract and staff attorneys, so for the purpose of rough cross-check this Court would be generous to allow a rate of even $240/hour. In *Anthem*, Judge Koh reckoned the value of staff attorney time—including some of the same individuals claimed in this case—at $240/hour. 2018 U.S. Dist. LEXIS 140137, at *133. *See also Nevarez v. Forty Niners Football Co.*, No. 16-CV-07013-LHK, 2020 U.S. Dist. LEXIS 131491, *22 (N.D. Cal. Jul. 23, 2020) (declining to allow staff attorneys to be marked up to $625/hr and awarding fees for them at $240/hour). Using this rate for the 25 contract and staff attorneys reduces the lodestar by $1,311,015.

Other claimed rates appear excessive, including paralegals billed at $450, IT staff at $475/hour, and a 2020 graduate (then law clerk) listed at $325/hour.[15] If all of these questionable rates are generously revised to $200/hour, even though some of them probably should not be paid at all, this would reduce the lodestar by another $209,470 for a total of $1.52 million:

---

[15] Levin Sedran & Berman LLP billed all its paralegals at $450/hour, a manifestly unreasonable rate, which is $125/hour higher than the next highest rate for paralegals listed by another firm—and then only listed for experienced paralegals. Dkt. 469-30, Ex. A. The same firm billed $475/hour for its IT staff, a cost that paying clients expect law firms to absorb as overhead. Finally, DiCello Levitt billed a law clerk, class of 2020 Ohio State University Law School (then ungraduated) at $325/hour (Dkt. 469-15, Ex. A), an unreasonable rate almost twice as high as the Cotchett billed for its 3L law clerk. *Compare Rosenfeld v. DOJ,* 904 F. Supp. 2d 988, 1002 (N.D. Cal. 2012) (approving $100/hour for student law clerk as within the typical range).

| Biller Type | Hours | Claimed | Blended | Generous | Adjusted |
|---|---|---|---|---|---|
| Contract/Staff Attorney Time | 11,582.7 | $4,090,863 | $353.19/hr | $240/hr | $ 2,779,848 |
| Excess Non-Attorney Rates | 837.7 | $377,010 | $450.05/hr | $200/hr | $ 167,540 |

**Difference:**   **$1,520,485**

As roughly adjusted, the more reasonable lodestar figure is $34,888,090, meaning that the attorneys' fee request represents a 2.51 multiplier, and St. John's proposed $52.6 million fee award represents a healthy 1.51 lodestar multiplier. And even this would be excessive. Defendant Apple almost certainly pays less than $50/hour for staff and contract attorney work. There is no reason the class should pay more than Apple for this kind of work. If this Court correctly attributes staff-attorney time at $50/hour, the lodestar would be reduced another $2 million.

Plaintiffs may protest that their submitted rates follow guidelines and were previously submitted to the Court. It appears the vast majority of contract and staff attorneys billed at $350/hour, which was the rate set in this case for document review according to Mr. Dearman's declaration, although it does not appear in any public document St. John has located. However, "[u]se of these rates does not guarantee their payment. The Court maintains the discretion to determine appropriate rates." Dkt. 148 at 8. The rates discussed above greatly exceed reasonable rates, so should be adjusted for the purpose of the cross-check.

**B.    Insufficient detail exists to evaluate the appropriateness of hours billed, but the sheer number of billers suggests duplication.**

Because plaintiffs' counsel have failed to provide any detail in their billing summaries, it is impossible for class members to estimate the lodestar overstatement. The lodestar "serves little purpose as a cross-check if it is accepted at face value." *In re Citigroup Secs. Litig.*, 965 F. Supp. 2d at 389. Under this Court's Procedure Guidance, "All requests for approval of attorneys' fees awards must include detailed lodestar information, even if the requested amount is based on a percentage of the settlement fund." N.D. Cal. Procedural Guidance for Class Action Settlements, *available at* http://cand.uscourts.gov/ClassActionSettlementGuidance; *see also In re Resistors Antitrust Litig.*, 2019 WL 5298143, 2019 U.S. Dist. LEXIS 174399, *9 (N.D. Cal. Sept. 6, 2019) (following Guidance and concluding that merely submitting names, rates and total hours is "plainly insufficient under well-established standards"). Lack of detailed billing submissions in their fee papers make it impossible for class members to precisely identify the duplication and inefficiencies. *See Intel Corp. v. Terabyte Int'l, Inc.*, 6

F.3d 614, 623 (9th Cir. 1993) (time records should demonstrate "whether the time devoted to particular tasks was reasonable and whether there was improper overlapping of hours"). "No paying client would ever stand for it, and it is a disservice to the class and the Court." *In re Resistors Antitrust Litig.*, 2019 U.S. Dist. LEXIS 174399, at *9.

