```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

      IN RE: APPLE INC. DEVICE         )  5:18-MD-02827-EJD
5     PERFORMANCE LITIGATION           )
                                       )  SAN JOSE, CALIFORNIA
6                                      )
                                       )  FEBRUARY 17, 2021
7                                      )
                                       )  PAGES 1-111
8                                      )
                                       )
9     _____)

10                 TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE EDWARD J. DAVILA
11                UNITED STATES DISTRICT JUDGE

12
                      A P P E A R A N C E S
13

14        FOR THE PLAINTIFF:    BY:  JOSEPH W. COTCHETT
                                     MARK MOLUMPHY
15                                   ELLE LEWIS
                                     BRIAN DANITZ
16                              COTCHETT PITRE & MCCARTHY LLP
                                840 MALCOLM ROAD, SUITE 200
17                              BURLINGAME, CA 94010

18

19        FOR THE DEFENDANT:    BY:  CHRISTOPHER CHORBA
                                GIBSON, DUNN & CRUTCHER LLP
20                              333 SOUTH GRAND AVENUE
                                LOS ANGELES, CA 90071
21

22            APPEARANCES CONTINUED ON THE NEXT PAGE

23     OFFICIAL COURT REPORTER:       SUMMER FISHER, CSR, CRR
                                      CERTIFICATE NUMBER 13185
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
               TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1          APPEARANCES CONTINUED:

 2          FOR THE DEFENDANT:        BY:  WESLEY SZE
                                      GIBSON DUNN & CRUTCHER LLP
 3                                    1881 PAGE MILL ROAD
                                      PALO ALTO, CA 94304
 4

 5          FOR THE PLAINTIFF:        BY:  LAURENCE D. KING
                                      KAPLAN FOX & KILSHEIMER LLP
 6                                    1999 HARRISON STREET, SUITE 1560
                                      OAKLAND, CA 94612
 7

 8          FOR THE PLAINTIFF:        BY:  FREDERIC FOX
                                           DONALD R. HALL, JR.
 9                                    KAPLAN FOX & KILSHEIMER LLP
                                      850 THIRD AVENUE, 14TH FLOOR
10                                    NEW YORK, NY 10022

11          FOR THE PLAINTIFF:        BY:  ANDREW BROWN
            JCCP ACTION               ATTORNEY AT LAW
12                                    501 W. BROADWAY, SUITE 1490
                                      SAN DIEGO, CA 92101
13

14          FOR THE PLAINTIFF:        BY:  MARK DEARMAN
                                      ROBBINS GELLER RUDMAN AND DOWD
15                                    120 E. PALMETTO PARK RD., STE 500
                                      BOCA RATON, FL 33432
16

17          FOR THE PLAINTIFF:        BY:  KENNETH JOHNSTON
            CORPORACION NACIONAL      JOHNSTON PRATT PLLC
18          DE CONSUMIRDORES          1717 MAIN STREET, SUITE 3000
                                      DALLAS, TEXAS 75201
19

20          AMICUS
            ATTORNEY GENERAL
21          OF THE COMMONWEALTH       BY:  PHILIP R. HELERINGER
            OF KENTUCKY               OFFICE OF THE KENTUCKY ATTORNEY
22                                    GENERAL
                                      1024 CAPITAL CENTER DR., STE 200
23                                    FRANKFORT, KY 40601

24

25
```

```
 1        APPEARANCES CONTINUED:

 2

 3        OBJECTOR ATTORNEYS:

 4        WEST                    BY:  ROBERT WILLIAM CLORE
                                  BANDAS LAW FIRM, PC
 5                                500 N. SHORELINE BOULEVARD.
                                  SUITE 1020
 6                                CORPUS CHRISTI, TX 78401

 7        FELDMAN, HONDO JAN       BY:  JOHN JACOB PENTZ
                                  ATTORNEY AT LAW
 8                                19 WIDOW RITES LANE
                                  SUDBURY, MA 01776

 9

10        SIXTY-SIX               BY:  DEBORAH ELLEN ARBABI
                                  CROWELL AND MORING LLP
11                                3 PARK PLAZA, 20TH FLOOR
                                  IRVINE, CA 92614

12

13                                BY:  ROSA MORALES
                                  CROWELL & MORING LLP
14                                590 MADISON AVENUE, 20TH FLOOR
                                  NEW YORK, NY 10022

15

16        SAUNDERS                BY:  ALLEN GRAVES
                                  THE GRAVES FIRM
17                                122 N. BALDWIN AVE., MAIN FLOOR
                                  SIERRA MADRE, CA 91024

18

19        ST. JOHN                BY:  THEODORE HAROLD FRANK
                                  HAMILTON LINCOLN LAW INSTITUTE
20                                1629 K STREET, NW, SUITE 300
                                  WASHINGTON, DC 20006

21

22

23

24

25
```

```
 1            SAN JOSE, CALIFORNIA              FEBRUARY 17, 2021

 2                      P R O C E E D I N G S

 3       (COURT CONVENED AT 1:10 P.M.)

 4            THE COURT:  WELL, I THINK IT'S 1:17 PACIFIC STANDARD

 5       TIME.  I THINK WE SHOULD GET STARTED WITH THE HEARING.

 6            AND MADAM CLERK, MAYBE YOU CAN CHECK E-MAIL TO SEE IF

 7       MR. FRANK AND OTHERS HAVE E-MAILED AND ARE HAVING ISSUES.  BUT

 8       I DO THINK WE SHOULD START THE PROCEEDINGS NOW, AND HOPEFULLY

 9       THEY CAN CATCH ON.

10            SO HAVING DONE ALL OF THAT, LET ME JUST ASK THE PARTIES IF

11       YOU WOULD JUST -- I DO HAVE A LIST THAT HAS MAIN SPEAKERS, BUT

12       PERHAPS WE COULD, JUST FOR THE RECORD, CAPTURE THE PARTIES.

13            SO WHO APPEARS FOR LEAD PLAINTIFFS FOR THE RECORD, PLEASE.

14            MR. COTCHETT:  JOSEPH COTCHETT, FROM COTCHETT, PITRE

15       & MCCARTHY, WILL BE THE ONE APPEARING.

16            THE COURT:  THANK YOU, MR. COTCHETT.

17            AND I THINK THERE'S ANOTHER YOUNG MAN FROM YOUR FIRM WHO

18       IS GOING TO BE A MAIN SPEAKER?

19            MR. MOLUMPHY:  GOOD AFTERNOON, YOUR HONOR.

20            MARK MOLUMPHY, COTCHETT, PITRE & MCCARTHY, FOR THE

21       PLAINTIFFS.

22            THE COURT:  THANK YOU.  WHEN I SAID YOUNG MAN, YOU

23       JUMPED IMMEDIATELY ON THAT.

24            MR. MOLUMPHY:  ABSOLUTELY.

25            THE COURT:  THAT WAS AMAZING, MR. MOLUMPHY.
```

1          THANK YOU.

2               MR. COTCHETT:  IT IS AMAZING YOU DIDN'T JUMP ON ME

3     FOR BEING A YOUNG MAN, YOUR HONOR.

4               THE COURT:  WELL, YES.  AGE HAS PRIVILEGES,

5     MR. COTCHETT.  I THINK YOU ARE AWARE OF THAT.

6          ALL RIGHT.  SO WHO ELSE APPEARS FOR PLAINTIFFS?

7               MR. KING:  GOOD AFTERNOON, YOUR HONOR.

8          LAURENCE KING FROM KAPLAN FOX.  AND WITH ME, AND ALSO WHO

9     MAY BE SPEAKING, FREDERICK FOX AND DONALD HALL.

10              THE COURT:  THANK YOU.  GOOD AFTERNOON TO ALL OF YOU.

11         AND LET'S SEE.  I UNDERSTAND ALSO PRESENT, I THINK -- YES,

12    MR. BROWN IS PRESENT FROM THE JCCP ACTION.

13         AND LET ME CALL OUT FOR THE DEFENDANTS, WHO APPEARS FOR

14    THE DEFENDANTS THEN.

15              MR. CHORBA:  GOOD AFTERNOON, YOUR HONOR.

16         CHRIS CHORBA AND WESLEY SZE OF GIBSON, DUNN & CRUTCHER ON

17    BEHALF OF APPLE.

18              THE COURT:  THANK YOU.  GOOD AFTERNOON TO BOTH OF

19    YOU.

20         AND FOR THE OBJECTORS, I THINK WE IDENTIFIED THOSE PARTIES

21    WHO AT LEAST ARE PRESENT RIGHT NOW.  MR. JOHN PENCE, YOU ARE

22    PRESENT FOR HONDO JAN AND SARAH FELDMAN.

23         AND LET'S SEE, I THINK I SAW MR. GRAVES.

24              MR. GRAVES:  YES, YOUR HONOR.

25              THE COURT:  FOR OBJECTOR KEVIN SAUNDERS.

1           AND MR. CLORE, I DON'T SEE, NOR MR. FRANK.

2           LET ME ASK WHO ELSE APPEARS THEN, MS. LEWIS, YES, THERE

3     YOU ARE.

4              MS. LEWIS:  YES.  HI, YOUR HONOR.

5           THIS IS ELLE LEWIS FOR THE PLAINTIFFS, OF COTCHETT, PITRE

6     & MCCARTHY.

