# Exhibit 1

**Nos. 21-15758 (L) and 21-15762 (C)**
(Consolidated with Nos. 21-15761 and 21-15763)

---

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

In re: APPLE INC. DEVICE PERFORMANCE LITIGATION,

NAMED PLAINTIFFS AND
SETTLEMENT CLASS MEMBERS
*Plaintiffs-Appellees*,
v.
SARAH FELDMAN; HONDO JAN,
*Objectors-Appellants*, and
DEBORAH PANTONI,
*Objector-Appellant*
v.
APPLE INC.,
*Defendant-Appellee.*

---

On Appeal from the Northern District of California
Civil Action No. 5:18-md-02827-EJD
Hon. Edward J. Davila

---

## JOINT OPENING BRIEF OF APPELLANTS SARAH FELDMAN,
## HONDO JAN, AND DEBORAH PANTONI

---

Kendrick Jan
Kendrick Jan, APC
402 W. Broadway, Ste. 1520
San Diego, CA 92101
(619) 231-7702
kj@jan-law.com

John J. Pentz
Law Offices of John J. Pentz
19 Widow Rites Lane
Sudbury, MA 01776
(978) 985-4668
jjpentz3@gmail.com

Jan L. Westfall
29896 Blue Water Way
Menifee, CA 92584
(619) 940-2880
jlwestfall.esq@gmail.com

*Attorneys for Feldman & Jan*

*Attorney for Pantoni*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... i

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION .................................................................................................. 1

JURISDICTIONAL STATEMENT .................................................................... 3

STATEMENT OF ISSUES ................................................................................... 4

STATUTORY AND REGULATORY AUTHORITIES ..................................... 5

STATEMENT OF THE CASE ............................................................................. 6

    A.    Background ........................................................................................ 6

    B.    Lawsuits are filed ............................................................................ 8

    C.    Plaintiffs' allegations and Defendant's motions to dismiss ............. 8

    D.    The proposed Settlement ................................................................. 11

    E.    Preliminary approval ...................................................................... 12

    F.    Class Counsel's fee request ............................................................ 15

    G.    Class member objections ................................................................ 15

    H.    Settlement approval and fee awards ............................................... 15

SUMMARY OF ARGUMENT ........................................................................... 17

    SETTLEMENT .......................................................................................... 17

    ATTORNEYS' FEES ................................................................................. 18

    INCENTIVE AWARDS ............................................................................. 19

i

STANDARD OF REVIEW ...................................................................21

ARGUMENT ....................................................................................23

I.  The district court erred in certifying the Settlement Class
    and approving a Settlement binding on all Class members
    where the requirements of Rule 23 were not satisfied..................................23

    A.  The Class was not adequately represented by Named
        Plaintiffs whose claims were not typical of iPhone
        owners able to attest to performance issues .................................26

    B.  A unified Class defined by common injury was
        bifurcated by the Settlement into two subclasses,
        with neither having separate representation and only
        one entitled to share in the Settlement .................................29

    C.  An overall assessment that a settlement is fair
        cannot substitute for the procedural protections
        of Rule 23, including those required by amended
        Rule 23(e)(2) ...............................................................33

        1.  The Claim Form denies former iPhone owners
            the ability to make a claim.......................................36

        2.  The Settlement ignores Class-wide injury and
            uniform damages, and inequitably denies a
            majority of the Class the right to make a claim ....................38

II. The district court abused its discretion and breached its
    fiduciary duty to the Class by awarding an unreasonable
    fee far in excess of awards in similar cases and based on
    an inflated lodestar.........................................................40

    A.  The district court's analysis of the *Vizcaino* factors
        (and the megafund rule) suggested fees below the
        non-megafund benchmark were warranted.........................................44

        1.  Results achieved.......................................................44

2.      The district court abused its discretion in its
        risk factor analysis ................................................................45

3.      The district court failed to meaningfully
        consider awards in similar cases with
        recoveries above $250 million ................................................47

B.   The district court abused its discretion when
     performing its lodestar analysis............................................49

        1.      The district court abused its discretion by
                allowing inclusion of hours spent in other
                cases, including the JCCP Action ............................................54

        2.      The district court should not have allowed
                excessive repetitive billing and inflated rates
                for discovery and document review to be
                included in lodestar ................................................................57

        3.      A multiplier should not be applied to
                paralegal fees in Class Counsel's lodestar................................60

C.   Applying the district court's multiplier to a correct
     lodestar would save the Class at least $13.6 million...........................63

III.    The preferential payments to Named Plaintiffs are prohibited
        and create a conflict between the Named Plaintiffs and
        absent Class members......................................................................65

CONCLUSION ............................................................................................72

STATEMENT OF RELATED CASES ................................................................74

CERTIFICATE OF COMPLIANCE................................................................75

CERTIFICATE OF SERVICE ......................................................................76

ADDENDUM ..........................................................................................A 1

# TABLE OF AUTHORITIES

**Cases**

*Alexander v.FedEx Ground Package Sys.,*
    No. 05-cv-00038, 2016 WL 3351017
    (N.D. Cal.  June 15, 2016) ..............................................................................48

*Allen v. Bedolla*,
    787 F.3d 1218 (9th Cir. 2015) .......................................................................24

*Amchem Prod. v. Windsor,*
    521 U.S. 591 (1997)...................................................................24, 29, 30, 33

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980).......................................................................................40

*Central Railroad & Banking Co. v. Pettus,*
    113 U.S. 116 (1885)...........................................................................67, 68, 71

*Chambers v. Whirlpool Corp.*,
    980 F.3d 645 (9th Cir.2020) ..........................................................................21

*Chemical Bank v. Jaffe & Schlesinger, P.A.*,
    19 F.3d 1306 (9th Cir. 1994) ............................................................51, 55, 56

*Churchill Village, L.L.C. v. General Electric*,
    361 F.3d 566 (9th Cir. 2004) ..................................................................53, 56

*Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*,
    305 F.3d 943 (9th Cir. 2002) .........................................................................21

*Davis v. City and County of San Francisco*,
    976 F.2d 1536 (9th Cir. 1992) ...............................................................60, 61

*Democratic Party of Wash. State v. Reed*,
    388 F.3d 1282 (9th Cir. 2004) .......................................................................50

*Dennis v. Kellogg Co.*,

697 F.3d 858 (2012)..................................................................22, 23, 24

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002)............................................................................3

*Dewey v. Volkswagen AG*,
    681 F. 3d 170 (3d Cir. 2012) ........................................................34

*Florida v. Dunne*,
    915 F.2d 542 (9th Cir.1990) ........................................................43

*Garcia v. Resurgent Cap. Servs., L.P.* ,
    No. 11-1253-EMC, 2012 WL 3778852
    (N.D. Cal. Aug. 30, 2012) ...........................................................50

*General Telephone Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982)......................................................................28

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ..........................................................45

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) .............................................21, 23, 27

*Hansberry v. Lee*,
    311 U.S. 32 (1940)................................................................26, 29

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)...............................................44, 50, 51, 53

*In re Anthem Inc. Data Breach Litig.*,
    No. 15-MD-02617, 2018 WL 3960068
    (N.D. Cal. Aug. 17, 2018)..............................................................46

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ......................................21, 47, 64

*In re Cardinal Health Inc. Sec. Litig.*,
    528 F. Supp. 752 (S.D. Ohio 2007) ..............................................41

*In re Cendant Corp. Sec. Litig.*,
    404 F.3d 173 (3d Cir. 2005). .................................................................53, 54

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ...............................................................69

*In re Equity Funding Corp. of America Securities Litig.*,
    438 F.Supp. 1303 (C.D. Cal. 1977) ...............................................................62

*In re General Motors Corp. Pick Up Truck Fuel Tank Prods.*
    *Liab. Litig.*, 55 F.3d 768 (3d Cir.1995) ...................................................31, 54

*In re High-Tech Employee Antitrust Litig.*,
    No. 11-CV-02509-LHK, 2015 WL 5158730
    (N.D. Cal. Sept. 2, 2015) ...............................................................48

*In re HP Inkjet Printer Litig.*,
    716 F.3d 1173 (9th Cir. 2013) ...............................................................21

*In re Joint Eastern and Southern Dist. Asbestos Litigation*,
    982 F.2d 721(2d Cir. 1992) *mod. on reh'g sub nom.*
    *In re Findley*, 993 F.2d 7 (2d Cir.1993) ...............................................................30

*In re Mego Financial Corp. Securities Litig.*,
    213 F.3d 454 (9th Cir. 2000) ...............................................................21

*In re Mercury Interactive Corp. Sec. Litig.*,
    618 F.3d 988 (9th Cir. 2010) ...............................................................40

*In re Online DVD Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ...............................................................67

*In re Volkswagon Clean Diesel*
    914 F.3d 623 (9th Cir. 2019) ...............................................................54

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ...............................................................40, 43, 50

*In re Wells Fargo &Co. S'holder Derivative Litig.*,
    845 Fed. Appx. 563 (9th Cir. 2021) ...............................................................63

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    445 F.Supp. 3d 508 (N.D. Cal. 2020) ............................................................57

*Johnson v. NPAS Sols. LLC*,
    975 F.3d 1244 (11th Cir.2020) ...................................................67, 68, 69, 70

*Melito v. Experian Mktg. Sols., Inc*.,
    923 F.3d 85 (2d Cir. 2019), *cert. denied*
    *sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019) ........................................68

*Missouri v. Jenkins*,
    491 U.S. 274 (1989)...................................................................................60, 62

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) .........................................................................32

*Oja v. U.S. Army Corps of Eng'rs*,
    440 F.3d 1122 (9th Cir. 2006) .......................................................................22

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)........................................................................................30

*Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.*,
    526 F.2d 1196 (9th Cir. 1975) .......................................................................60

*Rodriguez v. West Publishing Corp.*,
    563 F.3d 948 (9th Cir. 2009) ..........................................................40, 68, 71

*Sea Coast Foods, Inc. v. Lu–Mar Lobster & Shrimp, Inc.*,
    260 F.3d 1054 (9th Cir.2001) .......................................................................21

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ......................................................27, 31, 70, 71

*Trustees v. Greenough*,
    105 U.S. 527 (1882) ......................................................................67, 68, 71

*United States v. Clifford Matley Family Tr.*,
    354 F.3d 1154 (9th Cir. 2004) .......................................................................22

*Vizcaino v. Microsoft Corp.*,
    290 F. 3d 1043 (9th Cir. 2002) ...............................................18, 40, 44, 48, 49

*Vogel v. Harbor Plaza Ctr., LLC*,
    893 F.3d 1152 (9th Cir. 2018) ................................................................51, 53

*Wagner v. NTSB*,
    86 F.3d 928 (9th Cir. 1996) ........................................................................22

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) .......................................................32

## Rules and Statutes

28 U.S.C. § 1291 ............................................................................................3

28 U.S.C. § 1331 ............................................................................................3

28 U.S.C. § 1332(d) ........................................................................................3

Fed. R. App. Proc. 4(a)(1)(A) and 4(a)(3) ....................................................3

Fed. R. Civ. Proc. 23........................................................................23, 24, 27, 33

Fed. R. Civ. Proc. 23(a) ...........................................................................23, 25

Fed. R. Civ. Proc. 23(b)(3) .......................................................................23, 24, 26

Fed. R. Civ. Proc. 23(c)(5)...........................................................................30

Fed. R. Civ. Proc. 23(e)(2)(A-D).........................................5, 26, 33, 34, 35, 37, 38

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 .............................................3, 9

California Computer Data Access and Fraud Act
    (Cal. Penal Code § 502(c)(4) and (c)(5) ...........................................................9

## Other Authorities

Advisory Committee Notes, 2018,
    Rule 23, Subdivision (e)(2), Paragraphs (A) and (B).............................34, 35

Barnett, William P. *There is No Conservative Case for Class Actions*, 22 FED. SOC. REV. 192, 195 (2021) ..........................45, 47

Eisenberg, Theodore and Miller, Geoffrey P. *Attorney Fees and Expenses in Class Action Settlements (1993-2008)*, 7 J. EMPIRICAL LEGAL STUDIES 248 (2010)......................48, 49

Eisenberg, Theodore and Miller, Geoffrey P. *Incentive Awards to Class Action Plaintiffs an Empirical Study*, 53 UCLA LAW REVIEW 1303 (2006)............................................68

Fitzpatrick, Brian. *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010) .................................49

https://www.whistleout.com/CellPhones/Guides/this-is-how-long-youll-keep-iphone ........................................37

https://www.apple.com/iphone-13/?cid=CDM-USA-DM-P0021402-484902 .................................37

https://companiesmarketcap.com/apple/marketcap/ .................................6

Laffey Matrix ........................................62

Rubenstein, William B. 5 Newberg on Class Actions, §17:4 (5th ed. 2020) ........................................69

Rubenstein, William B. 5 Newberg on Class Actions, §3:51 (5th ed. 2020) ........................................27

Third Circuit Task Force on Selection of Class Counsel, 208 F.R.D. 340, 348 (2002)............................46

## INTRODUCTION

Following widespread reports of performance issues with Apple's smart phones, and a public acknowledgement and apology by Apple, a group of iPhone owners filed a class action lawsuit alleging violations of federal and state laws in connection with the impaired performance of their iPhones and the iOS software updates designed to throttle iPhone processing speeds.

But unlike the consumers who discovered the defect, the Named Plaintiffs who sued on behalf of the Class did not allege having individually experienced impaired performance attributable to Apple's iOS updates. Instead, recognizing the ability to perceive or attribute the throttled performance was beyond the ken of the average iPhone owner, Named Plaintiffs pled that every Class member was injured by slowed iPhone performance and relied on third party studies to establish the critical elements of injury and damage.

At the settlement stage, however, Named Plaintiffs disregarded their allegations of uniform Class member injury and agreed to a settlement that compensates only those who were aware of and therefore able to attest to diminished iPhone performance, and a claim form that ignores the Class definition and compensates only *current* iPhone owners. Less than 2.5% of the Class filed claims.

1

Ultimately, Named Plaintiffs and Class Counsel failed to adequately represent the Class in three ways: (1) their settlement-stage abandonment of a uniform theory of damages and former iPhone owners; (2) their inability to represent the interests of distinct subclasses created by the Settlement; and (3) their substantial incentive awards created a conflict of interest.

The court overcompensated Class Counsel for their pedestrian performance by applying an unwarranted multiplier to a substantially inflated lodestar, resulting in an unmerited, unreasonably high percentage fee in this megafund settlement – a fee that exceeds this Circuit's benchmark percentage for non-megafund cases.