St. John understands that class counsel have apparently been submitting regular billing records *in camera* to the Court, but that does not satisfy the Rule 23(h) requirement of allowing class members an opportunity to conduct their own assessment of the fee submissions. *Anthem Inc.*, 2018 WL 3960068, at *33-*34 (discussing issue and noting that "Almost the entirety of each attorney's narrative descriptions is now publicly disclosed."); *In re Cathode Ray Tube CRT Antitrust Litig.*, 2016 WL 1072097, *3 (N.D. Cal. Mar. 17, 2016) ("Where in camera review was challenged and litigated, courts have held that due process requires filing billing records on the docket so that opposing parties can examine all materials on which the court relied"); *see generally Yamada v. Nobel Biocare Holding AG,* 825 F.3d 536, 545 (9th Cir. 2016) ("The Due Process Clause requires that opposing counsel have access to the timesheets relied on to support the fee order").

Nevertheless, the basic facts of the submission suggest immoderation. MDL and JPPC counsel have included hours from a total of 47 firms, and an army 304 total billers! Exhibit B to Joint Declaration of Andrew J. Brown and Thomas J. Brandi (Dkt. 471-2 at 20-26); Exhibits 3-40 to Declaration of Mark J. Dearman (Dkts. 469-3, *et seq*). To see the global excess in those figures, one only need look to class counsel's initial proposed billing protocol. There, in an effort to ward off the metastasization of class counsel's team that was fiercely criticized by Judge Koh in the *Anthem Data Breach* litigation, class counsel proposed limiting each steering committee member to employing at most one junior attorney and one paralegal at his or her firm. Dkt. 110 at 3. Apple thought even this was too much, as it would "double the already very large number of lawyers staffed on this case" to "result[] in a total of 78 lawyers and 39 paralegals working without any prior approval from anyone." Dkt. 113 at 3. But when the Court excised this numeric cap from the official billing protocol (Dkt. 148), class counsel took it as a license to go hog wild. Now, at settlement, they've submitted billing invoices for nearly triple the amount of attorneys and paralegals that they claimed to be necessary. Essentially, this is a redux of *Anthem* and its 329 billers from 53 law firms. 2018 WL 3960068, 2018 U.S. Dist. LEXIS 140137, at *76. From all appearances the billers in this case produced less work than in *Anthem* as well, where there were 195 depositions, four complaints, two rounds of motions to dismiss, class certification and *Daubert*

1   briefing, and the settlement process. *Id.* at *145. As in *Anthem*, "employing [so many law firms] likely resulted

2   in unnecessarily duplicative or inefficient work by virtue of the fact that so many billers needed to familiarize

3   themselves with the case and keep abreast of case developments." *Id.* at *135-*36. "Class Counsel could not

4   'possibly conduct effective oversight of this very large team'…especially because 'every time a new law firm

5   was added to the group, those lawyers had to spend time learning the history, issues, and facts being litigated.'"

6   *Id.* at *136 (quoting Special Master's report).

7        This Court has also recognized the problem of overstaffing in many cases of smaller scope. *Rose v.*

8   *Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 121641, 2014 WL 4273358, at *9 (N.D. Cal. Aug. 29, 2014) ("Class

9   Members are asked to pay the costs of litigating six separate actions with a total of 18 attorneys and 8

10  paralegals…[T]he results achieved in the litigation do not justify such an expense"); *Lane v. Wells Fargo Bank,*

11  *N.A.*, 2013 WL 3187410, 2013 U.S. Dist. LEXIS 87669, at *43 (N.D. Cal. Jun. 21, 2013) (finding use of four

12  law firms "disturbing" and likely to beget a duplication of effort); *Wolph v. Acer Am. Corp.*, 2013 WL 5718440,

13  2013 U.S. Dist. LEXIS 151180, at *7 (N.D. Cal. Oct. 21, 2013) (concluding that having three law firms work

14  on all aspects of the case resulted in "significant duplication of work").

15       From the time of appointment (Dkt. 99 (May 15, 2018)) through July 31, 2020, counsel claims to have

16  collectively spent 68,731 hours. Dkt. 471 at 28.[16] Just as in *Anthem*, the sheer excess of this number is exposed

17  by a comparison to *In re High-Tech Emp. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 118052, 2015 WL 5158730

18  (N.D. Cal. Sept. 2, 2015). "Class counsel in *In re High-Tech* engaged in many more rounds of motions practice,

19  and the parties progressed significantly closer to trial than Class Counsel in the instant case. Most prominently,

20  in the four years that the case was pending, Class Counsel in *In re High-Tech* survived two motions to dismiss,

21  litigated two rounds of class certification, opposed an appeal to the Ninth Circuit under Federal Rule of Civil