7              THE COURT:  THANK YOU.

8              MR. DANITZ:  GOOD AFTERNOON YOUR HONOR.

9           BRIAN DANITZ OF COTCHETT, PITRE & MCCARTHY.

10             THE COURT:  THANK YOU.  GOOD AFTERNOON.

11          I SEE MS. ARBABI PRESENT AS WELL AND MS. MORALES.  AND YOU

12    REPRESENT?

13             MS. ARBABI:  WE REPRESENT THE SIXTY-SIX CORPORATIONS,

14     YOUR HONOR.

15             THE COURT:  THANK YOU.  GOOD AFTERNOON.

16          I THINK I'VE CAPTURED EVERYBODY WHO IS ON THIS SCREEN, AS

17    FAR AS I CAN TELL.

18          SO THIS HEARING IS A CONTINUED HEARING REGARDING THE

19    MOTION FOR SETTLEMENT, AS WELL AS THE MOTION FOR ATTORNEY'S

20    FEES.

21          I THINK WE HAD ONE DISCUSSION, AND THIS WAS ABOUT THE

22    MPP'S AND THE ATTESTATION THROUGH THE MPP'S.  AND I WONDER IF

23    THE PARTIES COULD JUST UPDATE ME ON THE STATUS OF THAT, PLEASE.

24             MR. KING:  I SEE MR. CHORBA UNMUTING, SO I ASSUME

25     THAT MEANS HE WAS READY TO GO, SO I'M HAPPY FOR MR. CHORBA TO

1      START.

2              THE COURT:  SURE.  THANK YOU.

3              MR. CHORBA:  YEAH, MR. KING, I WAS WAITING FOR ONE OF

4      YOUR MANY ATTENDEES, BUT I WILL JUST JUMP IN.

5              YOUR HONOR, FOLLOWING YOUR ORDER FROM A FEW WEEKS AGO,

6      ANGEION DID RECEIVE A NUMBER OF COMPLIANT ATTESTATIONS.  WE

7      DON'T YET HAVE A COMPLETE REPORT FOR YOU, EXCEPT TO SAY THAT WE

8      DID RECEIVE SEVERAL COMPLIANT ATTESTATIONS FROM INDIVIDUALS

9      EMPLOYED BY THE VARIOUS COMPANIES.

10             AS YOU WILL RECALL, THE DISPUTE THAT THE PARTIES HAD THAT

11     YOU RESOLVED WAS WHETHER OR NOT THE PERSON MAKING THE

12     ATTESTATION MUST BE DIRECTLY AFFILIATED OR EMPLOYED BY THE

13     CORPORATION AS OPPOSED TO BEING OUTSIDE COUNSEL OR EMPLOYED BY

14     ONE OF THESE CLAIMED SERVICES FIRMS.

15             YOU AGREED WITH APPLE THAT IT SHOULD BE SOMEONE EMPLOYED

16     BY OR AFFILIATED WITH THE COMPANY.  AND SO A NUMBER OF THE

17     CORPORATE AND NONNATURAL PERSON CLAIMANTS MADE THOSE

18     ATTESTATIONS.  OF COURSE THIS IS ONLY TRIGGERED IF THE DEVICES

19     SUBMITTED BY THOSE CLAIMANTS ACTUALLY MATCHES THE LIST.

20             SO ACCOUNTING FOR THAT, THERE WERE A NUMBER OF

21     ATTESTATIONS THAT WERE COMPLIANT AND WERE RECEIVED BY THE

22     FEBRUARY 8TH DEADLINE YOU SET.  THERE WERE A NUMBER THAT WERE

23     NONCOMPLIANT.  WE RECEIVED A NUMBER OF PLACEHOLDER CLAIMS,

24     CLAIMS WHERE I THINK SOME OF THESE CLAIMANTS VIEWED YOUR ORDER

25     AS AN INVITATION TO SUBMIT ADDITIONAL INFORMATION.

1        IN CONSULTATION WITH THE PARTIES, ANGEION HAS REJECTED

2   THOSE.  WE CERTAINLY DIDN'T VIEW YOUR ORDER AS INVITING A

3   RESTART OF THIS PROCESS, IT'S GONE ON FOR QUITE SOME MONTHS.

4        AS YOU WILL RECALL, THE INITIAL DEADLINE WAS OCTOBER 6TH.

5   SO I WILL ASK MY COLLEAGUE MR. SZE IF WE HAVE UPDATED SPECIFICS

6   TO GIVE YOU, BUT I KNOW THAT PROCESS IS UNDER WAY, AND ANGEION

7   ESTIMATES WE WILL HAVE FINAL NUMBERS FOR YOU, OF COURSE PENDING

8   THE ATTORNEY'S FEE DECISION, WE SHOULD HAVE FINAL NUMBERS IN

9   THE NEXT THREE WEEKS TO REPORT FOR THE COURT.

10        THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

11       MR. SZE, ANYTHING YOU WOULD LIKE TO ADD?

12        MR. SZE:  THANK YOU, YOUR HONOR.

13       AND I THINK MR. CHORBA SUMMARIZED THE STATUS ACCURATELY.

14        WITH RESPECT TO THE TABLE WE PRESENTED IN THE JOINT STATUS

15   REPORT, WE JUST WOULD STATE THAT THE NUMBERS WE EXPECT FOR OUR

16   CLAIMS WILL BE SLIGHTLY HIGHER THAN WHAT WE HAVE PREVIOUSLY

17   REPORTED BECAUSE OF THE CURED ATTESTATIONS THAT MR. CHORBA

18   REFERENCED WHICH THE ADMINISTRATOR IS FINALIZING ITS REVIEW OF.

19        THE COURT:  I SEE.  ALL RIGHT.  THANK YOU.

20       MR. KING?

21        MR. KING:  YES, YOUR HONOR.

22        PLAINTIFFS GENERALLY AGREE WITH MR. CHORBA'S AND MR. SZE'S

23   RECITATION.  THE CLAIMS PROCESS IS WORKING WELL.  IT WAS HELPED

24   SUBSTANTIALLY BY THE GUIDANCE YOU GAVE US IN THE LAST ORDER,

25   WHICH WE APPRECIATE AND WE ARE EVALUATING.  IT WAS A GOOD

1    NUMBER OF NEW OR UPDATED CLAIMS THAT CAME IN RIGHT AROUND THE

2    DEADLINE SET BY YOUR HONOR WHEN WE WERE STILL EVALUATING, AND

3    WE DO ANTICIPATE A LARGE NUMBER OF THOSE WILL BE ACCEPTED.  BUT

4    WE THINK THE CLAIMS PROCESS IS GOING VERY WELL.

5         AGAIN, YOUR HONOR'S GUIDANCE AT THE LAST HEARING AND THE

6    ORDER WERE VERY HELPFUL ON THAT.

7              THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

8         I JUST WANT TO NOTE MR. FRANK HAS NOW JOINED US.  NICE TO

9    SEE YOU, MR. FRANK.

10        WHAT IMPACT AFFECT, IF ANY, SHOULD THIS ONGOING PROCESS BE

11   IN REGARDS TO THE COURT'S ABILITY TO HEAR FROM YOU TODAY AND

12   ISSUE AN ORDER?

13        AND LET ME JUST INDICATE, JUST AGAIN FOR THE SPIRIT OF

14   FULL DISCLOSURE, DEPENDING ON WHAT I HEAR TODAY, I THOUGHT THAT

15   I WOULD LOOK AGAIN, I DON'T THINK YOU ARE GOING TO GET A RULING

16   FROM ME TODAY ON THE RECORD.

17        I WANT TO HEAR FROM YOU AS MUCH I CAN, ALL OF YOU, I WILL

18   PROBABLY REVIEW THE VIDEO OF THIS, OR AT LEAST THE TRANSCRIPT

19   OF OUR HEARING, MAKE SOME NOTES, AND I'M HOPING -- JUST LOOKING

20   AT MY SCHEDULE, I WOULD LIKE TO GET AN ORDER OUT TO YOU, MAYBE

21   A WEEK FROM FRIDAY, A WEEK FROM THIS FRIDAY, SOMETHING LIKE

22   THAT, THAT IS TO GIVE ME ALL NEXT WEEK TO PREPARE SOMETHING, SO

23   JUST TO GIVE YOU A HEADS UP AS TO THAT SCHEDULE.  THAT'S HOW I

24   ANTICIPATE, I HOPE THINGS GO.

25        SO AGAIN, MY QUESTION IS WHAT AFFECT, IF ANY, DOES THIS

1    ONGOING PROCESS WITH THE MPP'S HAVE ON OUR WORK TODAY?

2         MR. KING.

3              MR. KING:  YES, YOUR HONOR.

4         FROM PLAINTIFF'S PERSPECTIVE, LIKE MANY CASES, THE CLAIMS

5     PROCESS IS A PROCESS AND IT'S ONGOING.

6         WE HAVE MADE SUBSTANTIAL PROGRESS, IT'S GOING VERY WELL.

7     A LOT OF THE CLAIMS WORK WAS DONE UP FRONT IN THIS CASE, WHICH

8     HAS BEEN HELPFUL TO THE PARTIES AND THE COURT IN PROVIDING A

9     GREAT DEAL OF INFORMATION AT THE FINAL APPROVAL STAGE.

10        BUT PLAINTIFF'S PERSPECTIVE IS THAT THE RECORD, AS IT IS,

11    MAKES THE CASE RIPE FOR A RULING BY YOUR HONOR ON FINAL

12    APPROVAL.  THE CLAIMS PROCESS OF COURSE WILL CONTINUE TO

13    CONCLUSION, WHICH WILL NOT TAKE VERY LONG, YOU KNOW, AND THEN

14    AS IN MOST CLASS ACTIONS, I'M SURE THAT YOUR HONOR SEES, THERE

15    WILL BE A SUBSEQUENT FILING WHEN THE CLAIMS PROCESS IS COMPLETE

16    WITH RECOMMENDATIONS AS TO WHICH SHOULD BE ACCEPTED AND WHICH

17    SHOULD NOT BE ACCEPTED.  HOWEVER, WE BELIEVE ON THE RECORD

18    BEFORE THE COURT, THE CASE IS RIPE FOR FINAL RULING ON FINAL

19    APPROVAL OF THE SETTLEMENT.

20             THE COURT:  ALL RIGHT.  THANK YOU.

21        MR. CHORBA.

22             MR. CHORBA:  YES.  WE COMPLETELY AGREE WITH MR. KING,

23    YOUR HONOR.

24        THESE ISSUES HAVE BEEN FULLY BRIEFED READY FOR YOUR

25    DECISION.  THE SPECIFIC CALCULATIONS OF THE PER DEVICE AMOUNT,

1    WE BOTH NEED TO FINALIZE THE REMAINING CLAIMS THAT MR. KING

2    REFERENCED, ALSO WE NEED A FINAL RULING ON THE ATTORNEY'S FEES

3    OF COURSE, BECAUSE THAT WILL DETERMINE HOW MUCH EACH CLAIMANT

4    RECEIVES.  BUT FROM OUR PERSPECTIVE, WE ARE THERE.

5         AS I MENTIONED, I THINK ANGEION NEEDS MAYBE THREE WEEKS TO

6    PRESENT A FINAL REPORT TO THE COURT, BUT WE DO NOT BELIEVE

7    THERE'S ANYTHING IN THAT FINAL REPORT THAT SHOULD HOLD UP YOUR

8    RULING.  ALL OF THE ISSUES HAVE BEEN PRESENTED RIGHT NOW, IT'S

9    REALLY JUST AN EXERCISE OF PROCESSING AND CALCULATING.  AND AS

10   MR. KING NOTED, THIS PROCESS HAS BEEN UNDER WAY FOR QUITE SOME

11   TIME.

12         THE COURT:  ALL RIGHT.  GREAT.  THANK YOU VERY MUCH.

13   THANK YOU FOR THAT.

14         WELL, LET'S TURN TO THE TOPICS OF CONVERSATION FOR TODAY.

15   AT OUR LAST HEARING, AS YOU RECALL, I DID BENEFIT FROM AND WE

16   HEARD FROM MANY PARTIES WHO ADDRESSED THE COURT IN REGARDS TO

17   THE SETTLEMENT OF THE CLASS ITSELF.  I HEARD FROM PARTIES WHO

18   HAD ASKED TO JOIN.

19         I SHOULD TELL YOU I RECEIVED A FOLLOWUP LETTER -- PARDON

20   ME WHILE I REACH ACROSS MY DESK.  I THINK IF YOU RECALL, THERE

21   WAS A GENTLEMAN, MR. COUSIN, WHO WAS -- PARTICIPATED AT OUR

22   LAST HEARING.  HE WAS AN OBJECTOR, AND HE DID NOT FOLLOW THE

23   PROTOCOL TO SIGN ON, BUT HE WAS ON THE LINE, AND I NONETHELESS

24   WANTED TO HEAR FROM HIM AND GAVE HIM AN OPPORTUNITY TO BE

25   HEARD.

1     HE SENT TO ME, HERE IN MY OFFICE, A FOUR-PAGE LETTER, AND

2     I RECEIVED THAT HERE.  I WILL PUT THIS ON THE DOCKET.  IT IS

3     JUST ANOTHER FOLLOWUP FROM HIM.  I WILL PUT IT ON THE DOCKET SO

4     THE PARTIES CAN SEE IT.  AND I WILL SEE IF I CAN SHARE THAT

5     WITH COUNSEL.  OF COURSE IT'S AN EX PARTE LETTER, HE'S A

6     PRIVATE CITIZEN, SENT IT TO ME.  I HAVE IT HERE AND I WILL MAKE

7     SURE IT GETS DISTRIBUTED TO ALL OF YOU AS WELL, AND WE WILL PUT

8     IT ON THE DOCKET AS WELL.

9     I THINK I DID HEAR FROM PARTIES WHO OBJECTED TO THE

10    SETTLEMENT LAST TIME.  AND LET ME JUST TURN TO YOU GOOD LAWYERS

11    AND ASK YOU, IS THERE ANYTHING ELSE YOU WOULD LIKE ME TO KNOW

12    REGARDING THE SETTLEMENT?

13    AND MY THOUGHT IS THAT I WOULD HEAR ANY COMMENTS ABOUT

14    THAT AND THEN WE WOULD MOVE TO, I THINK WHAT REALLY THE ISSUE

15    FOR TODAY WAS GOING TO BE, WAS THE DISCUSSION ABOUT ATTORNEY'S

16    FEES.  AND I WILL HEAR FROM THE PARTIES, INCLUDING OBJECTORS ON

17    ATTORNEY'S FEES.

18    BUT ANYTHING ELSE ON THE SETTLEMENT THAT YOU WOULD LIKE ME

19    TO BE AWARE OF?

20    LET ME TURN TO PLAINTIFFS.  MR. MOLUMPHY, ANYTHING ELSE?

21          MR. MOLUMPHY:  NOTHING FROM THE PLAINTIFFS,

22    YOUR HONOR.

23          THE COURT:  OKAY.  THANK YOU.

24    MR. CHORBA?

25          MR. CHORBA:  NOTHING FROM APPLE, YOUR HONOR.

1          THE COURT:  ALL RIGHT.  THANK YOU.

2          ANY OTHER PARTY THAT WISHES TO BE HEARD AS TO THE

3     SETTLEMENT ITSELF?

4          MS. ARBABI:  YOUR HONOR, THIS IS DEBORAH ARBABI FOR

5     THE SIXTY-SIX CORPORATE OBJECTORS FROM CROWELL & MORING.

6          THE COURT:  YEAH.

7          MS. ARBABI:  SO THIS IS A QUICK POINT, YOUR HONOR,

8     BUT I WANT TO MAKE SURE THAT WE ARE ALL ON THE SAME PAGE WITH

9     REGARD TO THE PROCESS OF HOW THE SETTLEMENT IS BEING

10    ADMINISTERED, AND APPRECIATED YOUR RULING AND THE GUIDANCE ON

11    THE ATTESTATIONS FROM THE MPPC'S.  AND THOSE CLAIMS, IT SOUNDS

12    TO ME FROM THE REPORT OF THE MATTERS, THAT THERE HAVE BEEN SOME

13    CLAIMS THAT WERE CURED THROUGH THAT PROCESS.

14         AND I HEARD SOME TIMING PREDICTIONS OF WHEN FINAL REPORTS

15    WILL BE PROVIDED TO YOU ON THE CLAIMS THAT ARE -- THAT ARE IN

16    FRONT OF ANGEION AND WILL BE SORT OF APPROVED AND PUT THROUGH

17    THE PROCESS.

18         IT WOULD BE HELPFUL TO US TO UNDERSTAND THAT AS THIS

19    PROCESS UNFOLDS, THAT THERE WOULD BE A CHANCE FOR THE

20    CLAIMANTS, THEMSELVES, TO RESPOND OR REPLY TO ANY

21    DETERMINATIONS.

22         AND THE SPECIFIC CONCERN THAT WE HAVE IS THAT WE HAVE

23    RECEIVED SOME PRELIMINARY REPORTS FROM ANGEION OF NON MATCHING,

24    WHERE DEVICES DIDN'T MATCH THE LIST, THAT THEY HAVE THAT ARE

25    NOT LINING UP WITH THE RECORDS SOME OF OUR CORPORATE CLAIMANTS

1      HAVE IN THEIR POSSESSION THAT THE IOS WAS DOWNLOADED.

2          MOST CORPORATIONS SIMPLY DON'T HAVE THOSE RECORDS, BUT A

3      FEW DID MAINTAIN RECORDS OF IOS DOWNLOADS, AND THE NUMBERS THAT

4      WE HAVE JUST AREN'T MATCHING, IN EVERY CASE, WHAT WE'VE GOT

5      FROM ANGEION.  IN SOME CASES, THEY DO, BUT IN A FEW CASES THEY

6      DON'T.

7          SO IF CLAIMS ARE TO BE DENIED, WHILE CLAIMANTS HAVE THE

8      OPPORTUNITY TO PUT THOSE RECORDS IN FRONT OF ANGEION AND

9      SUBSTANTIATE THEIR CLAIMS THAT WAY, I JUST ASSUME THAT WOULD

10     TAKE A FEW EXTRA WEEKS IN THE PROCESS.

11          THE COURT:  THANK YOU.

12          IS THAT SOMETHING THAT CAN BE ACCOMPLISHED NOW?  IT SEEMS

13     LIKE YOU KNOW, AT LEAST A CERTAINTY NOW, OF A UNIVERSE OF

14     PHONES THAT THIS APPLIES TO.  IS THAT INFORMATION THAT YOU ARE

15     CURRENTLY SHARING WITH ANGEION?

16          MS. ARBABI:  WE DO NOT HAVE FULL RESULTS FROM

17     ANGEION, NO.  WE HAVE PRELIMINARY RESULTS.

18          THE COURT:  I SEE.  ALL RIGHT.

19          WELL, MR. BROWN, I THINK YOU MIGHT BE THE BEST PERSON TO

20     SPEAK TO THIS?

21          MR. BROWN:  YOUR HONOR, ANDREW BROWN ON BEHALF OF THE

22     JCCP PLAINTIFFS.  I DON'T THINK I AM QUALIFIED TO SPEAK TO

23     THIS, ACTUALLY.

24          THE COURT:  ALL RIGHT.  I'M SORRY.  I THOUGHT I HAD

25     YOU DOWN AS SPEAKER FOR ANGEION.  I BEG YOUR PARDON.  I DON'T

1    KNOW HOW THAT HAPPENED.

2        WELL, I THINK WE SHOULD LOOK AT ANGEION TO SEE WHAT THEY

3    HAVE.  AND ALL I CAN TELL YOU, MS. ARBABI IS, YOU KNOW, TO

4    PLEASE CONTINUE MEETING AND CONFERRING WITH THEM AS SOON AS YOU

5    GET THAT INFORMATION.

6        I WOULD ENCOURAGE COUNSEL TO SPEAK WITH ANGEION TO HAVE

7    THEM FERRET OUT THESE ANOMALIES AND GET THEM TO MS. ARBABI AS

8    SOON AS POSSIBLE.  IT WOULD BE TERRIFIC IF WE COULD WRAP ALL

9    THAT UP AND NOT HAVE ANY LINGERING THREADS THAT WE HAVE TO

10   MANICURE.

11       MR. CHORBA, YOU HAVE SOME THOUGHTS?

12          MR. CHORBA:  YES, YOUR HONOR, IF I COULD JUST ADDRESS

13   THAT.

14       I WANT TO REITERATE THE CLAIMS DEADLINE WAS OCTOBER 6TH.

15   ANGEION SENT TIMELY REJECTION OR DEFICIENCY NOTICES BACK IN

16   NOVEMBER, ON NOVEMBER 6TH, TO ALL CLAIMANTS, INCLUDING SEVERAL

17   OF MS. ARBABI'S CLIENTS AND OTHER NONNATURAL PERSON CLAIMANTS.

18       THIS PROCESS HAS BEEN UNDER WAY FOR QUITE SOME TIME.

19   ANGEION HAS, IN THE LAST ROUND, DELIVERED REPORTS TO

20   REPRESENTATIVES, SUCH AS MS. ARBABI, WHO HAVE INQUIRED, BUT I

21   HAVE TO DISAGREE WITH HER ASSERTION THAT THERE SHOULD BE YET

22   ANOTHER ATTEMPT TO CURE.  BECAUSE YOUR HONOR, OUR CONCERN IS

23   THIS PROCESS WILL NEVER END, OKAY.

24       WE GET CLAIMS IN OCTOBER, WE NOTIFY THEM OF THE

25   DEFICIENCIES IN NOVEMBER.  THERE HAVE BEEN MULTIPLE ROUNDS

1    SINCE THEN.  AND WE UNDERSTAND THERE WAS THIS DISPUTE OVER THE

2    ATTESTATIONS, WHICH YOU THEN RESOLVED LATE LAST MONTH AND SET

3    THE DEADLINE FOR FEBRUARY 8TH.

4         AS YOU MAY RECALL FROM THE DECEMBER HEARING, WE HAD BEEN

5    PREDICTING THAT THE BIGGER ISSUE WOULD BE DEVICE MATCHING.  NOW

6    THE QUALITY OF DATA THAT WE HAVE RECEIVED AND WE HAVE TAKEN

7    BACK TO APPLE REALLY VARIES WILDLY DEPENDING ON THE CLAIMANT.

8    SOME CLAIMANTS GIVE US SERIAL NUMBERS WE ARE ABLE TO MATCH.

9    ONE CLAIMANT SUBMITTED AROUND 2,000 DEVICES.  WE WERE ABLE TO

10   MATCH 98 PERCENT.

11        ANOTHER GAVE US A FEW THOUSAND, WE WERE ABLE TO MATCH 80

12   PERCENT.  SOME GAVE US SEVERAL THOUSAND AND WE COULDN'T MATCH

13   ANY OF THEM, EITHER BECAUSE WE DIDN'T HAVE SUFFICIENT DEVICE

14   IDENTIFYING INFORMATION.  WE CAN'T JUST TAKE A NAME AND A

15   MAILING ADDRESS AND MATCH THE DEVICE, WE NEED SOMETHING, AND WE

16   HAVE DONE OUR BEST.

17        SO WE ARE AT THE POINT NOW WHERE THE FINAL REPORT WILL BE

18   THERE, BUT WHAT WE REALLY HAVE TO OBJECT TO IS ANY PROCESS

19   WHEREBY THERE WERE PLACEHOLDERS SUBMITTED BY ONE CLAIMS

20   AGGREGATOR, WHERE THEY DIDN'T SUBMIT ANYTHING, THEY WERE BLANK

21   CLAIM FORMS.  AND JUST LAST WEEK THEY TRIED TO DUMP ON ANGEION,

22   JUST A MASSIVE AMOUNT OF DATA.  THAT HAS A COST ASSOCIATED WITH

23   IT, AND OUR POSITION IS THAT IS WAY, WAY LATE, WELL BEYOND THE

24   DEADLINE.

25        AND SO I DON'T THINK MS. ARBABI IS SUGGESTING THAT WOULD

1     BE APPROPRIATE.  WE WILL MOST ASSUREDLY GIVE HER A REPORT.  WE

2     HAVE ALREADY DISCUSSED WITH HER WHY SOME OF HER CLIENTS MAY

3     BELIEVE THEIR INDIVIDUAL USERS DOWNLOADED, BUT IT'S NOT TRUE,

4     ACCORDING TO OUR RECORDS.

5          AGAIN, SOME MATCH AT A VERY, VERY HIGH DEGREE OF ACCURACY,

6     AND SOME JUST DO NOT MATCH, AND THAT'S REALLY CLAIMANT OR

7     CORPORATION-SPECIFIC.

8          SO SHE ALSO BROUGHT TO OUR ATTENTION, I JUST WANT TO FLAG,

9     AN ARCHIVE OF AN APPLE DEVELOPER PAGE WHICH TALKS GENERALLY

10    ABOUT ADOPTION RATES FOR NEW IOS RELEASES.  AND AS ANGEION HAS

11    EXPLAINED, THAT IS NOT AT ALL AN ACCURATE COMPARISON.

12         AND I NEED TO FLAG, YOU WILL RECALL THE SPECIFIC IOS

13    UPDATES HERE, WHAT ARE CALLED DOT OR SUB DOT RELEASES.  SO YOU

14    WILL HAVE THE MAIN RELEASE, IOS 10, WHICH USUALLY COINCIDES

15    WITH THE NEW DEVICE.  HERE, WE ARE DEALING WITH 10.2.1, WHICH

16    IS CALLED THE SUB DOT RELEASE.  THE DATA THAT'S REPORTED ON

17    THOSE DEVELOPER PAGES DOES NOT ADDRESS THOSE RELEASES, WHICH

18    ARE GENERALLY OFF CYCLE AND ARE VERY, VERY DIFFERENT.

19         AND YOU KNOW THAT MATTERS IN THIS CASE, BECAUSE THE

20    SPECIFIC PERFORMANCE SOFTWARE UPDATES THAT WERE AT ISSUE IN

21    THIS CASE WERE RELEASED IN 10.2.1 FOR CERTAIN DEVICES AND 11.2

22    FOR OTHER DEVICES.

23         SO AGAIN, THIS IS SOMETHING WE ANTICIPATED, WE HAD BEEN

24    FLAGGING, THERE WAS A LOT OF ATTENTION PAID TO THE ATTESTATION

25    ISSUE, BUT THROUGHOUT THE PROCESS, WE HAVE EXPLAINED TO

1 MS. ARBABI AND OTHERS THAT A LOT OF THEIR DEVICES JUST AREN'T

2 GOING TO MATCH, EITHER AGAIN BECAUSE THE QUALITY OF THE DATA,

3 OR THEY JUST DON'T MATCH WITH APPLE'S RECORDS.

4   THE COURT:  ALL RIGHT.  THANK YOU FOR THAT.

5  MS. ARBABI?

6   MS. ARBABI:  YES, YOUR HONOR.

7  YES.  THANK YOU, MR. CHORBA, BUT REALLY NONE OF THAT IS

8 WHAT I'M SPEAKING OF, AND I WANT TO MAKE SURE WE ARE NOT

9 TALKING PAST ONE ANOTHER.  SO YOUR HONOR, I APPRECIATE THE

10 OPPORTUNITY TO RESPOND.

11  WHAT I'M TALKING ABOUT IS THAT OUR CLIENTS HAVE SUBMITTED

12 THE INFORMATION REQUIRED BY THE CLAIM FORM, SERIAL NUMBERS,

13 ET CETERA, AND ATTESTATIONS.  AND WE HAVE RECEIVED PRELIMINARY

14 REPORTS, OUT OF YOUR X NUMBER OF DEVICES, THIS SUBSET HAS, A

15 NUMBER HAVE MATCHED.  WE HAVEN'T BEEN TOLD WHICH DEVICES

16 MATCHED, WHICH DIDN'T MATCH, AND WE HAVEN'T RECEIVED ANY

17 DETERMINATION.

18  APPLE HAS A LIST THAT HAS BEEN PROVIDED TO ANGEION WHICH

19 THEY ARE CROSS CHECKING THESE DEVICES AGAINST.  BUT WE ARE NOT

20 BEING GIVEN THE RESULTS, WE ARE ONLY BEING TOLD X NUMBER OF

21 YOUR DEVICES MATCHED, AND WE DON'T HAVE A CHANCE TO RESPOND TO

22 THAT IN ANY MEANINGFUL WAY.

23  ALL I'M ASKING FOR IS A DETERMINATION OF WHICH DEVICES

24 MATCHED AND WHICH DIDN'T.  AND IF WE HAVE EVIDENCE THAT THOSE

25 IOS DOWNLOADS ON PARTICULAR DEVICES WERE UPDATED ON THOSE

1    DEVICES, WE SHOULD BE GIVEN AN OPPORTUNITY TO PRESENT THAT

2    EVIDENCE TO ANGEION, AS OPPOSED TO THE APPLE LIST BEING TREATED

3    AS THE ONE SOURCE OF TRUTH IN THIS CASE.  OUR RECORDS MAY

4    DIFFER FROM THAT.

5            THE COURT:  WHAT'S THE UNIVERSE OF NUMBERS OF THIS?

6    DO YOU KNOW, MS. ARBABI, HOW MANY PHONES ARE WE TALKING ABOUT?

7            MS. ARBABI:  HOW MANY PHONES ARE WE TALKING ABOUT

8    THAT DON'T MATCH?

9            THE COURT:  THAT YOU HAVE SOME ISSUE WITH.

10           MS. ARBABI:  THERE MAY BE THOUSANDS, YOUR HONOR.

11   BUT IT'S NOT HUNDREDS OF THOUSANDS, IT'S EITHER -- IT'S IN

12   THE HIGH HUNDREDS OR LOW THOUSANDS, I SUSPECT.

13   BUT IF I COULD -- SO, YOUR HONOR, AS AN EXAMPLE, IF WE

14   SUBMITTED 15,000 DEVICE NUMBERS FOR A PARTICULAR CLAIMANT, WE

15   ARE BEING TOLD 8,000 OF YOUR DEVICES MATCHED.  WE HAVEN'T BEEN

16   TOLD WHICH ONES.  SO I DON'T KNOW HOW MANY ULTIMATELY FALL INTO

17   THIS CATEGORY BECAUSE WE DON'T KNOW WHICH 8,000 THEY ARE

18   MATCHING AND WHICH 7,000 THEY ARE NOT MATCHING.

19           THE COURT:  AND WHEN DID YOU RECEIVE THAT

20   INFORMATION, MS. ARBABI?

21           MS. ARBABI:  IT WAS AFTER OUR LAST HEARING.  I THINK

22   IT WAS IN LATE JANUARY THAT WE RECEIVED SOME PRELIMINARY

23   RESULTS.  AND WE RECEIVED A COUPLE OF ADDITIONAL UPDATES SINCE

24   THEN BY E-MAIL OF JUST A CHART OF OUR CLAIMANTS, AND HERE'S HOW

25   MANY DEVICES MATCHED, HERE'S HOW MANY DIDN'T, BUT NOT

1       IDENTIFYING WHICH ONES.

2              THE COURT:  MR. CHORBA, SHOULD ANGEION PROVIDE THAT

3       INFORMATION TO THEM SO THEY CAN CORRECT, IF NECESSARY?

4              MR. CHORBA:  WELL, FIRST OF ALL, YOUR HONOR, I NEED

5       TO DISPUTE ONE THING, WELL TWO THINGS.

6          ONE, I DON'T THINK WE ARE TALKING PAST EACH OTHER.  AND

7       NUMBER TWO, I DISPUTE MS. ARBABI'S CONTENTION THAT SHE HAS NOT

8       HAD AN OPPORTUNITY TO SUBMIT THAT INFORMATION.  THAT'S WHAT WE

9       HAVE BEEN REQUESTING FOR AT LEAST THE LAST THREE MONTHS.

10         IF SHE HAS EVIDENCE THAT VARIOUS DEVICES DOWNLOADED, THAT

11      TIME HAS PASSED, THAT SHOULD HAVE BEEN PROVIDED TO US, WE WOULD

12      HAVE LOOKED INTO IT.

13         THIS IS EXACTLY WHAT I WAS REFERENCING EARLIER.  IF YOU

14      KEEP THIS PROCESS GOING, IT WILL NEVER END.  AND THERE WAS AN

15      AMPLE OPPORTUNITY.

16         BUT TO YOUR QUESTION, WE HAVE NO ISSUE.  I MEAN, CERTAINLY

17      AT THE DISTRIBUTION STAGE, ANGEION IS GOING TO NEED TO LET HER

18      KNOW WHICH CLAIMANTS ARE RECEIVING WHICH DEVICES -- OR EXCUSE

19      ME, WHICH DEVICES ARE GOING TO RECEIVE THE PAYMENTS.

20         SO I DON'T SEE ANY ISSUE WITH BREAKING IT DOWN.  SHE HAS

21      66 CLIENTS.  LETTING HER KNOW WHICH OF THE CLIENTS HAVE HOW

22      MANY, WHETHER OR NOT IT COULD BE MATCHED PRECISELY TO THE ROWS

23      ON HER CHART, THAT'S A LOT OF WORK.  WE HAVEN'T COMMITTED TO

24      DOING THAT, BUT I WILL COMMIT TO YOUR HONOR THAT WE WILL LOOK

25      IN WITH ANGEION TO DO THAT.

1        I WILL JUST REITERATE THERE'S A COST ASSOCIATED WITH EACH

2   ONE OF THESE STEPS, AND IT'S SOMETHING -- AGAIN, SHE REACHED

3   OUT TO US BACK IN MARCH 2020, AND WE HAVE BEEN URGING HER

4   THROUGHOUT THIS TIME TO PROVIDE THIS INFORMATION.

5        AND IF YOU SENSE SOME FRUSTRATION, IT'S BECAUSE WE ARE AT

6   THE TAIL END OF THIS PROCESS, THERE'S 2 MILLION INDIVIDUALS WHO

7   HAVE MADE VALID CLAIMS.  THEY ARE GOING TO RECEIVE, DEPENDING

8   ON THE FEE AWARD, UP TO A HUNDRED DOLLARS EACH.  WE ARE ANXIOUS

9   TO GET THIS MONEY OUT TO PEOPLE AND NOT HANG UP FOR THE

10  REMAINING ONE OR TWO PERCENT OF CLAIMS ADMINISTRATION.

11          THE COURT:  THANK YOU.

12      MS. ARBABI, I'M SORRY, DID SOMEONE ELSE --

13          MR. FOX:  YES, YOUR HONOR.

14      IF I COULD JUST QUICKLY ADD, MR. CHORBA IS INDICATING

15  THERE IS A COST, AND PERHAPS HE'S TALKING ABOUT A MONETARY

16  COST, BUT THERE'S ALSO A COST TO THE LARGER CLASS.

17      THE LONGER THIS GOES ON, THE LONGER IT'S GOING TO TAKE IN

18  ORDER FOR US TO GET PAYMENT TO THE, FRANKLY, MILLIONS OF PEOPLE

19  WHOSE CLAIMS HAVE BEEN ACCEPTED AND CAN GO FORWARD.

20      SO I THINK THAT HAS TO JUST BE CONSIDERED IN THE MIX AS

21  WELL.

22          THE COURT:  WELL, ALL OF THAT IS BEING CONSIDERED.

23      AND MS. ARBABI, I WAS JUST QUESTIONING THE TIMING OF THIS.

24  YOU KNOW, I DON'T WANT TO DELAY THIS, I'M NOT EAGER TO DELAY

25  THE CASE WHERE A LOT OF WORK HAS BEEN DONE ON IT ALREADY.

1            I ASKED YOU ABOUT WHEN YOU RECEIVED THIS INFORMATION

2      BECAUSE, CANDIDLY, I'M CURIOUS WHY WASN'T THIS DONE BEFORE?

3      AND I THINK WHAT YOU TELL ME IS WELL, WE DIDN'T KNOW THE

4      INFORMATION FROM THEM.

5            IT SOUNDS LIKE YOU HAD AN OPPORTUNITY TO PROVIDE ALL OF

6      THE INFORMATION TO ANGEION THAT YOU FEEL IS APPROPRIATE.  I

7      JUST REALLY DON'T WANT -- I'M NOT GOING TO GO IN AND TRY TO

8      HAVE CONTINUED HEARINGS ON, AND ON, AND ON OF THIS, MS. ARBABI.

9            I WILL ASK YOU TO WORK WITH ANGEION, AND IT SOUNDS LIKE

10     THERE'S A THREE-WEEK PERIOD OF TIME THAT THIS REPORT MIGHT BE

11     COMPLETED.  AND TO THE EXTENT YOU CAN GET WHAT YOU NEED TO GET

12     DONE WITH THEM IN THAT THREE-WEEK TIME PERIOD, I WOULD

13     APPRECIATE IT.  BUT I REALLY DON'T WANT TO BE SETTING HEARINGS

14     ON WHETHER OR NOT A PHONE IS IN THE CLASS OR NOT BECAUSE OF AN

15     OBJECTION BECAUSE A NUMBER MIGHT HAVE BEEN, WHATEVER, WRITTEN

16     DOWN INCORRECTLY OR WHATEVER IT MIGHT BE.  I DO THINK THAT THE

17     TIMING OF THIS LAWSUIT PROVIDED THE OPPORTUNITY FOR ALL OF THAT

18     TO OCCUR.

19           AND ALBEIT, THESE ISSUES OF ATTESTATION AND OTHERS CAME UP

20     SOMEWHAT LATE IN THE PROCESS, BUT I HOPE THE TAKEAWAY FROM OUR

21     LAST HEARING AND BEFORE, WAS I WAS HOPEFUL THAT THE PARTIES

22     COULD ENGINEER SOMETHING TOGETHER TO MAKE THE PROCESS -- WE ARE

23     LOOKING AT THE TAPE AT THE END OF THE RACE HERE, AND IT'S AT

24     THE POINT NOW WHERE EVERYBODY IS LEANING TO BREAK THE TAPE.

25           THOSE OF YOU WHO HAVE RUN TRACK AND CROSS COUNTRY REMEMBER

1    THAT WHEN YOU ALL PLACED FIRST PLACE IN YOUR HUNDRED YARD

2    DASHES, SO THAT'S WHERE WE ARE AT.  WE ARE NOT READY TO BREAK

3    THE TAPE, MS. ARBABI, BUT WE'VE GOT SOME TIME AND I ENCOURAGE

4    YOU TO WORK WITH COUNSEL TO SEE IF YOU CAN RESOLVE THAT.  I'M

5    CERTAIN YOU WILL BE ABLE TO.

6          SO THANK YOU VERY MUCH.  I APPRECIATE IT.

7              MS. ARBABI:  THANK YOU, YOUR HONOR.

8              THE COURT:  YOU'RE WELCOME.

9          LET'S MOVE THEN INTO THE ATTORNEY'S FEES PORTION OF OUR

10   DISCUSSION.  AND I DO HAVE THE MOTIONS AS WELL AS MOTIONS TO

11   OBJECT FROM OBJECTORS ON THAT GOING FORWARD.

12         SO LET ME FIRST TURN TO PLAINTIFFS IN REGARDS TO THEIR

13   PRAYER FOR ATTORNEY'S FEES IN THIS MATTER.  I WILL THEN TURN TO

14   THE DEFENDANTS IN THE CASE TO HEAR THEIR COMMENTS, AND THEN I

15   WILL ASK IF ANY OF THE OBJECTORS WISH TO BE HEARD AS WELL.

16         SO AS TO PLAINTIFFS ATTORNEYS FEES, WHO IS GOING TO SPEAK

17   TO THAT?  MR. COTCHETT?

18             MR. COTCHETT:  JOSEPH COTCHETT.

19         I AM GOING TO REFER EVERYONE TO MARK MOLUMPHY WHO IS GOING

20   TO PRESENT THE ATTORNEYS FEES ISSUE.

21             THE COURT:  THANK YOU VERY MUCH.

22         MR. MOLUMPHY, GOOD AFTERNOON.  WHAT WOULD YOU LIKE ME TO

23   KNOW IN SUPPORT OF YOUR REQUEST FOR ATTORNEY'S FEES.

24             MR. MOLUMPHY:  THANK YOU.  GOOD AFTERNOON,

25   YOUR HONOR.

1        OBVIOUSLY YOU SUPERVISED THIS CASE FROM THE BEGINNING AND

2    HAVE A FIRM HANDLE ON EVERYTHING THAT'S GONE ON BEFORE YOU, BUT

3    I DID WANT TO EMPHASIZE A FEW THINGS WE THOUGHT WERE PERTINENT

4    TO OUR MOTION AND ADDRESSED SOMEWHAT BY THE OBJECTIONS.

5        NUMBER ONE, THE SETTLEMENT ITSELF.  THIS IS, IF NOT THE

6    LARGEST, ONE OF THE LARGEST ALL-CASH RECOVERIES IN A COMPUTER

7    INTRUSION CASE EVER IN HISTORY IN ANY COURT, CERTAINLY THE

8    LARGEST UNDER CALIFORNIA'S COMPUTER DATA ACCESS AND FRAUD ACT.

9    IT WAS ACHIEVED NOT JUST BECAUSE OF THE SIZE OF THE CLASS, BUT

10   BECAUSE OF THE WORK OF COUNSEL.

11       THE CONTEXT, I THINK, IS WHAT SEPARATES THE OBJECTIONS

12   FROM WHAT WE TRIED TO PRESENT IN OUR MOTION, WHICH IS TO PUT

13   SOME CONTEXT INTO WHICH THIS RECOVERY WAS REACHED.

14       IT WAS REACHED AFTER YEARS OF LITIGATION BY WELL-INFORMED

15   PARTIES AFTER CONSIDERABLE LITIGATION AND DISCOVERY.  THE CASE

16   WAS FILED NOW FOR THREE YEARS.  IT QUICKLY RAMPED UP AFTER YOU

17   APPOINTED LEAD COUNSEL, RESULTED IN EXTENSIVE PLEADING MOTIONS

18   ADDRESSING NOVEL LEGAL ISSUES RELATING TO COMPUTER INTRUSION

19   STATUES, ANTI-HACKING STATUTES, AS WELL AS YOU WILL RECALL,

20   PRODUCT DEFECTS THEORIES THAT YOU WERE ASKED TO CONSIDER, ALL

21   OF WHICH WERE IN THE MIDST OF CHANGING LAW.

22       IN FACT, I THINK WITH RESPECT TO THE MOTIONS TO DISMISS

23   ADDRESSING PRODUCT DEFECT CLAIMS, YOUR HONOR MODIFIED ITS

24   OPINION FROM THE FIRST DECISION TO THE SECOND BECAUSE OF THE

25   LANGUAGE OF LAW IN THOSE CASES.

1        ALL IN THE MIDST OF THIS, WERE ONGOING EXTENSIVE

2   LITIGATION, INCLUDING DISCOVERY.  THERE WERE 18 SEPARATE

3   MOTIONS FILED IN THIS COURT, MULTIPLE MOTIONS TO DISMISS, AND

4   NOVEL ISSUES THAT YOUR HONOR WAS ASKED TO DECIDE, WHICH FRANKLY

5   THERE WAS NO ROAD MAP.

6        THIS WAS NOT A CASE IN WHICH THERE WAS A GOVERNMENT

7   INVESTIGATION OR A PLEA OR SOME PRE-DONE FACTUAL DISCOVERY THAT

8   WE COULD FOLLOW.  WE WERE THE LEADERS IN THIS CASE, WE CREATED

9   THE ROAD MAP FOR OTHERS, INCLUDING GOVERNMENT INVESTIGATIONS

10  THAT FOLLOWED US.  I THINK THAT'S IMPORTANT CONTEXT IN WHICH TO

11  CONSIDER OUR FEE APPLICATION.

12       OBVIOUSLY, THERE ARE A LOT OF RISKS INVOLVED THAT I WILL

13  TOUCH UPON.  SOME OF THEM WERE THE LEGAL RISKS THAT YOUR HONOR

14  DID ALLOW US TO PROCEED UNDER THESE COMPUTER INTRUSION STATUES,