Finally, the court awarded $216,000 to 132 Named Plaintiffs for their inadequate representation of the Class, even though some of the Named Plaintiffs were not Class members and very few conferred any value at all upon the absent Class members.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over the state claims alleged in this action under 28 U.S.C. §1332(d) because the suit is a class action in which the citizenship of one or more plaintiffs differed from that of the defendant and the aggregate amount in controversy exceeded $5,000,000. The court also had federal question jurisdiction in this matter pursuant to 28 U.S.C. §1331 because Plaintiffs alleged defendant Apple Inc. violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

This Court has appellate jurisdiction because this is an appeal following entry of a final judgment. 28 U.S.C. §1291. The district court's orders granting final approval and attorney's fees, expenses and service awards were entered on March 17, 2021. ER-12, 33. The amended final judgment was entered on March 23, 2021. ER-4. Appellants Hondo Jan and Sarah Feldman timely filed their Notice of Appeal on April 13, 2021, and an Amended Notice of Appeal on April 28, 2021. ER-258, 263. Appellant Deborah Pantoni timely filed her Notice of Appeal on April 16, 2021. ER-260. Fed. R. App. Proc. 4(a)(1)(A) and 4(a)(3). Appellants objected to the Settlement and so have standing to appeal. ER-123, 136. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

3

## STATEMENT OF ISSUES

1.     Did the district court abuse its discretion by certifying a settlement class where the whole class was not adequately represented and approving a settlement that does not match the theory of the case set forth in the complaint? Raised at ER-126, 137, overruled at ER-33.

2.     Did the division of the class into two de facto subclasses, one comprised of iPhone owners able to attest to having experienced diminished performance and a second comprised of iPhone owners unable to so attest, prevent certification where the two subclasses were not separately represented by named plaintiffs advocating on behalf of their distinct interests?   Raised at ER-125, overruled at ER-33.

3.     Did the district court abuse its discretion by approving a settlement that excludes a vast majority of the class from compensation? Raised at ER-123, 144, overruled at ER-33.

4.     Did the district court abuse its discretion by approving a settlement and related claim form that prevent claims of class members who no longer own their eligible iPhone, where former owners are included in the Settlement Class definition and subject to the same release as current owners who are able to file claims? Raised at ER-137, overruled at ER-33.

5.     Did the district court violate Rule 23(e)(2)(D) by approving a settlement that does not treat "class members equitably relative to each other"? Raised at ER-123, 137, overruled at ER-33.

6.     Did the court abuse its discretion by awarding attorneys' fees of $80.6 million, or 26% of the settlement amount of $310 million, based on a multiplier applied to a lodestar inflated by inclusion of insufficiently documented, redundant, and unnecessary work of attorneys whose work did not benefit the class?  Raised at ER-131, 137, overruled at ER-12, 21.

7.     Did the district court abuse its discretion by applying a risk multiplier to paralegal fees?  Raised at ER-131, 138, overruled at ER-12.

8.     Are the district court's incentive awards to named plaintiffs, including non-class members, unauthorized by and inconsistent with Supreme Court precedent?  Raised at ER-130, 137-138, 153, overruled at ER-12 & -24.


## STATUTORY AND REGULATORY AUTHORITIES

Statutes and Rules are set forth in an Addendum following the brief.

## STATEMENT OF THE CASE

### A.    Background

Defendant-Appellee Apple Inc. is a world leader in the massive smart device market.   During years relevant to this case, Apple's smart devices, including its ubiquitous iPhones, "represented at least 70% of Apple's overall revenue" (ER-245), contributing substantially to Apple's position as the largest company in the world with a market capitalization in the range of $2.521 trillion.[1]

Apple's several generations of iPhones run on Apple's proprietary smart device operating systems ("iOS").   "In 2015, reports of unexplained shutdowns of Apple devices began surfacing, with consumers complaining their devices were suddenly shutting down even though the batteries were more than 30% charged … Complaints accelerated in the autumn of 2016 and were accompanied by reports of unexplained heating."   ER-34.   In response to these product issues, beginning in 2017 Apple released updated software versions iOS 10.2.1 and iOS 11.2.

Apple invited customers to download and install the iOS updates to their iPhones without informing them the updates contained software code intended to impair iPhone functions in order to moderate poor battery performance.   ER-256.

---

[1] As of Sept. 1, 2021.  *See* https://companiesmarketcap.com/apple/marketcap/

Dkt. 244, p. 174, ¶ 508.  A majority of Apple's iPhone customers download updates shortly after release.[2]

Rather than fixing the iPhone problems, these iOS updates allegedly "concealed [them] by secretly throttling the Devices' performance to reduce the number of unexpected shutdowns to a more manageable volume."  ER-34.  An independent report based on an analysis of 100,000 iPhones concluded "the decrease in performance of the affected iPhones was caused by the iOS 10.2.1 and iOS 11.2 updates, and not the normal decreased function that would be caused by an aging battery."  ER-249.  On December 20, 2017, Apple admitted to "one of the largest consumer frauds in history, affecting hundreds of millions of Apple Devices across the globe."  ER-241.  On December 28, 2017, Apple issued an additional statement regarding the throttling effect of the subject iOS updates (described by Plaintiffs as an "Apology").  ER-243.  Regulators in the United States, Canada and several other countries then began investigating Apple's conduct.  ER-244, ER-237 (listing investigations and prosecutions).  At about that

---

[2]  For example, at Apple's 2018 World Wide Developers Conference, Apple's Senior Vice President of Software Engineering, Craig Federighi, stated "half of our customers upgraded to iOS 11 in just seven weeks. It's incredible. Now as we stand here today, 81 percent of our over a billion active iOS devices are running our latest release."  ER-247, n. 33.

same time, in connection with these issues, Apple offered a $50 credit toward battery replacement to iPhone customers.  ER-111.

Despite Apple's acknowledgment of and apology for its throttling of iPhone performance, Plaintiffs contend "there was no way for ordinary consumers to quantify these [inklings of reduced functionality] or give them credence."  ER-248.

## B.      Lawsuits are filed

In early 2018, sixty-six class actions related to Apple's throttling software updates and purported iPhone defects were filed in various federal district courts around the country ("Federal Actions"), and four class actions were filed in the California Superior Court and consolidated into a single JCCP action which proceeded independently from this case.  ER-36.

In mid-2018, the Federal Actions were consolidated in the Northern District of California into this MDL proceeding.  ER-36.

## C.      Plaintiffs' allegations and Defendant's motions to dismiss

In the controlling Second Consolidated Amended Complaint ("SCAC") filed on November 30, 2018, 132 plaintiffs from 50 states, U.S. territories and foreign countries sued on behalf of "all persons worldwide who purchased, owned, used or leased one or more of Apple's Devices."  ER-241.  The SCAC alleged

Apple sold its iPhones without disclosing a known defect, then attempted to conceal the defect through software updates that slowed processing speeds to mitigate battery drain and avoid unexplained power offs.

Plaintiffs' SCAC included 76 causes of action: Counts 1-16 alleged violations of federal and California law, including statutory claims (e.g. computer fraud, consumer fraud, unfair competition, etc.), traditional tort claims (e.g. fraud, trespass to chattels, etc.), and common law and contract claims (e.g. money had and received, breach of contract, etc.); Counts 17-76 alleged violations of the consumer protection statutes of every other of the United States, Puerto Rico, the U.S. Virgin Islands, and the United Kingdom. ER-238-240.

Following Apple's motions to dismiss, the court found Plaintiffs had sufficiently pled damages under the Computer Fraud and Abuse Act 18 U.S.C. §1030 *et seq.* (specifically as to 18 U.S.C. §1030(a)(5)(A)), California's Computer Data Access and Fraud Act, Cal. Penal Code § 502(c)(4) and (c)(5), and California's common law trespass to chattels, each including allegations that the iOS updates impaired the function of the iPhones by substantially slowing their processing speed. E.g., "The Complaint's allegations that the iOS updates slowed processor speeds in Plaintiffs' iPhones readily fit [the definition of damage under the CFAA.]" ER-227. While iPhone owners consented to these iOS

downloads, the district court found Plaintiffs had sufficiently "alleged that Apple concealed the throttling effect of the iOS updates" and "never gave permission for Apple to cause damage to their iPhones." ER-226.

In their motion to dismiss, Apple argued that none of the Named Plaintiffs alleged having experienced either unexpected power offs or manifestations of the throttling software. In their opposition, Plaintiffs made clear that Class claims and damages did not depend on any Class member's subjective experience of the throttling effects of the iOS updates:

> Apple instead is really complaining about the absence of two particular allegations, neither of which are relevant to Plaintiffs' theories of damages—first, whether any individual personally experienced a UPO, and second, whether any individual personally experienced a manifestation of the throttling software. Apple premises both objections on a fundamental mischaracterization of plaintiffs' theory; **Apple manufactures a straw-man at odds with the SAC**, and then attacks the SAC for not alleging facts to support Apple's preferred theory. Apple's gambit should be rejected.

ER-230 (emphasis added).

Plaintiffs stressed that their case was based on injury shared by all members of the proposed class:

> **Apple now argues that plaintiffs must allege additional individualized experiences, beyond the uniform injury sustained by all Plaintiffs.** This mischaracterizes the theory of the case and mischaracterizes the data. … Apple's

10

> software Updates "impaired" the availability "of normal CPU performance, which is damage regardless of any particular customer's observations. ***The previously available CPU performance was artificially reduced for everyone, uniformly – no Device was exempt from throttling.***

ER-232 (emphasis added).

### D.   The proposed Settlement

The parties accepted a mediator's settlement proposal following a September 27, 2019 mediation, just 14 months after the filing of Plaintiffs' consolidated complaint and five months after the district court ruled on Apple's motion to dismiss.   The Settlement provides for a $310 million minimum Settlement amount,[3] and defines the "Settlement Class" as "all former or current U.S. owners of iPhone 6, 6 Plus, 6s, 6s Plus, 7, 7 Plus, and SE devices running iOS 10.2.1 or later (for iPhone 6, 6 Plus, 6s, 6s Plus, and SE devices) or iOS 11.2 or later (for iPhone 7 and 7 Plus devices), and who ran these iOS versions before December 21, 2017."   ER-203.

Although Plaintiffs had alleged "there was no way for ordinary consumers to quantify these [inklings of reduced functionality] or give them credence" (ER-248), the Settlement requires claimants to certify under penalty of perjury they

---

[3] The Settlement has a scaling feature, but the paltry number of claims submitted fell far short of the number necessary to trigger any higher amount.  ER-214.

11

"experienced diminished performance on the eligible [iPhone] when running iOS 10.2.1 or iOS 11.2 before December 21, 2017" (ER 205) – the precise requirement Plaintiffs had earlier referred to as Apple's "straw man."  ER-248. The attestation requirement conflicts with the uniform theory of damages that animated Plaintiffs' case, thereby *throttling* Settlement claims and effectively guaranteeing Apple would pay no more than the minimum $310 million Settlement amount.

Further, the Claim Form inexplicably restricts claims to current owners of subject iPhones, even though the Settlement Class definition includes both current *and* former owners.  ER-203.

### E.    Preliminary approval

At the May 15, 2020 preliminary approval hearing, counsel for Apple explained the claim requirements: "So it's not everybody who owned one of those devices.  It's not even everybody who owned one of those devices and ever upgraded or updated their system to the latest iOS software, and **so it's a very, very narrow group**."  ER-187 (emphasis added).

Counsel continued:

> [a]nd that's why the claim form, frankly, has an attestation requirement as well. It's not just if you downloaded the software. The claim in [t]his case is that you experienced some sort of impact on performance ...  So for us that was a very critical and material component to negotiating this settlement.

12

ER-190.

Apple's attorney further explained that, by contrast, the release covers all Settlement Class members, even those not able to make a claim: "Now I need to stress the class is very broad. In Apple's view it will cover every single device that was potentially impacted." ER-192.

Regarding the dichotomy between the broad Class definition and the narrow sub-set of Class members able to make a claim, Apple's counsel explained:

> The additional piece that is required in the claim form is to attempt to align the compensation and recovery in this case with the theory of injury, which again wasn't just everyone who owned a device. There was a defect theory that your honor dismissed on the pleadings that would have possibly captured that, but if those people who have experienced or can attest under penalty of perjury that they observed some impact on the performance of their device.

ER-192-3.

Thus, although the court had determined that none of the Named Plaintiffs alleged or needed to allege awareness of any specific manifestations of the software throttling (ER-219, 223-4),[4] the settlement fund compensates only Class

---

[4] "[U]nlike with the defect theory, here the Court concludes that Plaintiffs adequately plead injury based on allegations that iOS updates were designed to reduce the processing speed of their phones in order to prevent UPO's. While Apple characterizes this as a power management feature, Apple does not contest that the iOS updates performed this function. Because the [SCAC] adequately alleges that the iOS updates affected *all Plaintiffs alike*…" ER-223-4.

members able to certify they had experienced such an impact on their iPhones. Unsurprisingly, Apple's counsel conceded the parties never expected the settlement to exceed the $310 million minimum settlement amount: "No one expects this, [that] the amounts reach the ceiling of the proposed settlement … Most likely the parties anticipate that it will be at the $310 million number." ER-194.

On May 27, 2020, the district court granted preliminary approval to the Settlement and the Class definition.

### F.    Class Counsel's fee request

Class Counsel requested a fee award of "$87,730,000, or 28.3%" of $310 million. ER-12. Class Counsel submitted a lodestar totaling $36,103,148, and included in that number the work of JCCP Counsel, foreign liaison counsel, and paralegals. ER-26. JCCP Counsel alone accounted for "9,678.8 hours … and $3,993,154.55 of the total." ER-26, 165. International liaison counsel made up $547,037 (ER-122) and paralegals added at least another $2,846,443. ER-72, et seq. (paralegals shown as Category 06).

Apple objected to Class Counsel's percentage fee request, arguing that fees should be limited to lodestar because the Settlement does not establish a common

14

fund.  ER-103.  Apple also objected to inclusion of excessive, redundant and unnecessary hours in the lodestar.  ER-119.

### G.    Class member objections

Over 75 timely objections were filed on behalf of 145 objectors.  ER-50. Appellants Pantoni, Jan, and Feldman objected to adequacy of representation, the mismatch between the class definition, pled claims and claim requirements, the requested attorneys' fees, overstatement of lodestar, subjecting paralegal fees to a lodestar multiplier, and incentive awards. ER-123, 136.