22

23       [16] Class counsel are correct to exclude time spent before appointment, because time jostling for
appointment is not compensable. *See, e.g, In re Cendant Corp. Litig.*, 404 F.3d 173, 204-05 (3d Cir. 2005) (filing a
24  duplicative complaint for consolidation with an already pending action does not confer a benefit on the class
and is not compensable); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL
25  2438645, 2017 U.S. Dist. LEXIS 87451, at *731 (N.D. Cal. June 6, 2017) ("MPP's application to become a
member of the PSC was for its own benefit, not that of the class."); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp.
26  2d 369 (S.D.N.Y. 2013) (discounting time spent by non-lead counsel attempting "to secure appointment as
lead counsel"); *In re Heritage Bond Litig.*, 2005 WL 1594403, 2005 U.S. Dist. LEXIS 13555, at *85-*86 (C.D.
27  Cal. June 10, 2005) ("As Lead Counsel points out, MMK's fee request includes approximately 450 hours spent
drafting a duplicative compliant and moving for lead status in federal court. Such time spent is not
28  compensable.")

23(f), survived five summary judgment motions, survived multiple rounds of Daubert challenges, filed and opposed motions in limine, filed a motion and reply regarding application of the rule of reason, prepared for the pretrial conference and trial, negotiated three settlements, and opposed mandamus in the Ninth Circuit." *Anthem*, 2018 U.S. Dist. LEXIS 140137, at *142. With more efficient staffing, *High-Tech* counsel submitted a lodestar of only 36,215 hours for the four-year litigation. *Id.* at *144; *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 U.S. Dist. LEXIS 129939, *116 (N.D. Cal. Jul. 22, 2020 (reducing and approving just over 40,000 hours as reasonable for a massive 4 year-old MDL and parallel JCCP action); *In re Google LLC St. View Elec. Communs. Litig.*, No. 10-md-02184-CRB, 2020 U.S. Dist. LEXIS 47928 (N.D. Cal. Mar. 18, 2020) (approving 8,083.2 hour lodestar for a 10 year-old MDL); *In re Google, Inc. Cookie Placement Consumer Privacy Litig.*, No. 12-md-2358, 2017 U.S. Dist. LEXIS 14646 (D. Del. Feb. 2, 2017), *rev'd on other grounds* 934 F.3d 316 (3d Cir. 2019) (approving 4,843 hour lodestar for a 5 year-old MDL that included litigation at the Third Circuit and Supreme Court); *In re MagSafe Apple Power Adapter Litig.*, 2015 WL 428105, 2015 U.S. Dist. LEXIS 11353, at *41 (N.D. Cal. Jan. 30, 2015) (Davila, J.) (reducing 5,752 claimed hours in 6 year-old non-MDL litigation by 10% to reflect that "the partners, in particular, spent an unreasonable amount of time conferring with co-counsel, performing tasks that are typically performed by associates or paralegals, emailing and corresponding with others in their firms and co-counsel, and performing duplicative work by editing co-counsels' briefs.").

But without detailed submissions, the class lacks critical information regarding the nature and timing of the work performed. For example,

- Were there excessive and duplicative expenditures on "deposition time" and "settlement time?" *Anthem*, 2018 U.S. Dist. LEXIS 140137, at *146. *See also Ros,* 2014 WL 4273358, at *8 ("800 hours in settlement negotiations and mediation stands out as particularly excessive"; reduced to 400).

- Was work appropriately slowed and halted after settlement was reached in principle in front of mediator Phillips? *See Citigroup Secs. Litig.*, 965 F. Supp. 2d at 392 (striking $7.5 million of lodestar where class counsel had brought on twenty additional contract attorneys to perform document review after the parties had reached the settlement agreement in principle that was an attempt to "inflate the lodestar").

- How many hours were expended by expensive partners performing administrative or other lesser skill tasks? *See Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983) ("A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn."); *accord MacDougal v. Catalyst Nightclub*, 58 F. Supp. 2d 1101, 1106-07 (N.D. Cal. 1999) (holding that it was inappropriate for a senior attorney bill $325/hr for routine and clerical tasks).

- At various times the Court ordered plaintiffs not to bill for certain tasks on the litigation. *See* Dkt. 331 at 1-2 ("Plaintiffs shall not submit any billing requests related to production of this extraneous document"); Dkt. 350 at 5-6 ("Plaintiffs shall not submit any billing requests for any work related to this issue including but not limited to reviewing Apple's motion and reply, preparing Plaintiffs' opposition, or preparing or attending the May 30, 2019 hearing"). Did class counsel include any such forbidden time in their settlement lodestar?