15  FRANKLY, RISKS THAT REMAIN TODAY AND THAT WILL REMAIN BEFORE WE

16  MOVE FORWARD IN THIS CASE THROUGH CLASS CERTIFICATION, SUMMARY

17  JUDGEMENT AND TRIAL.  THINGS LIKE ARTICLE III STANDING ISSUES,

18  ALLEGATIONS RELATING TO THE UNAUTHORIZED ACCESS TO THESE

19  DEVICES AND WHAT THAT MEANS.

20       THE U.S. SUPREME COURT HAS A DECISION PENDING RIGHT NOW

21  THAT WAS ARGUED ABOUT A MONTH AGO ABOUT THE SCOPE OF THE CFAA

22  AND THE MEANING OF UNAUTHORIZED ACCESS.

23       THE CALIFORNIA SUPREME COURT, THERE'S A DISTRICT SPLIT

24  REGARDING THE MEANING OF THE CDAFA AND SOME OF THOSE STATUES,

25  WHICH HAS NOT BEEN RESOLVED, ANY OF WHICH COULD HAVE BEEN

1       POTENTIALLY DISPOSITIVE TO THE PLAINTIFFS IN THIS CASE.

2               OBVIOUSLY THERE'S BEEN A BIG RISK IN THIS CASE.  I DON'T

3       THINK I NEED TO TELL YOU THAT APPLE HAS CONTESTED VIRTUALLY

4       EVERYTHING, INCLUDING THIS FEE MOTION.  THEY ARE REPRESENTED BY

5       SOME OF THE MOST COMPETENT AND WELL-RESOURCED COUNSEL IN THE

6       NATION, AND THEY HAVE LEFT NO STONE UNTURNED IN THIS CASE.

7               OBVIOUSLY WE TALKED ABOUT THE ACTIVITY IN YOUR COURTROOM,

8       BUT THE VAST MAJORITY OF ACTIVITY ACTUALLY TOOK PLACE OUTSIDE

9       OF YOUR COURTROOM.  THINGS LIKE THE PRE-COMPLAINT INVESTIGATION

10      WHICH TOOK US ACROSS STATE AND INTERNATIONAL LINES TO DEAL WITH

11      APPLE'S DEALINGS WITH FOREIGN GOVERNMENTS.

12              DISCOVERY IN THIS CASE WAS MASSIVE, AS ONE WOULD EXPECT

13      WHEN DEALING WITH A DEVICE AS UBIQUITOUS AS APPLE'S IPHONE.

14      DEALING WITH THE SCALE OF APPLE'S DESIGN, ENGINEERING AND

15      MARKETING OPERATIONS.

16              THERE ARE MULTIPLE SETS OF DISCOVERY SERVED ON APPLE AND

17      MULTIPLE SETS OF DISCOVERY SERVED ON THE NAMED PLAINTIFFS.  THE

18      EVIDENCE THAT WE SOUGHT IN THIS CASE WAS LABORIOUS, TIME

19      CONSUMING, BUT ABSOLUTELY VITAL TO OUR ABILITY TO AMEND OUR

20      COMPLAINT, PREPARE FOR DEPOSITIONS, AND PREPARE FOR MEDIATION

21      DISCUSSIONS IN THIS CASE.

22              WE ISSUED 24 SUBPOENAS TO THIRD PARTIES, INCLUDING APPLE'S

23      MARKETING FIRMS AND CRISIS MANAGEMENT FIRMS.

24              ESI.  I JUST WANT TO TAKE A MOMENT ON ESI, ELECTRONICALLY

25      STORED INFORMATION.  IT WAS ITS OWN SATELLITE LITIGATION IN

1    THIS CASE.  AGAIN, MUCH OCCURRED OUTSIDE OF THIS COURTROOM.

2         BUT FOR EXAMPLE, KARIN SWOPE, AND ARIANA TADLER, TWO OF

3    THE COUNTRY'S FOREMOST EXPERTS IN ESI WERE TASKED WITH

4    NEGOTIATING SEARCH TERMS WITH APPLE.  THAT PROCESS TOOK NINE

5    MONTHS AND ULTIMATELY RESULTED IN 222 SEPARATELY NEGOTIATED

6    SEARCH TERMS AND THE PRODUCTION OF OVER 7.5 MILLION DOCUMENTS.

7    MUCH OF IT ELECTRONIC FORMAT, MUCH OF IT INVOLVING HIGHLY

8    TECHNICAL INFORMATION, SOME IN DIFFERENT LANGUAGES THAT HAD TO

9    BE TRANSLATED.

10        OUR CO-COUNSEL AT KAPLAN FOX, JUST TO GIVE AN EXAMPLE, WAS

11   CHARGED WITH THE 8,000 PAGE PRIVILEGE LOG PRODUCED BY APPLE IN

12   THIS CASE, SEVEN PERCENT OF ALL THE RESPONSIVE DOCUMENTS, AND

13   NEGOTIATING THAT.  I REMEMBER -- I SEE ELLE LEWIS ON THE

14   SCREEN.  ELLE LEWIS AND OTHER EC MEMBERS WERE CHARGED

15   PREDOMINANTLY WITH DEALING WITH THE DOCUMENT REVIEW.  THAT WAS

16   AN ENORMOUS PROCESS IN ORDER TO GET US READY FOR DEPOSITIONS,

17   AS WELL AS IDENTIFYING KEY INFORMATION FOR YOUR HONOR'S REVIEW

18   FOR THE PLEADINGS.

19        SO WITH THE BENEFIT OF ALL OF THAT INFORMATION,

20   YOUR HONOR, WE WERE ABLE TO TAKE DEPOSITIONS, ABLE TO PREPARE

21   FOR MEDIATION, AND ABLE TO NEGOTIATE WHAT WE BELIEVE TO BE A

22   HISTORIC SETTLEMENT.

23        WITH RESPECT TO THE NAMED PLAINTIFFS THEMSELVES, WE HAD TO

24   RESPOND TO OVER 2,300 DOCUMENT REQUESTS, 900 INTERROGATORIES,

25   AND WE DID, WITH THE SUPPORT OF OUR EXECUTIVE COMMITTEE

1      MEMBERS, WE RESPONDED TO ALL OF THEM.

2           AND I WOULD LIKE TO NOTE A LOT OF THE EXECUTIVE COMMITTEE

3      MEMBERS ARE NOT SHOWN ON THE SCREEN, SOME ARE LISTENING ON TO

4      THIS CALL, BUT THEY WERE TREMENDOUS RESOURCES TO THE TEAM,

5      LOCATED THROUGHOUT THE COUNTRY, AND THEY DID FANTASTIC WORK TO

6      DRIVE THE RESULT HERE.

7           WE ALSO HAD FORENSIC IMAGING.  APPLE WANTED TO IMAGE EVERY

8      SINGLE ONE OF THE DEVICES OWNED BY THE SEVERAL HUNDRED NAMED

9      PLAINTIFFS.  THAT WAS AN ISSUE OF DISPUTE IN THIS CASE THAT WAS

10     ULTIMATELY RESOLVED.  THAT WAS ONE OF MANY ISSUES RESOLVED BY

11     JUDGE WESTERFIELD, RETIRED JUDGE WESTERFIELD WHO WAS APPOINTED

12     BY YOUR HONOR AS THE SPECIAL DISCOVERY MASTER.

13          IN FACT, SHE PROBABLY DIDN'T KNOW WHAT SHE WAS GETTING

14     INTO, BUT SHE JUMPED INTO THIS CASE, WE HAD WEEKLY DISCOVERY

15     CONFERENCES WITH THE PARTIES, MANY IN PERSON, SOME DOWN IN

16     SAN JOSE THAT WERE ALL-DAY AFFAIRS IN WHICH SHE INSISTED THAT

17     WE HAVE MEET AND CONFER SESSIONS, AND IF WE COULDN'T RESOLVE

18     THEM OURSELVES, SHE RESOLVED THEM ON THE SPOT.

19          SHE UNDERSTOOD THAT IT WAS IMPORTANT TO RESOLVE THINGS

20     CONTEMPORANEOUSLY TO CONTINUE THE DISCOVERY PROCESS AND MAKE

21     SURE THAT THIS CASE MOVED FORWARD ON THE SCHEDULE THAT

22     YOUR HONOR SET.

23          SO THE REASON I BRING THIS UP AND GO THROUGH A LITTLE BIT

24     MORE OF THIS BACKGROUND, BUT IT IS DETAILED IN OUR

25     DECLARATIONS, INCLUDING MR. COTCHETT AND MR. KING'S JOINT

1    DECLARATION, IS THAT IT PUTS IN CONTEXT THE SETTLEMENT THAT WE

2    WERE ABLE TO ACHIEVE.  IT WAS THE RESULT OF WORK AND EFFORT,

3    AND THAT WORK AND EFFORT ABSOLUTELY DROVE THE OUTCOME IN THIS

4    CASE.

5         SO WE ARE GOING TO HEAR, I KNOW, FROM SEVERAL OF THE

6    OBJECTORS, AND I WILL POINT OUT THAT MUCH OF THE OBJECTORS THAT

7    YOU WILL SEE IN THE PAPERS DO NOT ADDRESS THIS HISTORY, WHICH

8    WE VIEW IS ABSOLUTELY ESSENTIAL TO VIEWING THE CONTEXT OF THE

9    SETTLEMENT.

10        WE ARE ASKING FOR 28.3 PERCENT OF THE $310 MILLION MINIMUM

11    SETTLEMENT FUND, WHICH WE NOW KNOW IS THE AMOUNT APPLE WILL PAY

12    BASED UPON THE CLAIMS THAT WERE SUBMITTED.

13        THIS IS A COMMON FUND SETTLEMENT, THAT $310 MILLION WILL

14    NOT REVERT BACK TO APPLE, IT WILL BE PAID TO THE CLASS, WITH

15    ANY AMOUNTS TAKEN AWAY FOR FEES AND EXPENSES.

16        OF COURSE THIS COURT HAS WIDE DISCRETION ON WHICH METHOD

17    TO APPLY FOR ATTORNEY'S FEES, BE IT PERCENTAGE, OR LODESTAR,

18    YOU ALSO HAVE WIDE DISCRETION ON WHAT PERCENTAGE TO APPLY TO

19    DETERMINE THE PERCENTAGE METHOD AS WE PROPOSE AS THE BEST

20    METHOD.

21        AND I THINK THE KEY THAT THE CASES SAY IS THAT IT JUST HAS

22    TO BE REASONABLE AND SUPPORTED.  WE SUBMIT, YOUR HONOR, THAT

23    THAT PERCENTAGE WE ARE SEEKING, WHILE SLIGHTLY ABOVE THE

24    25 PERCENT BENCHMARK THAT IS APPLIED, EVEN IN MEGAFUND TYPE

25    SETTLEMENTS, IS APPROPRIATE HERE BASED UPON THE FIVE FACTORS

1     THAT THE NINTH CIRCUIT HAS ASKED THAT YOU APPLY IN CONSIDERING

2     A REASONABLE AMOUNT.

3          CERTAINLY THIS IS A MEGAFUND SETTLEMENT.  HOWEVER, COURTS

4     DO NOT HESITATE TO APPLY A PERCENTAGE METHOD, OR THE BENCHMARK

5     IN MEGAFUND CASES, AND THEN TO USE THE LODESTAR CROSS-CHECK TO

6     ENSURE THAT THAT PERCENTAGE, WHATEVER IT IS, AND HERE WE ARE

7     ASKING FOR 28.3, DOES NOT RESULT IN A WINDFALL.

8          THAT IS THE BASIC ANALYSIS THAT THE NINTH CIRCUIT ASKS

9     COURTS TO APPLY.  AND FOR THAT REASON, WE PROVIDED BOTH

10    INFORMATION RELATING TO THE PERCENTAGE IN THOSE FACTORS, AS

11    WELL AS OUR LODESTAR, SO YOU CAN DO THAT CROSS-CHECK.

12         WE WILL SUBMIT TO YOU THERE IS NO WINDFALL.  AS WE GO

13    THROUGH THIS, HOPEFULLY WE WILL BE ABLE TO CONVINCE YOUR HONOR

14    THAT THE LODESTAR MULTIPLIER IN THIS CASE IS WITHIN THE

15    NINTH CIRCUIT'S STANDARD JUDICIALLY APPLIED RANGE, FIRST

16    ADOPTED BY VIZCAINO, AND APPLIED FOR YEARS SINCE THEN OF ABOUT

17    2.4.  WE INCLUDE TIME SPENT PRE-APPOINTMENT, IT'S ACTUALLY

18    CLOSER TO 2.2, AND OF COURSE WE SUBMITTED THAT TIME BACK IN

19    JULY OF 2020 NOW, SO THAT'S ALMOST SEVEN, EIGHT MONTHS AGO.

20    AND WE HAVE SPENT THOUSANDS OF HOURS OVER THE LAST SEVEN MONTHS

21    ADDRESSING ISSUES RELATING TO CLASS MEMBER QUESTIONS, CLASS

22    MEMBER CLAIMS, OBJECTOR CLAIMS, THE TIME HAS NOT STOPPED SINCE

23    JULY OF LAST YEAR WHEN WE SUBMITTED THIS MOTION.

24         SO THE POINT BEING, YOUR HONOR, WHILE IT'S A 2.4

25    MULTIPLIER, THAT IS A CONSERVATIVE NUMBER.  IF WE WERE TO

1        INCLUDE PRE AND POST-PRELIMINARY APPROVAL TIME, IT WOULD BE

2        CLOSER TO 2.  SO UNDER THAT CROSS-CHECK, YOUR HONOR, THERE IS

3        NO WINDFALL.

4            NOW I WOULD LIKE TO QUICKLY GO THROUGH THOSE FIVE FACTORS,

5        WITH YOUR HONOR'S PERMISSION.

6            THE MOST CRITICAL FACTOR, OF COURSE, IS THE RESULTING

7        ACHIEVED.  HERE WE HAVE, JUST FOCUSSING ON THE MINIMUM AMOUNT,

8        310 MILLION, IT'S AN ALL-CASH RECOVERY, LITERALLY UNPRECEDENTED

9        IN A CALIFORNIA CDAFA CASE AND BELIEVED TO BE THE LARGEST

10       ALL-CASH SETTLEMENT IN ANY COMPUTER INTRUSION CASE, THE

11       LARGEST, DWARFS OTHER SETTLEMENTS BY A MULTIPLE OF THIRTY OR

12       FORTY TIMES.  THAT'S JUST ON A MACRO LEVEL.

13           WE HAVE NOW PRESENTED TO YOU, SINCE OUR LAST HEARING, WITH

14       SOME FURTHER ANALYSIS ABOUT THE DAMAGES OF THE POTENTIAL

15       RECOVERY IN THIS CASE.  AND USING A SIMILAR METHODOLOGY THAT

16       JUDGE KOH ADOPTED AND APPROVED AGAINST APPLE IN THE GRACE CASE,

17       I THINK CONSISTENT WITH MOST DAMAGES MODELS IN THIS TYPE OF A

18       CASE, A DEPRECIATION IN VALUE.

19           WE DID A REGRESSION ANALYSIS IN ORDER TO ISOLATE THE

20       AFFECT OF THE THROTTLING ON THE REDUCTION AND PRICE OF APPLE

21       DEVICES.  AND THE RANGE IS GENERALLY ABOUT 12.29 -- $12.29 TO

22       $18.99, SO ROUGHLY $12 TO $19 PER DEVICE ARE THE DAMAGES, BASED

23       UPON THIS REGRESSION ANALYSIS.

24           SO EVEN IF WE ASSUME FOR PURPOSES OF ARGUMENT THAT EVERY

25       SINGLE ONE OF THE NINETY MILLION DEVICES DOWNLOADED THE

1    SOFTWARE AND WAS IMPACTED, AND WE COULD PROVE THAT ALL THE WAY

2    THROUGH TRIAL, THE DAMAGES THAT WE ARE TALKING ABOUT HERE ARE

3    ROUGHLY 1.1 BILLION.

4         SO USING THE 310 TO 500 MILLION RANGE WE HAD HERE, THE

5    RECOVERY HERE IS ACTUALLY ABOUT 28 TO 45 PERCENT POTENTIAL

6    DAMAGES.  SO USING THE 310 MILLION FIGURE, WHICH WE HAVE,

7    28 PERCENT RECOVERY OF DAMAGES.  SO IT'S A SUBSTANTIAL

8    SETTLEMENT, A HISTORIC SETTLEMENT, JUST ON THE MACRO LEVEL.

9    AND THEN WITH RESPECT TO THE DAMAGES IN THIS CASE, THAT'S AN

10   EXCEPTIONAL RECOVERY, AND WE WOULD SUBMIT TO YOU JUSTIFIES AN

11   UPWARD DEPARTURE.

12        WE HAVE ALSO COMPARED THAT AGAINST OTHER CFAA AND CDAFA

13   CASES.  WE FOUND ABOUT 400 OR SO, BASED UPON OUR RESEARCH.

14   LESS THAN TEN RESULTED IN A RECOVERY TO CLASS MEMBERS, ALL OF

15   WHICH, WITH ONE EXCEPTION, WERE BELOW TEN MILLION DOLLARS.

16        SO AGAIN, THIS RECOVERY IN THIS TYPE OF CASE ABSOLUTELY

17   DWARFS OTHER RECOVERIES AND THESE TYPES OF CLAIMS.

18        AND WHY IS THAT?  WELL, I WOULD SUBMIT TO YOU THIS FALLS

19   INTO THE SECOND ELEMENT, THE RISK OF THE CASE.  THESE ARE

20   EXCEPTIONALLY DIFFICULT CLAIMS.  AFTER THE MOTIONS TO DISMISS,

21   THESE WERE THE CLAIMS THAT WE WERE PURSUING.

22        SO THE RISK OF LITIGATION, THE SECOND FACTOR THAT YOU

23   SHOULD CONSIDER, ACTUALLY MAKES THIS RECOVERY EVEN MORE

24   REMARKABLE, FROM OUR POINT OF VIEW.  THERE HAS NOT BEEN

25   WIDESPREAD APPLICATION OF THESE, BASICALLY PENAL STATUTES, IN

1    CIVIL CASES, AND THE FEE DECISIONS OUT THERE HAVE TAKEN

2    SOMEWHAT DIFFERENT INTERPRETATIONS OF THE KEY ELEMENTS

3    UNAUTHORIZED ACCESS VERSUS KNOWING ACCESS.

4        WHAT IS AN UNLAWFUL USE?  IS THE REQUIREMENT OF INTENT TO

5    CAUSE INJURY, AND OF COURSE ARTICLE III INJURY.  AGAIN, MANY OF

6    THESE ISSUES YOU HAVE DEALT WITH AT THE MOTION TO DISMISS

7    STAGE, SOME OF WHICH WERE DEFERRED TO THE CLASS CERT, BUT

8    CERTAINLY WOULD COME UP AGAIN AND AGAIN.

9        I NOTED CASES HAVE SETTLED, THE VAST MAJORITY OF THESE

10   CASES WERE DISMISSED AT THE SUMMARY JUDGEMENT OR MOTION TO

11   DISMISS STAGE.  IN FACT, WE WOULD SUBMIT THAT THESE COMPUTER

12   INTRUSION CLAIMS HAVE OFTEN BECOME A LEGAL GRAVEYARD FOR

13   PLAINTIFFS OVER THE LAST DECADE OR SO.

14       CASES RESOLVED IN THIS DISTRICT, FOR EXAMPLE, THE

15   BRODSKY V. APPLE CASE IN WHICH A MOTION TO DISMISS WAS GRANTED.

16   THE IPHONE APPLICATION CASE, THE IPHONE -- EXCUSE ME -- APPLE

17   AND ATM ANTITRUST CASE BEFORE JUDGE WARE, ALL INVOLVING THESE

18   SIMILAR TYPE OF CLAIMS, ALL THROWN OUT AT THE MOTION TO DISMISS

19   OR SUMMARY JUDGEMENT STAGE.  YOUR HONOR HAD THE HP CASE

20   RELATING TO UPDATING THEIR PRINTERS AND HAD A CFAA CLAIM, THAT

21   WAS DISMISSED.

22       THOSE ARE CASES, AGAIN, SIRIUS, GOOGLE, FACEBOOK, HAVE ALL

23   BEEN THROWN OUT AT THE MOTION TO DISMISS STAGE BECAUSE OF THE

24   DIFFICULTY NOT JUST PROVING, BUT ALLEGING THE ELEMENTS FOR

25   THESE RELATIVELY ANTI-HACKING CLAIMS.

1          YOU WILL REMEMBER MR. CHORBA MADE A BIG POINT THAT THESE

2    WERE ANTI-HACKING STATUTES AT THE MOTION TO DISMISS STAGES.

3    WHILE THEY DO PROVIDE CIVIL LIABILITY, COURTS HAVE BEEN

4    SOMEWHAT STRICT IN THEIR APPLICATION.

5          ALL OF THESE RISKS ARE COMPOUNDED BY THE FACT THAT APPLE,

6    AS WE EXPECTED, HAD POWERFUL INCENTIVE TO DEFEND THIS CASE AND

7    TO DEVOTE WHATEVER RESOURCES THEY COULD, GIVEN THE POTENTIAL

8    IMPACT ON THEIR BUSINESS MODEL, ON THEIR PRODUCTS, AND ON

9    FUTURE SOFTWARE UPDATES.

10         AGAIN, THEY HAVE CONTESTED VIRTUALLY EVERYTHING IN THIS

11   CASE.  AND I DON'T FAULT THEM FOR DOING THAT, I JUST POINT OUT

12   THE OBVIOUS, THIS WAS A HOTLY CONTESTED CASE, AND WE HAD TO

13   HAVE THE RESOURCES IN ORDER TO REBUT AND RESPOND TO THOSE

14   CHALLENGES BY APPLE.

15         THE THIRD FACTOR IS THE SKILL REQUIRED AND THE QUALITY OF

16   WORK.  OBVIOUSLY THIS IS A SOMEWHAT SUBJECTIVE FACTOR, BUT ON

17   THE MERITS, THIS CASE INVOLVED HIGHLY TECHNICAL ISSUES, HIGHLY

18   TECHNICAL FACTS RELATING TO THE DESIGN OF THE IPHONE, BATTERY

19   USE, DEGRADATION ISSUES, AND THE SOFTWARE UPDATES THAT APPLE

20   USED TO ADDRESS THESE ISSUES, HOW THEY WERE CONVEYED TO THE

21   PUBLIC, REQUIRED LAWYERS AND STAFF EXPERIENCED IN DATA BREACH,

22   PRIVACY AND PRODUCT DEFECT CASES, AS WELL AS ENGINEERING.

23         THE CASE ALSO REQUIRED TECHNICAL NOTES TO REVIEW THE

24   DOCUMENTS THAT WERE PRODUCED TO US AND PREPARE FOR DISCOVERY.

25   THE CASE REQUIRED FORENSIC EXPERTS, PRODUCT MARKETING EXPERTS,

1    MARKET DAMAGES STUDIES FOR PURPOSES OF DAMAGES.

2         THERE WERE NO PRIOR GUIDES FOR US ON THESE TYPE OF CASES.

3    AND THE SKILL -- I WOULD SUBMIT TO YOU, THE SKILL AND THE

4    BACKGROUND OF COUNSEL AND THE QUALITY OF COUNSEL'S WORK WERE

5    INSTRUMENTAL IN IDENTIFYING THE EVIDENCE, USING THEM IN

6    PLEADINGS EFFECTIVELY AND PREPARING FOR DEPOSITIONS AND

7    MEDIATIONS THAT HELPED CREATE LEVERAGE AGAINST APPLE WHERE THEY

8    FELT THAT A SETTLEMENT WOULD BE IN THEIR INTEREST.

9         AGAIN, QUICK POINT, THE REGULATORS DID NOT LEAD THIS CASE,

10   WE LEAD THE REGULATORS IN THIS.  WE DID NOT HAVE A SCRIPT TO

11   FOLLOW, QUITE THE OPPOSITE, THEY FOLLOWED OUR SCRIPT IN THIS

12   CASE.

13        THE FOURTH FACTOR IS THE CONTINGENT REPRESENTATION.  NO

14   ONE DISPUTES THAT THIS CASE WAS TAKEN ON A HUNDRED PERCENT

15   CONTINGENCY BASIS.  THOUSANDS OF HOURS WERE ADVANCED OVER THE

16   PAST THREE YEARS, INCLUDING THE SIGNIFICANT EFFORTS OF THE

17   EXECUTIVE COMMITTEE MEMBERS THAT I'M SPEAKING FOR TODAY AND

18   LOCATED THROUGHOUT THE COUNTRY, IN NEW YORK AND TEXAS AND

19   NEW JERSEY AND TENNESSEE, I'M PROUD TO SPEAK FOR THEM, BUT THEY

20   PROVIDED SUBSTANTIAL WORK, ALL ON A CONTINGENCY BASIS.

21        THE FINAL FACTOR, YOUR HONOR, IS THE AWARDS IN OTHER

22   CASES.  AGAIN, THERE'S FEW COMPARABLES HERE, BUT WE BELIEVE THE

23   PERCENTAGE WE ARE SEEKING HERE, WHILE SLIGHTLY ABOVE THE

24   BENCHMARK, IS CONSISTENT WITH OTHER OUTSTANDING RESULTS

25   ACHIEVED IN OTHER CASES, INCLUDING OTHER MEGAPHONE MEGAFUND

1    SETTLEMENTS.

2         THE VIZCAINO CASE IS OBVIOUSLY THE SEMINAL CASE, BUT IN

3    THAT CASE THE NINTH CIRCUIT APPROVED A 28 PERCENT FEE IN A

4    MEGAFUND SETTLEMENT, AND THEN DID A CANVASSING OF OTHER

5    MEGAFUND SETTLEMENTS AND DETERMINED THAT THE RANGE OF IMPLIED

6    MULTIPLIERS IN THIS OTHER CASE WAS ABOUT 1 TO 4, WITH MOST

7    BETWEEN 1.5 AND 3.

8         USING THAT RANGE, THE NINTH CIRCUIT FOUND A FEES, BASED

9    UPON 28 PERCENT, WERE CONFIRMED BY A CROSS-CHECK OF THE

10   LODESTAR WITH A MULTIPLIER OF 3.6, THAT WAS THE MULTIPLIER IN

11   THE VIZCAINO CASE.

12        SINCE THEN, COURTS THROUGHOUT THIS DISTRICT HAVE APPLIED

13   THE VIZCAINO FACTORS AND THAT SAME TEST TO OTHER MEGAFUND

14   CASES.  SO WE CITE A FEW OF THESE CASES IN OUR PAPERS, BUT JUST

15   TO QUICKLY TO TOUCH UPON A COUPLE OF THEM, THE LIDODERM CASE,

16   JUDGE ORRICK APPROVED A 33 PERCENT FEE AWARD IN A MEGAFUND

17   SETTLEMENT, NOTING IMPORTANTLY THAT THE RECOVERY WAS ONE OF THE

18   FIRST IN THE PAY-FOR-DELAYED DRUG CASE EVER LITIGATED IN THE

19   NINTH CIRCUIT.  IT THEN LOOKED AT THE LODESTAR MULTIPLIER AND

20   FOUND IT WAS WITHIN THE VIZCAINO RANGE.

21        NOW WHY IS THAT IMPORTANT?  BECAUSE WE THINK THIS CASE IS

22   COMPARABLE.  THIS WAS ONE OF THE FIRST AND LARGEST RECOVERIES

23   IN A CDAFA CASE, AND AS WELL AS A CFAA CASE.  COMPUTER

24   INTRUSION STATUTES JUST DO NOT RESULT IN THESE TYPES OF

25   SETTLEMENTS.  THEY HAVE NOT, THIS IS THE FIRST.

1          THE SAME RATIONAL WAS APPLIED BY JUDGE WILKEN IN THE NCAA

2     GRANT-IN-AID CASE IN WHICH SHE AWARDED PERCENTAGE-BASED FEES

3     AND THEN CROSSCHECKED IT AGAINST THE MULTIPLIER TO MAKE SURE

4     THERE WAS NO WINDFALL.  THE MULTIPLIER IN THAT CASE WAS 3.66.

5          THAT WAS THEN AFFIRMED BY THE NINTH CIRCUIT.  SO THE

6     NINTH CIRCUIT HAS WEIGHED IN AND APPROVED THAT TYPE OF LODESTAR

7     CROSS-CHECK.  AGAIN, OUR LODESTAR IS FAR BELOW THAT, OUR

8     MULTIPLIER IS FAR BELOW 3.6.

9          AND MOST RECENTLY, YOUR HONOR, IN THE ANTHEM CASE,

10    JUDGE KOH APPROVED A 27 PERCENT OF A MEGAFUND SETTLEMENT,

11    APPLYING A PERCENTAGE-BASED METHOD WITH A LODESTAR CROSS-CHECK.

12         NOW THERE'S A LOT OF SIMILARITIES, THERE'S A LOT OF

13    DIFFERENCES BETWEEN CASES, BUT IN ANTHEM, I JUST WANT TO POINT

14    OUT SOME SIMILARITIES.  IT WAS A LARGE MDL CASE JUST LIKE THIS,

15    IT WAS A CLASS WITH OVER 80 MILLION PEOPLE WHO STORED DATA ON

16    ANTHEM'S DATABASE.  TWO YEARS OF LITIGATION, MULTIPLE ROUNDS OF

17    MOTIONS TO DISMISS, EXTENSIVE DISCOVERY, AND THE CASE WAS

18    SETTLED BEFORE CLASS CERTIFICATION, ALL JUST LIKE THIS CASE.

19         THE SETTLEMENT THAT WAS REACHED WAS, AT THE TIME, THE

20    LARGEST DATA BREACH SETTLEMENT THAT HAD EVER BEEN OBTAINED.

21    AND IT PROVIDED ABOUT FOURTEEN AND A HALF PERCENT RECOVERY TO

22    CLASS MEMBERS.

23         AGAIN, VERY SIMILAR TO THIS CASE.  IN FACT, OUR RECOVERY

24    IS ACTUALLY CLOSER TO 28 TO 45 PERCENT TO CLASS MEMBERS, JUST

25    ON AN INDIVIDUAL BASIS, ASSUMING ALL THE 90 MILLION DEVICES ARE

1    IN PLAY.

2        SO ARGUABLY, OUR SETTLEMENT IS EVEN BETTER THAN THE ONE IN

3    ANTHEM.  AND DEPARTING UPWARD FROM THE BENCHMARK, JUDGE KOH

4    NOTED THE CIRCUMSTANCES THAT ARE VERY SIMILAR TO THOSE FOUND

5    HERE.  LARGEST RECOVERY, NOVEL CLAIMS, UNTESTED PRIVACY

6    PRECEDENT, TECHNICAL AND FACTUAL ISSUES IN DISCOVERY AND

7    CONTINGENT REPRESENTATION, ALL THE SAME THAT EXIST HERE.

8        THE OBJECTORS, QUICKLY, HAVE CITED TO A FEW OTHER CASES,

9    AND THEY ASKED THE COURT SEEMINGLY TO APPLY A NEGATIVE SLIDING

10   SCALE FOR FEE AWARDS, ACTUALLY DECREASE AS SETTLEMENTS

11   INCREASE.  THE NINTH CIRCUIT HAS NEVER ENDORSED THAT RULE.

12       CERTAINLY THE SIZE OF A RECOVERY IS A CIRCUMSTANCE THAT

13   YOUR HONOR CAN CONSIDER, BUT EVEN IN LARGER SETTLEMENTS,

14   DISTRICT COURTS DID NOT HESITATE TO AWARD FEES AT OR ABOVE THE

15   25 PERCENT BENCHMARK BASED UPON THE EXTRAORDINARY EFFORT OF

16   COUNSEL AND TRULY SUPERLATIVE RESULTS, WHICH WE THINK WE HAVE

17   OBTAINED IN THIS CASE.

18       THE TWO CASES I THINK STAND OUT IN THE OBJECTIONS,

19   ACTUALLY I THINK SUPPORT OUR ARGUMENT.  WE CITE THE HIGH-TECH

20   EMPLOYEE CASE WITH JUDGE KOH WHERE JUDGE KOH AWARDED FEES BASED

21   UPON A LODESTAR METHOD AND NOT A PERCENTAGE-BASED METHOD.

22       BUT IN THAT CASE, THE ATTORNEYS WERE ASKING FOR FEES BASED

23   UPON A MULTIPLIER OF BETWEEN 4.8 AND 8.7, WHICH JUDGE KOH FOUND

24   TO BE A POSSIBLE WINDFALL.  MUCH HIGHER THAN THAT SOUGHT HERE.

25       I WOULD ALSO POINT OUT IN THE HIGH-TECH CASE, JUDGE KOH

1    WAS DEALING WITH TWO COMPETING CLAIMANTS, TWO DIFFERENT LAW

2    FIRMS THAT WERE SEEKING FEES AND CLAIMING RESPONSIBILITY FOR

3    THE SETTLEMENT THAT WAS NEGOTIATED.  AND SHE FELT, AND SHE SAYS

4    THIS IN HER OPINION, THAT IT WOULD BE EASIER FOR HER TO APPLY A

5    LODESTAR AND INDIVIDUALLY ACCESS EACH OF THOSE COMPETING

6    ATTORNEY'S CLAIMS, AND THEREFORE ADJUST THOSE LODESTARS AS

7    APPROPRIATE BASED UPON THEIR CONTRIBUTIONS TO THE SETTLEMENT;

8    WHEREAS THE PERCENTAGE-BASED APPROACH, SHE THOUGHT WOULD NOT BE

9    AS AMENABLE TO THAT TYPE OF ANALYSIS.

10        THAT DOESN'T EXIST HERE YOU DON'T HAVE THAT SPECIAL

11   CIRCUMSTANCE.

12        AND THEN FINALLY, THE COURT -- JUDGE KOH ACTUALLY AWARDED

13   FEES BASED UPON A 2.5 LODESTAR MULTIPLIER IN THAT CASE.  AGAIN,

14   SIMILAR TO THE RANGE APPROVED IN VIZCAINO AND SIMILAR TO THAT

15   WHICH WE SEEK HERE.

16        THE OTHER CASE CITED BY THE OBJECTORS, I BELIEVE MR. FRANK

17   AND HIS CLIENT, WAS THE WELLS FARGO CASE IN WHICH THE ATTORNEYS

18   SOUGHT 25 PERCENT OF THE MEGAFUND SETTLEMENT OR OVER

19   $50 MILLION, I THINK THE SETTLEMENT WAS $203 MILLION.

20        AND I THINK IT WAS JUDGE ALSUP IN THAT CASE, BUT BASICALLY

21   JUDGE ALSUP SAID THAT THE LODESTAR WAS ONLY 5 MILLION.  SO THAT

22   WOULD RESULT IN A TEN TIMES MULTIPLIER, BASED UPON WHAT THEY

23   WERE SEEKING.  AND HE SAID THAT WAS A WINDFALL, TEN TIMES WAS

24   TOO LARGE.  HE ULTIMATELY AWARDED FEES BASED ON A 5.5

25   MULTIPLIER.

1        SO AGAIN, I THINK THESE CASES, EVEN IF YOU APPLY THEM,

2    ACTUALLY SUPPORT WHAT WE ARE SEEKING HERE.

3        WE HAVE PROVIDED YOU THE INFORMATION REGARDING OUR

4    LODESTAR, WE BELIEVE THAT THE LODESTAR CROSS-CHECK SUPPORTS THE

5    FEES WE ARE SEEKING.  WE HAVE INCLUDED TIME FOR BOTH THE

6    FEDERAL AND THE JCCP CASE BECAUSE THAT WAS PART OF THE

7    SETTLEMENT.  THIS WAS A GLOBAL SETTLEMENT.  YOUR HONOR MAY

8    RECALL SOME OF THOSE NEGOTIATIONS.  BUT THAT WAS PART OF THE

9    DEAL.  APPLE WANTED ONE FEE MOTION IN ONE COURT AT ONE TIME.

10   AND CERTAINLY SINCE THE FEES ARE GOING TO BE PAID TO BOTH THE

11   FEDERAL AND THE STATE COUNSEL FROM THIS SETTLEMENT, IT'S

12   APPROPRIATE TO INCLUDE THEIR TIME IN ANY LODESTAR CROSS-CHECK.

13       THE HOURLY RATES, WE SUBMIT, ARE CONSISTENT WITH THOSE IN

14   THE MARKETPLACE.  WE HAVEN'T HEARD MUCH TO DISPUTE THAT.  AND

15   SIMILAR TO THE CASES THAT YOU, YOUR HONOR, HAVE APPROVED,

16   HOURLY RATES IN OTHER CASES AS WELL.

17       I WOULD ALSO POINT OUT THERE WAS SOME MENTION BY OBJECTORS

18   ABOUT OUR LODESTAR BEING LARDED SOMEHOW BY CONTRACT ATTORNEYS.

19   THAT'S NOT THE CASE.  WE USED VERY FEW CONTRACT ATTORNEYS.

20       AND I THINK MR. DEARMAN, WHO IS ON THIS LINE IN CASE YOU

21   EVER WANTED TO SPEAK WITH HIM, HE WAS ACTUALLY TASKED WITH

22   DEALING WITH EVERYONE'S TIME ON A CONTEMPORANEOUS BASIS

23   THROUGHOUT THIS CASE.

24       BUT OUT OF AN ABUNDANCE OF CAUTION FOR PURPOSES OF OUR

25   LODESTAR ANALYSIS AND OUR PRESENTATION AT THIS TIME, WE TOOK

1    ALL THE CONTRACT TIME OUT.  IT WAS ONLY A COUPLE HUNDRED

2    THOUSAND.  WE JUST TOOK IT OUT.  SO OUR LODESTAR THAT WE

3    SUBMITTED HERE DOES NOT INCLUDE ANY CONTRACT ATTORNEY TIME.

4         I WOULD ALSO POINT OUT WE CAPPED OUR DOCUMENT REVIEW TIME

5    AT 350 BUCKS AN HOUR, EVEN IF AN ATTORNEY'S HOURLY RATE WAS

6    HIGHER THAN THAT.  ALL TOLD, YOUR HONOR, THE LODESTAR IS

7    APPROXIMATELY 36.1 MILLION, NOT INCLUDING ANY TIME BEFORE

8    APPOINTMENT AND NOT INCLUDING ANY TIME SINCE JULY OF LAST YEAR

9    WHEN THE PRELIMINARY APPROVAL PAPERS WERE FILED.  WE ESTIMATE

10   THAT THE TIME, IF YOU INCLUDE THAT, IS WELL OVER $40 MILLION BY

11   THIS POINT.

12        THE MULTIPLIER, INCLUDING THE FEDERAL AND JCCP'S TIME, IS

13   2.42.  AGAIN, IF YOU INCLUDE THE PRE-APPOINTMENT TIME, IT'S

14   CLOSER TO 2.2.  EVEN IF YOU ADOPTED THE ARGUMENT THE STATE JCCP

15   TIME SHOULD NOT BE INCLUDED IN THE LODESTAR, AND WE CAN'T THINK

16   OF ANY REASON WHY THAT SHOULD BE THE CASE, BUT OUR IMPLIED

17   MULTIPLIER JUST ON THE FEDERAL TIME, IS 2.73.  AGAIN, ALL WELL

18   BELOW THE THRESHOLD AND WITHIN THE VIZCAINO RANGE THAT'S BEEN

19   APPROVED, AS SHOWING THAT THERE IS NO WINDFALL.

20        WE ARE NOT AWARE OF A SINGLE REPORTED CASE, AND NONE HAS

21   BEEN CITED TO US, IN WHICH A COURT HAS FOUND A WINDFALL BASED

22   UPON A MULTIPLIER BELOW 3, AND WE ARE SUBSTANTIALLY BELOW 3,

23   AND WE THINK THAT'S IMPORTANT.

24        SO THAT'S MY PRESENTATION ON ATTORNEY'S FEES, YOUR HONOR.

25        BEFORE I GO THROUGH EXPENSES AND SERVICE AWARDS, I JUST

1        WANTED TO STOP THERE AND ASK IF YOU HAD ANY QUESTIONS.

2               THE COURT:  NO, I DON'T.

3        I DO KNOW -- WELL, I NOTE THAT IN THE HIGH-TECH CASE, AND

4    ALSO THE FEDEX CASE, I THINK WE ARE BENEFITTED BY MY COLLEAGUES

5    JUDGES KOH AND CHEN, AND THEY WENT THROUGH SOME EMPIRICAL

6    RESEARCH ON MEGAFUND CASES, AND I'M SURE YOU ARE FAMILIAR WITH

7    THAT AND I THINK THE RESULTS OF THAT EMPIRICAL RESEARCH CAME UP

8    WITH SOME OTHER FIGURES.

9        CAN YOU COMMENT ON THAT FOR ME, OR DO YOU WISH TO COMMENT?

10              MR. MOLUMPHY:  WELL, I UNDERSTAND ABOUT PROFESSOR

11   FITZGERALD'S REPORT, AND I BELIEVE THERE WAS ANOTHER ONE THAT

12   WAS CITED BY JUDGE KOH IN THE HIGH-TECH CASE.  I GUESS MY

13   COMMENT WOULD BE THAT A LOT OF THOSE STUDIES ARE BASED UPON

14   CASES THAT WERE RESOLVED SOME TIME AGO.

15       I'M NOT --

16              THE COURT:  I THINK THOSE WERE 2006 TO 2007 OR 2008,

17   IF I RECALL.

18              MR. MOLUMPHY:  RIGHT.

19       AND THE CONCERN THAT I'VE ALWAYS HAD AND THE REASON WE DID

20   NOT PROVIDE, FOR EXAMPLE, A PROFESSOR'S REPORT IN THIS CASE, IS

21   WE THINK IT'S IN YOUR EVALUATION OF WHAT A PROPER PERCENTAGE

22   SHOULD BE.  YOU ARE THE ONE WHO HAS EVALUATED THIS CASE FROM

23   DAY ONE.  AND WHILE THAT EMPIRICAL RESEARCH IS HELPFUL AS A

24   BENCHMARK TO EVALUATE OTHER TYPES OF CASES, IT REALLY DOES NOT

25   DISTINGUISH WHAT WE VIEW TO BE A RUN-OF-THE-MILL CONSUMER

```
1        PRODUCT DEFECT CASE AND TRULY EXCEPTIONAL RESULTS.  IT RUNS

2        NUMBERS WITHOUT DISTINGUISHING BETWEEN UNIQUE CIRCUMSTANCES OF

3        THE CASE.

4            AND THAT'S WHY I THINK IT'S IMPORTANT, AND WHAT WE TRIED

5        TO DO IN OUR PAPERS TO PRESENT THE CONTEXT.  AND I THINK THAT'S

6        WHAT DRIVES THE FEE REQUESTS THAT WE ARE MAKING IN THIS CASE.

7        THIS IS AN EXCEPTIONAL RESULT, NOT JUST BECAUSE OF THE AMOUNT

8        THAT WAS OBTAINED, BUT ALSO THE NATURE OF THE CASE, THE

9        DEFENSES THAT WE HAD TO SURMOUNT AND THE AMOUNT OF WORK THAT

10       WAS INVOLVED TO GET THERE.

11           SO WE THINK THAT'S A BETTER MEASURING STICK RATHER THAN

12       USING A PROFESSOR'S REVIEW OF OTHER SETTLEMENTS BASED UPON

13       OTHER UNIQUE CIRCUMSTANCES.

14               THE COURT:  OKAY.  THANK YOU VERY MUCH.  THANK YOU.

15           WHY DON'T WE -- YOU KNOW, MR. MOLUMPHY, WHY DON'T I STOP

16       NOW FOR THE ATTORNEY'S FEES PORTION AND INVITE COUNSEL TO, IF

17       THEY HAVE ANY COMMENTS, YOUR COLLEAGUE OPPOSITES, AND THEN WE

18       WILL TAKE UP ANY EXPENSES.

19           I THINK THIS IS PROBABLY GOING TO GENERATE MORE

20       CONVERSATION THAN THE OTHERS, THAT'S MY SENSE OF IT, BUT WHY

21       DON'T WE STOP HERE WITH THIS.

22           MR. CHORBA, DO YOU WISH TO BE HEARD?

23               MR. COTCHETT:  BEFORE MR. CHORBA, YOUR HONOR, THIS IS

24       JOE COTCHETT, CAN I JUST ADD SOMETHING TO MR. MOLUMPHY?

25               THE COURT:  YES, OF COURSE.
```