### H.    Settlement approval and fee awards

On March 17, 2021, the district court granted final certification of the Settlement Class and gave final approval to the Settlement.  ER-43.  In approving the Settlement, the court relied on the late-filed expert declaration of Michael A. Williams estimating diminution in value damages, which was filed on December 11, 2020, *after* the first fairness hearing.  ER-48 referencing Dkt. 591.[5]  Based on an estimated Class size of 90 million, the settlement represents approximately $3.44 per device.  Out of 90 million Class members, only 2,268,860 claims were approved, an effective rate of less than 2.5%.  ER-41.

---

[5] Unless otherwise stated, "Dkt." shall refer to the N.D. Cal docket in Civil Action No. 5:18-md-02827.

The district court denied Class Counsel's fee request because the resulting multiplier of 2.43 would have been too "high," and instead awarded $80,600,000, 26% of the $310 million Settlement fund, which it calculated by multiplying an inflated lodestar by its chosen maximum multiplier of 2.232. ER-26. Even though the district court allowed that JCCP counsel's work may have "increased inefficiency and duplication without any benefit to the class," the court took no action to reduce the exaggerated lodestar. ER-28. JCCP counsel's hours and fees of $3,993,154 (ER-26), when multiplied by the court's 2.232 multiplier, account for $8,912,720 of the court's fee award. Applying the same multiplier to international liaison counsel's fees and paralegal charges added an extra $4,727,805 to the court's fee award.

The district court also awarded the 132 Named Plaintiffs, including eleven non-Class-member foreign nationals, awards of either $1,500 or $3,500, depending on whether they had been deposed, for a total of $216,000.

# SUMMARY OF ARGUMENT

## SETTLEMENT

Named Plaintiffs failed to adequately represent the interests of the Class by agreeing to a Settlement that does not conform to the theory of damages pled in their Complaint, and that restricts compensation to a tiny subset of the Class able to attest to current ownership and impaired performance. The attestation requirement created a subclass defined by subjective awareness of performance issues. The Named Plaintiffs had not themselves alleged having experienced performance issues, and were aware the average Class member could not attest to performance issues caused by the iOS software updates.

The subclass of iPhone owners unable to make the Claim Form's performance attestation were inadequately represented in this case, as were Class members who no longer own their phones and are thus ineligible to file a claim. Clearly, for these Class members, further litigation of this case is preferable to a settlement that provides them nothing. Similarly, for Class members able to make claims, Named Plaintiffs' failure to allege subjective awareness of impaired performance rendered them inadequate representatives for Class members able to so attest.

17

## ATTORNEYS' FEES

The district court committed at least three errors: (1) awarding an unmerited percentage fee; (2) calculating the percentage fee using a padded lodestar; and (3) inappropriately applying a multiplier to paralegal fees.

The district court's fiduciary duty to the Class compels it to set the fee at the lowest reasonable percentage, not the highest. This duty required the district court to consider and explain why a 17.5% fee, as suggested by the Appellants, would result in unjust enrichment of the Class. ER-148. A 17.5% fee of $54,250,000 would be in line with empirically-determined market rates and provide Class Counsel with a substantial return on their investment of permissible time, while not unjustly enriching the class.

The district court misapplied the *Vizcaino* factors pertaining to results achieved and risk. Seventy cases were filed by 41 separate law firms within months of Apple's acknowledgement of the throttling effect of its iOS updates. There was virtually no chance this case would go to trial, given Apple's pre-litigation admissions and early offer of restitution. The district court grossly overstated the risk of litigation in determining a "risk" multiplier.

The district court also misconstrued the results achieved. While the court anticipated payment of $25 per claim, the Settlement recovered just $3.44 per

iPhone,[6] in contrast to Apple's pre-litigation offer to all iPhone owners providing a $50 credit toward battery purchase/replacement. The Settlement's reduced benefit to consumer Class members cannot be regarded as worthy of the "results achieved" multiplier awarded by the district court.

Rejecting the percentage fee requested by Class Counsel, the district court awarded attorneys' fees based on a lodestar plus multiplier, using an inflated lodestar that included the unproductive, redundant, and unnecessary work of scores of attorneys whose work did not benefit the Class. Also, allowing inclusion of the work of counsel in extraneous actions in Class Counsel's lodestar was an abuse of the district court's discretion.

The district court also abused its discretion by applying a multiplier to paralegal fees. While paralegals' fees may be charged to the Class at rates higher than the actual cost to the firms employing them, paralegal lodestar should not be enhanced by a lodestar multiplier when calculating Class Counsel's fee award.

### INCENTIVE AWARDS

Incentive awards of any amount are prohibited by Supreme Court precedent, and the district court should have denied approval of the requested service awards on that basis alone. Even if such awards were permissible, the district court

---

[6] Claims were made on a per iPhone – not per Class member – basis. ER-209.

abused its discretion by approving service awards for many Named Plaintiffs who contributed nothing to the result.

Named Plaintiffs' service awards dwarf their claims by a factor of 50, an inducement that rewards their abandonment of Class-wide claims.

In particular, the payment of service awards to 11 foreign nationals who are not members of the Settlement Class, who do not represent certified foreign classes, and whose work achieved nothing for the Class, represents the height of abuse of such awards, lending further support to the Supreme Court's wise policy of forbidding them from the outset.

## STANDARD OF REVIEW

**Standard of Review as to settlement approval.** A district court's decision to approve a class action settlement is reviewed for abuse of discretion. *In re Bluetooth Prod. Liab. Litig.*, 654 F 3d 935, 940 (9th Cir. 2011). Whether the district court applied the correct legal standard is reviewed de novo. *Sea Coast Foods, Inc. v. Lu–Mar Lobster & Shrimp, Inc.*, 260 F.3d 1054, 1058 (9th Cir. 2001). "Settlements that take place prior to formal class certification require a higher standard of fairness." *In re Mego Financial Corp. Securities Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *citing Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

**Standard of review as to the award of attorneys' fees.** A district court's "award of fees and costs to class counsel, and its method of calculation," is reviewed for abuse of discretion. *Chambers v. Whirlpool Corp.*, 980 F.3d 645, 656 (9th Cir. 2020), *quoting In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1177 (9th Cir. 2013). We review de novo the "legal bases" of a fee award. *Chambers, quoting Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 956 (9th Cir. 2002). "A court abuses its discretion when it fails to apply the correct legal standard or bases its decision on unreasonable findings of fact." *Dennis v. Kellogg*

21

*Co.*, 697 F.3d 858 (2012) (internal citations omitted).  Whether paralegal fees may be enhanced by a multiplier is a legal question reviewed *de novo*.

**Standard of review as to incentive awards.**  Incentive awards are reviewed *de novo*, as this appeal presents a purely legal question of first impression in this Circuit. *Wagner v. NTSB*, 86 F.3d 928, 930 (9th Cir. 1996) ("Purely legal questions are reviewed de novo.").  *Cf. Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1127 (9th Cir. 2006) ("We ... review de novo the district court's application of the Federal Rules of Civil Procedure ...."); *United States v. Clifford Matley Family Tr.*, 354 F.3d 1154, 1159 n.4 (9th Cir. 2004) ("We review de novo interpretations of the Federal Rules of Civil Procedure.")

# ARGUMENT

## I. The district court erred in certifying the Settlement Class and approving a Settlement binding on all Class members where the requirements of Rule 23 were not satisfied

Prior to certifying a settlement class and approving a settlement, a court must ensure the four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are satisfied. In addition, in a damages class action, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members."

Rule 23 and Ninth Circuit precedent require a court to make detailed findings that the prerequisites of the rule have been satisfied prior to certification of the settlement class. *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (*citing Hanlon*, 150 F.3d at 1026).

Here, the district court's findings regarding class certification consist of four terse sentences: "On May 27, 2020, the Court preliminarily approved the Class. Nothing has occurred that changes this Court's previous determination that class certification is appropriate under Rule 23. The requirements of Rule 23(a) and (b) are fully satisfied. Accordingly, the Court grants final certification of the

23

Settlement Class."[7]  This abbreviated approach to class certification fails to satisfy Ninth Circuit's requirements.  *Dennis* 697 F.3d at 864.  *See also Allen v. Bedolla* 787 F.3d 1218, 1223–1224 (9th Cir. 2015) (vacating settlement and class certification where district court did not satisfy procedural requirements and "because the record before us does not allow us to undertake even our deferential substantive review.").

In *Amchem Prod. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court clarified that the requirements of Rule 23 continue to apply in a settlement context:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, see Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial. But other specifications of the Rule—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.

*Amchem* at 620.

---

[7] In its preliminary approval order, the district court similarly failed to provide any analysis to support its holding, stating: "this Court preliminarily finds, for the purpose of settlement only, that the Settlement Class meets all the prerequisites of [FRCP Rule 23] for class certification, including numerosity, commonality, typicality, and predominance of common issues, superiority and that the Named Plaintiffs and Class Counsel are adequate representatives of the Settlement Class." ER-196.

In a case alleging common injury shared by 90 million iPhone owners, the prerequisites of Rule 23(a) should easily be satisfied. The commonality of injury and uniformity of damages were the predominant feature of the Class complaint; the complaint did not include any allegation of personal experience of impaired performance. The court acknowledged this key point in its Order on MTD. ER-219.

After motions to dismiss, the case was winnowed down to computer intrusion claims the district court found had been alleged on a class-wide basis. Apple sought to defeat these claims by arguing that none of the Named Plaintiffs alleged having personally experienced the effects of the throttling software. The court rejected this argument, finding the theory of the case does not rest on individual experience of impaired performance, as plaintiffs had adequately alleged that *all* iPhones running the specified iOS updates suffered from impaired performance. ER-224. Thus, following the motion to dismiss, it seemed the Named Plaintiffs – individuals who had downloaded the iOS software but not alleged awareness of impaired performance – could adequately represent the interests of all iPhone owners who had downloaded the iOS updates.

In the course of settlement negotiations, however, Named Plaintiffs and Class Counsel abandoned Class-wide damages and agreed to a Settlement

explicitly designed to compensate only a small subset of the Class who *could* attest to personal experience of performance issues. By allowing individual subjective experience to prevail over Class claims, the Settlement disregards the predominance requirements of Rule 23(b)(3).[8] Moreover, because the Settlement is not fair to the vast majority of the Class – whose claims were extinguished for no consideration – Class members were neither adequately represented nor equitably treated within the meaning of Rules 23(e)(2)(A) and (D), and the district court erred in approving the Settlement.

### A. The Class was not adequately represented by Named Plaintiffs whose claims were not typical of iPhone owners able to attest to performance issues

As a matter of constitutional due process, a court may give preclusive effect to a judgment against unnamed/absent parties only if they were adequately represented. *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940) ("members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present"). *See also* William

---

[8] Had this case included one or more Plaintiffs who alleged personal awareness of the performance issues in their complaints, the intra-class conflict would have been apparent from the outset, and the court could have required the establishment of subclasses at an earlier time. Simply because the Plaintiffs waited until settlement to bring the conflict to the fore does not excuse the failure to require adequate representation for each subclass.

B. Rubenstein, 5 Newberg on Class Actions, §3:51 (5th ed. 2020) ("adequate representation" is the "*sine qua non* of class action law.").

Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel prosecute the action vigorously on behalf of the class.   *See e.g., Staton v. Boeing Co*., 327 F.3d 938, 957 (9th Cir. 2003) and *Hanlon v. Chrysler Corp*. 150 F.3d 1011, 1020 (9th Cir. 1998).  The adequacy of representation requirement assumes representative parties will zealously pursue the claims of absent class members with whom they share a common litigation interest.

Here, the broader Class defined by the Settlement was not adequately represented under Rule 23 because the Named Plaintiffs and Class Counsel agreed to settle the claims of the vast majority of the Class for no compensation, without regard to Class-wide injury and damages.  In the circumstances of this case, no zealous representative would agree to compromise the legal claims of tens of millions of uniformly injured class members for zero compensation.

Neither was the compensated subclass adequately represented.  The district court recognized that none of the Named Plaintiffs had alleged personal awareness of the performance issues.  ER-219 ("Plaintiffs concede that they do not plead that

any named plaintiff personally experienced an Unexpected Power Off ("UPO"), and they do not plead that any named plaintiff experienced manifestations of the throttling software.").  Despite this, however, the Settlement compensates only the narrow sub-set of Class members whose awareness of impaired performance is not shared by Named Plaintiffs; since the alleged claims of Named Plaintiffs' were not *typical* of this subclass they had no incentive to maximize their recovery.

The Supreme Court has repeatedly stressed that allegations of named plaintiffs must by typical of the class they seek to represent.  *See e.g.*, *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982) ("We have repeatedly held that 'a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'")  (Internal citations omitted.).  Based on their allegations, it is not clear whether the Named Plaintiffs are even able – in good faith – to make claims on the Settlement fund.

The district court found Plaintiffs had alleged damages capable of proof on a class-wide basis.  With the Settlement, however, the Named Plaintiffs allowed individualized experience of performance issues to become the overriding, determinative, *predominant* issue in establishing whether a class member could receive compensation.  The terms of the Settlement created an intra-Class conflict,

by limiting compensation to those few Class members who had subjective awareness of iPhone performance issues during the class period.

**B.**   **A unified Class defined by common injury was bifurcated by the Settlement into two subclasses, with neither having separate representation and only one entitled to share in the Settlement**

With the motion to dismiss it became apparent the Class included individuals, like the Named Plaintiffs, who had not comprehended the impaired performance alleged in the complaint, as well as others who *were* aware of performance issues.  Once they abandoned Class-wide claims and damages, the Named Plaintiffs no longer had commonality of interest with the subclass cognizant of performance issues and were not competent to represent the interests of this subclass.  *See Amchem* at 627 (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals affected.").  *See also Hansberry,* 311 U.S. at 43-43.

The conflict between subclasses became fixed when Named Plaintiffs chose to ignore the Class-wide impaired performance and resulting uniform damages, and agreed to a Settlement that restricted claims to the subclass aware of impaired performance.  ER-210-212.

A Class initially defined by common injuries related to the download of throttling software was thus divided into two groups by the parties' negotiations

and by the Settlement based on a theory of injury not found in the Complaint, according to the non-uniform, individualized, subjective experience of iPhone performance issues. When Named Plaintiffs chose to advocate for what Apple's counsel described as a "very, very narrow group" (ER-187), it became apparent there were competing, separate groups within the Class, whose uniform legal claims were now being differentiated by a subjective standard. "[T]he adversity among subgroups requires that members of each subgroup cannot be bound to a settlement except by consents given by those who understand their role is to represent solely the members of their respective subgroups." *Amchem*, 521 U.S. at 627, *citing In re Joint Eastern and Southern Dist. Asbestos Litig*., 982 F.2d 721, 742–743 (2d Cir. 1992), *modified on reh'g sub nom. In re Findley*, 993 F.2d 7 (2d Cir. 1993).