- Does the lodestar include time spent on plaintiffs' unsuccessful pursuits? *E.g.* Dkt. 223 (denying plaintiffs' request to impose a 23(d) restriction upon Apple's communications with putative class members)

Instead of providing sufficient lodestar detail, class counsel employs a "just trust us" approach, which is unacceptable in class action proceedings. *Dennis v. Kellogg Co.*, 697 F.3d 858, 869 (9th Cir. 2012). It "is essential" to allow "class members an opportunity to thoroughly examine counsel's fee motion, inquire into the bases for various charges and ensure that they are adequately documented and supported." *Mercury Interactive*, 618 F.3d at 994.

Should class counsel provide detailed billing, St. John requests an opportunity to respond to the detailed billing. She also requests that the hours be provided to her counsel in Excel format—which they were periodically collected and maintained in. Dkt. 469-1 at 5.

**C.    Only a modest risk multiplier is appropriate here because plaintiffs' counsel bore little risk of non-payment.**

In *Perdue v. Kenny A.*, the Supreme Court established a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. 559 U.S. 542, 546 (2010). A lodestar enhancement is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that a lodestar alone "would not have been adequate to attract competent counsel." *Id.* at 554.

No such showing has been made here, and available evidence suggests the case posed relatively little risk. This is apparent from even a cursory glance at the number of cases filed in the MDL.

Plaintiffs' law firms didn't fear non-payment. They feared missing out.

An enhancement is not necessary "to compensate counsel for the contingent nature of this case. … that conclusion is bolstered by the number of attorneys seeking to be first in the door in filing lawsuit on behalf of [class members], and the intense level of competition litigating who would become lead counsel. … from counsel's perspective, this was a 'promising' case, holding the prospect of a large fee recovery from solvent defendants." *In re Johnson & Johnson Derivative Litig.*, No. 11-2511(FLW), 2013 WL 6163858, at *11 (D.N.J. Nov. 25, 2013); *contrast Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (affirming risk enhancement when "no other law firm was willing to serve as lead counsel" at the case's inception).

Nor is a multiplier appropriate due to the nature or length of the litigation. The fact that a claim is difficult or time-consuming is already reflected in the hours consumed. A multiplier "may not be awarded based on a factor that is subsumed in the lodestar calculation"—either in the number of hours or hourly rate. *Kenny A.*, 559 U.S. at 553. Thus, "the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors presumably are fully reflected in the number of billable hours recorded by counsel." *Id.* (cleaned up); *accord Bluetooth*, 654 F.3d at 942 n.7. Similarly, a multiplier based on outstanding results requires some "exceptional success" beyond the "expectancy of excellent or extraordinary results" already baked into pricey hourly rates. *WPPSS*, 19 F.3d at 1304.

Co-lead counsel is mistaken that they are entitled to a risk multiplier and an upward deviation of this circuit's 25% benchmark. Multipliers are not granted as a matter of course. *E.g. In re MagSafe Apple Power Adapter Litig.*, 571 F. App'x 560, 564 (9th Cir. 2014) (remanding where a 1.5 multiplier was applied without an explanation of why it was "necessary to adequately compensate class counsel"). On this record, little rebuts the "strong presumption" that lodestar provides sufficient compensation, let alone a multiplier well over 2.

**CONCLUSION**

The Court should deny fee approval until class counsel discloses detailed billing and the division of the fee award amongst counsel. Once disclosed, the Court should assign awards to each law firm, such that the total fee award does not provide a windfall to any firm. Objector suggests a reasonable fee would be no more than $52.7 million, or 17.7% of the net fund, and the Court may consider awarding less than that given co-lead counsel's failure to control costs and failure to implement reasonable notice. Such award would still provide a healthy 1.51 multiplier on reasonable billing rates for all billers, including contract and staff attorneys. The Court should also direct the settlement administrator to investigate whether their database of covered phones is complete, and what—if any—corrective notice the administrator and Apple may allow.

Dated: October 6, 2020        Respectfully submitted,

                                      */s/ Theodore H. Frank*
                                      Theodore H. Frank (SBN 196332)
                                      HAMILTON LINCOLN LAW INSTITUTE
                                      CENTER FOR CLASS ACTION FAIRNESS
                                      1629 K Street NW, Suite 300
                                      Washington, DC 20006
                                      Voice: 703-203-3848
                                      Email: ted.frank@hlli.org

                                      *Attorneys for Objector Anna St. John*

I, Anna St. John, am the objector. I sign this written objection drafted by my attorneys as required by the Class Notice ¶ 19.

_Anna St John_
Anna St. John

1

2

<u>PROOF OF SERVICE</u>

3

4

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case.

5

DATED this 6th day of October, 2020.

6

*/s/ Theodore H. Frank*

7

Theodore H. Frank

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28