1          MR. COTCHETT:  YOU CALLED ON MR. CHORBA, AND I'M SO

2     DELIGHTED YOU DID.

3          I WANT TO ADD A COUPLE OF FACTORS THAT YOU DON'T FIND THEM

4     IN THE CASES, BUT YOU FIND THEM IN THE COURTROOMS AND YOU FIND

5     THEM IN LAW.  MR. CHORBA SITTING HERE TODAY IS NOT JUST ANOTHER

6     LAWYER.  THE FIRM THAT WE WERE UP AGAINST, GIBSON, DUNN &

7     CRUTCHER, THEY ARE THE FINEST LAWYERS IN THE COUNTRY.

8          AND MR. CHORBA, WE HAVE HAD OUR DIFFERENCES BEFORE YOU,

9     ALL OF US COHORTS, WE HAVE FOUGHT VERY DIFFICULTLY, BUT THE

10    TRUTH OF THE MATTER IS WHEN YOU ARE LOOKING AT ATTORNEY'S FEES

11    IN A CASE LIKE THIS, YOU ARE LOOKING ACROSS THE BOARD AND YOU

12    LOOK AT WHO IS IT WHO IS HANDLING THESE CASES.

13         AND I WANT TO GIVE GIBSON, DUNN & CRUTCHER THE PRAISE THAT

14    REALLY ADDS TO WHAT THIS HEARING TODAY IS ALL ABOUT.  THEY

15    FOUGHT BEYOND ANY LAW FIRM.  AND BY FOUGHT, YOU UNDERSTAND WHAT

16    I MEAN BY THAT PHRASE.  THE DEFENDANT, APPLE, THE LIKES OF

17    WHICH I HAVE SEEN VERY RARELY, AND IT GOES TO SHOW HOW GOOD

18    THEY ARE.

19         NOW MR. MOLUMPHY QUICKLY WENT THROUGH LOOKING AT THE CASES

20    AND WHAT HAVE YOU, BUT I WANT TO LOOK AT A BIGGER ASPECT OF

21    THIS.  I THINK WE HAVE 58,000 HOURS OF FEES, SOMETHING LIKE

22    THAT, BUT ONE THING SHOULD BE UNDERSTOOD, THERE WERE NO HOURS

23    PUT IN PRIOR TO THE APPOINTMENT BY YOU OF INTERIM LEAD COUNSEL.

24    THOSE WERE THOUSANDS OF HOURS THAT WERE PUT IN BY RESEARCH.

25         THE OTHER ASPECT I WANT TO JUST PUT OUT HERE ON THE TABLE

1    IS SOMETHING THAT IS UNIQUE TO THIS CASE.  AND MR. MOLUMPHY

2    WENT OVER IT SO QUICKLY, I WANT TO MAKE SURE IT'S IN THE

3    RECORD.  THERE WAS A STEERING COMMITTEE HERE THAT BATTLED EVERY

4    DAY, AND I'M GOING TO CALL IT THE PLAINTIFF'S EXECUTIVE

5    COMMITTEE, OF ROUGHLY SIXTEEN LAW FIRMS.

6        SO I WANT TO MAKE SURE THAT EVERYBODY WHO IS GOING TO

7    OBJECT AND/OR PRAISE THE WORK DONE IN THIS FIRM, IT WAS NOT

8    ONLY THE TWO LEAD COUNSEL FIRMS, I JUST WANT TO POINT OUT, I

9    DON'T WANT TO WASTE THE TIME HERE WITH THE NAMES OF THE LAW

10   FIRM, BUT I WANT TO POINT OUT SOMETHING SO INTERESTING.

11       OF THOSE LAW FIRMS, WE HAD PEOPLE LIKE, I'M JUST GOING TO

12   TELL YOU SOME OF THE PEOPLE THAT DEDICATED THEIR LIFE, A WILD

13   STATEMENT TO MAKE, BUT I'M GOING TO MAKE IT TO THIS CASE.

14   AMY KELLER, TINA WOLFSON, KARIN SWOPE, AS YOU HEARD THAT NAME

15   MENTIONED BEFORE, WHO DEALT FOR NINE MONTHS, KARIN SWOPE OUT OF

16   SEATTLE, WITH MR. CHORBA'S CREW ON ESI.  YOU HAD

17   KATHLEEN HERKENHOFF, YOU HAD GALE BLATT FROM THE CASEY FIRM IN

18   SAN DIEGO, ARIANA TADLER, ROSEMARY RIVAS.

19       I COULD GIVE YOU THE NAMES OF THESE EXTRAORDINARY PEOPLE

20   THAT ALL STEPPED UP, SO IT IS NOT TWO FIRMS ASKING FOR A FEE

21   HERE, IT IS THE PEOPLE THAT WORK -- AND THERE'S GOING TO BE

22   PEOPLE THAT TELL YOU THAT THE STATE PLAINTIFFS DIDN'T DO

23   ANYTHING, IN FACT THEY DID, BUT THERE WAS SIXTEEN LAW FIRMS

24   HERE.

25       YOU HEARD THE NAMES OF THE PEOPLE I CITED THAT STAND OUT.

1    I COULD GIVE YOU MANY OTHERS AND PUT IT ALL ON THE RECORD, BUT

2    THOSE ARE THE PEOPLE THAT ARE REALLY HERE.  WHILE THEY CAN'T

3    SPEAK, THOSE ARE THE PEOPLE THAT DESERVE YOUR FULL THOUGHT, IF

4    YOU SEE WHERE I'M GOING.  IT IS NOT THE TWO LEAD COUNSEL FIRMS,

5    IT IS ALL THE PEOPLE THAT MADE THIS HAPPEN.

6         AND I'M GOING TO BE VERY FRANK WITH YOU, IF IT WAS JUST

7    THE TWO LEAD COUNSEL FIRMS, THIS RESULT WOULD NOT HAVE

8    HAPPENED.  AND IT GOES TO THE BENEFIT OF ALL OF THOSE FABULOUS,

9    FABULOUS, AND I DIDN'T MEAN TO SINGLE OUT JUST THE WOMEN

10   LAWYERS, IT WAS JUST THOSE PEOPLE THAT JUST STEPPED FORWARD AND

11   GAVE THEIR WHOLE LIFE TO THE CASE, KARIN SWOPE.  SHE DEVOTED

12   EIGHT SOLID MONTHS, OUT OF SEATTLE, CALLING AND TALKING ABOUT

13   ESI.  I COULDN'T LIGHT A CANDLE OR HOLD A CANDLE TO HER

14   KNOWLEDGE IN WHAT SHE DOES.  I COULD SAY THAT FOR ALL THE OTHER

15   PEOPLE.

16        I JUST WANTED TO ADD, YOUR HONOR, I DIDN'T MEAN TO WASTE

17   YOUR TIME, I JUST WANTED TO ADD IT'S MUCH BIGGER THAN JUST TWO

18   LAW FIRMS.

19             THE COURT:  THANK YOU, MR. COTCHETT.

20        THE RECORD SHOULD REFLECT YOU NEVER WASTE ANYONE'S TIME,

21   MR. COTCHETT.  WE ALL BENEFIT FROM YOU AND YOUR COLLEAGUE

22   OPPOSITES COMMENTS HERE.  I CERTAINLY HAVE AND CONTINUE TO DO

23   THAT THROUGHOUT THE LIFE OF THIS CASE.

24        AND MR. CHORBA, WHAT WOULD YOU LIKE ME TO KNOW, SIR.

25             MR. CHORBA:  THANK YOU, YOUR HONOR.

1        AND IN PARTICULAR, WE WELCOME MR. COTCHETT'S COMMENTS WHEN

2     HE'S PRAISING GIBSON, DUNN AND MYSELF, SO WE DO APPRECIATE

3     THAT.

4        WE WILL BE VERY BRIEF BECAUSE I KNOW THERE ARE A LOT OF

5     OBJECTORS ON THE LINE, YOUR HONOR.

6        THERE'S NO QUESTION THERE WAS A LOT OF WORK IN THIS CASE,

7     BUT THE CENTRAL ISSUE, AND I WANT TO JUST REPEAT THE NUMBER

8     BECAUSE I DIDN'T HEAR IT MENTIONED EARLIER, WE ARE TALKING

9     ABOUT A REQUEST FOR $87.7 MILLION, AND THAT WOULD BE AN

10    EXTRAORDINARY AMOUNT.  AND IT MATTERS BECAUSE BASED ON CURRENT

11    PROJECTIONS, IF YOU WERE TO AWARD THAT AMOUNT, IT WOULD RESULT

12    IN A NET REDUCTION OF $19 TO $20 TO EACH CLASS MEMBER.  IF YOU

13    AWARD JUST THE LODESTAR, THEY WILL BREAK $100 PER CLAIMANT.  SO

14    THIS IS REAL MONEY, IT'S A VERY, VERY IMPORTANT DECISION, AND

15    WE KNOW YOU ARE TAKING IT AS SUCH.

16       SO THERE WAS NO QUESTION THERE WAS A LOT OF LITIGATION

17    INVOLVED.  WE WOULD RESPECTFULLY SUBMIT THAT THERE WAS FAR MORE

18    LITIGATION THAN WAS NECESSARY.  YOU WILL RECALL VERY EARLY IN

19    THE CASE WHEN WE WERE DISCUSSING LEAD COUNSEL APPOINTMENTS,

20    THIS WAS SOMETHING THAT APPLE WAS VERY, VERY WORRIED ABOUT,

21    THAT WITH A LARGE COMMITTEE, YOU WOULD HAVE MORE LITIGATION

22    THAN WOULD BE NECESSARY.  AND UNFORTUNATELY, THAT'S WHAT

23    OCCURRED.

24       AND WE WOULD RESPECTFULLY SUBMIT THAT SHOULD NOT BE

25    REWARDED IN THIS CASE.  THE LODESTAR, MINUS SOME DEDUCTIONS

1    THAT I WILL GET TO IN A SECOND IS GOING TO MORE THAN COMPENSATE

2    ALL OF THE LAWYERS THAT MR. COTCHETT IDENTIFIED AND THE ONES HE

3    DIDN'T IDENTIFY WHO WORKED ON THIS CASE.

4         AND TO MR. MOLUMPHY'S POINT, THERE'S ALSO NO QUESTION THIS

5    RESULT WOULD BE HISTORIC, BUT NOT IN A GOOD WAY.  BOTH THE

6    AMOUNT OF FEES AND THE PERCENTAGE THAT THEY ARE SEEKING, EVEN

7    ASSUMING YOU TREAT THIS CLAIMS MADE SETTLEMENT AS A COMMON FUND

8    SETTLEMENT, WHICH WE DISPUTE, THERE WAS A FLOOR, SO IT'S A BIT

9    OF A HYBRID, BUT IT WOULD STAND OUT IN A VERY, VERY ABERRANT

10   WAY AS COMPARED TO OTHER SETTLEMENTS, AND WE ARE CONCERNED IT

11   WOULD SET A VERY BAD PRECEDENT GOING FORWARD WHEN YOU LOOK AT

12   THE WAY THESE CASES ARE LITIGATED.

13        SO THREE OUR FOUR QUICK POINTS TO REBUT ABOUT THE

14   ARGUMENTS MADE BY MR. MOLUMPHY.  AND I WON'T BELABOR THESE,

15   THEY ARE DISCUSSED EXTENSIVELY IN OUR PAPERS, BUT IT BEARS

16   MENTIONING AGAIN THAT THE ONLY PEOPLE BEFORE YOU TODAY THAT ARE

17   ADVOCATING FOR THIS FEE AWARD ARE PLAINTIFFS COUNSEL

18   THEMSELVES.

19        YOU HAVE THE GOVERNMENT THAT HAS TAKEN AN EXTRAORDINARY

20   POSITION IN OPPOSING THIS, BOTH THE AG'S AS WELL AS THE U.S.

21   GOVERNMENT.  YOU HAVE PRIVATE PARTIES REPRESENTED BY COUNSEL

22   HERE, AND YOU ALSO HAVE PLAINTIFF'S COUNSEL'S CLIENTS, THE

23   CLASS MEMBERS.  BY FAR, THE MOST FREQUENT COMPLAINT, IN BOTH

24   THE INFORMAL LETTERS SENT TO YOUR HONOR AND THE FORMAL

25   COMPLAINTS, HAVE ADDRESSED THE ATTORNEY'S FEES REQUEST HERE

1    BECAUSE IT IS SO EXTRAORDINARY.  AS I MENTIONED, IT MATTERS,

2    IT'S GOING TO REALLY SIGNIFICANTLY IMPACT THE RECOVERY TO THE

3    CLASS MEMBERS.

4        THERE WAS REALLY NO ATTEMPT IN THE PAPERS, MR. MOLUMPHY

5    WENT THROUGH THEM QUICKLY, BUT THERE WAS REALLY NO ATTEMPT IN

6    THE PAPERS TO WALK THROUGH EACH OF THE FACTORS THAT COURTS

7    CONSIDER IN WHETHER THEY SHOULD DEVIATE FROM THE LODESTAR.  WE

8    HAVE ARGUED IT AT LENGTH, WE DON'T THINK ANY ONE OF THOSE

9    FACTORS JUSTIFIES DEPARTURE.  AND REALLY, YOU ARE EXACTLY

10   RIGHT, WHEN YOU HAVE A MEGAFUND CASE LIKE THIS, THEY ARE

11   TREATED DIFFERENTLY.

12       MR. MOLUMPHY REFERENCED HOW IPHONES ARE UBIQUITOUS, AND

13   THAT'S REALLY THE REASON YOU HAVE SUCH A LARGE SETTLEMENT HERE,

14   IS WE'RE DEALING WITH MANY DEVICES AND MANY PEOPLE WHO USE

15   THOSE DEVICES.

16       THERE'S REALLY NO RELEVANT ANALOG TO THIS CASE.  THE ONLY

17   ONE THAT'S SIMILAR IN TERMS OF THE PERCENTAGE, IS THE SPECIFIC

18   CASE CITED IN THE PAPERS THE TFT LCD CASE, WHICH IS VERY

19   DIFFERENT, SPANS SIX YEARS OF LITIGATION, HERE THERE WAS ONLY

20   TWO, AND JUST A VERY, VERY DIFFERENT SET OF CIRCUMSTANCES.

21       FINALLY, EVEN WITH THE LODESTAR, AS WE ARGUED IN OUR

22   PAPERS, WE THINK THE LODESTAR ITSELF WAS OVERSTATED AND

23   INADEQUATELY SUPPORTED.  AND WE LAID OUT WHY WE BELIEVE IT

24   SHOULD BE REDUCED BY AT LEAST 7.1 MILLION.  THAT WOULD PUT THE

25   RECOVERY HERE AT ABOUT $30 MILLION, WHICH IS A TREMENDOUS

1        AMOUNT, WOULD MORE THAN ADEQUATELY COMPENSATE ALL THE LAWYERS.

2              YOUR HONOR, WE ARE NOT BEFORE YOU SAYING THEY SHOULDN'T

3        GET FEES, THAT'S NOT OUR POSITION.  BUT THE FEES THAT ARE

4        REQUESTED ARE JUST SO OUTSIDE THE NORM AND SO IN EXCESS OF WHAT

5        WOULD BE APPROPRIATE, THAT WE HAVE TAKEN THE POSITION OF COMING

6        IN AND OPPOSING.

7              FINALLY, AS WE NOTED IN OUR PAPERS AND I DON'T THINK

8        THERE'S MUCH DISPUTE OVER THIS, PER YOUR ORDER, THERE SHOULD BE

9        A REDUCTION BASED ON THE AMOUNTS WE HAD TO INCUR IN LITIGATING

10       THE SANCTIONS ISSUE.

11             AND FINALLY, WE ALSO WOULD MAKE TWO OTHER POINTS.  THE

12       JCCP LAWYERS, THE SETTLEMENT AGREEMENT EXPLICITLY PROVIDES THAT

13       THERE WILL NOT BE A SEPARATE FEE APPLICATION.  TO THE EXTENT

14       THOSE LAWYERS WANT TO JOIN IN THE REQUEST OR HAVE A PORTION,

15       BUT TO TACK ON ANOTHER FOUR MILLION FOR THAT LAWSUIT, THAT IS

16       CONTRARY TO THE PARTIES' AGREEMENT.

17             SO I WANT TO BE CLEAR, THE PLAINTIFFS IN THEIR REPLY,

18       SUGGESTED SOMEHOW WE WERE TAKING A POSITION THAT WAS CONTRARY

19       TO THE AGREEMENT.  THE AGREEMENT PROVIDES THAT IF THEY WANT TO

20       SHARE THEIR FEES, THEY MAY DO SO, BUT WHAT JCCP CAN'T DO IS

21       SUBMIT A SEPARATE REQUEST, THAT CASE WAS FULLY SUBSUMED WITHIN

22       THIS CASE.

23             AND FINALLY, THE LAST ONE IS THERE WERE REQUESTS BY

24       INTERNATIONAL LIAISON COUNSEL.  AND WE MAKE A SPECIFIC ISSUE,

25       OR WE TAKE SPECIFIC ISSUE WITH THAT BECAUSE THE LAWYERS WHO

1    WERE HEAD OF THAT PARTICULAR COMMITTEE, AND ALTHOUGH THEIR

2    SPECIFIC REQUEST WASN'T SIGNIFICANT, AS YOU KNOW, THOSE LAWYERS

3    HAVE TAKEN THE POSITION THAT THEIR LAWSUIT, SINCE THEIR CLIENT

4    OPTED OUT, THAT THEIR LAWSUIT SHOULD SOMEHOW CONTINUE.

5         WE OBVIOUSLY DISAGREE WITH THAT, I THINK THAT WILL BE

6    ADDRESSED AT A LATER TIME.  BUT THE NOTION THAT THE LAWYERS WHO

7    ARE GOING TO CONTINUE THAT PART OF THE CASE SHOULD BE PERMITTED

8    AN ATTORNEY'S FEE AS PART OF THIS SETTLEMENT, SEEMS VERY

9    IMPROPER, IN OUR VIEW.

10        SO UNLESS YOUR HONOR HAS QUESTIONS, THOSE WERE THE POINTS

11   WE WOULD LIKE TO MAKE.

12             THE COURT:  WELL, THANK YOU VERY MUCH.  I APPRECIATE

13    YOUR COMMENTS.  I APPRECIATE YOUR BREVITY.

14        I WILL TURN TO OBJECTORS HERE.  BUT LET ME -- AS I

15   UNDERSTAND IT, AND MAYBE MR. MOLUMPHY CAN ADD TO THIS, AS I

16   UNDERSTAND IT, THE COURT'S ORDER REGARDING NO BILLINGS FOR TIME

17   WE HAD ON AN ANCILLARY HEARING REGARDING SANCTIONS, WERE TO BE

18   APPLIED.  IS THAT RIGHT, MR. MOLUMPHY, YOU'VE DEDUCTED THOSE?

19             MR. MOLUMPHY:  CORRECT.  WE DID NOT INCLUDE ANY OF

20    THAT TIME.

21             THE COURT:  RIGHT.  THAT'S WHAT I THOUGHT HAD

22    HAPPENED.

23        AND LET ME JUST TAKE A MOMENT, BEFORE I TURN TO MR. FRANK

24    AND OTHERS, AND THEN OF COURSE LEAD COUNSEL AND MR. CHORBA WILL

25    HAVE AN OPPORTUNITY TO SPEAK AS WELL.

1          I WANT TO TALK ABOUT THIS.  THERE HAS BEEN SOME MENTION

2     ABOUT THIS SANCTION HEARING AND THE FEES AND ALL OF THAT, AND

3     YOU ALL KNOW, I'M NOT GOING TO REVISIT IT, YOU ALL REMEMBER

4     THAT AND RECALL WHAT OCCURRED.

5          AND THE SANCTION IN THAT CASE REALLY WAS A MONETARY

6     SANCTION, THAT'S WHAT IT WAS.  IT WAS, OKAY, WE'VE TAKEN THIS

7     ISSUE, WE HAVE TAKEN YOUR VALUABLE TIME, THAT IS, ALL COUNSEL'S

8     VALUABLE TIME, TO TALK ABOUT THIS ISSUE.  AND THE SANCTION THAT

9     THE COURT FOUND WAS, YOU ARE NOT GOING TO GET TO BILL THIS, YOU

10    ARE NOT GOING TO BILL THAT.

11         THERE WAS ANOTHER PART OF THE SANCTION THAT SOME PEOPLE

12    SAID OH, YOU SANCTIONED A LAWYER AND MADE A LAWYER DO

13    SOMETHING.  BUT WHAT I JUST WANT TO SAY IS WHAT THE COURT

14    REALLY DID WAS, YOU ALL KNOW, YOU ARE ALL VERY EXPERIENCED

15    COUNSEL AND YOU ALL UNDERSTAND HOW TO PROCEED IN COURT.  PEOPLE

16    IN COURT, THEY DON'T SPEAK IN COURT UNLESS THEY HAVE PERMISSION

17    TO SPEAK IN COURT.  THAT'S THE WAY IT WORKS, AS I RECALL.

18         AND SO THAT OTHER PART OF THE SANCTION, IF THAT'S WHAT --

19    I KNOW ONE OF THE OBJECTORS COMMENTED ON THAT, THAT PART OF THE

20    SANCTION WAS REALLY NOT A SANCTION AT ALL.  I THINK, IF YOU

21    LOOK AT IT, IT WAS BASICALLY THE COURT SAYING, I'M GOING TO

22    FOLLOW THE PROTOCOL OF THE COURT, PEOPLE CAN'T SPEAK UNLESS YOU

23    ARE RECOGNIZED.  AND THAT'S THAT.  THAT'S WHAT IT SAID.  IT

24    WASN'T ANYTHING EXTRAORDINARY.

25         I SUPPOSE IF THERE WAS ANYTHING EXTRAORDINARY ABOUT THAT,

1      IT WAS THAT OKAY, WE HAVE DEALT WITH THIS ISSUE, WE ARE ALL

2      BETTER FOR IT, AND THERE'S NO BILLING ALLOWED AS TO THIS ISSUE.

3      BUT AS TO ANY PERSONAL POINT AS TO ANY SPECIFIC COUNSEL, NO,

4      THAT WASN'T A SANCTION.  IT BASICALLY -- WHAT I SAID WAS, OR

5      WHAT THE ORDER SHOULD BE INTERPRETED AS IS PEOPLE CAN'T SPEAK

6      IN COURT UNTIL THEY HAVE PERMISSION.  THAT'S THE WAY IT IS.

7      AND ALL OF YOU HAVE ALWAYS ADHERED TO THAT.  EVERY ONE OF YOU

8      SAID, MAY I BE HEARD, MAY I BE HEARD.

9          SO I JUST WANTED TO CLARIFY THAT SO THERE WASN'T SOME TYPE

10     OF MISUNDERSTANDING ABOUT WHAT THE COURT WAS DOING WHEN IT

11     RULED ON THAT.

12         ALL RIGHT.  THANK YOU.  LET ME TURN TO OBJECTORS.

13         IS THERE -- HAVE THE OBJECTORS MET AND DISCUSSED WHO WANTS

14     TO GO FIRST OR ANYTHING?  OKAY.  IS THERE A REQUEST FOR SOMEONE

15     TO GO FIRST?

16         ALL RIGHT.  WELL, THE RECORD WILL REFLECT THE OBJECTORS DO

17     NOT WISH TO BE HEARD.

18         MR. FRANK, YOU IMMEDIATELY UNMUTED YOURSELF.  SO WHAT

19     WOULD YOU LIKE ME TO KNOW, SIR?

20         MR. FRANK:  YOU SAID MR. FRANK AND THE OTHER

21     OBJECTORS, I SORT OF ASSUMED YOU WANTED ME TO GO FIRST.  I WILL

22     DO IT IN ANY ORDER YOU LIKE, YOUR HONOR.

23         THE COURT:  YOU MAY PROCEED, YES.

24         MR. FRANK:  I DO WANT TO TAKE ISSUE WITH THE

25     ASSERTION THAT THERE IS NO REVERSION HERE.  APPLE WAS WILLING

1    TO PUT $500 MILLION ON THE TABLE TO SETTLE THIS CASE AND PAY UP

2    TO $500 MILLION TO SETTLE THE CASE, AND BECAUSE OF THE WAY THE

3    CLAIMS PROCESS WAS HANDLED, THE WAY THE NOTICE WAS HANDLED, IT

4    WAS CONSTITUTIONALLY SUFFICIENT, YOU KNOW, IT MEETS THE MINIMUM

5    STANDARDS OF FAIR, ADEQUATE AND REASONABLE, BUT $200 MILLION

6    THAT APPLE COULD HAVE PAID TO CLASS MEMBERS WILL NOT BE PAID TO

7    CLASS MEMBERS AND WILL REMAIN IN APPLE'S POCKETS.

8         AND THE ATTORNEYS ARE ASKING FOR THE EXACT SAME FEE NOW

9    THAT LESS THAN $300 MILLION IS GOING TO THE CLASS THAN IT WOULD

10   HAVE GOTTEN HAD ALL $500 MILLION GONE TO THE CLASS.  AND IT'S

11   IRONIC BECAUSE THEY ARE ASKING FOR A PERCENTAGE OF THE FUNDS,

12   BUT THEY ARE EFFECTIVELY SAYING THAT LAST $200 MILLION SHOULD

13   BE TREATED AT ZERO PERCENT, WHICH IS EXACTLY THE SORT OF

14   DECLINING RATE WE ARE PROPOSING, THAT WHEN YOU HAVE A MEGAFUND,

15   THE STEP RATE GOES DOWN AS THE MORE MONEY GOES UP, AND THAT'S

16   NOT DECREASED FEES, IT'S A DECREASED PERCENTAGE AS THE AMOUNT

17   GOES UP AT THE MARGIN.

18        AND AT THE VERY MINIMUM, THERE NEEDS TO BE A HAIRCUT FOR

19   THE $200 MILLION THAT WAS LEFT ON THE TABLE BECAUSE OF THE WAY

20   THE NOTICE WAS HANDLED.  THIS COULD HAVE BEEN $500 MILLION TO

21   THE CLASS, INSTEAD IT'S LESS THAN $300 MILLION.

22        AND THERE HAVE TO BE SOME CONSEQUENCES FOR THAT, OTHERWISE

23   IN THE FUTURE, ATTORNEYS WILL HAVE NO INCENTIVE TO GO BEYOND

24   THE BARE MINIMUM REQUIRED BY THE NINTH CIRCUIT FOR NOTICE, BARE

25   MINIMUM IN GETTING MONEY TO THE CLASS, AND BECAUSE OF THAT, WE

1    ONLY HAVE A CLAIMS RATE HERE OF 3.5 PERCENT, EVEN THOUGH THESE

2    WERE PRETTY SIGNIFICANTLY SIZED CLAIMS, THAT CLASS MEMBERS

3    COULD HAVE -- WHEN YOU HAVE A CLAIMS PROCESS FOR SOMETHING OF

4    THIS SIZE THAT WE'VE GOT THIS MUCH FREE PUBLICITY WITHOUT THE

5    ADDITIONAL PROBLEM OF NOTICE AND YOU ONLY HAD A 3.5 PERCENT

6    CLAIMS RATE, THAT IS VERY, VERY SAD.

7            THE COURT:  YOU KNOW, WHAT DOES THAT TELL US?

8        WHAT CAN WE DEDUCE FROM THAT, MR. FRANK?  IS THERE SOME --

9    WHAT DOES THAT SAY?  DOES IT TEACH THAT PEOPLE ARE AGNOSTIC OR

10   APATHETIC TOWARDS THESE TYPES OF CASES, WHEN PEOPLE RECEIVE

11   POSTCARDS, WHEN THEY RECEIVE E-MAILS AND THOSE TYPES OF THINGS,

12   ARE PEOPLE JUST GENERALLY TOO BUSY, ARE THEY -- DO THEY THINK,

13   I'M NOT GOING TO GET INVOLVED, OR I DON'T HAVE TIME FOR THAT?

14       OR WHAT IS IT?  WHAT DO WE DRAW FROM THAT?

15           MR. FRANK:  WELL, I THINK IN THIS CASE WE CAN DRAW

16   THAT THE NOTICE WAS DONE VERY POORLY.

17       THERE IS A HUGE PROBLEM WITH THE SPAM FILTERS.  EVERYBODY

18   WITH A GOOGLE ACCOUNT, AND THAT'S ABOUT HALF OF THE CLASS, I

19   WOULD IMAGINE, HAD THEIR NOTICE GO TO A SPAM FILTER.

20       I DON'T KNOW WHAT IT WAS LIKE FOR YAHOO USERS AND OTHER

21   MAJOR E-MAIL SERVICES, BUT NOBODY FROM ANGEION WENT TO GOOGLE

22   AND SAID, WE ARE GOING TO SEND 45 MILLION E-MAILS TO YOUR

23   SERVICE, DON'T PUT IT IN THE SPAM FILTER, WHITE LIST US.

24       NOBODY DID THAT.  AND BECAUSE OF THAT, EVERYBODY IN THIS

25   CLASS WHO HAD A GMAIL ACCOUNT, ONLY GOT THE NOTICE IF THEY WERE

1          LOOKING FOR IT IN THEIR SPAM BOX.

2              EVERYBODY I HAVE TALKED TO WITH A GMAIL ACCOUNT, INCLUDING

3      ME WHO GOT A NOTICE THAT WAS IN MY SPAM FILTER, INCLUDING MY

4      CLIENT, INCLUDING PEOPLE WHO CAME TO ME WANTING TO OBJECT AND

5      WE DIDN'T TAKE THEM ON, THEIR NOTICE WENT TO THE SPAM FILTER.

6              CLASS MEMBERS -- AND, YOU KNOW, WHATEVER THE CASE LAW IS

7      ON THAT, NOBODY HAS EVER SAID THAT THAT'S NOT SUFFICIENT

8      NOTICE, BECAUSE THERE IS PUBLICATION NOTICE AND ALL THE OTHER

9      THINGS THAT OTHERWISE HAVE BEEN SAID IS SUFFICIENT, BUT YOU

10     KNOW, HAD THE CLASS COUNSEL CARED ABOUT GETTING THE MONEY TO

11     THE CLASS, WE WOULD HAVE HAD HIGHER THAN THE 3.5 PERCENT RATE.

12             AND I THINK CLASS MEMBERS DO CARE.  YOU HEARD HOW MANY

13     CLASS MEMBERS CARED.  YOU HEARD HOW MANY PEOPLE WHO WERE CLASS

14     MEMBERS SHOWED UP TO THE FAIRNESS HEARING AND CARED.

15             PEOPLE WERE PRETTY MAD ABOUT THE FRAUD, AND THERE ARE A

16     LOT OF CLASS MEMBERS LIKE ME WHO WEREN'T ELIGIBLE TO MAKE

17     CLAIMS BECAUSE WE ACTUALLY HELD BACK ON UPDATING OUR IOS

18     SOFTWARE BECAUSE WE HEARD ABOUT THE THROTTLING PROCESS.  AND BY

19     DOING THAT, THOUGH, WE DAMAGED OURSELVES BY ENGAGING THAT

20     MITIGATION TO AVOID THE THROTTLING, IT MEANT THAT WE COULDN'T

21     MAKE CLAIMS.

22             WE WEREN'T ELIGIBLE TO MAKE CLAIMS, BUT WE ARE AFFECTED BY

23     THE SETTLEMENT AND WERE PRECLUDED.  WE ARE NOT COMPLAINING

24     ABOUT THAT, THAT'S FINE, BUT AT THE END OF THE DAY, YOU KNOW,

25     YOU SHOULD HAVE HAD AT LEAST HIGH SINGLE DIGITS ON THIS.

1    NORMALLY FOR A CASE THIS HEAVILY PUBLICIZED WITH SO MUCH

2    MONEY ABLE TO BE CLAIMED, YOU WOULD EXPECT A CLAIMS RATE IN THE

3    HIGH SINGLE DIGITS, EVEN DOUBLE DIGITS.  AND INSTEAD, 3.5

4    PERCENT IS NOTHING.

5    I'M NOT SAYING THAT'S A REASON TO REJECT THE SETTLEMENT,