The conflict within the Class was readily apparent. In such a case the appropriate action is to create subclasses. *Cf. Ortiz v. Fibreboard Corp*., 527 U.S. 815, 856 (1999) ("a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under [Rule 23(c)(5)], with separate representation to eliminate conflicting interests of counsel."), *citing Amchem*, 521 U.S., at 627 (class settlements must provide "structural assurance of fair and adequate representation for the diverse groups and individuals

30

affected"). When Settlement approval was sought, it was incumbent on the court to require separately represented subclasses, with separate counsel, to ensure adequate representation of the newly competing interests and theories of recovery of the respective subclasses.

Though the Settlement favors the subclass aware of impaired performance, as noted above, that subclass was nonetheless inadequately represented in this action. Abundant legal authority has established that representatives of one group of claimants to a settlement cannot adequately represent the interests of another group when their interests are adverse. *See e.g.*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig*., 55 F.3d 768, 801 (3d Cir. 1995) ("[W]e must be concerned that the individual owners had no incentive to maximize the recovery of the government entities; they could skew the terms of the settlement to their own benefit."). *Cf. Staton v. Boeing*, 327 F. 3d 939, 958 (9th Cir. 2003) (presence of both rank and file and supervisory employees in one class was acceptable because both groups were represented). If Named Plaintiffs were not aware of performance problems, then they are not competent to represent the claimant subclass.

The subclass defined by awareness of performance issues is also problematic because a class cannot be defined by purely subjective criteria.

Courts have consistently rejected class and subclass definitions based on subjective criteria. *See, e.g. Mullins v. Direct Digital, LLC,* 795 F.3d 654, 660 (7th Cir. 2015) ("[C]lasses that are defined by subjective criteria, such as by a person's state of mind, fail the objectivity requirement."). *See Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011) (Class membership must be "determinable from objective, rather than subjective, criteria.").

Here defining a subclass by subjective criteria is particularly cynical because Named Plaintiffs and Class Counsel acknowledged that ordinary consumers had "no way" to understand the fact or cause of reduced iPhone functionality. See ER-248. ("Users of Apple devices immediately began reporting reduced functionality, but there was no way for ordinary consumers to quantify these inklings or give them credence.")

Over 97% of Class members did not submit a Claim Form, and there is no way to determine what portion of the Class was eligible to do so.

The district court abused its discretion by allowing a purely subjective criterion to define the subclass of members able to make a claim, rendering the subclass unidentifiable until after claims are filed. The court also erred by certifying a broader Class when only a small subclass – unidentifiable prior to the

claims process – was able to receive compensation through the Settlement. Because of the new and subjective theory of damage adopted by the parties at the settlement stage, the vast majority of iPhone owners should not be included in the Class and should not be compelled to give a release. Because neither subclass was adequately represented, the district court should not have certified the Settlement Class.

C. **An overall assessment that a settlement is fair cannot substitute for the procedural protections of Rule 23, including those required by amended Rule 23(e)(2)**

An overall assessment that a settlement is fair (e.g., that the $310 million settlement fund here was adequate) cannot be substituted for the structural protections provided by the requirements of Rule 23.

> The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments – checks shorn of utility – in the settlement-class context. First, the standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind – class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.

*Amchem*, 521 U.S. 591, at 621 (1997).

As amended in 2018, Rule 23(e)(2) specifies that a court must consider whether: "the class representatives and class counsel have adequately represented the class" and "[look] to the *conduct of the litigation and of the negotiations leading up to the proposed settlement*. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement." Advisory Committee Notes, Rule 23, 2018 Amendments, Subdivision (e)(2), Paragraphs (A) and (B) (emphasis added). "[T]he focus at this point is on the actual performance of counsel acting on behalf of the class." *Id.*

As described *supra,* neither the excluded subclass nor the claimant subclass was adequately represented. Lack of adequacy cannot be excused by claiming "no harm, no foul." When a Settlement includes inadequately represented class members, it must be vacated, without regard to whether "the class members' interests were actually damaged." *Dewey v. Volkswagen AG*, 681 F. 3d 170, 189 n.19 (3d Cir. 2012). The Settlement is not adequate for all Class members and does not treat Class members equitably relative to each other in violation of Rule 23(e)(2)(C) and (D).

Rule 23(e)(2)(C) requires a court to consider whether "the relief provided for the class is adequate" (providing factors to consider) and Rule 23(e)(2)(D) requires the district court consider whether "the proposal treats class members

34

equitably relative to each other." These sections of the rule focus on "a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern." Advisory Committee Notes, 2018, Rule 23, Subdivision (e)(2), Paragraphs (C) and (D).

The $310 million Settlement represents a recovery of no more than $3.44 per phone. Weighed against the uniformly suffered iPhone damages, the per-phone recovery is insignificant. The district court found "[T]he $25 cash payment per eligible device is comfortably in the middle of [the] estimated damages range." ER-46-7. But the district court's analysis is flawed because it fails to consider the value of the Settlement for the entire Class, as opposed to the claimants. It was never contemplated that each Class member would receive $25 per eligible device. That would have required a settlement fund of $2.25 billion, net of attorney's fees. The court abused its discretion by failing, as required by Rule 23(e)(2)(C), to consider the value of the $310 million Settlement relative to the damages it recognized were uniformly suffered by Class members.

Under Rule 23(e)(2)(D), a district court may only approve a settlement if "the proposal treats class members equitably relative to each other." As described above, the terms of Settlement divided the Class into two subclasses, one able to make a claim on the Settlement fund, another which could not. The Claim Form,

an integral part of the Settlement, is the vehicle by which the majority of the Class was excluded from making claims. The Claim Form specifically excluded two groups of Class Members.

### 1. The Claim Form denies former iPhone owners the ability to make a claim

The Settlement Class consists of "*all former or current* U.S. owners of [subject iPhones who ran the subject iOS updates prior to December 21, 2017]." (Emphasis added.) ER-203-4. This was reiterated in the Class Notice. ER-214 ("You are a member of the Settlement Class if *you are or were* (1) a United States owner of [a subject iPhone]…" (Emphasis added)).

The Claim Form Instruction, however, states: "Eligibility. The Settlement will provide a cash payment if you *are* the owner of an eligible device…" (Emphasis added.) ER-212. Likewise, the Electronic Claim Form requires a claimant attest to current ownership. ER-210 ("Please select only one option … I *am* the owner of an iPhone [6 series]; [or] I *am* the owner of an iPhone [7 series]…" (Emphasis added.)).[9]

---

[9] The printed Claim Form also requires attestation that the Class member is an owner of a subject iPhone on the date the Claim is signed. ER-212.

While the Settlement Class includes current and former iPhone owners, the court-approved Claim Forms – both electronic and print versions – deny former owners the ability to make a claim. The Claims period ended October 6, 2020 – 33.5 months after the Class period closed on December 21, 2017. Consumers keep their iPhones for an average of 31 months,[10] so it is very likely most Class members no longer owned their subject iPhones during the Claims process and would not have been able to sign a Claim form attesting to current ownership.[11]

The clear disconnect between the definition of the Settlement Class (former and current owners) and the court-approved Claim Forms (current owners only) renders former owners unable to register a claim and subjects them to inequitable treatment relative to other Class members in violation of Rule 23(e)(2)(D).

---

[10] https://www.whistleout.com/CellPhones/Guides/this-is-how-long-youll-keep-iphone

[11] For perspective, this action relates to the iPhone 6 and 7 series. The iPhone 7 was introduced September 7, 2016, and Apple has just released its iPhone 13 line. Some Class members are likely on their third or fourth phone since owning a 6 or 7 series. *See* https://www.apple.com/iphone-13/?cid=CDM-USA-DM-P0021402-484902

37

## 2. The Settlement ignores Class-wide injury and uniform damages, and inequitably denies a majority of the Class the right to make a claim

The distribution of Settlement proceeds also neglects an additional subset of Class members whose causes of action survived Apple's motion to dismiss. For the vast majority of Class members – who, like claimants, were victims of computer intrusion and trespass to chattels – the Settlement imposes an inequitable apportionment of relief relative to actual damages in violation of Rule 23(e)(2)(D).

The excluded Class members give up all their claims and rights, but receive *nothing* from the settlement, even though all Class members suffered the same impairment of iPhone performance and uniform damages. The Settlement clearly does not treat Class members equitably relative to each other, and the district court erred by failing to so find.

The Settlement broadly releases the legal claims of all Class members, but compensates only those who can declare under penalty of perjury "I am the owner of [a subject Apple device]" and "I experienced diminished performance on my [subject Apple device] when running [a subject iOS] before December 21, 2017. ER-210-13.

Only 2.27 million claims were received from Class members able to attest they currently own[12] a subject iPhone that had, following installation of a subject iOS, suffered "diminished performance" some three or four years earlier. The other 87.7 million Class members, including those who no longer own their outdated iPhones or have no recollection of impaired performance, will not be compensated – even though all Class members suffered the same impaired performance and damages testified to by Plaintiffs' experts.

The district court erred by approving a Settlement that provides inadequate relief for the Class in violation of Rule(e)(2)(C), and that fails to treat "class members equitably relative to each other" in violation of Rule(e)(2)(D). The district court's Settlement approval should be reversed.

---

[12] The Notice to Class members states "you may be entitled to settlement benefits if you *are or were* [an owner of a subject iPhone]." The Claim Form requires that a claimant attest to being a current owner through use of the language "I am the owner of [a subject iPhone]." Oddly, only those who have sold their subject iPhones – and thus cannot make a claim – have actually realized the damages that support the court's reasonableness finding.

**II.** **The district court abused its discretion and breached its fiduciary duty to the Class by awarding an unreasonable fee far in excess of awards in similar cases and based on an inflated lodestar**

Class Counsel sought a percentage fee of 28.3% of the $310 million Settlement Amount.  The availability of a percentage fee is consistent with the "common fund doctrine."  Grounded in equity, this exception to the American Rule "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

When class counsel are seeking a common fund fee, however, their interest is adverse to the interest of their class clients, and this Court has long held that a district court has a fiduciary duty to protect the interests of the class at the fee-setting stage.  *See e.g., Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002); *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) ("As a fiduciary for the class, the district court must 'act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.'"); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994) (same); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) (court has fiduciary role for class at fee-setting stage).

When making an attorneys' fee award, the district court, in its fiduciary role, must act in the best interest of the absent Class. That duty, however, is commonly eclipsed by class counsel's interest in recovering the highest possible fee.

The common practice of beginning the fee analysis with class counsel's request prejudices the class and is inconsistent with the court's fiduciary duty.

> [C]ases that employ the percentage approach arbitrarily tend to start their analysis with the attorneys' request, rather than an objective marker, such as the hours worked…. [C]ourts tend to anchor their analysis to the percentage first requested by counsel [which] allows plaintiffs' counsel to set the baseline based on its biased valuation of its work…. [C]ourts have shown a propensity to adjust the requested amount by only a few percentage points, if at all. This anchoring effect allows plaintiffs' counsel to manipulate the fee award they are likely to receive by simply requesting a higher percentage.

*In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 762-763 (S.D. Ohio 2007) (internal citations omitted).

This is precisely what occurred here. Because Class Counsel requested a supra-competitive fee of $87,730,000 – 28.3% of $310 million and well beyond this Circuit's benchmark – the court properly identified the windfall that would result from such a fee. The court ultimately knocked the percentage down by just a couple of points, however, and settled on a 26% fee award – only 2.3% less than the requested fee and unjustifiably higher than the non-megafund benchmark. The court's analysis started with Class Counsel's excessive request and flirted

41

with an empirically reasonable percentage award, then turned to a lodestar calculation to arrive at an excessive and unmerited 26% fee award. The most plausible explanation for the court's fee award is that it was anchored to Class Counsel's absurd request of 28.3%, because it does not pass muster under any reasonable metric.

In working its way to a fee, the district court first determined "the better approach is to look at empirical research on megafund cases" (ER-23), but then ignored those studies and cases. After referencing empirical research finding the median fee award in megafund class actions is 10.2% and Northern District cases relying on those findings, the court veered off into a lodestar analysis, not to cross-check a reasonable 10%-16% fee award, but to arrive at a fee far in excess of the empirically supported range, and within a few points of Class Counsel's request. ER-27. The court used the lodestar methodology to back into a 26% fee award, but failed to scrutinize a proffered lodestar loaded with redundant, unnecessary, and unproductive work.

The district court had a fiduciary duty to consider the empirically supported percentage fee urged by Appellants and to explain why that proposed level of compensation – and resulting increase in funds available for payment of class claims – would unjustly enrich the Class. The court was not free to proceed to a

26% fee before it had considered the reasonableness of the lower fee suggested by the Appellants. A 17.5% fee of $54,250,000, as advocated by Appellants (ER-137), would represent a generous multiplier of Class Counsel's corrected lodestar and would be more consistent with the court's fiduciary duty to award a fee no greater than an amount below which the Class would be unjustly enriched.

This court has held "in common fund cases, no presumption in favor of either the percentage or the lodestar method encumbers the district court's discretion to choose one or the other." *In re: Wash. Pub. Power Supply Sys. Secs. Litig.*, 19 F.3d 1291 (9th Cir. 1994). Most importantly, "the district court should be guided by the fundamental principle that fee awards out of common funds be 'reasonable under the circumstances.'" *Id., quoting Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir.1990). While the court had discretion to award fees either as a percentage of the fund or based on a reasonable lodestar, that discretion is constrained by a fiduciary duty to protect the interests of absent class members at the fee-setting stage. The court erred by disregarding its duty to the Class, by failing to consider Appellants' fee recommendation, by applying an unwarranted multiplier to a lodestar bloated by hours not spent for the benefit of the Class, and by finding a "downward adjustment to the [non-megafund] benchmark is not appropriate." ER-27.

**A.    The district court's analysis of the *Vizcaino* factors (and the megafund rule) suggested fees below the non-megafund benchmark were warranted**

In considering whether to depart from the Ninth Circuit's 25% non-megafund benchmark, the district court considered five factors:  "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." (Citations omitted.) ER-17.  The court further noted "[t]he "most critical factor" in determining appropriate attorneys' fee awards "is the degree of success obtained."" ER-17, *citing Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

**1.    Results achieved**

Regarding the results achieved, the court failed to examine the actual per iPhone recovery achieved by the Settlement.  The Settlement represents a recovery of approximately $3.44 per eligible device.[13]    By way of comparison, prior to the initiation of litigation, Apple had indicated its willingness to

---

[13] The district court made a clear error in finding "[t]he $25 cash payment per eligible device is comfortably in the middle of [the] estimated damage range," as the Settlement does not provide anything close to $25 per iPhone.  ER-46.  It appears the court was confusing a per claim recovery based on a low projected claim rate (i.e., no more than 18%) with the actual per iPhone Settlement value of $3.44.

compensate consumers by offering a $50 credit per iPhone, sixteen times the per eligible device recovery created by the Settlement.