6    BUT WE ARE SAYING CLASS COUNSEL DIDN'T TRY, DIDN'T TAKE THE

7    EXTRA STEP TO GO FROM THE 300 MILLION TO 500 MILLION, BUT THEY

8    ARE ASKING FOR THE SAME FEES AS IF THEY HAD EARNED 500 MILLION.

9    AND AT A MINIMUM, YOU SHOULD CONSIDER A HAIRCUT FOR THAT.

10   BUT YOU DON'T EVEN HAVE TO DO A HAIRCUT, HAIRCUT, BECAUSE YOU

11   CAN GET THERE SIMPLY BY GOING BY THE REAL BENCHMARK IN THE

12   EMPIRICAL DATA FOR THIS SORT OF MEGAFUND SETTLEMENT, WHICH IS A

13   10 TO 18 PERCENT RANGE.  THE 28 PERCENT THEY ARE ASKING FOR IS

14   TWO STANDARD DEVIATIONS ABOVE WHAT ISENBERG AND MILLER SAID IS

15   THE MEDIAN AMOUNT FOR A SETTLEMENT OF THIS SIZE.  A SETTLEMENT

16   ABOVE ONE 175.5 MILLION, SO THAT EVEN INCLUDES SETTLEMENTS THAT

17   ARE BELOW THAT.

18   AND IF YOU LOOK AT THE CASES THEY ARE CITING TO, THE

19   REASON THAT THOSE COURTS WENT ABOVE THE 25 PERCENT BENCHMARK,

20   LIDODERM, ANTHEM, TFT, ALL OF THOSE CASES WERE JUST SO HEAVILY

21   LITIGATED WITH MUCH SMALLER SETTLEMENTS THAN 310 MILLION.  THE

22   REASON THE COURTS WERE WILLING TO GO ABOVE 25 PERCENT WAS

23   BECAUSE IF THEY WENT WITH JUST 25 PERCENT OR IF THEY WENT BELOW

24   25 PERCENT, REFLECTING THE MEGAFUND, IT WOULD HAVE BEEN A

25   NEGATIVE MULTIPLIER.

1      LIDODERM WAS A 1.37 MULTIPLIER.  ANTHEM, THE MULTIPLIER

2  WAS JUST OVER 1, AND THAT WAS AFTER THE COURT HAD A SPECIAL

3  MASTER COME IN AND REALLY HACK AWAY AT THE LODESTAR.

4      AND WE THINK YOU SHOULD BE HACKING AWAY AT THE LODESTAR

5  HERE, AND I WILL GET TO THAT.  TFT LCD, AGAIN, MULTIPLIER

6  PRETTY CLOSE TO 1.

7      AND THESE SORTS OF STUDIES, AS THE YAHOO CASE SAYS, I

8  THINK ARE JUST MUCH MORE IMPORTANT TO WHERE THE BENCHMARK

9  SHOULD BE THAN THE INDIVIDUAL ANECDOTE OF FINDING THIS UPWARD

10  RATCHETING.  YOU TAKE THE ONE CHERRY-PICKED CASE WHERE A REALLY

11  HIGH MULTIPLIER AND A REALLY HIGH PERCENTAGE WAS GRANTED AND

12  THEN SAY EVERYBODY SHOULD GET THAT.

13      AND NOT EVERY CASE IS EXCEPTIONAL.  YOU KNOW, THE REASON

14  THAT YOU ARE GETTING $100 PER PHONE IS BECAUSE YOU HAVE 3.5

15  PERCENT CLAIMS RATE INSTEAD OF THE HIGHER PERCENTAGE YOU SHOULD

16  BE HAVING.

17      AS WE DOCUMENT IN OUR OBJECTION AT PAGES 15 TO 23, THE

18  LODESTAR REALLY IS EXCESSIVE HERE.  THEY EXCLUDED A LOT OF THE

19  CONTRACT ATTORNEY TIME, BUT WHAT THEY DIDN'T EXCLUDE WAS STAFF

20  ATTORNEY TIME FOR DOCUMENT REVIEW.  AND THEY BILLED FOUR

21  MILLION DOLLARS TO THAT AT $350 AN HOUR, AND WE DO CHALLENGE

22  THOSE RATES.

23      APPLE DOES NOT PAY $350 AN HOUR FOR STAFF ATTORNEYS TO DO

24  DOCUMENT REVIEW.  I AM VERY SKEPTICAL THAT ANY OF MS. ARBABI'S

25  CLIENTS, WHEN THEY HIRE ATTORNEYS AND THEY HIRE STAFF ATTORNEYS

1     TO DO DOCUMENT REVIEW, THEY ARE NOT PAYING $350 AN HOUR.  AND I

2     DON'T THINK THE CLASS SHOULD BE PAYING $350 AN HOUR EITHER.

3         AND YOUR HONOR, YOU HAVE THE POWER TO ASK MR. CHORBA WHAT

4     APPLE WAS PAYING FOR ITS CONTRACT ATTORNEYS, FOR ITS STAFF

5     ATTORNEYS.  AND WE WILL ABIDE BY THAT.  WE WILL SAY OKAY,

6     THAT'S THE MARKET RATE.  BUT WE ARE PRETTY CONFIDENT THAT IT'S

7     NOT $350 AN HOUR.  WE ARE PRETTY CONFIDENT THAT IT'S A VERY,

8     VERY TINY FRACTION OF $350 AN HOUR AND THAT THE LODESTAR SHOULD

9     BE REDUCED ACCORDINGLY.

10        THERE'S NO DETAILED BILLING PROVIDED, SO WE ARE LIMITED TO

11    THE EXTENT THAT WE CAN CHALLENGE THE LODESTAR, BUT WHAT WE CAN

12    NOTICE ARE THE RAW NUMBERS.  304 TOTAL BILLERS, AND THERE IS A

13    CASE ORDER IN THIS CASE THAT NOBODY SHOULD BE BILLING WITHOUT

14    PRIOR AUTHORIZATION.  BUT 77 OF THESE, 38 ATTORNEYS AND 39 OF

15    THE PARALEGALS ON THAT 304 LIST SEEM TO HAVE WORKED WITHOUT

16    PRIOR AUTHORIZATION.

17        68,000 HOURS IN THIS CASE.  IF YOU COMPARE THAT TO THE

18    HIGH-TECH ANTITRUST CASE WHERE THERE IS MORE DISCOVERY, MORE

19    DEPOSITIONS, MORE MOTIONS BRIEFED, THEY WERE ABLE TO DO THAT IN

20    36,000 HOURS.  AND THAT'S NOT A COMPLEX ANTITRUST CASE, AND

21    THAT'S WHY THEY WERE ABLE TO GET SUCH -- AND, YOU KNOW, THAT'S

22    WHY THEY WERE ABLE TO GET TEN PERCENT AND STILL HAVE A HIGH

23    MULTIPLIER.

24        THE COURT:  MR. MOLUMPHY TELLS US THAT, AND PERHAPS

25    THE NUMBERS YOU ARE USING WERE FROM JULY AND THERE'S BEEN

1    ADDITIONAL WORK SINCE THEN, SHOULD I CONSIDER THAT?

2            MR. FRANK:  YOU KNOW, HE'S TRYING TO HAVE IT BOTH

3    WAYS, BUT WE ALREADY THINK THAT 68,000 IS PRETTY INFLATED IF

4    YOU COMPARE IT TO COMPLICATED LITIGATIONS LIKE HIGH-TECH

5    ANTITRUST WITH 304 BILLERS HERE, THERE SEEMS TO HAVE BEEN A LOT

6    OF DUPLICATION, BUT WE DON'T KNOW, WE DON'T HAVE THE DETAILED

7    BILLING RECORDS.  AND WE DON'T THINK YOU NEED TO REACH THAT.

8        WE AGREE WITH MR. MOLUMPHY AND DISAGREE WITH MY COLLEAGUE

9    FROM THE ATTORNEY GENERAL'S OFFICE WHO WROTE A VERY FINE BRIEF,

10   THAT THE RIGHT WAY TO LOOK AT THIS IS WITH PERCENTAGE RATHER

11   THAN DOING A GREEN SHADE AND GOING OVER THOSE 68,000 HOURS AND

12   PICKING OUT THIS HOUR OR THAT HOUR, YOU DON'T NEED TO DO THAT.

13           BUT, YOU KNOW, WE ARE NOT SAYING, DON'T PAY THESE GUYS,

14   RIGHT.  IF YOU PAY THEM 10 TO 17 PERCENT, THAT'S A VERY

15   HANDSOME COMPENSATED TENS OF MILLIONS OF DOLLARS HERE.  BUT WE

16   DON'T -- YOU KNOW, IF ALL $500 MILLION THAT APPLE WAS WILLING

17   TO PAY UNDER THIS SETTLEMENT WENT TO THE CLASS, THAT WOULD HAVE

18   BEEN -- THEY WOULD HAVE BEEN GETTING 18 PERCENT.  AND BECAUSE

19   $200 MILLION OF THAT ISN'T GOING TO THE CLASS, THEY ARE NOW

20   ASKING FOR 28 PERCENT.  IF YOU GIVE THEM THE 18 PERCENT, THEY

21   ARE GOING TO BE VERY HANDSOMELY COMPENSATED, TENS OF MILLIONS

22   OF DOLLARS, AND IT'S ABSOLUTELY REASONABLE, AND IT'S EVEN ABOVE

23   THE MEDIANS AND AVERAGES IN THE EMPIRICAL STUDIES THAT WE

24   MENTION.

25           I'M HAPPY TO ANSWER ANY QUESTIONS YOU MIGHT HAVE.

1         THE COURT:  THE QUESTION I HAD WAS ABOUT -- YOU'VE

2    ANSWERED IT.

3         I WAS CURIOUS ABOUT THE PARTICIPATION.  AND HERE, I

4    APPRECIATE YOUR COMMENTS ABOUT GMAIL BEING -- GOING TO SPAM.  I

5    THINK THERE WAS PUBLICATION, AS YOU POINT OUT AS WELL, PART OF

6    MY QUESTION, I SUPPOSE, WAS ALSO REACHING OUT TO, DO PEOPLE

7    READ ANYMORE?  ARE THEY JUST TURNING TO ELECTRONIC INFORMATION

8    AS OPPOSED TO EITHER PRINTED INFORMATION THAT COMES ACROSS THEM

9    ON NEWS SERVICES ON THEIR ELECTRONIC DEVICES?  WE JUST DON'T

10   KNOW.  YOU KNOW, WHAT IS IT, IS IT APATHY, IS IT PEOPLE BEING

11   AGNOSTIC OR APATHETIC OR JUST A COMPLETE LOSS OF INTEREST?  WE

12   JUST DON'T KNOW.

13         MR. FRANK:  WELL, I MEAN, THERE ARE OTHER WAYS TO DO

14   NOTICE HERE.

15         APPLE HAS THE APPLE ID'S FOR ALL OF THE CLASS MEMBERS, AND

16   COULD HAVE CROSS REFERENCED, AND THEY COULD HAVE NEGOTIATED FOR

17   APPLE TO BE SENDING A MESSAGE OR EVEN JUST AN APP, YOU KNOW,

18   CLICK THIS BUTTON AND YOU ARE SIGNED UP FOR A CLAIM.

19         AND APPLE --

20         THE COURT:  THERE'S AN APP FOR EVERYTHING, MR. FRANK.

21   APPARENTLY THERE'S APPS FOR EVERYTHING IN TODAY'S WORLD.

22         MR. FRANK:  AND, YOU KNOW, THERE ARE LOTS OF

23   INNOVATIVE WAYS, RATHER THAN THE PAINT BY NUMBERS PUBLICATION

24   AND GENERIC E-MAIL THAT GOES TO A SPAM FOLDER WITHOUT EVEN

25   BOTHERING TO DO A WHITE LIST TO TRY TO GET THE CLAIMS RATE UP

1       HERE, AND CLASS COUNSEL DIDN'T DO IT.

2            AND WHILE THAT PASSES MUSTER UNDER 23(E), 23(C), YOU KNOW,

3       MAYBE SOMEBODY SHOULD MAKE THAT CLAIM AT SOME POINT AND HOLD

4       ATTORNEYS TO HIGHER STANDARDS.  BUT AT A MINIMUM, THERE SHOULD

5       BE SOME SORT OF HAIRCUT.  THEY WOULD HAVE BEEN ASKING FOR THE

6       EXACT SAME ATTORNEY FEE IF ALL $500 MILLION WENT OUT.

7            AND WE AGREE THAT MATTERS, CLASS COUNSEL SHOULD BE

8       COMPENSATED FOR THE AMOUNT THE CLASS ACTUALLY RECEIVES, WHICH

9       IS WHY YOU SHOULD BE DEDUCTING THE NOTICE AND ADMINISTRATION

10      COST FROM THE 310 MILLION AND RECOGNIZE THAT THEY WOULD HAVE

11      BEEN HAPPY WITH 18 PERCENT.  IF ALL 500 MILLION WENT OUT, THEN

12      THEY SHOULD BE HAPPY AND GRATEFUL FOR THE SAME 18 PERCENT FOR

13      THE 310 MILLION NUMBER.

14            THE COURT:  OKAY.  THANK YOU VERY MUCH, MR. FRANK.  I

15      APPRECIATE IT.

16            ANYONE ELSE FROM THE OBJECTOR COLUMN THAT WISHES TO BE

17      HEARD?

18            MR. PENTZ, IS THAT YOU?

19            MR. PENTZ:  YES, IT IS, YOUR HONOR.  THANK YOU.

20            WELL, I WANT TO START OUT BY SAYING THAT I AGREE MORE WITH

21      MR. FRANK THAN I DO WITH APPLE'S COUNSEL.  I DO THINK THAT EVEN

22      THOUGH THIS IS A CLAIMS-MADE SETTLEMENT, IT CAN BE TREATED AS

23      IF IT WERE A $310 MILLION COMMON FUND BECAUSE THAT AMOUNT IS

24      REQUIRED TO BE PAID OUT NO MATTER WHAT, NO MATTER HOW LOW THE

25      CLAIMS RATE IS.  I ALSO AGREE THAT THE THREE PERCENT IS PRETTY

1    PUNY IN A CASE LIKE THIS.

2         BUT BE THAT AS IT MAY, I THINK THE BENCHMARK IN THIS CASE

3    AND EVERY MEGAFUND SHOULD BE SUPPLIED BY THE EMPIRICAL STUDIES

4    LIKE PROFESSOR FITZPATRICK, WHICH I BELIEVE COMES IN AT 7.8, I

5    BELIEVE, AT LEAST THAT'S THE STUDY WE CITED TO IN OUR

6    OBJECTIONS.

7         AND THAT SHOULD BE THE STARTING POINT.  THAT'S THE POINT

8    OF THE CASES LIKE WASHINGTON PUBLIC POWER SUPPLY AND IN RE

9    BLUETOOTH, BUT I DISAGREE, QUITE FRANKLY, WITH MR. MOLUMPHY'S

10   ARGUMENT THAT THE NINTH CIRCUIT HAS NOT ENDORSED THE IDEA THAT

11   IN A MEGAFUND CASE, IT SHOULD GO DOWN.  I THINK THEY HAVE

12   SEVERAL TIMES.  IT MAY NOT BE MANDATED, BUT THEY'VE SEVERAL

13   TIMES, STRONGLY SUGGESTED THAT IN A MEGAFUND, THE 25 PERCENT

14   BENCHMARK IS PRETTY MUCH OUT THE WINDOW.

15        AND JUDGE TIGAR SAID THE SAME THING RECENTLY IN WELLS

16   FARGO, AND AN EARLIER CASE, I MEAN, THIS IDEA IS NOT FOREIGN TO

17   THE NINTH CIRCUIT.  AND IN A CASE LIKE THIS, IT IS ABSOLUTELY

18   APPROPRIATE TO START AT A BENCHMARK OF 17.7 PERCENT.

19        AND WE ALSO AGREE THAT THE LODESTAR HERE IS EXCESSIVE AND

20   IT HAS BEEN PADDED.  YOU KNOW, I'VE NEVER HEARD COUNSEL SPEAK

21   UP AND BRAG THAT STEERING COMMITTEE INVOLVED 16 FIRMS.  I MEAN,

22   USUALLY THAT'S ABOVE, NOT A FEATURE.  JUDGE KOH HIT THE ROOF

23   ABOUT THAT IN ANTHEM, IN FACT, THAT THERE WAS SO MANY FIRMS

24   BILLING IN THIS CASE.

25        HERE WE HAVE 47 LAW FIRMS CONTRIBUTING TO BUILD THIS

1     $36 MILLION LODESTAR.  I KNOW MR. COTCHETT SAID THAT THESE LAW

2     FIRMS THAT FILED 49 STATE CASES THAT WERE DISMISSED, SOMEHOW

3     AIDED THIS CASE, BUT HE NEVER REALLY EXPLAINED HOW.

4         YOU KNOW, WE ALSO IDENTIFIED THE STAFF AND PROJECT

5     ATTORNEY WORK HERE THAT WE BELIEVE ARE SIMPLY CONTRACT

6     ATTORNEYS MASQUERADING UNDER ANOTHER NAME.  WE DID NOTE THAT OF

7     THE EIGHT STAFF ATTORNEYS THAT KAPLAN FOX BILLED, ONLY ONE OF

8     THEM IS STILL ON THEIR WEBSITE, OR AT LEAST HAS HIS BIO ON

9     THEIR WEBSITE.

10        SO, YOU KNOW, PERHAPS WE NEED MORE INFORMATION ABOUT HOW

11    LONG DID THESE ATTORNEYS WORK AT THIS FIRM, HOW LONG DO YOU

12    HAVE TO WORK AT A LAW FIRM BEFORE YOU BECOME A STAFF ATTORNEY,

13    OR DID THEY JUST COME ON BOARD AS STAFF ATTORNEYS AND THEN GET

14    FIRED AS SOON AS THIS CASE WAS OVER, IN WHICH CASE, THEY ARE

15    INDISTINGUISHABLE FROM CONTRACT ATTORNEYS.

16        AND I BELIEVE JUDGE TIGAR IN THE WELLS FARGO CASE DID SOME

17    INDICATION, AND WHAT HE ADDUCED AT THE FAIRNESS HEARING WAS

18    STAFF ATTORNEYS ARE TREATED NO DIFFERENTLY THAN CONTRACT

19    ATTORNEYS, THEY ARE PAID THE SAME AMOUNT, AROUND $42 AN HOUR,

20    THERE'S NO ADDITIONAL OVERHEAD ASSOCIATED WITH THEM.  THEIR

21    TENURE AT THE FIRMS IS EQUALLY TENUOUS, SHALL WE SAY, AND THEY

22    COME AND GO JUST LIKE CONTRACT ATTORNEYS.

23        IT'S JUST BECOME FASHIONABLE NOW TO USE THE TERM "STAFF

24    ATTORNEY" INSTEAD OF "CONTRACT ATTORNEY" WHERE SOMETIMES THEY

25    CALL THEM "PROJECT ATTORNEYS" BUT THAT'S TO GET AROUND WHAT

1    COURTS HAVE STARTED TO DO, WHICH IS TO LIMIT OR TREAT CONTRACT

2    ATTORNEYS AS AN EXPENSE AND NOT AS A, YOU KNOW, PART OF THE

3    LODESTAR THAT'S GOING TO BE MULTIPLIED BY -- HERE, THEY ARE

4    REQUESTING AN ADDITIONAL 2.5 ON TOP OF THE BUILT-IN MULTIPLIER

5    OF MORE THAN 7 HERE.

6         THE $350 AN HOUR CHARGED FOR DISCOVERY ATTORNEYS, IT

7    PROBABLY ALREADY ENTAILS A MULTIPLIER, A BUILT-IN MULTIPLIER OF

8    7 OR MORE, IF THEY ARE PAYING THESE STAFF ATTORNEYS THE SAME

9    THING THEY PAID THEM IN THE WELLS FARGO CASE AND THE ANTHEM

10   CASE.  I THINK IT'S A STANDARD MARKET RATE, I DON'T THINK IT

11   VARIES BY PLAINTIFF'S FIRM.

12        SO WE BELIEVE THAT THE LODESTAR IS OVERSTATED BY AT LEAST

13   4 MILLION, PROBABLY AS MUCH AS 10 MILLION.  WE DO AGREE WITH

14   APPLE ON THAT.  WE THINK THAT A LOT OF THE BILLING BY THE 47

15   LAW FIRMS SWEPT INTO THIS CASE BECAUSE THEY FILED A CASE IN

16   EVERY STATE AND LATER WAS DISMISSED.  WE THINK A LOT OF THAT

17   SHOULD BE PARED DOWN.

18        AND IF YOU DO THAT, ONCE YOU DO THAT AND YOU GET THE TRUE

19   LODESTAR, UNDER 30 MILLION, A 17.7 PERCENT MARKET RATE, WHAT

20   SHOULD BE THE BENCHMARK IN A MEGAFUND CASE, ENDS UP BEING A

21   PRETTY GOOD RETURN ON INVESTMENT, A MULTIPLIER OF AROUND 2,

22   WHICH IS AS MR. FRANK POINTED OUT, IN MANY OF THE CASES, THAT'S

23   PRETTY MUCH WHERE THE MULTIPLIER ENDS UP IN A LOT OF MEGAFUND

24   CASES, EVEN THE ONES WHERE THE PERCENTAGE EXCEEDS 25 PERCENT.

25        SO I THINK THAT PRETTY MUCH CONCLUDES MY REMARKS WITH

1    RESPECT TO THE FEES.  THANK YOU, YOUR HONOR.

2              THE COURT:  THANK YOU.  THANK YOU VERY MUCH,

3    MR. PENTZ.

4         LET ME TURN TO MR. GRAVES, I THINK.

5              MR. GRAVES:  THANK YOU, YOUR HONOR.

6         WHEN WE BROUGHT OUR OBJECTION TO THE APPROVAL, ONE OF THE

7    KEY AREAS OF CONCERN WAS THAT THE SETTLEMENT WAS PRESENTED AS A

8    RANGE, WHEN IN FACT THERE WAS JUST NO MATHEMATICAL WAY ANYTHING

9    LESS THAN THE MINIMUM AMOUNT WOULD BE PAID.

10         THAT IS THE CONDITION WE HAVE NOW, WHICH WE NOW KNOW IS

11   APPLE PAYING THE MINIMUM POSSIBLE AMOUNT, WAS NOT ONLY

12   FORESEEABLE, BUT GUARANTEED.  THERE WAS NO WAY GIVEN THE NOTICE

13   PROCEDURE IN THE SETTLEMENT, THAT THERE WAS GOING TO BE

14   ANYTHING APPROACHING THE KIND OF DOUBLE DIGIT RESPONSE RATE

15   THAT WHATEVER CAUSED APPLE TO PAY $500 MILLION, OR ANYTHING

16   MORE THAN THE MINIMUM.  OUR CONCERN WITH THE FEE IS IT IS

17   UNTETHERED FROM THAT REALITY.

18         IN TERMS OF THE FEE, THIS IS, WAS AND ALWAYS WILL BE A

19   $310 MILLION SETTLEMENT, THERE WAS NEVER A DOLLAR MORE THAT WAS

20   GOING TO FLOW BECAUSE THERE WAS NEVER A WAY THAT GIVING NOTICE

21   IN THE WAY THAT WE DID WAS GOING TO HAVE THE KIND OF RESPONSE

22   RATE THAT WOULD PUSH IT ABOVE THAT MINIMUM.

23         BEFORE WE KNEW THAT THE RESPONSE RATE WAS, WHEN WE FIRST

24   FILED OUR OBJECTION, WE SAID WE HAVE NO OBJECTION TO

25   PERCENTAGE, JUST TIE A PERCENTAGE TO THE ACTUAL PAYMENT THAT IS

1     PAID, NOT THE HYPOTHETICAL PAYMENT THAT WILL NEVER BE PAID.

2          NOW WE KNOW, WE KNOW THAT WE ARE GETTING THE ABSOLUTE

3     MINIMUM PAYMENT, AND THE FEES SHOULD REFLECT THAT.  28 PERCENT

4     REPRESENTS A PREMIUM FOR WHAT IS, EFFECTIVELY, POOR

5     PERFORMANCE.

6          AS YOU HEARD FROM OTHER SPEAKERS, THE COMPANY ENDED UP

7     PAYING THE MINIMUM.  AND AS A POLICY MATTER, WE SHOULD

8     STRUCTURE FEES TO INCENTIVIZE DEALS WHERE THERE'S A CHANCE OF

9     SOMETHING OTHER MAN THAN THE MINIMUM BEING PAID AND WHERE

10    COUNSEL ARE INCENTIVIZED TO ACT TO CAUSE SOMETHING MORE THAN

11    THE MINIMUM TO BE PAID.

12         SO WE AGREE THERE'S A HAIRCUT APPROPRIATE HERE, BECAUSE

13    THERE'S NO OTHER WAY TO INCENTIVIZE THAT CONDUCT, RIGHT.  IF

14    YOU GO BACK AND LOOK AT WHAT WE DID EX ANTE, THERE WAS NOTHING

15    IN THE SYSTEM THAT MADE IT IN ANY WAY IN THE PLAINTIFF'S

16    INTEREST TO DRIVE THAT NUMBER UP TO GET ANYTHING OTHER THAN 310

17    MILLION, AND THERE SHOULD BE.  THE AMOUNT WE RECOVERED SHOULD

18    BE LINKED TO HOW MUCH ACTUALLY GETS PAID TO OUR CLIENTS.

19         AND SO YES, 28 PERCENT, UNDER THOSE CIRCUMSTANCES, IS TOO

20    MUCH.  AND IT'S NOT BECAUSE WE QUESTION THE BILLING AWARD OF

21    COUNSEL, WE AGREE IT'S EXCELLENT, IT'S JUST BECAUSE THE

22    INCENTIVES NEED TO BE RIGHT.

23         ONE OF THE ISSUES YOU HEARD ABOUT IS WHAT IS THE RIGHT

24    PERCENTAGE.  DO WE APPLY 25 PERCENT IN THE MEGAFUND CASE?  AND

25    PART OF THE LAW WE ALL AGREE ON, IS YOU ARE TRYING TO FIND A

1    MARKET.  YOUR GOAL IN A FEE AWARD IS TO FIGURE OUT WHAT A

2    MARKET FEE LOOKS LIKE.

3         WHEN I SELL A HOUSE THAT COSTS A HALF MILLION DOLLARS, I

4    PAY A SIX PERCENT REALTOR FEE.  WHEN I SELL A HOUSE THAT COSTS

5    TEN MILLION, I PAY LESS.

6         THE TRUTH IS, YOU NEED TO LOOK AT THE CLASS MEMBERS IN

7    THIS MEGAFUND CASE AS A VERY, VERY WEALTHY CONSUMER WITH A LOT

8    OF MARKET POWER WHO IS ENTITLED TO PAY A SMALLER PERCENTAGE

9    BECAUSE THEY HAVE A GREAT BIG GIANT CASE TO INCENTIVIZE GOOD

10   LEGAL WORK.

11        THERE IS NO NEED TO PAY 28 PERCENT TO GET TOP NOTCH LEGAL

12   WORK FOR A CASE OF THIS SIZE, THE SAME REASON THERE IS NO NEED

13   TO PAY SIX PERCENT IF I'M SELLING A VERY EXPENSIVE HOUSE.  IN

14   BOTH CASES, THE VERY LARGE VALUE MEANS WE CAN GET THE VERY BEST

15   PEOPLE, WHOM WE MAY WELL HAVE HAD DOING THE BEST WORK FOR A LOT

16   LESS THAN 28 PERCENT.  AND YOU SHOULD TREAT THESE CLASS MEMBERS

17   AS EMPOWERED PEOPLE WITH AN EXTRAORDINARILY VALUED CLAIM WHO

18   HAVE THE ABILITY TO BARGAIN IN THE MARKET FOR FEES AT A LOWER

19   PERCENTAGE.

20        BECAUSE THAT'S EXACTLY WHAT THEY ARE.  THEY MAY VERY

21   INDIVIDUALLY BE A COLLECTION OF SOMETIMES VERY POOR PEOPLE, BUT

22   COLLECTIVELY, THEY HAVE AN AMAZINGLY VALUABLE ASSET, AND YOU

23   SHOULD PRESUME THAT THEY WOULD BARGAIN FOR A MUCH TIGHTER FEE

24   THAN 28 PERCENT.  THEY ARE ECONOMICALLY POWERFUL AND DESERVE TO

25   BE TREATED AS SUCH.  AND THEY DESERVE BETTER THAN THE ABSOLUTE

1    BOTTOM OF A POTENTIAL RANGE.

2         SO YEAH, IT SHOULD BE LESS.  WE AGREE WITH THE OTHER

3    SPEAKERS IT SHOULD NOT BE NOTHING, GREAT WORK WAS DONE, IT

4    SHOULD BE COMPENSATED AT A PREMIUM.  THE MULTIPLIER SHOULDN'T

5    BE ONE, IT SHOULD BE 1.5 OR MAYBE EVEN 2.  THE IDEA THAT PEOPLE

6    WITH AN ASSET SO VALUABLE ARE GOING TO GET THE BOTTOM END OF

7    THE RANGE AND PAY FULL GRADE, THAT'S JUST NOT THE MARKET FOR AN

8    ASSET THIS VALUABLE.

9         THANK YOU.

10            THE COURT:  THANK YOU VERY MUCH, MR. GRAVES.

11       MR. CLORE.

12            MR. CLORE:  THANK YOU, YOUR HONOR.  ROBERT CLORE FOR

13   THE OBJECTOR ALEXIS WEST.

14        WE ARE CALLING FOR CLASS COUNSEL TO BE HELD TO THEIR

15   ADJUSTED LODESTAR UNDER EITHER THE LODESTAR METHOD OR

16   PERCENTAGE OF THE FUND METHOD.  WE CITED THE ISENBERG STUDY, AN

17   EARLIER STUDY, AND A MORE RECENT STUDY WHICH SET FEES FOR

18   SETTLEMENTS OF THIS SIZE AROUND 10.2 PERCENT.

19        THIS IS THE FIRST TIME I HAVE HEARD CLASS COUNSEL SPEAK TO

20   THE AGGREGATE POTENTIAL DAMAGES AND ESTIMATING THAT ONE BILLION

21   DOLLARS, AND USED THEIR OWN EXPERT'S NUMBERS AT $46 POTENTIAL

22   DAMAGES PER DEVICE, AND WE MULTIPLIED THAT TIMES 90 MILLION TO

23   ARRIVE AT FOUR BILLION IN AGGREGATE CLASS DAMAGES.

24        AND SO WITH THAT NUMBER BEING THE CASE, 310 MILLION IS

25   APPROXIMATELY FIVE PERCENT RECOVERY OF POTENTIAL DAMAGES.  AND

1    SO FIVE PERCENT IS NOT AN EXCEPTIONAL RECOVERY AND IT'S NOT THE

2    SUPPORTED RECOVERY THAT WOULD SUPPORT A PUSH UPWARD FROM THE

3    LODESTAR AMOUNT OR UNDER THE PERCENTAGE OF FUND, THE ISENBERG

4    FIGURE OF 10.2 PERCENT, IT CERTAINLY WOULDN'T SUPPORT A RISE

5    ABOVE THE 25 PERCENT BENCHMARK.

6         CHAMBERS V. WHIRLPOOL, A RECENT NINTH CIRCUIT OPINION,

7    REITERATED THAT THE LODESTAR IS ONLY TO BE PUSHED UPWARD IF

8    UNDER EXCEPTIONAL CIRCUMSTANCES.  AND THOSE JUST AREN'T PRESENT

9    HERE.

10        WE ALSO -- I'M NOT GOING TO BELABOR THE POINTS THAT HAVE

11   ALREADY BEEN MADE BY THE THREE OTHER OBJECTORS' COUNSEL, BUT WE

12   ALSO DISAGREE THAT THE LODESTAR SHOULD BE TAKEN AT FACE VALUE.

13   MR. FRANK REFERENCED FOUR MILLION IN DOCUMENT REVIEW, BUT IT'S

14   CLOSER, IT'S AROUND 4.7 MILLION OR NEARLY FIVE MILLION, WHICH

15   IS WELL ABOVE WHAT THE NINTH CIRCUIT IN WHIRLPOOL SAID WAS --

16   2.6 MILLION WAS THE AMOUNT OF DOCUMENT REVIEW THAT CHAMBERS V.