In fact, the $310 million represents a recovery of only 14% of what the district court determined were reasonable $25 damages. The district court's chosen method of measuring the degree of success (i.e., based on per claimant recovery and ignoring the low number of claims received) merely rewarded Class Counsel for abandoning the interests of a majority of the Class and achieving an extremely low 2.5% claims rate. The results achieved warrant a downward adjustment from the 25% benchmark and only a modest, if any, multiplier.

### 2. The district court abused its discretion in its risk factor analysis

The district court overstated the risk of litigation, as the risk of not settling was very low from the outset. Corporations are risk-averse and inclined to settle large class actions filed against them, regardless of the merits. *See* William P. Barnett, *There is No Conservative Case for Class Actions*, 22 Fed. Soc. Rev. 192, 195 (2021). In this case, Apple explained it settled "to avoid the expenses, uncertainties, delays and other risks inherent in continued litigation of the MDL" even though it was confident it would prevail on the merits. ER-20. *See also Goldberger v. Integrated Res.*, 209 F.3d 43, 52 (2nd Cir. 2000) (no appreciable risk of non-recovery because virtually all class actions settle).

45

The district court also disregarded the risk-diminishing effect of governmental investigations and the virtual stampede of case filings that followed Apple's public statements regarding the throttling effect of the subject iOS updates and its offer to compensate consumers through a $50 credit. Sixty-six separate federal cases and four state cases were filed in the hope of making fees on a virtually guaranteed settlement. As Apple described, "the many law firms that vied to represent the class demonstrates that the plaintiffs' bar viewed this matter as a lucrative and desirable – rather than risky and precarious – engagement." ER-103.

Relying on the fact that only three motions to serve as lead counsel were filed (in contrast to *In re Anthem Inc. Data Breach Litig*., 2018 WL 3960068, at *27 (N.D. Cal. Aug. 17, 2018), where 18 firms filed such motions), the court here suggests other attorneys were discouraged by the risk of the litigation. ER-20. In practice, firms typically agree to support one or another lead-counsel candidate in exchange for assurances related to sharing of work and fees. *See* Third Circuit Task Force on Selection of Class Counsel, 208 F.R.D. 340, 348 (2002) ("voluntary agreements among lawyers may create cartel-like groupings that favor some lawyers…[and] may also result in overstaffing and padded hours. In order to reach a 'deal', lead counsel may have to 'cut in' so many lawyers that the

46

representation of the class becomes inefficient and the ultimate fee request becomes inflated.") *See also* Barnett, 22 Fed. Soc. Rev. at 195. Ignoring this reality, the district court misinterpreted the decision by 38 law firms to defer to counsel with the pole position in the race to be lead counsel, and erred in viewing this as an indication of risk.

Further evidence of the limited risk to which Class Counsel was exposed was Apple's decision to enter into early mediation, which allowed the case to settle just 14 months after consolidation in the Northern District of California. Indeed, "the parties [ ] reached resolution and the litigation never progressed to the phases that entail the most risky, time-intensive, and difficult endeavors." ER-103.

### 3. The district court failed to meaningfully consider awards in similar cases with recoveries above $250 million

This Court has recognized "[w]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *In re Bluetooth Headset Products Liability Litigation*, 654 F. 3d 939, 942-943 (9th Cir. 2011).

In considering awards made in similar cases (*Vizcaino* factor five), the district court recognized the $310 million as a megafund:

> the size of the Settlement is a function of the number of devices at issue, estimated to be 90 million… Class Counsel's work in litigating this case up to the point of reaching settlement would have been the same whether there were 10,000, 100,000, 1,000,000 or more devices at issue.

ER-27.

Rather than looking to Class Counsel's cherry-picked cases as a basis for comparison, the court stated that it would follow the approach taken by two Northern District judges and "look to empirical research on megafund cases," as Judge Chen did in *Alexander v. FedEx Ground Package Sys*., No. 05-cv-00038, 2016 WL 3351017, at *2-3 (N.D. Cal. June 15, 2016). Judge Chen ultimately awarded fees of 16.4% of the $226,500,000 common fund, citing to *In re High-Tech Emp. Antitrust Litig*., No. 11-CV-02509, 2015 WL 5158730, at *13 (N.D. Cal. Sept. 2, 2015), in which Judge Koh awarded fees of 10.5% of a $435 million settlement.[14] The $310 million Settlement fund in this case falls almost exactly in the middle of these two Northern District megafund cases cited by Judge Davila,

---

[14] Judge Koh relied on Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements (1993-2008)*, 7 J. Empirical Legal Studies 248 (2010) which reviewed 68 "megafund" settlements and found median attorney fees were 10.2% of the fund and the mean was 12%.

suggesting a reasonable fee would be somewhere in the 10.5%-16.4% range. But the district court abused its discretion by ignoring the empirical research and similar cases and awarding 26%, a fee even higher than the Ninth Circuit's 25% benchmark in small-value class cases. ER-23.

Consistent with empirical research and the two California megafund cases cited in the district court's fee order, fees well below the 25% benchmark are warranted in this case. In summarizing its review of the *Vizcaino* factors the court found "no single factor or combination of factors supports the requested 28.3% … [which] far exceeds the mean and median percentages reported in both the Eisenberg & Miller study and the Fitzpatrick study." ER-24. Instead of choosing a percentage fee in line with these empirical studies, however, the court elected to "proceed with a lodestar calculation to evaluate whether there is a basis to deviate upward or downward from the 25% benchmark." ER-24-5.

## B. The district court abused its discretion when performing its lodestar analysis

Having determined the *Vizcaino* factors did not support class counsel's 28.3% fee request (ER-24), the district court then turned to a lodestar analysis to determine the appropriate fee. The court found Class Counsel's requested "2.43

multiplier is high" and any "award exceeding a 2.232 multiplier[15] would result in

"windfall profits" for Class Counsel.  ER-26-7.

The court's fee methodology makes a precise calculation of Class

Counsel's lodestar essential.  A fee applicant bears the "burden of "documenting

the appropriate hours expended" in the litigation and therefore must submit

evidence supporting the hours worked."  *Garcia v. Resurgent Cap. Servs., L.P.*,

No. 11-1253-EMC, 2012 WL 3778852, at *4 (N.D. Cal. Aug. 30, 2012) (*quoting*

*Hensley v. Eckerhart*, 461 U.S. 424, 433 and 437).[16]  The court must be provided

sufficient details "to form a judgment on whether [the fee applicant's] fees were

legitimate" in order to determine "whether the work was an appropriate basis for

fees."  *Democratic Party of Wash. State v. Reed*, 388 F.3d 1282, 1286 (9th Cir.

2004).  *See also Garcia* at * 24 (Lodestar filings must "contain enough specificity

---

[15]The court did not explain, nor can Appellants determine, where the curiously precise figure of 2.232 came from.  But it is clear that it did not emerge from a rigorous consideration of this Circuit's fee factors, or correspond to the real risk of non-recovery in this case.

[16] Whether in a fee shifting or common fund case, the same reasonable standards apply and lodestar must be precisely calculated and relate directly and intimately to the prosecution of the litigation at hand.  *See In re WPPSS, supra*, 19 F.3d 1291, 1304 (principles developed in fee shifting cases are applicable to common fund fee awards when they make sense in common fund context).  There is no "cogent argument" why the rules of lodestar calculation should differ in fee-shifting and common fund contexts, including the rule requiring sufficient detail to permit a court to determine whether particular hours furthered the litigation. *Id*.

as to individual tasks to ascertain whether the amount of time spent performing them was reasonable."). A district court "does not discharge its duty simply by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1160 (9th Cir. 2018). Rather, it must disallow inclusion of "excessive, redundant, or otherwise unnecessary" hours in lodestar. *Hensley*, 461 U.S. at 434.

Here, Class Counsel failed to carry its burden of establishing the reasonableness of its claimed $36,103,148 lodestar, and the district court violated its fiduciary duty to the Class by accepting all of Class Counsel's claimed hours at face value. Other than broad categorization of work performed, Class Counsel provided no supporting detail whatsoever for its proffered lodestar. Accordingly, the district court's lodestar analysis was uninformed and its findings were without necessary information or perspective.

Further, Class Counsel included in their lodestar more than $3.9 million incurred in a parallel state litigation, but that time is improperly charged to *this* Class.[17] *See Chemical Bank v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1309 (9th Cir. 1994) (counsel who litigate a parallel state action are not entitled to a fee

---

[17] In addition, JCCP Counsel failed to identify timekeepers by title or categorize their work.

award where state counsel do "not formally represent [ ] [the federal] class," even though their "activities in representing others [may] incidentally benefit the class."). For the same reason, the fees of international liaison counsel must be excluded from lodestar charged to this exclusively U.S. Class.

The district court found Class Counsel's lodestar was $36,103,148 (ER-26), thereby accepting thousands of hours of excessive, redundant, and otherwise unnecessary attorney time of no benefit to the Class[18] which unjustifiably increased the actual lodestar by millions of dollars.[19] After the padding is removed, the fee award actually represents a multiplier far in excess of the number the court determined to be a maximum, to the substantial detriment of the Class.

By accepting at face value all the lodestar submitted by the 40 firms that billed time to this case – including for work without supporting detail, work by JCCP Counsel, and international liaison counsel's fees – the district court failed

---

[18]  The district court appointed Cotchett, Pitre & McCarthy LLC and Kaplan, Fox & Kilsheimer LLP as interim co-lead counsel, and in addition appointed attorneys from 23 firms to the Plaintiffs' Executive Committee, and attorneys from an additional 14 firms to the Steering Committee. ER-105. Charges from 40 firms, including at least 275 timekeepers, are included in lodestar.

[19]  Apple calculates that at least $7,100,000 of excessive and duplicative charges are included in the submitted lodestar. ER-104.

to discharge its fiduciary duty to the Class.[20]  *See Vogel* 893 F.3d at 1160 (9th Cir. 2018) (the court erred "by taking at face value the word of the prevailing party's lawyer for the number of hours expended on the case.").  *See also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566 (9th Cir. 2004) (attorneys in unsuccessful Florida suit not entitled to fees out of a N.D. Cal class action common fund regardless of whether they advanced the litigation; they did not seek fees on behalf of a successful party and were not themselves parties).

Class Counsel have the burden of establishing the work included in lodestar added value and was not merely duplicative or superfluous.  *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 200 (3d Cir. 2005) ("[C]ounsel's proof must be specific: it must show what its efforts were, how they created a benefit, and why that benefit would not have been created absent its efforts.").  *See also Hensley* at 436.  The benefit conferred by the work of 275 timekeepers was not discernable from the summary documents provided with Class Counsel's fee motion.  The district court should have required the filing of sufficiently detailed

---

[20] By Apple's description, Class Counsel "inflated the lodestar by unnecessarily soliciting and including more than 120 named plaintiffs in the consolidated complaints ... This extra work was unnecessary.... the vast majority of the 120 Named Plaintiffs have contributed nothing for the class's benefit, except generating more work for Plaintiffs' counsel." ER-121-2.

time records to allow determination of what time was spent in the successful pursuit of the Class' interest, and what time was not.

While Class Counsel may elect to share their fees as permitted by law, fees for unrelated, duplicative, or unproductive work may not be included in Class Counsel's lodestar to the detriment of the Class. *See In re Volkswagon Clean Diesel* 914 F.3d 623, 645 (9th Cir. 2019) ("The mere fact that a non-designated counsel worked diligently and competently with the goal of benefiting the class is *not* sufficient to merit compensation. Instead, only attorneys `whose efforts create, discover, increase, or preserve' the class's ultimate recovery will merit compensation from that recovery." *Quoting Cendant* at 197 (*quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n.39 (3d Cir. 1995)).

### 1. The district court abused its discretion by allowing inclusion of hours spent in other cases, including the JCCP Action

The court does not anywhere find the JCCP Action or the international actions added value.[21]  As described by Apple, JCCP counsel's "work on the parallel action increased inefficiency and duplication without any benefit to the

---

[21] Non-U.S. individuals are not part of the settlement Class.  ER-39.

class members." ER-28. JCCP Counsel does not represent parties in this litigation—they represented plaintiffs suing in a different forum, where no class was ever certified.[22] Charging the MDL Class for JCCP Counsel's work on behalf of other representative plaintiffs in different proceedings is clear legal error, as this Court held in *Chemical Bank, supra*.

> The [state] action was never part of the MDL 551 action, but instead was parallel litigation. By its terms, however, the settlement of MDL 551 also resolved the [state] litigation…. Although the district court conceded that the [state] counsel's efforts may have benefited the Class Plaintiffs, it concluded that the litigation undertaken by the [state] counsel was not sufficiently related to the class action involving Class Counsel. The court found that the state court proceeding was an independent, somewhat parallel action in a different forum. It was not undertaken by MDL Counsel. It was not waged on behalf of the entire Class, and the entire Class would not have shared all potentially attainable benefits. The two actions were distinct and detached…. The [state] counsel did not represent the Class Plaintiffs in MDL 551, but represented distinct plaintiffs in another proceeding in state court. No money judgment or settlement fund was generated in that litigation.

*Chemical Bank,* 19 F.3d at 1307-1309.

---

[22]While JCCP plaintiffs may be absent members of the settlement Class, the district court did not find JCCP Counsel's work benefited the Class in any way. Rather, the court found the JCCP Action was separately pursued and followed its "own lengthy litigation history, including demurrers, amended complaints, discovery, etc. …" ER-36.

The foregoing quotation applies with equal force to this case, and *Chemical Bank* compels exclusion of the JCCP lodestar from the fee calculations in this MDL case.  *See also Churchill,* 361 F.3d at 579.

In obvious disregard of its fiduciary duty to the Class, the district court conceded Apple's objection to inclusion of JCCP Counsel's lodestar had "some merit," but decided it didn't matter, stating "[e]ven if JCCP Counsel's roughly $4 million in attorneys' fees are excluded from the lodestar, the lodestar would decrease to $32,103,148.05 and this adjusted lodestar would have an insignificant impact on the multiplier."  ER-28-9.  This is demonstrably false, and it also represents a missed opportunity for the court to fulfill its fiduciary duty to the Class.  If Apple's argument regarding JCCP Counsel has merit, then the district court abused its discretion by failing to exclude JCCP Counsel's lodestar from its fee calculation, which would have saved the Class over $8 million.  If a fiduciary duty to the Class means anything, then it compels the Court to reasonably exercise its discretion in a way that reduces the fee to Class Counsel, not the opposite.