17   WHIRLPOOL, IN THE NINTH CIRCUIT, FOUND STAGGERING.  SO WE

18   BELIEVE SOME ADJUSTMENT NEEDS TO BE MADE TO THE LODESTAR

19   FIGURE, WHICH WE'VE OUT LINED IN OUR PAPERS.

20        AND THEN FINALLY, I JUST WANTED TO GET SOME CLARIFICATION

21   ON THE QUICKPAY PROVISION WHICH I ARGUED AT THE PREVIOUS

22   HEARING.  YOUR HONOR NOTED THAT THE SETTLEMENT CALLS FOR, IN

23   THE EVEN OF REVERSAL, FOR FEES TO BE PAID BACK TO APPLE.  AND

24   MY ISSUE, OR THE ISSUE THAT WE RAISED IS WHAT HAPPENS IF THE

25   SETTLEMENT IS UPHELD BUT FEES ARE MODIFIED OR VACATED ALL

1    TOGETHER?  SAY THEY ARE MODIFIED AND THE NINTH CIRCUIT DECIDES

2    THAT CLASS COUNSEL NEED TO BE LIMITED TO THEIR LODESTAR, THE

3    SETTLEMENT NEEDS TO EXPLAIN IF THE FEES ARE GOING TO BE

4    RETURNED TO THE CLASS, IT NEEDS TO EXPLAIN AS MUCH.  IT DOESN'T

5    RIGHT NOW, AND CLASS COUNSEL REPRESENTING THAT THIS IS A COMMON

6    FUND, SECTION 5.3.2 OF THE SETTLEMENT INDICATES THAT IF THERE

7    ARE RESIDUAL, THAT THAT RESIDUAL AMOUNT SHOULD BE APPLIED TO

8    INCREASE THE CLASS MEMBERS, THE CLAIMANT'S RECOVERIES CAPPED AT

9    $500 PER CLAIM.

10        SO THE SETTLEMENT INDICATES THAT THOSE FEES SHOULD BE

11   RETURNED TO THE CLASS, BUT IT DOESN'T SAY SO IN ITS CURRENT

12   ITERATION.  SO WE WOULD CALL FOR CLARIFICATION ON THAT POINT.

13   AND IF IT'S -- IF FEES ARE NOT MEANT TO RETURN TO THE CLASS,

14   THAT NEEDS TO BE STATED AS WELL, AND THEN THOSE AMOUNT, THE

15   FEES SHOULD BE REMOVED FROM THE SUM FROM WHICH THE COURT SHOULD

16   CALCULATE.  TO THE EXTENT THE COURT IS GOING TO RULE UNDER THE

17   PERCENTAGE METHOD, THOSE FEES TO BE REMOVED FROM THE SUM.

18        THE COURT:  OKAY.

19        WELL, THANK YOU VERY MUCH MR. CLORE.  I APPRECIATE IT.

20        MR. HELERINGER, IS THERE ANYTHING ELSE YOU WOULD LIKE TO

21   SAY SIR ANYTHING ELSE YOU WANT ME TO KNOW.

22        MR. HELERINGER:  YES, YOUR HONOR.  GOOD AFTERNOON.

23   AND THANK YOU FOR GIVING ME AN OPPORTUNITY TO SPEAK TO THE

24   COURT.

25        TODAY, AS BOTH OUTLINED IN OUR PAPERS AND MY POINT TODAY,

1          IS REALLY TO EMPHASIZE THREE POINTS TO YOUR HONOR.

2                THE FIRST ONE YOUR HONOR IS ALREADY AWARE OF, BUT IT DOES

3          BARE MENTIONING; AND THAT IS, UNDER NINTH CIRCUIT CASE LAW, THE

4          COURT SERVES AS A FIDUCIARY TO THE ABSENT CLASS MEMBERS.  AND

5          THAT'S IMPORTANT BECAUSE AT THIS STAGE OF THE PROCEEDING, THE

6          CLASS COUNSEL AND THE ABSENT CLASS MEMBERS, THERE IS A BIT OF

7          TENSION THERE.  AND THE COURT HAS TO STEP IN AND SERVE AS THE

8          FIDUCIARY FOR THOSE ABSENT CLASS MEMBERS.

9                AND WHAT THAT MEANS, ACCORDING TO THE NINTH CIRCUIT, IS

10         THAT THE COURT HAS TO HAVE A JEALOUS REGARD FOR THOSE ABSENT

11         CLASS MEMBER'S INTERESTS.  AND CERTAINLY THOSE ABSENT CLASS

12         MEMBERS HAVE AN INTEREST IN MAXIMIZING THEIR RECOVERY.

13               AND ON BEHALF OF THE KENTUCKY ATTORNEY GENERAL'S OFFICE

14         AND THE SISTER STATES WHO JOINED US IN OUR BRIEF, WE SUBMIT

15         THAT A JEALOUS REGARD FOR THE ABSENT CLASS MEMBERS MEANS

16         AWARDING CLASS COUNSEL A LODESTAR WITH NO MULTIPLIER.  THAT

17         WILL ALLOW THE COURT TO PROPERLY BALANCE AWARDING A REASONABLE

18         FEE TO COUNSEL WHILE ALSO MAXIMIZING THE RECOVERY TO CLASS

19         MEMBERS.  AND SPECIFICALLY, DOING SO, HOLDING CLASS COUNSEL TO

20         THE LODESTAR, WILL RESULT IN OVER FIFTY MILLION DOLLARS THAT

21         WILL GO BACK TO THE CLASS MEMBERS.  THAT'S CERTAINLY A

22         SIGNIFICANT SUM.

23               IN THE EXERCISE OF THE COURT'S FIDUCIARY DUTY, THE SECOND

24         POINT I WANTED TO EMPHASIZE, AND IT'S BEEN SAID BEFORE, BUT WE

25         DO BELIEVE THE COURT SHOULD USE THE LODESTAR AMOUNT INSTEAD OF

1      THE PERCENTAGE OF THE FUND APPROACH.

2          AS OTHERS HAVE RECOGNIZED AND AS THE PLAINTIFFS COUNSEL

3      HAS ADMITTED, THIS IS A MEGAFUND CASE.  YOUR HONOR KNOWS FULL

4      WELL THAT IT IS.  AND THE NINTH CIRCUIT HAS SAID YES, WHILE

5      COURTS HAVE DISCRETION IN COMMON FUND CASES TO USE A LODESTAR

6      OR A PERCENTAGE METHOD, THE END GOAL IS A REASONABLE AWARD.

7          AND THE NINTH CIRCUIT HAS SAID THAT WHEN APPLYING THE

8      25 PERCENT BENCHMARK IN A COMMON FUND CASE, OR IN A MEGAFUND

9      CASE, RESULTING IN WINDFALL PROFITS TO CLASS COUNSEL, THEN THE

10     COURT SHOULD EITHER ADJUST THAT PERCENTAGE OR USE THE LODESTAR.

11         AND IN THIS CASE, APPLYING THAT 25 PERCENT BENCHMARK, AND

12     SPECIFICALLY THE AMOUNT ABOVE AND BEYOND THAT BENCHMARK, THE

13     28 PERCENT THE CLASS COUNSEL WERE ASKING FOR, DOES RESULT IN A

14     WINDFALL TO CLASS COUNSEL.  OTHERS -- THAT'S NOT A REMARKABLE

15     PROPOSITION, OTHERS TODAY HAVE NOTED THAT.

16         BUT I DO WANT TO DIRECT YOUR HONOR TO THE IN RE YAHOO

17     CASE.  IN THAT CASE, THE COURT THERE FOUND THAT $10 MILLION

18     ABOVE, OF A DISCREPANCY BETWEEN THE LODESTAR AND THE

19     PERCENTAGE, WAS UNACCEPTABLE TO APPLY THE PERCENTAGE FUND.

20         AND HERE, WE HAVE FIVE TIMES A DISCREPANCY, WE HAVE OVER

21     $50 MILLION.  IF YOU LOOK AT -- AND I'M SURE THE COURT IS AWARE

22     OF THIS MATH, BUT THE REQUEST OF 28.3 PERCENT OF 310 MILLION IS

23     ROUGHLY 87.7 MILLION, YET THEIR LODESTAR IS AT 36.4 MILLION.

24     SO THAT'S WHERE THE DIFFERENCE OF 51 MILLION DOLLARS COMES

25     THROUGH.

1          AND AGAIN, COMPARING THAT TO THE IN RE YAHOO CASE, THAT

2     DISCREPANCY, THE 51 MILLION, IS FIVE TIMES WHAT THE COURT --

3     THE NORTHERN DISTRICT FOUND UNACCEPTABLE IN ITS OWN CASE WHERE

4     THERE WAS A DISCREPANCY OF TEN MILLION DOLLARS.

5          THAT'S NOT THE ONLY INSTANCE WHERE COURTS HAVE FOUND THAT

6     THERE'S GOING TO BE A WINDFALL PROFIT IN A MEGAFUND CASE.

7     OTHERS HAVE TALKED ABOUT THE IN RE HIGH-TECH CASE.  I LABEL IT

8     THE GUTIERREZ CASE, BUT I THINK IT'S MORE WELL KNOWN AS THE

9     WELLS FARGO CASE.  BOTH OF THOSE CASES, CLASS COUNSEL HAD

10    REQUESTED PERCENTAGES OF THE FUND, 20.6 PERCENT IN IN RE

11    HIGH-TECH CASE, OR 85 MILLION DOLLARS, AND THAT WAS A

12    415 MILLION DOLLAR FUND.  AND THE COURT SAID NO, THAT'S TOO

13    MUCH, USE THE LODESTAR, AND IT AWARDED 40.8 MILLION, OR ABOUT

14    9.8 PERCENT, CLEARLY WELL BELOW WHAT CLASS COUNSEL IS

15    REQUESTING HERE.

16         SAME GOES FOR THE WELLS FARGO CASE.  COUNSEL REQUESTED

17    PERCENTAGE OF ABOUT 25 PERCENT, 24.9 SPECIFICALLY.  AGAIN, THE

18    COURT SAID EVEN THOUGH THAT'S BELOW THE BENCHMARK, THAT'S TOO

19    MUCH, AND ENDED UP USING THE LODESTAR OF ABOUT -- AWARDING

20    EIGHTEEN AND A HALF MILLION, WHICH WAS ABOUT NINE PERCENT OF

21    THE FUND.  SO AGAIN, PERCENTAGES THAT ARE WELL BELOW WHAT CLASS

22    COUNSEL HAS REQUESTED HERE.

23         USING THE PERCENTAGE OF THE FUND ALSO RESULTS IN AN

24    UNREASONABLE AWARD FOR A SECOND REASON, AND THAT'S BECAUSE

25    GIVEN HOW THE $310 MILLION MINIMUM IS CALCULATED UNDER THE

1   SETTLEMENT AGREEMENT, IT DOESN'T MAKE MUCH SENSE TO BASE THE

2   PERCENTAGE ON THAT AMOUNT.  AND THAT'S BECAUSE UNDER

3   NINTH CIRCUIT LAW, THE FEE AWARD SHOULD BE TIED TO THE TOTAL

4   VALUE OF THE CLASS'S RECOVERY.

5        AND I SUBMIT THAT UNDER THIS COURT'S -- UNDER THE

6   NINTH CIRCUIT DECISION IN STATON V. BOEING CASE, THE

7   NINTH CIRCUIT INSTRUCTED DISTRICT COURTS TO LOOK AT THE TRUE

8   BENEFIT TO THE CLASS.

9        AND IN THAT CASE, THEY WERE DEALING WITH INJUNCTIVE RELIEF

10  AND THE COURT REVERSED BECAUSE THE AWARD WAS BASED IN PART ON A

11  VALUE OF INJUNCTIVE RELIEF THAT THE COURT SAID WAS TOO

12  SPECULATIVE, THAT'S NOT THE TRUE BENEFIT TO THE CLASS.

13       AND HERE, OBVIOUSLY WE ARE NOT DEALING WITH INJUNCTIVE

14  RELIEF, THAT CASE IS STILL IMPORTANT BECAUSE IT TELLS LOWER

15  COURTS TO PEEK BEHIND THE NUMBER THAT CLASS COUNSEL PUTS OUT

16  THERE AND TO LOOK AT IT CLOSELY AND FIND THE TRUE VALUE.  AND I

17  SUBMIT THAT THE $310 MILLION DOES NOT HAVE A DOLLAR-FOR-DOLLAR

18  $310 MILLION VALUE TO THE CLASS.  AND THAT'S BECAUSE AS ITS

19  DEFINED IN THE SETTLEMENT AGREEMENT, ALL THE MINIMUM DOES IS

20  GUARANTEES THAT APPLE WILL PAY 310 MILLION.  IT DOESN'T

21  GUARANTEE THAT CLASS MEMBERS WILL RECEIVE 310 MILLION.

22       IT SERVES -- IT'S A BENEFIT BECAUSE IT SERVES AS A FLOOR

23  WHERE IF THERE'S ANY DISCREPANCY BETWEEN THE AMOUNT OF APPROVED

24  CLAIMS AND THE 310 MILLION, AFTER ATTORNEY'S FEES ARE ADDED,

25  AFTER EXPENSES ARE ADDED, AFTER ADMINISTRATION COSTS ARE ADDED,

1    IF THERE'S STILL A GAP, THEN AND ONLY THEN DO CLASS MEMBERS GET

2    A PRO RATA ADJUSTMENT TO THEIR PAYMENT.  AND SO IT DOES NOT --

3    THE 310 MILLION DOES NOT GUARANTEE THAT CLASS MEMBERS WILL

4    RECEIVE $310 MILLION.

5         EVEN IF THE COURT WERE INCLINED TO REJECT THE ARGUMENT WE

6    HAVE PUT FORTH IN OUR PAPERS ABOUT THE TRUE BENEFIT ABOUT THE

7    310 MILLION, IT REMAINS TRUE THAT USING THAT 310 MILLION STILL

8    MAKES -- DOESN'T MAKE A WHOLE LOT OF SENSE TO USE TO APPLY

9    AGAINST THE PERCENTAGE.

10        AND THAT'S BECAUSE, AGAIN, BASED ON HOW THAT 310 MILLION

11   IS DEFINED IN THE SETTLEMENT AGREEMENT, THAT NUMBER IS, ITSELF,

12   CALCULATED BY INCLUDING ATTORNEY'S FEES.  SO IT'S CIRCULAR

13   LOGIC, YOU CAN'T SEPARATE THE TWO.  IN ORDER TO REACH THE 310,

14   YOU HAVE TO INCLUDE ATTORNEY'S FEES.

15        WELL, IN ORDER TO DETERMINE ATTORNEY'S FEES, YOU HAVE TO

16   USE THE 310.  SO IT WOULD RESULT IN AN ARBITRARY AWARD IF YOU

17   USE A PERCENTAGE OF THAT 310.

18        THE FINAL REASON WHY THE LODESTAR SHOULD BE USED INSTEAD

19   OF A PERCENTAGE IS THAT THE AMOUNT THAT THEY HAVE REQUESTED

20   ACTUALLY FAILS THE LODESTAR CROSS-CHECK.

21        THE POINT OF THAT INQUIRY IS TO CONFIRM THAT CLASS COUNSEL

22   ARE NOT RECEIVING, IN THE COURT'S WORDS, I BELIEVE AN

23   EXORBITANT FEE, IN COMPARISON TO HOW MANY HOURS THEY SPENT ON

24   THE CASE.  AND IF YOU DO THAT CALCULATION UNDER THE PERCENTAGE

25   METHOD, IT COMES OUT TO BE -- YOU KNOW, THEY ARE GETTING PAID

1       ABOUT $1,276.  SO YOU TAKE THE 87.7 MILLION, DIVIDED BY THE

2       STATED NUMBERS OF HOURS ON THE CASE, THE 68,000, AND YOU GET

3       THAT ROUGHLY $1,276 PER HOUR AMOUNT.

4           IF YOU DO THE SAME TYPE OF CALCULATION BASED ON THEIR

5       LODESTAR, THEIR HOURLY RATE COMES TO $529.  SO THE RATE THAT

6       THEY ARE GETTING UNDER THE PERCENTAGE AMOUNT, PERCENTAGE OF THE

7       FUND CALCULATION, IS DOUBLE WHAT THEY WERE GETTING UNDER THE

8       LODESTAR AMOUNT.

9           SO FOR THAT REASON, IT FAILS THE LODESTAR CROSS-CHECK AND

10      JUST CONFIRMS THAT USING THE PERCENTAGE METHOD TO CALCULATE

11      FEES WOULD RESULT IN AN UNREASONABLE AWARD.

12          THE LAST POINT THAT I WANT TO BRING TO THE COURT'S

13      ATTENTION IS OUR POSITION THAT THE COURT SHOULD USE A BASE

14      LODESTAR WITH NO MULTIPLIER.

15          THERE ARE CERTAINLY -- IF THE COURT WERE TO DO THAT, THE

16      COURT WOULD CERTAINLY NOT BE AN OUTLIER, THERE ARE PLENTY

17      EXAMPLES OF THE COURTS USING LODESTAR OVER THE PERCENTAGE.  WE

18      HAVE TALKED ABOUT MOST OF THOSE TODAY, I THINK ALL OF THEM,

19      FOLKS HAVE MENTIONED THE IN RE WASHINGTON PUBLIC POWER SUPPLY

20      CASE, THE WELLS FARGO CASE, IN RE YAHOO, IN RE HIGH-TECH, ALL

21      OF THOSE USED A LODESTAR OVER THE PERCENTAGE OF THE FUND

22      METHOD.

23          AND THE BASE LODESTAR IN THIS CASE WOULD BE A GOOD FIT FOR

24      THE CASE FOR THE SAME REASON THAT A BASE LODESTAR AMOUNT IS

25      GOOD IN GENERAL.  AND THAT'S BECAUSE, AS THE U.S. SUPREME COURT

1    HAS SAID, THE LODESTAR HAS REASONABLENESS BAKED INTO IT.  ALL

2    OF THE FACTORS THAT ORDINARILY WOULD CAPTURE THE EFFORT OF

3    COUNSEL, ARE CAPTURED IN A LODESTAR AMOUNT.  AND THAT REMAINS

4    TRUE HERE.

5         THE COURT HAS EVEN GONE SO FAR TO SAY THERE IS A STRONG

6    PRESUMPTION THAT THE LODESTAR IS SUFFICIENT, AND IN ORDER TO

7    JUSTIFY DEPARTURE FROM THAT THERE HAVE TO BE RARE OR

8    EXCEPTIONAL CIRCUMSTANCES.  AND WE SUBMIT THAT THERE ARE NONE

9    HERE.

10        I THINK IT WAS MR. CLORE TALKED ABOUT THE CHAMBERS

11   DECISION, THAT WAS ONE OF THE REASONS WE JUSTIFIED OUR FILING

12   OF AN AMICUS BRIEF WAS THAT CASE, IT WAS HANDED DOWN BY THE

13   NINTH CIRCUIT, I BELIEVE JUST AFTER PLAINTIFF'S COUNSEL HAD

14   FILED THEIR MOTION FOR FEES.  AND THERE HAS BEEN SOME ATTEMPT

15   TO DISTINGUISH CHAMBERS ON THE BASIS THAT IT SPEAKS ONLY TO

16   COUPON RELIEF, AND CLEARLY THIS CASE DOES NOT DEAL WITH COUPON

17   RELIEF, WE ACKNOWLEDGE THAT.  BUT THE COURT IN CHAMBERS ISSUED

18   AN EQUALLY IMPORTANT PART OF ITS OPINION, TALKED ABOUT WHETHER

19   MULTIPLIERS ARE APPROPRIATE AND WHEN, ON LODESTARS.

20        AND WE ENCOURAGE THE COURT TO REVIEW THAT CASE CAREFULLY,

21   BECAUSE AS WE LAID OUT IN OUR PAPERS, IF A CLOSE COMPARISON IS

22   MADE, YOU WILL SEE THAT MANY, IF NOT ALL OF THE JUSTIFICATIONS

23   CLASS COUNSEL HAVE USED IN THIS CASE TO JUSTIFY HAVING A

24   MULTIPLIER ON THEIR LODESTAR, ARE ACTUALLY SUBSUMED IN THE

25   LODESTAR CALCULATION, AND THE NINTH CIRCUIT HAS HELD AS MUCH IN

1       THE CHAMBERS DECISION.

2           I'M HAPPY TO GO THROUGH EACH OF THOSE FACTORS, I THINK WE

3       HAVE LAID THEM OUT FAIRLY WELL IN OUR PAPERS, BUT I DID WANT TO

4       JUST TOUCH ON A COUPLE, BECAUSE PLAINTIFF'S COUNSEL MENTIONED A

5       FEW IN HIS OPENING PRESENTATION.

6           ONE IS ABOUT ACHIEVING AN EXCEPTIONAL RESULT.  I THINK FOR

7       THE REASONS I TALKED ABOUT, ABOUT WHY THE 310 MILLION IS NOT

8       THE TRUE BENEFIT TO THE CLASS, THAT ALSO FACTORS -- CUTS

9       AGAINST THERE BEING AN EXCEPTIONAL RESULT HERE.

10          I THINK THE COURT NOTED AT THE DECEMBER 4TH HEARING THAT

11      MUCH OF WHAT THE CLASS COUNSEL HAS TRIED TO SUPPORT THEIR

12      EXCEPTIONAL RESULT CLAIM WITH IS THEIR OWN EXPERT IN HIS

13      METHODOLOGY ON WHAT THE DAMAGES WOULD BE.  IT IS TRUE THAT THEY

14      SUPPLEMENTED THAT PRONG OF THEIR ARGUMENT AND THEIR EXPERT,

15      THEY PUT FORTH SOME METHODOLOGY, BUT I WOULD SUBMIT THAT EVEN

16      NOTWITHSTANDING WHAT THEY HAVE SUBMITTED, THERE ARE STILL SOME

17      QUESTIONS THAT REMAIN.

18          I DON'T INTEND TO TURN THIS INTO A DAUBERT HEARING BY ANY

19      MEANS, BUT IF THE COURT REVIEWS THAT SUPPLEMENTAL FILING, I

20      THINK THE COURT WILL FIND A COUPLE QUESTION MARKS IN THE

21      EXPERT'S ANALYSIS.  SUFFICE IT TO SAY WHAT THE EXPERT PUT FORTH

22      IS NOT THE BE ALL END ALL, AND IT STILL IS THEIR EXPERT THAT

23      HASN'T GONE THROUGH THE CRUCIBLE OF GOING ALL THE WAY TO TRIAL.

24          THAT NOTWITHSTANDING, IN TERMS OF DEALING WITH SUBSTANTIAL

25      RISK, I THINK THE CHAMBERS DECISION TALKED ABOUT THAT.  THEY

1   SAID THAT LODESTAR TYPICALLY REFLECTS THE DIFFICULTY OF

2   ESTABLISHING THE MERITS OF THE CLAIM.  AND FOR THAT REASON,

3   JUST THE FACT THAT YOU DEAL WITH SUBSTANTIAL RISK, DOESN'T MEAN

4   YOU GET A MULTIPLIER.  IT'S NOT ENOUGH THAT YOU ARE UP AGAINST

5   A TOUGH OPPONENT OR A WELL-HEALED OPPONENT.

6       I BELIEVE PLAINTIFF'S COUNSEL MENTIONED THAT AT LEAST ONCE

7   DURING THE OPENING, THAT WE ARE GOING UP AGAINST APPLE, AND

8   THEY HAVE PRACTICALLY ALL THE RESOURCES ONE COULD EVER WANT.

9   AND THE NINTH CIRCUIT SAID THAT'S NOT ENOUGH.  IF THAT WERE THE

10  CASE, THEN THE RULE ABOUT NOT HAVING A MULTIPLIER, EXCEPT IN

11  EXCEPTIONAL CIRCUMSTANCES, WOULD MAKE NO SENSE BECAUSE THEN

12  EVERYBODY COULD CLAIM THAT.  SO IT'S NOT ENOUGH THAT THEY ARE

13  GOING UP AGAINST A GOLIATH.

14      IN TERMS OF THE SKILL AND THE HIGH QUALITY OF THE WORK

15  FACTOR, CHAMBERS TALKED ABOUT BECAUSE TIME AND LABOR SPENT ON A

16  CASE IS ALREADY BUILT INTO THE LODESTAR, NO MULTIPLIER ON THAT

17  IS WARRANTED.

18      THE SAME GOES FOR THE NOVELTY AND THE COMPLEXITY OF THE

19  CASE.  JUST BECAUSE A CASE IS NOVEL AND COMPLEX, YOU CAN'T JUST

20  GENERALLY STATE THAT.  THAT'S USUALLY REFLECTED IN THE HOURS

21  THEMSELVES.

22      IN TERMS OF WORKING ON A CONTINGENT BASIS, CHAMBERS DIDN'T

23  SPEAK DIRECTLY TO THIS, AT LEAST NOT UNDER THAT NAME, BUT THEY

24  DID TALK ABOUT RISK GENERALLY, AND UNDESIRABILITY.  AND IN THAT

25  CASE THE NINTH CIRCUIT SAID, WELL, THE FACTS BELIE THE

1    CONTENTION THAT THIS IS UNDESIRABLE BECAUSE FIVE DIFFERENT LAW

2    FIRMS PURSUED THESE CLAIMS AGAINST WHIRLPOOL, AND COLLECTIVELY

3    LITIGATED THE CASE FOR MANY YEARS.

4         WELL HERE, IF I'M NOT MISTAKEN, I THINK IN THE BEGINNING,

5    81 FIRMS FILED LAWSUITS AND FOUR FILED TO SERVE AS LEAD

6    COUNSEL.  SO AGAIN, UNDER CHAMBERS, THE FACT THAT SO MANY FIRMS

7    WERE VYING TO PARTICIPATE IN THIS LITIGATION SEEMS TO UNDERCUT

8    ANY NOTION THAT THIS WAS EXCESSIVELY RISKY OR UNDESIRABLE.

9         AND THEN THE LAST FACTOR THAT CLASS COUNSEL TALKED ABOUT

10   WAS HOW THEIR REQUEST IS ON PAR WITH FEES IN OTHER CASES.  AND

11   I DO TAKE EXCEPTION TO THAT.  I DON'T THINK IT IS ON PAR.  THE

12   COURT DIDN'T HAVE TO LOOK FAR TO SEE THAT FACT, CITING THE SAME

13   COUPLE OF CASES THAT WE HAVE BEEN TALKING ABOUT, THE WASHINGTON

14   PUBLIC POWER SUPPLY CASE, IN RE HIGH-TECH, THE IN RE YAHOO, THE

15   WELLS FARGO, AS WELL AS THE GENERAL OBSERVATION BY THE

16   NINTH CIRCUIT THAT THE LARGER THE FUND BECOMES, THE LARGER THE

17   SIZE OF THE FUND, USUALLY THE LOWER THE SIZE OF THE AWARD.

18        I THINK THAT OBSERVATION IS CORRECT AND IT SHOULD BE,

19   HOPEFULLY IT INFLUENCES THE COURT'S DECISION IN THIS CASE.

20        THOSE ARE THE THREE POINTS THAT I WANTED TO MAKE TO THE

21   COURT.  THE BOTTOM LINE IS THAT ABSENT CLASS MEMBERS ARE JUST

22   THAT, THEY ARE ABSENT, THEY ARE NOT HERE, AND THEY DON'T

23   NECESSARILY HAVE ANYONE TO SPEAK ON THEIR BEHALF BUT FOR

24   THROUGH ATTORNEY GENERAL'S OFFICES, OR POTENTIALLY THROUGH THE

25   U.S. ATTORNEY'S OFFICE OR ATTORNEY GENERAL'S OFFICE.  BOTH HAVE

1    WEIGHED IN ON THIS CASE, HAVE ACCEPTED TO MEET THE EXCESSIVE

2    FEE THAT HAS BEEN REQUESTED, AND WE SIMPLY ASK THAT THE COURT

3    CAREFULLY EXERCISE ITS FIDUCIARY DUTY TO THOSE ABSENT CLASS

4    MEMBERS TO HAVE A JEALOUS REGARD FOR THEIR INTERESTS, TO

5    MAXIMIZE THEIR INTERESTS TO THE FULLEST EXTENT WITHOUT

6    SACRIFICING REASONABLENESS OF THE FEE.

7         AND WE THINK THAT CAN BE DONE BY USING THE BASE LODESTAR

8    WITHOUT ANY MULTIPLIER.  AND IF THE COURT DOES THAT, IT WILL

9    RESULT IN OVER $50 MILLION TO THE CLASS, WHICH IS SIGNIFICANT

10   ANY WAY YOU SLICE IT.

11        AND FOR THOSE REASONS, WE SUBMIT THAT AND REQUEST THAT THE

12   COURT AWARD A FEE THAT'S JUST ON THE BASE LODESTAR, WITH NO

13   MULTIPLIER.

14        AND I THINK WE SAID IT OUR PAPERS AND I DON'T WANT TO GO

15   OVER IT TOO MUCH NOW, BUT I THINK THE ACCURACY OF THOSE

16   RECORDS, CERTAINLY THE COURT AND THE PARTIES ARE MUCH MORE IN

17   TUNE TO WHAT ACTUALLY OCCURRED IN THE CASE THAN THE ATTORNEY

18   GENERAL COMING IN AT THIS POINT, BUT IT DOES APPEAR ON THE

19   SURFACE THAT THERE MAY BE SOME INACCURACIES AND REDUNDANCIES IN

20   THERE, SO WE JUST JOIN IN ALL OF THE ARGUMENTS THAT THE

21   LODESTAR BE ACCURATELY SUPPORTED AND SUFFICIENTLY SUPPORTED.

22        THANK YOU, YOUR HONOR.

23           THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH.

24        I THINK THAT -- I BELIEVE THAT EXHAUSTS THE OBJECTORS THAT

25   I HAVE ON MY LIST.

```
1              IS THERE ANYONE ELSE WHO HAS NOT SPOKEN FOR OBJECTORS THAT
2    WISHES TO BE HEARD?  I DON'T SEE ANYONE.
3              WE HAVE BEEN SPEAKING NOW ON THE RECORD FOR ABOUT
4    TWO-AND-A-HALF HOURS.  I WOULD LIKE TO GIVE OUR COURT REPORTER
5    A BREAK.
6              SO CAN WE TAKE ABOUT SEVEN MINUTES AND DO THAT.
7              MADAM CLERK, WE ARE GOING TO STAY ON, WE ARE NOT GOING TO
8    DISENGAGE?
9                   THE CLERK:  THAT'S CORRECT, YOUR HONOR.
10                  THE COURT:  SO NOBODY LEAVE.  YOU CAN TURN YOUR
11   SCREEN DARK, BUT I DO WANT TO GIVE OUR COURT REPORTER ABOUT A
12   SEVEN-MINUTE BREAK HERE.
13             AND THEN WHEN WE RETURN, I WILL RETURN TO MR. MOLUMPHY,
14   AND PLAINTIFFS, IF YOU WISH TO RESPOND TO ANY OF THE
15   OBJECTIONS, AND THEN I WOULD LIKE TO MOVE ON TO THE OTHER PART,
16   EXPENSES AND OTHER MATTERS.
17             SO LET'S TAKE ABOUT SEVEN MINUTES.  WE WILL SEE EVERYONE
18   BACK IN ABOUT SEVEN MINUTES.
19             THANK YOU.
20                  THE CLERK:  THE COURT IS IN RECESS.
21        (RECESS FROM 3:20 P.M. UNTIL 3:29 P.M.)
22                  THE COURT:  ALL RIGHT.  LET'S GO BACK ON THE RECORD.
23             ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.
24             AND MR. MOLUMPHY, DO YOU WISH TO BE HEARD IN RESPONSE TO
25   ANYTHING THAT WAS SAID IN REGARDS TO THE ATTORNEY'S FEES?
```