The impact of JCCP Counsel's lodestar on fees and the multiplier is hardly negligible, as the district court held.  Eliminating JCCP Counsel's $3,993,154 from the lodestar pushes the multiplier far higher than the 2.232 the court held was the maximum permissible enhancement.  When combined with international

liaison counsel's charges of $547,037, these unproductive, redundant, and unnecessary fees total $4,540,191, which when subjected to the district court's 2.232 multiplier cost the Class at least $10,133,706 – hardly an "insignificant impact."

### 2. The district court should not have allowed excessive repetitive billing and inflated rates for discovery and document review to be included in lodestar

Following objections, Class Counsel reduced document review rates to a maximum of $350 per hour. The Dearman Declaration, however, indicates over 13,700 hours of "Tier 1" document review time that could have been performed by amply qualified project attorneys at a much lower hourly rate.[23] In *Wells Fargo*, Judge Tigar issued an order to show cause why he should not appoint an expert to determine the true market rate for contract and staff attorneys, which was intended to "determine what actual clients typically pay for contract attorneys' services when a law firm utilizes those contract attorneys' services…" *In re Wells Fargo & Co. S'holder Derivative Litig.*. 445 F. Supp. 3d 508, 529 (N.D. Cal. 2020). Based on class counsel's admission regarding the actual amount paid for their services, Judge Tigar required that all contract attorneys be billed to the class

---

[23] Tier I document review typically consists of "coding" documents into a database for a more extensive later review.

at their actual cost, or $42.50/hour.  *Id*. at 531.[24]  This same rate should apply regardless of the label attached to the discovery-review attorney.

Class Counsel included in its lodestar charges of $4,566,693 for "Tier 1" document review.  ER-100.  Applying a market rate of $42.50 to the 13,703 hours of first-pass document review time yields a fair market cost of $582,377.  This means Class Counsel's lodestar was overstated by $3,984,316 for low level document review, costing the Class $8,892,993.[25]

The district court also failed to consider the amount charged to the class for discovery related work as a whole.  Apart from Tier I document review, written discovery and document production alone cost the class $12,114,524.29 after application of the multiplier.  It is hard to understand how Plaintiffs' attorneys spent 3,576.6 hours propounding written discovery and 6,653.65 hours on document production – where class members had almost no documentation related to any of the claims in the case, other than their proof of purchase and form

---

[24] Judge Tigar also endorsed a rule requiring contract attorneys to be treated as a cost, but noted that no court has yet required that.  *Id*. at 528.  This Court should now adopt this practice as a rule in this Circuit.

[25] I.e. ($4,566,693 - $582,377) x 2.232 = $8,892,993.

warranties. The 4,673 hours devoted to non-expert depositions is also excessive, in a case where Class Counsel took only 10 depositions and defended only nine. ER-162-3.

For this Court's convenience, the entire billing related to discovery is provided in the following table:

| Description of category | Hours | Lodestar | Total (with 2.232 multiplier) |
|---|---|---|---|
| Written Discovery | 3,576.60 | $2,357,991.00 | $5,263,035.91 |
| Document Production | 6,653.65 | $3,069,663.25 | $6,851,488.37 |
| Tier I Document Review | 13,702.77 | $4,566,693.50 | $10,192,859.89 |
| Depositions non- expert | 4,673.10 | $2,482,860.00 | $5,541,743.52 |
| Expert Discovery | 67.40 | $51,827.00 | $115,677.86 |
| Discovery Motions | 2,450.00 | $1,676,624.00 | $3,742,224.77 |
| Other Discovery | 4,986.90 | $2,731,102.00 | $6,095,819.66 |
| **Totals** | 36,110.42 | $16,936,760.75 | $37,802,849.99 |

ER-100.

By way of comparison, counsel in the JCCP actions did most of the same work as MDL Class Counsel, including "initial investigation….to develop

59

theories of liability "draft[ing] and extensively research[ing]" two complaints,[26] "draft[ing] and propound[ing] two sets of Requests for Production of Documents," and reviewing the same 7 million documents produced by Apple, but they needed only 9,679 hours to accomplish *all* of their work – including discovery – in contrast to the 35,110.42 hours spent by Class Counsel on discovery alone. Once the multiplier is applied, Class Counsel's excessive $16.9 million billed exclusively for discovery efforts cost the Class a preposterous $37.8 million. The district court's cursory lodestar review ignored these issues.

### 3.  A multiplier should not be applied to paralegal fees in Class Counsel's lodestar

The Supreme Court and this Court permit paralegal fees to be included as part of an attorneys' fee award in fee-shifting cases in order to "encourage [ ] cost-effective delivery of legal services." *See Missouri v. Jenkins*, 491 U.S. 274, 288-289 (1989) ("reasonable attorney's fee" provided for by statute should compensate the work of paralegals, as well as that of attorneys."). *See also Pacific Coast Agr. Export Ass'n v. Sunkist Growers, Inc.* 526 F.2d 1196, 1210, n. 19 (9th Cir. 1975); *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1543 (9th

---

[26] The number of hours Class Counsel billed to "Pleadings" should have raised red flags. MDL counsel billed lodestar of $2,374,609, resulting in charges to the Class of $5,300,127. ER-100.

Cir. 1992)[27] ("It simply is not reasonable for a lawyer to bill, at her regular hourly rate, for tasks that a non-attorney employed by her could perform at a much lower cost.").

Clearly, however, "cost-effective delivery of legal services" is lost when a paralegal is billed at $475/hour,[28] and that hourly rate is then subjected to a 2.232 multiplier – which in this non-fee shifting case resulted in an hourly charge to the Class of up to $1,060 for paralegal services.[29]  In their objection, Appellants argued the "payment of a reasonable "market rate," without a lodestar multiplier adequately compensates Class Counsel for the work performed by their paralegals. Any attorney's fee award that includes a multiplier of a paralegal's market rate provides an unsupportable windfall to Class Counsel."  ER-154.

At least one court has held that paralegal time is not properly subjected to a risk enhancement. "The Court finds it unreasonable to multiply the hourly rate

---

[27] Vacated in part on other grounds *Davis,* 984 F.2d 345 (9th Cir. 1993).

[28] This amount is $100/hour greater than the $350 cap on licensed attorneys performing document review in this case.  ER-70.

[29]  Counsel Levin Sedran & Berman bills paralegals at between $450 and $475/hour.  ER-92.

requested by any contingency factor. *Although they provide a valuable service, for which compensation should be given, paralegals are not members of the bar and do not share in the attorneys' risk of litigation.*" *In re Equity Funding Corp. of America Securities Litig.*, 438 F.Supp. 1303, 1330 (C.D. Cal. 1977) (internal citations omitted) (emphasis added).

Class Counsel should be compensated for paralegal services at a reasonable market rate, and no more. Class Counsel's lodestar includes paralegal time billed at rates of between $125 and $475 per hour. The district court abused its discretion by approving above market-rate paralegal charges of up to $475 per hour, well over twice the Laffey Matrix rate of $206.[30] ER-157. Once appropriate market-rate hourly charge(s) are determined, subjecting those rates to a multiplier undermines the policy of *Missouri v. Jenkins, supra.* The district court disregarded Appellants' objection and applied its 2.232 multiplier to the full

---

[30] Of the 84 paralegals who performed services in the captioned matter, 71 were charged at rates up to 2.3 times the Laffey Matrix rate (with combined fees of $2,753,453). Applying the district court's 2.232 multiplier, these paralegal services alone account for $6,145,707, or 7.6%, of the court's $80.6 million *attorneys' fee* award.

$2,846,443 [31] of Class Counsel's paralegal charges, thus costing the Class $3,506,818 (i.e., ($2,846,443 x 2.232) - $2,846,443 = $3,506,818).[32]

The district court erred by failing to consider this issue. *See In re Wells Fargo & Co. S'holder Derivative Litig.*, 845 Fed. Appx. 563, 565 (9th Cir. 2021) (court errs by summarily dismissing objections without analysis or reasoning). This concern presents a legal issue of first impression for this Court and may be considered *de novo*.

### C. Applying the district court's multiplier to a correct lodestar would save the Class at least $13.6 million

Applying the district court's maximum 2.232 multiplier to a corrected lodestar, once JCCP Counsel's fees and international liaison fees are removed, and paralegal charges are treated as a cost, reduces the fee to $66,959,474,

---

[31] The amount of $951,918 was used in Appellants' objection, which was filed prior to Class Counsel filing their Supplemental Declaration of Mark J. Dearman in support of their attorneys' fee motion. A review of Exhibit 43 to that declaration shows paralegal fees of $2,866,443 are included in the proffered lodestar. ER-72-99.

[32] Class Counsel has also included in their lodestar "Investigator" charges of $88,999, billed at rates of $325-$475 per hour. Subjecting these charges to the district court's lodestar multiplier – rather than treating the charges as an expense – results in an overcharge to the Class of $109,647.

representing a savings to the Class of $13,640,526.[33,34] This is not *de minimis* amount, but represents an overcharge of 17% of the court-awarded fee.

Viewed another way, the court-awarded attorneys' fees of $80,600,000, less $2,846,443 in paralegal fees, cross-checked against a reduced lodestar of $28,716,514 yields a 2.71 multiplier,[35] which by the district court's own findings is too high and results in windfall profits for Class Counsel. See ER-27 ("[A]n award exceeding a 2.232 multiplier would result in "windfall profits for class counsel in light of the hours spent on the case." In *re Bluetooth Headset Prods. Liability Litig.*, 654 F. 3d at 942."). This evidences clear error requiring reversal and remand.

---

[33] I.e., ($80,600,000 - (2.232 x ($3,993,155 + $547,037 + $2,846,443)) + $2,846,443 = $66,959,474, and $80,600,000 - $66,959,474 = $13,640,526.

[34] If Tier 1 discovery was included in lodestar at $42.50/hour with charges totaling $582,377, the savings to the Class would grow to $22,533,517.

[35] I.e., ($80,600,000 - $2,846,443) ÷ ($36,103,148 - $4,540,191 - $2,846,443) = 2.71. If Tier 1 discovery was included in lodestar at $42.50/hour, the multiplier would grow to 3.14.

In contrast, a market-rate, empirically-supported 17.5% fee of $54,250,000, yields a multiplier of 1.78,[36] a more than adequate bonus to account for risk and results in this MDL.

## III. The preferential payments to Named Plaintiffs are prohibited and create a conflict between the Named Plaintiffs and absent Class members

The district court granted each of the 132 Named Plaintiffs, including ten non-Class-member foreign nationals, "service awards" in the amount of either $1,500 or $3,500 (if deposed), for a total award amount of $216,000. ER-32. As argued below, Supreme Court precedent prohibits such awards in any amount, but they are particularly egregious here as the Named Plaintiffs did not allege the subjective awareness of impaired iPhone performance required to make a Claim. ER-219. Presumably, without the service award inducement, no Named Plaintiff would have agreed to the Settlement or the Claim Form, since no rational plaintiff would consent to a settlement that provides him/her nothing. Nevertheless, the Named Plaintiffs agreed to a Claim Form that prevents them and most other typical Class members from making a claim, rendering them inadequate. They

---

[36] I.e. ($54,250,000 - $2,846,443) ÷ ($36,103,148 - $4,450,191- $2,846,443) = 1.78. If Tier 1 discovery was included in lodestar at $42.50/hour with charges totaling $582,377, the multiplier would rise to 2.07.

have not earned a service award in this case, since their settlement negotiations harmed the Class through the disregard of economic damages uniformly suffered by Class members.

While all the service awards in this case were unearned, the most egregious abuse of the incentive award concept occurred when the district court awarded service awards to ten *foreign* plaintiffs whose cases were not certified as class actions, and who are ineligible to file claims since they are not members of the certified Settlement Class of "all former or current U.S. owners of [the subject iPhones]." The foreign plaintiffs have only their individual claims against Apple pending in the district court. While Apple is free to settle those cases on an individual basis, it is not at liberty to raid the U.S. Class' settlement fund to do so. Apple and the court treated the Settlement like a slush fund to get rid of all of Apple's litigation headaches. Permitting a defendant to settle the individual claims of *non-class-members* with monies taken from a settlement fund created for the exclusive benefit of another class – which the non-class members did nothing to help create – is a particularly egregious and impermissible abuse of incentive awards.

The Eleventh Circuit held last year that two U.S. Supreme Court precedents bar the granting of service or incentive awards of any kind, even when, unlike

here, they have been earned.  *See Johnson v. NPAS Sols. LLC*, 975 F.3d 1244 (11th Cir.2020).  As the Eleventh Circuit put it, the ubiquity of incentive awards is the product of "inertia and inattention," and "we are not at liberty to sanction a device or practice, however widespread, that is foreclosed by Supreme Court precedent."  *Id*. at 1259-60.

The two landmark cases first authorizing recovery of attorney's fees from a common fund, *Trustees v. Greenough*, 105 U.S. 527 (1882) and *Central Railroad & Banking Co. v. Pettus* (1885), specifically prohibit recovery of any amounts by representative plaintiffs for personal services and private expenses. *Johnson* at 1257.  These two seminal cases have been ignored by modern courts when rationalizing awards to lead plaintiffs, whether as a bounty for obtaining a settlement, or compensation for hours spent on litigation tasks or exposure to reputational risk.  None of these rationales can surmount the constraints established by *Greenough* and *Pettus* which, while allowing reasonable compensation for counsel's services, plainly prohibit compensating named plaintiffs for personal services.  *Id*. at 1258.

While there are Ninth Circuit decisions upholding incentive or service awards to lead class action plaintiffs, [37] those decisions should yield to the

---

[37] *See e.g., In re Online DVD Rental Antitrust Litig.,* 779 F.3d 934 (9th Cir. 2015).

controlling Supreme Court precedent followed by the Eleventh Circuit in *Johnson*. Just as with the decision of the Second Circuit[38] cited by the *Johnson* court in footnote 8 of its opinion, *id*., the decisions of the Ninth Circuit should not control because they do not grapple with *Greenough* and *Pettus*, nor do they cite to any original authority for such awards. The class action industry has simply grown to expect service awards will be given, and courts have commonly stopped asking about the legal basis for such awards. Somehow, that for which there was no statutory or case authority became commonplace, and routine has now become justification for these awards that have been "created out of whole cloth." *Johnson* at 1259.