1     MR. MOLUMPHY:  I WOULD, YOUR HONOR.

2        I WILL DO MY BEST, THERE WAS A LOT OF THINGS SAID THERE.

3     AND THEN I'M GOING TO, WITH YOUR HONOR'S PERMISSION, INVITE MY

4     COLLEAGUES, TO THE EXTENT THEY HAVE ANY ADDITIONAL COMMENTS.  I

5     KNOW THERE WAS SOME WITH RESPECT TO THE CLASS NOTICE PROCESS,

6     FOR EXAMPLE, THAT WERE RAISED THAT MR. FOX, I THINK, IS

7     PREPARED TO COVER.

8        AND IN ADDITION, I JUST WANTED TO LET YOU KNOW, AND I

9     THINK I POINTED THIS OUT BEFORE, BUT MARK DEARMAN FROM THE

10    ROBBINS GELLER FIRM, WHO WAS APPOINTED BY YOUR HONOR AT THE

11    INCEPTION OF THE CASE TO BASICALLY SUPERVISE AND TO MONITOR THE

12    TIME AS IT CAME IN TO ENSURE IT WAS A, COMMON BENEFIT WORK, AND

13    B, THAT IT WOULD FIT WITHIN YOUR HONOR'S DIRECTIONS, AND WHEN

14    THAT DIRECTION WAS NOT FOLLOWED, TO ACTUALLY REJECT THAT TIME.

15    AND HE ACTUALLY PREPARED SOME PRETTY DETAILED DECLARATIONS THAT

16    WERE SUBMITTED WITH OUR PAPERS.

17       SO HE IS ALSO ON LINE TODAY.  IF THE COURT WANTED TO ASK

18    FURTHER QUESTIONS, FOR EXAMPLE, WITH RESPECT TO THE CONTRACT

19    ATTORNEY ISSUE.  I THINK I DEALT WITH THAT, I KNOW THERE SOME

20    EFFORT TO OBFUSCATE THE ISSUE, AND IT'S NO LONGER A CONTRACT

21    ATTORNEY ISSUE, NOW WE ARE TALKING ABOUT A STAFF ATTORNEY, AND

22    WELLS FARGO ALSO BARRED STAFF ATTORNEYS, WHICH IS BY THE WAY

23    FALSE, JUDGE TIGAR DID NOT DO THAT IN THE WELLS FARGO DECISION.

24       BUT IF THE COURT WANTS TO DELVE INTO THAT DEEPER, I THINK

25    MR. DEARMAN IS PREPARED TO ADDRESS THAT.

1             THE COURT:  THANK YOU.

2         AND I THOUGHT I WOULD CALL ON MR. DEARMAN AT SOME

3    APPROPRIATE TIME JUST TO COMMENT, JUST TO GIVE US A COMMENT ON

4    THE WORK HE DID, A BRIEF STATEMENT ABOUT THE WORK THAT HE DID,

5    INCLUDING ANY CARVE OUTS, ANY DENIALS.  HE CAN COMMENT ON THIS

6    ISSUE ABOUT CONTRACT ATTORNEY, STAFF ATTORNEY, ADJUNCT

7    ATTORNEY, WHATEVER THEY ARE CALLED, IF HE WISHES.

8         DO YOU WANT HIM TO DO THAT BEFORE YOU COMMENT

9    MR. MOLUMPHY?

10            MR. MOLUMPHY:  WHY DON'T WE DO THAT, YOUR HONOR, THAT

11   WAY WE DON'T BREAK IT UP.

12            THE COURT:  SURE.

13        MR. DEARMAN, WHY DON'T YOU JUST INFORM US, IF YOU WOULD

14   PLEASE, OF THE TASK THAT YOU WERE ASSIGNED AND WHAT YOU DID TO

15   ACCOMPLISH THAT TASK.

16            MR. DEARMAN:  YES, YOUR HONOR.  THANK YOU.

17        MARK DEARMAN, PARTNER AT ROBBINS GELLER RUDMAN & DOWD ON

18   BEHALF OF THE PLAINTIFFS.

19        YOUR HONOR, OUT OF THE GATE, I CAN'T BELIEVE THAT WE ARE

20   TALKING ABOUT IN 2018, THIS COURT ENTERED CTO3, WHICH IS DOCKET

21   NUMBER 148, WHICH IS REALLY THE TIME AND EXPENSE BILLING

22   PROTOCOL.

23        IN CONJUNCTION WITH THAT PROTOCOL, AS A WAY TO COMPLIMENT

24   THAT PROTOCOL, THE PLAINTIFF'S LEADERSHIP ALSO IMPLEMENTED

25   BILLING GUIDELINES AND PROCEDURES TO COMPLIMENT THE PROTOCOL

1    THAT YOU ENTERED.  IT WAS A PROTOCOL THAT WAS ENTERED BY THE

2    PLAINTIFF'S LEADERSHIP, WAS MORE STRINGENT THAN CTO3, NEVER

3    LESS STRINGENT, MORE RESTRICTIVE.

4         THE THINGS THAT WE DID, YOUR HONOR, AS A RESULT OF YOU

5    APPOINTING ME TO HANDLE THE TIME AND EXPENSE REPORTING WITH

6    REGARDS TO THE PROTOCOL THAT YOU ENTERED, WAS MAKE SURE THAT

7    ALL OF THE TIME KEEPERS IN THIS CASE WERE AWARE OF THE

8    PROTOCOL, WERE AWARE OF THE ADDITIONAL GUIDELINES, AND

9    UNDERSTOOD THAT THEY WOULD BE KEEPING THEIR TIME

10   CONTEMPORANEOUSLY, THEY WOULD BE SUBMITTING IT TO ME ON A

11   MONTHLY BASIS, CERTIFYING THAT IT WAS ACCURATE, AND THAT THEY

12   UNDERSTOOD THAT ON A MONTHLY BASIS, THAT I WOULD BE REVIEWING

13   IT.

14        THEY FURTHER UNDERSTOOD YOUR HONOR'S ADMONITION THAT THEY

15   WOULD BE REQUIRED TO -- IN CTO3, THE COURT SORT OF SET FORTH

16   EXAMPLES OF THINGS THAT WOULD BE TREATED AS COMMON BENEFIT AND

17   THINGS THAT WOULD NOT BE TREATED ASS COMMON BENEFIT, AND

18   EVERYONE KNEW THAT, AND I KNEW THAT.

19        AND AS I REVIEWED THE BILLS ON A MONTHLY BASIS,

20   YOUR HONOR, WE CAME UP WITH A DEFICIENCY SORT OF CHECK LIST AT

21   THE BEGINNING OF THE CASE.  AND I ATTACHED THAT DEFICIENCY FOR

22   THE COURT'S CONVENIENCE, TO MY INITIAL DECLARATION WHICH IS AT

23   DOCKET NUMBER 469.  AND THE REASON I DID THAT IS BECAUSE I

24   WANTED THE COURT TO SEE THE SAFEGUARDS THAT WE PUT IN PLACE.

25   THE TYPES OF -- AND IT EITHER COULD HAVE BEEN BY LETTER OR IT

1    COULD HAVE BEEN BY A CALL WHERE I WOULD TALK ABOUT THINGS THAT

2    SORT OF WERE NOT EITHER FOR COMMON BENEFIT AND NEEDED TO BE

3    EXCLUDED, OR IF THERE WAS BLOCKED BILLING THAT NEEDED TO BE

4    FIXED, OR IF THERE WERE TOO MANY PEOPLE WORKING ON A TASK, WE

5    WOULD HAVE A DISCUSSION ABOUT THAT TO MAKE SURE THE TIME

6    KEEPERS WHO WERE DOING THE WORK WERE AUTHORIZED TO DO THE WORK.

7            WE HAD WEEKLY CALLS WHERE I ATTENDED THOSE CALLS AND SO I

8    KNEW WHAT WAS GOING ON WITH THE STATUS AND STRATEGY OF THE CASE

9    AND I KNEW WHO WAS DOING WHAT.  AND IF I HAD A QUESTION, I

10   COULD PICK UP THE PHONE AND FIND OUT WHAT WAS GOING ON SO THAT

11   I COULD BE SURE THAT THE WORK THAT WAS BEING PERFORMED WAS

12   AUTHORIZED, AND THAT THE WORK THAT WAS BEING PERFORMED WAS TO

13   BENEFIT THE PROSECUTION OF THE LITIGATION TO BE COMMON BENEFIT.

14           I SENT MORE DEFICIENCY LETTERS OUT EARLY THAN I DID LATE

15   BECAUSE PEOPLE START TO GET -- YOU KNOW, THEY GOT WITH THE

16   PROGRAM, SO I EXCLUDED LESS TIME AS TIME WENT ON BECAUSE PEOPLE

17   BEGAN TO -- THEY UNDERSTOOD THAT I WAS LOOKING AT THIS EVERY

18   MONTH, THAT I WAS SUBMITTING REPORTS TO THE COURT, AND SO THAT

19   WAS THE, SORT OF, DIRECTION THAT WE WENT ON.  IT WAS A MONTHLY

20   REVIEW OF THE LODESTAR.

21           AND YES, THERE WAS TIME THAT WAS EXCLUDED.  AND THERE WERE

22   TIMES WHERE THERE WERE TIME THAT WE COULD DISCUSS HOW THAT TIME

23   COULD BE SORT OF HANDLED APPROPRIATELY BECAUSE IT WAS COMMON

24   BENEFIT, AND IF IT WAS COMMON BENEFIT, IT COULD BE APPROPRIATE

25   TO BE SUBMITTED TO THE COURT.

1       THERE'S THIS ISSUE WITH RESPECT TO CONTRACT ATTORNEYS, AND

2   WHAT I WILL TELL THE COURT IS THAT THE ATTORNEYS THAT DID DOC

3   REVIEW IN THIS CASE, IF THEY HAD A RATE LOWER THAN $350 AN

4   HOUR, THAT WAS THE RATE THAT WAS UTILIZED.  IF THEY HAD A RATE

5   THAT WAS HIGHER THAN $350 DOLLARS, $350 WAS UTILIZED.

6       THE LAWYERS THAT DID THE DOC REVIEW IN THIS LITIGATION

7   WERE EMPLOYEES OF THE FIRMS INVOLVED IN THE LITIGATION, THEY

8   WERE NOT EMPLOYEES OF AN AGENCY THAT WAS SUPPLYING PEOPLE TO DO

9   REVIEW, THESE WERE EXPERIENCED LAWYERS THAT UNDERSTOOD THE CASE

10  AND THAT DID WORK ON THE CASE, AND SO THAT'S THAT SORT OF

11  DISTINCTION.

12      AS IT CAME TO FINAL APPROVAL, I SUBMITTED THAT FIRST

13  DECLARATION, I ALSO SUBMITTED A SECOND DECLARATION WHERE, IN

14  THAT DECLARATION, I INDICATED THAT I DISCOVERED THAT THERE WERE

15  TWO REVIEWERS WHO WERE CONTRACT LAWYERS.  THAT TIME, AS

16  MR. MOLUMPHY INDICATED BEFORE, WAS COMPLETELY EXCLUDED FROM THE

17  CASE.

18      IN ADDITION TO THAT, WE FOUND THAT THERE WERE SOME

19  REVIEWERS, FIRM EMPLOYEES, WHO DID WORK THAT WAS DOC REVIEW,

20  BUT ALSO OTHER LEGAL TASKS.  AND IN THAT CASE, WE ALLOWED

21  CUSTOMARY RATES FOR THE WORK THAT WAS NOT DOC REVIEW, AND WE

22  LIMITED THEIR WORK TO $350 IF THE RATE WAS HIGHER FOR DOC

23  REVIEW.

24      AND IN THE SUBMISSIONS WE MADE TO THE COURT IN SUPPORT OF

25  FINAL APPROVAL, WE BROKE THAT OUT SO YOU COULD SEE WHICH TIME

1     KEEPERS THAT DID WORK THAT WAS DOC REVIEW AND OTHER.

2          AND SO I TOOK MY APPOINTMENT SERIOUSLY.  I THINK AS WITH

3     ANY FEE APPLICATION, PRIOR TO THE FILING OF AN APPLICATION,

4     THERE IS, YOU KNOW, THERE IS SOME JUDGMENT.  AND BASED ON MY

5     30 YEARS OF EXPERIENCE REPRESENTING PLAINTIFFS AND DEFENDANTS,

6     I UTILIZED THAT EXPERIENCE TO SORT OF MAKE CALLS AS TO WHAT WAS

7     COMMON BENEFIT AND WHAT WASN'T, AND WE HAD CONVERSATION AND I

8     HAD CONVERSATIONS WITH LEADERSHIP REGARDING THAT POINT

9     FREQUENTLY.

10          AND SO I JUST WANTED THE COURT TO AT LEAST HAVE A FLAVOR

11     AS TO WHAT WAS DONE WITH RESPECT TO THE COURT'S MANDATES

12     REGARDING CTO3 AND REGARDING MY APPOINTMENT AND WHAT I DID

13     THROUGHOUT THE TENURE OF THE LITIGATION.

14          THE COURT:  THANK YOU VERY MUCH, MR. DEARMAN.  I

15     APPRECIATE YOU GIVING ME THAT STATEMENT.  THAT'S HELPFUL.

16          AND THE COURT DID RECEIVE YOUR DOCUMENTS WHEN YOU FILED

17     THEM, YOUR STATEMENTS WHEN YOU FILED THEM, SO I'M APPRECIATIVE

18     OF THAT.  THANK YOU VERY MUCH.

19          LET ME GO BACK TO MR. MOLUMPHY.

20          MR. MOLUMPHY:  THANK YOU, YOUR HONOR.

21          THE REASON I WANTED TO POINT THAT OUT IS OBVIOUSLY A

22     NUMBER OF THE OBJECTORS CITED TO AND REFERRED TO OUR LODESTAR

23     IN REFERRING TO THE DOCUMENT REVIEW PORTION SPECIFICALLY, AND

24     THE IMPLICATION WAS THAT IT WAS WASTED TIME OR TOO MUCH TIME.

25          THE OPPOSITE WAS THE CASE.  WE VERY EARLY IN THE PROCESS,

1    AS MR. DEARMAN SAID, AND CERTAINLY FROM A CO-LEAD PERSPECTIVE,

2    ATTEMPTED TO MAKE THIS AS EFFICIENT A PROCESS AS POSSIBLE.

3    JUST FRANKLY, GIVEN THE NUMBER OF PAGES AND DOCUMENTS AND THE

4    TYPES OF DOCUMENTS THAT WERE SUBMITTED, THE TYPES OF PEOPLE

5    THAT HAD TO REVIEW THOSE AND THE TIMELINE TO GET READY, NOT

6    JUST TO AMEND OUR COMPLAINT TO SATISFY YOUR HONOR'S INITIAL

7    MOTION TO DISMISS RULING, BUT ALSO THE DEPOSITIONS.

8         THIS WAS A CRITICAL TASK TO THE CASE.  AND IT WAS CRITICAL

9    IN THIS CASE BECAUSE A, THIS WAS NOT SOME PUBLIC CASE THAT

10   EVERYONE KNEW WHAT WAS GOING ON.  THE BASIC DETAILS AND FACTS

11   OF THIS CASE WERE INTERNAL TO APPLE.

12        SECONDLY, THERE WAS REGULATORY ACTION IN WHICH THE KEY

13   DOCUMENTS HAD ALREADY BEEN IDENTIFIED.  SO I THINK THAT'S

14   IMPORTANT CONTEXT FOR THE DOCUMENT REVIEW THAT WAS DONE HERE.

15   IT WAS EXTENSIVE, BUT IT ALSO WAS ABSOLUTELY CRUCIAL TO OUR

16   ABILITY TO NEGOTIATE THE SETTLEMENT THAT WE OBTAINED IN THIS

17   CASE.

18        THE OTHER OBJECTIONS THAT WE ARE HEARING, I FEEL A LITTLE

19   BIT LIKE I'M TILTING AT WINDMILLS, IN THAT I HEAR FROM SOME

20   OBJECTORS THAT THE COURT SHOULD BE APPLYING THE LODESTAR

21   METHODOLOGY UNLESS THERE'S SOME REASON TO DEVIATE FROM THAT,

22   AND OTHERS SAYING THAT YOU SHOULD BE APPLYING A

23   PERCENTAGE-BASED.

24        OBVIOUSLY WE THINK THE BETTER APPROACH AND WE THINK THE

25   APPROACH THAT'S BEEN UPHELD BY MORE COURTS, AND FRANKLY ALIGNS

1    THE INTEREST OF COUNSEL WITH THE CLASS THE BEST TO MAXIMIZE

2    RECOVERY, IS THE PERCENTAGE-BASED APPROACH.  AND THAT'S WHY WE

3    HAVE PROPOSED THAT HERE.

4         WE HAVE PROVIDED OUR LODESTAR, WHICH I THINK SUPPORTS THE

5    FEE THAT WE ARE ASKING, BUT WHETHER YOU APPLY THE PERCENTAGE OR

6    THE LODESTAR, WE THINK THE RESULT, THE FEE WE ARE SEEKING IS A

7    REASONABLE ONE BASED UPON THE SIGNIFICANT RECOVERY WE'VE MADE.

8         ANOTHER PART OF THE PRESENTATION THAT I DID NOT SEE

9    ADDRESSED BY ANY OF THE OBJECTORS, AND THAT'S ONE OF THE

10   REASONS WE MADE IT IN OUR PAPERS AND I LEAD WITH IT TODAY, WAS

11   THE SPECIFIC CONTEXT OF THIS CASE.  THE RISKS THAT WE HAD IN

12   THIS CASE.  THE CLAIMS THAT WE HAD IN THIS CASE.  NOT ADDRESSED

13   BY ANY OF THE OBJECTORS; RATHER, IT SEEMS TO BE THAT THEY ARE

14   ASKING YOUR HONOR TO APPLY A ONE-SIZE-FITS-ALL APPROACH TO

15   ATTORNEY'S FEES.  LOOK AT THE STUDIES BY THIS PROFESSOR, IT

16   FITS WITHIN THIS STRUCTURE, SO THEREFORE YOU SHOULD APPLY THE

17   SAME FEE HERE.

18        IT DOESN'T REALLY MATTER WHAT THE FACTS AND CIRCUMSTANCES

19   ARE ON THE INDIVIDUAL CASE, WHICH OF COURSE IS DIAMETRICALLY

20   THE OPPOSITE OF WHAT NINTH CIRCUIT LAW IS.

21        WE'VE HEARD ABOUT NINTH CIRCUIT CASES SOMEHOW NOT LIKING

22   THE BENCHMARK IN MEGAFUND CASES.  WELL, THAT'S NOT THE LAW.  AS

23   JUDGE ORRICK SAID IN THE LIDODERM CASE, THERE IS NO ROLE IN THE

24   NINTH CIRCUIT THAT REQUIRES A COURT TO DECREASE THE PERCENTAGE

25   OF THE FEE AWARD AS THE SIZE OF THE SETTLEMENT INCREASES.

1    FEDERAL DISTRICT COURTS ACROSS THE COUNTRY HAVE, IN A CLASS

2    ACTION SETTLEMENT CONTEXT, ROUTINELY AWARDED CLASS COUNSEL FEES

3    IN EXCESS OF THE 25 PERCENT BENCHMARK, EVEN IN SO CALLED

4    "MEGAFUND" CASES.