This Circuit did not pioneer incentive awards; the concept seems rather to have simply been imported from other Circuits that were early adopters. Indeed, in *Rodriguez,* this Court, in observing "incentive *awards* are fairly typical in class action cases" cited to *Newberg on Class Actions* and Theodore Eisenberg and Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs an Empirical Study,* 53 UCLA Law Review 1303 (2006). *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009). Of course, treatises are not authority for the awards

---

[38] *Melito v. Experian Mktg. Sols., Inc*., 923 F.3d 85 (2d Cir. 2019), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677 (2019).

they observe and describe, and *Newberg* has updated its section on incentive awards to acknowledge that incentive awards appear to have been "created out of whole cloth" and "few courts have paused to consider the legal authority for incentive awards." William B. Rubenstein, 5 *Newberg on Class Actions* §17:4 (5th ed. 2020). *See also In re Dry Max Pampers Litig.*, 724 F.3d 713, 722 (6th Cir. 2013) ("To the extent that incentive awards are common, they are like dandelions on an unmowed lawn – present more by inattention than by design.").

While the district court acknowledged Appellants' objection to the service awards "raises a valid issue," it rightly left the task of overruling Circuit precedent to this Court. ER-32. This Court should closely consider the Eleventh Circuit's rationale in *Johnson* and hold that incentive or service awards are prohibited by longstanding Supreme Court precedent.

The $3,500 "service awards" are 140 times, and the $1,500 awards 60 times, as large as each class member's "negotiated" $25 recovery.[39] These payments

---

[39] As in *Johnson*, an extremely low claims rate in this case has pushed the expected claimant recovery closer to $80-$100, but that is simply a function of the fact that over 97% of the class is unable to attest to slowed performance or current ownership – and therefore is ineligible to file a claim. It would be a perverse irony to reward the Named Plaintiffs for agreeing to an unsuccessful claims process that left over 97% of the class uncompensated.

69

divorce the interests of Named Plaintiffs from the interests of the absent Class members.  This case illustrates the pernicious effects of service awards to a greater degree than *Johnson* did.  The Named Plaintiffs should receive *nothing* from the claims process because they have not alleged awareness of diminished performance on their iPhones following download of the subject iOS.  The Named Plaintiffs would not have agreed to a claim form requiring an attestation that none of them can in good faith execute, *unless* they were being separately compensated in an amount that makes them indifferent to the claims process.  *See Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003) ("[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.").

In this case, even more so than in *Johnson*, the service awards drove a wedge between the Named Plaintiffs and the vast majority of other Class members; a clear conflict of interest was created that induced the Named Plaintiffs – in consideration of their service awards – to consent to the Settlement.

In agreeing to the Settlement and the associated Claim Form, the Named Plaintiffs breached their duties to the Class they were charged with representing.

For this reason alone they should be denied service awards.[40] The service awards effectively bought the consent of Named Plaintiffs to a settlement in which 97% of the Class could not participate – even though Named Plaintiffs alleged *all* Class members experienced slower performance, and their expert testified to uniform economic damage suffered by *all* Class members.

This Court should hold that service fees or incentive awards of any kind are prohibited by *Greenough* and *Pettus* and no longer permitted in this Circuit. In the alternative, this Court should reverse the service awards approved by the district court because the Named Plaintiffs breached their duties of adequacy and loyalty to the class by agreeing to a settlement in which only an insignificant fraction of the Class is eligible to participate. Approving service awards in these circumstances will encourage settlements in which representative parties are unable to participate, and that sell out the interest of absent class members while compensating representative plaintiffs for a job poorly done.

---

[40] This Circuit has consistently refused to approve incentive awards that divorce a representative plaintiff's interests from the interests of the represented class. *See Rodriguez, v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009), and *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003).

At the very least, this Court must overrule the service awards made to non-Class-member foreign nationals who were never appointed as representatives of any foreign class.

## CONCLUSION

This Court should reverse the district court's approval of the Settlement and remand for further proceedings. In the alternative, this Court should reverse the district court's award of attorneys' fees and remand with instruction to recalculate lodestar without inclusion of excessive, redundant and unnecessary hours, exclude paralegal fees from any multiplier, and reverse the district court's approval of incentive awards.

Dated: September 30, 2021

Respectfully submitted,

Sarah Feldman and Hondo Jan,
by their attorneys:

*/s/ Kendrick Jan*
Kendrick Jan, SBN 105149
Kendrick Jan, APC
402 West Broadway, Ste. 1520
San Diego, CA 92101
Tel: (619) 231-7702
kj@jan-law.com

*/s/ John J. Pentz*
John J. Pentz, Esq.,
19 Widow Rites Lane
Sudbury, MA 01776
Phone: (978) 261-5725
jjpentz3@gmail.com

and

Deborah Pantoni,
by her attorney:

*/s/ Jan L. Westfall*
29896 Blue Water Way
Menifee, CA 92584
Phone: (619) 940-2880
jlwestfall.esq@gmail.com

# STATEMENT OF RELATED CASES

## (CIRCUIT RULE 28-2.6)

The undersigned attorneys or self-represented party states the following:

I am aware of one or more related cases currently pending in this Court. The case number and name of each related case and its relationship to this case are:

The below cases are generally styled *In re: Apple Inc. Device Performance Litigation*, and are consolidated with Case no. 21-15758:

**No. 21-15758** (L) (Appellants Feldman & Jan)

**No. 21-15762** (C) (Appellant Pantoni,
filing joint brief with No. 21-15758)

**No. 21-15761** (C) (Appellant Best Companies, Inc., filing separately)

**No. 21-15763** (C) (Appellant St. John, filing separately)

Signature:  s/Kendrick Jan          Date: 9/30/2021

Signature:  s/Jan L. Westfall          Date: 9/30/2021

74

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-1578 and 21-15762

I am the attorney or self-represented party.

**This brief contains** | 14,934 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ◉ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [       ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Kendrick Jan & s/Jan L. Westfall | **Date** | Sept. 30, 2021

*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**         75         *Rev. 12/01/2018*

## <u>CERTIFICATE OF SERVICE</u>

**9th Cir. Case Number: 21-15758**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system thereby effecting service on all counsel of record.

**Description of Documents**:

Joint Opening Brief of Appellants' Sarah Feldman,
Hondo Jan, & Deborah Pantoni

Appellants' Excerpts of Record
(Circuit Rule 30-1)

Signature:   __s/Kendrick Jan_____          Date: 9/30/2021

*In re: APPLE INC. DEVICE PERFORMANCE LITIGATION*
Case Nos. 21-15758 (L) and 21-15762

### ADDENDUM TO JOINT OPENING BRIEF OF APPELLANTS
### SARAH FELDMAN, HONDO JAN, AND DEBORAH PANTONI

Statutes and Rules

### INDEX

Computer Fraud and Abuse Act
    18 U.S.C. 1030, et seq. ........................................................ A 2-10

California Computer Data Access and Fraud Act
    California Penal Code § 502............................................. A 11-17

Federal Rules of Civil Procedure, Rule 23 ................................ A 18-24

A 1

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 47. Fraud and False Statements (Refs & Annos)

18 U.S.C.A. § 1030

## § 1030. Fraud and related activity in connection with computers

Effective: October 20, 2020
Currentness

**(a)** Whoever--

**(1)** having knowingly accessed a computer without authorization or exceeding authorized access, and by means of such conduct having obtained information that has been determined by the United States Government pursuant to an Executive order or statute to require protection against unauthorized disclosure for reasons of national defense or foreign relations, or any restricted data, as defined in paragraph y. of section 11 of the Atomic Energy Act of 1954, with reason to believe that such information so obtained could be used to the injury of the United States, or to the advantage of any foreign nation willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it;

**(2)** intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--

**(A)** information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

**(B)** information from any department or agency of the United States; or

**(C)** information from any protected computer;

**(3)** intentionally, without authorization to access any nonpublic computer of a department or agency of the United States, accesses such a computer of that department or agency that is exclusively for the use of the Government of the United States or, in the case of a computer not exclusively for such use, is used by or for the Government of the United States and such conduct affects that use by or for the Government of the United States;

**(4)** knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**(5)(A)** knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

**(B)** intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

**(C)** intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.[1]

**(6)** knowingly and with intent to defraud traffics (as defined in section 1029) in any password or similar information through which a computer may be accessed without authorization, if--

   **(A)** such trafficking affects interstate or foreign commerce; or

   **(B)** such computer is used by or for the Government of the United States;[2]

**(7)** with intent to extort from any person any money or other thing of value, transmits in interstate or foreign commerce any communication containing any--

   **(A)** threat to cause damage to a protected computer;

   **(B)** threat to obtain information from a protected computer without authorization or in excess of authorization or to impair the confidentiality of information obtained from a protected computer without authorization or by exceeding authorized access; or

   **(C)** demand or request for money or other thing of value in relation to damage to a protected computer, where such damage was caused to facilitate the extortion;

shall be punished as provided in subsection (c) of this section.

**(b)** Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

**(c)** The punishment for an offense under subsection (a) or (b) of this section is--

   **(1)(A)** a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(1) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

**(B)** a fine under this title or imprisonment for not more than twenty years, or both, in the case of an offense under subsection (a)(1) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(2)(A)** except as provided in subparagraph (B), a fine under this title or imprisonment for not more than one year, or both, in the case of an offense under subsection (a)(2), (a)(3), or (a)(6) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(B)** a fine under this title or imprisonment for not more than 5 years, or both, in the case of an offense under subsection (a)(2), or an attempt to commit an offense punishable under this subparagraph, if--

**(i)** the offense was committed for purposes of commercial advantage or private financial gain;

**(ii)** the offense was committed in furtherance of any criminal or tortious act in violation of the Constitution or laws of the United States or of any State; or

**(iii)** the value of the information obtained exceeds $5,000; and

**(C)** a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(2), (a)(3) or (a)(6) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(3)(A)** a fine under this title or imprisonment for not more than five years, or both, in the case of an offense under subsection (a)(4) or (a)(7) of this section which does not occur after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph; and

**(B)** a fine under this title or imprisonment for not more than ten years, or both, in the case of an offense under subsection (a)(4),[3] or (a)(7) of this section which occurs after a conviction for another offense under this section, or an attempt to commit an offense punishable under this subparagraph;

**(4)(A)** except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of--

**(i)** an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)--

**(I)** loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**(II)** the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

**(III)** physical injury to any person;

**(IV)** a threat to public health or safety;

**(V)** damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

**(VI)** damage affecting 10 or more protected computers during any 1-year period; or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(B)** except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

**(i)** an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) a harm provided in subclauses (I) through (VI) of subparagraph (A)(i); or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(C)** except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 20 years, or both, in the case of--

**(i)** an offense or an attempt to commit an offense under subparagraphs (A) or (B) of subsection (a)(5) that occurs after a conviction for another offense under this section; or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(D)** a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

**(i)** an offense or an attempt to commit an offense under subsection (a)(5)(C) that occurs after a conviction for another offense under this section; or

**(ii)** an attempt to commit an offense punishable under this subparagraph;

**(E)** if the offender attempts to cause or knowingly or recklessly causes serious bodily injury from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for not more than 20 years, or both;

**(F)** if the offender attempts to cause or knowingly or recklessly causes death from conduct in violation of subsection (a)(5)(A), a fine under this title, imprisonment for any term of years or for life, or both; or

**(G)** a fine under this title, imprisonment for not more than 1 year, or both, for--

**(i)** any other offense under subsection (a)(5); or

**(ii)** an attempt to commit an offense punishable under this subparagraph.

**[(5)** Repealed. Pub.L. 110-326, Title II, § 204(a)(2)(D), Sept. 26, 2008, 122 Stat. 3562]

**(d)(1)** The United States Secret Service shall, in addition to any other agency having such authority, have the authority to investigate offenses under this section.

**(2)** The Federal Bureau of Investigation shall have primary authority to investigate offenses under subsection (a)(1) for any cases involving espionage, foreign counterintelligence, information protected against unauthorized disclosure for reasons of national defense or foreign relations, or Restricted Data (as that term is defined in section 11y of the Atomic Energy Act of 1954 (42 U.S.C. 2014(y)), except for offenses affecting the duties of the United States Secret Service pursuant to section 3056(a) of this title.

**(3)** Such authority shall be exercised in accordance with an agreement which shall be entered into by the Secretary of the Treasury and the Attorney General.

**(e)** As used in this section--

**(1)** the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

**(2)** the term "protected computer" means a computer--

**(A)** exclusively for the use of a financial institution or the United States Government, or, in the case of a computer not exclusively for such use, used by or for a financial institution or the United States Government and the conduct constituting the offense affects that use by or for the financial institution or the Government;

**(B)** which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States; or

**(C)** that--

    **(i)** is part of a voting system; and

    **(ii)(I)** is used for the management, support, or administration of a Federal election; or

    **(II)** has moved in or otherwise affects interstate or foreign commerce;

**(3)** the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any other commonwealth, possession or territory of the United States;

**(4)** the term "financial institution" means--

**(A)** an institution, with deposits insured by the Federal Deposit Insurance Corporation;

**(B)** the Federal Reserve or a member of the Federal Reserve including any Federal Reserve Bank;

**(C)** a credit union with accounts insured by the National Credit Union Administration;

**(D)** a member of the Federal home loan bank system and any home loan bank;

**(E)** any institution of the Farm Credit System under the Farm Credit Act of 1971;

**(F)** a broker-dealer registered with the Securities and Exchange Commission pursuant to section 15 of the Securities Exchange Act of 1934;

**(G)** the Securities Investor Protection Corporation;

**(H)** a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); and

**(I)** an organization operating under section 25 or section 25(a) of the Federal Reserve Act;

**(5)** the term "financial record" means information derived from any record held by a financial institution pertaining to a customer's relationship with the financial institution;

**(6)** the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

**(7)** the term "department of the United States" means the legislative or judicial branch of the Government or one of the executive departments enumerated in section 101 of title 5;

**(8)** the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

**(9)** the term "government entity" includes the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province, municipality, or other political subdivision of a foreign country;

**(10)** the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

**(11)** the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

**(12)** the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity;

**(13)** the term "Federal election" means any election (as defined in section 301(1) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(1))) for Federal office (as defined in section 301(3) of the Federal Election Campaign Act of 1971 (52 U.S.C. 30101(3))); and

**(14)** the term "voting system" has the meaning given the term in section 301(b) of the Help America Vote Act of 2002 (52 U.S.C. 21081(b)).