5         AND OF COURSE THERE'S A BACKSTOP, THERE'S AN INSURANCE

6    THAT YOUR HONOR CAN APPLY TO MAKE SURE THAT A PERCENTAGE IS

7    REASONABLE, AND THAT'S THE WINDFALL ANALYSIS.

8         AND AGAIN, THERE'S CASES AFTER CASES DISCUSSING WHAT THAT

9    WINDFALL ANALYSIS IS.  THERE'S BEEN SEVERAL DIFFERENT

10   INTERPRETATIONS HERE TODAY OF WHAT A WINDFALL IS.  AND I THINK

11   WE HEARD, FOR EXAMPLE, SOME PEOPLE SAY THAT THE YAHOO CASE IS A

12   PERFECT EXAMPLE OF A WINDFALL ANALYSIS.

13        WELL, THE YAHOO CASE WAS A DATA BREACH CASE IN WHICH CLASS

14   MEMBERS RECEIVED SIXTY CENTS PER CLAIM.  AND JUDGE KOH, I

15   BELIEVE IT WAS JUDGE KOH, BUT I'M NOT POSITIVE ON THAT, BUT THE

16   LODESTAR WAS USED BECAUSE OF THE DIFFERENCE BETWEEN THE FEES

17   AND WHAT CLASS MEMBERS WERE RECEIVING.

18        THIS CASE, CLASS MEMBERS, EVEN IF YOU RECEIVE A HUNDRED

19   PERCENT OF WHAT WE ARE ASKING FOR, CLASS MEMBERS WHO SUBMITTED

20   ELIGIBLE CLAIM FORMS WILL RECEIVE, WE BELIEVE NOW TO BE,

21   ROUGHLY $80 PER CLAIM -- PER DEVICE.  THE DAMAGES, EVEN ON BEST

22   CASE, ARE $46, UNDER OUR REGRESSION, SOMETHING BETWEEN $12 AND

23   $18.  SO AN $80 RECOVERY WILL BE THREE, FOUR, FIVE TIMES THEIR

24   DAMAGES, A HUNDRED PERCENT OF THEIR DAMAGES.

25        IT'S NOTHING CLOSE TO THE YAHOO CASE, RESPECTFULLY.  AND

1    SO WE DON'T THINK THAT'S A GOOD ANALOGY.  RATHER, WE FEEL LIKE

2    RELYING ON THE CASES IN WHICH THERE WAS SIGNIFICANT RECOVERY,

3    BOTH ON A GLOBAL LEVEL AS WELL AS A PERCENTAGE, AND WE CITED

4    THOSE CASES TO YOU.

5        THERE'S BEEN DISCUSSION ABOUT THE INCENTIVE OF THIS CASE,

6    AND IN FACT WE STRUCTURED IT WITH A $310 MILLION MINIMUM AND

7    $500 MILLION MAXIMUM BASED UPON THE NUMBER OF CLAIMS.  AND THE

8    SUGGESTION, AS FAR AS I CAN TELL FROM CERTAIN OF THE OBJECTORS,

9    IS THAT ACTUALLY PUT A DISINCENTIVE ON CLASS COUNSEL TO TRY GET

10   CLAIMS.  SINCE WE WERE GOING TO BE SEEKING FEES FROM THE LOWER

11   AMOUNT AND NOT THE HIGHER AMOUNT, WE THEREFORE DID NOT HAVE AN

12   INCENTIVE TO TRY TO MAXIMIZE FEES.

13       WELL, WE DIDN'T MAKE A DECISION ON WHEN WE WERE GOING TO

14   SEEK FEES BASED UPON THE SMALLER AMOUNT, WE WERE TRYING TO GET

15   AS MANY CLAIMS AS POSSIBLE.  BUT EVEN IF WE ALWAYS WANTED TO

16   GET FEES BASED UPON THE LOWER AMOUNT, BECAUSE WE THOUGHT THAT

17   WAS A REASONABLE APPROACH, THERE'S NO EVIDENCE THAT WE EVER

18   TRIED TO SOMEHOW REDUCE OR ARTIFICIALLY DEFLATE THE NUMBER OF

19   CLAIMS.  THE RECORD IS THE EXACT OPPOSITE.

20       AND I THINK IF MR. FOX, IF HE'S AVAILABLE, IF YOU WANT TO

21   DISCUSS OUR NOTICE PROCESS, BUT WE BENT OVER BACKWARDS TO TRY

22   TO GET AS MUCH NOTICE PROCESS OUT AS POSSIBLE TO TRY TO MAKE

23   THE CLAIM PROCESS AS SIMPLE AS POSSIBLE.  MOST OF THE CLAIMS

24   WERE ACTUALLY PRE-APPROVED WHEN WE SENT OUT THIS E-MAIL TO

25   CLASS MEMBERS.

1           SO THE FACT THAT THEY GOT AN E-MAIL BASICALLY MEANT THAT

2     THEY HAD A DEVICE THAT WAS PART OF THE CLASS.  AND WE DID A LOT

3     OF WORK AT THE FRONT END TO TRY TO IDENTIFY AS MANY CLASS

4     MEMBERS AS POSSIBLE THAT WERE ELIGIBLE.  WE DID EVERYTHING IN

5     OUR POWER, YOUR HONOR, AS AN OFFICER OF THE COURT, TO TRY TO

6     MAXIMIZE CLAIMS IN THIS CASE.  SOMETIMES THERE'S NOT MORE WE

7     CAN DO.

8           THERE WERE OVER THREE MILLION CLAIMS THAT WERE SUBMITTED.

9     AND I THINK THE FACT THAT IT'S A LOWER PERCENTAGE, PERHAPS,

10    THAN SOME OF US WANTED, YOU KNOW, IT IS CONSISTENT, FRANKLY,

11    WITH OTHER CONSUMER PRODUCT DEFECT CASES.

12          I THINK WE ALL STRIVE TO DO BETTER, BUT THERE WAS NO

13    INCENTIVE, AND CERTAINLY THE SETTLEMENT WAS NOT STRUCTURED IN A

14    WAY WHERE WE WOULD SEEK FEES BECAUSE WE HAD NO INCENTIVE TO

15    MAXIMIZE THE AMOUNT OF CLAIMS.  THERE'S BEEN NO EVIDENCE OF

16    THAT AND THAT'S SIMPLY NOT THE CASE.  AND FRANKLY, I TAKE A BIT

17    OF OFFENSE TO THAT IMPLICATION.

18          APPLE HAS MADE A NUMBER OF OBJECTIONS AS WELL.  AS WE

19    POINTED OUT IN OUR PAPERS, YOUR HONOR, APPLE DOES NOT HAVE

20    STANDING TO OBJECT TO FEES.  THERE'S NO REVERSIONARY INTEREST

21    HERE, AND WE DON'T THINK THAT YOUR HONOR SHOULD ENTERTAIN ANY

22    APPLE OBJECTIONS TO FEES.

23          BUT EVEN IF IT DID, I THINK YOU'VE GOT TO VIEW THOSE WITH

24    REQUISITE SKEPTICISM.  THE IDEA THAT THERE WAS TOO MUCH

25    LITIGATION OR THAT A FEE AWARD IN THIS CASE SOMEHOW REWARDS US

1    FOR ACTIVELY LITIGATING THIS CASE IS ABSURD.  I THINK THE COURT

2    OBVIOUSLY HAD BOX SEATS TO WHAT WAS GOING ON IN THIS CASE.  YOU

3    COULD OBSERVE WHAT WAS GOING ON, IT WAS AN ACTIVELY LITIGATED

4    CASE.

5         THE REASON WE PROVIDE YOU WITH SUCH DETAILED DECLARATIONS

6    ABOUT WHAT WENT ON OUTSIDE OF COURT IN FRONT OF

7    JUDGE WESTERFIELD, AND WE ENCOURAGE YOU TO CONTACT

8    JUDGE WESTERFIELD IF THERE'S ANY QUESTIONS ABOUT THIS, BUT

9    DISCOVERY WAS WORLD WAR III.  I MEAN, IT WAS OPEN WARFARE.

10   EVERYTHING WAS CONTESTED.  EVERY SINGLE THING WAS CONTESTED IN

11   THIS CASE, FROM THE NUMBER OF INTERROGATORIES, TO THE NUMBER OF

12   DEPOSITIONS, TO WHO WE COULD DEPOSE.

13        WE HAD NEWBORN PARENTS, NEW PARENTS WHO WERE NAMED

14   PLAINTIFFS IN THIS CASE THAT APPLE WAS INITIALLY REQUIRING TO

15   TRAVEL FROM NORTH CAROLINA TO PALO ALTO FOR THEIR DEPOSITION

16   WITH THEIR KIDS.  WE APPLIED MOTIONS FOR PROTECTIVE ORDER TO

17   PREVENT DEPOSITIONS FROM GOING FORWARD ON THE TIMETABLE BECAUSE

18   PEOPLE WERE LITERALLY HAVING DIFFICULTY GETTING TO THE

19   DEPOSITION LOCATION.  EVERYTHING WAS BATTLED IN THIS CASE,

20   INCLUDING THIS FEE MOTION.

21        SO AGAIN, I ECHO MR. COTCHETT'S VIEW THAT THERE'S NOTHING

22   WRONG WITH MR. CHORBA AND GIBSON DUNN VIGOROUSLY DEFENDING

23   APPLE, WE WOULD EXPECT NOTHING LESS.  BUT TO THEN SAY THAT WE

24   ARE SOMEHOW LARDING OUR HOURS OR WE SPENT TOO MUCH TIME IN THIS

25   CASE OR IT WOULD BE "BAD PRECEDENT TO AWARD US FEES BASED UPON

1    THE TIME WE SPENT" WE THINK IS ABSURD.

2         AND I THINK THE OPPOSITE IS TRUE.  IF THE COURT WAS TO

3    APPLY A LODESTAR, OR FIND THAT A LODESTAR IS A BETTER PROXY, IT

4    WOULD ONLY INCENTIVIZE ATTORNEYS TO PUT IN MORE TIME AND NOT

5    WORK EFFICIENTLY.  AND WE DON'T THINK THAT'S THE BETTER

6    APPROACH HERE, AND CERTAINLY NOT ONE THAT WE DID.  WE DID NOT

7    PUT IN TIME JUST TO PUT IN TIME IN THIS CASE.

8         THE FINAL POINT, YOUR HONOR, I THINK THERE WAS SOME

9    SUGGESTION THAT THE JCCP COUNSEL'S TIME, AGAIN UNDER THE

10    SETTLEMENT AGREEMENT, SHOULD NOT HAVE BEEN INCLUDED.

11         MR. CHORBA WAS CORRECT THAT THE AGREEMENT DID NOT ALLOW

12    THEM TO SUBMIT A SEPARATE REQUEST, BUT THEY HAVEN'T SUBMITTED A

13    SEPARATE REQUEST.  TO THE CONTRARY, WE COMBINED OUR REQUESTS.

14    WE INCLUDED THEIR TIME IN OUR JOINT FEE MOTION JUST AS WE

15    AGREED TO IN THE SETTLEMENT.  AND JUST AS IS APPROPRIATE, WE

16    ARE MAKING A FEE REQUEST THAT WILL ULTIMATELY BE PAID TO ALL

17    COUNSEL, INCLUDING THE JCCP COUNSEL.

18         AGAIN, MR. BROWN IS HERE IF YOU HAVE ANY QUESTIONS ABOUT

19    THE EXTENT OF HIS WORK.  I WILL JUST SIMPLY SAY THAT ONCE THEY

20    WERE APPOINTED AND JUDGE MASSULLO WAS ASSIGNED THIS CASE AS A

21    COMPLEX CASE IN SAN FRANCISCO, WE LEARNED VERY QUICKLY FROM

22    JUDGE MASSULLO THAT SHE WANTED MR. BROWN TO COORDINATE WITH US.

23    SHE ALSO DENIED APPLE'S MOTION TO STAY THAT CASE.

24         SO WE TOOK THAT MESSAGE, AND I THINK WE ADVISED YOUR HONOR

25    AT THE TIME, THAT WE WERE COORDINATING WITH THE STATE COUNSEL.

1    AND WE DID SO.  LODESTAR IN THIS CASE IS 1/10TH OF WHAT OURS

2    WAS BECAUSE WE COORDINATED SO CLOSELY WITH THEM AND WE DID NOT

3    DUPLICATE WORK.

4         THEY DID HELP ON DOCUMENT REVIEW IN PREPARATION FOR

5    DEPOSITIONS, AND THEY ASSISTED IN ACTUALLY EXAMINING SOME OF

6    THE WITNESSES AND TOOK VERY IMPORTANT DEPOSITIONS.  BUT IT WAS

7    IN CLOSE COORDINATION WITH THE LEAD COUNSEL IN THIS CASE,

8    PRECISELY SO WE COULD REDUCE DUPLICATION AND KEEP OUR TIME

9    DOWN.

10        SO THOSE WERE SOME OF THE KEY POINTS I THINK THAT WERE

11   RAISED BY THE OBJECTIONS.  AGAIN, I APOLOGIZE IF I EXPRESSED

12   SOME FRUSTRATION, BUT WITH ALL THE MISSED BIRTHDAYS AND

13   ANNIVERSARIES AND FAMILY EVENTS THAT I'VE MESSED OVER THE LAST

14   COUPLE OF YEARS BECAUSE I WAS SPENDING MY HEART AND SOUL ON

15   THIS CASE, I TAKE IT SOMEWHAT PERSONALLY WHEN PEOPLE CHALLENGE

16   THAT TIME.

17        SO WE APPRECIATE YOUR CONSIDERATION OF OUR RESPONSE.

18        I'M ALSO PREPARED TO ADDRESS THE EXPENSES IN THE NAMED

19   PLAINTIFF SERVICE AWARDS IF YOU WOULD LIKE TO MOVE ON TO THAT

20   NEXT.

21             THE COURT:  MAY I CALL ON MR. FOX TO TALK ABOUT THE

22   NOTICE FOR JUST A COUPLE OF MINUTES?

23        MR. FOX, WHY DON'T YOU GIVE US A REPORT ABOUT THAT,

24   PLEASE.

25             MR. FOX:  YES.  THANK YOU SO MUCH, YOUR HONOR.

1      I WOULD JUST LIKE TO TAKE -- JUST QUICKLY RESPOND TO THE

2  NOTION THAT WAS MADE BY SOME OF THE OBJECTORS THAT THE NOTICE

3  HERE WAS SOMETHING AKIN TO THE BARE MINIMUM PERMISSIBLE UNDER

4  THE RULES.

5      I THINK ALL OF THE FACTS THAT ARE UNCONTESTED IN THE

6  RECORD BEFORE YOUR HONOR SHOW COMPLETELY THE OPPOSITE.

7  INITIALLY THERE WERE MORE THAN 90 MILLION CLASS NOTICES SENT

8  OUT TO POTENTIAL CLASS MEMBERS.  AND ALTHOUGH NOT REQUIRED BY

9  THE COURT'S PRELIMINARY APPROVAL ORDER, THE PARTIES THEN AGREED

10  TO A SUPPLEMENTAL NOTICE BETWEEN AUGUST 24TH AND SEPTEMBER 9TH,

11  A SECOND E-MAIL NOTICE WAS SENT TO 89.3 MILLION CLASS MEMBERS.

12      ADDITIONALLY, BEGINNING ON AUGUST 6TH, AND I THINK THIS IS

13  SOMETHING THAT YOUR HONOR NOTED EARLIER, THERE WAS POSTCARD

14  NOTICE SENT TO CERTAIN OF THE CLASS MEMBERS WHO DIDN'T HAVE AN

15  E-MAIL ADDRESS THAT WAS OTHERWISE VERIFIABLE.  AND THAT WAS NOT

16  A SMALL AMOUNT.  THERE WERE 5.6 MILLION POSTCARDS SENT BY

17  U.S. MAIL.

18      ADDITIONALLY, PURSUANT TO THE COURT'S ORDER, THE PARTIES

19  SET UP A CASE-SPECIFIC SETTLEMENT WEBSITE.  THROUGH

20  NOVEMBER 16TH, THE WEBSITE HAD 16.4 MILLION PAGE VIEWS AND

21  9.8 MILLION SESSIONS.  WE ALSO SET UP A TOLL FREE NUMBER THAT

22  WAS AVAILABLE SEVEN DAYS A WEEK.  IT RECEIVED MORE THAN 30,000

23  CALLS TOTALING MORE THAN 142,000 MINUTES.

24      AND IN ADDITION TO ALL THAT, AS YOUR HONOR IS AWARE, AS WE

25  SAID IN THE INITIAL SETTLEMENT HEARING, THERE WAS AN INCREDIBLE

1   AMOUNT OF MEDIA ATTENTION PAID TO THIS SETTLEMENT, BOTH WHEN IT

2   WAS INITIALLY APPROVED BY THE COURT, AND THEN THROUGHOUT THE

3   PROCESS.  AND ANGEION HAS ESTIMATED THAT THERE WERE AT LEAST

4   2,670 PIECES OF COVERAGE OF THE PROPOSED SETTLEMENT, THAT

5   REACHED AN ESTIMATED 7.3 MILLION USERS, AND THERE WAS 51,000

6   SHARES ACROSS SOCIAL MEDIA, AND ALSO OVER 150,000 YOUTUBE

7   VIEWS.

8        ALL OF THIS, AS FAR AS I CAN TELL, IS UNCONTVERTED IN THE

9   RECORD, ALL OF THIS CONSTITUTES NOT BARE MINIMUM NOTICE, BUT

10  ROBUST AND EXCEPTIONAL NOTICE.  AND I WILL SAY JUST PERSONALLY,

11  I, ALONG WITH MY COLLEAGUES, MR. MOLUMPHY, MR. KING, MR. HALL,

12  AND THOSE COLLEAGUES ON THE APPLE SIDE, MR. CHORBA AND MR. SZE,

13  WORKED VERY, VERY DILIGENTLY.  WE SPENT A VERY, VERY, VERY

14  SUBSTANTIAL AMOUNT OF TIME PERSONALLY GOING THROUGH ALL THESE

15  ISSUES, MAKING SURE THE NOTICE WENT OUT.

16       AND ALTHOUGH, YOU KNOW, WE DIDN'T AGREE ON A LOT OF THINGS

17  DURING THE LITIGATION, EVERYONE ON THE PLAINTIFF'S SIDE WHO WAS

18  INVOLVED IN THE NOTICE AND EVERYBODY ON THE APPLE SIDE TOOK

19  THAT EXTREMELY SERIOUSLY, AND THE EFFORT WAS ALWAYS, HOW DO WE

20  MAKE SURE THAT THE MOST POSSIBLE, BEST POSSIBLE NOTICE PROGRAM

21  IS OUT THERE AND THE MOST POSSIBLE PEOPLE GET NOTIFIED, WHO ARE

22  CLASS MEMBERS, GET NOTIFIED OF THIS.  AND THERE WAS ALWAYS

23  COMPLETE AGREEMENT BETWEEN THE PLAINTIFFS AND EVERYBODY ON THE

24  APPLE SIDE OF THAT.

25       SO THE FACTS ARE IN THE RECORD, AS WELL AS MY PERSONAL

1    EXPERIENCE WORKING WITH THE LAWYERS, REALLY CONFIRMS THAT.

2          I JUST WANT TO RESPOND TO ONE OTHER POINT, BECAUSE I KNOW

3    THE HOUR IS LATE.  I BELIEVE THAT MR. FRANK HAS RUMINATED UPON

4    THE IDEA OF SPAM E-MAIL, AND I BELIEVE HAS STATED, IN EFFECT,

5    THAT NOTHING WAS DONE TO PREVENT THAT.

6          AND I WOULD DIRECT THE COURT'S ATTENTION TO THE

7    SUPPLEMENT -- SECOND SUPPLEMENTAL DECLARATION SUBMITTED BY

8    DENISE EARL WHO WAS EMPLOYED BY THE ANGEION FIRM, AND I KNOW

9    FROM PERSONAL EXPERIENCE THAT MS. EARL SPENT HUNDREDS OF HOURS

10   OF HER TIME ON THIS PROJECT.  AND HER DECLARATION, SPECIFICALLY

11   AT PARAGRAPH 4, AND THAT IS NUMBER -- DOCUMENT NUMBER 592-1 ON

12   THE DOCKET, AT PARAGRAPH 4 SHE DETAILS ALL OF THE THINGS THAT

13   ANGEION DID DO TO MAKE SURE THAT THERE WASN'T A PROBLEM WITH

14   SPAM, AND ALL THE MEASURES THAT THEY TOOK, WHICH INCLUDED

15   PROACTIVELY COMMUNICATING WITH INTERNET SERVICE PROVIDERS TO

16   MAXIMIZE DELIVERABILITY, INCLUDING GOOGLE, YAHOO, ICLOUD,

17   VERIZON, COMCAST, AT&T AND COX, AND MANY OTHER MEASURES TAKEN

18   THAT ARE DESCRIBED IN THAT AFFIDAVIT.

19          AND I WILL LEAVE IT AT THAT.  THANK YOU, YOUR HONOR.

20            THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH, MR. FOX.

21          WELL, LET'S MOVE TO THE EXPENSES AND OTHER AWARDS THEN,

22   MR. MOLUMPHY, PLEASE.

23            MR. MOLUMPHY:  YES.  THANK YOU, YOUR HONOR.

24          WE REQUEST REIMBURSEMENT OF EXPENSES THAT WERE ADVANCED,

25    AND I AM INCLUDING AGAIN, EXPENSES INCURRED BOTH BY THE FEDERAL

1    CLASS COUNSEL AS WELL AS THE JCCP COUNSEL WHICH ARE DESCRIBED

2    IN THE DEARMAN DECLARATION AS WELL AS IN THE JCCP DECLARATION

3    WHICH WERE ORIGINALLY FILED.

4         THE TOTAL EXPENSES ARE LESS THAN A MILLION DOLLARS, IN A

5    CASE OF THIS SIZE, WHICH WE THINK IS PRETTY GOOD, $995,244.93.

6    WE BELIEVE THEY ARE AUTHORIZED UNDER RULE 23(H) AND

7    NINTH CIRCUIT LAW.  THEY ARE THE TYPES OF EXPENSES THAT ARE

8    TYPICALLY BILLED TO PAYING CLIENTS FOR NON-CONTINGENCY WORK.

9    THINGS SUCH AS DEPOSITIONS, SPECIAL MASTER'S AND MEDIATIONS,

10   EXPERT CONSULTANTS, LEGAL RESEARCH.

11        THERE WAS TRAVEL FOR DEPOSITIONS.  I KNOW SOME PEOPLE --

12   OBJECTORS WERE ASKING ABOUT TRAVEL FOR DEPOSITIONS, WELL THAT'S

13   BECAUSE MY OFFICE OFTEN HELPED WITH DEPOSITION TRAVEL EXPENSES

14   FOR SOME OF THE NAMED PLAINTIFFS, SO THAT'S WHY THEY WERE

15   INCURRED BY MY FIRM.

16        WE HAD OTHER CUSTOMARY LITIGATION EXPENSES.  WE USED A

17   JOINT LITIGATION FUND TO MONITOR THESE EXPENSES AND TO KEEP

18   TRACK OF THEM CLOSELY ON A CONTEMPORANEOUS BASIS.

19        SO WE RESPECTFULLY REQUEST THAT THE COURT APPROVE

20   REIMBURSEMENT OF THOSE EXPENSES.

21             THE COURT:  ALL RIGHT.  THANK YOU.

22        MR. CHORBA, DO YOU WISH TO BE HEARD ON EXPENSES?

23             MR. CHORBA:  YES, YOUR HONOR.

24        GIVEN THE HOUR, I THINK WE WOULD REST ON OUR PAPERS ON

25    THAT.

1        I DO JUST HAVE ONE CORRECTION, WE DID NOT REQUIRE A

2    PREGNANT OR RECENT MOTHER WHO GAVE BIRTH TO TRAVEL.  IN FACT,

3    WE TRAVELLED TO NORTH CAROLINA.  SO I'M JUST -- I'M SORRY, I'M

4    BITING MY TONGUE ON A LOT OF THIS, BUT I JUST CAN'T LET THAT

5    ONE STAND.

6            THE COURT:  ALL RIGHT.

7        WELL, THANK YOU, MR. CHORBA.  I APPRECIATE YOU CLARIFYING

8    THAT.  THANK YOU.

9        MR. MOLUMPHY.

10           MR. MOLUMPHY:  YEAH.  AND I APOLOGIZE, WHAT I THOUGHT

11   I SAID WAS WITH THE EXCEPTION OF HER.  ALTHOUGH, I THINK SHE

12   DROVE QUITE A BIT WITH A YOUNG CHILD, BUT WE DON'T NEED TO GO

13   THERE.

14       THE FINAL POINT, YOUR HONOR, IS WITH THE NAMED PLAINTIFF

15   SERVICE AWARDS.  WE HAVE REQUESTED SERVICE AWARDS.  WE THINK

16   THEY ARE WELL BELOW WHAT HAVE BEEN APPROVED IN OTHER LARGE

17   CASES, BUT THEY ARE SUBSTANTIAL IN TOTAL, GIVEN THE NUMBER OF

18   NAMED PLAINTIFFS.

19       WE ARE ASKING FOR SERVICE AWARD OF $3,500 FOR NAMED

20   PLAINTIFFS, TO REACH THE NINE NAMED PLAINTIFFS WHO WERE

21   ACTUALLY DEPOSED IN THIS CASE, INCLUDING THE ONE THAT ONLY HAD

22   TO DRIVE TO OUR DEPOSITION.

23       ALSO $1,500 TO EACH OF THE OTHER NAMED PLAINTIFFS, ALL OF

24   WHOM, INCLUDING THOSE WHO WERE DEPOSED AND THOSE WHO WERE NOT

25   DEPOSED, ACTIVELY PARTICIPATED IN THE CASE.

1        I REVIEWED PLEADINGS, WE ARE IN REGULAR CONTACT WITH OUR

2    OFFICES, AND RESPONDED TO DISCOVERY, BOTH DOCUMENT REQUESTS AND

3    INTERROGATORIES.

4        A NUMBER OF PLAINTIFFS ALSO HAD THEIR PHONES ACTUALLY

5    IMAGED, FORENSICALLY IMAGED, AND TO THIS DAY, I DON'T BELIEVE

6    THOSE PHONES HAVE BEEN RETURNED TO THEM BECAUSE OF THE PENDENCY

7    OF THIS CASE.

8        SO WE WOULD RESPECTFULLY REQUEST THAT THE COURT APPROVE,

9    CONSISTENT WITH NINTH CIRCUIT LAW, THESE SERVICE AWARDS OF

10   $3,500 TO THE NINE NAMED PLAINTIFFS WHO WERE DEPOSED AND $1,500

11   TO THE OTHER ONES.

12       THERE WAS ONE OBJECTION, PERHAPS TWO, CITING TO A RECENT

13   11TH CIRCUIT CASE.  WE DON'T BELIEVE THAT THAT CASE IS BINDING

14   ON THIS COURT, NOR SHOULD IT BE, IT HAS NOT BEEN APPLIED BY ANY

15   OTHER COURT IN ANY OTHER CIRCUIT.  AND WE THINK UNDER

16   CONTROLLING NINTH CIRCUIT LAW, SERVICE AWARDS ARE AUTHORIZED,

17   OBVIOUSLY UNDER YOUR DISCRETION, AND WE THINK YOUR DISCRETION

18   IS APPROPRIATE HERE.

19            THE COURT:  THANK YOU.

20       MR. CHORBA, DO YOU WISH TO BE HEARD AS TO THE SERVICE

21   AWARDS?

22            MR. CHORBA:  NOTHING TO ADD FROM WHAT'S IN OUR

23    PAPERS, YOUR HONOR.

24        THANK YOU.

25            THE COURT:  THANK YOU VERY MUCH.  WELL, THANK YOU.

1        MR. MOLUMPHY, IS THERE ANYTHING ELSE THAT PLAINTIFFS WISH

2    TO BRING TO MY ATTENTION IN REGARDS TO ATTORNEY'S FEES,

3    EXPENSES, SERVICE AWARDS OR ANY OTHER COSTS OR FINANCIAL

4    MATTER?

5            MR. MOLUMPHY:  NO.  I THINK BETWEEN WHAT WE HAVE SAID

6    TODAY, AND HOPEFULLY WHAT WE HAVE PRESENTED IN DETAIL IN OUR

7    PAPERS, WE PROVIDED YOUR HONOR WITH A RECORD THAT SUPPORTS OUR

8    REQUEST.

9        AND WE APPRECIATE YOUR CONSIDERATION, BOTH OF THIS

10   REQUEST, AND FRANKLY YOUR OVERSIGHT OF THIS CASE FROM ITS

11   INCEPTION.  I THINK FOR BOTH SIDES IN THIS CASE, WE APPRECIATE

12   THE ACT OF OVERSIGHT, AND I THINK IT HELPED DRIVE AN EFFICIENT

13   PROCESS AND A GOOD RESULT FOR ALL PARTIES.

14           THE COURT:  THANK YOU VERY MUCH.  I APPRECIATE THAT.

15       MR. CHORBA, ANYTHING FROM THE DEFENSE?

16           MR. CHORBA:  YES.  TWO QUICK MATTERS, YOUR HONOR.

17           NUMBER ONE, WE WANTED TO JUST ADVISE THE COURT THAT DURING

18   THIS SETTLEMENT ADMINISTRATION PROCESS, SINCE THE LAST HEARING,

19   ANGEION DID RECEIVE A SUBPOENA FROM THE WASHINGTON STATE AGENCY

20   THAT'S RESPONSIBLE FOR CHILD SUPPORT.

21       WE ARE WORKING WITH PLAINTIFF'S COUNSEL AND WITH ANGEION.

22   OBVIOUSLY, WE WANT TO MAKE SURE WE COMPLY WITH ALL APPLICABLE

23   LAWS.  THE AGENCY IS IN DIALOG WITH ANGEION.  THE BOTTOM LINE

24   IS THERE IS A LOT OF INFORMATION, PERSONAL IDENTIFYING

25   INFORMATION, THAT WE, ANGEION, AND PLAINTIFFS SIMPLY DON'T

1    HAVE, AND THAT'S A GOOD THING; BUT NEVERTHELESS, THE AGENT HAS

2    ASKED FOR CERTAIN IDENTIFYING INFORMATION.

3         THEY OBVIOUSLY HAVE AUTHORITY UNDER FEDERAL AND STATE LAW

4    TO GARNISH CERTAIN PAYMENTS IN SETTLEMENTS.  I CAN'T SAY I'VE

5    HAD THIS COME UP BEFORE, BUT IT HAS HERE, NOT SURPRISING GIVEN

6    THE EXTENSIVE ATTENTION AND EARNED MEDIA NOTICE OF THIS CASE,

7    SO WE WILL WORK WITH THEM.

8         OBVIOUSLY WE HAVE TWO PRIMARY CONCERNS; NUMBER ONE, NOT

9    GET IN THE WAY OF ANY LAWFUL ORDERS REGARDING CHILD SUPPORT.

10   BUT NUMBER TWO, NOT -- TAKE NECESSARY PRECAUTIONS SO THAT

11   COMMON NAMES AREN'T INADVERTENTLY GARNISHED UNINTENTIONALLY.

12        AND THEN THE FINAL PIECE I WOULD LIKE TO SAY, MR. MOLUMPHY

13   SPOILED MY THUNDER A LITTLE BIT, I WOULD JUST LIKE TO SAY IF

14   THIS IS OUR LAST LIVE HEARING BEFORE YOUR HONOR, JUST TO THANK

15   YOU AND THE COURT STAFF.

16        I THINK WE HAVE DISAGREED WITH PLAINTIFF'S COUNSEL ON

17   VIRTUALLY EVERYTHING IN THIS CASE, EXCEPT TWO THINGS, ONE AT

18   THE BEGINNING AND ONE AT THE END, AND THAT IS THAT YOUR

19   LEADERSHIP IN THIS CASE WAS REALLY INSTRUMENTAL.  I THINK ALL

20   PARTIES THAT ARE HERE BEFORE YOU WERE HOPEFUL THAT THE JPML

21   WOULD APPOINT YOU, AND HERE AT THE END, I THINK THEIR DECISION

22   WAS VERY, VERY WELL JUSTIFIED.

23        I THINK I SPEAK FOR EVERYONE WHEN I SAY WE COULD NOT HAVE

24   REACHED THIS POINT IN AN MDL OF THIS COMPLEXITY WITHOUT YOUR

25   STEWARDSHIP.  I THINK THE LAST TWO HEARINGS IN PARTICULAR

1    DEMONSTRATE YOUR PATIENCE AND WILLINGNESS TO LET EVERYONE SPEAK

2    AT LENGTH ABOUT ANY MATTERS THEY ARE CONCERNED WITH.  AND AS AN

3    ADVOCATE, I JUST HAVE TO SAY THAT MAKES IT GREAT.

4         YOU HAVEN'T ALWAYS AGREED WITH APPLE, CERTAINLY, BUT WE'VE

5    ALWAYS FELT LIKE WE'VE HAD OUR FAIR SHAKE AND CAREFUL

6    CONSIDERATION OF THE ISSUES, AND THAT'S REALLY ALL WE CAN ASK

7    FOR.

8         SO THANK YOU, THANKS TO YOUR STAFF AND EVERYONE WHO MADE

9    THIS POSSIBLE.

10          THE COURT:  WELL, THANK YOU, MR. CHORBA, THAT'S VERY

11    GENEROUS OF YOU.

12         AND I APPRECIATE YOUR RECOGNITION OF OUR STAFF.  I'M JUST

13    REALLY BLESSED WITH A TERRIFIC STAFF, CHAMBERS IS WONDERFUL,

14    WONDERFUL CHAMBERS HERE, SO I APPRECIATE YOUR RECOGNITION OF

15    THAT.

16         AND I SUPPOSE THIS MIGHT BE THE LAST TIME WE SEE EACH

17    OTHER ON THIS CASE, HOPEFULLY I WILL SEE ALL OF YOU IN OTHER

18    CASES AS WELL.  IT'S ALWAYS A JOY TO HAVE YOU IN MY COURTROOM.

19    I ALWAYS WALK AWAY FROM OUR HEARINGS HAVING LEARNED SOMETHING,

20    LET ME JUST SAY THAT, AND HAVING BEEN BETTER FOR IT, SO I

21    APPRECIATE THAT.

22         I DO WANT TO COMMENT ON JUST A COUPLE OF THINGS.  WE

23    TALKED ABOUT JUDGE WESTERFIELD, AND THANK YOU FOR CALLING HER

24    OUT, I KNOW SHE WAS INSTRUMENTAL IN HELPING YOU ALONG, AND IT

25    WAS WONDERFUL THAT SHE WAS ABLE TO RECEIVE THE ASSIGNMENT AND

1    DO THE GOOD WORK THAT SHE DID.

2        AND SHE DID COMMENT TO ME, I CAN RECALL RECEIVING PHONE

3    CALLS ON THE WEEKENDS FROM HER JUST TELLING ME, ADVISING ME HOW

4    THINGS WERE GOING.  THEY WERE ALL PLEASANT CALLS, THERE WAS NO

5    HAIR PULLING OR ANYTHING LIKE THAT, BUT SHE WAS JUST TELLING

6    ME, INFORMING ME ABOUT THE WORK.  AND SUFFICE IT TO SAY THAT

7    YOU KEPT HER BUSY, YOU KEPT HER CHALLENGED.  THERE WERE

8    FASCINATING ISSUES THAT SHE WRESTLED WITH, AND I'M GLAD THAT

9    SHE WAS OF ASSISTANCE TO YOU, SHE CERTAINLY HELPED THIS CASE TO

10   RESOLUTION.

11       I ALSO WANT TO COMMENT ON -- MR. COTCHETT STARTED OFF

12   TALKING ABOUT SOME LAWYERS THAT DESERVE SOME RECOGNITION.  AND

13   I DO WANT TO COMMENT, I DO WANT TO THANK YOU, BOTH SIDES, ALL

14   PARTIES HERE, FOR ALLOWING PARTICIPATION OF, HOW SHALL I SAY,

15   JUNIOR LAWYERS, NEW LAWYERS, NEWER MEMBERS TO THE BAR.

16       IT'S SO IMPORTANT THAT YOU DO THAT AND THAT YOU ALLOW THAT

17   GREAT, I WILL SAY DIVERSITY OF PEOPLE TO COME, BOTH THE AGE OF

18   PRACTICE, BACKGROUNDS, YOUNG WOMEN WHO HAVE -- AND I WILL JUST

19   SAY THIS, SO FORGIVE ME, BUT WHO HAVE, FOR SOME REASON, NOT

20   BEEN ABLE TO ENGAGE THESE LARGE CASES FOR SOME REASON.  YOUR

21   FIRMS AND THE WORK THAT YOU'VE DONE, POINTED OUT BY

22   MR. COTCHETT AND OTHERS, INDICATED THAT THERE'S BEEN A DEARTH

23   OF WOMEN IN LEADERSHIP ROLES IN THESE CASES, AND I APPRECIATE

24   BOTH FIRMS, BOTH MR. CHORBA'S FIRM AND MR. COTCHETT AND OTHERS

25   WHO HAVE RECOGNIZED THAT AND HAVE SOUGHT TO ADVANCE WOMEN TO

1    POSITIONS OF LEADERSHIP IN THESE CASES. THAT'S SO IMPORTANT.

2    AND OTHERS.

3         BECAUSE AS YOU KNOW, I KNOW MR. COTCHETT WILL TELL US THAT

4    HE'S IMMORTAL, THE REST OF US ARE NOT, SO WE NEED TO PREPARE

5    THE BENCH TO MAKE SURE THAT THERE ARE NEW LAWYERS WHO CAN COME

6    IN AND ASSIST THE COURTS, ASSIST THEIR CLIENTS, YOUR CLIENTS;

7    AND IN THAT RESPECT, MAKE THE BAR STRONGER, MAKE CAUSES, JUST

8    CAUSES THAT COME BEFORE OUR COURTS, LITIGATED SO MUCH BETTER.

9         AND I APPRECIATE IT, I THANK YOU FOR THAT EFFORT, BOTH

10   SIDES. I KNOW MR. CHORBA'S FIRM HAS DONE THAT. I THINK -- I'M

11   NOT GOING TO SING OUT ANY -- I'M NOT GIVING AN IMPRIMATUR OF

12   YOUR FIRM, MR. CHORBA, BUT JUST TO SAY I KNOW YOUR FIRM

13   RECOGNIZES THAT, BOTH IN YOUR HIRING PRACTICES AND THE WAY YOU

14   CONDUCT THINGS, I APPRECIATE THAT. I KNOW MR. COTCHETT AND THE

15   OTHER FIRMS HERE AS WELL DO THAT, AND I'M GRATEFUL FOR THAT,

16   ALL OF US, WE ALL BENEFIT FROM THAT.

17        LET ME CLOSE BY SAYING I GREATLY APPRECIATE WORKING WITH

18   ALL OF YOU, IT'S JUST BEEN A PLEASURE FOR ME. WHAT A TREAT FOR

19   ME WHEN I GOT THE CALL FROM THE MDL TO ASK IF I WOULD RECEIVE

20   THIS CASE.

21        AND IT'S BEEN A JOY TO WORK WITH YOU. YOU KNOW, I SAID

22   RECENTLY, IT'S JUST A PLEASURE TO HAVE GOOD LAWYERS IN A

23   JUDGE'S COURTROOM. I THINK I TALKED ABOUT MOZART, IT'S LIKE

24   MOZART, IT'S JUST A JOY TO LISTEN.

25        AND MR. CHORBA WOULD PROBABLY SAY, WELL, HOW ABOUT

1    LYNYRD SKYNYRD, AND WE WILL LEAVE IT AT THAT, MR. CHORBA, BUT

2    TO EACH THEIR OWN, BUT IT REALLY HAS BEEN A JOY.

3         I'M GOING TO -- I'M LOOKING AT MY CALENDAR, AND I SAID TO

4    YOU THAT I HOPE YOU WOULD GIVE ME NEXT WEEK TO GET SOMETHING

5    OUT TO YOU, AND I THINK I'M GOING TO TAKE THE ENTIRETY OF THE

6    WEEK.  YOU HAVE MADE EXCELLENT POINTS HERE THAT I'M GOING TO

7    LOOK AT.

8         I'VE TALKED TO THE COURT REPORTER ABOUT GETTING A

9    TRANSCRIPT TO US.  SHE'S GOING TO GET SOMETHING TO US.  I THINK

10   I'M GOING TO TAKE NEXT WEEK TO GO OVER EVERYTHING, WHICH IS TO

11   SAY I HOPE I AM GOING TO GET SOMETHING TO YOU BY THE FIRST WEEK

12   OF MARCH.  AND I HOPE YOU DON'T HANG UP ON THE PHONE OR MAKE

13   YOUR SCREENS GO DARK WHEN I ASK FOR THAT ADDITIONAL WEEK.  I

14   HOPE YOU WILL UNDERSTAND THAT THAT'S OWING TO THE EXCELLENCE OF

15   YOUR PRESENTATION THIS AFTERNOON, SO I APPRECIATE THAT.

16        WITH THAT, LET ME JUST WISH YOU ALL WELL, BE SAFE, YOU AND

17   YOUR FAMILIES, CONTINUE TO BE SAFE.  I LONG FOR THE DAY WHEN

18   NORMALCY RETURNS AND I CAN WELCOME ALL OF YOU INTO MY CHAMBERS.

19        I RECALL I HAD SEVERAL OF YOU IN CHAMBERS SOME TIME AGO

20   AND WE LOOKED AT MY BOOKCASE AND LOOKED AT SOME FAVORITE BOOKS

21   THAT I HAD THERE, AND I WELCOME THE OPPORTUNITY TO HAVE YOU

22   COME IN CHAMBERS WHEN THE CASE IS OVER AND WE CAN REVIEW THOSE

23   BOOKS TOGETHER, PERHAPS SOME TIME, AND SPEAK ABOUT THE QUALITY

24   OF THE LITERATURE.

25        SO WITH THAT, LET'S CALL IT A DAY.  THANKS SO MUCH.  THE

1    MATTER IS UNDER SUBMISSION.

2        AND AS I SAY, I HOPE TO GET SOMETHING OUT TO YOU THAT

3    FIRST WEEK IN MARCH.  THANK YOU VERY MUCH.

4            MR. COTCHETT:  THANK YOU, YOUR HONOR.

5            MR. MOLUMPHY:  THANK YOU, YOUR HONOR.

6            MR. CHORBA:  THANK YOU, YOUR HONOR.

7            THE CLERK:  THIS HEARING IS ADJOURNED.

8        (THE PROCEEDINGS WERE CONCLUDED AT 4:09 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **CERTIFICATE OF REPORTER**

5

6

7

8              I, THE UNDERSIGNED OFFICIAL COURT

9     REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12    CERTIFY:

13              THAT THE FOREGOING TRANSCRIPT,

14    CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15    CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16    SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17    HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18    TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24    _____
      SUMMER A. FISHER, CSR, CRR
25    CERTIFICATE NUMBER 13185          DATED: 2/19/21