**(f)** This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

**(g)** Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses[4] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A) (i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or

the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

**(h)** The Attorney General and the Secretary of the Treasury shall report to the Congress annually, during the first 3 years following the date of the enactment of this subsection, concerning investigations and prosecutions under subsection (a)(5).

**(i)(1)** The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States--

    **(A)** such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

    **(B)** any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

**(2)** The criminal forfeiture of property under this subsection, any seizure and disposition thereof, and any judicial proceeding in relation thereto, shall be governed by the provisions of section 413 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853), except subsection (d) of that section.

**(j)** For purposes of subsection (i), the following shall be subject to forfeiture to the United States and no property right shall exist in them:

    **(1)** Any personal property used or intended to be used to commit or to facilitate the commission of any violation of this section, or a conspiracy to violate this section.

    **(2)** Any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of this section, or a conspiracy to violate this section[5]

## CREDIT(S)

(Added Pub.L. 98-473, Title II, § 2102(a), Oct. 12, 1984, 98 Stat. 2190; amended Pub.L. 99-474, § 2, Oct. 16, 1986, 100 Stat. 1213; Pub.L. 100-690, Title VII, § 7065, Nov. 18, 1988, 102 Stat. 4404; Pub.L. 101-73, Title IX, § 962(a)(5), Aug. 9, 1989, 103 Stat. 502; Pub.L. 101-647, Title XII, § 1205(e), Title XXV, § 2597(j), Title XXXV, § 3533, Nov. 29, 1990, 104 Stat. 4831, 4910, 4925; Pub.L. 103-322, Title XXIX, § 290001(b) to (f), Sept. 13, 1994, 108 Stat. 2097-2099; Pub.L. 104-294, Title II, § 201, Title VI, § 604(b)(36), Oct. 11, 1996, 110 Stat. 3491, 3508; Pub.L. 107-56, Title V, § 506(a), Title VIII, § 814(a)-(e), Oct. 26, 2001, 115 Stat. 366, 382-384; Pub.L. 107-273, div. B, Title IV, §§ 4002(b)(1), (12), 4005(a)(3), (d)(3), Nov. 2, 2002, 116 Stat. 1807, 1808, 1812, 1813; Pub.L. 107-296, Title XXII, § 2207(g), formerly Title II, § 225(g), Nov. 25, 2002, 116 Stat. 2158; renumbered § 2207(g), Pub.L. 115-278, § 2(g)(2)(I), Nov. 16, 2018, 132 Stat. 4178; amended Pub.L. 110-326, Title II, §§ 203, 204(a), 205 to 208, Sept. 26, 2008, 122 Stat. 3561, 3563; Pub.L. 116-179, § 2, Oct. 20, 2020, 134 Stat. 855.)

Footnotes

| | |
|---|---|
| 1 | So in original. The period probably should be a semicolon. |
| 2 | So in original. Probably should be followed by "or". |
| 3 | So in original. The comma probably should not appear. |
| 4 | So in original. Probably should be "subclause". |
| 5 | So in original. A period probably should appear. |

18 U.S.C.A. § 1030, 18 USCA § 1030

Current through PL 117-39.

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

West's Annotated California Codes
    Penal Code (Refs & Annos)
        Part 1. Of Crimes and Punishments (Refs & Annos)
            Title 13. Of Crimes Against Property (Refs & Annos)
                Chapter 5. Larceny [Theft] (Refs & Annos)

West's Ann.Cal.Penal Code § 502

# § 502. Unauthorized access to computers, computer systems and computer data

Effective: January 1, 2020

Currentness

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, cause input to, cause output from, cause data processing with, or communicate with, the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

(2) "Computer network" means any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities.

(3) "Computer program or software" means a set of instructions or statements, and related data, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions.

(4) "Computer services" includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network.

(5) "Computer system" means a device or collection of devices, including support devices and excluding calculators that are not programmable and capable of being used in conjunction with external files, one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic,

data storage and retrieval, communication, and control. A "computer system" includes, without limitation, any such device or system that is located within, connected to, or otherwise integrated with, any motor vehicle as defined in Section 415 of the Vehicle Code.

(6) "Government computer system" means any computer system, or part thereof, that is owned, operated, or used by any federal, state, or local governmental entity.

(7) "Public safety infrastructure computer system" means any computer system, or part thereof, that is necessary for the health and safety of the public including computer systems owned, operated, or used by drinking water and wastewater treatment facilities, hospitals, emergency service providers, telecommunication companies, and gas and electric utility companies.

(8) "Data" means a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

(9) "Supporting documentation" includes, but is not limited to, all information, in any form, pertaining to the design, construction, classification, implementation, use, or modification of a computer, computer system, computer network, computer program, or computer software, which information is not generally available to the public and is necessary for the operation of a computer, computer system, computer network, computer program, or computer software.

(10) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(11) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(12) "Computer contaminant" means any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consume computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network.

(13) "Internet domain name" means a globally unique, hierarchical reference to an internet host or service, assigned through centralized internet naming authorities, comprising a series of character strings separated by periods, with the rightmost character string specifying the top of the hierarchy.

(14) "Electronic mail" means an electronic message or computer file that is transmitted between two or more telecommunications devices; computers; computer networks, regardless of whether the network is a local, regional, or global network; or electronic devices capable of receiving electronic messages, regardless of whether the message is converted to hard copy format after receipt, viewed upon transmission, or stored for later retrieval.

A 12    2

(15) "Profile" means either of the following:

(A) A configuration of user data required by a computer so that the user may access programs or services and have the desired functionality on that computer.

(B) An Internet website user's personal page or section of a page that is made up of data, in text or graphical form, that displays significant, unique, or identifying information, including, but not limited to, listing acquaintances, interests, associations, activities, or personal statements.

(c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

(9) Knowingly and without permission uses the internet domain name or profile of another individual, corporation, or entity in connection with the sending of one or more electronic mail messages or posts and thereby damages or causes damage to a computer, computer data, computer system, or computer network.

(10) Knowingly and without permission disrupts or causes the disruption of government computer services or denies or causes the denial of government computer services to an authorized user of a government computer, computer system, or computer network.

(11) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a public safety infrastructure computer system computer, computer system, or computer network.

(12) Knowingly and without permission disrupts or causes the disruption of public safety infrastructure computer system computer services or denies or causes the denial of computer services to an authorized user of a public safety infrastructure computer system computer, computer system, or computer network.

(13) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or public safety infrastructure computer system computer, computer system, or computer network in violation of this section.

(14) Knowingly introduces any computer contaminant into any public safety infrastructure computer system computer, computer system, or computer network.

(d)(1) Any person who violates any of the provisions of paragraph (1), (2), (4), (5), (10), (11), or (12) of subdivision (c) is guilty of a felony, punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years and a fine not exceeding ten thousand dollars ($10,000), or a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, by a fine not exceeding five thousand dollars ($5,000), or by both that fine and imprisonment.

(2) Any person who violates paragraph (3) of subdivision (c) is punishable as follows:

(A) For the first violation that does not result in injury, and where the value of the computer services used does not exceed nine hundred fifty dollars ($950), by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000) or in an injury, or if the value of the computer services used exceeds nine hundred fifty dollars ($950), or for any second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(3) Any person who violates paragraph (6), (7), or (13) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B) For any violation that results in a victim expenditure in an amount not greater than five thousand dollars ($5,000), or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(C) For any violation that results in a victim expenditure in an amount greater than five thousand dollars ($5,000), by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, or by both that fine and imprisonment, or by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(4) Any person who violates paragraph (8) or (14) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, a misdemeanor punishable by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(B) For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment.

(5) Any person who violates paragraph (9) of subdivision (c) is punishable as follows:

(A) For a first violation that does not result in injury, an infraction punishable by a fine not exceeding one thousand dollars ($1,000).

(B) For any violation that results in injury, or for a second or subsequent violation, by a fine not exceeding five thousand dollars ($5,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment.

(e)(1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

(2) In any action brought pursuant to this subdivision the court may award reasonable attorney's fees.

(3) A community college, state university, or academic institution accredited in this state is required to include computer-related crimes as a specific violation of college or university student conduct policies and regulations that may subject a student to disciplinary sanctions up to and including dismissal from the academic institution. This paragraph shall not apply to the University of California unless the Board of Regents adopts a resolution to that effect.

(4) In any action brought pursuant to this subdivision for a willful violation of the provisions of subdivision (c), where it is proved by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice as defined in subdivision (c) of Section 3294 of the Civil Code, the court may additionally award punitive or exemplary damages.

(5) No action may be brought pursuant to this subdivision unless it is initiated within three years of the date of the act complained of, or the date of the discovery of the damage, whichever is later.

(f) This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any transaction, nor shall it make illegal any employee labor relations activities that are within the scope and protection of state or federal labor laws.

(g) Any computer, computer system, computer network, or any software or data, owned by the defendant, that is used during the commission of any public offense described in subdivision (c) or any computer, owned by the defendant, which is used as a repository for the storage of software or data illegally obtained in violation of subdivision (c) shall be subject to forfeiture, as specified in Section 502.01.

(h)(1) Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of lawful employment. For purposes of this section, a person acts within the scope of employment when the person performs acts which are reasonably necessary to the performance of their work assignment.

(2) Paragraph (3) of subdivision (c) does not apply to penalize any acts committed by a person acting outside of their lawful employment, provided that the employee's activities do not cause an injury, to the employer or another, or provided that the value of supplies or computer services which are used does not exceed an accumulated total of two hundred fifty dollars ($250).

(i) No activity exempted from prosecution under paragraph (2) of subdivision (h) which incidentally violates paragraph (2), (4), or (7) of subdivision (c) shall be prosecuted under those paragraphs.

(j) For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction.

(k) In determining the terms and conditions applicable to a person convicted of a violation of this section the court shall consider the following:

(1) The court shall consider prohibitions on access to and use of computers.

(2) Except as otherwise required by law, the court shall consider alternate sentencing, including community service, if the defendant shows remorse and recognition of the wrongdoing, and an inclination not to repeat the offense.

**Credits**

(Added by Stats.1987, c. 1499, § 3. Amended by Stats.1989, c. 1076, § 1; Stats.1989, c. 1110, § 1; Stats.1989, c. 1357, § 1.3; Stats.1998, c. 863 (A.B.1629), § 3; Stats.1999, c. 254 (A.B.451), § 3; Stats.2000, c. 634 (A.B.2232), § 1; Stats.2000, c. 635 (A.B.2727), § 2; Stats.2009, c. 70 (A.B.22), § 1; Stats.2009-2010, 3rd Ex.Sess., c. 28 (S.B.18), § 26, eff. Jan. 25, 2010; Stats.2011, c. 15 (A.B.109), § 378, eff. April 4, 2011, operative Oct. 1, 2011; Stats.2014, c. 379 (A.B.1649), § 1, eff. Jan. 1, 2015; Stats.2015, c. 614 (A.B.32), § 1, eff. Jan. 1, 2016; Stats.2019, c. 16 (A.B.814), § 1, eff. Jan. 1, 2020.)

West's Ann. Cal. Penal Code § 502, CA PENAL § 502

Current with urgency legislation through Ch. 172 of 2021 Reg.Sess. Some statute sections may be more current, see credits for details.

---

**End of Document**
© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

> United States Code Annotated
>   Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
>     Title IV. Parties

Federal Rules of Civil Procedure Rule 23

# Rule 23. Class Actions [Rule Text & Notes of Decisions subdivisions I to VII]

### Currentness

< Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 23 are displayed in multiple documents. >

**(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)** the class is so numerous that joinder of all members is impracticable;

**(2)** there are questions of law or fact common to the class;

**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)** prosecuting separate actions by or against individual class members would create a risk of:

**(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**A 18**

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1)** *Certification Order.*

**(A)** *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

**(B)** *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

**(C)** *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

**(2)** *Notice.*

**(A)** *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

**(B)** *For (b)(3) Classes.* For any class certified under Rule 23(b)(3)--or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)--the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language:

**(i)** the nature of the action;

**(ii)** the definition of the class certified;

**(iii)** the class claims, issues, or defenses;

**(iv)** that a class member may enter an appearance through an attorney if the member so desires;

**(v)** that the court will exclude from the class any member who requests exclusion;

**(vi)** the time and manner for requesting exclusion; and

**(vii)** the binding effect of a class judgment on members under Rule 23(c)(3).

**(3)** *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

**(A)** for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

**(B)** for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

**(4)** *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

**(5)** *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

**(1)** *In General.* In conducting an action under this rule, the court may issue orders that:

**(A)** determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

**(B)** require--to protect class members and fairly conduct the action--giving appropriate notice to some or all class members of:

**(i)** any step in the action;

**(ii)** the proposed extent of the judgment; or

**(iii)** the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

**(C)** impose conditions on the representative parties or on intervenors;

**(D)** require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

**(E)** deal with similar procedural matters.

**(2)** *Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class--or a class proposed to be certified for purposes of settlement--may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

**(1)** *Notice to the Class.*

**(A)** *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

**(B)** *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

**(i)** approve the proposal under Rule 23(e)(2); and

**(ii)** certify the class for purposes of judgment on the proposal.

**(2)** *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

**(A)** the class representatives and class counsel have adequately represented the class;

**(B)** the proposal was negotiated at arm's length;

**(C)** the relief provided for the class is adequate, taking into account:

**(i)** the costs, risks, and delay of trial and appeal;

**(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

**(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and

**(iv)** any agreement required to be identified under Rule 23(e)(3); and

**(D)** the proposal treats class members equitably relative to each other.

**(3)** *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

**(4)** *New Opportunity to be Excluded.* If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

**(5)** *Class-Member Objections.*

**(A)** *In General.* Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

**(B)** *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

**(i)** forgoing or withdrawing an objection, or

**(ii)** forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

**(C)** *Procedure for Approval After an Appeal.* If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered, or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

**(1)** *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

  **(A)** must consider:

    **(i)** the work counsel has done in identifying or investigating potential claims in the action;

    **(ii)** counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

    **(iii)** counsel's knowledge of the applicable law; and

    **(iv)** the resources that counsel will commit to representing the class;

  **(B)** may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

  **(C)** may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

  **(D)** may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

  **(E)** may make further orders in connection with the appointment.

**(2)** *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

**(3)** *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

**(4)** *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h) Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

A 23  6

**(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

**(2)** A class member, or a party from whom payment is sought, may object to the motion.

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

**CREDIT(S)**

(Amended February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 24, 1998, effective December 1, 1998; March 27, 2003, effective December 1, 2003; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009; April 26, 2018, effective December 1, 2018.)

Fed. Rules Civ. Proc. Rule 23, 28 U.S.C.A., FRCP Rule 23
Including Amendments Received Through 9-1-21

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.